Case No. 25-1048

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

_____

CHARLES REDDICKS, Petitioner-Appellant,

v.

KENNETH LIZOTTE, Superintendent,
Respondent - Appellee.

_____

BRIEF OF THE PETITIONER-APPELLANT
APPEAL FROM THE DECISION OF UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS, DENYING HABEAS RELIEF
UNDER §2254

_____

Charles Reddicks
By his Attorneys
Rosemary Curran Scapicchio
Law Office of Rosemary C. Scapicchio
Court of Appeals No. 30306
Attorney for Petitioner-Appellant
107 Union Wharf
Boston, MA 02109
(617) 263-7400
Rosemary@scapicchiolaw.com

Jillise McDonough
Law Office of Rosemary C. Scapicchio
Court of Appeals No. 1202184
Attorney for Petitioner-Appellant
107 Union Wharf
Boston, MA 02109
(617) 263-7400
Jillise@scapicchiolaw.com

## Table of Contents

Table of Authorities . . . . . . . . . . . . . . . . . 4

Jurisdictional Statement . . . . . . . . . . . . . . .5

Statement of the Issues . . . . . . . . . . . . . . 6

Statement of the Case . . . . . . . . . . . . . . .7

Summary of the Argument . . . . . . . . . . . . . . 21

Standard of Review . . . . . . . . . . . . . . . 23

Argument . . . . . . . . . . . . . . . . . .24

1.  Permitting prosecutors to run prospective juror criminal records violates the Equal Protection Clause and a defendant's right to a jury drawn from a representative cross-section of the community, and excluding two black jurors who made a genuine mistake as to their criminal histories, without requiring the Commonwealth to provide a race-neutral reason for the strike where Reddicks satisfied step one of *Batson* was error. . . . . . . . 24

2.  Detectives used impermissible and unconstitutional tactics during 18-year old Reddicks' interrogation, and the Appeals Court erroneously applied Supreme Court precedent where it found that because Reddicks did not provide a full confessions, his will was not overborn. . . . . . . . 40

3.  The search of Reddicks' phone violated his Fourth and Fourteenth Amendment rights and this claim may be challenged in a habeas proceeding where the Appeals Court did not address the error, finding that Reddicks was collaterally estopped. . . . . . . . . . . . . . . . . 43

4.  The Appeals Court failed to consider the Commonwealth's egregious closing argument in finding that the prior bad act evidence pertaining to multiple past firearms did not violate Reddicks' due process and fair trial rights. . . . . . . . . . . . . . . . 47

2

5. The court's restriction on cross relating to the witness who saw Reddicks with a firearm in the past violated Reddicks' confrontation and due process rights, and the Appeals Court's decision was based on an unreasonable application of the facts . . . . . . . . . . . . . . . . . . . . . .49

6. The lead detective provided a back-door identification of Reddicks, and the Appeals Court decision to the contrary was based on an unreasonable application of the facts. . . . . . . . . . . . . . . . . . . . . . .51

Conclusion . . . . . . . . . . . . . . . . . . . . . . . 53

Certificate of Compliance with Fed. R. App. P. 32 . . . . . . . . . . . 54

Certificate of Service . . . . . . . . . . . . . . . . . . . 54

Addendum . . . . . . . . . . . . . . . . . . . . . . . 55

# Table of Authorities

## Cases

*Batson v. Kentucky,* 476 U.S. 79, 85 (1986). ...........................................34

*Chambers v. Mississippi*, 410 U.S. 284 (1973)...............................47

*Colorado v. Connelly*, 479 U.S. 157 (1986)...................................41

*Commonwealth v. Carter*, 488 Mass. 191 (2021) ...............................26

*Commonwealth v. Cousin*, 449 Mass. 809 (2007)...............................31

*Commonwealth v. Dorelas*, 473 Mass. 496 (2016). .........................44, 45

*Commonwealth v. Issa*, 466 Mass. 1 (2013). .............................27, 28, 32

*Commonwealth v. Jones*, 477 Mss. 307 (2017)...............................26

*Commonwealth v. Ortega*, 480 Mass. 603 (2018)...............................26

*Commonwealth v. Reddicks*, 99 Mass. App. Ct. 1118 (2021)....................passim

*Commonwealth v. Thomas,* 476 Mass. 451, 457 (2017) ..........................49

*Commonwealth v. Vitello*, 376 Mass. 426 (1978) ..............................50

*Commonwealth v. White*, 475 Mass. 583 (2016)..............................44, 45

*Commonwealth v. Williams*, 481 Mass. 443 (2019)............................24

*Coolidge v. New Hampshire*, 403 U.S. 443 (1971)............................45

*Davis v. Alabama*, 415 U.S. 308 (1974)...................................48

*Duren v. Missouri*, 439 U.S. 357 (1979)..................................28

*Flowers v. Mississippi*, 139 S.Ct. 2228 (2019) ...........................passim

*Foster v. Chatman*, 548 U.S. 488, 136 S.Ct. 1737 (2016) ..................passim

*Haring v. Prosise*, 462 U.S. 306 (1983)..................................43

*Hernandez v. United States*, 500 U.S. 352 (1991). ........................passim

*J.E.B. v. Alabama*, 511 U.S. 127 (1994) ..................................37

*JDB v. North Carolina*, 564 U.S. 261 (2011). .............................40

*Miranda v. Arizona*, 384 U.S. 436 (1966);................................41

*Miller v. Alabama*, 567 U.S. 460 (2012)..................................41

*Miller-El v. Cockrell*, 537 U.S. 332 (2003)...............................32

*Montana v. United States*, 440 U.S. 147 (1979). .........................42

*Pike v. Guarino*, 492 F.3d 61 (1st Cir.2007)............................22, 51

*Porter v. McCollum*, 558 U.S. 30 (2009). .............................43, 46

*Stone v. Powell*, 428 U.S. 465 (1976). ..................................42

*Riley v. California,* 134 S.Ct. 2473 *(2014).*..........................44, 45

*Scales v. U.S.*, 367 U.S. 203 (1961) ....................................47

*Smith v. Illinois*, 390 U.S. 129 (1968) .................................48

*United States v. Jackman*, 48 F.3d 1 (1st Cir. 1995)......................50

*United States v. Meises*, 645 F.3d 5 (1st Cir. 2011) ................................................50

**Statutes**

28 U.S.C. § 1291 ...........................................................................................4

28 U.S.C. § 2253(c)(2) ...................................................................................6

28 U.S.C. § 2254 ...............................................................................4, 6, 21, 51

**Other Authorities**

*Arresting Batson*: *How Striking Jurors Based on Arrest Records Violates Batson*,
    Yale Law & Policy Review, at 389 (June 2016)..................................................34

*On Better Jury Selection: Spotting UFO Jurors Before They Enter the Jury Room*,
    33 CT. REV. 10, 11 (Spring 1999). ....................................................36

*The Right to Remain a Child: The Impermissibility of the Reid Technique in
    Juvenile Interrogations*, 92 NYU L. Rev. 1719 (2017) ........................................40

*The Unexonerated, Factually Innocent Defendant's Who Plead Guilty*, Cornell
    Law Library (2014). ..........................................................................48

Timothy J. Conklin, The End of Purposeful Discrimination: The Shift to an
    Objective Batson Standard, 63 B.C. L. Rev. 1037, 1047-49 (2022)....................30

*Why Batson Misses the Point*, 97 Iowa L. Rev. 1713, 1714 (2012).........................37

## Jurisdictional Statement

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28

U.S.C. § 2254, gives federal courts jurisdiction to entertain habeas corpus petitions

from individuals who are "in custody" pursuant to a state court judgment.  In this

case, the Appellant, Charles Reddicks, was convicted in Massachusetts state court

and sentenced to a custodial punishment of life in state prison with the possibility

of parole in fifteen years.  His habeas petition to the United States District Court,

District of Massachusetts, was denied on December 5, 2024.

Reddicks is authorized under 28 U.S.C. § 1291 to appeal a final decision of the District Court to the Circuit Court of Appeals. The District Court issued a Certificate of Appealability on December 5, 2024. Reddicks filed a timely notice of appeal on December 20, 2024.

## Statement of the Issues

1. Whether it was improper for the court to permit the Commonwealth to use 2 peremptory challenges on African-American jurors their records – who each made a genuine mistake as to their criminal histories – without conducting the constitutionally required *Batson* analysis.

2. Whether the practice of running CORI records of prospective jurors violates the Equal Protection Clause and a defendant's right to a jury drawn from a cross-section of the community, and whether the Appeals Court applied an erroneous standard in contravention of Supreme Court precedent.

3. Whether the court erred in permitting the Commonwealth to present cumulative prior bad act firearm evidence, especially where the Commonwealth impermissibly argued the "scariest part" of the case was that Reddicks likely possessed multiple firearms in the past, and where the court completely foreclosed Reddicks from cross-examining a witness who claimed to see Reddicks with a silver revolver, ruling that any cross-examination would open the door to Reddicks' guilty plea and the allegation that he shot the firearm out of a car window.

4. Whether the court erred in permitting the Commonwealth to introduce photographs of firearms recovered from Reddicks' phone seized during the unrelated prior incident where the search warrant did not establish any nexus between the phone and the crime, and the warrant lacked particularity.

5. Whether it was error to permit the lead investigator to testify that Reddicks "matched" the description provided by the witness who saw the alleged

shooter enter the building, and to identify a vehicle on surveillance footage, and whether the Appeals Court erred in finding this was not an identification.

6. Whether 18-year old Reddicks' statement should have been suppressed where the detectives used impermissible "now or never" and other coercive tactics, and whether the Appeals Court decision was in contravention of Supreme Court precedent where it found the statements were not coercive because Reddicks did not confess.

## <u>Statement of the Case</u>

**Procedural History**

Reddicks was indicted for 1st degree murder, armed robbery, carrying a firearm without a license, and carrying a loaded firearm on July 13, 2012. Reddicks filed a motion to suppress his statements on May 12, 2014, which was denied. R11. A jury trial commenced on 1/13/16. Reddicks also filed a motion to suppress or in the alternative, to exclude the evidence recovered from Reddicks' cell phone in an unrelated case, which was denied. (Giles, J.). Reddicks was found guilty of 2nd degree murder, carrying a firearm without a license and carrying a loaded firearm. R16. He was found not guilty of armed robbery.

Reddicks appealed his conviction to the Massachusetts Appeals Court. The Appeals Court affirmed his convictions in a written opinion issued on April 8, 2021. Reddicks filed an Application for Further Appellate Review with the Massachusetts Supreme Judicial Court on April 29, 2021. The Court denied the

Application on August 2, 2021. On September 1, 2021, Reddicks filed a Motion

for Reconsideration, which the Court denied on October 22, 2021.

Reddicks filed a writ of habeas corpus under 28 U.S.C. § 2254 on February

27, 2023. The Respondent filed his Answer on May 1, 2023, with a memorandum

of law filed on July 3, 2023. Reddicks filed a reply on September 15, 2023. The

court heard argument as to the petition on April 4, 2024, and issued an Order

denying the petition on December 5, 2024, but granted Reddicks a certificate of

appealability pursuant to 28 U.S.C. § 2253(c)(2) and Rule 11(a) of Rule Governing

Section 2254 Cases in the United States District courts  on all issues raised in his

habeas petition. (Young, J.). Reddicks filed a timely notice of appeal on December

20, 2024.  The appeal was docketed with this Court on January 21, 2025.

**Statement of Relevant Facts**

The Commonwealth's theory was that Reddicks arranged a deal with

Mariano Malave to purchase 2 lbs of marijuana on 4/27/12. The Commonwealth

alleged they arranged the transaction via text, where Reddicks allegedly disguised

his identity as "Jonathan," then shot Malave when the two met in the stairwell

outside of Malave's apartment; Reddicks then allegedly fled in his grandmother's

vehicle. No one affirmatively identified Reddicks as the perpetrator, except

Detective Daley.

**A. The Commonwealth's Civilian Witnesses**

In April of 2012, Mariano Malave was living at 132 Hyde Park Avenue in Jamaica Plain. 2:209-210.[1] There were two entrances to the apartment, one in the front and one in the back; they used the back door as the entrance. 2:214. The apartment was on the second-floor, with approximately 15 to 20 steps leading to the back door. 2:214, 260.

On the day of the incident, Malave was supposed to pick his girlfriend Camille up at school at Quincy College at 1:00pm, but did not show up until 4:00pm, with his friend Edwin. Her, Malave and Edwin went back to Malave's apartment, where they met Edwin's cousin Alex. Malave purchased marijuana from Alex that day. 2:267. An individual named Lucky arrived sometime later, and Malave, Edwin, Alex and Lucky all hung out in the kitchen. 2:271.

At some point Malave went into their bedroom, and Camille heard him speaking to someone, giving directions and the address to the house. 2:272-274.[2] After he got off of the phone, he told Camille he was taking the dog out. 2:273. Camille saw Malave walk back into the kitchen. 2:275. She never heard any

---

[1] Trial transcripts are cited as "Day:Page #". Citations to the Record Appendix are cited as "R#." Citations to the Addendum are cited as "A#."

[2] Camille did not tell the police the first night she spoke to them that Malave was giving someone directions or that he was telling someone to park. 2:293.

arguing in the kitchen. 2:276. As Camille started falling asleep, she heard three loud gunshots and ran out the back door of the apartment. 2:276-278.

Around the time of Malave's death, he would sell marijuana to people that he grew up with and went to school with. 2:217. Camille would frequently see Malave at the back door, at times with people she did not know. 3:7. Camille testified before the grand jury that she thought Lucky shot Malave. After conducting a voir dire, the court excluded this testimony. 3:17-20. Malave knew Lucky because he grew up with his older brother, Rod Meniede. 2:218. Meneide knew Lucky to deal drugs, particularly crack cocaine, in Maine. 2:321-233; 2:290. He would go to Malave's apartment every three to four weeks. 2:291-292.

Lucky lived in Maine but came down to Boston that afternoon; it was unclear why he came down to Boston; a woman named Leanne Parker drove him down. 3:34. Lucky hung out with Parker's daughter, Natasha, and Natasha asked Leanne to drive him to Boston; she was told to just drop him off. 3:34-35, 77, 95. Parker went to "You Save Auto," rented a car, and drove Lucky down to Boston. 3:36. Lucky directed her where to go, the turns to make and where to park; she was not familiar with Boston. 3:39.

When Parker and Lucky arrived at the location Lucky directed her to, they parked behind a vehicle on the street; the vehicle was an older model blue station wagon, in good condition. 3:43. On direct, she testified that it looked to her like a

Subaru station wagon, but on cross admitted she thought it was a Tempo or a Corsica. 3:44; 3:88. There were three people in the vehicle; she could tell the person in the back seat was a black male, but she could not see the front passenger. 3:45. There was a guy in the back seat that kept looking back towards her and Lucky; he looked back about five or six times. 3:43, 46. Parker told Lucky that there was a guy staring at them, then Lucky got out of the car and went upstairs. 3:46-47.

At some point, the driver got out of the vehicle, and he was on his cell phone. 3:48. He was black, and wearing a ball cap with a bubble or "puffy" jacket, and had curly hair down to his shoulders; she previously described them as dreads, but did not think they were dreads because "there was nice curls" down to his shoulders. 3:49. He went from the car to the direction of the porch stairs Lucky went to. 3:51.

Parker heard gunshots seconds after seeing the man pass her. 3:52. After being pressed by the prosecutor, Parker testified she heard the shots no longer than 2 minutes after the man passed. 3:52. The man came down in a fast pace, jumped into his car and took off. 3:43. Lucky came running down soon after, and jumped in the car saying "go, go, go" and gestured for her to go towards the train station. 3:54. When they got down by the train station, Lucky instructed her to go back. 3:55.

Once Lucky and Parker returned, Lucky got out and was speaking to a girl when officers arrived. 3:56. Parker did not tell officers about the car; she told them she did not see anything because she was scared and wanted to get home. 3:58. After Parker left the scene, Lucky called her and asked for the license plate number for the car she saw. 3:61. The police immediately called and asked her to return to speak to them again. 3:61. Parker told the police she saw a car and gave them the license plate number; she told them it was either 6837 or 6738, with letters after the numbers. 3:63.

A woman named Elissa Dennehy lived on first floor, and she noted a lot of foot traffic to the third flood during the period of time that Malave lived there. 3:162-63. On the evening of April 27, she heard Malave greeting someone on the steps outside of his apartment; it sounded as if they did not know one another. 3:188. She then heard a scuffle, and three to four loud noises that sounded like a cookie sheet banging up against something. 3:189. Someone then ran down the stairs from the third-floor. 3:189-190.

An initial call for a robbery in progress came in at 6:27pm. 3:130. Over the radio, there was a transmission about a possible suspect, a light skinned Hispanic male, blue and red hat, 5'8", last seen walking towards Walk Hill. 3:146-147. When first responders arrived, the kitchen was in disarray; the kitchen table was

turned upside down, and there was stuff strewn everywhere; Malave was lying on his back just inside the back door to the kitchen. 3:141.

On the afternoon of 4/27/12, Reddicks was with his girlfriend Khadijah Warren. 5:153. Their typical routine after school was to go to Reddicks' aunt's, house on Westminster Ave, and hang out with his cousins Javeon and Jay. 5:157-158. They went sometime after 2:30pm that day, and drove there in his grandmother's car. 5:166. At some point that evening, Reddicks and Javeon left the house; Reddicks told Warren they were going to the park. 5:169, 171. Warren watched TV then fell asleep so she was not certain how long they were gone, but she thinks it was a couple of hours. 5:172. When she woke up, she realized she had a number of missed calls from Reddicks. 5:176.

The Commonwealth's main witness was Ian Follette, who claimed he was the link between Reddicks and Malave. 5:87. Follette alleged he frequently purchased marijuana from Reddicks, and weeks prior to the incident, Reddicks asked Follette for a name of someone from whom he could purchase a larger supply of marijuana. 5:108-110. Follette alleged he provided Reddicks with the name "Sean Warfield." 5:115.

Warfield alleged that someone named "Jonathan" – a person Warfield claimed sounded black on the phone – contacted him asking to purchase a pound

13

of marijuana. 5:32.[3] Warfield claimed he thought it sounded odd, so he stopped responding to "Jonathan." 5:34. Reddicks then allegedly went to Follette and requested the name of another supplier, and Follette allegedly provided Malave's name and contact information. 5:127. Follette alleged that on the day of the incident, Reddicks texted Follette shortly after 6:00pm and indicated that he was going to meet "that guy." 5:130.

## B. The Cell Phone and Video Evidence

A phone registered to Catherine Reddicks was calling and texting with Malave throughout the day, leading up to the incident. 7:37-40. There were calls from the phone to Malave's phone at 6:20 and 6:41pm. 7:53-54. The 6:20 call hit the tower near the Forrest Hills t-station. 7:107. The 6:41pm call hit the tower just north of 132 Hyde Park Avenue. 7:104. The account for the phone registered to Catherine Reddicks was disconnected on May 1, 2012. 7:55.

## C. Prior Bad Acts Regarding Firearms

Thomas Washington attended Boston Latin Academy with Reddicks, and they also attended a Northeastern Program together. 3:227. He testified he and Reddicks were driving in his car on 1/2/2011, and he observed Reddicks with a black-handled silver revolver. 3:227. Reddicks was unable to cross-examine

---

[3] Warfield could not articulate what "sounding black" meant, stating only that the person had a deep voice.

Washington in any manner because the court ruled if counsel attempted to undermine what Washington allegedly saw, the court would allow the Commonwealth to introduce evidence Reddicks shot the firearm out of the car window, and that he pled guilty as a result of the incident. 3:223.[4]

The Commonwealth also introduced photographs of firearms recovered from Reddicks' phone. Reddicks moved to exclude the photographs on the grounds the search was conducted without probable cause, without establishing a nexus between the phone and the crime, and because the warrant was not particularized. R158.

During closings the Commonwealth argued the following:

You know that Charles Reddicks had access to guns, and I'm saying guns with an S, plural, to make sure the Court Reporter gets it and you get it because you have evidence that he had access to firearms, multiple.

First, you'd got Thomas Washington who testified from that witness stand that he saw Charles Reddicks a few months before the murder sticking a silver-colored revolver with a black handle inside of his waistband.

And, yes, it looks an awful lot like the picture we have here. But here's the scariest part of the whole story. We don't know if the gun that Thomas Washington saw him with in December is that same gun that's pictured here.

We don't know if it's the same gun that's pictured here. All we know is that it's a silver revolver. All of them are revolvers. And you heard from Detective Camper, semi-automatic weapons leave shell casings. Revolvers do not. No shell casings were left at the scene.

---

[44] Reddicks did not testify and a filed a motion to exclude prior bad act evidence relating to firearms. R137.

…

But they're important not just because he didn't want to say something about having weapons, but because what's pictured and what Thomas Washington saw on him in December of 2011 is the exact, same type of weapon used to execute and rob Mariano Malave.

8:53-54 (R866-867).

What goes through your mind when you're preparing to rob and shoot somebody? What do you think about when you're going to put a bullet in someone's head? Was he stuffing the gun into his waistband like Thomas Washington had seen him do a few months before?

8:70-71 (R883-884).

The Court permitted Sgt. Det. Daley to testify he looked through video retrieved from the MBTA station to find the Ford Escort with license plate number 6738TV, and then saw that vehicle parked at Reddicks' grandmother's residence. 7:132 (R752). Sgt. Det. Daley testified while he saw the vehicle pass the Forest Hills station before and after the shooting, he watched video from the Dunkin Donuts on the other side of Malave's apartment and did not ever see the Ford Escort pass from either direction. 7:139 (R759).

They ran the partial plate and it came back to a 1992 blue Ford Escort registered to Catherine Reddicks of 116 Millet Street. 7:84 (R704). Detective Callahan ran the address and determined there were six licensed drivers at that location, three males and three females. 7:85 (R705). Sgt. Det. Daley retrieved the license photographs from the police databases and, over defense objection, he

testified he determined Charles Reddicks matched the description provided by

Leanne Parker. 7:96-97 (R716-717).

**Reddicks' Statement to Police**

Reddicks provided a statement to police where he denied knowing Malave,

denied being in the area of Forest Hills T on the afternoon/evening of 4/27/2012,

and where he maintained he was at his friends' Jay and Javeon Hyman's house that

afternoon. R55, 65, 77. He also denied recently speaking to Ian Follette. R104.

Reddicks filed a motion to suppress the statement, which was denied. R21;

Add. 59. The court found although the officers improperly told 18-year old

Reddicks it would be his only opportunity to tell his side of the story, this was

irrelevant because Reddicks continued to deny involvement. The Commonwealth

used almost every portion of Reddicks' statement throughout its entire closing to

argue Reddicks was a liar, and that his repeated lying was "designed to keep him

as far away from the scene of the murder as possible." 8:57, 60, 66 (R870, 873,

879).

**Jury Selection**

Over Reddicks' objection, the court permitted the Commonwealth to run the

records of selected jurors, so long as the Commonwealth provided copies of the

records to defense counsel. R131. The Commonwealth requested to inquire further

17

of two of the African-American jurors who had outdated records, then used the new information to exercise peremptory challenges.

### A. The Commonwealth's Challenge of Juror 47.

During the initial voir dire of Juror 47, the prospective juror answered all questions in a way suggesting she could be fair and impartial during the proceedings. 1:128-130 (R312-314). The prosecutor asked this juror a disparate number of questions, relating to where she was born, questions regarding her employment, and questions regarding her 11-year old daughter, including whether her daughter could take care of herself while she was on jury duty. 1:130 (R314).[5] After questioning, both parties indicated they were content with the juror, and she was seated in seat number 5. 1:131 (R315).

The Commonwealth ran Juror 47's record, and she had what the court deemed as "innocuous" motor vehicle offenses on her record from 2001, and she was charged with possession of a Class B in 2000, which was dismissed. 1:223-224 (R407-408). The Commonwealth requested further voir dire of the juror. 1:222 R406).

---

[5] The prosecutor asked Juror 62, a black male, about child responsibilities. 1:161 (R345). The prosecutor also asked Juror 108, another black male, how many of his five children he was responsible for right now, apparently delving into childcare, however, the juror indicated that all children were with their mother. 1:271 (R455). The prosecutor did not ask any white jurors about childcare limitations. The prosecutor asked every other non-minority juror questions about his/her education or employment, or asked no questions at all.

After calling Juror 47 back in, the court explained that "it's come to my attention that even though on your questionnaire you indicated that you had never been convicted or charged with any crime, you do have some criminal matters." 1:223 (R407). The juror responded, "I wasn't convicted, I was arrested." Id. The juror explained that she did not think she had to include the matters on her record because they were all dismissed. 1:224 (R408). The court found no reason to excuse her for cause, and accepted the juror's explanation. 1:225 (R409). The Commonwealth exercised a peremptory challenge, and Reddicks objected. 1:225 (R409).

### B. The Commonwealth's Challenge of Juror 122.

Juror 122 checked the box on the juror questionnaire indicating "experience with the law" and wrote "assault and battery" on the form. 1:297 (R481). The prosecutor followed-up on this response, inquiring as to who was involved in that incident. The juror admitted he was charged with assault and battery, and received one-year probation and completed a domestic batterers program through the Roxbury District Court. 1:298 (R482). The juror was arrested by the Boston Police, and prosecuted by the Suffolk County District Attorney's Office, but he did not blame them because his house was "completely out of control." 1:298 (R482). Both parties were content; he was seated in Seat 11. 1:300 (R484).

After running Juror 122's record, it was revealed that he also had a number of charges dating back seven to twenty years prior, that he did not mention during the initial voir dire. 2:90 (R593).

The court inquired of Juror 122 further – upon the Commonwealth's request – and Juror 122 explained he had all of his charges sealed except for the 2009 assault and battery charge, which he could not seal until 2019, so that was the only charge he disclosed. 2:91 (R594). He explained "I really didn't recognize the fact that I had to write down every charge that I ever went through in life." 2:92 (R595). The court indicated that it accepted his explanation, that it had heard it before, and that "it's absolutely reasonable for him to think that because his case was sealed, all other offenses were sealed, and note that he scrupulously put the assault and battery because it hadn't been sealed." 2:92 (R595). The court specifically noted that it credited what the juror said, and that his interpretation of the questionnaire was reasonable because "I think a layperson wouldn't understand that notwithstanding the fact that it's been sealed, he still has to disclose it for the purposes of the questionnaire." 2:92-93 (R595-596).

The Commonwealth then exercised a peremptory challenge of Juror 122. 2:93 (R596). Reddicks objected on the grounds that running records disproportionately effects African American jurors in that both jurors excluded due to the running of records were African American, and the practice leads to the

20

exclusion of African Americans as potential jurors in violation of Reddicks' rights given that he is African-American. 2:94 (R597). The court overruled the objection. 2:94 (R597).

Later in the day, the court stated the following relating to the objection:

Just one last comment I need to put on the record, apropos of an objection that Ms. Scapicchio lodged during empanelment about Mr. Henning challenging jurors after seeing their CORI records. I just need to put on the record the fact that the composition of this jury consists of at least five African Americans. I just wanted to let the record reflect that.

2:177-178.

## Summary of the Argument

The Appeals Court's decision was contrary to established Supreme Court precedent and was as a result of a misapplication of the facts where it found the Commonwealth's practice of running juror records – with no limitation – was permissible and did not violate Reddicks' constitutional rights. The court erroneously found, generally, that the practice does not violate the Equal Protection Clause although it disparately impacts people of color, and results in an exclusion from jury service. Moreover, the court erroneously found that defense counsel's objections to the exclusion of two black jurors during Reddicks' trial, after the Commonwealth ran their records, were insufficient to raise a *Batson* challenge, although counsel made a specific, race-based challenge.  24.

Next, the Commonwealth introduced impermissible prior bad act evidence where Reddicks allegedly possessed firearms in the past, then used that evidence to make a propensity argument in closing, urging the jurors to find it was "scary" Reddicks possessed multiple firearms. The Appeals Court's decision was erroneous where it failed to consider the prosecutor's closing argument. 40. The error was exasperated where the court limited counsel's cross of the witness to testify regarding Reddicks possessing a firearm in the past, where the court ruled that any questions would open the door to the fact that Reddicks pled guilty, and also that he was allegedly observed shooting the firearm. This precluded Reddicks from in any way suggesting that the firearm from the past incident was not the firearm used in this homicide. 43.

Furthermore, the Court should have excluded photographs of firearms on Reddicks' phone, where the search warrant was not supported by probable cause, and provided officers with carte blanche to search the entire contents of the phone without particularization, and thus the contents should have been suppressed. 47.

Moreover, the court permitted the lead investigator in this case to testify that Reddicks "matched" the description provided by an eyewitness, and to provide an identification of the subject vehicle from surveillance footage. The Appeals Court erroneously found that this was not an identification, and therefore the testimony was permissible. 49.

Lastly, the court erred in not suppressing Reddicks' statement where the interrogators erroneously informed Reddicks the interview would be the only time for Reddicks to tell his side of the story, where they called him a sociopath, told him they "knew" he was guilty of 1st degree murder and would be going away for life. All of these improper statements rendered his statements involuntary, and the Commonwealth used the statements in closing to argue Reddicks was a liar and a murderer. 51.

## **Standard of Review**

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d), when a petitioner presses a claim that was adjudicated on the merits in state court, federal habeas courts must defer to the state court determination unless it:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In the appeal of a habeas ruling, the District Court's legal conclusions are reviewed de novo.  Likewise, factual findings are reviewed de novo because "[w]hen the district court undertakes no independent factfinding in a habeas case,

we are effectively in the same position as the district court vis-à-vis the state court record." *Pike v. Guarino,* 492 F.3d 61, 68 (1st Cir. 2007).

**Argument**

I.  **THE SANCTIONED PRACTICE OF PERMITTING THE PROSECUTION TO RUN PROSPECTIVE JUROR CRIMINAL RECORDS – WITH NO RESTRICTION – VIOLATES THE EQUAL PROTECTION CLAUSE AND A DEFENDANT'S RIGHT TO A JURY DRAWN FROM A REPRESENTATIVE CROSS-SECITON OF THE COMMUNITY, AND THE EXCLUSION OF TWO JURORS OF COLOR WHO EACH MADE A GENUINE MISTAKE AS TO THEIR CRIMINAL HISTORIES, WITHOUT REQUIRING THE COMMONWEALTH TO OFFER A RACE-NEUTRAL REASON WHERE REDDICKS SATISFIED STEP ONE OF *BATSON*, VIOLATED ESTABLISHED SUPREME COURT PRECEDENT UNDER THE SIXTH AND FOURTEENTH AMENDMENTS.**

The Commonwealth engages in a practice of running seated juror records, then excluding jurors even for minor criminal charges, which would typically not serve as an adequate race-neutral justification for the challenge. Massachusetts Courts permit the Commonwealth unfettered access to prospective jurors' criminal records, with no temporal limitation, spanning back for the jurors' entire lives, regardless of whether the charge resulted in a conviction, was dismissed or had some other favorable resolution. The courts rest this practice on the erroneous justification that "a criminal justice function of prosecutors is 'the selection of a qualified and impartial jury,' and that '[i]nquiring into the criminal records of jurors in a criminal case' assists in serving that function."

Not only is there no correlation between inquiring into the criminal records of jurors, and ensuring a fair and impartial jury, the practice results in discrimination against qualified jurors. Moreover, in this case, the practice resulted in the exclusion of two black jurors where Reddicks, a black male, stood trial. Even though counsel raised a race-based challenge to the Commonwealth's peremptory challenges of these jurors, the Appeals Court erroneously applied established Supreme Court precedent and found that the prosecutor's strikes of Jurors 47 and 122 "appeared to be made for obvious reasons that did not raise any inference of bias." *Commonwealth v. Reddicks*, 99 Mass. App. Ct. 1118, 2021 WL 1307911 at *6 (2021) (R909).

As the district court recognized in its decision relating to Reddicks' habeas petition:

> Massachusetts classifies a significant cohort of its citizens as 'criminal offenders' even though none of them has ever been convicted of any crime. What's more, this group is disproportionately composed of people of color." As the court noted, "the Massachusetts Criminal Offender Record Information ("CORI") system includes arrest records along with records of conviction. So it is that a citizen whose sole brush with the law is his arrest at a boisterous party which got out of hand, the charges later dropped, will continue to turn up as a 'criminal offender' though he is, of course, presumed innocent of the dropped charges and his conduct is otherwise spotless. One need to look no further to recognize the systemic racism which Chief Justice Budd lamented in <u>Commonwealth v. Williams</u>, 481 Mass. 443, 451 n. 6 (2019) (Budd. J.).
>
> A24, *citing* Elizabeth Tsai Bishop et al., Harvard Law Sch., Crim. Just. Pol'y Program, <u>Racial Disparities in the Massachusetts Criminal System</u>, 36 (2020).

Despite that it is uncontroverted that criminal record searches disparately exclude jurors of color, and there is no sound basis for concluding that this record search in any way ensures a more fair and impartial jury, a blanket acceptance that if a prosecutor excludes a juror because of his criminal record, the strike must be for a race-neutral reason, does not pass constitutional muster and is in contravention of established Supreme Court precedent.

Moreover, beyond unconstitutionality of the general practice of running juror records, the Appeals Court also failed to analyze whether the exclusion of these jurors – and the reliance on their criminal records learned after a CORI inquiry – was pretextual. Juror 122 had disclosed his more serious, and more recent criminal case, and the only one that was not sealed. Juror 47 had relatively minor offenses. The Commonwealth did not take issue with any "untruthfulness" as it was undisputed that not including these offenses on their juror questionnaires was innocent and inadvertent.

The Appeals Court distorted the facts, recast Reddicks' arguments and improperly applied Supreme Court precedent in finding both that the general practice of running juror records is not unconstitutional, and that challenging two jurors in this case after the criminal record inquiry was proper. The District Court erred in denying the petition.

**A. The Appeals Court erroneously found that counsel's race-based objection of excluding the jurors after the record inquiry did not satisfy step one of a *Batson* challenge.**

The Appeals Court erroneously found that defense counsel's objections to the Commonwealth's challenges of jurors 47 and 122 did not "trigger an obligation on the judge's part to make a finding whether the presumption of propriety was rebutted" and so the trial judge did not err in finding step one of *Batson* was not satisfied, in order to require the Commonwealth to offer a race-neutral reason for the challenges. *See Commonwealth v. Reddicks*, 99 Mass. App. Ct. 1118, 2021 WL 1307911 at *5 (2021) (R907). The Appeals Court went on to find that even if *Batson* was triggered, the court did not err in not requiring a race-neutral reason, where the reason for the strike was "obvious." *Id.* (R909).

The record is clear that Reddicks made a race-based challenge, and the trial judge considered Reddicks' challenge to be race-based, but that the court did not require any explanation from the prosecutor because of its assessment that there were already people of color on the jury. 2:177-178. A28. Reddicks' motion in limine specifically[s] objected to running records because it "disturb[s] the right to a fair jury made up of a true cross-section of the community," and counsel re-raised the objection to the practice of running records once the Commonwealth challenged Juror 47. R133.

Then, when the Commonwealth challenged Juror 122, defense counsel argued that running the records "leads to the exclusion of African-American individuals or potential jurors. My client is an African-American. I would object at this point, Judge." *Id.* A short time later, the court stated that it had "[j]ust one last comment I need to put on the record," relating to counsel's objection to "challenging jurors after seeing their CORI records" and that "I just need to put on the record" that there were five African-American jurors. 2:177-178.

This is in line with the trial judge's findings in other cases, when ruling on race-based challenges by counsel. *See Commonwealth v. Ortega*, 480 Mass. 603, 605 (2018) (noting there was already one African American woman seated on the jury); *Commonwealth v. Jones*, 477 Mss. 307, 325 (2017) (same); *Commonwealth v. Carter*, 488 Mass. 191, 194-195 (2021) (same).

Under the circumstances, defense counsel adequately satisfied step one of a *Batson* challenge, where the motion in limine raised a racial objection, and counsel then preserved the objection both when juror 47 was challenged, and again when juror 122 was challenged.

The Appeals Court finding that the reason for the prosecutor's strikes was "obvious," and so there was a sound basis in the record for the ruling, was erroneous. Not only did the prosecutor already ask a disparate number of questions of these jurors before the records were run – presumably in an attempt to find a

28

race-neutral reason to challenge – the criminal charges revealed after the record inquiry were old, innocuous charges; the SJC has already recognized that a relatively minor criminal history is not a race-neutral reason to strike an otherwise qualified juror. *See Commonwealth v. Issa*, 466 Mass. 1, 11 n. 13 (2013).

Under these circumstances, Reddicks met the low burden of satisfying step one in the *Batson* three-step inquiry. The court should have required a race-neutral reason, then assessed whether this reason was pretextual. *See Foster v. Chatman*, 548 U.S. 488, 136 S.Ct. 1737, 1754 (2016). Failing to do so was erroneous, and the District Court erred in denying the petition.

## B. In finding the practice of running juror records is proper, the Appeals Court erroneously analyzed whether there was adequate representation in the venire, rather than whether jurors of color were improperly struck for race-based reasons.

Instead of addressing the discrete issues of whether the Commonwealth's use of peremptory challenges on two black jurors where Reddicks is black, including whether the court should have required the Commonwealth to provide race-neutral reasons, the Appeals Court recast Reddicks' argument and claims, and applied the three-factor test for assessing whether the venire as a whole systematically discriminated against a protected class. <u>See</u> A51. The court then went on to state that "[t]he defendant, however, has not provided us with sufficient information regarding the number of African-American jurors in his venire or in

29

past Suffolk County venires. Nor is there any information in the record about the racial composition of the community from which the venire was drawn." A52.

The Appeals Court applied too high a burden, contrary to establish Supreme Court precedent. The Supreme Court has distinguished between adequate representation within the venire, and improperly striking qualified jurors: the former bars only *systemic* exclusion, while the latter bars discrimination against even just one juror. *See Duren v. Missouri*, 439 U.S. 357 (1979) (outlining test where entire protected class exempted from jury selection resulting in systemic exclusion), *contrast with*, *Flowers v. Mississippi*, 139 S.Ct. 2228, 2243 (2019). The Appeals Court confused the issue of a claim alleging systemic exclusion – and the high bar applicable to demonstrating an Equal Protection on that basis – and challenging an otherwise qualified juror. *See Hernandez v. United States*, 500 U.S. 352, 363 (1991).

The analysis the Appeals Court should have applied was whether using past criminal charges disproportionately excluded members of one protected class, and whether it demonstrated a discriminatory intent or purpose. *Id.* at 360-361. As the Supreme Court stated, while a disparate impact on one race, standing alone, does not establish Equal Protection violation "an invidious discriminatory purpose may often by inferred from the totality of the relevant facts, including the fact, if it is true, that the [classification] bears more heavily on one race than another." *Id.*

30

The state courts' justification for permitting the Commonwealth to run records where it claims that "a criminal justice function of prosecutors is 'the selection of a qualified and impartial jury,' and that '[i]nquiring into the criminal records of jurors in a criminal case' assists in serving that function" is also contrary to established Supreme Court precedent. There is no basis for this broad statement, and permitting a practice that disproportionately excludes members of a protected class, and where it has an underlying discriminatory purpose, cannot be upheld as it violates the Sixth and Fourteenth Amendments. *See Hernandez*, 500 U.S. at 363; *Flowers*, 139 S.Ct. at 2243.

Instead, the practice both disparately impacts people of color, and there is an underlying discriminatory intent where this is the only fact on a jury questionnaire that the Commonwealth goes through pains to either confirm or refute, in order to exclude otherwise qualified jurors. Therefore, it is established that this practice violates the Equal Protection Clause, and the Appeals Court's decision – which applied the test for determining whether the entire venire was adequately represented – was in contravention to established Supreme Court precedent, and the Appeals Court decision was based on an unreasonable factual determination. *See Hernandez*, 500 U.S. at 363. The District Court erred in denying the petition.

   **a. The prosecutor's use of juror criminal records to exclude African-American jurors was a pretext and disingenuous group-neutral reason to exclude jurors, violating *Batson* principles.**

The Supreme Court has firmly stated that even where there is a race-neutral reason to exclude a juror, it will still be unconstitutional if the reason is merely pretextual. *See Flowers*, 139 S.Ct. at 2235; *Foster v. Chatman*, 548 U.S. 488, 136 S.Ct. 1737, 1754 (2016). The Appeals Court ignored this dictate, finding that the reason for the prosecutor's strikes was "obvious," where the criminal charges revealed after the record inquiry were old, innocuous charges, and where the SJC has already recognized that a relatively minor criminal history is not a race-neutral reason to strike an otherwise qualified juror. *See Issa*, 466 Mass. at 11 n. 13. *See also* A27 ("the history of opposition to Black citizens' service on the juries is significant, long and part of a larger history of systemic discrimination and violence against Blacks."), *citing* Timothy J. Conklin, <u>The End of Purposeful Discrimination: The Shift to an Objective Batson Standard</u>, 63 B.C. L. Rev. 1037, 1047-49 (2022).

Most notably, the Commonwealth **did not** exclude these jurors because omissions in their questionnaire raised questions as to their ability to be impartial or follow the courts instructions, but rather only because they were learning new information as to their criminal history. The minor criminal histories (where Juror 122 already disclosed the more serious charge that resulted in a conviction), however, did not rise to the level of a race-neutral, non-pretextual reason to exclude the jurors.

32

Juror 47 had minor charges that were dismissed over 15 years prior to Reddicks' trial. She stated that she did not believe she had to list the charges because they were dismissed, which the court accepted as genuine. Therefore, this is not a situation where the juror purposefully concealed her record so as to ensure she could serve as a juror. *Cf. Commonwealth v. Cousin*, 449 Mass. 809, 822 (2007).

Likewise, as to Juror 122, the court credited his statements that he believed he only had to disclose charges that remained unsealed, and that he did not realize he had to list "every charge he ever went through in life." 2:92. Significantly, Juror 122 *did* list his most recent case, and when the Commonwealth inquired on voir dire as to whether he harbored any ill will towards the Boston Police or Suffolk County District Attorney's Office, he answered in the negative. Charges ranging from ten to fifteen years prior to trial did nothing to sufficiently alter the court's original assessment that he stood indifferent.

While the Appeals Court claimed that excluding juror numbers 47 and 122 "appeared to be made for obvious reasons that did not raise any inference of bias," it is not so obvious, and the trial court should have delved into whether the prosecutor's use of challenges on these jurors was pretextual. *See Foster v. Chatman*, 578 U.S. 488, 509 (2016), *citing Miller-El v. Cockrell*, 537 U.S. 332, 339 (2003); *Flowers*, 139 S.Ct. at 2243.

33

Notably, even before the Commonwealth ran Juror 47's criminal record, the prosecutor asked her far more questions than other jurors, presumably attempting to find cause to exclude her, but his inquiries did not yield the result he was seeking. The prosecutor asked the juror a range of questions, from where she was born, a number of questions about her job, and even went on to ask whether Juror 47's 11-year old daughter would be in a position to take care of herself, despite the fact that Juror 47 reported she did not have any hardship that would prevent her from serving. Juror 47's old, and unserious criminal history, for which she provided an honest explanation, was an out for the prosecutor to exclude a juror based on race, for which he was otherwise unable to come up with a race-neutral reason to exclude her. The Appeals Court did not use the disproportionate number of questions asked by the prosecutor of this juror in assessing whether her criminal history was merely a pretextual reason to exclude her. *See Miller-El*, 545 U.S. at 238-240 (rejecting supposition that any race-neutral reason for strike suffices, and implicitly rejecting claim that juror's family member's criminal charge was not pretext).

While Reddicks is unable to do an exact side-by-side comparison between each black juror and each white juror to determine the number of questions asked to each, that he asked more questions of this juror than any other is powerful evidence that he was attempting to find a race-neutral reason to exclude her before

her criminal record was returned. The prosecutor also asked more questions of Juror 60, a juror from Kenya, who was presumably black. The most extensive questioning was of Juror 108, who was also black.

Had the trial court and Appeals Court conducted the proper inquiry under established Supreme Court precedent, it would have led them to the conclusion that the Commonwealth challenged only jurors of color who had past criminal records, and the records were old and for the most part, relatively minor. 1:123, 274; 2:90. *See also id.* at 241.

Permitting the prosecution to strike the two jurors because of "new information" where the disclosure would not serve as an adequate race-neutral reason to challenge the jurors had they included the information in their questionnaire amounted to a violation of Reddicks' Equal Protection Rights. *See Flowers v. Mississippi*, 139 S.Ct. 2228, 2233-2234 (2019).

After finding the omissions from their juror questionnaires were inadvertent, the court assumed the charges would have been a sufficient race-neutral reason to challenge the jurors had the information been listed on the questionnaire, and the Appeals Court sanctioned this practice of excluding members of a protected class; this was contrary to established Supreme Court precedent and violated the Equal Protection Clause. *Flowers*, 139 S.Ct. at 2235; *Foster v. Chatman*, 548 U.S. 488,

136 S.Ct. 1737, 1754 (2016); *Batson v. Kentucky,* 476 U.S. 79, 85 (1986). The

District Court erred in denying the petition.

> **b. The Practice of the Government in Running Criminal Records for Prospective Jurors Violates Equal Protection Rights Under the Fourteenth Amendment, and a Defendant's Right to an Impartial Jury under the Sixth Amendment.**

The Appeals Court's decision was contrary to established Supreme Court

precedent under Sixth Amendment jurisprudence, where the practice of running

juror records violates a black defendant's right to an impartial jury of his peers.

Here, the practice of running juror records disparately impacts jurors of

color where they are more likely to be arrested, charged, prosecuted and sentenced

than their white counterparts. Using an arrest record as a basis for challenging a

juror "compounds the racially disparate impact of our criminal justice system." *See*

Vida B. Johnson, *Arresting <u>Batson</u>: How Striking Jurors Based on Arrest Records*

*Violates <u>Batson</u>,* Yale Law & Policy Review, at 389 (June 2016).

The disproportionate impact on African-American jurors as a result of

running records is apparent in this case. Juror 47 had only "innocuous" driving

charges on her record and a possession of Class B charge – all of which were

dismissed – which were from 15 years prior to trial. Where "[p]eople of color are

far more likely to be arrested in this country than Whites," an African-American is

more likely to face discrimination during every single phase of our criminal justice

system: she is more likely to be arrested, more likely to be prosecuted, more likely

to receive a sentence of incarceration, and more likely to be excluded from a jury because of a 15-year old minor case. *Id.*

Criminal record checks serve the prosecution with an opportunity to challenge jurors they might not otherwise be in a position to offer a race-neutral reason to overcome a *Batson* challenge – especially where the Appeals Court has taken the erroneous position that such challenges "a criminal justice function of prosecutors is 'the selection of a qualified and impartial jury" and that "[i]nquiring into the criminal records in a criminal case' assists in serving that function" – while falling back on the disingenuous excuse that it constitutes "new information."

The practice is even more troubling in Massachusetts, where most other states limit inquiry into an arrest record to the past 10 years. *See* Gregory E. Mize, *On Better Jury Selection: Spotting UFO Jurors Before They Enter the Jury Room*, 33 CT. REV. 10, 11 (Spring 1999). Here, the prosecution has unfettered access to a person's entire arrest record, covering the juror's entire life, for the prosecution to pick apart and scrutinize whether the juror made a full disclosure on a questionnaire and during voir dire. *See Arresting Batson* at 395. The standard practice, however, permits a prosecutor to discriminate based on outdated charges, where that person may have only been arrested, charged and prosecuted due to racial disparities.

37

Running jurors' records is racist and runs afoul of the principles set forth in *Batson* and its progeny. Allowing the prosecution to strike a juror because a CORI check reveals charges the juror did not disclose, where the omission does not undermine the juror's honesty or in any way affect a juror's impartiality, provides the Commonwealth with a tool to discriminate that will withstand a *Batson* challenge, regardless of the prosecutor's true intentions. *See Arresting Batson*, at 408 (noting that "questions about arrest records do little to establish the 'honesty' of prospective jurors except in some narrow circumstances").

Where the Commonwealth's practice disproportionately excludes members of a protected class, the exclusion of two jurors in the same protected class as Reddicks violated his rights under the Equal Protection Clause of the Fourteenth Amendment. *See Hernandez*, 500 U.S. at 376 (Blackmun, J., dissenting) ("[a]n avowed justification that has a significant disproportionate impact will rarely qualify as a legitimate, race-neutral reason sufficient to rebut the prima facie case *because disparate impact is itself evidence of discriminatory purpose."). See also Flowers*, 139 S.Ct. at 2233. The District Court erred in denying the petition.

   **c.  Even if the Practice of Running Juror Records Does Not Violate Fourteenth Amendment Equal Protection Rights, it Violates a Defendant's Right to an Impartial Jury Under the Sixth and Fourteenth Amendments.**

While the Court has primarily applied Equal Protection analysis to whether a peremptory strike was valid and constitutional, as discussed *supra*, this analysis has not achieved the goal of accomplishing a truly diverse and impartial jury, which requires a jury "drawn from a cross-section of the community." *See J.E.B. v. Alabama*, 511 U.S. 127, 148-149 (1994) (noting *Batson's* logic was meant to be aspirational rather than factual and court should look to "fair cross-section" under the Sixth Amendment). *See also* Tania Tetlow, *Why Batson Misses the Point*, 97 Iowa L. Rev. 1713, 1714 (2012) (arguing Court should look to whether defendant's Sixth Amendment right to impartial jury impacted by strike, rather than assess on Equal Protection terms).

This Court should find the Appeals Court erroneously applied established Supreme Court precedent where it improperly rejected Reddicks' claim; the Massachusetts Court of Appeals applied the test for determining whether there was systemic exclusion of jurors in the jury venire, rather than whether the prosecution's use of juror records to exclude two jurors violated his right to an impartial jury of his peers. The Appeals Court decision effectively supplied Massachusetts prosecutors with a cover for any challenge of a person of color after running a criminal record, regardless of the seriousness of the offense, whether the charge was dismissed, and how long ago the incident occurred.

Where the practice in this case removed two jurors from a protected class, who were both of the same racial makeup as Reddicks, this violated both Reddicks' right to a jury of his peers under the Sixth and Fourteenth Amendments. *See Thiel v. S. Pac. Co.*, 328 U.S. 217, 220 (1946); *Ballard v. United States*, 329 U.S. 187, 193-94 (1946). The District Court erred in denying the petition.

## II. THE DETECTIVES' IMPERMISSIBLE AND UNCONSTITUTIONAL TACTICS RENDERED 18-YEAR OLD REDDICKS' STATEMENTS INVOLUNTARY, AND THE APPEALS COURT ERRONEOUSLY APPLIED SUPREME COURT PRECEDENT WHERE IT FOUND THAT BECAUSE REDDICKS DID NOT PROVIDE A FULL CONFESSION, HIS WILL WAS NOT OVERBORN.

The Appeals Court found that the interrogating detectives engaged in impermissible "now or never tactics" but that the "improper tactics were unsuccessful" in that Reddicks did not make a full-blown confession, so any statements made were voluntary. A70-71. The statements were not exculpatory; the Commonwealth used almost the entirety of Reddicks' statement to argue he was a liar, and a murderer.

This rationale was contrary to established Supreme Court precedent where it specifically stated in *Miranda v. Arizona* that the "privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; **it does not distinguish degrees of incrimination**…no distinction

may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory." 384 U.S. at 477.

In response to the detectives calling 18-year old Reddicks a sociopath and a cold-blooded killer, and telling him he was looking at first-degree murder and life in prison, Reddicks made many admissions to fill in the gaps in the Commonwealth's case, while also adamantly denying involvement.

The Appeals Court found the statements were exculpatory, but the Commonwealth used them throughout closing, repeatedly outlining statements Reddicks made, then calling Reddicks a liar. See e.g., 8:57 ("The police asked him, 'Did Ian connect you to Mariano Malave?' "Nope, nope. Absolutely not.' And he lied because that's exactly how it happened."); 8:60 ("You know that's a lie…He needed time to come up with how this lie would fit in place with all the other lies."); 8:66 ("If you compare those things and then consider what Charles Reddicks said when he was asked by police, you will understand that these are not tiny, white lies. These are whoppers, and they're designed to keep him as far away from the scene of the murder as possible.").

The Appeals Court erroneously found that "none of the incriminating statements made by the defendant were tired to or otherwise made in response to the pressure tactics employed by the officers." *Commonwealth v. Reddicks*, 99 Mass. App. Ct. 1118, 2021 WL 1307911 at *10 (2021) (R921). It is impossible to

41

make this determination, and it is an unreasonable application of the facts.

Reddicks did not make any statements until the pressure tactics were employed, and then Reddicks oscillated between denying all accusations, and providing some information which the Commonwealth later used against him. The infected the entire interrogation, and one cannot parse out certain statements Reddicks made, and directly correlate them, individually, to the coercion tactics used by the detectives.

While the false statements made by the detectives may not have phased a grown adult, Reddicks was just past 18, and was more susceptible to pressure and influence. The Appeals Court focused on how Reddicks continued to deny involvement, however, this ignores that a younger person feels a greater pull to deny the accusations, rather than just terminate the interview. *See JDB v. North Carolina*, 564 U.S. 261 (2011). *See also The Right to Remain a Child: The Impermissibility of the Reid Technique in Juvenile Interrogations*, 92 NYU L. Rev. 1719 (2017) (explaining that juveniles are more susceptible to police coercive tactics than adults). The Appeals Court, however, failed to consider that Reddicks' age, his under-developed brain, and his heightened susceptibility to pressure all combine with the false police statements to render his statements involuntary in the constitutional sense. *See Miller v. Alabama*, 567 U.S. 460 (2012); *JBD v. North Carolina*, 564 U.S. 261 (2011).

Reddicks' statements were involuntary under the Fifth and Fourteenth Amendments, and the Appeals Court's decision was contrary to established Supreme Court precedent where it found Reddicks' statements were voluntary. *See Miranda v. Arizona*, 384 U.S. 436, 477 (1966); *Colorado v. Connelly*, 479 U.S. 157 (1986). The District Court erred in denying the petition.

### III. THE SEARCH OF REDDICKS' CELL PHONE VIOLATED HIS 4TH AND 14TH AMENDMENT RIGHTS, AND BARRING HIM FROM CHALLENGING THE SEARCH UNDER THE PRINCIPLES OF COLLATERAL ESTOPPEL VIOLATED HIS DUE PROCESS RIGHTS.

The Appeals Court found Reddicks' challenge of was barred by his prior litigation of a motion to suppress the same phone in an unrelated case. The Appeals Court's decision, however, was based on an unreasonable determination of the facts in light of the evidence presented where it found Reddicks' prior case was not less serious than the murder indictment he was facing, and that he had a full opportunity to litigate the motion to suppress in the prior proceedings. Moreover, the Appeals Court's decision was contrary to clearly established Supreme Court precedent where it failed to consider that the applicable law drastically changed since Reddicks litigated the motion to suppress in the prior proceedings.

Reddicks acknowledges that typically Fourth Amendment claims are not reviewable in a habeas petition, however, Reddicks was precluded from fully litigating his claim in state court where the Massachusetts Appeals Court found

Reddicks' Fourth Amendment challenge was precluded by collateral estoppel. Where the Appeals Court did not provide Reddicks with a "opportunity for full and fair litigate of a Fourth Amendment claim," this Court may "grant[] federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465 (1976). As such, Reddicks' claim is not precluded from review on the grounds that Fourth Amendment claims are not reviewable in a petition under 28 U.S. 2254. *Id.*

### A. The Appeals Court decision was based on unreasonable determination of the facts where it found Reddicks had the same opportunity to litigate the motion to suppress in the prior case.

While the parties and the legal issues were the same in both cases, Reddicks most certainly did not have the same incentive to fully litigate, and appeal the judgment in the unrelated case. *See United States v. Levasseur*, 699 F.Supp. 965, 981 (D. Mass. 1988); *Montana v. United States*, 440 U.S. 147, 155 (1979).

The Appeals Court found Reddicks' charges on the prior docket were not "minor," so he had adequate incentive to appeal. The question, however, was whether the prior charges were "relatively minor **compared to the present charges**." *Id.* (emphasis added). The charges on the unrelated docket were by no means minor, but they paled in comparison to the first-degree murder charge

Reddicks faced in this case.[6] This is highlighted by the disparate nature of the sentences: he received three to three and a day on the prior docket and is now serving a life sentence with parole on this case. The finding that the charges were "significant," and therefore, he had an adequate incentive to appeal the decision, was based on an unreasonable determination of the facts.

**B.    The Appeals Court failed to consider the drastic change in the law between the motion to suppress litigation in the prior case, and this case, which was contrary to established Supreme Court precedent, so Reddicks was not collaterally estopped from raising the issue.**

Collateral estoppel does not apply because of the drastic change in the law between the litigation of the motion to suppress in Reddicks' prior case, and this case. *See Levasseur*, 699 F.Supp. at 981 n. 23 (noting that change in governing law precludes estoppel); *Haring v. Prosise*, 462 U.S. 306, 313 (1983) (observing that collateral estoppel not appropriate when "controlling facts or legal principles have changed significantly" since prior judgment). Since the Appeals Court did not address this argument on the merits, this Court reviews it *de novo*. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009).

In support of the search warrant application, the affiant outlined the basic facts surrounding the shooting, stated only that "[c]ell phones are often times used by individuals as a means of communication when planning a crime or used as a

---

[6] On the unrelated docket, Reddicks was charged with assault and battery with a dangerous weapon, and carrying a firearm without a license. <u>See</u> 1284CR10533.

means of communication after the commission of a crime" and that "based upon my training and experience, I believe probable cause exists" to forensically examine the phone. R174-175.

Reddicks' motion to suppress in the prior case was litigated and decided in April of 2013, prior to the SJC's decisions in *Commonwealth v. White*, 475 Mass. 583 (2016) and *Commonwealth v. Dorelas*, 473 Mass. 496 (2016), and the Supreme Court decision in *Riley v. California*, 134 S.Ct. 2473 (2014). In *White*, the SJC explicitly found that the exact language used in the Reddicks search warrant affidavit was insufficient to establish probable cause to search a cell phone.

In applying the law that arose after Reddicks' motion to suppress was litigated in the unrelated case, it is clear the search violated Reddicks' Fourth and Fourteenth Amendment rights. The search warrant for the phone permitted a generalized search of the entire contents of the phone on the basis that phones are typically used in crimes. Both the SJC and Supreme Court have found a search of a phone must be based on probable cause to believe the phone contains evidence of a crime, and must be particularized. *See Riley v. California*, 134 S.Ct. 2473 (2014); *Commonwealth v. Dorelas*, 473 Mass. 496, 504 (2016); *Commonwealth v. White*, 475 Mass. 583 (2016).

Here, the generalized and conclusory statement that "cell phones are often times used by individuals as a means of communication when planning a crime or

used as a means of communication after the commission of a crime" fell far short of what the Court deemed sufficient to establish probable cause to search the photograph files in <u>Dorelas</u>. *Id.*

Ultimately, there was no probable cause to search the phone and the search warrant affidavit was not particularized. *See White*, 475 Mass. at 589; *Coolidge v. New Hampshire*, 403 U.S. 443, 480 (1971). Since the Appeals Court did not permit Reddicks to fully litigate this claim based on an erroneous finding of collateral estoppel, but the search violated Reddicks' Fourth and Fourteenth Amendment rights, the District Court erred in denying the petition. *See Riley v. California*, 134 S.Ct. 2473 (2014); *Coolidge v. New Hampshire*, 403 U.S. 443, 480 (1971). *See also Stone v. Powell*, 428 U.S. 465 (1976).

**IV.    THE APPEALS COURT FAILED TO ADDRESS WHETHER THE COMMONWEALTH'S EGREGIOUS CLOSING ARGUMENT – WHERE THE PROSECUTOR ASKED THE JURY TO CONSIDER PRIOR BAD ACTS AS PROPENSITY EVIDENCE – RENDERED EVIDENCE AS TO REDDICKS' PRIOR POSSESSION OF FIREARMS UNDULY PREJUDICIAL AND VIOLATED REDDICKS' DUE PROCESS AND FAIR TRIAL RIGHTS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS.**

The Appeals Court found that permitting the Commonwealth to introduce evidence Reddicks allegedly possessed firearm(s) in the past was permissible because they could have been used in the crime. What this sidesteps is that the prosecutor *used this evidence **as propensity evidence,** and argued Reddicks*

*possessed more than one firearm in the past, and that the jurors should be "scared" by this revelation*. The Appeals Court, however, did not address this issue on the merits, so this Court should review the claim *de novo*. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009).

Washington testified he saw Reddicks brandish a silver revolver, then tuck it in his waistband, several months prior to the homicide. The Commonwealth was not able to definitively link the firearm from the previous incident to this case. The Commonwealth also introduced photographs of firearms recovered from Reddicks phone, seized in conjunction with that prior incident. The Commonwealth then used the firearm evidence to argue in closing that Reddicks had access to multiple firearms, which was "the scariest part of the whole story" and played on the jurors' emotions, using this information to argue they should infer he is someone who would shoot Malave. 8:53-54, 70-71. This was plainly an improper use of prior bad acts as propensity evidence. *See Varoudakis*, 233 F.3d at 123.

Given the totality of the evidence and arguments by the Commonwealth, it violated Reddicks' due process and fair trial rights pursuant to the 5th, 6th, and 14th Amendments, and the District Court erred in denying the petition. *Scales v. U.S.,* 367 U.S. 203, 224 (1961); *U.S. v. Olano,* 507 U.S. 25, 28 (1993).

**V.    THE COURT'S RULING THAT IF REDDICKS IN ANY WAY CHALLENGED A WITNESS'S CLAIM THAT HE SAW REDDICKS POSSESS A GUN ON A PAST OCCASION IT WOULD OPEN THE DOOR TO HIS PRIOR FIREARM CONVICTION HAMSTRUNG REDDICKS' DEFENSE, AND VIOLATED REDDICKS' FIFTH, SIXTH AND FOURTEENTH AMENDMENT RIGHTS; THE APPEALS COURT DECISION WAS BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS.**

Not only did the court allow the prior bad act firearm evidence, the court specifically ruled that if Reddicks conducted any meaningful cross-examination of Washington, it would permit the Commonwealth to present evidence that Reddicks pled guilty to possessing a firearm as a result of the prior incident, and Washington also observed Reddicks shoot the firearm out of a car window. This restriction on cross-examination violated Reddicks' 5th, 6th and 14th Amendment rights to due process and to confront and cross-examine the witnesses against him. *See Chambers v. Mississippi*, 410 U.S. 284 (1973).

Here, this case was entirely circumstantial, and the Commonwealth used Washington's testimony to argue Reddicks' brandished a revolver on a past occasion, a revolver was used in the homicide, and thus the jury should infer Reddicks had the means to commit this homicide.

On the opposing side of the scale, the court restricted Reddicks' cross-examination of Washington entirely, on the erroneous basis that because Reddicks pled guilty, any questioning of Washington would leave a false impression with the jury that Washington could have been mistaken. This finding ignores that

individuals may plead guilty for a number of reasons, other than actual guilt. *See The Unexonerated, Factually Innocent Defendant's Who Plead Guilty*, Cornell Law Library (2014).

Additionally, questioning Washington as to the details surrounding his observations would not necessarily leave a false impression with the jury, as the Appeals Court found. Reddicks pled guilty to possessing a firearm, not a revolver, specifically. Reddicks should have been permitted to undermine Washington's conclusion that he saw a silver revolver, especially where the Commonwealth relied heavily on Washington's assertion that it was a revolver to argue the firearm Reddicks previously possessed "matched the type" of firearm used in the homicide. *See Smith v. Illinois*, 390 U.S. 129 (1968) (defendant entitled to test witness perceptions and bias); *Davis v. Alabama*, 415 U.S. 308 (1974).

Ultimately, the court's complete restriction on Reddicks' cross-examination of Washington violated Reddicks' due process rights and his right to cross-examination the witnesses against him under the 5th, 6th and 14th Amendments. The Appeals Court's decision was based on an unreasonable determination of the facts, and so the District Court erred in denying the petition.

**VI.    THE COMMONWEALTH ELICITED A BACK-DOOR IDENTIFICATION WHERE THE LEAD DETECTIVE TESTIFIED THAT HE PULLED REDDICKS' RMV PHOTOGRAPH AND DETERMINED IT MATCHED THE ONLY EYEWITNESS DESCRIPTION IN VIOLATION OF REDDICKS' DUE PROCESS RIGHTS UNDER THE 6TH and 14TH AMENDMENTS AND THE APPEALS COURT DECISION TO THE CONTRARY WAS BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS.**

Sgt Det Daley was permitted to testify over objection that he pulled RMV photographs for the individuals residing at the location to which a vehicle was registered to, that Reddicks matched the description provided by Leanne Parker – the sole "eyewitness," who never participated in an identification procedure – and that Reddicks' grandmother's vehicle was the suspect vehicle described by Parker and depicted in surveillance video. Sergeant Detective Daly was also permitted to identify Reddicks' grandmother's vehicle in surveillance footage.

The opinion evidence as to both the match between the description and the RMV photograph, and the identification of Reddicks' grandmother's vehicle in video footage were improper, and was improper lay opinion testimony, and invaded the province of the jury. *See id.; Commonwealth v. Thomas*, 476 Mass. 451, 457 (2017) (applying principles of suggestiveness an inanimate object); *U.S. v. Meises*, 645 F.3d 5, 16 (1st Cir. 2011).

The Commonwealth used Sgt Det Daley's testimony as identification evidence:

The police investigated from the moment they arrived on scene and had two separate, distinct and completely independent, unbiased routes to connect to Charles Reddicks. It wasn't just thrown up in the air and identifying him from the scene. They didn't randomly pick him. There was a car with a license plate going back to Mrs. Reddicks, and one of the licensed driver's happened to fit the description of what Leanne Parker had given.

8:63.

The effect of the state court decision was to deprive Reddicks of a fair trial and thus violate his right to due process as guaranteed by the Fourteenth Amendment. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (habeas relief for state law errors is appropriate if the state court's evidentiary ruling was "so arbitrary or capricious as to constitute an independent due process…violation" and thus results in a fundamentally unfair trial); *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996). A police officer may not render an opinion from either a photograph or video of the identity of the person or object unless the officer has special familiarity with the suspect, or there is otherwise reason the officer is in a better position than the jury to make an identification. *See Vitello*, 376 Mass. at 460; *Jackman*, 48 F.3d at 4-5; *Wardsworth*, 482 Mass. 454; *Meises*, 645 F.3d at 16. The Appeals Court decision was based on an unreasonable determination of the facts where it found Sergeant Detective Daly did not actually made an identification, so the District Court erred in denying Reddicks' petition.

52

## **<u>Conclusion</u>**

Based on the foregoing, Charles Reddicks requests that this Court grant him

habeas relief under 28 U.S.C. § 2254.

Respectfully Submitted,
CHARLES REDDICKS
By his Attorneys,

<u>/s/ Rosemary Curran Scapicchio</u>
Rosemary Scapicchio
Law Office of Rosemary C.
Scapicchio
#30306
107 Union Wharf
Boston, MA 02109
(617) 263-7400
Rosemary@Scapicchiolaw.com

<u>/s/ Jillise McDonough</u>
Jillise McDonough
Law Office of Rosemary C.
Scapicchio
#1202184
107 Union Wharf
Boston, MA 02109
(617) 263-7400
Jillise@scappichiolaw.com

## Certificate of Compliance with Fed. R. App. P. 32

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains exactly 10,799 words by machine count, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Times New Roman 14-point font.

/s/ Rosemary Curran Scapicchio

Attorney for Appellant Petitioner

CHARLES REDDICKS

## Certificate of Service

I hereby certify that, on May 28, 2025, I filed the foregoing *Petitioner- Appellant's Brief* electronically with the United States Court of Appeals for the First Circuit by using the CM/ECF system.

/s/ Rosemary Curran Scapicchio

Attorney for Appellant Petitioner

CHARLES REDDICKS

# **<u>Addendum</u>**

Decision and Order on 1:23-cv-10455 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A1

Final Judgement on 1:23-cv-10455. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A63

Notice of Appeal on 1:23-cv-10455 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A64

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
CHARLES REDDICKS,                       )
                                        )       CIVIL ACTION
                   Petitioner,          )       No. 23-10455-WGY
                                        )
          v.                            )
                                        )
SUPERINTENDENT NELSON B ALVES,          )
                                        )
                   Respondent.          )
_____)

YOUNG, D.J.                                     December 4, 2024

### MEMORANDUM & ORDER

Through this petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2254, Charles Reddicks ("Reddicks") requests this Court vacate his convictions for second-degree murder, carrying a firearm without a license, and carrying a loaded firearm without a license, and order his release from custody. Pet. 16, ECF No. 1. Reviewing Reddicks' claim pursuant to the demanding standards that govern, this Court is constrained to deny Reddicks' petition for the reasons explained below.

## I.  INTRODUCTION

### A.  Procedural History

In January 2016, a jury convicted Reddicks of second-degree murder, carrying a firearm without a license, and carrying a loaded firearm without a license. Pet. 1; Commonwealth v.

Reddicks, 99 Mass. App. Ct. 1118 (2021) (unpublished).  Reddicks

appealed his conviction to the Massachusetts Appeals Court ("the

Appeals Court"), which affirmed his conviction on April 8, 2021.

Reddicks, 99 Mass. App. Ct.  Reddicks filed an application for

further appellate review ("FAR") with the Massachusetts Supreme

Judicial Court, which was denied on August 2, 2021.

Commonwealth v. Reddicks, 448 Mass. 1102 (2021).  Reddicks filed

this petition for a writ of habeas corpus on February 27, 2023.

Pet.

### B.  Factual Background

"In a proceeding instituted by an application for a writ of

habeas corpus by a person in custody pursuant to the judgment of

a State court, a determination of a factual issue made by a

State court shall be presumed to be correct.  The applicant

shall have the burden of rebutting the presumption of

correctness by clear and convincing evidence."  28 U.S.C.

2254(e)(1).  This memorandum therefore incorporates the factual

recitation of the Appeals Court.

In Commonwealth v. Reddicks, the Appeals Court recited that

on the evening of April 27, 2012, Reddicks drove to the victim's

home in the Jamaica Plain neighborhood of Boston to purchase

approximately one pound of marijuana, which he had set up

earlier via text messages.  No. 19-P-71, 2021 WL 1307911, at *1.

After a call placed from Reddicks' cell phone to the victim's

[2]

**A2**

cell phone, the victim exited his apartment with a sample of marijuana.  Id.  Soon after, the victim retrieved additional marijuana, and returned to the back hallway.  Id.  Three shots were then fired at the victim, two of which struck him, resulting in his death.  Id.  A witness, Leanne Parker ("Parker"), later told police that she had observed a Black man with long dreads or curls exit a blue vehicle and walk toward the victim's house while talking on the phone, shortly before the shooting.  Id. at *2.  Parker then heard gunshots and observed the man run from the house into the blue car and drive away.  Id.  The police traced a partial license plate number to a vehicle registered to Reddicks' grandmother.  Id.  Out of the six registered drivers living at that address, the police determined that Reddicks was the only one fitting Parker's description.  Id.  Sergeant Detective Daley ("Daley") testified about this investigative process at trial.  Id. at *8.  Reddicks was interviewed by Detective Callahan ("Callahan") and Daley, and admitted to driving the blue vehicle on the day of the homicide and to sending text messages to the victim to purchase marijuana.  Id. at *2.  Reddicks, however, stated that he had never met the victim in person and denied involvement in the homicide.  Id.  Reddicks was ultimately indicted for murder, armed robbery, carrying a firearm without a license, carrying a

[3]

**A3**

loaded firearm without a license, and possession of ammunition
without a license.  Id.

    Prior to trial, the trial justice allowed the
Commonwealth's motion seeking to conduct a Criminal Offender
Record Information ("CORI") inquiry of prospective jurors.  Id.
During jury empanelment, the CORI inquiry revealed that six
jurors had not disclosed all or part of their criminal record on
their jury questionnaires.  Id.  Four of those jurors were
seated in the jury box without further inquiry.  Id.  After voir
dire, the other two jurors were struck by the Commonwealth,
exercising peremptory challenges.  Id. at *2-3.

    Prior to trial, Reddicks sought the exclusion of statements
he made in his interview with Callahan and Daley.  Id. at *9-10.
Reddicks also moved to exclude two photographs depicting him
holding a firearm, obtained in an unrelated prior case, alleging
the invalidity of the search warrant that permitted the
photographs to be obtained from his cell phone.  Id. at *7.
Those motions were denied.  Id. at *7, *10.  At trial, Reddicks
objected to the testimony of his friend, Thomas Washington
("Washington"), who testified that several months before the
homicide he saw Reddicks in possession of a firearm, and
objected again to the admission of the photographs, alleging
that those pieces of evidence were prior bad act evidence.  Id.
at *6.  When deciding the motion in limine and at trial, the

[4]

**A4**

court informed Reddicks' counsel that a cross-examination of
Washington suggesting that he was lying might open the door to
Reddicks' conviction for possessing the firearm in question.
Id. at *11.  Reddicks' counsel did not cross-examine Washington.
Id.

The jury convicted Reddicks of murder in the second degree,
carrying a firearm without a license, and carrying a loaded
firearm without a license.  Id. at *1.

## II.  ANALYSIS

### A.  Standard of Review

"In a proceeding instituted by an application for a writ of
habeas corpus by a person in custody pursuant to the judgment of
a State court, a determination of a factual issue made by a
State court shall be presumed to be correct.  The applicant
shall have the burden of rebutting the presumption of
correctness by clear and convincing evidence."  28 U.S.C. §
2254(e)(1).

Habeas petitions seeking relief from state court
convictions are reviewed under the highly deferential standard
codified by the Antiterrorism and Effective Death Penalty Act of
1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, which
provides, in part:

> An application for a writ of habeas corpus on
> behalf of a person in custody pursuant to the judgment
> of a State court shall not be granted with respect to

[5]

**A5**

any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

      (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

      (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) ("Section 2254(d)").

"A state court decision is contrary to clearly established federal law if it 'contradicts the governing law set forth in the Supreme Court's cases or confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court' but reaches a different result." Companonio v. O'Brien, 672 F.3d 101, 109 (1st Cir. 2012) (quoting John v. Russo, 561 F.3d 88, 96 (1st Cir. 2009)). "Clearly established law" refers only to the holdings of Supreme Court decisions and the governing legal principles set forth by the Supreme Court at the time the state court renders its decision, and does not extend to the dicta of Supreme Court decisions. Howes v. Fields, 565 U.S. 499, 505 (2012); Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003).

The "unreasonable application" branch applies when the state court identified the correct legal principal but applied it unreasonably to the facts in the case at hand. Williams v. Taylor, 529 U.S. 362, 407-08 (2000). A habeas court reviewing

[6]

**A6**

this prong must ask if the state court's application was "objectively unreasonable." Id. at 409. A petitioner meets this standard upon a showing that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011).

An unreasonable determination of the facts occurs when a state court's determination of facts is "objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Substantial deference is accorded to the state trial court's factual determination under this standard. Brumfield v. Cain, 576 U.S. 305, 314 (2015). Factual determinations are not deemed unreasonable "merely because [the court] would have reached a different conclusion in the first instance." Id. at 313-14 (quoting Wood v. Allen, 558 U.S. 290, 301 (2010)). Even where "'[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" Wood, 558 U.S. at 301 (alteration in original) (quoting Rice v. Collins, 546 U.S. 333, 341-342 (2006)).

These standards apply only to claims that were adjudicated on the merits in state court proceedings.  Pike v. Guarino, 492 F.3d 61, 67 (1st Cir. 2007).  A federal claim not adjudicated on the merits is reviewed de novo.  Id.

Even if a federal court uncovers an error under Section 2254(d), relief is appropriate only if the error found "had substantial and injurious effect or influence in determining the jury's verdict."  Fry v. Pliler, 551 U.S. 112, 116 (2007) (quoting Brecht v. Abrahamson, 507 U.S. 619, 631 (1993)).  "Relevant factors to be considered in determining whether the jury was substantially swayed by the error include: '(1) the extent to which the error permeated the proceeding, (2) the centrality of the issue affected by the error to the case as actually tried, and (3) the relative strength of the properly admitted evidence of guilt.'"  Pettiway v. Vose, 100 F.3d 198, 200-01 (1st Cir. 1996) (quoting Levasseur v. Pepe, 70 F.3d 187, 193 (1st Cir. 1995)).

**B.    The Appeals Court's Decision Allowing CORI Inquiry of Prospective Jurors and the Subsequent Peremptory Challenges of Two Jurors Was Reasonable.**

Reddicks first argues that the practice of running criminal records searches for prospective jurors violates the Equal Protection Clause of the Fourteenth Amendment and the right to an impartial jury under the Sixth Amendment because it

[8]

**A8**

disproportionally excludes jurors of color from juries.  Pet'r's Mem. Supp. Pet. ("Pet'r's Mem.") 23-27, ECF No. 2.  Reddicks argues that the review of criminal records of prospective jurors in his case specifically caused the exclusion of Black jurors for pretextual reasons.  Id. at 20.

The Commonwealth argues that habeas corpus relief cannot be granted, as no clearly established Supreme Court precedent exists concerning the practice of running criminal records searches for prospective jurors.  Resp't's Mem. Opp'n Pet. ("Resp't's Mem.") 19-24, ECF No. 15.  In addition, the Commonwealth argues that the Appeals Court correctly applied the relevant Supreme Court precedents concerning the striking of two jurors.  Id. at 24-28.

This Court concludes that Reddicks has not met his burden of proving that the Appeals Court unreasonably applied clearly established federal law.  Reddicks' petition on the first ground is thus denied.

### 1.  Background

Prior to trial, the Commonwealth filed a motion in limine seeking a CORI inquiry of the prospective jurors.  Reddicks, 2021 WL 1307911, at *2.  Reddicks opposed the motion and, in the alternative, requested that the prospective jurors' information also be run through the victim/witness database.  Id.  The trial justice allowed the Commonwealth's motion and ordered that the

[9]

**A9**

prospective jurors' information be checked with both the CORI database and the victim/witness database.  Id.

During jury empanelment, the inquiry revealed that six jurors, all of whom were Black, had not disclosed all or part of their criminal record on their juror questionnaires.  Id. at *2, *4.  As to four of them, the Commonwealth and Reddicks agreed that no further inquiry was necessary.  Id. at *2.  During voir dire, juror no. 47 informed the trial justice that all of her undisclosed charges were dismissed and that she did not know that she was required to disclose dismissed charges.  Id.  The trial justice credited the juror's explanation and informed counsel that there was no reason to excuse the juror for cause.  Id.  The Commonwealth then exercised a peremptory challenge, and Reddicks objected.  Id.  The trial justice excused juror no. 47 over Reddicks' objection.  Id.

It was also discovered that juror no. 122 had not disclosed a number of charges and convictions that had occurred over a fourteen-year period.  Id. at *3.  The juror explained that those charges and convictions were sealed and that he did not know that he was required to disclose sealed charges and convictions.  Id.  The trial justice accepted his explanation and declined to excuse the juror for cause.  Id.  The Commonwealth exercised a peremptory challenge, and Reddicks objected, arguing that the Commonwealth's practice of inquiring

[10]

A10

into prospective jurors' criminal records resulted in the systematic exclusion of Black jurors.  <u>Id.</u>  The judge noted the objection, but excused juror no. 122, explaining that even though he accepted the two jurors' explanations, those explanations did not excuse them from fully revealing their criminal history.  <u>Id.</u>

### 2.  The Appeals Court Decision

Following Reddicks' appeal of the trial justice's ruling allowing the Commonwealth to conduct a CORI inquiry on prospective jurors and the Commonwealth's peremptory challenges to jurors nos. 47 and 122, the Appeals Court issued a ruling affirming the trial justice's decisions.  <u>Id.</u> at *1.  Concerning the practice of running prospective jurors' CORI, the Appeals Court explained:

> The defendant, however, has failed to provide us with the factual basis or the constitutional standard to [determine that the practice of running prospective jurors' CORI is unconstitutional].  In supporting his claim, the defendant has done no more than argue that prospective jurors who are African-American are more likely to have a criminal record, and as such, are more likely to be excluded from jury service for that reason.  In doing so, he cites law review articles that assert this very proposition.  To be sure, the SJC, in recent decisions, has acknowledged that there is systemic racism present in the Commonwealth's criminal justice system that leads to disproportionate stops, frisks, searches, and in turn, arrests of people of color.  However, this observation, alone, does not provide us with a basis for declaring unconstitutional a practice specifically sanctioned by the SJC.

[11]

**A11**

To begin with, the defendant has not set forth the standard to be applied to his claim. The Commonwealth argues that, to show systemic discrimination in jury selection, the defendant must demonstrate that "(1) the group allegedly discriminated against is a 'distinctive' group in the community, (2) that the group is not fairly and reasonably represented in the venires in relation to its proportion of the community, and (3) that underrepresentation is due to systematic exclusion of the group in the jury selection process." We agree.

It is undisputed that African-American jurors are a distinctive group in the community, and specifically that the two jurors who were ultimately excluded in this case as a result [sic] the CORI inquiry were African-American. The defendant, however, has not provided us with sufficient information regarding the number of African-American jurors in his venire or in past Suffolk County venires. Nor is there any information in the record about the racial composition of the community from which the venire was drawn. Accordingly, the defendant has failed to carry his burden. While "[a] criminal defendant is constitutionally entitled to a jury selection process free of systematic discrimination against his grouping in the community," on this record, we cannot conclude that permitting the Commonwealth to check the CORI of prospective jurors is inconsistent with that right.

Moreover, we note that, contrary to the defendant's contentions, the CORI inquiry conducted by the Commonwealth did not result in the exclusion of jurors simply for having a criminal record. In fact, the judge did not excuse for cause any of the jurors who had a criminal record but failed to disclose it, and perhaps more significantly, the majority of the jurors who failed to make the requisite disclosure, all of whom were African-American, were seated on the jury without a voir dire being conducted. Only juror no. 47 and juror no. 122, who arguably had more significant charges on their record, were questioned by the judge about their lack of disclosure. Though the judge recognized that individuals with dismissed charges or sealed records often misinterpret their obligation with regard to disclosure, and found that both jurors' omissions were inadvertent, the prosecutor had an independent duty to ensure that "a qualified and impartial jury" was selected. A

[12]

**A12**

properly exercised peremptory challenge serves that
purpose.

Id. at *3-4 (alteration in original) (footnotes omitted)

(citations omitted).  Concerning the Commonwealth's two

peremptory challenges, the Appeals Court further explained:

> First, when the prosecutor exercised a peremptory
> challenge to juror no. 47, the defendant objected, but
> not on the ground of discriminatory exclusion.
> Rather, defense counsel stated that she was preserving
> her objection to the Commonwealth conducting a CORI
> inquiry in the first place.  At this point, no mention
> of discriminatory purpose had been made, and
> accordingly, the defendant's objection failed to
> "trigger an obligation on the judge's part to make a
> finding whether the presumption of propriety was
> rebutted."  While a trial judge may raise a Batson-
> Soares violation sua sponte, the judge here did not
> abuse her discretion in failing to do so where the
> challenge was in direct response to the juror failing
> to disclose her criminal record.
>    Secondly, after it was learned that juror no. 122
> had an extensive and undisclosed criminal record, the
> prosecutor exercised a peremptory challenge, and the
> defendant objected raising the issue of race for the
> first time.  However, in his objection, the defendant
> did not argue that the prosecutor was improperly
> challenging the juror based on the juror's race, nor
> did he specifically raise a Batson-Soares objection.
> Instead, he argued that the practice of checking
> prospective jurors' CORI, in Suffolk County, leads to
> the exclusion of African-American jurors from the
> jury.  It is the defendant's burden to not only state
> his objection to the Commonwealth's peremptory
> challenge, but also to state the grounds for that
> objection.  Although we agree with the defendant that
> he need not specifically cite Batson-Soares, a general
> objection is likely insufficient to preserve such a
> challenge.
>    Moreover, even if we were to determine that the
> defendant properly raised a Batson-Soares objection to
> the strike of prospective juror no. 122, a conclusion
> we do not reach, "[w]e will not overturn the judge's
> ruling if there is a sound basis in the record for her

[13]

**A13**

ruling."  The judge, in her response to defense
counsel's objection, implicitly determined that the
requisite showing of impropriety had not been made.
While rebutting the presumption of propriety is "not
an onerous task," the defendant must show "that the
totality of the relevant facts gives rise to an
inference of discriminatory purpose."

Here, the strike exercised by the Commonwealth
against juror no. 122 "appeared to be made for obvious
reasons that did not raise any inference of bias."
Initially, juror no. 122 was seated on the jury and
the Commonwealth expressed contentment with the juror.
It was only after the CORI inquiry revealed that juror
no. 122 failed to "faithfully disclose [his] criminal
history" that the Commonwealth exercised a peremptory
challenge.  The judge, accordingly, determined that
the Commonwealth was entitled to exercise such a
challenge at that point because the juror's CORI was
"a piece of information that was not available to [the
prosecutor] at the time of his vetting."  Though the
defendant is also African-American, there were, in
total, five African-American jurors seated on the
sixteen-person jury.  Based on the totality of the
facts and circumstances here, the judge did not abuse
her discretion in concluding that the defendant failed
to meet his burden of showing the impropriety of the
prosecutor's peremptory challenge to prospective juror
no. 122.

Id. at *5-6 (alteration in original) (footnotes omitted)

(citations omitted).

    3.   **The Appeals Court's Decision Was Not Based on an
         Unreasonable Application of Supreme Court
         Precedent.**

         a.   **The CORI Inquiry of Prospective Jurors**

              i. **Reddicks' Equal Protection Claim Under
                 the Fourteenth Amendment**

The Supreme Court has consistently reaffirmed the principle

that racial discrimination during jury selection violates the

Equal Protection Clause.  Batson v. Kentucky, 476 U.S. 79, 84

[14]

**A14**

(1986).  Purposeful racial discrimination denies a defendant the
protection that a jury trial is intended to secure and the right
to a jury "composed of the peers or equals of the person whose
rights it is selected or summoned to determine; that is, of his
neighbors, fellows, associates, persons having the same legal
status in society as that which he holds."  Id. at 86 (quoting
Strauder v. West Virginia, 100 U.S. 303, 308 (1879)).  Moreover,
racial discrimination does not only harm the defendant, but also
harms the excluded jurors and extends to "touch the entire
community."  Id. at 87.  It is relevant here to note that Batson
was decided in the context of a prosecutor's use of peremptory
challenges purposefully to discriminate against and exclude all
Black persons on the venire.  Id. at 100.  Later Supreme Court
cases applied and extended Batson to other forms of
discrimination.  J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127
(1994) (holding that intentional discrimination based on gender
in the use of peremptory strikes during jury selection violates
the Equal Protection Clause); Powers v. Ohio, 499 U.S. 400
(1991) (holding that defendant may object to race-based
exclusion of jurors through peremptory challenges, whether or
not defendant and excluded jurors share the same race); Flowers
v. Mississippi, 588 U.S. 284 (2019) (finding Batson violation
based on a pattern of strikes spanning several trials and other
circumstantial evidence).

[15]

**A15**

Reddicks argues that the Appeals Court imposed too high a burden when it assessed whether there was systemic discrimination against a protected class within the venire. Pet'r's Mem. 18-20.  Reddicks reaffirms that he claims a violation of the Equal Protection Clause based on the exclusion of two jurors and that the Appeals Court confused his claim with a claim alleging systemic exclusion of Black jurors.  Id. Therefore, Reddicks argues that the Appeals Court ought have applied the Batson test.  Id.

The habeas corpus standard commands this Court to look at the application of any clearly established Supreme Court precedent and to determine whether this application was reasonable.  Wright v. Van Patten, 552 U.S. 120, 126 (2008) (habeas relief pursuant to Section 2254(d)(1) not authorized where no Supreme Court cases gave a "clear answer to the question presented, let alone one in [the petitioner's] favor"); Carey v. Musladin, 549 U.S. 70, 77 (2006) ("Given the lack of holdings from this Court . . . it cannot be said that the state court 'unreasonably applied clearly established Federal law.'" (citation omitted)).

Here, Reddicks challenges the practice of running searches of prospective jurors' criminal records. Pet'r's Mem. 17-27. Batson and its progeny, however, address the discriminatory use of peremptory challenges, and do not address whether checking

[16]

**A16**

prospective jurors' criminal records during empanelment violates the Equal Protection Clause.  Batson and its progeny, therefore, cannot be applied as clearly established federal law governing this issue.  Wright, 552 U.S. at 125.  As no clearly established law exists on this issue, this Court necessarily defers to the Appeals Court's thorough decision.  Carey, 549 U.S. at 77.

### ii. Reddicks' Right to an Impartial Jury Claim Under the Sixth and Fourteenth Amendments

The Supreme Court has held that a trial by jury requires an impartial jury drawn from a representative cross-section of the community.  Ballard v. United States, 329 U.S. 187, 192 (1946) (citing Thiel v. Southern Pac. Co., 328 U.S. 217, 220 (1946)).  The Supreme Court has explained this to mean that "prospective jurors shall be selected by court officials without systematic and intentional exclusion of a group."  Id. at 192-93 (quoting Thiel, 328 U.S. at 220).  In both Ballard and Thiel, the Supreme Court reaffirmed this principle -- at the heart of the jury system -- in the context of the exclusion of a whole group from the jury panel.  Ballard, 329 U.S. at 193 ("[T]he purposeful and systematic exclusion of women from the panel in this case was a departure from the scheme of jury selection which Congress adopted . . . .");  Thiel, 328 U.S. at 224 ("[A] blanket exclusion of all daily wage earners, however well-intentioned and however justified by prior actions of trial judges, must be

counted among those tendencies which undermine and weaken the institution of jury trial.").

Here, Reddicks cites to Ballard and Thiel, arguing that the Commonwealth's practice violated Reddicks' right to an impartial jury of his peers. Pet'r's Mem. 26. Those cases are, however, distinguishable from Reddicks' case and cannot be considered as clearly established federal law for the purpose of the petition review. Indeed, Reddicks challenges the exclusion of two Black jurors, not the exclusion of all Black jurors from the panel. Pet'r's Mem. 17-23. Therefore, as no clearly established law exists on this issue, this Court again necessarily defers to the Appeals Court's decision. Carey, 549 U.S. at 77; Wright, 552 U.S. at 126.

### b. The Peremptory Challenges

In Batson, the Supreme Court strongly reaffirmed that "racial discrimination in jury selection offends the Equal Protection Clause" and that "[s]election procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." 476 U.S. at 85, 87. To make a claim of racial discrimination in the exercise of peremptory challenges, the defendant must first establish a prima facie case of purposeful discrimination. Id. at 92-97. When the defendant has made his prima facie case, the "burden shifts to the State to come forward with a neutral

explanation for challenging black jurors." Id. at 97. Finally, the court must decide whether the explanation is adequate or if it is a pretext for discrimination. Id. at 97-98.

The issue in this case is whether the Appeals Court's determination at the first step of Batson was reasonable. Under Batson, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." Johnson v. California, 545 U.S. 162, 168 (2005) (quoting Batson, 476 U.S. at 93-94). A defendant may do so by "offering a wide variety of evidence." Id. at 169. First, the defendant is "entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" Batson, 476 U.S. at 96 (quoting Avery v. State of Georgia, 345 U.S. 559, 562 (1953)).

In evaluating whether discrimination occurred, courts may consider a variety of factors including:

> statistical evidence about the prosecutor's use of
> peremptory strikes against black prospective jurors as
> compared to white prospective jurors in the case;
> evidence of a prosecutor's disparate questioning and
> investigation of black and white prospective jurors in
> the case; side-by-side comparisons of black
> prospective jurors who were struck and white
> prospective jurors who were not struck in the case; a
> prosecutor's misrepresentations of the record when
> defending the strikes during the Batson hearing;
> relevant history of the State's peremptory strikes in

past cases; or other relevant circumstances that bear
upon the issue of racial discrimination.

Flowers, 588 U.S. at 301-02.  The presence of an apparent race-
neutral reason for the strike is another important factor.
Sanchez v. Roden, 753 F.3d 279, 302 (1st Cir. 2014).  Courts
note that the composition of the jury itself is a factor that
should be assessed in context, and that the presence of one or
several Black jurors cannot be the only reason to allow a
Batson-challenged strike.  Id. at 299-300; Commonwealth v.
Jones, 477 Mass. 307, 325 (2017).  Courts around the country
have held that the fact that a juror has a criminal record or
failed to disclose it is an adequate race-neutral reason to
strike a prospective juror.  See United States v. Forrest, 402
F.3d 678, 687 (6th Cir. 2005) (holding that a record of criminal
charges and a negative reaction to being called as a juror are
adequate race-neutral reasons to excuse a juror); United States
v. Wilcox, 487 F.3d 1163, 1170 (8th Cir. 2007) (holding that a
prospective juror's criminal record is a proper race-neutral
reason for excusing him); Fields v. Thaler, 588 F.3d 270, 277
(5th Cir. 2009) (holding that a juror's failure to disclose his
own conviction for driving while under the influence is a race-
neutral reason to strike the juror); United States v. Brown, 553
F.3d 768, 796 (5th Cir. 2008) (observing that a prospective
juror's lack of veracity on his juror form as to a criminal

[20]

**A20**

conviction provides a clearly legitimate reason for the exercise of a peremptory challenge); Commonwealth v. Grier, 490 Mass. 455, 468 (2022) (affirming the trial judge's ruling excusing a juror who did not disclose multiple prior arrests and charges, which raised concerns as to his candor and level of comprehension).

Here, the Appeals Court rejected Reddicks' challenge to the peremptory strikes of juror no. 47 and juror no. 122, holding that no Batson objection was properly raised, and that, even if it was, the court did not abuse its discretion in determining that Reddicks had failed to raise an inference of discrimination, as required by the first step of the Batson test. Reddicks, 2021 WL 1307911, at *5-6. In reaching this conclusion, the Appeals Court considered that even the juror whose removal was challenged on race-based grounds was excused for the obvious reason that he had failed faithfully to disclose his criminal history on the jury questionnaire. Id. at *6. Both jurors provided explanations for their failure to disclose, and the trial justice credited those explanations as "absolutely reasonable" when declining to excuse the jurors for cause. Id. at *2-3. The fact that those jurors were not excused for cause, however, does not prevent the prosecution from exercising peremptory challenges against them. Flowers, 588 U.S. at 293

[21]

**A21**

(observing that "peremptory strikes traditionally may be used to remove any potential juror for any reason").

Moreover, the trial justice took into consideration that there were in total five Black jurors seated on the sixteen-person jury. Reddicks, 2021 WL 1307911, at *3, *6. Information regarding other potentially relevant factors is scarce: here, the record reflects that all six jurors who failed faithfully to disclose their criminal history were Black, and that two of them were excused by the Commonwealth. Reddicks, 2021 WL 1307911, at *2-3. The Appeals Court had no opportunity to engage in a side-by-side comparison between the jurors or a broader inquiry into discriminatory patterns, as it was presented with no information regarding the racial composition of the venire, of past venires, or of the community from which the venire was drawn. Id. at *4. By contrast, in Flowers the Supreme Court devoted a significant part of its analysis to the State's dramatically disparate questioning of Black and white prospective jurors, and to side-by-side comparisons of Black prospective jurors who were struck and white prospective jurors who were not struck. 588 U.S. at 307-15. There, the record was detailed enough that the Supreme Court was able to identify that the State had asked the five struck Black prospective jurors a total of 145 questions, against twelve questions asked to the eleven seated white jurors. Id. at 308. In addition, the Court was able to

[22]

**A22**

identify that while the State struck a Black prospective juror because she knew several defense witnesses, it did not strike three white prospective jurors who also knew many individuals involved in the case.  Id. at 312.  Those factors, along with the concerning history of the State's peremptory strikes in Flowers' first four trials and the fact that in the trial at issue the State had struck five of the six Black prospective jurors, led the Supreme Court to conclude that at least one of the peremptory strikes was motivated in substantial part by discriminatory intent.  Id. at 304-07.  See also Johnson, 545 U.S. at 173 (holding that a prima facie case under Batson had been established when "the inference of discrimination was sufficient to invoke a comment by the trial judge that 'we are very close,' and on review, the California Supreme Court acknowledged that 'it certainly looks suspicious that all three African-American prospective jurors were removed from the jury'"); Miller-El v. Dretke, 545 U.S. at 265-66 (holding that clear and convincing evidence showed that the prosecution's strikes were racially determined when: no facts other than race could explain the strikes; the prosecution used shuffling and disparate questioning during the selection; the prosecution expressed pretextual positions; and the prosecution's notes showed the use of a jury selection manual that included racial stereotypes); Sanchez, 753 F.3d at 304 (holding that an

[23]

inference of racial discrimination was raised when the side-by-side comparison of a white juror and a Black juror showed that the only significant difference between them was race, and the government struck only the Black juror).

For these reasons, this Court concludes that the Appeals Court's decision that Reddicks did not establish a prima facie case of discriminatory intent was not contrary to or an unreasonable application of clearly established federal law. This Court therefore denies Reddicks' petition for a writ of habeas corpus on this ground.

### C.    Reflections on **Batson** and Massachusetts Jury Practice

The text in Section II.B above satisfactorily sets forth the factual record, identifies the controlling legal principles, and properly applies them.  Yet, the result is far from satisfactory.

Why?

Because Massachusetts classifies a significant cohort of its citizens as "criminal offenders" even though none of them has ever been convicted of any crime.  What's more, this group is disproportionately composed of people of color.  Elizabeth Tsai Bishop et al., Harvard Law Sch., Crim. Just. Pol'y Program, Racial Disparities in the Massachusetts Criminal System 36 (2020), https://hls.harvard.edu/wp-content/uploads/2022/08/Massachusetts-Racial-Disparity-Report-

[24]

**A24**

FINAL.pdf.  Significantly, the Massachusetts Criminal Offender Record Information ("CORI") system includes arrest records along with records of conviction.  So it is that a citizen whose sole brush with the law is his arrest at a boisterous party which got out of hand, the charges later dropped, will continue to turn up as a "criminal offender" though he is, of course, presumed innocent of the dropped charges and his conduct is otherwise spotless.  One need to look no further to recognize the systemic racism which Chief Justice Budd lamented in Commonwealth v. Williams.  481 Mass. 443, 451 n.6 (2019) (Budd, J.).

Within our criminal justice system, explicit and implicit bias are both prevalent.  Willamette Univ. Coll. of L. Racial Just. Task Force, Remedying Batson's Failure to Address Unconscious Juror Bias in Oregon, 57 Willamette L. Rev. 85, 88 (2021).  Explicit bias is related to an individual's conscious beliefs.  Id.  Good examples of explicit bias are overt racism and racist comments.  Id.  Explicit and implicit bias are related but differ in that implicit bias is an unconscious bias that operates via attitudes or stereotypes that affect our understanding, decisions, and actions in an unconscious manner. Id. at 89. (citing Cheryl Statts et al., Kirwan Inst. for the Study of Race & Ethnicity, State of the Science: Implicit Bias Review 62 (2015)).

Implicit bias can affect every individual. Id. Because implicit bias is unconscious, it can occur without individuals realizing that it influences their thoughts and actions. Id. Research has established that people can hold implicit bias against their own group and against out-of-group members. Id. at 89-90. There is no exception for those directly involved in the criminal justice system, including judges, lawyers, and potential jurors. It therefore has affected the legal system in many ways and continues to do so today. Id. at 89-91; Melissa L. Breger, Making the Invisible Visible: Exploring Implicit Bias, Judicial Diversity, and the Bench Trial, 53 U. Rich. L. Rev. 1039, 1051-57 (2019).

The courts, and society in general, have been aware of the presence of explicit bias for years. Hon. Mark W. Bennett, Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge Dominated Voir Dire, the Failed Promise of Batson, and Proposed Solutions, 4 Harv. L. & Pol'y Rev. 149, 151 (2010). This assessment is heightened as studies on judicial decision-making have shown that judges rely heavily on their intuition when they decide problems, and often feel compelled to make decisions quickly. Id. at 156-57; L. Song Richardson, Systemic Triage: Implicit Racial Bias in the Criminal Courtroom, 126 Yale L.J. 862, 882 (2017) (reviewing Nicole Van Cleve, Crook County: Racism and Injustice in America's Largest Criminal Court

[26]

**A26**

(2016)).  There is some evidence that, with sufficient motivation, training, and information, however, judges and lawyers can compensate for the influence of those biases. Bennett, supra, at 157; Teyah S. Giannetta et al., Eliminating Bias in the Courtroom?: A Content Analysis of Judges' Opinions Regarding Implicit Bias Training, 54 U. Mem. L. Rev. 1, 28 (2023) ("[M]ost judges believed judicial education on implicit bias would aid courts in reducing implicit bias in the courtroom.").

An American citizen has the right to serve on a jury regardless of race, national origin, or gender.  See Strauder, 100 U.S. at 310; J.E.B., 511 U.S. at 146; Carter v. Jury Comm'n of Greene Cnty., 396 U.S. 320, 330 (1970).  Demographic characteristics have, however, for decades, been used by lawyers to shape juries to their advantage.  Anna Offit, Race-Conscious Jury Selection, 82 Ohio St. L.J. 201, 207 (2021).

Moreover, the history of opposition to Black citizens' service on juries is significant, long, and part of a larger history of systemic discrimination and violence against Blacks. Timothy J. Conklin, The End of Purposeful Discrimination: The Shift to an Objective Batson Standard, 63 B.C. L. Rev. 1037, 1047-49 (2022).  The Supreme Court first wrote on the issue in Strauder v. West Virginia, in which the Court held that race-based exclusions from jury service were unconstitutional and

[27]

**A27**

violated the Equal Protection Clause.  Id.; Strauder, 100 U.S. at 310.  More than fifty years after Strauder, discrimination persisted, and even though more Black citizens were called for jury service, the discriminatory use of peremptory challenges often prevented them from being seated as jurors.  Conklin, supra, at 1047-49.  In 1984, the Supreme Court established a more searching purposeful discrimination threshold.  Batson, 476 U.S. at 96-98.  The Court later extended the same prohibition to gender and sex-based peremptory challenges.  J.E.B., 511 U.S. at 146.

The Batson standard and its progeny, however, have not eradicated discrimination in juror selection.  Conklin, supra, at 1049.  Since its publication Batson has engendered many criticisms.  Id. at 1038-39.  While Justice Thurgood Marshall agreed with the majority holding, he argued in a concurring opinion that the three-step analysis had two core flaws: (1) a lawyer who intends to discriminate purposefully could easily provide an unprejudiced reason for the strike; and (2) a lawyer who does not intentionally discriminate may still be consciously, or unconsciously, motivated by discriminatory reasons.  Batson, 476 U.S. at 106 (Marshall, J., concurring).  Justice Marshall also argued that a judge's ruling on a peremptory challenge could similarly be distorted by "conscious or unconscious racism."  Id.  This led Justice Marshall to argue

[28]

**A28**

that peremptory challenges should be prohibited in criminal
trials.  Id.; Conklin, supra, at 1038.

Indeed, a major problem with the Batson standard is its
inability to address situations where honest, well-intentioned
lawyers and judges nevertheless discriminate because of the
influence of implicit bias.  See Antony Page, Batson's Blind-
Spot: Unconscious Stereotyping and the Peremptory Challenge, 85
B.U. L. Rev. 155, 179-80 (2005).  As explained earlier,
unconscious discrimination occurs almost inevitably due to the
normal cognitive processes that form stereotypes.  Id.  It
therefore seems that the more we know about implicit bias, and
how it is formed and maintained, the more the Batson standard
becomes irrelevant and ineffective.  See Bennett, supra, at 163-
65.  Indeed, as stated in Batson's majority opinion, peremptory
challenges constitute a jury selection practice that permits
"those to discriminate who are of a mind to discriminate."
Batson, 476 U.S. at 96 (quoting Avery, 345 U.S. at 562).

What to do?

- abolish peremptory challenges?

It is not surprising to note that the most recurring
solution proposed by scholars to Batson's flaws is the abolition
of peremptory challenges.  Bennett, supra, at 165-69; Conklin,
supra, at 1089-91; Page, supra, at 245-46; Willamette Univ.
Coll. of L. Racial Just. Task Force, supra, at 117-19; Colleen

P. Graffy, Harry M. Caldwell & Gautam K. Sood, First Twelve in the Box: Implicit Bias Driving the Preemptory Challenge to the Point of Extinction, 102 Or. L. Rev. 355, 400-403 (2024). Frankly, this is unlikely in view of the unanimous support of peremptory challenges by the trial bar nationwide.

- limit peremptory challenges?

Since it was decided, courts have continued to identify flaws in the application of Batson, Conklin, supra, at 1039 n.10, and since 2018 at least seven state supreme courts -- in California, Connecticut, Iowa, Massachusetts, New Jersey, Utah, and Washington -- and the Oregon Court of Appeals have considered implicit bias's effect on Batson's efficacy, id. at 1057 n.119. California, Connecticut, New Jersey, and Washington have commissioned working groups to study the role of implicit bias in jury selection, among other issues, and to recommend modifications to their states' Batson framework. Id. at 1058.

The Supreme Court of Washington took a significant step in 2018, adopting a new rule (General Rule 37 or GR37) and framework for discerning litigant bias.[1] Offit, supra, at 242.

---

[1] GR37 was the product of the collaborative labor of a workgroup convened by the Supreme Court of Washington, drawing on input from the American Civil Liberties Union (ACLU) and Washington Association of Prosecuting Attorneys (WAPA), among others. See Proposed New GR 37 - Jury Selection Workgroup: Final Report, Wash. State Cts. (2018),

Stating in a related case that the Batson protections are not sufficient to combat racial discrimination, State v. Jefferson, 192 Wash. 2d 225, 239 (2018), the court replaced the third part of the Batson test with a new inquiry into whether an "objective observer could view race or ethnicity as a factor in the use of the peremptory challenge," Wash. Ct. Gen. R. 37(e). The new rule adds that the objective observer would be someone aware that implicit, institutional, and unconscious biases, along with purposeful discrimination, result in the unfair exclusion of jurors. Wash. Ct. Gen. R. 37(f). Moreover, the new rule prohibits using certain characteristics and dispositions as neutral reasons for strikes because of their historical association with racial exclusion. Wash. Ct. Gen. R. 37(h). The new rule encourages parties to object to suspect peremptory strikes and to deliberate during voir dire. Offit, supra, at 244. As this rule implicitly recognizes, increased knowledge about implicit bias should push judges and lawyers to recognize and emphasize that various non-racial experiences and characteristics are inherently linked to race and therefore may constitute illegitimate grounds for striking and dismissing potential jurors. Id. at 246. Rule 37 includes, for example,

---

http://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20Orders/OrderNo25700-A-1221Workgroup.pdf.

having prior contact with law enforcement officers or living in a high-crime neighborhood as presumptively invalid reasons for a strike.[2]  Wash. Ct. Gen. R. 37(h).

Washington is not the only state to have reformed the Batson standard.  Willamette Univ. Coll. of L. Racial Just. Task Force, supra, at 104.  California adopted rule AB-3070, which specifies presumptively invalid reasons for excluding a juror. Id.  The presumption of invalidity may be overcome only if the party exercising the peremptory challenge can show by clear and convincing evidence that the rationale for using the challenge was unrelated to a prospective juror's membership in a protected class, and that the reasons articulated bear on the prospective juror's ability to be fair and impartial in the case.[3]  Id.

---

[2] A growing scholarly consensus asserts that making these experiences a legitimate basis for challenging jurors will result in discriminatory empanelment.  Offit, supra, at 246 (citing Anna Roberts, Casual Ostracism: Jury Exclusion on the Basis of Criminal Convictions, 98 Minn. L. Rev. 592, 602 (2013)).  Scholars also argue that emphasizing the influence of implicit bias and its consequences can push lawyers to avoid using this kind of information as part of their decision-making process during jury selection.  Id.

[3] It is, of course, a misnomer to call this a "presumption" of invalidity.  It is nothing of the sort.  Cf. Fed. R. Evid. 301; Peter Murray, Basic Federal Evidence 65–69 (2024).  This is not a true presumption at all; it is a powerful burden shifting rule.  Of course, the Supreme Court of California is in good company.  The so-called "presumption" of patent validity and "presumption" of presidential official acts work the same way and are similarly imprecise.

[32]

**A32**

The Supreme Judicial Court of Massachusetts took a similar step, recognizing the reality of Black citizens' disparate treatment in the criminal justice system when it stated that a "juror may not be excused for cause merely because he or she believes that African-American males receive disparate treatment in the criminal justice system." Williams, 481 Mass. at 451; see Offit, supra, at 243-44.

- Enhance the role of the trial judge?

The Supreme Court has recognized that "the job of enforcing Batson rests first and foremost with trial judges," who "possess the primary responsibility to enforce Batson and prevent racial discrimination from seeping into the jury selection process." Flowers, 588 U.S. at 302.

With this in mind, here's a protocol that I've learned to follow to address Batson's deficiencies.

Every time a peremptory challenge is exercised against a racial or ethnic minority, I ask, "Why?" Simply asking the question operates as a strong deterrent to any further such peremptory challenges against minorities in that particular case.

My experience has been that in about half of the cases counsel responds with an appropriate, case specific, race-neutral explanation. The Court then allows the challenge without comment.

[33]

**A33**

In a very few cases, counsel's demeanor coupled with a deer-in-the-headlights response so obviously masks a racial motivation that it becomes my duty to call it out on the record, disallow the challenge, and seat the juror.  After all, it is the juror's constitutional right to serve.  See Carter, 396 U.S. at 330; but see United States v. Bowles, 751 F.3d 35, 38 (1st Cir. 2014) (Souter, J.) (deeming it possible error to seat a juror based on sua sponte Batson inquiry without prior indication of discriminatory purpose or pattern[4]).

Most often, counsel's answer, while facially race-neutral, calls for further inquiry.  For example, suppose counsel challenges based on the fact that the juror works in the health care field and another unchallenged white juror does as well. That disparity needs to be followed up.  Usually the resultant colloquy results in the challenged juror being excused after I've expressed varying levels of skepticism or disapprobation. The practical result is that a juror -- perhaps impartial and fully qualified -- is excused.  Consistently, however, once the colloquy has occurred, no other potential juror from that racial

---

[4] One may question whether this reasoning remains sound now that Flowers has firmly reiterated that even a single discriminatory peremptory challenge in a criminal case violates the Equal Protection Clause.  588 U.S. at 300, 303. Nevertheless, this Court is mindful that it may apply Supreme Court precedent in the face of established First Circuit precedent only at its peril.  United States v. Moore-Bush, 963 F.3d 29, 36-37 (1st Cir. 2020).

[34]

or ethnic group will be challenged.  That's about the best I can
do to breathe life into Batson.

D.   **The Appeals Court's Decision Affirming the Denial of
     the Motion to Suppress Reddicks' Statements Was
     Reasonable.**

Reddicks argues that the Appeals Court erred in affirming
the trial justice's decision that several statements Reddicks
made during an interrogation were voluntary, when evidence
showed that the detectives used improper interrogation tactics.
Pet'r's Mem. 27-31.  The Commonwealth argues that the trial
justice correctly applied the voluntariness test and that, in
affirming the lower court's decision, the Appeals Court
considered all relevant factors.  Resp't's Mem. 34-38.

This Court concludes that Reddicks has not met his burden
of proving that the Appeals Court unreasonably applied clearly
established federal law.  Reddicks' petition on this second
ground is thus denied.

1.   **Background**

During an interview with two police detectives, Reddicks
made several statements which he later filed a motion to
suppress.  Reddicks, 2021 WL 1307911, at *2, *9-10.  The motion
was denied.  Id.  The trial justice found that the detectives
improperly conveyed to Reddicks that the interview was his only
opportunity to tell his side of the story, and improperly
suggested that his silence and denials could be used against him

[35]

**A35**

in court.  Id. at *10.  The trial justice, however, concluded that despite those improper tactics, Reddicks' statements were voluntary.  Id.

### 2.  The Appeals Court Decision

On appeal, Reddicks argued that the trial justice erred in denying the motion to suppress, arguing that considering the detectives' improper tactics, his statements were not voluntary. Id. at *9.  The Appeals Court affirmed the trial justice's denial of the motion to suppress, explaining:

> The defendant next claims that statements made by him during an interview with Detective Callahan and Sergeant Detective Daley were not voluntary and should have been suppressed.  "[I]n reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error but conduct an independent review of his ultimate findings and conclusions of law."  "[W]e 'review de novo any findings of the motion judge that were based entirely on the documentary evidence.'"
>
> "A voluntary statement is one that is 'the product of a rational intellect and a free will,' and not induced by physical or psychological coercion." "The test for voluntariness is 'whether, in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act.'"  "Factors relevant to the totality of the circumstances include whether promises or other inducements were made to the defendant by the police, as well as the defendant's age, education, and intelligence; experience with the criminal justice system; and his physical and mental condition, including whether the defendant was under the influence of drugs or alcohol."  In addition, "the 'use of false information by police during an interrogation is deceptive and is a relevant factor indicating a possibility that the defendant's statements were made involuntarily.'"

During the interview, Detective Callahan made statements to the defendant suggesting that the defendant's silence and denial could be used against him in court.  Specifically, Detective Callahan stated,

> "[T]his is a golden opportunity to give your version of the story because a year down the road, two years down the road we're going to be in a courtroom and I'm going to be sitting across from you, maybe both, or Rich Daley and if I'm there, it's me, I'm going to be looking at you.  I'm going to be sitting up there in a suit and tie.  I'm going to be looking at you, and I'm going to be saying I gave him, Sergeant Daley gave him, the opportunity to offer a reason as to why he did what he did, as opposed to not saying anything and me looking over at the jury as I'm looking back to you and everything that is going to come out of our investigation to the jury is going to be that Charles Reddicks is a cold-blooded killer.  That he robbed dude, shot dude over nothing.
> As opposed to you telling us, there's got to be a viable reason you do what you did.  You can -- Charles you can deny it all you want but you're there, we've got you there."

We agree with the motion judge that these statements were improper and were akin to the "now-or-never" language that was deemed impermissible in [Commonwealth v. Novo, 442 Mass. 262 (2004)].  In an attempt to get the defendant to confess his motive for the murder, the detective improperly suggested to the defendant that his failure to provide that information, and his denial of committing the murder, could be used against him in court, which is "plainly untrue."  We, however, also agree with the motion judge that the Commonwealth met its burden of proving that the defendant's statements were nevertheless voluntary.

On the date of the interview, the defendant was eighteen years old, and was a student at the Community Academy.  During the interview, the defendant admitted

[37]

**A37**

to knowing someone by the name of "Mario," admitted to
sending him text messages on the date of the homicide
to purchase marijuana, and further admitted to knowing
the difference between an automatic weapon and a
revolver.  However, none of the incriminating
statements made by the defendant were tied to "or
otherwise made in response to the pressure tactics
employed by the officers."  The improper statements
made by Detective Callahan were designed to elicit a
motive for the murder, or put another way, a
confession.  Throughout the interview, however, the
defendant never wavered in denying his involvement in
the murder.  In short, the detective's improper
tactics were unsuccessful.  As the motion judge
concluded, the defendant's behavior during the
interview reflects "a young man who made limited,
carefully chosen responses."  The defendant remained
calm during the interview, and acted in a manner that
revealed that he was not "at the mercy of the
interrogating officers."  Based on the totality of the
circumstances here, the defendant's will was not
overborne by the improper statements made by the
detective.  There was no error in the denial of the
motion to suppress.

Reddicks, 2021 WL 1307911, at *9-10 (footnotes omitted)

(citations omitted).

> ### 3. The Appeals Court's Decision Was Not Based on an Unreasonable Application of Supreme Court Precedent.

A statement or confession must be voluntary in order to be

admitted into evidence, pursuant to both the Fifth Amendment

protection against self-incrimination and the Due Process Clause

of the Fourteenth Amendment.  See Dickerson v. United States,

530 U.S. 428, 433 (2000).  In Miranda v. Arizona, the Supreme

Court strongly affirmed that the right against self-

incrimination applies during all in-custody interrogations, and

that to ensure that every accused person or suspect can properly exercise this privilege, the accused "must be adequately and effectively apprised of [his or her] rights and the exercise of those rights must be fully honored."  384 U.S. 436, 467 (1966). Moreover, no distinction should be drawn between inculpatory statements and exculpatory statements, as the latter are often used to impeach the defendant's testimony, demonstrate untruths, and prove guilt by implication.  Id. at 476-77.  Therefore, no incriminating statements made during in-custody interrogations can be used unless the defendant received a full warning of his rights, including the right to remain silent, and voluntarily and effectively waived those rights.  Id. at 475-77.  The "[o]pportunity to exercise these rights must be afforded to [the accused] throughout the interrogation."  Id. at 479.  The requirement that Miranda warnings be given does not, however, dispense with the voluntariness inquiry, which remains the "ultimate test."  Culombe v. Connecticut, 367 U.S. 568, 602 (1961); Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). The test is as follows:

> Is the confession the product of an essentially free and unconstrained choice by its maker?  If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

Culombe, 367 U.S. at 602.

The determination of voluntariness "depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing." Dickerson, 530 U.S. at 434 (alteration in original) (quoting Stein v. New York, 346 U.S. 156, 185 (1953)).  To make this determination, courts consider the totality of the circumstances, including the characteristics of the accused, such as age and education, and the details of the interrogation, such as the length of the detention, the repeated and prolonged nature of the questioning, and the use of physical force.  Schneckloth, 412 U.S. at 226.

Here, Reddicks challenges whether his will, in making the incriminating statements, was overborne by the detectives' improper statements during his interrogation or, in other words, whether Reddicks' statements were voluntary, considering the detectives' improper interrogation tactics.  The Appeals Court took into consideration the fact that Reddicks was eighteen years old on the date of the interview, that he was a high school student, and the substance of what he admitted to after the detective improperly used false statements.  Reddicks, 2021 WL 1307911, at *10.  In doing so, the Appeals Court correctly applied the test of voluntariness pursuant to applicable Supreme Court precedent.  Indeed, the detectives' statements were designed to elicit from Reddicks either a motive for the homicide or a confession.  Id.  Nevertheless, Reddicks continued

[40]

**A40**

to deny his involvement in the homicide altogether. Id.  Given
the need to balance the circumstances of pressure against the
power of resistance of the person confessing, the nature of
Reddicks' admission was relevant to the voluntariness analysis.
Dickerson, 530 U.S. at 434; see also Commonwealth v. Durand, 457
Mass. 574, 596-98 (2010).  Here, despite his age and the
detectives' improper statements, Reddicks continued to deny his
involvement in the homicide.  This shows Reddicks' resistance to
the detectives' improper tactics and allows this Court to
conclude that the Appeals Court's decision that Reddicks'
statements were voluntary was reasonable.

Reddicks has not met his burden of proving that the Appeals
Court unreasonably applied Supreme Court precedent, and his
petition for a writ of habeas corpus on this ground is thus
denied.

> **E.    The Appeals Court's Decision Affirming the Allowance
> of Evidence from Reddicks' Cell Phone Search and
> Barring Him from Challenging the Search Again Was
> Reasonable.**

Reddicks argues that the Appeals Court's decision that
Reddicks had the same opportunity and incentive to litigate a
motion to suppress evidence derived from a search of his cell
phone in a prior case was based on an unreasonable determination
of the facts.  Pet'r's Mem. 31-33.  Moreover, Reddicks argues
that the Appeals Court should have considered a change in the

relevant law between the motion to suppress in the prior case and the one in the present case, and that not doing so was contrary to established Supreme Court precedent. Id. at 33-38. The Commonwealth argues that this Court is barred from reviewing the claim because the Appeals Court rejected the claim on an independent state-law ground. Resp't's Mem. 39.

This Court concludes that Reddicks has not met his burden of proving that the Appeals Court unreasonably applied clearly established federal law or based its decision on an unreasonable determination of the facts. Reddicks' petition on this ground is thus denied.

### 1.   Background

On March 2, 2012, the police applied for a search warrant for Reddicks' cell phone in connection with an unrelated prior case. Suppl. Answer 267-71, ECF No. 11-1; Reddicks, 2021 WL 1307911, at *7. The police seized photographs of the defendant holding a silver revolver with a black handle. Reddicks, 2021 WL 1307911, at *7. Reddicks was charged with assault and battery with a dangerous weapon and carrying a firearm without a license. Id. at *6 n.15. Reddicks, arguing that the warrant to search his cell phone lacked the required probable cause, sought to suppress the evidence discovered on his phone. Suppl. Answer 240-45, 254-66. The motion to suppress was denied, Suppl. Answer 346-348, and Reddicks subsequently pleaded guilty to the

[42]

**A42**

charges in the case, Reddicks, 2021 WL 1307911, at *7.  Before
trial in the present case, Reddicks moved to exclude the
photographs seized during Reddicks' previous case.  Reddicks,
2021 WL 1307911, at *7; Suppl. Answer 158-170.  The trial
justice allowed the introduction of the photographs.  Suppl.
Answer 110.

### 2.    The Appeals Court Decision

On appeal, Reddicks argued that the search warrant
authorizing the search of his cell phone lacked the requisite
probable cause.  Reddicks, 2021 WL 1307911, at *7.  The
Commonwealth opposed Reddicks' claim, arguing that Reddicks was
collaterally estopped from re-litigating this issue because it
had already been resolved during the earlier assault and battery
case.  Id.  The Appeals Court affirmed the trial justice's
denial of Reddicks' motion to suppress, on the ground of
collateral estoppel.  Id.

### 3.    The Appeals Court's Affirmation of the Trial Justice's Ruling Was Based on a Reasonable Determination of the Facts and Reasonable Application of Supreme Court Precedent.

The independent and adequate state ground doctrine
precludes federal district courts from addressing state
prisoners' claims in habeas corpus actions when the state court
has resolved the claim on a state-law ground that is
"independent of the federal question and adequate to support the

[43]

**A43**

judgment." <u>Coleman</u> v. <u>Thompson</u>, 501 U.S. 722, 729-31 (1991).
Habeas relief will be barred as long as the state "regularly
follows the rule and has not waived it by relying on some other
ground," <u>Jewett</u> v. <u>Brady</u>, 634 F.3d 67, 76 (1st Cir. 2011), and
the rule is not applied so exorbitantly as effectively to defeat
review of federal claims, <u>Lee</u> v. <u>Kemna</u>, 534 U.S. 362, 376
(2002).

The doctrine of collateral estoppel provides that a
defendant is estopped from relitigating an issue when (1) the
issues in the two proceedings are identical; (2) the party
estopped had sufficient incentive to litigate the issue fully
and vigorously; (3) the party estopped was a party to the
previous litigation; (4) the applicable law is identical in both
proceedings; and (5) the first proceeding resulted in a final
judgment on the merits such that the defendant had sufficient
incentive and opportunity to appeal. <u>Commonwealth</u> v. <u>Cabrera</u>,
449 Mass. 825, 829 (2007). This doctrine is firmly established
in Massachusetts jurisprudence. <u>See</u> <u>Commonwealth</u> v. <u>Williams</u>,
431 Mass. 71, 74 (2000); <u>Commonwealth</u> v. <u>Ringuette</u>, 60 Mass.
App. Ct. 351, 356-57 (2004).

### a. Factual Reasonableness

Here, the Appeals Court concluded that Reddicks had
sufficient incentive to litigate the validity of the search
warrant due to the "nature of the significant charges against

[44]

**A44**

[him]." Reddicks, 2021 WL 1307911, at *7.  Reddicks was charged
in the prior case with assault and battery with a dangerous
weapon and carrying a firearm without a license.  Id. at *6
n.15.  In addition, the Appeals Court took into consideration
that Reddicks pleaded guilty in the prior case and, in doing so,
gave up his right to challenge the denial of his suppression
motion via trial and appeal, rendering the judgment final with
regard to the suppression issue.  Id. at *7.  In the present
case, Reddicks is serving a life sentence with the possibility
of parole after fifteen years for second-degree murder, a
concurrent sentence of five years to five-years-and-one-day for
carrying a firearm without a license, and an additional one-day
sentence for carrying a loaded firearm without a license.  Pet.;
Suppl. Answer 112-13.  This Court credits that there is a
significant difference between the nature of the charges in the
prior case and those in the present case.  This difference,
however, especially considering that Reddicks pled guilty in the
prior case, is not significant enough to conclude that the
Appeals Court applied the collateral estoppel doctrine
exorbitantly.

Therefore, this Court concludes that the Appeals Court's
decision was not based on an unreasonable determination of the
facts.

### b.    Reasonable Application of Supreme Court Precedent

Reddicks argues that after the initial motion to suppress was decided the law applicable to this issue significantly changed, such that the usual rules of collateral estoppel should not have applied. Pet'r's Mem. 35-36. Reddicks cites to three decisions that he argues significantly changed the probable cause requirement for a cell phone search warrant: Commonwealth v. White, 475 Mass. 583 (2016); Commonwealth v. Dorelas, 473 Mass. 496 (2016); and Riley v. California, 573 U.S. 373 (2014). Id. at 36. Reddicks moved to exclude the contents of the cell phone search conducted in the prior case on January 12, 2016, and the motion was denied on the same day. Suppl. Answer 110. White and Dorelas were decided by the Supreme Judicial Court after the trial justice considered Reddicks' motion in limine, and thus are not considered in this Court's analysis.[5]  White,

---

[5] Even though they were issued too late to be used in this case, the two Supreme Judicial Court cases cited by Reddicks did operate to work an important change in the determination of the probable cause requirement to search cell phones. The Supreme Judicial Court concluded that "probable cause to search or seize a person's cellular telephone may not be based solely on an officer's opinion that the device is likely to contain evidence of the crime under investigation," White, 475 Mass. at 584-85, but "[r]ather police first must obtain information that establishes the existence of some 'particularized evidence' related to the crime," id. at 589-90 (quoting Dorelas, 473 Mass. at 502). It is only when the police "believe, based on training or experience, that this 'particularized evidence' is likely to be found on the device in question, [that] they have probable cause to seize or search the device in pursuit of that

[46]

**A46**

475 Mass. at 583; Dorelas, 473 Mass. at 496.  In Riley, the
Supreme Court held that a cell phone seized incident to an
arrest generally may not be searched without first obtaining a
warrant, but did not deal with the probable cause standard or
particularity requirement applicable to the search warrant.
Riley, 573 U.S. at 385-86.  Therefore, Riley did not
significantly change the law governing a cell phone search
warrant's particularity requirement.  Reddicks thus fails to
show that the law governing the particularity requirement
applicable to cell phone search warrants changed significantly
between the denial of the motion in limine in the prior case and
the denial in the case under consideration here.

        This Court thus concludes that the Appeals Court correctly
applied the doctrine of collateral estoppel, and that the
independent and adequate state ground doctrine precludes it from
addressing Reddicks' Fourth and Fourteenth Amendments claims
concerning the search of his cell phone.

        This Court therefore denies Reddicks' petition for a writ
of habeas corpus on the ground that the search of his cell phone
violated his Fourth and Fourteenth Amendments rights.

---

evidence," White, 475 Mass. at 589 (citing Dorelas, 473 Mass. at
498, 503), and even then police must conduct their search with
"special care" to avoid searching files not related to the
warrant, Dorelas, 473 Mass. at 502.  Dorelas was decided on
January 14, 2016, a mere two days after Reddicks' motion in
limine was decided.  Dorelas, 473 Mass.

**F.** **The Appeals Court's Decision Affirming the Admission of Evidence Showing Prior Firearm Possession Was Reasonable.**

Reddicks attacks the admission of evidence showing his prior firearm possession as "only marginally relevant" and prejudicial, and argues that the Commonwealth improperly used the evidence during its closing argument to make a propensity argument in violation of the Due Process Clause. Pet'r's Mem. at 38-40. In addition, Reddicks asserts that this Court ought review the claim <u>de novo</u> because the Appeals Court did not make mention of the Commonwealth's allegedly improper comment in its closing. <u>Id.</u> at 40. The Commonwealth argues that it cannot be concluded from the mere absence of a mention of the allegedly problematic closing argument that the trial justice bypassed the federal due process issue entirely. Resp't's Mem. 49-53.

This Court concludes that Reddicks is not entitled to review de novo on this ground and that the Appeals Court's decision was reasonable.

### 1. Background

At trial, a friend of Reddicks testified that he observed him in the possession of a silver revolver with a black handle several months before the homicide. <u>Reddicks</u>, 2021 WL 1307911, at *6. Moreover, the Commonwealth introduced two photographs from Reddicks' phone picturing him holding a silver revolver with a black handle. <u>Id.</u>

[48]

**A48**

##### 2.    The Appeals Court Decision

Reddicks objected to the admission of this evidence at

trial, but the Appeals Court decided that the trial justice did

not err in admitting the evidence, explaining:

> [E]vidence that the defendant possessed a weapon
> prior to the commission of a weapons related crime may
> be admissible "to show that the defendant had access
> to or knowledge of firearms and bullets."  "The
> critical questions are whether the weapons-related
> evidence is relevant and, if so, whether the probative
> value of the evidence is substantially outweighed by
> its prejudicial effect."  The decision to admit such
> evidence is left to the sound discretion of the trial
> judge, and we will not disturb that decision "absent
> palpable error."
>
> Here, the Commonwealth introduced the two
> photographs of the defendant holding a silver
> revolver, as well as the testimony of Washington, to
> demonstrate that the defendant had access to firearms,
> and more specifically revolvers, just four months
> prior to the homicide.  There was testimony before the
> jury that, of the possible seventeen firearms that
> could have been used as the murder weapon, fifteen of
> those firearms were in fact revolvers.  Accordingly,
> the challenged firearm evidence was relevant, and we
> discern no abuse of discretion in the judge's
> determination that the probative value of this
> evidence was not substantially outweighed by its
> prejudicial effect.  Further, immediately following
> Washington's testimony, the judge provided a limiting
> instruction to the jury cautioning them that they were
> only permitted to consider the defendant's prior
> possession of a firearm as evidence that the defendant
> had "familiarity with or access to firearms."  The
> judge specifically instructed the jurors that there
> was no evidence that the firearm, testified to by
> Washington, was the same firearm used during the
> homicide.  We presume the jury followed these
> instructions, and perceive no prejudicial error by the
> admission of this evidence.

Id. at *6-7 (footnote omitted) (citations omitted).

[49]

3. **The Appeals Court's Affirmation of the Trial Justice's Ruling Was Based on a Reasonable Determination of the Facts and Reasonable Application of Supreme Court Precedent.**

"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington v. Richter, 562 U.S. 86, 99 (2011); see also Johnson v. Williams, 568 U.S. 289, 298-301 (2013). The presumption may be cast aside only when "the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court." Johnson, 568 U.S. at 303.

Here, the Commonwealth argues that by examining whether the admission of the evidence constituted a prejudicial error, the Appeals Court adjudicated the federal constitutional issue on the merits, therefore precluding review de novo. Resp't's Mem. 50-53; see Lyons v. Brady, 666 F.3d 51, 54 (1st Cir. 2012) (holding that the Supreme Judicial Court adjudicated the petitioner's federal due process claim on the merits, even though it did not elaborate its reasoning, because the constitutional argument was included in the petitioner's brief and the court concluded that there was no merit in the allegations of error). This Court agrees with the Commonwealth,

[50]

especially considering that the record does not present any evidence that the Appeals Court overlooked any federal claim.

As the Commonwealth points out, there is no clearly established Supreme Court precedent that addresses whether the admission of propensity evidence violates the Due Process Clause. Resp't's Mem. 53. At the same time, however, "[a] misbegotten evidentiary ruling that results in a fundamentally unfair trial may violate due process and, thus, ground federal habeas relief." Coningford v. Rhode Island, 640 F.3d 478, 484 (1st Cir. 2011).

Here, the Appeals Court's application of state evidence standards conformed with federal evidentiary principles, which in turn supports an inference that due process was honored. See Robertson v. Ryan, No. 16-CV-10609, 2019 WL 2501481, at *8 (D. Mass. June 17, 2019) (Burroughs, J.). In addition, the prosecutor referred to the testimony and the firearms photographs in his closing argument to argue to the jurors that they could infer that Reddicks had access to revolvers, which was likely the type of firearm used for the murder. Resp't's Answer, Ex. 10, Trial Tr. Morn. Day Nine 53-54, ECF No. 11-11.[6]

---

[6] The prosecutor's closing argument on this issue stated:

You know that Charles Reddicks had access to guns, and I'm saying guns with an S, plural, to make sure the Court Reporter gets it and you get it because

[51]

**A51**

This is consistent with the trial justice's limiting instruction that the evidence could only be considered as showing Reddicks' access to or familiarity with firearms.  <u>Reddicks</u>, 2021 WL 1307911, at *7.

Keeping in mind the strict habeas corpus review standard, this Court concludes that the Appeals Court's decision was not based on an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law.  This Court therefore denies Reddicks' petition for a writ of habeas corpus on the ground that the use of propensity evidence during closing arguments violated his federal due process rights.

---

you have evidence that he had access to firearms, multiple.

First, you've got Thomas Washington who testified from that witness stand that he saw Charles Reddicks a few months before the murder sticking a silver-colored revolver with a black handle inside of his waistband.

And, yes, it looks an awful lot like the picture we have here.  But here's the scariest part of the whole story.  We don't know if the gun that Thomas Washington saw him with in December is the same gun that's pictured here.

We don't know if it's the same gun that's pictured here.  All we know is that it's a silver revolver.  All of them are revolvers.

Trial Tr. Morn. Day Nine 53.

[52]

**A52**

**G.  The Appeals Court's Decision Affirming the Trial Court's Indirect Restriction of the Scope of Cross-Examination Was Reasonable.**

Reddicks argues that the Appeals Court's decision to uphold the trial justice's indirect restriction of his cross-examination of a witness was based on an unreasonable determination of the facts.  Pet'r's Mem. 40-42.  The Commonwealth opposes, and argues that the Appeals Court's decision was not contrary to or an unreasonable application of any clearly established Supreme Court precedent.  Resp't's Mem. 72-74.

This Court concludes that Reddicks has not met his burden of proving that the Appeals Court unreasonably applied clearly established federal law or based its decision on an unreasonable determination of the facts.  Reddicks' petition on this fifth ground is thus denied.

**1.  Background**

Prior to trial, Reddicks filed a motion in limine seeking to exclude the testimony of Thomas Washington ("Washington"), wherein he planned to testify that he had observed Reddicks commit a shooting with a weapon similar to the one used in the crime at issue in 2011.  Suppl. Answer 233-45.  The trial justice excluded any testimony relating to the commission of a prior shooting; however, Washington's observation of Reddicks in possession of a firearm was determined relevant and admissible.

[53]

Resp't's Resp., Ex. 1, Mots. Lim. Tr. 72-73, ECF No. 11-2.  The

trial justice warned Reddicks' defense counsel that if she

suggested on cross-examination that Washington was lying about

his observation, this could open the door to the introduction

into evidence of Reddicks' prior conviction.  Id. at 76-78;

Reddicks, 2021 WL 1307911, at *11.[7]  Defense counsel did not

cross-examine Washington.  Reddicks, 2021 WL 1307911, at *11.

### 2.  The Appeals Court Decision

On appeal, Reddicks argued that he was impermissibly

restricted from cross-examining Washington.  Id.  The Appeals

Court disagreed.  Id.

---

[7] The trial justice stated the following during the motion
in limine hearing:

> If you start attacking Mr. Washington's
> credibility and arguing to the Court, don't believe
> Mr. Washington, he's a liar, you know, my client never
> possessed that gun, that is a false narrative, because
> we all know that your client admitted to it.
> I'm just warning you, Ms. Scapicchio, I don't
> want to make any prejudgments here, the farther you go
> down that road, I think that that conviction could
> come in.  If you argue not to believe Mr. Washington,
> it strikes me as unfair to the Commonwealth not to
> introduce the conviction if that's the tack you're
> going to take.
> It's uncontroverted your client pled guilty to
> doing just that.  If you take the tack that Mr.
> Washington is a liar, don't believe him, your client's
> conviction -- you could be opening the door to the
> admission of your client's conviction.

Mots. Lim. Tr. 76-77.  Before Washington's examination, the
trial justice gave the same warning.  Resp't's Resp., Ex. 4,
Trial Tr. Day Three 222-24, ECF No. 11-5.

3.  **The Appeals Court's Affirmation of the Trial Justice's Ruling Was Based on a Reasonable Determination of the Facts and Reasonable Application of Supreme Court Precedent.**

a.  **Factual Reasonableness**

Here, the Appeals Court ruled that the trial justice "did not wholly restrict [Reddicks] from cross-examining [Washington]." Id.  Indeed, during the hearing on the motion in limine and before Washington's examination, the trial justice warned defense counsel that if she was to argue that Washington was lying and should not be believed, the prior conviction "could come in." Mots. Lim. Tr. 76-77.  The trial justice only used general terms and warned defense counsel against making the argument that Washington was lying. See Reddicks, 2021 WL 1307911, at *11.  The trial justice did not, however, state that "any avenue of questioning [would] have opened the door to the conviction and underlying facts," as Reddicks alleges. Pet'r's Mem. 41.

The Appeals Court's determination that the trial justice did not "wholly restrict" the possibility of cross-examination was therefore not based on an unreasonable determination of the facts, and this Court denies Reddicks' petition for a writ of habeas corpus on this ground.

[55]

**A55**

>     b.    Reasonable Application of Supreme Court
>           Precedent

The right to cross-examination is not an absolute right and may be restricted by trial judges for appropriate purposes. Delaware v. Fensterer, 474 U.S. 15, 20 (1985) ("[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent . . . ."); Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986) ("[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . [defense counsel's] cross-examination [for bias] based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.").

Here, had defense counsel made the argument that Washington's testimony was a lie, when the Court knew that Reddicks himself had pled guilty to the conduct alleged and the Commonwealth might then have introduced the conviction itself, it could have confused the issues for the jury. The trial justice's comments on the cross-examination were therefore not improper. Indeed, Reddicks' counsel was allowed to cross-examine Washington as she wished. Reddicks, 2021 WL 1307911, at *11. The trial justice only stated that, if Reddicks' counsel were to cross-examine on this issue, those questions might by

[56]

**A56**

their very nature open the door to evidence of Reddicks' prior conviction. Id. Reddicks' right to cross-examine was thus not significantly diminished.

Therefore, the Appeals Court's decision was not based on an unreasonable interpretation of Supreme Court precedent, and this Court denies Reddicks' petition for a writ of habeas corpus on this ground.

### H. The Appeals Court's Decision Affirming the Allowance of the Detective's Testimony Was Reasonable.

At trial, the Commonwealth introduced the testimony of Daley. Id. at *8. The Appeals Court described Daley's testimony as follows:

> At trial, Sergeant Detective Daley testified that, upon interviewing Parker on the date of the murder, he obtained a partial license plate number and a physical description of the defendant and the vehicle he was operating. Another detective conducted a query of the partial license plate number in the Registry of Motor Vehicles database and discovered that the vehicle was a 1992 blue Ford Escort registered to Catherine Reddicks at 116 Millet Street. The detective then conducted a search of that address in the Registry of Motor Vehicles database and learned that three males and three females were registered drivers at that location. At this point, Sergeant Detective Daley testified that only one of those registered drivers looked similar to the physical description provided by Parker; that individual was the defendant. Sergeant Detective Daley then identified the defendant in court. Contemporaneously, the judge instructed the jury that they were not to consider Sergeant Detective Daley's testimony as an identification of the defendant by Parker.

Id. (footnotes omitted).

[57]

### 1. The Appeals Court Decision

On appeal, Reddicks argued that Daley's testimony was improper lay opinion and constituted both an impermissible in-court identification of Reddicks and an improper identification of Reddicks' grandmother Catherine Reddicks' vehicle from surveillance footage presented at trial.  Id. at *2, *9.  The Appeals Court rejected those claims, explaining:

> The defendant is correct that "[m]aking a determination of the identity of a person from a photograph or video image is an expression of an opinion," and that such an identification by a lay witness is admissible only "when the witness possesses sufficiently relevant familiarity with the defendant that the jury cannot also possess."  However, the defendant is incorrect in his assertion that this is what occurred here.
>
> Sergeant Detective Daley was not shown a photograph of the defendant to identify at trial.  Rather, the detective merely testified that he obtained a photograph of the defendant from the Registry of Motor Vehicles database, and connected the defendant to the crime based on the physical description provided by Parker as well as the partial license plate number that led him to the defendant's address.  Contrary to the defendant's claim, at trial there was no lay opinion identification made by Sergeant Detective Daley based on a photograph of the defendant.
>
> Additionally, there was no "back-door" admission of an in-court identification of the defendant by Parker. . . .  Parker did not identify the defendant in-court, and Sergeant Detective Daley did not testify that she had.  Instead, Daley merely testified to the steps taken by the detectives during the course of the investigation that ultimately led them to narrow their focus on the defendant.  This was permissible in light of the fact that, in his defense, the defendant attacked the nature and quality of the police investigation. . . .

[58]

**A58**

> The defendant also claims that Sergeant Detective Daley improperly identified Catherine Reddicks's vehicle from Massachusetts Bay Transportation Authority surveillance footage presented at trial. However, contrary to the defendant's contentions, Sergeant Detective Daley did not identify at trial the blue Ford Escort from video surveillance footage. Daley testified only to the steps he took in locating the vehicle and connecting it to the crime based on the partial license plate number he obtained from a witness on the date of the murder.

Id. at *8-9 (footnotes omitted) (citations omitted).

**2. The Appeals Court's Affirmation of the Trial Justice's Ruling Was Based on a Reasonable Determination of the Facts and Reasonable Application of Supreme Court Precedent.**

**a. Factual Reasonableness**

As the Appeals Court observed, determining the identity of a person from a photograph or video image is an expression of an opinion. Id. at *8. A lay witness identification in this manner will therefore only be admissible when "the subject matter to which the testimony relates cannot be reproduced or described to the jury precisely as it appeared to the witness at the time," and "the witness possesses sufficiently relevant familiarity with the defendant that the jury cannot also possess." Commonwealth v. Wardsworth, 482 Mass. 454, 475 (2019) (citations omitted). The lay witness here, however, did not make such an identification.

Here, the Appeals Court pointed out that the prosecutor did not show Daley a photograph of Reddicks to identify during trial. Reddicks, 2021 WL 1307911, at *8. Rather, Daley's

[59]

**A59**

testimony was only a description of the steps that detectives had taken in their investigation.  Id. at *9.  Similarly, the Appeals Court observed that Daley did not identify in court Reddicks' grandmother's vehicle from the surveillance video introduced at trial, but rather described the steps that led him to the car in his investigation.  Id.  Moreover, the Appeals Court pointed out that Daley did not testify that Parker had identified Reddicks in court.  Id.  Finally, the trial justice gave a limiting instruction informing the jury that the testimony should not be construed as an identification of Reddicks by Parker.  Id. at *8.

The Appeals Court's rulings that Daley's testimony did not constitute a lay opinion identification, and that there was no "back-door" in-court identification of Reddicks by Parker or of Reddicks' grandmother's car, were reasonable interpretations of the factual record.

        **b.**    **Reasonable Application of Supreme Court Precedent**

Reddicks argues that the state court's decision allowing Daley's testimony violated his federal due process rights. Pet'r's Mem. 44.  Reddicks would be entitled to habeas corpus relief if he could show that the state court's evidentiary decisions rendered his trial fundamentally unfair.  Coningford, 640 F.3d at 484.

Here, the Appeals Court reasonably determined that Daley's testimony was relevant and admissible. See Reddicks, 2021 WL 1307911, at *8-9. Moreover, the jury received the trial justice's very clear instruction that the testimony was offered "for the limited purpose of helping [the jury] understand what steps the police took in this investigation and why they took them, and for no other reason." Resp't's Answer, Ex. 8, Trial Tr. Day Seven 97, ECF No. 11-9.

Therefore, even were this Court to hold that the challenged evidentiary decisions were erroneous, those decisions simply did not render Reddicks' trial fundamentally unfair in light of the record as a whole. This Court denies Reddicks' petition for a writ of habeas corpus on this ground.

**III. CONCLUSION**

Reddicks has not met his burden of proving that the Appeals Court's decision pertaining to any of his current claims involved an unreasonable application of Supreme Court precedent or was based on an unreasonable determination of the facts. Moreover, even had any of Reddicks' arguments passed muster, any error therefrom had no substantial and injurious effect or influence on the jury's verdict. For these reasons, Reddicks' petition for a writ of habeas corpus, ECF No. 1, is **DENIED** and this action is **DISMISSED**. The Clerk is directed to enter a separate order of dismissal and close the case.

Pursuant to 28 U.S.C. § 2253(c)(2) and Rule 11(a) of Rule Governing Section 2254 Cases in the United States District courts, a certificate of appealability is hereby issued as to all issues raised in the petition because Reddicks has made a substantial showing of the denial of a constitutional right inasmuch as "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" Slack v. McDaniel, 529 U.S. 473, 484 (2000) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[8]

---

[8] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents. Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 46 years.

[62]

**A62**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

<u>CHARLES REDDICKS</u>
**Petitioner**

V.

CIVIL ACTION
NO. <u>23cv10455-WGY</u>

<u>SUPERINTENDENT NELSON B. ALVES</u>
**Respondent**

**ORDER OF DISMISSAL**

**<u>YOUNG D.J.</u>,**

 In accordance with the Court's MEMORANDUM AND ORDER entered on December 4, 2024, Reddick's petition for writ of habeas corpus is DENIED and this action is hereby DISMISSED.

By the Court,

**/s/Matthew A. Paine**

Deputy Clerk

December 5, 2024

**A63**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Charles Reddicks,      )
     *Petitioner*      )
            )
v.      )      CIVIL ACTION # 23-cv-10455-WGY
            )
Nelson Alves, Superintendent      )
MCI Norfolk      )
     *Respondent*      )

## NOTICE OF APPEAL

Now comes the petitioner-defendant, Charles Reddicks, and respectfully notify this

Honorable Court of his intent to appeal this Court's denial of the petition under 28 U.S.C. §

2254. Reddicks intends to appeal all issues, which were granted a Certificate of Appealability on

December 4, 2024.

                           Respectfully Submitted,
                           CHARLES REDDICKS
                           By His Attorney

                           /s/ Rosemary Scapicchio
                           Rosemary Curran Scapicchio
                           107 Union Wharf
                           Boston, Massachusetts 02109
                           (617) 263-7400
                           Rosemary@Scapicchiolaw.com
                           BBO # 558312

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each party and upon any party appearing pro se by complying with this Court's directives on electronic filing.

Dated: December 20, 2024       Signed: /s/ Jillise McDonough