Case No. 25-1048

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

_____

CHARLES REDDICKS, Petitioner-Appellant,

v.

KENNETH LIZOTTE, Superintendent,
Respondent - Appellee.

_____

RECORD APPENDIX OF THE PETITIONER-APPELLANT

_____

Charles Reddicks
By his Attorneys
Rosemary Curran Scapicchio
Law Office of Rosemary C. Scapicchio
Court of Appeals No. 30306
Attorney for Petitioner-Appellant
107 Union Wharf
Boston, MA 02109
(617) 263-7400
Rosemary@scapicchiolaw.com

Jillise McDonough
Law Office of Rosemary C. Scapicchio
Court of Appeals No. 1202184
Attorney for Petitioner-Appellant
107 Union Wharf
Boston, MA 02109
(617) 263-7400
Jillise@scapicchiolaw.com

## RECORD APPENDIX TABLE OF CONTENTS

Notice of Appeal                                                                 R3

Trial Court Docket                                                               R4

Motion to Suppress Statements with Memorandum                                     R21

Commonwealth's Opposition to Motion to Suppress                                   R31

Supplemental Memorandum in Support of Motion to Suppress Statements               R38

Interview of Charles Reddicks                                                     R50

Motion in Limine to Prevent Commonwealth from Accessing CORI Records             R131
of Prospective Jurors

Motion in Limine to Exclude Allegations that Reddicks Possessed a Firearm         R137
on Previous Occasions

Motion in Limine to Prohibit a Commonwealth Witness from Giving                   R150
Unqualified Opinion Testimony from Surveillance Footage

Motion in Limine to Exclude Contents of the Cell Phone Search in                  R158
an Unrelated Case

Search Warrant for Phone in Unrelated Case                                       R171

Memorandum of Decision and Order on Motion to Suppress Statements                 R176

Trial Transcript Day 1, Motions and Impanelment                                  R185

Excerpt of Trial Transcript Day 2, Impanelment                                   R504

Excerpt of Trial Transcript Day 3, Thomas Washington Testimony                   R663

Excerpt of Trial Transcript Day 7, Sgt Det Daley                                 R689

Excerpt of Trial Transcript Day 9, Closing Arguments                             R814

Massachusetts Appeals Court Rule 23.0 Decision                                   R893

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                          SUPERIOR COURT
                                     DOCKET NO. SUCR2012-10714

COMMONWEALTH

v.

CHARLES REDDICKS

## NOTICE OF APPEAL

Now comes the defendant, Charles Reddicks, and notifies this Honorable Court of

his intent to appeal his January 28, 2016 convictions after a trial by jury, including

second-degree murder (lesser included), carrying a firearm without a license, carrying a

loaded firearm without a license, and leaving a firearm unattended, as well as the Court's

subsequent sentencing of Reddicks to life with the possibility of parole in 15 years to run

concurrently with a five year sentence for unlawful possession of a firearm followed by a

one day sentence for carrying a loaded firearm imposed on January 29, 2016.

Respectfully submitted,
CHARLES REDDICKS
By His Attorney,

Rosemary Curran Scapicchio
107 Union Wharf
Boston, MA 02109
(617) 263-7400
BBO# 558312

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the
attorney of record for each party and upon any party appearing pro se by first class mail,
postage prepaid or by hand delivery.

Dated: _2/11/2016_                    Signed: _Ayla M._

**R3**

## 1284CR10714 Commonwealth vs. Reddicks, Charles

- Case Type
- Indictment
- Case Status
- Open
- File Date
- 07/31/2012
- DCM Track:
- C - Most Complex
- Initiating Action:
- MURDER c265 §1
- Status Date:
- 07/31/2012
- Case Judge:
-
- Next Event:



**All Information** | **Party** | **Charge** | **Event** | **Tickler** | **Docket** | **Disposition**

### Party Information

**Commonwealth**
- Prosecutor

| Alias |
|---|

**Party Attorney**
- Attorney
- Campbell, Esq., Julianne
- Bar Code
- 691188
- Address
- Suffolk County District Attorney's Office
  One Bulfinch Place
  Boston, MA  02114
- Phone Number
- (617)619-4000
- Attorney
- Henning, Esq., Gregory D
- Bar Code
- 663189
- Address
- West Hill Associates
  141 Tremont St
  5th floor
  Boston, MA  02111
- Phone Number
- (617)299-6534
- Attorney
- Zanini, Esq., John P
- Bar Code
- 563839
- Address
- Office of the District Attorney Plymouth County
  166 Main St
  Brockton, MA  02301
- Phone Number
- (508)587-8000

**More Party Information**

**Reddicks, Charles**
- Defendant

| Alias |
|---|

**Party Attorney**
- Attorney
- Scapicchio, Esq., Rosemary C
- Bar Code
- 558312
- Address
- Law Office of Rosemary Scapicchio, Inc.
  107 Union Wharf
  Boston, MA  02109

Location X    Case Details - Massachusetts Trial Court

- Phone Number
- (617)263-7400

More Party Information

## Party Charge Information

- **Reddicks, Charles**
- - Defendant
  - Charge # 1 :
    - **265/1-0 - Felony**     MURDER c265 §1

- Original Charge
- 265/1-0 MURDER c265 §1 (Felony)
- Indicted Charge
- Amended Charge

  | **Charge Disposition** |
  | Disposition Date |
  | Disposition |
  | 01/28/2016 |
  | Guilty Verdict - Lesser Included |

- **Reddicks, Charles**
- - Defendant
  - Charge # 2 :
    - **265/17/A-0 - Felony**     ROBBERY, ARMED c265 §17

- Original Charge
- 265/17/A-0 ROBBERY, ARMED c265 §17 (Felony)
- Indicted Charge
- Amended Charge

  | **Charge Disposition** |
  | Disposition Date |
  | Disposition |
  | 01/28/2016 |
  | Not Guilty Verdict |

- **Reddicks, Charles**
- - Defendant
  - Charge # 3 :
    - **269/10/J-1 - Felony**     FIREARM, CARRY WITHOUT LICENSE c269 s.10(a)

- Original Charge
- 269/10/J-1 FIREARM, CARRY WITHOUT LICENSE c269 s.10(a) (Felony)
- Indicted Charge
- Amended Charge

  | **Charge Disposition** |
  | Disposition Date |
  | Disposition |
  | 01/28/2016 |
  | Guilty Verdict |

- **Reddicks, Charles**
- - Defendant
  - Charge # 4 :
    - **269/10/DD-0 - Felony**     FIREARM UNATTENDED c269 s.10(h)(2)

- Original Charge
- 269/10/DD-0 FIREARM UNATTENDED c269 s.10(h)(2) (Felony)
- Indicted Charge
- Amended Charge

  | **Charge Disposition** |
  | Disposition Date |
  | Disposition |
  | 01/28/2016 |
  | Guilty Verdict |
  | 01/29/2016 |
  | Dismissed |

- **Reddicks, Charles**
- - Defendant
  - Charge # 5 :
    - **269/10/EE-0 - Felony**     FIREARM, CARRY WITHOUT LICENSE LOADED c269 s.10(n)

**R.5**

- Original Charge
- 269/10/EE-0 FIREARM, CARRY WITHOUT LICENSE LOADED c269 s.10(n) (Felony)
- Indicted Charge
- Amended Charge

**Charge Disposition**
Disposition Date
Disposition
01/28/2016
Guilty Verdict

## Events

| Date | Session | Location | Type | Event Judge | Result |
|------|---------|----------|------|-------------|--------|
| 08/15/2012 09:30 AM | Magistrate's Session | | Arraignment | | Held as Scheduled |
| 09/18/2012 02:00 PM | Criminal 6 | | Pre-Trial Conference | | Held as Scheduled |
| 11/06/2012 02:00 PM | Criminal 6 | | Hearing | | Not Held |
| 01/24/2013 02:00 PM | Criminal 6 | | Pre-Trial Conference | | Not Held |
| 02/05/2013 02:00 PM | Criminal 6 | | Status Review | | Held as Scheduled |
| 02/21/2013 02:00 PM | Criminal 6 | | Status Review | | Not Held |
| 02/28/2013 02:00 PM | Criminal 6 | | Pre-Trial Conference | | Not Held |
| 03/07/2013 02:00 PM | Criminal 6 | | Pre-Trial Conference | | Not Held |
| 03/07/2013 02:00 PM | Criminal 6 | | Hearing | | Not Held |
| 03/19/2013 02:00 PM | Criminal 6 | | Pre-Trial Conference | | Not Held |
| 03/19/2013 02:00 PM | Criminal 7 | | Hearing | | Held as Scheduled |
| 05/09/2013 02:00 PM | Criminal 6 | | Pre-Trial Conference | | Not Held |
| 05/09/2013 02:30 PM | Criminal 1 | | Pre-Trial Conference | | Rescheduled |
| 06/20/2013 02:00 PM | Criminal 6 | | Hearing | | Rescheduled |
| 06/27/2013 02:00 PM | Criminal 6 | | Hearing | | Held as Scheduled |
| 07/30/2013 02:00 PM | Criminal 6 | | Hearing | | Held as Scheduled |
| 08/15/2013 02:00 PM | Criminal 6 | | Status Review | | Rescheduled |
| 09/03/2013 02:00 PM | Criminal 6 | | Status Review | | Rescheduled |
| 09/09/2013 09:00 AM | Criminal 6 | | Jury Trial | | Rescheduled |
| 09/26/2013 02:00 PM | Criminal 6 | | Status Review | | Held as Scheduled |
| 10/15/2013 09:00 AM | Criminal 1 | | Hearing | | Canceled |
| 10/17/2013 09:00 AM | Criminal 1 | | Hearing | | Held as Scheduled |

**R6**

Case Details - Massachusetts Trial Court

| Date | Session | Location | Type | Event Judge | Result |
|------|---------|----------|------|-------------|--------|
| 11/15/2013 09:00 AM | Criminal 1 | | Hearing | | Held as Scheduled |
| 12/03/2013 02:00 PM | Criminal 6 | | Status Review | | Not Held |
| 12/17/2013 02:00 PM | Criminal 6 | | Status Review | | Held as Scheduled |
| 01/28/2014 09:00 AM | Criminal 6 | | Trial Assignment Conference | | Not Held |
| 02/11/2014 09:00 AM | Criminal 6 | | Status Review | | Held as Scheduled |
| 02/11/2014 02:00 PM | Criminal 6 | | Trial Assignment Conference | | Rescheduled |
| 03/13/2014 02:00 PM | Criminal 6 | | Hearing RE: Discovery Motion(s) | | Held as Scheduled |
| 04/24/2014 02:00 PM | Criminal 6 | | Status Review | | Held as Scheduled |
| 05/14/2014 09:00 AM | Criminal 9 | | Evidentiary Hearing on Suppression | | Rescheduled |
| 06/25/2014 09:00 AM | Criminal 9 | | Non-Evidentiary Hearing on Suppression | | Not Held |
| 09/04/2014 09:00 AM | Criminal 9 | | Evidentiary Hearing on Suppression | | Held as Scheduled |
| 09/16/2014 02:00 PM | Criminal 9 | | Evidentiary Hearing on Suppression | | Held as Scheduled |
| 11/20/2014 02:00 PM | Criminal 6 | | Final Pre-Trial Conference | | Not Held |
| 11/20/2014 02:00 PM | Criminal 2 | | Final Pre-Trial Conference | | Held as Scheduled |
| 12/02/2014 09:00 AM | Criminal 6 | | Jury Trial | | Not Held |
| 12/02/2014 09:00 AM | Criminal 2 | | Jury Trial | | Canceled |
| 01/22/2015 02:00 PM | Criminal 6 | | Status Review | | Rescheduled |
| 02/12/2015 02:00 PM | Criminal 6 | | Status Review | | Rescheduled |
| 03/03/2015 02:00 PM | Criminal 6 | | Status Review | | Held as Scheduled |
| 04/06/2015 02:00 PM | Criminal 2 | | Final Pre-Trial Conference | | Rescheduled |
| 04/07/2015 02:00 PM | Criminal 6 | | Status Review | | Held as Scheduled |
| 05/11/2015 09:00 AM | Criminal 2 | | Jury Trial | | Rescheduled |
| 06/25/2015 02:00 PM | Criminal 6 | | Status Review | | Held as Scheduled |
| 07/14/2015 02:00 PM | Criminal 6 | | Final Pre-Trial Conference | | Canceled |
| 07/20/2015 09:00 AM | Criminal 6 | | Jury Trial | | Rescheduled |
| 11/02/2015 09:00 AM | Criminal 6 | | Status Review | | Held as Scheduled |
| 12/09/2015 09:00 AM | Criminal 6 | | Jury Trial | | Rescheduled |
| 12/15/2015 02:00 PM | Criminal 6 | BOS-9th FL, CR 906 (SC) | Conference to Review Status | | Held as Scheduled |
| 01/04/2016 09:00 AM | Criminal 7 | BOS-9th FL, CR 907 (SC) | Trial Assignment Conference | | Held as Scheduled |

**R7**

| Date | Session | Location | Type | Event Judge | Result |
|------|---------|----------|------|-------------|--------|
| 01/12/2016 11:00 AM | Criminal 7 | BOS-9th FL, CR 907 (SC) | Final Pre-Trial Conference | Giles, Hon. Linda E | Held as Scheduled |
| 01/13/2016 09:00 AM | Criminal 6 | BOS-9th FL, CR 906 (SC) | Trial Ready | | Canceled |
| 01/13/2016 09:00 AM | Criminal 7 | BOS-9th FL, CR 907 (SC) | Jury Trial | Giles, Hon. Linda E | Held as Scheduled |
| 01/13/2016 09:00 AM | Criminal 6 | BOS-9th FL, CR 906 (SC) | Jury Trial | Locke, Hon. Jeffrey A | Rescheduled |
| 01/14/2016 09:00 AM | Criminal 7 | BOS-9th FL, CR 907 (SC) | Jury Trial | Giles, Hon. Linda E | Held as Scheduled |
| 01/14/2016 09:00 AM | Criminal 7 | BOS-9th FL, CR 907 (SC) | Jury Trial | Giles, Hon. Linda E | Held as Scheduled |
| 01/15/2016 09:00 AM | Criminal 7 | BOS-9th FL, CR 907 (SC) | Jury Trial | Giles, Hon. Linda E | Held as Scheduled |
| 01/19/2016 09:00 AM | Criminal 7 | BOS-9th FL, CR 907 (SC) | Jury Trial | Giles, Hon. Linda E | Held as Scheduled |
| 01/20/2016 09:00 AM | Criminal 7 | BOS-9th FL, CR 907 (SC) | Jury Trial | Giles, Hon. Linda E | Held as Scheduled |
| 01/21/2016 09:00 AM | Criminal 7 | BOS-9th FL, CR 907 (SC) | Jury Trial | Giles, Hon. Linda E | Held as Scheduled |
| 01/22/2016 09:00 AM | Criminal 7 | BOS-9th FL, CR 907 (SC) | Jury Trial | Giles, Hon. Linda E | Held as Scheduled |
| 01/25/2016 09:00 AM | Criminal 7 | BOS-9th FL, CR 907 (SC) | Jury Trial | Giles, Hon. Linda E | Held as Scheduled |
| 01/26/2016 09:00 AM | Criminal 7 | BOS-9th FL, CR 907 (SC) | Jury Trial | Giles, Hon. Linda E | Held as Scheduled |
| 01/27/2016 09:00 AM | Criminal 7 | BOS-9th FL, CR 907 (SC) | Jury Trial | Giles, Hon. Linda E | Held as Scheduled |
| 01/28/2016 09:00 AM | Criminal 7 | BOS-9th FL, CR 907 (SC) | Jury Trial | Giles, Hon. Linda E | Held as Scheduled |
| 01/29/2016 09:00 AM | Criminal 7 | BOS-9th FL, CR 907 (SC) | Jury Trial | Giles, Hon. Linda E | Held as Scheduled |
| 02/08/2018 02:00 PM | Criminal 3 | | Motion Hearing | Giles, Hon. Linda E | Canceled |
| 03/28/2018 02:00 PM | Criminal 3 | | Motion Hearing | Giles, Hon. Linda E | Held as Scheduled |

## Ticklers

| Tickler | Start Date | Due Date | Days Due | Completed Date |
|---------|-----------|----------|----------|----------------|
| Pre-Trial Hearing | 08/15/2012 | 08/15/2012 | 0 | 01/29/2016 |
| Final Pre-Trial Conference | 08/15/2012 | 08/06/2013 | 356 | 01/29/2016 |
| Case Disposition | 08/15/2012 | 08/20/2013 | 370 | 01/29/2016 |

## Docket Information

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|-------------|-------------|---------------|--------------|
| 07/31/2012 | Indictment returned | 1 | Image |
| 07/31/2012 | MOTION by Commonwealth for arrest warrant to issue; filed & allowed. Roach, J | 2 | |
| 07/31/2012 | Warrant on indictment issued | | |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 07/31/2012 | Warrant was entered onto the Warrant Management System 7/31/2012 | | |
| 07/31/2012 | Order of notice of finding of murder indictment | | |
| 07/31/2012 | Notice & copy of indictment sent to Chief Justice & Atty General (copies in file - 8/1/12) | | |
| 07/31/2012 | Notice & copy of indictment & entry on docket faxed (verification in file - 8/1/12) and sent to Sheriff | | |
| 08/15/2012 | Defendant brought into court. Warrant Recalled. | | |
| 08/15/2012 | Order of notice of finding of murder indictment w/return of service endorsed thereon was received from the Sheriff and filed. | 3 | |
| 08/15/2012 | Appearance of Deft's Atty: Rosemary Curran Scapicchio | 3.1 | |
| 08/15/2012 | Deft arraigned before Court. Indictment Read as to Offense #001. | | |
| 08/15/2012 | RE Offense 1:Plea of not guilty | | |
| 08/15/2012 | Deft waives reading of indictment as to Offenses #002 thru 005. | | |
| 08/15/2012 | RE Offense 2:Plea of not guilty | | |
| 08/15/2012 | RE Offense 3:Plea of not guilty | | |
| 08/15/2012 | RE Offense 4:Plea of not guilty | | |
| 08/15/2012 | RE Offense 5:Plea of not guilty | | |
| 08/15/2012 | Mittimus without bail issued to Suffolk County Jail (Nashua Street) w/o/p. Mittimus issued. | | |
| 08/15/2012 | Commonwealth files statement of the case. | 4 | |
| 08/15/2012 | Commonwealth files notice of discovery I. | 5 | |
| 08/15/2012 | Assigned to track "C" see scheduling order | | |
| 08/15/2012 | Tracking deadlines Active since return date | | |
| 08/15/2012 | Case Tracking scheduling order mailed 8/15/2012 | | |
| 08/15/2012 | Continued to 9/18/2012 for hearing on PTC | | |
| 08/15/2012 | Continued to 9/3/2013 for hearing on FPTH | | |
| 08/15/2012 | Continued to 9/9/2013 for hearing on PTD. Wong, Mag - D. Mulhern, ADA - ERD/JAVS - R. Scapicchio, Attorney | | |
| 08/15/2012 | Warrant canceled on the Warrant Management System 8/15/2012 | | |
| 09/18/2012 | Defendant not present | | |
| 09/18/2012 | Commonwealth files notice of discovery II | 6 | |
| 09/18/2012 | Commonwealth files motion for protective order | 7 | |
| 09/18/2012 | Continued to 11/6/2012 for hearing on protective order.Jail list (Jeffrey Locke, Justice) D.Mulhern,ADA; R.Scappichio,Atty; M.Wrighton,court reporter | | |
| 10/18/2012 | Defendant's General Motion for Discovery filed. | 8 | |
| 11/02/2012 | Defendant's Motion and Memorandum in Opposition to the Commonwealth's Unsupported Motion for a Protective Order | 9 | |
| 12/18/2012 | Commonwealth files: Notice of Discovery IV | 10 | |
| 12/19/2012 | Defendant's Ex Parte Motion for An Adolescent Brain Development Expert filed. | 11 | |
| 01/02/2013 | The Court, Locke, RAJ. allows Paper #11 in part as endorsed. Copy given in hand to attorney on 1/3/13. | | |
| 02/05/2013 | Defendant present, transported, but Attorney Scappichio waives her client's presence. Status conference held before Locke, RAJ. Parties report they are still negotiating the protective order. Case continued until 2/21/2013 by agreement for status re: protective order and filing of PTC report. (Jail List) Locke, RAJ - D. Mulhern, ADA - R. LeRoux, Court Reporter - R. Scappichio, Attorney | | |

**R9**

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 02/28/2013 | Defendant present, brought into court. Event not held. ADA Mulhern unavailable. Case continued until 3/7/2013 at the request of the Commonwealth for hearing on protective order. (Jail List) Locke, RAJ - I. Polumbaum, ADA for D. Mulhern, ADA - N. King, Court Reporter - R. Scapicchio, Attorney (Notice sent to D. Mulhern, ADA; copy in file) | | |
| 03/19/2013 | Court case received in VII session | | |
| 03/19/2013 | Defendant brought into court. Hearing re: motion held. Giles, J. - J. Janezic for D. Mulhearn, ADA's - D. Cercone, C./R. - R. Scapicchio, Atty | | |
| 03/19/2013 | Deft files motion for motion for transcriptionist with affidavit in support thereof | 12 | |
| 03/19/2013 | MOTION (P#12) after hearing, allowed (Linda E. Giles, Justice) | | |
| 03/20/2013 | ORDERED: re: protective order, filed. Giles, J. | 13 | |
| 03/27/2013 | Defendant's Motion for Grand Jury Discovery or in the Alternative Motion to Dismiss filed. | 14 | |
| 05/08/2013 | Commonwealth files: Opposition to the Defendant's Motion for Grand Jury Discovery or to Dismiss | 15 | |
| 05/09/2013 | Defendant not present, case continued until 6/20/2013 at the request of the deft for motions in the 6th Criminal Session (Ctrm 906) at 2:00 PM. (Jail List) Locke, RAJ - R. Scapicchio, Attorney | | |
| 06/07/2013 | Commonwealth files: Notice of Discovery V | 16 | |
| 06/18/2013 | Defendant's Response to Commonwealth's Opposition to His Motion for Grand Jury Discovery or in the Alternative Motion to Dismiss filed. | 17 | |
| 06/27/2013 | Defendant brought into court. | | |
| 06/27/2013 | After hearing Motion P#14 taken under advisement. | | |
| 06/27/2013 | Continued by agreement to 7/30/2013 for hearing on Discovery re: Transcript. Ball, J. - D. Mulhern, ADA- H. Sachese, ADA - R. Scapicchio, Attorney - N. King, Court Reporter. | | |
| 06/28/2013 | The Court, Ball, J. allows Paper #14 in part as endorsed. Ball, J. (Copy of endorsement mailed to parties). | | |
| 07/30/2013 | Defendant not present in court. Status Conference Held before Connors, J. | | |
| 07/30/2013 | The Commonwealth reports that it will appeal Judge Ball's order on Paper # 14. | | |
| 07/30/2013 | Continued to 08/15/2013 by agreement for status re: Appeal (Jail List). at 02:00pm. Connors, J. - D. Mulhern, ADA- ADA - R. Scapicchio, Attorney. | | |
| 08/29/2013 | Notice of docket entry received from the SJC: JUDGEMENT: denying relief under c. 211, s. 3, for reasons set forth in accompanying Memorandu. (Duffly, J) | 18 | |
| 09/03/2013 | Defendant not present. Continued to 9/26/13 for status request of defendant for status and trial assignment. Connors, J. | | |
| 09/09/2013 | Notice of assembly of the record on appeal received from the SJC. | 19 | |
| 09/09/2013 | Notice received from the SJC (see endorsed motion) | 20 | |
| 09/26/2013 | Defendant brought into court. | | |
| 09/26/2013 | Commonwealth files: Notice of compliance re: Grand Jury instructions. | 21 | |
| 09/26/2013 | Continued to 10/15/2013 for hearing re: Grand Jury instruction before Ball, J. at 9:30am in (First Session, CtRm.704). (Thomas A. Connors, Justice) - D. Mulhern, ADA - R. Scapicchio, Attorney - R. LeRoux, Court Reporter | | |
| 10/11/2013 | Defendant not present, (cancel 10/15/13 event) Case continued until 10/17/2013 at the request of the deft for hearing re: P#21 motion before Ball, J. Roach, J- D. Mulhern, ADA (via telephone) | | |
| 10/17/2013 | Defendant present, brought into court. Case continued until 11/15/2013 by agreement for status re: P#21 re: discovery. Ball, J- I. Polumbaum, ADA for D. Mulhern, ADA - ERD - R. Scapicchio, Atty | | |
| 10/28/2013 | Commonwealth files: Notice of Discovery VI | 22 | |

R.10

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 11/15/2013 | Defendant brought into court. Continued to 12/03/2013 by agreement. Hearing Re: Status at 2pm (VI, 906) Habeas Corpus MCI Cedar Junction for 12/03/2013. Ball, J- I. Polumbaum, ADA for D. Mulhern, ADA - ERD - R. Scapicchio, Atty | | |
| 11/22/2013 | Order on Deft's Request for Grand Jury Instruction, filed. (Ball, J.) (Notice sent & Copy Enclosed). | 23 | |
| 12/17/2013 | Defendant not in Court, Presence waived. Status Conference held before Lock, RAJ. | | |
| 12/17/2013 | Commonwealth files Motion to reconsider or, in the Alternative, Motion to vacate Re: Grand Jury Instructions (Copy sent to Ball, J.) | 24 | |
| 12/17/2013 | Continued until 1/28/2014 at 2:00pm by agreement for Trial Assignment. Locke-RAJ, D. Mulher-DA, R. Scapicchio-Atty N. King-CR. (Habe Issued) | | |
| 12/18/2013 | ORDERED on Commonwealth's Motion to reconsider or, in the Alternative, Motion to Vacate Re: Grand Jury Instructions. (Carol S. Ball, Justice) Filed | 25 | |
| 12/18/2013 | As to paper #23 Amended, see Order Filed this Day (Notice sent to DA Polumbuam and Atty. R. Scapicchio) | | |
| 02/10/2014 | Commonwealth files: Notice of Discovery VII | 27 | |
| 02/11/2014 | Defendant brought into court. Status conference held before Kottmyer, J. | | |
| 02/11/2014 | Commonwealth files Second notice of compliance re grand jury instructions | 26 | |
| 02/11/2014 | Case continued until 3/13/2014 at 2pm by agreement for appearance of commonwealths' counsel and status re discovery. Kottmyer, J. - D. Mulhren, ADA. - P. Pietrella, CR. - R. Scapicchio, Atty. | | |
| 02/11/2014 | Commonwealth's Affidavit in Support of Motion for a Protective Order filed. | 28 | |
| 03/13/2014 | Defendant not present, presence waived. ADA J. Janezic appears for the Commonwealth. Scheduling conference held before Kottmyer, J. Case continued until 11/20/2014 by agreement for FPTC at 2 PM and 12/2/2014 for trial. Continued to 5/14/2014 by agreement for hearing on motion to suppress in the 9th Criminal Session (Ctrm 713) Motion to be file by 4/25/2014. Kottmyer, J - J. Janezic, ADA - N. King, Court Reporter - R. Scapicchio, Atty | | |
| 04/24/2014 | Defendant not in Court, status re: filing deadline held. | | |
| 04/24/2014 | Continued by agreement to 6/25/14 for hrg re: Motion to Suppress (IX criminal ctrm 713) - Kottmyer, J. - J.Janezic, ADA - N.King, CR - R. Scapicchio, Atty | | |
| 05/12/2014 | Deft files Motion to Suppress Statements, w/Affidavit and Memorandum in support of | 29 | |
| 06/23/2014 | Defendant not present, continued at request of Commonwealth until 9/4/2014 for Hearin g re: Motion to Suppress. Krupp, J. - J. Janezic, ADA - R. Scapicchio, Attorney. | | |
| 09/04/2014 | Defendant brought into court. | | |
| 09/04/2014 | Commonwealth files Memorandum in Opposition to the Defendant's Motion to Suppress Statements | 30 | |
| 09/04/2014 | After hearing, Continued to 9/16/14 for Further Hearing on Motion to Suppress. Hely, J. - J. Janezic, ADA - R. Scapicchio, Attorney - Javs. | | |
| 09/16/2014 | Defendant brought into court. | | |
| 09/16/2014 | Deft files Supplemental Memorandum in Support of Motion to Suppress Statements. | 31 | |
| 09/16/2014 | After hearing Motion to Suppress P#29, taken under advisement. Case has next Court date of 11/20/14 for FPTC Courtroom 906. Hely, J. - J. Janezic, ADA - R. Scapicchio, Attorney - Javs. | | |
| 10/29/2014 | MEMORANDUM of DECISION & ORDER: on Motion to Suppress Statements, filed Hely, J. ( Copies mailed to both parties 10/29/14 ). | 32 | |
| 10/29/2014 | MOTION to Suppress Statements (P#29) denied. Hely, J. | | |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 11/10/2014 | NOTICE of APPEAL FILED by Charles Reddicks | 33 | |
| 11/20/2014 | Defendant not in Court. | | |
| 11/20/2014 | Commonwealth & Defendant's JOINT Motion to Continue Trial. | 34 | |
| 11/20/2014 | MOTION (P#34) allowed (Jeffrey A. Locke, RAJ). | | |
| 11/20/2014 | Continued until 1/22/2015 by agreement ; Status re: Appeal (Ctrm 906 @ 2:00pm), FPTH 04/06/2015 @ 2:00pm and Jury Trial 05/11/2015 (Ctrm 806). Locke-RAJ. - J. Janezic, ADA. - R. Scapicchio, Atty. - W. Greenlaw, CR. | | |
| 12/08/2014 | Deft files Motion to Extend Time to File Application for Leave to Appeal the Denial of the Defendant's Motion to Suppress Statements. (Locke, RAJ notified) | 35 | |
| 01/20/2015 | Deft files Assented to Motion and to Advance and Continue. | 36 | |
| 01/22/2015 | Defendant not present, status hearing not held before Locke, RAJ | | |
| 01/22/2015 | Case continued until 2/12/2015 by agreement for status re appeal(906, 2pm, deft excused, Atty Scapichio notified). | | |
| 01/22/2015 | MOTION (P#36) allowed. Locke, RAJ. - J. Janezic, ADA. - N.McCann, C.R. | | |
| 01/23/2015 | Deft files Motion to withdraw defendant's motion to extend time to file application for leave to appeal the denial of defendant's motion to suppress statements | 37 | |
| 02/12/2015 | Defendant not present(presence waived). Status review not held before Locke, RAJ | | |
| 02/12/2015 | Continued to 3/3/2015 by agreement for status re appeal(906, 2pm, parties notified). Locke, RAJ. - J. Janezic, ADA. - R. Scappichio, Atty. - JAVS. | | |
| 02/23/2015 | The SJC files a notice of docket entry. The SJC allows the deft's request to extend time for filing his application for leave to pursue an interlocutory appeal. The deft's application for leave to pirsue an interlocutory appeal is denied. | 38 | |
| 03/03/2015 | Defendant not present. Status review held before Locke, RAJ | | |
| 03/03/2015 | Case remains on track For FPTH 4/6/15 and 5/11/15 for trial in 806(habes issued). Locke, RAJ. - J Janezic, ADA. - R. Scapicchio, Atty. - JAVS. | | |
| 04/03/2015 | Defendant not present. | | |
| 04/03/2015 | Recsheduled by order of the Court to April 7, 2015 at 2PM in Sixth Session (Rm 906). This date selected after consultation with Office of the Defense Counsel and ADA Janezic. | | |
| 04/03/2015 | Habeas corpus for Deft at Souza-Baranowski Correctional Center, Gaziano, J. | | |
| 04/07/2015 | Defendant not present, present in lock-up. FPTC not held, status conference held before Locke, RAJ | | |
| 04/07/2015 | Continued to 7/14/2015 by agreement re FPT(906, 2pm, habe issued) | | |
| 04/07/2015 | Continued to 7/20/2015 by agreement re trial(906, habe needed to Souza). Locke, RAJ. - J. Janezic, ADA. - R. Scapicchio, Atty. - N. King, CR. | | |
| 06/25/2015 | Defendant not in court, presence waived, hrg. re: Motion to Continue held before Locke, RAJ. | | |
| 06/25/2015 | Commonwealth files Motion to Continue | 39 | |
| 06/25/2015 | After hearing P# 39 allowed Locke,RAJ | | |
| 06/25/2015 | Continued to 11/2/2015 by agreement for Status Conference at 9AM (Ctrm 906) Locke, RAJ - J. Janezic, ADA -R. Seapicchio, Atty -L. Beers 704 JAVS | | |
| 06/25/2015 | Continued to 12/9/2015 by agreement re: Trial (Ctrm 906 ) Habe to issue to Souza-Baranowski Correcetional Center for 11/2/2015 and 12/9/2015 events. Locke, RAJ - J. Janezic, ADA -R. Scapicchio, Atty - L. Beers 704 JAVS | | |
| 11/02/2015 | Habeas Corpus for defendant issued to Souza Baranowski Correctional Center returnable for 12/09/2015 09:00 AM Jury Trial. HABE CANCELLED | | |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 11/02/2015 | Event Result:<br>The following event: Status Review scheduled for 11/02/2015 09:00 AM has been resulted as follows:<br>Result: Held as Scheduled | | |
| 11/02/2015 | Event Result:<br>The following event: Jury Trial scheduled for 12/09/2015 09:00 AM has been resulted as follows:<br>Result: Rescheduled to 1/13/16 due to Comm's trial calender(See gennerally record of 10/28/15 in Comm v Yerri Perez 13-11007).<br>Reason: Request of Commonwealth<br>Locke, RAJ. | | |
| 11/19/2015 | Defendant 's   Motion for Discovery relating to the surveilance system at Forest Hills MBTA station filed | 40 | |
| 12/15/2015 | Not in court<br>Continued to 1/4/16 by order of court status conference re trial date and request for remand(907). Habe issued.<br>Locke, RAJ. - G. Henning/J. Janezic, ADA. - R. Scapicchio, Atty. | | |
| 12/21/2015 | Habeas Corpus for defendant issued to Souza Baranowski Correctional Center returnable for 01/04/2016 09:00 AM Trial Assignment Conference. | | |
| 01/04/2016 | Commonwealth 's   Motion for habeas corpus to issue. Allowed Giles,J | 41 | |
| 01/04/2016 | Commonwealth 's   Motion in limine for demonstrative maps,charts, and photographs | 42 | |
| 01/04/2016 | Commonwealth 's   Motion in limine to admit statements of the Defendant | 43 | |
| 01/04/2016 | Commonwealth 's   Motion in limine to admit certain evidence of prior and subsequent acts of the Defendant to demonstrate access to firearms and motive | 44 | |
| 01/04/2016 | Commonwealth 's   Motion for Judicial inquiry into criminal history records of potential trial jurors..... | 45 | |
| 01/04/2016 | Event Result:<br>The following event: Jury Trial scheduled for 01/13/2016 09:00 AM has been resulted as follows:<br>Result: Rescheduled<br>Reason: Transferred to another session | | |
| 01/04/2016 | Event Result:DEft brought into court<br>The following event: Trial Assignment Conference scheduled for 01/04/2016 09:00 AM has been resulted as follows:<br>Result: Held as Scheduled Continued to 1/12/16 for FPTH at 11:00am Jail list.Deft remanded to NSJ for trial. Giles,J;G.Henning,ADA; R.Scappichio,Atty; N.McCann,court reporter | | |
| 01/05/2016 | Commonwealth 's   Motion to Rule 17 motion for documents and materials from Suffolk County Sheriff's Dept.,Allowed as endorsed Giles,JOrdered | 46 | |
| 01/05/2016 | Commonwealth 's   Certificate of compliance regarding pre trial discovery | 47 | |
| 01/12/2016 | Event Result: Defendant brought into court - Hearing on Motions in Limine held<br><br>The following event: Final Pre-Trial Conference scheduled for 01/12/2016 11:00 AM has been resulted as follows:<br><br>Result: Held as Scheduled - GIles, J.  G. Henning, ADA -  R. Scappichio & Jilanese McDonough, Attys - N. McCann, C/R. | | |
| 01/12/2016 | Commonwealth Gregory D. Henning, Esq.'s   Motion in limine to preclude introduction of any self-serving statements made by defendant | 48 | |
| 01/12/2016 | Endorsement on Motion in limine to admit statements of the defendant, (#43.0):  ALLOWED as endorsed.  Giles, J. | | |
| 01/12/2016 | Endorsement on Motion in limine regarding demonstrative maps, charts, and photographs, (#42.0):  ALLOWED<br>as endorsed, Giles, J | | |
| 01/12/2016 | Endorsement on Motion in limine to preclude introduction of any self-serving statements made by defendant, (#48.0):  ALLOWED | | |
| 01/12/2016 | Commonwealth Gregory D. Henning, Esq.'s   Motion for a view | 49 | |
| 01/12/2016 | Commonwealth 's   Motion in limine regarding autopsy photographs of victim | 50 | |
| 01/12/2016 | Commonwealth 's   Motion in limine to inquire of a witness' immunity agreement | 51 | |
| 01/12/2016 | Commonwealth 's   Motion in limine for a limited exemption from any general order of sequestration | 52 | |
| 01/12/2016 | Endorsement on Motion for judicial inquiry into criminal history records of potential trial jurors, or in the alternative, notice of intent to independently seek such information for limited purposes of jury empanellment prusuant to Comm v. Cousins, (#45.0):  ALLOWED | | |
| 01/12/2016 | Endorsement on Motion in limine for view, (#49.0):  ALLOWED | | |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 01/12/2016 | Endorsement on Motion in limine regarding autopsy photographs of victim, (#50.0): ALLOWED | | |
| 01/12/2016 | Endorsement on Motion in limine to inquire ofd a witness' immunity agreement, (#51.0): ALLOWED | | |
| 01/12/2016 | Endorsement on Motion in limine for a limited exemption from any general order of sequestration, (#52.0): ALLOWED | | |
| 01/12/2016 | Commonwealth 's   Motion in limine to preclude inquiry into pending charges of witnesses | 53 | |
| 01/12/2016 | Endorsement on Motion in limine to preclude inquiry into pending charges of witnesses, (#53.0): DENIED | | |
| 01/12/2016 | Defendant 's   Motion in limine to prevent the Commonwealth from accessing cori records of prospective jurors | 54 | |
| 01/12/2016 | Endorsement on Motion in limine to prevent the Commonwealth from accessing cori records of prospective jurors, (#54.0): Other action taken DENIED but ALLOWED in the alternative as endorsed, GIles J | | |
| 01/12/2016 | Defendant 's   Motion in limine to prohibit a commonwealth witness from giving unqualified and unconstitutional opinion testimony from surveillance footage | 55 | |
| 01/12/2016 | Defendant 's   Motion to sequester witnesses | 56 | |
| 01/12/2016 | Endorsement on Motion in limine to prohibit a commonwealth witness from giving unqualified and unconstitutional opinion testimony from surveillance footage, (#55.0): ALLOWED | | |
| 01/12/2016 | Endorsement on Motion to sequester witnesses, (#56.0): ALLOWED | | |
| 01/12/2016 | Defendant 's   Motion in limine to exclude references to gangs or violent organizations | 57 | |
| 01/12/2016 | Endorsement on Motion in limine to exclude references to gangs or violent organizations, (#57.0): ALLOWED | | |
| 01/12/2016 | Defendant 's   Motion in limine to exclude allegations that Reddecks sold Marijuana in the past | 58 | |
| 01/12/2016 | Endorsement on Motion in limine to exclude allegations that Reddicks sold Marijuana in the past, (#58.0): Other action taken ALLOWED IN PART as endorsed. | | |
| 01/12/2016 | Defendant 's   Motion in limine to exclude the contents of teh cell phone search in an unrelated case | 59 | |
| 01/12/2016 | Endorsement on Motion in limine to exclude the contents of the cell phone search in an unrelated case, (#59.0): DENIED | | |
| 01/12/2016 | Defendant 's   Motion in limine to exclude pontification by any testifying police officers | 60 | |
| 01/12/2016 | Endorsement on Motion in limine to exclude pontification by any testifying police officers, (#60.0): DENIED as overly broad, as endorsed, Giles, J | | |
| 01/12/2016 | Defendant 's   Motion to advance and continue trial due to Commonwealth's lat disclosure of expert opinion evidence | 61 | |
| 01/12/2016 | Defendant oral motion to be heard EX PARTE at side bar on P#61 - ALLOWED Giles, J.  -  Court ORDERS ex parte hearing IMPOUNDED | | |
| 01/12/2016 | 's   Motion for funds for a medical expert Case continued to 1/13/16 at 9:00 a.m. for jury empanellment in Courtroom 907 by agreement.  Giles, J.  -  G. Henning, ADA  - R. Scappichio, Atty - N. McCann, C/R. | 62 | |
| 01/13/2016 | Event Result:Deft brought into Court The following event: Jury Trial scheduled for 01/13/2016 09:00 AM has been resulted as follows: Result: Held as Scheduled.Commonwealth moves for trial. Court orders sixteen(16) jurors empaneled.Eleven jurors empaneled but not sworn.Continued to 1/14/16 for further empanelment and jury trial.Giles,J; G.Henning,ADA; R.Scappicchio,Atty; J.McDonough,Atty; N.McCann,court reporter | | |
| 01/13/2016 | Defendant 's   Submission of witness list | 63 | |
| 01/13/2016 | Defendant 's   Statement of the case(proposed) | 64 | |
| 01/13/2016 | Commonwealth 's   Notice of intent to call expert witness | 65 | |
| 01/13/2016 | Commonwealth 's   Notice of intention to call certain expert witnesses | 66 | |
| 01/13/2016 | Defendant 's   Motion for suggested questions to be asked by counsel of individual voir dire | 67 | |
| 01/13/2016 | Defendant 's   Motion for individual voir dire conducted by counsel | 68 | |
| 01/13/2016 | Defendant 's   Motion to exclude "overview" testimony | 69 | |
| 01/13/2016 | Defendant 's   Motion to exclude firearm identification testimony and evidence  or alternatively for a Daubert hearing with incorporated memorandum | 70 | |
| 01/13/2016 | Defendant 's   Motion in limine to exclude allegations that Reddicks possessed a firearm on previous occasions | 71 | |

R.14

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 01/14/2016 | Event Result:Deft brought into Court.<br>The following event: Jury Trial scheduled for 01/14/2016 09:00 AM has been resulted as follows:<br>Result: Held as Scheduled Sixteen(16) jurors empaneled and sworn. Jury trial commences before Giles,J; G.Henning,ADA; R.Scapicchio,Atty; N.McCann,court reporter<br>Paper #62, #67, #68  allowed as endorsed Giles,J; Paper #70 and 71 denied as endorsed ,Giles,J; Paper #44 allowed in part,denied in part,Giles,J;Paper #69 allowed as endorsed,Giles,J | | |
| 01/15/2016 | Event Result:Deft brought into Court<br>The following event: Jury Trial scheduled for 01/15/2016 09:00 AM has been resulted as follows:<br>Result: Held as ScheduledJury trial continues with sixteen(16) jurors present before Giles,J; G.Henning,ADA; R.Scapicchio,Atty; J.McDonough,Atty; N.McCann,court reporter.After hearing at side bar,Court determines witness Theodat,5th amendent exists | | |
| 01/19/2016 | Event Result:Deft brought into Court.<br>The following event: Jury Trial scheduled for 01/19/2016 09:00 AM has been resulted as follows:<br>Result: Held as Scheduled. Jury trial continues with sixteen(16) jurors present before Giles,J; G.Henning,ADA; R.Scapicchio,Atty; J.McDonough,Atty; N.McCann,court reporter. View taken | | |
| 01/19/2016 | Commonwealth 's   Motion to preclude defense from arguing th so-called "missing witness" inference for the jury and for an instruction for the absence of Ronald "Lucky" Theodat | 72 | |
| 01/19/2016 | Habeas Corpus issued for Commonwealth, witness in federal custody at Arbour for 01/22/2016 09:00 AM<br>Jury Trial | | |
| 01/19/2016 | Commonwealth 's   Motion for Habeas Corpus to issue for witness Ronald Theodat.allowed Giles,J | 73 | |
| 01/19/2016 | Defendant 's   Motion in limine to exclude Commonwealth's " experts" | 75 | |
| 01/20/2016 | Event Result:Deft brought into Court<br>The following event: Jury Trial scheduled for 01/20/2016 09:00 AM has been resulted as follows:<br>Result: Held as Scheduled. Jury trial continues with sixteen(16) jurors present before Giles,J; G.Henning,ADA; R.Scapicchio,Atty; J. McDonough,Atty; N. McCann,court reporter | | |
| 01/21/2016 | Event Result:DEft brought into court<br>The following event: Jury Trial scheduled for 01/21/2016 09:00 AM has been resulted as follows:<br>Result: Held as Scheduled Jury trial continues with sixteen(16) jurors present before Giles,J; G.Henning,ADA; R.Scapicchio,Atty; J.McDonough,Atty; N.McCann,court reporter. Deft's oral motion for mistrial Denied,Giles,J | | |
| 01/22/2016 | Event Result:Deft brought into Court<br>The following event: Jury Trial scheduled for 01/22/2016 09:00 AM has been resulted as follows:<br>Result: Held as Scheduled. Jury trial continues with sixteen(16) jurors present before Giles,J; G.Henning,ADA; R.Scapicchio,Atty; J.McDonough,Atty; N.McCann,court reporter.After hearing,paper #72,Commonwealth's motion to preclude defense from arguing so-called missing witness", allowed as stated on the record,Giles,J. After hearings ,paper #74, Deft's motion to exclude Commonwealth's "experts" denied as stated on the record,Giles,J | | |
| 01/25/2016 | Defendant 's   Request for jury instruction | 74 | |
| 01/25/2016 | Event Result:Deft brought into Court<br>The following event: Jury Trial scheduled for 01/25/2016 09:00 AM has been resulted as follows:<br>Result: Held as Scheduled.Jury trial continues with sixten(16) jurors present before Giles,J; G.Henning,ADA; R.Scapicchio,Atty; J. McDonough,Atty; N.McCann,court reporter.Commonwealth rests it's case in chief. Deft rests<br>Charge conference held | | |
| 01/25/2016 | Defendant 's   Motion for requiring finding of not guilty at close of Commonwealth's case and after hearing denied as stated on the record,Giles,J | 76 | |
| 01/25/2016 | Defendant 's   Motion for requiring finding of not guilty (renewed.After hearing Denied as stated on the record Giles,J | 77 | |
| 01/26/2016 | Event Result:Deft brought into Court<br>The following event: Jury Trial scheduled for 01/26/2016 09:00 AM has been resulted as follows:<br>Result: Held as Scheduled.Jury trial continues with sixteen(16) jurors present before Giles,J; G.Henning,ADA; R.Scapicchio,Atty; J.McDonough,Atty; N.McCann,court reporter. At the final submission of the case,a panel of sixteen(16) members of the jury present, Court appoints juror # 12 in seat #13 as foreperson. Court orders the jury reduced to twelve(12)members. The following jurors are designated as alternate jurors. Juror #42  in seat #4  , juror #102  in seat # 5  Juror #80  in seat #  9 and juror # 48  in seat #16   .After inspection,attorneys are satisfied with exhibits and verdict slips.Jury deliberations commence at 12:00pm | | |
| 01/27/2016 | Event Result:DEft brought into court<br>The following event: Jury Trial scheduled for 01/27/2016 09:00 AM has been resulted as follows:<br>Result: Held as ScheduledJury deliberations continue before Giles,J; G.Henning,ADA; R.Scapicchio,Atty; J.McDonough,Atty; R.LeRoux,court reporter | | |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 01/28/2016 | Event Result:Deft brought into court<br>The following event: Jury Trial scheduled for 01/28/2016 09:00 AM has been resulted as follows:<br>Result: Held as Scheduled.Jury trial continues before Giles,J;G.Henning,ADA; R.Scapicchio,Atty;<br>J.McDonough, atty; N.McCann,court reporter.<br>,Juror #5 in seat # 1 dismissed. Juror #42 in seat #4 replaces juror # 5 as deliberating juror<br>(11:05am). Continued to 1/29/16 for sentencing .Deft discharged as to #002. Deft remains on mittimus<br>without bail.Giles,J.Jail list | | |
| 01/28/2016 | Offense Disposition:<br>Charge #1 MURDER c265 §1<br>    Date: 01/28/2016<br>    Method: Jury Trial<br>    Code: Guilty Verdict - Lesser Included<br>    Judge: Giles, Hon. Linda E<br><br>Charge #2 ROBBERY, ARMED c265 §17<br>    Date: 01/28/2016<br>    Method: Jury Trial<br>    Code: Not Guilty Verdict<br>    Judge: Giles, Hon. Linda E<br><br>Charge #3 FIREARM, CARRY WITHOUT LICENSE c269 s.10(a)<br>    Date: 01/28/2016<br>    Method: Jury Trial<br>    Code: Guilty Verdict<br>    Judge: Giles, Hon. Linda E<br><br>Charge #4 FIREARM UNATTENDED c269 s.10(h)(2)<br>    Date: 01/28/2016<br>    Method: Jury Trial<br>    Code: Guilty Verdict<br>    Judge: Giles, Hon. Linda E<br><br>Charge #5 FIREARM, CARRY WITHOUT LICENSE LOADED c269 s.10(n)<br>    Date: 01/28/2016<br>    Method: Jury Trial<br>    Code: Guilty Verdict<br>    Judge: Giles, Hon. Linda E | | |
| 01/28/2016 | Verdict affirmed, verdict slip filed<br><br>as to #001 | 78 | |
| 01/28/2016 | Verdict affirmed, verdict slip filed<br><br>as to #002 | 79 | |
| 01/28/2016 | Verdict affirmed, verdict slip filed<br><br>as to #003 | 80 | |
| 01/28/2016 | Verdict affirmed, verdict slip filed<br><br>as to #004 | 81 | |
| 01/28/2016 | Verdict affirmed, verdict slip filed<br><br>as to #001<br><br>as to #005 | 82 | |
| 01/29/2016 | Defendant notified of right of appeal to the Appelate Division of the Superior Court within ten (10) days. | | |
| 01/29/2016 | Defendant notified of right of appeal to the Appeals Court within thirty (30) days. | | |
| 01/29/2016 | Defendant warned as to submission of DNA  G.L. c. 22E, § 3 | | |
| 01/29/2016 | Event Result:Deft brought into Court.The following event: Jury Trial scheduled for 01/29/2016 09:00 AM has been resulted as follows:<br>Result: Held as Scheduled.Commonwealth moves for sentencing. Def files sentencing memoranda. Deft files    . as to #001-Murder 2nd degree- MCI Cedar Junction for and during term of natural life. as to #003- MCI Cedar Junction not more than five(5) years and one(1)day not less than five(5)years concurrent with #001.  as to #005- Suffolk County H.O.C. at SouthBay for a term of One(1) day from and after #001. Rule  64 as to #003, only. Rule 65. Victim /witness fee of $90.00 imposed. Days credit (330) applied to #001 and #003 only. DNA notice given .As to #004 verdict set aside and dismissed (dupliicitive). Giles,J; G.Henning,ADA; R.Scapicchio,Atty; J.McDonough,Atty; N.McCann,court reporter | | |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 01/29/2016 | Defendant sentenced: <br> Sentence Date: 01/29/2016 Judge: Giles, Hon. Linda E <br><br> Charge #: 3 FIREARM, CARRY WITHOUT LICENSE c269 s.10(a) <br> State Prison Sentence <br> State Prison Sentence-Not Less Than: 5 Years, 0 Months, 0 Days <br><br> State Prison Sentence-Not More Than: 5 Years, 0 Months, 1 Days <br><br> Served Concurrently Charge # 1 <br><br> Committed to MCI - Cedar Junction (at Walpole) <br><br> Credits 330 Days | | |
| 01/29/2016 | Issued on this date: <br><br> Mitt For Sentence (First 6 charges) <br> Sent On: 01/29/2016 14:35:27 | | |
| 01/29/2016 | Defendant sentenced: <br> Sentence Date: 01/29/2016 Judge: Giles, Hon. Linda E <br><br> Charge #: 1 MURDER c265 §1 <br> Life <br> Served Primary Charge <br><br> Committed to MCI - Cedar Junction (at Walpole) <br><br> Credits 330 Days <br><br> Financials <br> Docket Type Victim/Witness Assessment on felony G.L. c. 258B, § 8. Amount $90.00 | | |
| 01/29/2016 | Issued on this date: <br><br> Mitt For Sentence (First 6 charges) <br> Sent On: 01/29/2016 14:44:16 | | |
| 01/29/2016 | Issued on this date: <br><br> Mitt For Sentence (First 6 charges) <br> Sent On: 01/29/2016 14:49:39 | | |
| 01/29/2016 | Defendant sentenced: <br> Sentence Date: 01/29/2016 Judge: Giles, Hon. Linda E <br><br> Charge #: 5 FIREARM, CARRY WITHOUT LICENSE LOADED c269 s.10(n) <br> Committed to HOC <br> Term: 0 Years, 0 Months, 1 Days <br><br> To Serve: 0 Years, 0 Months, 1 Days <br><br> Served Consecutively Charge # 1 <br><br> Committed to Suffolk House of Correction (South Bay) | | |
| 01/29/2016 | Issued on this date: <br><br> Mitt For Sentence (First 6 charges) <br> Sent On: 01/29/2016 14:53:30 | | |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 01/29/2016 | Offense Disposition:<br>Charge #1 MURDER c265 §1<br>    Date: 01/28/2016<br>    Method: Jury Trial<br>    Code: Guilty Verdict - Lesser Included<br>    Judge: Giles, Hon. Linda E<br><br>Charge #2 ROBBERY, ARMED c265 §17<br>    Date: 01/28/2016<br>    Method: Jury Trial<br>    Code: Not Guilty Verdict<br>    Judge: Giles, Hon. Linda E<br><br>Charge #3 FIREARM, CARRY WITHOUT LICENSE c269 s.10(a)<br>    Date: 01/28/2016<br>    Method: Jury Trial<br>    Code: Guilty Verdict<br>    Judge: Giles, Hon. Linda E<br><br>Charge #4 FIREARM UNATTENDED c269 s.10(h)(2)<br>    Date: 01/29/2016<br>    Method: Other Court Event<br>    Code: Dismissed<br>    Judge: Giles, Hon. Linda E<br><br>Charge #5 FIREARM, CARRY WITHOUT LICENSE LOADED c269 s.10(n)<br>    Date: 01/28/2016<br>    Method: Jury Trial<br>    Code: Guilty Verdict<br>    Judge: Giles, Hon. Linda E | | |
| 01/29/2016 | Defendant 's   Notice of sentencing memoranda | 83 | |
| 01/29/2016 | Defendant 's   Motion for funds, ex parte for adolescent brain expert,Denied after hearing,see attachment,Giles,J | 84 | |
| 02/05/2016 | Notice of appeal from sentence to MCI - Cedar Junction (at Walpole) filed by defendant (Notices sent to C.J. Fabricant, Giles, J. and the Appellate Division). | 89 | Image |
| 02/24/2016 | Notice of appeal filed<br><br>Applies To: Reddicks, Charles (Defendant) | 85 | |
| 02/24/2016 | Court Reporter Nancy McCann is hereby notified to prepare one copy of the transcript of the evidence of 01/12/2016 11:00 AM Final Pre-Trial Conference, 01/13/2016 09:00 AM Jury Trial, 01/14/2016 09:00 AM Jury Trial, 01/15/2016 09:00 AM Jury Trial, 01/19/2016 09:00 AM Jury Trial, 01/20/2016 09:00 AM Jury Trial, 01/21/2016 09:00 AM Jury Trial, 01/22/2016 09:00 AM Jury Trial, 01/25/2016 09:00 AM Jury Trial, 01/28/2016 09:00 AM Jury Trial, 01/29/2016 09:00 AM Jury Trial, 01/26/2016 09:00 AM Jury Trial, 01/27/2016 09:00 AM Jury Trial | 86 | |
| 02/24/2016 | Court Reporter Richard LeRoux is hereby notified to prepare one copy of the transcript of the evidence of 01/27/2016 09:00 AM Jury Trial | 87 | |
| 03/23/2016 | CD of Transcript of 01/27/2016 09:00 AM Jury Trial received from Court Reporter Richard LeRoux. | | |
| 08/22/2016 | Defendant 's   Motion for funds for Transcripts | 88 | |
| 08/22/2016 | Endorsement on Motion for funds for Transcripts, (#88.0):  ALLOWED | | |
| 08/23/2016 | The following form was generated:<br>A Clerk's Notice was generated and sent to:<br>Attorney:  Rosemary C Scapicchio, Esq.<br>Attorney:  Gregory D. Henning, Esq. | | |
| 09/02/2016 | CD of Transcript of 01/13/2016 09:00 AM Jury Trial, 01/12/2016 11:00 AM Final Pre-Trial Conference, 01/14/2016 09:00 AM Jury Trial, 01/15/2016 09:00 AM Jury Trial, 01/19/2016 09:00 AM Jury Trial, 01/20/2016 09:00 AM Jury Trial, 01/21/2016 09:00 AM Jury Trial, 01/22/2016 09:00 AM Jury Trial, 01/25/2016 09:00 AM Jury Trial, 01/26/2016 09:00 AM Jury Trial, 01/28/2016 09:00 AM Jury Trial received from Court Reporter Nancy McCann.<br>Received and Sent to Attorneys | | |
| 09/13/2016 | Appeal: notice of assembly of record sent to Counsel | | |
| 09/13/2016 | Appeal: Statement of the Case on Appeal (Cover Sheet). | | |
| 09/15/2016 | Document:<br><br>Letter to the Appellate Division<br>Sent On:  09/15/2016 10:10:39 | | |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 09/27/2016 | Appeal for review of sentence entered at the Appellate Division:<br>Originating Court: Suffolk County Criminal<br>Receiving Court: Suffolk County Criminal<br>Case Number: 1684AD002-SU<br>; | | |
| 01/05/2017 | Notice of docket entry received from Appeals Court<br>Motion for additional transcripts. Treated as a motion to stay is allowed to 01/17/2017. Transcripts sent to Attorney and ADA 01/11/2017 and hand delivered to the Appeals Court.. | 90 | |
| 06/15/2017 | Defendant 's   Motion for Access to Jury Contact Information. (Notice sent to Roach-RAJ with copy of Motion and Docket Sheets). | 91 | |
| 07/03/2017 | Commonwealth 's   Notice of Appearance re: Julianne Campbell | 92 | |
| 07/03/2017 | Opposition to paper #91.0 Defendant's Motion for Access to Jury Contact Information. filed by Commonwealth(Notice sent to Roach-RAJ with copy of Opposition and Docket Sheets).<br>(NOTICE WITH DOCKET RESENT TO GILES, J,  SITTING IN Suffolk, CTRM 916 PER ROACH, RAJ) | 93 | |
| 01/25/2018 | Habeas Corpus for defendant issued to Souza Baranowski Correctional Center returnable for 02/08/2018 02:00 PM Motion Hearing. | 94 | |
| 01/29/2018 | Notice of docket entry received from Appeals Court<br>Re #12: Due to the ongoing proceedings in the trial court that are indeterminate in nature, entry of the defendant's appeal on this court's docket is vacates without prejudice to re-entry on this court's docket subsequent to the conclusion of the post- trial motion practice in the trial court, including as decision on any motion for new trial that may be filed (Kinder, J). | 95 | Image |
| 02/05/2018 | Event Result:<br>Judge: Giles, Hon. Linda E<br>The following event: Motion Hearing scheduled for 02/08/2018 02:00 PM has been resulted as follows:<br>Result: Canceled<br>Reason: Not reached by Court | | |
| 02/22/2018 | Habeas Corpus for defendant issued to Souza Baranowski Correctional Center returnable for 03/28/2018 02:00 PM Motion Hearing. | 96 | |
| 03/26/2018 | Habeas Corpus for defendant issued to Souza Baranowski Correctional Center returnable for 03/28/2018 02:00 PM Motion Hearing. | 97 | |
| 03/28/2018 | Defendant brought into court.<br><br>Hearing re:Motion (P #91) Defendant 's Motion for Access to Jury Contact Information, after hearing No action taken. Court gives Defendant thirty(30) days to file brief. Comm. has forty-five(45) days to file an opposition.<br><br>Giles,J-  -J.Campbell,ADA.  -  Scarpicchio,R.  -  N.McCann C/R.<br><br>Judge: Giles, Hon. Linda E<br><br>Judge: Giles, Hon. Linda E | | |
| 04/27/2018 | Defendant 's   Supplemental  memorandum of law relating to juror contact information | 98 | |
| 05/14/2018 | Commonwealth 's   Supplemental  memorandum in opposition to defendant's motion for access to contact information of discharged jurors | 99 | |
| 05/14/2018 | Commonwealth 's   Motion  to accept its supplemental memorandum as timely filed | 100 | |
| 06/07/2018 | ORDER: Memorandum of decision and order on defendant's motion for access to jury contact information. Filed.<br>(Copy of Memorandum sent to J. Campbell ADA and R. Scapicchio Atty)<br><br>Judge: Giles, Hon. Linda E | 101 | Image |
| 06/07/2018 | The following form was generated:<br>A Clerk's Notice was generated and sent to:<br>Attorney:  Rosemary C Scapicchio, Esq.<br>Attorney:  Julianne Campbell, Esq. | | |
| 01/18/2019 | Notice of Entry of appeal received from the Appeals Court<br>Case was entered in this court on January 15, 2019 | 102 | Image |
| 01/18/2019 | Notice of docket entry received from Appeals Court<br>ORDER: The defendant's appeal from Suffolk Superior Court docket no. 1284CR10714 is hereby re-entered on the Appeals Court docket as docket no. 19-P-71. Appellate proceedings stayed to 02/25/2019. A status report is due then concerning how the defendant intends to proceed regarding post-trial juror contact and the anticipated motion for new trial. All papers filed into Appeals Court docket no. 16-P-1249 shall be transferred to 19-P-71, and all future filings shall refer only to 19-P-71 | 103 | Image |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 06/12/2019 | Notice of docket entry received from Appeals Court<br>"RE#5: As it appears that the defendant's new trial motion will not be filed within a reasonable amount of additional time, the stay of appellate proceedings is vacated. The defendant is granted leave to file and the trial court leave to consider, a motion for a new trial during the pendency of the direct appeal; however the defendant shall file his brief and appendix in his direct appeal on or before July 22, 2019. (Kinder,J.)" | 104 | Image |
| 07/16/2019 | Defendant 's Motion to reconsider this Court's order relating to jury contact information, P#101<br>(this filing not docketed on 7/5/18 day date stamped)<br>Copy w/docket to Giles, J | 105 | Image |
| 07/18/2019 | Rosemary C Scapicchio, Esq.'s Submission : Affidavit in support of request fof juror contact information<br>Information received from jury pool, sent via US Mail to Attorney Scipicchio | 106 | Image |
| 07/19/2019 | ORDER: On Defendant's Motion To Reconsider This Court's Order Relation To Jury Contact Information.<br>(Copy of Memorandum sent to J. Campbell ADA and R. Scapicchio Atty) | 107 | Image |
| 07/19/2019 | Defendant 's Motion For Withdrawal Of Erroneously Filed Motion To Reconsider Court's Order (Filed).<br>(Copy of motion and docket sheets sent to Giles,J) | 108 | Image |
| 07/22/2019 | Endorsement on Motion for withdrawal of erroneously filed motion to reconsider court's order, (#108.0):<br>DENIED<br>As the court has already acted on the defendant's motion to reconsider, the motion for withdrawal is hereby Denied.<br><br>Parties notified |  | Image |
| 07/24/2019 | The following form was generated:<br>A Clerk's Notice was generated and sent to:<br>Attorney:  Rosemary C Scapicchio, Esq.<br>Attorney:  Julianne Campbell, Esq. |  |  |
| 09/11/2019 | Notice of docket entry received from Appeals Court<br>RE#6: Allowed to 11/22/2019 | 109 | Image |
| 09/12/2019 | Exhibits Returned to Boston Police Department: Evidence Control Unit<br>*In accordance with the Trial Court's Retention of Exhibits Policy of 07/21/2014 related to storage of criminal evidence, Section I(D)(1)& Section I(D)(3). Sec I(D)(1): A Clerk of Courts/Clerk Magistrate, in the exercise of his or her discretion may return an exhibit to the party who offered it into evidence if post-trial retention of that exhibit within the courthouse is impracticable due to the size of the exhibit, the bulk of the exhibit, or any physical characteristic of the exhibit. SEC. I(D)(3): The party shall be responsible for retaining the exhibit for the period of time that the defendant remains incarcerated or under parole or probation supervision in connection with that crime. | 110 | Image |
| 10/01/2019 | Docket Note: CD transcript placed in file, now stored in the "Impound" section of Clerk's Office<br>re: 1/12/16, 1/15/16, 1/22/16, 1/21/16 |  |  |

## Case Disposition

| Disposition | Date | Case Judge |
|---|---|---|
| Disposed by Jury Verdict | 01/29/2016 |  |

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss                         SUPERIOR COURT DEPARTMENT
                                    DOCKET NO: SUCR2012-10714

COMMONWEALTH

v.

CHARLES REDDICKS

## **MOTION TO SUPPRESS STATEMENTS**

Now comes the defendant, Charles Reddicks, pursuant to Massachusetts Rules of

Criminal Procedure, Rule 13, and moves that statements allegedly made by him on May

10, 2012, be suppressed.

As reasons therefore, Reddicks asserts that the alleged statements were

involuntary. As such, the interrogation was in direct violation of Reddicks' rights

pursuant to the Fifth, Sixth, and Fourteenth Amendments of the United States

Constitution as well as Article XII of the Massachusetts Declaration of Rights. See

Miranda v. Arizona, 384 U.S. 426 (1966); *see also* JBD v. North Carolina, 131 S. Ct.

2394 (2011); *see also* Commonwealth v. Simon, 456 Mass. 280, 286-87 (2010).

As additional reasons therefore, Reddicks asserts that the alleged statements

should be suppressed because he was questioned without a parent present. Reddicks'

date of birth is April 20, 1994; on the date the alleged statements were made, Reddicks

had been 18 years old for 21 days. Given his youth, Reddicks should have been

questioned with a parent or interested adult present as required by Commonwealth v. A

Juvenile, 402 Mass. 275 (1988). See also, Commonwealth v. Alfonso A, 53 Mass. App.

Ct. 279 (2001).

Respectfully Submitted,
CHARLES REDDICKS
By His Attorney,

Rosemary Curran Scapicchio
107 Union Wharf
Boston, MA  02109
(617) 263-7400
BBO#:  558312

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each party and upon any party appearing pro se by first class mail, postage prepaid or by hand delivery.

Dated: 5/9/2014                    Signed:

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss                                      SUPERIOR COURT DEPARTMENT
                                                 DOCKET NO: SUCR2012-10714

COMMONWEALTH

v.

CHARLES REDDICKS

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF HIS
MOTION TO SUPPRESS STATEMENTS**

Now comes the defendant, Charles Reddicks, and files this memorandum in
support of his Motion to Suppress Statements. Specifically, Reddicks asserts that the
May 10, 2012 interrogation was conducted in direct violation of his rights pursuant to
the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and
Article XII of the Massachusetts Declaration of Rights. See Miranda v. Arizona, 384
U.S. 426 (1966); *see also* Commonwealth v. Simon, 456 Mass. 280, 286-87 (2010).

**ARGUMENT**

The Fifth Amendment states "no person…shall be compelled in any criminal
case to be a witness against himself…" This privilege against self-incrimination extends
to custodial interrogations. See Miranda v. Arizona, 384 U.S. 436 (1966). Further, any
statements made during such interrogations must be voluntary, knowing, and intelligent;
if they are not, then the statements are inadmissible. See Commonwealth v. Simon, 456
Mass. 280, 286-86 (2010). The validity of interrogation statements becomes more
complicated when the defendant is a teenager. Where the defendant is a juvenile, courts

must proceed with special caution when reviewing purported waivers of constitutional rights. See Commonwealth v. A Juvenile, 389 Mass. 128 (1983).[1]

## I. The Statements Were Made Involuntarily

It has long been established that interrogations involve "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." Miranda, 384 U.S 436 at 467. A statement is considered "voluntary" only when, in addition to considering the "totality of the circumstances" which includes "both the nature of the police activity and the defendant's situation" (U.S. v. Hughes, 640 F.3d 428, 438 (1st Cir. 2011)) was "not the product of inquisitorial activity which had overborne [the defendant's] will." See Commonwealth v. Ray, 467 Mass. 115, 134 (2014). In other words, a voluntary statement is one that is offered freely and is not the product of aggressive police intimidation and/or interrogation. When determining voluntariness of statements, additional considerations include the defendant's personal circumstances, including but not limited to the defendant's age, education, intelligence, and mental condition. See Hughes, 640 F.3d at 438.

In the present case, Reddicks was questioned for two hours and subjected to aggressive police interrogation tactics. The police began the interview by telling Reddicks "you're in an uncomfortable situation. You know we dot our I's and cross our T's, and there's more. I mean this is just the beginning." (See May 10, 2012 interview transcript, pg. 14). In addition, the officers repeatedly called him a "cold blooded killer," threatened him, and ordered him to defend himself: "everything that is going to come

---

[1] Reddicks date of birth is April 20, 1994. The interrogation took place 21 days after his 18th birthday.

out of our investigation to the jury is…that Charles Reddicks is a cold blooded killer" (Interview transcript, pg. 24); "let us know you're not a cold-blooded sociopath" (Id. at 25); "We work hard and then when everything's ready we come.  Somebody pays the price" (Id. at 26); "don't let [your family] hear about their cold-blooded relative" (Id.); "the deck is stacked against you…I don't know if you're being hard headed or if you're just a stone-cold sociopath" (Id. at 35); "defend yourself kid…don't be a cold-blooded killer" (Id. at 61); "defend yourself" (Id.); "our guy [Reddicks] is…a cold-blooded sociopath" (Id. at 62); "give us a defense" (Id. at 62).

Reddicks was subjected to this behavior for two hours.  The Supreme Court has recognized that such aggressive police tactics often generate a sense of obligation to speak to the police, and even worse, can elicit false confessions at a "frighteningly" high rate. Corley v. United States, 129 S. Ct, 1558, 1570 (2009).  Given the aggressive police action and relentless threats, insults, and orders that Reddicks "defend himself" coupled with Reddicks' young age and limited education, it is unsurprising that he was afraid and felt obligated to talk to the police.  His statements, then, were not voluntary but the product of police activity that "overborne" his will. Commonwealth v. Ray, 467 Mass. 115, 134 (2014).  Therefore, the statements should be suppressed.

## II. Reddicks Was Questioned Without An Adult Present

The Supreme Court has repeatedly recognized that young people "generally are less mature and responsible than adults," (Eddings v. Oklahoma, 455 U.S., 104, 115-116 (1982)); that they "often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them," (Bellotti v. Baird, 443 U.S. 622, 635 (1979) (plurality opinion)); and that they "are more vulnerable or susceptible to . . .

outside pressures" than adults (Roper v. Simmons, 543 U.S. 551, 569 (2005)). Specific

to police interrogation, the Supreme Court stated "[N]o matter how sophisticated," a

juvenile subject of police interrogation "cannot be compared" to an adult subject.

Gallegos v.Colorado, 370 U.S. 49, 54 (1962). As such, they are afforded additional

protections when it comes to statements made to the police and/or confessions.

    The Commonwealth adopted similar juvenile protections. Where the defendant

is a juvenile, courts must proceed with 'special caution' when reviewing purported

waivers of constitutional rights. As to juveniles at least fourteen years old at the time of

the purported waiver, the prosecution must show that, before the disputed statement was

obtained, the juvenile was advised of constitutional rights through a reading of the

Miranda warnings and was afforded the opportunity to consult with an interested adult

who was informed of and understood, those rights. In Commonwealth v. A Juvenile,

389 Mass. 128 (1983), the Supreme Judicial Court held:

> We conclude that, for the Commonwealth successfully to demonstrate a
> knowing and intelligent waiver by a juvenile, in most cases it should
> show that a parent or an interested adult was present, understood the
> warnings, and had the opportunity to explain his rights to the defendant
> so that the defendant understands the significance of waiver of these
> rights. For the purpose of obtaining the waiver, in the case of juveniles
> who are under the age of fourteen, we conclude that no waiver can be
> effective without this added protection. This procedure reflects our
> assumption that an informed parent, or person standing in loco parentis,
> will be better able to understand the child's rights, rights which a child of
> such tender years is unlikely to comprehend fully without the assistance
> of such a person. For cases involving a juvenile who has reached the age
> of fourteen, there should ordinarily be a meaningful consultation with the
> parent, interested adult, or attorney to ensure that the waiver is knowing
> and intelligent. For a waiver to be valid without such a consultation the
> circumstances should demonstrate a high degree of intelligence,
> experience, knowledge, or sophistication on the part of the defendant.
> (Footnote omitted ). Id. at 134.

For juveniles at least fourteen years old at the time of the purported waiver, the prosecution must show that, before the disputed statement was obtained, the juvenile was advised of constitutional rights through a reading of the Miranda warnings and was afforded the opportunity to consult with an interested adult who was informed of and understood, those rights.  In addition,

> "It is not necessary for such a juvenile actually to consult with the interested adult, for it is the *opportunity* to consult that is critical. So long as the juvenile is at least fourteen and has the opportunity for a meaningful consultation, the juvenile may make a valid waiver without actual consultation. The ultimate question is whether the juvenile has understood his rights and the potential consequences of waiving them before talking to the police."
> Commonwealth v. A Juvenile, 389 Mass. 128 (1983).

Reddicks asserts that he should have been provided additional protections based on his age.  His date of birth is April 20, 1994.  That means that at the time of the interrogation, he had been 18 years old for a total of 21 days.  In other words, had the interrogation taken place just twenty-one days prior, Reddicks would have automatically been categorized a juvenile and would have received additional juvenile protections.  A child's age is "far more than a chronological fact." J.D.B.v. North Carolina, 131 S. Ct. 2394, 2397 (2011).  A child does not, simply because he or she turns the age of 18, magically obtain the same level of rationality, maturity, and understanding of social and judicial issues as an adult.  Reddicks was no more an adult on May 10, 2012 than he was on April 19th, 2012.

Reddicks should not have been interrogated without a parent or other interested adult present.  Because Reddicks was deprived of his right to have his parent or an otherwise interested adult present during questioning in violation of Miranda v. Arizona,

384 U.S. 436 (1966), the Fifth, Sixth, and Fourteenth Amendments of the United States

Constitution, as well as Article 12 of the Massachusetts Declaration of Rights, and

Commonwealth v. A Juvenile, as cited above, the statements should be suppressed.

**CONCLUSION**

For all of the foregoing reasons, Reddicks moves that all statements should be

ordered suppressed as the interrogation was conducted in violation of his rights pursuant

to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and

Article XII of the Massachusetts Declaration of Rights.

Respectfully submitted,
CHARLES REDDICKS,
By his Attorney,

Rosemary Curran Scapicchio
107 Union Wharf
Boston, MA 02109
(617) 263-7400
BBO#: 558312

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was served upon the
attorney of record for each party and upon any party appearing pro se by first class mail,
postage prepaid or by hand delivery.

Dated: 5/9/2014          Signed: _____

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

SUPERIOR COURT DEPARTMENT
DOCKET NO: SUCR2012-10714

COMMONWEALTH

v.

CHARLES REDDICKS

**AFFIDAVIT OF CHARLES REDDICKS**

I, Charles Reddicks, hereby depose and state:

1. My name is Charles Reddicks.

2. I am the defendant *IN* the above-captioned case.

3. On or about May 10, 2012, I was interrogated by members of the Boston Police Department.

4. I was questioned by Detective Jack Callahan and Sergeant Detective Richard Daley in the Boston Homicide Unit for approximately two hours.

5. When the interview began, the officers interrogated me about a murder, repeatedly said "defend yourself, kid," and called me a "cold blooded killer," and a "sociopath."

6. I did not have a parent or any other adult present with me during the interrogation.

7. I was scared and felt bullied. I thought I had to "defend myself."

Signed under the pains and penalties of perjury, this _2nd_ day of _May_ 2014.

Charles Reddicks

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                          SUFFOLK SUPERIOR COURT
                                                     NO: SUCR2012-10714


COMMONWEALTH

v.

CHARLES REDDICKS

---

## COMMONWEALTH'S MEMORANDUM IN OPPOSITION TO THE DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

---

Now comes the Commonwealth in the above-captioned matter and respectfully requests that this Honorable Court deny the Defendant's Motion to Suppress. In support of this request the Commonwealth states the following:

### STATEMENT OF FACTS

Charles Reddicks was asked by Boston Police Homicide Investigators to come to Boston Police Headquarters for an interview on May 10, 2012, to be questioned about the facts and circumstances surrounding the death of Mariano Malave, which occurred on April 27, 2012. Mr. Reddicks arrived with his mother, and was interviewed after being apprised of all *Miranda* warnings.

### ARGUMENT

I.    THE STATEMENTS MADE BY CHARLES REDDICKS TO BOSTON POLICE HOMICIDE DETECTIVES ON MAY 10, 2012, ARE ADMISSIBLE BECAUSE THE STATEMENTS WERE VOLUNTARY.

The Defendants' Motion to Suppress should be denied because his statements to Boston Police Homicide Investigators Sgt. Det. Richard Daley and Det. Jack Callahan were voluntary and not the product of overborne will. An admission is a statement by the

accused of facts pertinent to the issue, which tends in connection with proof of other facts to establish his guilt. *Commonwealth v. Pike*, 430 Mass. 317, 325 (1999).

*Miranda* requires warnings before custodial "interrogation," which the court in *Commonwealth v. Rubio* defined as being present if "'an objective observer (with the same knowledge of the suspect as the police officer) would…infer that the [officer's speech or conduct was] designed to elicit an incriminating response from the suspect.'" 27 Mass.App.Ct. 506, 512 (1989) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). *Commonwealth v. Rubio* further emphasized that when determining whether police inquiries constitute custodial interrogation or "its functional equivalent," the court should focus on the suspect's perception, because the purpose of *Miranda* is to prevent law enforcement from using the "coercive nature of confinement to extract confessions" that the suspect would not otherwise provide but for the confining environment. *Id.* (citing *Innis*, 446 U.S. at 301; *Arizona v. Mauro*, 481 U.S. 520, 528 (1987)).

### A. Charles Reddicks' Response Was Voluntary

"A statement is voluntary if it is 'the product of a rational intellect and a free will.'" *Commonwealth v. Jackson*, 432 Mass. 82, 85, (2000) (quoting *Commonwealth v. Davis*, 403 Mass. 575, 581 (1988)). "An admission or a confession made to a civilian as much as to a police officer is admissible only if it is voluntarily made." *Commonwealth v. Smith*, 426 Mass. 76, 82 (1997). A defendant must raise the question of voluntariness and he must offer some proof to support his claim. *Id.* The test for voluntariness is whether, in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the statement was

not the result of a free and voluntary act. *Commonwealth v. Byrd*, 52 Mass. App. Ct. 642,

646 (2001). Relevant factors may include, but are not limited to,

> . . . promises or other inducements, conduct of the defendant, the
> defendant's age, education, intelligence and emotional stability, experience
> with and in the criminal justice system, physical and mental condition, the
> initiator of the discussion of a deal or leniency (whether the defendant or the
> police), and the details of the interrogation, including the recitation of
> Miranda warnings.

*Commonwealth v. LeBlanc*, 433 Mass. 549, 554 (2001) (quoting *Commonwealth v.*

*Mandile*, 397 Mass. 410, 413 (1986)). In evaluating whether the statement was made

voluntarily, the court in *Commonwealth v. Moran* highlighted a number of the

aforementioned factors, including the defendant's experience in the criminal justice

system. 75 Mass.App.Ct. 513, 519 (2009).

The court in *Commonwealth v. Allen* determined that absent evidence of threats,

promises or trickery, the defendant was "not entitled to have [his] statements suppressed

on the ground that they were coerced." 395 Mass. 448, 456 (1985). Further, the court

found the defendant's statements were not involuntary, despite his having made them a

week after he sustained a gunshot wound to the head and underwent brain surgery. *Id.* at

458.

Absent any proof offered by the defendant that shows otherwise, the

circumstances surrounding Mr. Reddicks' statements do not suggest that his will was so

overborne as to make his statement the product of an involuntary act.

B. Charles Reddicks was not in Custody When Questioned on May 10, 2012

Charles Reddicks was not in custody when questioned on May 10, 2012. When

assessing whether an individual has been subjected to custodial interrogation, Courts

apply a well-settled 4 factor test:

> In assessing the circumstances, the court considers several factors: (1) the place of
> the interrogation; (2) whether the officers have conveyed to the person being questioned
> any belief or opinion that that person is a suspect; (3) the nature of the interrogation,
> including whether the interview was aggressive or, instead, informal and influenced in its
> contours by the person being interviewed; and (4) whether, at the time the incriminating
> statement was made, the person was free to end the interview by leaving the locus of the
> interrogation or by asking the interrogator to leave, as evidenced by whether the
> interview terminated with an arrest.Commonwealth v. Groome, 435 Mass. 201, 221-222
> (2001), citing *Commonwealth v. Morse*, 427 Mass. 117, 121-127, 691 N.E.2d 566 (1998).
> *Commonwealth v. Bryant*, 390 Mass. 729, 737, 459 N.E.2d 792 (1984) . "'Rarely is any
> single factor conclusive.' *Commonwealth v. Bryant*, 390 Mass. 729, 736 (1984)

When assessing whether defendant in "custody" for *Miranda* purposes, the crucial

question is whether, in all the circumstances, reasonable person would have believed he

was in custody. *Commonwealth v. Hilton*, 443 Mass. 597, 609 (2005). The four factor test

for determining whether an interrogation is custodial is well-settled. See *Commonwealth*

*v. Carnes*, 457 Mass. 812, 819 (2010). In *Commonwealth v. Murphy*, 442 Mass. 485,

492-493 (2004), the Court held that a statement given at police station was not custodial

where defendant went to the station voluntarily, the interview was informal and

defendant was free to terminate interview and leave if he chose. Furthermore, the focus is

not on the police officer's intent, but rather on the interviewee's perception and whether a

reasonable person in his position would have felt free to leave. *Pennsylvania v. Muniz*,

496 U.S. 582, 601 (1990); *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) ;

*Commonwealth v. Sheriff*, 425 Mass. 186, 198 (1997).

In this case, Charles Reddicks came to the police station voluntarily on his own accord, arriving with his mother. The interview of Mr. Reddicks is not aggressive, and there is neither yelling nor deception by police. The recorded interview shows that the detectives never said or implied that they had evidence that they did not. *Contra Commonwealth v. Selby*, 420 Mass. 656, 664 (1995) (officer falsely told defendant that they had recovered a handprint from the scene); *Commonwealth v. Meehan*, 377 Mass. 552, 562-63 (1979) (officers gave misleading account of the strength of the evidence against the defendant). *Compare Commonwealth v. Johnson*, 463 Mass. 95, 105 (2012) (officer accurately informed defendant of the charges he faced and the evidence against him, and, while he "also questioned the defendant about additional evidence the police investigation might produce, he never implied the police had evidence that they did not, nor did he exaggerate the strength of the evidence they did possess."); *with DiGiambatista*, 442 Mass. at 434 (officers presented defendant with a videotape with a false label and an "artificially thick file," which was prepared in advance of the interview with the intention of convincing the defendant of the "ostensible strength of the evidence against him"). Furthermore, Mr. Reddicks did not receive an offer of leniency or any promises. The police may tell a defendant that it would be better to tell the truth or to get his side of the story out, and "'may state in general terms that cooperation has been considered favorably by the courts in the past.'" *Johnson*, 461 Mass. at 105 (quoting *Meehan*, 377 Mass. at 564). The police may not, however, offer a defendant leniency or

make any promises that a confession would aid his defense. *Commonwealth v. Tolan*, 453 Mass. 634, 643 (2009).

Finally, at the end of the interview, he conveys to detectives that he has "nothing left to say," and is then allowed to leave.

### C.There is no basis to extend the interested adult rule to provide that this defendant, himself an adult, should have had the benefit of his parent to consult with before he chose to speak.

The defendant makes a claim with no relevant authority that he should have been provided the presence of his parent before he chose whether to speak with the police. The defendant offers no evidence, no science, and no relevant law in support of this argument. There is no rule that the police violated at bar, so no basis to apply the exclusionary rule. Cf. Commonwealth v. Tavares, 385 Mass. 140, 144-46 (1982) (The Court rejected the 17 year old defendant's claim that his youth and inexperience vitiated his waiver, and that his statements were not voluntary; and gave no deference to his reliance on several studies that have suggested that youths are particularly susceptible to the inherent coerciveness of interrogations. See Gage, Protecting the Juvenile Witness, 17 J. of Family L. 439, 451 (1978); Note, Interrogations in New Haven, The Impact of Miranda, 76 Yale L.J. 1519, 1577 (1967)). In fact, the Court in Commonwealth v. Bermudez, 83 Mass. App. Ct. 46, 51-54 (2012), specifically declined to consider other individualized factors peculiar to a defendant, such as his status as a special needs student, as bearing on a custody determination. In this case, Mr. Reddicks, an 18 year-old, evidenced no individualized factors that would have placed him in a different posture than any other adult.

In this case, 18 year-old Charles Reddicks displayed sophistication, education,

maturity, and a calm demeanor throughout the entirety of the interview.

## CONCLUSION

For the foregoing reasons, the Commonwealth respectfully requests that this honorable court deny the Defendant's Motion to Suppress.

Respectfully submitted,
DANIEL F. CONLEY
Suffolk County District Attorney

By his assistant,
Joseph Janezic, III
Assistant District Attorney
Suffolk Co. District Attorney's Ofc.
1 Bulfinch Place
Boston, MA 02114
(617) 619-4135

Date: September 4, 2014

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss                                    SUPERIOR COURT DEPARTMENT
                                               DOCKET NO: SUCR2012-10714

COMMONWEALTH

v.

CHARLES REDDICKS

## SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS STATEMENTS

Now comes the defendant, Charles Reddicks, and respectfully submits this Supplemental Memorandum in Support of his Motion to Suppress Statements.

Reddicks relies on his original memorandum and further emphasizes that any statements made while in police custody were not voluntary and were taken in violation of his due process rights pursuant to the 14th Amendment of the United States Constitution and Article XII of the Massachusetts Declaration of Rights. Commonwealth v. Callahan, 401 Mass. 627, 631 (1988); Colorado v. Connelly, 479 U.S. 157 (1986). As such, any and all statements made by Reddicks and the fruits of those statements must be suppressed. Commonwealth v. Raymond, 424 Mass. 382, 395 (1997); Miranda v. Arizona, 384 U.S. 436 (1966); Wong Sun v. United States, 371 U.S. 471 (1963).

ARGUMENT

    I.    BASED ON THE TOTALITY OF THE CIRCUMSTANCES, ANY STATEMENTS MADE BY REDDICKS WERE NOT VOLUNTARY, IN VIOLATION OF REDDICKS'S DUE PROCESS RIGHTS PURSUANT TO THE 14TH AMENDMENT AND ARTICLE XII.

In assessing whether an individual's statements were voluntary under the due process clause of the Fourteenth Amendment, the court must consider (1) whether the defendant was coerced into making the statement and, (2) whether the statement was the

1

"product of a rational intellect." <u>Commonwealth v. Callahan</u>, 401 Mass. 627, 631 (1988);

<u>Colorado v. Connelly</u>, 479 U.S. 157 (1986).  The test for voluntariness of a statement is

"whether, in light of the totality of the circumstances surrounding the making of the

statement, the will of the defendant was overborne to the extent that the statement was

not the result of a free and voluntary act." <u>Commonwealth v. Raymond</u>, 424 Mass. 382,

395 (1997).

Ultimately, "[t]he Commonwealth…bears the burden of proving beyond a

reasonable doubt that, in the totality of the circumstances, the defendant's statements

were made voluntarily." <u>Commonwealth v. Novo</u>, 442 Mass. 262, 267 (2004), *quoting,*

<u>Commonwealth v. Jackson</u>, 432 Mass. 82, 85 (2000).

In evaluating the voluntariness of a statement, courts look to a number of factors

"including promises or other inducements, conduct of the defendant, the defendant's age,

education, experience, intelligence and emotional stability, experience with and in the

criminal justice system, physical and mental condition, the initiator of the discussion of a

deal or leniency (whether the defendant or the police), and the details of the interrogation,

including the recitation of Miranda warnings." <u>Commonwealth v. Mandile</u>, 397 Mass.

410, 413 (1986).

Where the interrogating officers advise an individual that this is his only

opportunity to offer an explanation as to why he committed a criminal act, the subsequent

statement is rendered involuntary.  <u>See</u> <u>Commonwealth v. Novo</u>, 442 Mass. 262, 269

(2004); <u>see also</u> <u>Commonwealth v. Thomas</u>, 469 Mass. 531, 542-43 (2014).  This "now

or never" theme creates a misrepresentation of a defendant's right to defend himself at

trial and "is a particularly egregious intrusion on rights that art. 12 declares to be

fundamental." Novo, 442 Mass. at 268-69. As such, the tactic "casts substantial doubt

on the voluntariness of a subsequent confession" and "[t]his doubt would be extremely

difficult for the Commonwealth to overcome in any case." Id. at 269 (finding

misrepresentations regarding the law more intolerable than misrepresentations relating to

the strength or existence of evidence); see also Wayne R. LaFave et al., Relevant Factors

in the Totality of Circumstances, 2 Crim. Proc. § 6.2(c) (3 ed. 2010) ("Courts are much

less likely to tolerate misrepresentations of law.").

In Thomas, the interrogating officers coerced the defendant into speaking by

indicating that by "lawyering up," she was losing her chance to tell her story to a jury and

that this was her "only chance" to present her version of events. Thomas, 469 Mass. at

542. Although the defendant in Thomas asserted her right to counsel, such statements or

implications that the defendant will only have one opportunity to share his side of the

story are impermissible regardless of whether a defendant invokes his Miranda rights.

See Novo, 442 Mass. at 269.

In Novo, the officers recurrently indicated that if the defendant did not offer an

explanation for his actions, the jury would never hear a reason. Id. at 267 ("If you don't

give us a reason, Roy, if you don't give us a reason right now why you did this, a jury's

never going to hear a reason."). The Court found that these statements were plainly

untrue; "[r]egardless of whether Novo offered an explanation to the officers, he would be

entitled to present a defense to the jury" or testify on his own behalf. Id. Additionally,

the Court reasoned that "there is nothing that would bar a suspect…from deciding to

speak to police, and there is no sound reason why the police would refuse such a

request." Thomas, 469 Mass. at 542.

3

Here, the questioning detectives engaged in the same impermissible behavior prohibited in both <u>Novo</u> and <u>Thomas</u>. The officers initiated questioning by informing Reddicks that they brought him in to offer him an opportunity to share his side of the story and that "normally [they] don't give people opportunities." Tr. at 14. Officers indicated that they were certain that Reddicks was the perpetrator, then led into the impermissible misrepresentation of Reddicks's constitutional rights:

> We're 100%, and this is a golden opportunity to give your version of the story because a year down the road, two years down the road we're going to be in a courtroom and I'm going to be sitting across from you, maybe both, or Rich Daley and if I'm there, it's me, I'm going to be looking at you. I'm going to be sitting up there in a suit and tie. I'm going to be looking at you, and I'm going to be saying I gave him, Sergeant Daley gave him, the opportunity to offer a reason as to why he did what he did, as opposed to not saying anything and me looking over at the jury as I'm looking back at you and everything that is going to come out of our investigation to the jury is going to be that Charles Reddicks is a cold-blooded killer. That he robbed dude, shot dude over nothing.

Tr. at 24.

Later, the officers again falsely indicated that the interview was the only time Reddicks would have an opportunity to present his version of the events when Detective Callahan stated:

> What's the story, Charles? What is the story? What is the story?...They are going to get the truth. They're going to get our version. And our version is ugly. Our version is very ugly. There's no prettiness. There's no sugarcoating it. We can only be so kind and we can't sugarcoat the truth. The truth gets exposed. The truth gets exposed in a court of law. Where there's a jury sitting there.

Tr. at 63-64.

> And when we get to court we tell the story. At this stage, in this room, this is where you have a chance to tell it, the story. When we tell the story we're going to tell it the way we presented it and put it together. But without your version it looks ugly. That's why we're doing this right now. An opportunity to get the truth out of what really happened...We're going to present a pretty solid case. This is your opportunity to present your solid case, or your explanation for your

4

**R41**

actions or actions of your friends.  If you want to take advantage of that, you know.

Tr. at 65.

Come on, come on brother, we've been around the block a long time here and again you can tell us ten ways to Sunday that you didn't do it, but we already know you're the guy and we're going to further strengthen that with additional stuff.  And it's a great opportunity now to say why you did it.  To say why you did it as opposed to us sitting in the courtroom telling your mother and your grandmother who are going to be there this is what happened.

Tr. at 73.

Exasperating the impropriety of misrepresenting Reddicks's constitutional rights to testify and to present his own defense was the fact that the officers continued to emphasize that Reddicks was facing first-degree murder and would go away for life if convicted.  See Novo, 442 Mass. at 264 (admonishing officer for indicating that if defendant did not offer reason, he would be "going first degree murder…going life in prison without parole").  The officer stated to Reddicks, "[y]ou got some problems.  You're looking at first-degree murder.  Right now you're looking at first-degree murder."  Tr. at 69.  Detective Callahan further stated, "[t]his is a first-degree murder.  You're looking at life imprisonment so when we talk to you, we're talking to you with sincerity and, you know, our job is to solicit the truth that's all we want."  Tr. at 77-78.

Not only do these improper statements relating to Reddicks's only chance to offer an explanation render his statement involuntary, the indecency was heightened where the officers also repeatedly called Reddicks a sociopath and a cold-blooded killer, leading Reddicks to believe that he must make statements in order to clear his name of such descriptions and finger pointing.  The officers referred to Reddicks as a cold-blooded

5

killer fourteen times throughout the interview and a sociopath at least five times during the interview. (Tr. at 24, 25, 26, 27, 35, 61, 62, 69).

Furthermore, the officers also used Reddicks's personal relationships with his mother and grandmother to coerce him to speak. The officers began the interview by stating, "[t]hink about the woman that's out there, your mother. Your mother Erica. Think about your grandmother Katherine…Great women. Caring women." Tr. at 13. Later, the officers stated, "[y]our mother deserves the truth, your grandmother deserves the truth." Tr. at 63-64. "Your mother outside deserves it, she deserves the truth. Don't let her hear the truth from us. Because the truth from us, her son isn't who she believes you to be." Tr. at 27. Later, the officer stated, "Charles, you're being selfish. You're involved, its just about yourself and your grandmother and your mother right now…but you've involved a lot of people, exposed a lot of people to a lot of drama now by the people you put on the table…" Tr. at 76.

Lastly, the officers failed to determine whether Reddicks was actually waiving his Miranda rights before beginning the interrogation. Commonwealth v. Chung, 378 Mass. 451, 458-59 n. 9 (1979) ("[E]vidence bearing on whether warnings were given and rights were validly waived is relevant in determining whether a confession is voluntary"); Miranda v. Arizona, 384 U.S. 436, 475 (1966). While Reddicks signed the Miranda form indicating he understood his rights, he did not indicate that he agreed to waive those rights and answer any questions the officers had. Tr. at 3 ("And then it goes on, I have read and understood the above rights as explained to me by John Callahan…You're supposed to sign here.").

6

**R43**

Reddicks's acknowledgement that he understood his rights is not the same as a decision to waive those rights. No officer explained to him that by signing the form, he would not only be acknowledging that he understood his rights, but would be making a knowing and voluntary waiver of those rights. A court cannot merely presume a waiver based on an individuals silence after warnings are provided or by an individual's failure to assert his rights and instead making statements to the officers. Miranda, 384 U.S. at 475 ("An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained."). Without specifically determining whether Reddicks wished to waive his rights, his signature on the waiver form was meaningless where officers merely indicated that he should sign the form if he *understood* his rights not if he wanted to *waive* the rights and speak to officers without consulting with counsel. Id. Since Reddicks never expressly indicated that he wished to waive his rights, the statement that followed cannot be considered voluntary. Id.

Analyzing the totality of the circumstances and the fact that the officers indicated to Reddicks that the interrogation would be Reddicks's opportunity to present "his solid case" and his version of the events, the line of questioning impermissibly misrepresented Reddicks's constitutional rights and rendered any statements involuntary. See Commonwealth v. Callahan, 401 Mass. 627, 631 (1988); Colorado v. Connelly, 479 U.S. 157 (1986); Commonwealth v. Thomas, 469 Mass. 531, 542-43 (2014).

7

This error was exasperated by the fact that the officers continually indicated that based on their version of events, Reddicks was facing first-degree murder and would go away for life. Commonwealth v. Novo, 442 Mass. 262, 269 (2004). Furthermore, the officers impermissibly used Reddicks's family relationship with his mother and grandmother to coerce a confession while simultaneously encouraging Reddicks to clear his name as a "sociopath" and cold-blooded killer. Lastly, Reddicks never waived his Miranda rights. Commonwealth v. Chung, 378 Mass. 451, 458-59 n. 9 (1979).

As such, any statements made by Reddicks were taken in violation of his due process rights pursuant to the 14th Amendment of the United States Constitution and Article XII and must be suppressed. Commonwealth v. Raymond, 424 Mass. 382, 395 (1997); Miranda v. Arizona, 384 U.S. 436 (1966) ("The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination…no distinction may be drawn between inculpatory statements and statements alleged to be merely "exculpatory."); Wong Sun v. United States, 371 U.S. 471 (1963).

## II. CONTRARY TO THE COMMONWEALTH'S ASSERTION, REDDICKS WAS IN CUSTODY.

An individual is in custody whenever he is "deprived of his freedom of action in any significant way." Commonwealth v. Haas, 373 Mass. 545, 550 (1977); Miranda v. Arizona, 384 U.S. 436, 444 (1966). "The crucial question is whether, considering all the circumstances, a reasonable person in the defendant's position would have believed that he was in custody…Thus, if the defendant reasonably believed he was not free to leave, the interrogation occurred while the defendant was in custody, and Miranda warnings were required." Commonwealth v. Damiano, 422 Mass. 10, 13 (1996).

The relevant factors in determining whether an individual was in custody include: "(1) the place of interrogation, (2) whether officers conveyed that the defendant is a suspect, (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the person being interviewed, (4) whether, at the time the incriminating statement was made, the person was free to end the interview by leaving the locus of the interrogation, as evidenced by whether the interview terminated in an arrest." Commonwealth v. Groome, 435 Mass. 201, 221-22 (2001); Commonwealth v. Morse, 427 Mass. 117, 121-27 (1998).

Here, Reddicks was at the police station in the company of two Boston Police detectives at the time of the interrogation. Secondly, not only did officers indicate that Reddicks was the sole suspect, he was told that the case against him for first-degree murder was "open and shut," and that officers were merely presenting Reddicks with an opportunity to tell his side of the story and redeem himself for being a "cold-blooded killer" and a "sociopath." Tr. at 25, 35 60-62. Furthermore, the interrogation was aggressive; the officers insisted Reddicks was guilty, that he was a sociopath and a cold-blooded killer, and whenever Reddicks attempted to say something other than a full-blown confession, he was cut off by the detectives. Id.

Lastly, the Commonwealth's claim that Reddicks terminated the interview is a stretch, at best. The Commonwealth points to Reddicks' statement that he had "nothing left to say," however, this was *after* the detectives had already terminated the interview. See Tr. at 78. Detective Callahan ended the interview by stating, "[w]e're looking at the right guy. And this isn't going away...I'm going to give you my cell number, Sergeant Daley will give you his number." The officers then handed Reddicks their business cards

9

and allowed him to leave. Reddicks's statement that he had "nothing left to say" was during their goodbyes after the officers had already terminated the interview and essentially "released" Reddicks.

While Reddicks was not arrested at the completion of the interview, this is irrelevant. The Court must consider whether a reasonable person in Reddicks's shoes would believe he was free to leave during the course of the interview. An 18-year old male who was being told that the officers believed he was unequivocally guilty of first-degree murder with an "open and shut" case, would not reasonably believe that he would be released at the end of the interview or that he could terminate the interview whenever he wanted to. Tr. at 61-62 ("You see we've got you, we got our guy. We got our guy. We got the guy who killed Mario. And we have a lot of evidence as you – as you have heard over an hour and it's going to get better."). If the officers had as strong of a case as they were presenting during the interview, they would have arrested him at the termination of the interview and a reasonable person in Reddicks's shoes would believe the same.

The unreasonableness of the assertion that a reasonable person would feel free to leave the interview is heightened by the fact that Reddicks was in a small room with two officers, where one of the officers may have been armed, and was told that he would be going away for the rest of his life due to the alleged overwhelming evidence against him.

Furthermore, this is not a situation where the officers told Reddicks he would be free to leave at the end of questioning, or where Reddicks was permitted to freely enter and exit the building during questioning. See Commonwealth v. Groome, 435 Mass. 201, 215 (2001). Additionally, the fact that Reddicks came to the police station with his

10

R47

mother upon the request of the police is not dispositive.  See Novo, 442 Mass. at 262 (defendant in custody at time of interrogation even though he voluntarily went to police station for questioning and drove there with his wife).

Viewing the totality of the circumstances, a reasonable person in Reddicks's shoes would not believe he was free to leave a police interview where officers had already unequivocally made up their minds that the suspect was guilty of first degree murder and where officers had an "open and shut" case.  See Commonwealth v. Haas, 373 Mass. 545, 550 (1977); Miranda v. Arizona, 384 U.S. 436, 444 (1966).  A reasonable person would believe that the officers were merely trying to elicit a confession before arresting him and sending him off to jail.  As such, Reddicks was clearly in custody at the time of the interrogation, contrary to the Commonwealth's argument, and any statements made must be suppressed.  Commonwealth v. Groome, 435 Mass. 201, 221-22 (2001); Miranda v. Arizona, 384 U.S. 436, 444 (1966); Wong Sun v. United States, 371 U.S. 471 (1963).

CONCLUSION

Wherefore, Reddicks respectfully requests that any and all statements made be suppressed as they were taken in violation of Reddicks's 5th and 14th Amendment rights under the United States Constitution and Article XII of the Massachusetts Declaration of Rights.

11

Respectfully Submitted,
CHARLES REDDICKS
By His Attorney,

Rosemary Curran Scapicchio
107 Union Wharf
Boston, MA 02109
(617) 263-7400
BBO#: 558312

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each party and upon any party appearing pro se by first class mail, postage prepaid or by hand delivery.

Dated: 9/15/2014          Signed:

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS:                          SUPERIOR COURT DEPARTMENT

POLICE INTERVIEW TRANSCRIPT

---

DATE:           May 10, 2012  2:40 p.m.

CASE NAME:      Commonwealth vs. Charles Reddicks
                Docket No. SUCR2012-10714

INTERVIEWERS:   Detective Jack Callahan
                Sergeant Detective Richard Daley
                Boston Homicide Unit

DISCLAIMER:  *The following <u>may</u> contain indiscernible or inaudible words due to the recording quality and/or accents and speech patterns of the individuals.*

---

1      DETECTIVE CALLAHAN:  Come in folks, have a seat

2   for one second.

3   (Pause)

4                INTERVIEW OF CHARLES REDDICKS

5      DETECTIVE CALLAHAN:  Charles this is Sergeant

6   Rich Daley.

7      SERGEANT DETECTIVE DALEY:  Charles have a seat.

8   Just to let you know this room is -- why don't you have a

9   seat over here.  This is audio taped and video taped so

10  that we can hear each other, and it's being video recorded

11  and auto taped.

12      Charles we'd like to talk to you for about 10 or

13  15 minutes, but because of this situation because we came

14  out there today, we executed a couple of warrants, because

1    your name came up in a criminal matter, by law we have to

2    afford you your constitutional rights.  All right.  Your

3    Miranda rights and then we'll get into a little

4    conversation.

5            Do we have a copy of this in here or?

6            All right.  Let me sit with you for a quick

7    second.  Charles, I'm going to ask you a few things.  We'll

8    sign it, I'll sign it with you, Richie will sign it, we'll

9    date and sign it.  Okay.

10           MR. REDDICKS:  All right.

11           DETECTIVE CALLAHAN:  Charles, you have the right

12   to remain silent.  Do you understand that right?

13           MR. REDDICKS:  (Nods head).

14           DETECTIVE CALLAHAN:  Can you do me a favor and

15   put your initials in that box, the line.

16           All right.  Anything you say can be used against

17   in a court of law or other proceeding.  Do you understand

18   that right?

19           MR. REDDICKS:  (Nods head).

20           DETECTIVE CALLAHAN:  You do.

21           Okay.  You have the right to talk to a lawyer for

22   advice before we ask you any questions and to have him or

23   her with you during questioning.  Do you understand that

24   right?

25           MR. REDDICKS:  Yeah.

3

1          DETECTIVE CALLAHAN:  Okay.  If you cannot afford

2     a lawyer and you want one, a lawyer will be provided for

3     you by the Commonwealth at no cost.  Do you understand that

4     right?

5          MR. REDDICKS:  Fine.

6          DETECTIVE CALLAHAN:  All right.  And if you

7     decide to answer now you will still have the right to stop

8     answering questions at any time, do you understand that

9     right?

10          MR. REDDICKS:  All right.

11          DETECTIVE CALLAHAN:  Okay.  All right.  And then

12     it goes on, I have read and understood the above rights as

13     explained to me by John Callahan.  Okay.  You know did I,

14     this is a new form -- witnessed by Rich Daley, signature

15     Rich Daley.  You're supposed to sign here.

16          Charles will you do me a favor, print your name.

17     Right next to -- that's mine, obviously.  Okay.  The

18     Sergeant's going to sign his name.

19          All right.  Today is the 10th and I've got 2:40

20     p.m.

21     Q    Okay.  Charles, you turned 18 in April, fair to say?

22     A    Yeah.

23     Q    Okay.  Charles, what comes to your mind as to why we

24     asked you to come in here today?

25     A    When I spoke to my mother she said that you guys said

4

1    the car was involved in the shooting.

2    Q    Mm-hmm.

3    A    I'm not sure.

4    Q    Okay.  How often do you drive -- your grandmother's

5    Katherine Reddicks?

6    A    Yeah.

7    Q    Okay.  Charles, you live at 116 Millet Street?

8    A    Yeah.

9    Q    Okay.  You're a student at Community Academy; is that

10   fair to say?

11   A    Yeah.

12   Q    How often do you drive the Ford Escort wagon?

13   A    Probably every other day.

14   Q    Every other day.  Do you drive it during the day or

15   during the evenings?

16   A    She usually drives it during the day.

17   Q    Mm-hmm.

18   A    She has to work.  Sometimes she doesn't get home till

19   eight.

20   Q    Okay.  So you were afforded the availability of the

21   car sometimes at night?

22   A    If she let's me use it.  Sometimes she'll let me use

23   it.

24   Q    Okay.  On a weekly basis, Charles, how often do you

25   use that car?

 1  A    I'm honestly not sure.

 2  Q    Okay.

 3  A    In a week maybe, four days in a week maybe.

 4  Q    Four days out of the week, okay.

 5       Charles, your current cell phone, 857 -- what's your

 6  current, your new number?

 7  A    Yeah.

 8  Q    857, I'm sorry, I didn't memorize it by heart.

 9  A    857-277-2448.

10  Q    2448.  How long have you had that number?

11  A    Um, I'm not exactly sure.

12  Q    Okay.  Can you tell us your old cell number?

13  A    My old one?

14  Q    Yeah.

15  A    857-205-2687.

16  Q    Okay.  How about 857-277-8189?

17  A    That was a phone that I had taken away a long time

18  ago.

19  Q    Okay.  How long's a long time ago?

20  A    I'm not exactly sure.

21  Q    Okay.  In conversation with your grandmother, you hang

22  around Jamaica Plain?

23  A    Huh?

24  Q    Having had conversation with your grandmother she says

25  you hang around Jamaica Plain with your cousins?

6

```
 1   A    Yeah.  They live in Westminster.

 2   Q    Okay, so --

 3   A    Almost always in Westminster.

 4   Q    Roxbury?

 5   A    Yeah.

 6   Q    Okay.  What are your cousins' names, Charles?

 7   A    John Hyman (ph).

 8   Q    John Hyman?

 9   A    Yeah.

10   Q    And who's the other brother?

11   A    Javon Hyman(ph).

12   Q    Okay.  Fair to say you were stopped with Javon Hyman

13   the other night?

14   A    When?

15   Q    You were stopped the night before last over at

16   Westminster Court?

17   A    Oh, at his house?

18   Q    Yeah.

19   A    Oh, yeah.

20   Q    Okay.  Think back on your other phone, was it stolen,

21   the 857-277-8189, was it stolen or did you lose it?

22   A    That one was stolen.  I had reported it stolen and

23   then they sent me a new phone in the mail.

24   Q    Okay.  But how long, your best memory Charles?

25   A    How long what?
```

7

1    Q    How long ago did you report it stolen?

2    A    Maybe it was two weeks ago, three weeks ago.  I'm not

3    sure.

4    Q    Okay.  Do you recall what kind of phone it was?

5    A    Huh?

6    Q    Do you recall what kind of phone it was?

7    A    It was a T-Mobile.

8    Q    T-Mobile.  Was it a iPhone or was it a --

9    A    I don't think iPhone's T-Mobile.

10   Q    What are the text phones here the -- like we carry the

11   flat screens, you can scroll, that's an iPhone.  Was it a

12   touch phone?

13   A    Yeah.

14   Q    Okay.  And you think about two weeks ago you had it

15   stolen?

16   A    Yeah.

17   Q    Do you recall from where?

18   A    I think I lost it somewhere at Egelston Square.

19   Because like the last time I checked my phone, I was

20   checking I couldn't find it.

21   Q    Okay.  Charles, let's ask you about some friends from

22   Jamaica Plain.  Who else do you hang around with other than

23   the Hyman brothers?

24   A    I basically know everyone in the community.

25   Q    Okay.  Who are your circle of friends, your small

1    circle of friends?

2    A    I try to like not really talk to much people, like get

3    too many people close to me.

4    Q    Okay.  But say for the sake of argument you got John

5    Hyman, you got Javon Hyman, who else is in that circle?

6    Your small, close core group of friends?

7    A    I'd say really them.

8    Q    Okay.  No other, no other guys with you?

9    A    Whatda mean?

10    Q    No other dudes hang around with ya and your circle of

11    friends?

12    A    Um, no just them.

13    Q    Okay.  Do you know any -- anybody by the name of

14    Jonathan?

15    A    Jonathan?  No.

16    Q    Anybody by the name of Ian?

17    A    Ian?

18    Q    Mm-hmm.

19    A    I know an Ian.

20    Q    Okay.  What's Ian's last name?

21    A    Huh?

22    Q    What's Ian's last name?

23    A    I don't know.

24    Q    Okay.  Where's Ian from?

25    A    Huh?

9

1    Q    Where's Ian from?

2    A    I have no idea.

3    Q    Is he from Jamaica Plain, Roxbury, Mattapan?

4    A    I don't know where he's from.

5    Q    Okay.  When's the last time you saw Ian?

6    A    Haven't seen him.

7    Q    Okay.  Going back a couple of weeks, Charles, you go

8    to school Monday through Thursday is that correct?

9    A    Monday through Friday.

10   Q    Monday through Friday.  Okay.  What time do you get

11   out on Fridays?

12   A    2:20.

13   Q    2:20.  Okay.

14        A couple of weeks ago, today's Thursday -- two weeks

15   ago tomorrow, April 27th.  Were you around Jamaica Plain

16   area?

17   A    I was in Egelston at my aunt's house.

18   Q    Okay.  Where's your aunt live?

19   A    Westminster.  That's the one I was telling you about.

20   Q    What time were you there on the 27th?  Now again

21   today's the 10th and tomorrow's the 11th so go back two

22   weeks.

23   A    How long was I there?

24   Q    Two weeks ago.  Two weeks ago tomorrow.  It was a

25   Friday.

1   A    You saying how long was I there?

2   Q    Yeah.

3   A    I have no idea.  I usually stay in the area and if I

4   do leave I go to Egelston Square or I either go to a park

5   where we smoke and stuff.

6   Q    Okay.

7   A    That's it.

8   Q    You're in school, what time do you start school?

9   A    Seven.

10  Q    Seven a.m.?

11  A    What is it -- actually 8, and on Friday we start at 9.

12  Q    Okay.

13  (break in audio/video)

14  Q    ... we got videos, videos are huge in society today.

15  They're everywhere.  They can't, you can't get away from --

16  any time you go out of your house, every day you're on

17  video a couple of times.  There are statistics, I don't

18  know what the statistics are.  So we get a lot of, we have

19  a lot of investigatory tools that we use.

20       Obviously you know we seized your grandmother's car

21  today.  We did a search warrant on Millett Street.  I know

22  you know that.  This is not new.  And there's a third

23  search warrant that's, it's being, processing your phone.

24  The one you reported stolen.

25  A    All right.

1    Q    And in our experience it's not uncommon that after a

2    murder the person we focus on, or person or persons we

3    focus on, and again not to say -- we're open minded at this

4    level.  We never focus on one person because you've got to

5    be open minded because reality is reality, you know.

6    Somebody might, somebody might be seen at a corner when in

7    fact they're at school and, you know, you work around that

8    with the phones, with video, with witness statements.  And

9    it's ironic, beyond coincidence that most times we have

10   somebody in mind they always cancel their phone service

11   right after a murder.

12        So not only are they a target, or a potential target

13   in a murder investigation all of a sudden after the murder

14   they cancel their phone.  We're not surprised by it because

15   it's human nature, people try to get ahead of or they think

16   they can get ahead of us, you know.

17        But here's where we're at in time.  Here's where we're

18   at.  And again we're good guys.  We like to put some cards

19   on the table, not all.  We have a gentlemen whose shot dead

20   and your name is all over the investigation.

21        Now with that being said Charles, you're 18 years old,

22   you have a good education behind you.  From what we're told

23   you're gonna, you'd like to go into college next year.

24   With that being said for every crime that we investigate we

25   always look to motive.  Why did it happen?  Why did this

1    person get killed?  How were they killed?  What time of

2    day?  What neighborhood?  What was the person's background?

3    Was the person a drug dealer, was the person robbing bank,

4    was he a bad person that went around harming people?

5        And then we look to the potential person or persons

6    responsible for that murder.  What would they have to gain

7    by taking somebody else's life.  And based on what we know

8    to the present day as we sit here with you Charles

9    Reddicks, and you're not here beyond coincidence, you know

10   that, you're here for a reason.  We didn't go out in the

11   street and grab the first guy we saw with dreads, with your

12   height, with your weight, with your age, with the fact that

13   not only does your grandmother drive a car that we were

14   looking at, but Charles Reddicks drives that car.  And not

15   only does your grandmother have that car, but she also

16   subscribed to a cell phone that you have care and control

17   of until after the murder when Charles loses the phone or

18   shuts off service.

19       But here's where we're at in time Charles, we know

20   that you were over in Jamaica Plain when the gentleman was

21   killed two weeks ago.  We know you were over there.  We

22   know that you communicated with that gentlemen, and at this

23   point in time Charles we brought you in here to give you

24   the opportunity to tell us why.  Maybe this guy was a bad

25   guy.  Maybe he pulled a gun on your.  Maybe he threatened

13

1    to pull a gun on you.  Maybe he was calling around the

2    neighborhood and saying I'm gonna get that dude, I'm gonna

3    get him, I'm gonna do him.  And you, maybe you went to

4    squash matters with him.  Things got out of hand and you

5    did something that is, that is not the right thing to do

6    but you felt like your back was up against a wall.

7        But take it to the bank Sergeant Daley and I know --

8    you're here for a reason Charles.

9        We took your car for a reason.  We searched your house

10   this morning for a reason.  We have another search warrant

11   that's current that's completely doing a forensic

12   background on your phone.  We're not only going to get text

13   messages that we know of now between you and the dude that

14   got killed, we're going to get everybody you communicated

15   with for a month's period.  We're going to get all the

16   pictures you took and all that stuff.

17       Think about that for a second.  Think about the woman

18   that's out there, your mother.  Your mother Erica.  Think

19   about your grandmother Katherine.  And you got Katherine

20   tattooed?

21   A    Yeah.

22   Q    On both arms.

23   A    First and last name.

24   Q    Good women.  Great women.  Caring women.  And Richie

25   and I spoke to your grandmother this morning and it was,

14

1    it's very hard to take that car from her, to deprive her

2    because she goes to work every day.  She puts a roof over

3    your head.  She loves you unconditionally.

4        Your mother is the same way.  She goes to work, two

5    beautiful women doing the best they can for Charles

6    Reddicks and other family members.

7        And as heinous is a crime of murder it's at least,

8    think to yourself that, let me be honest from jump.  Let me

9    stand up like a young man that I am, face the consequences,

10   offer my side of the story, tell why I did what I did

11   because Charles normally we don't give people

12   opportunities, people don't get good opportunities or they

13   decide to take a detour thinking they're going to outsmart

14   us.

15       And I already exposed some of my cards with Richie.

16   You know sometimes we do that, sometimes we don't.  But, I

17   mean things happen for a reason.  You're a young man, you

18   deserve the right to tell your side of the story.

19       And I think from me speaking for the past few minutes

20   you're in an uncomfortable situation.  You know we dot our

21   I's and we cross our T's, and there's more.  I mean this is

22   just beginning stages.  But at least think to yourself what

23   do I want to do here?  Do I want to alienate myself from

24   being there when the detectives got me dead to right there

25   when things are still ongoing with your phone, and by your

1    own words Charles you're the only one that drives that car

2    other than your grandmother.  And to let you in on a

3    secret, your grandmother told us that you drive the car

4    other than her during the evening.

5         You know a guy was killed during the evening hours and

6    I'll tell you right now Charles in addition to the phone

7    and why you went over there and everything else that we

8    did, fingerprints and all that stuff in the apartment, and

9    the witnesses were, that made observations, we pulled

10   video.  And I can tell you right now your car's on video

11   going to the area, coming from the area.  And take it to

12   the bank, take it to the bank that that's a little of a

13   lot, you know.

14        So think to yourself, do I want to be fair to my

15   mother, my grandmother.  Let's get the truth out.  Let's

16   face the consequences up front, but let's face the

17   consequences by letting you, Charles Reddicks tell us why

18   you did what you did.  There's go to be a reason because

19   you're -- it's not of your character.  You've got two

20   loving women in your house, you've got an uncle who's a

21   great guy, you've got a great education behind you and you

22   were looking forward to going off to the college in the

23   fall.

24        So why Charles?  What makes, why did you go over there

25   and pull the trigger?

1    A    I didn't murder anyone.

2    Q    What were you doing over in man's house?

3    A    What man's house?

4    Q    The guy that got killed.

5    A    I wasn't at his house.

6    Q    Charles --

7    A    I tried to tell you where I was at.  That was my

8    story, that's where I was at.

9    Q    Do you have 100 percent faith in your cousins that

10   they're going to back you up, that they're going to give

11   you an alibi?

12   A    I was with them, yeah.

13   Q    How did your car get over to Forest Hills?

14   A    I honestly don't think the car was at Forest Hills.

15   Q    Okay.

16   A    Because when I left from my house I walked to the park

17   and then after we were done smoking we came back.

18   Q    Think about who you called that day.

19   A    When?

20   Q    Think about who you called on April 27th.

21   A    Is there a specific time?

22   Q    In the morning, afternoon, early evening.  Who'd you

23   call?

24   A    I can't recall.

25   Q    Okay.  When you see phone records down the road that

1  will help you out?

2  A    Yeah.  But I'm telling you I didn't murder anyone.

3  Q    Maybe you were just driving the car.  Maybe you just

4  drove the car over there and let somebody out of the car

5  that went to do something and things got out of hand.  Mm?

6  A    No.

7  Q    No.  What about your past Charles?  You got some

8  things going on --

9  A    Well, yeah, I have --

10  Q    -- that not only, that are highly consistent with why

11  you're sitting here with us today.  Highly consistent.

12  A    Well I don't --

13  Q    What about those things?

14  A    Right now I'm on probation for weed, and I have a A&D

15  with a dangerous weapon that I have an open case for right

16  now.

17  Q    And again it's you don't have to discuss the open

18  cases, but just the contents of those cases mirror, they're

19  like a good proclivity -- do you know what the word

20  proclivity means?

21  A    Nah.

22  Q    It means that you have a set pattern to go out and do

23  things.  You have a set way of going out and setting things

24  up, just as this guy was murdered in Jamaica Plain.

25      And you know Charles we've sat here with a lot of

1    people over the years, young and old.  And we know the guys

2    that can come in and absolutely deny everything, and you

3    know I can -- we can tell from jump, and we can tell -- we

4    knew before you sat down in here that you were over there

5    that day.  That you went into a residence, and you pulled

6    the trigger.  And you, yourself, told us that you were the

7    only one driving the car, you had the phone and

8    coincidentally your phone, the phone gets canceled that

9    night or shortly thereafter.

10   A    But you know the car was only in Egelston.

11   Q    Okay.  How doe sit get on video in Jamaica Plain?

12   How's it get on video up by Forest Hills?

13   A    I don't understand because I told you that the only

14   time I ever left besides when I went home is when I walked

15   to the park.  That's the only time.

16   Q    Maybe you let somebody drive it.  Who did you let use

17   the car?

18   A    I let no one use the car.

19   Q    Okay.  How does it get on video Charles?  And you

20   don't have to take our word for anything, I mean you don't

21   know us from a hole in the wall.

22   A    Right.

23   Q    But you know we don't talk out of school.  Ever hear

24   the saying, it is what it is?

25   A    Yeah.

19

1    Q    We have no reason to buffalo you or anything.  Steer

2    you in a wrong direction.  Tell you things that aren't

3    true.  But take it to the bank, Charles, your car's on

4    video as clear as day.  Your car's on video.  And you

5    know --

6    A    Well I let you know I wasn't in that area.

7    Q    Okay.

8    A    So it doesn't make sense to me.

9    Q    Okay.  And take it to the bank that your grandmother

10   wasn't driving it over there that day.  Take it to the bank

11   that there were people that were over there that day, other

12   than video, other than phone companies who can give us

13   everything we ask for, there were human beings that have

14   eyes, have ears, have emotions, have instincts, have street

15   smarts -- and it's like a big bowl of salad.  Everybody's

16   in there together, cucumbers, tomatoes, lettuce, dressing,

17   and it works in our favor.  Everything that we have in that

18   salad bowl works in our favor and it all, by your own

19   admissions about the car and about the about the phones and

20   it works against you.

21        And again, maybe you're a pathological liar, but maybe

22   you're -- you have a good mind set that hey I'm denying

23   everything.  Let them to their job and let them get me into

24   the courthouse.

25        But you know that when everything's on the table,

1    points to you Charles.  And denying it only, you know,

2    denying it only hinders yourself, it hinders your

3    relationship with your mother, your grandmother.  They

4    deserve the truth.

5    A    Well I'm letting you know I didn't go over to the

6    Forest Hills area, and I didn't murder anyone.

7    Q    Okay.

8    A    And like yeah that's my phone.

9    Q    Do you recall having a text dialogue with a guy in the

10   morning over some marijuana?

11   A    What was it about?

12   Q    About buying some weed.  Purchasing some weed.

13        And again, maybe somebody else used your phone and

14   you're just covering up for that person.  Maybe, I don't

15   know we don't know you well.  But we, if that's the case,

16   your mother, your grandmother deserve you to tell the

17   truth, correct?  Did you let anybody use your phone that

18   day?

19   A    I told you other people use my phone all the time.

20   Q    Okay.  Did you let anybody drive the car that night,

21   Friday evening?  That went over to Forest Hills.

22   A    I didn't give anyone consent to drive the car.

23   Q    Okay.  So you're saying that you had the keys in your

24   pocket at that time too?

25   A    Yeah.

21

1   Q    You don't have any memory of giving the keys to

2   anybody?

3   A    No.

4   Q    Go back a month.  If you go back as far as your memory

5   can take you, you ever give the keys out to your car to

6   anybody other than your grandmother?

7   A    A month ago?

8   Q    Mm-hmm.  As far back as you can remember -- two months

9   ago, do you ever recall giving your keys up to anybody but

10  your grandmother?

11  A    Um, nah.

12  Q    No?  Okay.

13       So let's assume you're telling us that you had the

14  car, that you didn't let anybody use it.  And you do let

15  people use your phone.  But letting people use your phone,

16  I mean did your phone get stolen on the 27th?  We're going

17  to have records from T-Mobile as to when you terminated

18  service.

19  A    Yeah.

20  Q    And there going to tell us if -- we know you had the

21  phone that day, the day that this kid was killed.  His name

22  was Mariano Malave.  And I know you know his name because

23  you've read the papers and everything else.

24       Isn't it a coincidence that kid's murdered and that

25  your phone is all over the murder investigation and it

1   disappears or it's stolen right after the murder?  Isn't

2   that weird.  Sound -- ring a bell.

3   A    It is a weird coincidence, but when did the murder

4   take place because I told you when my phone went missing.

5   Q    Right.  After the murder.  After the murder.

6   A    When was the murder?

7   Q    The murder was April 27th, two weeks ago Friday.

8   A    What time?

9   Q    6:30.  And the male that did the shooting, not only is

10  his car there, his phone's there but the dreads are there

11  too.  The male that did the shoot.  Dreads.  You have

12  dreads.  That's odd, isn't it?  It's not odd, it's -- it

13  screams cause.

14       It screams that you're dead smack in the middle of a

15  murder investigation and all you're doing is denying that

16  you were there.  When it was your car, it was your phone.

17  We know you have a little past history with marijuana, and

18  with people who sell marijuana.  We know a lot more than

19  we're going to tell you here Charles, I'll tell you that

20  right now.

21       We know all about your little conversation with the

22  guy who was killed, in addition to conversation there are

23  numerous phone calls between you and this guy.  And your

24  physical description, including the dreads, you're dead

25  smack in the middle.

1        And mark my words, and mark Richie's words your car is

2   on video.  Your car is on video.  And we're not even done

3   with this investigation yet.  We got more, we took some

4   stuff from the house.  The car's down in a secure evidence

5   bay.  That's going to be forensically examined.  And then

6   we've got a lot more to work with.

7        And we have live witnesses.  With some cases we don't

8   have witnesses.  We have great witnesses, great phone

9   records.  And those records -- I'm sorry, I got allergies

10  from the -- those records are going to put you all around.

11  They're going to put you at school that day.  I thought you

12  went to school Monday through Thursday?

13  A    Nah, Friday just get out early.

14  Q    Okay.  Okay.  They're going to put you in school,

15  they're going to put you at home, they're going to put you

16  at Westminster, and they're going to put you over Jamaica

17  Plain.  Because there are cell towers everywhere you go.

18       So as you're picking up the jack to call your man to

19  let him know you're there, it's going to register you right

20  there.  Right dead smack there.  The nearest cell tower.

21  And there are cell towers all over the city.

22       So they're going to tell us, they're going to tell us

23  everything about where you were that day.  They're going to

24  tell us about everybody you were with, everybody you spoke

25  to, everybody you text, and where you went before and after

1    Mario Malave was shot dead.

2        And Charles all you got to do and again you can deny

3    it all you want, and you know I can look in your eyes, I

4    can see your body language as Richie can, that you know

5    that we're not talking out of school.  We're letting you

6    know some of the cards and you know we're dead on.  We're

7    100 percent, and this is a golden opportunity to give your

8    version of the story because --

9    A    I --

10   Q    -- a year down the road, two years down the road we're

11   going to be in a courtroom and I'm going to be sitting

12   across from you, maybe both, or Rich Daley and if I'm

13   there, it's me, I'm going to be looking at you.  I'm going

14   to sitting up there in a suit and tie.  I'm going to be

15   looking at you, and I'm going to be saying I gave him,

16   Sergeant Daley gave him, the opportunity to offer a reason

17   as to why he did what he did, as opposed to not saying

18   anything and me looking over at the jury as I'm looking

19   back to you and everything that is going to come out of our

20   investigation to the jury is going to be that Charles

21   Reddicks is a cold-blooded killer.  That he robbed dude,

22   shot dude over nothing.

23       As opposed to you telling us, there's got to be a

24   viable reason you do what you did.  You can -- Charles you

25   can deny it all you want but you're there, we've got you

1   there.  We know you.  We know, we -- prior to you even

2   being in this room today we did a lot of work.  We found

3   out all about Charles Reddicks.  We found out all about you

4   brother.  Maybe there's something we don't know that's --

5   absolutely.  We're not magic.  We're not, we don't have

6   crystal balls.  But mark our words and you know we come

7   from full strength, you're there and without saying

8   anything, without defending yourself you can say all you

9   want about I wasn't there and my car -- I don't know how my

10  car could have been over there.  Offer us a viable reason

11  why you shot this kid dead.  Offer us -- get it out, get it

12  out because you know we're coming.  You know we're coming.

13      Let us know that you're not a cold-blooded sociopath

14  killer.  Let us know that hey he pulled his gun on me, he

15  threatened me.  I mean there's got to be viable reason.

16  Other than that if you're going to let things lie where

17  you're letting them lie right now, you're just a cold-

18  blooded killer.

19      You had no intentions of brokering a deal about the

20  weed.  You were just taking the shit and shooting.  That's

21  a cold-blooded killer.  That's with somebody without a

22  moral conscious, without heart.  As opposed to giving

23  yourself an out, tell us -- you know again there's got to

24  be a reason Charles because we're -- I'll tell you right

25  now.  This is getting done.  You know it's getting done

1    because you've heard me talk for the past 20 minutes. It's

2    strong. There's a lot of evidence here and the

3    investigation is still in preliminary stages. We dot our

4    I's, cross our T's. It ain't TV where things are done in

5    two days, we take our time. We work hard, and then when

6    everything's ready we come. Somebody pays the price.

7         And this kid has family, this Mariano Malave, he's got

8    family, he's got friends, he's got a mother too, he's got a

9    father that loved him unconditionally even though he did

10   what he did and it's all, he sold his weed. You have a

11   mother and grandmother who love you. You have uncles that

12   love you, you have aunt, a couple of aunts, you have

13   cousins. Don't let them hear about their cold-blooded

14   relative, cold-blooded relative. Because what we saw in

15   that apartment, what we gathered that night and what we

16   gathered to this day is the person was a cold-blooded

17   killer. And you got to have some reason, you got to have

18   some reason why you would pull the trigger. There's got to

19   be some reason Charles.

20        Put the cards on the table, put the cards on the

21   table. Get a night's sleep because you know you walk out

22   of here today, how you gonna sleep. You're a young man.

23   You know decisions have to be made. You're 18 years old,

24   you're an adult. You've been an adult for a year. Don't

25   let it go down as you being a cold-blooded killer. Offer

1    yourself a defense as to why, don't let it go down as a

2    cold-blooded killer, Charles.

3        Your mother outside there deserves it.  She deserves

4    te truth.  Don't let her hear the truth from us.  Because

5    the truth from us, her son isn't who she believes you to

6    be.  Your grandmother the same.  Your uncles the same.

7    Your aunts the same.  Your cousins the same.  There's go to

8    be a reason, there's always a reason why things are done.

9        And those murders that are done like this one here

10    that aren't defended with a viable reason why it was done,

11    we just say, you know, it's a cold-blooded person I

12    wouldn't want to turn my back on.  Cold-blooded people.

13    And we've been doing this a long time.  We've sat with many

14    people who did murders and a lot of them can justify their

15    actions, a lot of them viably justify their actions.  But

16    some of them are cold-blooded killers that don't justify

17    their actions.

18        Don't be in that group, Charles.  Be fair to your

19    family.  You know what we have, we're going to keep

20    working, we're not done.  We've got a lot more work, even

21    though we have a lot of compelling evidence against Charles

22    Reddicks, including your own version of events to the

23    present.

24    A    How?

25    Q    Because it's your car, it's your cell phone and like

28

1    many times before your version of events after the incident

2    my phone was stolen, my phone was stolen.

3        We just sent away a 20-year old, 19 or 20 -- was he 20

4    or younger?  We sent a young man away to prison for life

5    for the same crime two years ago.  Same set of facts, same

6    circumstances.  Sent away for life in prison.  Not going to

7    school.  Just gone from his family.  A family that loved

8    him and, you know, and he's only one of many that just

9    think they're going to beat us.

10       This isn't a chess game.  This is a game of reality.

11   This is a game of life.  It's a game of making the right

12   choices from the get go because it's getting done Charles.

13       Rich, do you want to talk to Charles for a few

14   minutes.

15       SERGEANT DETECTIVE DALEY:  Sure.

16   BY SERGEANT DETECTIVE DALEY:

17   Q    Thanks for coming in.  How you feeling?  All right?

18   A    Yeah.

19   Q    You look a little nervous.

20   A    Well I'm trying to tell you guys that I was at

21   Westminster.  I stayed there.  The car was in the back.

22   The only time I left was when I went to the car and came

23   back and then I left that night.  You guys said it happened

24   at 6:30, I didn't have my phone around four -- so like I

25   don't get anything.

29

```
1    Q    Why are you recalling that time now?

2    A    I said four.  I said in Egelston Square I lost my

3    phone.

4    Q    Okay.  What did you do last Friday night?  Do you

5    remember what you did last Friday night?

6    A    Last Friday?

7    Q    Yeah.  A week from, a week go.

8    A    No.

9    Q    You don't?

10   A    I was at my cousin's.  I usually go over to my

11   cousins.

12   Q    Do you know what time you got there last Friday night?

13   A    What time I got to his house?

14   Q    Yeah.

15   A    I mean I probably got there around four.

16   Q    Okay.  Why do you remember so much detail about the

17   27th, but the other night you're not sure.  I mean you seem

18   to have a lot of details about the night in question.

19   A    I told you Friday I was at my cousins.

20   Q    Right, right.  Now the night you went up there that

21   you were there that night the 27th you're saying.

22   A    Yeah.

23   Q    What time do you think you got there?

24   A    At my cousin's house?

25   Q    Yes.
```

30

1    A    Around the four area.

2    Q    Four p.m.?

3    A    Yeah.

4    Q    Okay.  And you walked up to the park.  Who did you

5    walk up to the park with?  To smoke a little weed?

6    A    Yeah.

7    Q    Who'd you walk up there with?

8    A    My cousin.

9    Q    Cousin or cousins?

10   A    Cousin.

11   Q    Which one?

12   A    John.

13   Q    John?  Thought the other one was home, I thought the

14   other one was home too?

15   A    Yeah, he was home.

16   Q    But he didn't go to the park with you?

17   A    No.

18   Q    Okay.  And where is John's baby's mother?  You say

19   that's who he's staying with now.

20   A    Yeah.

21   Q    Who is she?  Do you know her name?

22   A    Kelsey.

23   Q    Where does Kelsey live?

24   A    I'm not even sure.  I think she lives in Attleboro.

25   Q    Oh, really.

31

```
1    A    Yeah.

2    Q    Okay.  And is it fair to say you came in here today,

3    your mother brought you in?

4    A    Yeah.

5    Q    Okay.  I mean apparently your grandmother means a lot

6    to you if you put her tattoo on your hands, you know what I

7    mean?

8    A    Yeah.

9    Q    And at some point today or you're going to have to

10   back and talk to her and she's, if she hasn't already asked

11   you questions.  And a person that important in your life

12   you want to be honest with them, and I hope you are.  You

13   going to be as honest with her as you are with us?

14   A    Yeah, I'm going to be honest with her.

15   Q    Really.  She's pretty upset.  And we really threw her

16   off today.

17        How do you get to school in the morning?

18   A    I get dropped off.

19   Q    How do you get there, who drops you off?

20   A    My mother or grandmother.

21   Q    They take you there and how do you get home in the

22   afternoon?

23   A    Take the bus home.

24   Q    You do, okay.  And this is the Community Academy?

25   A    Yeah.
```

32

1    Q    How long you been going there?

2    A    Since about January, I think.

3    Q    January of this year?

4    A    Yeah.

5    Q    Okay.  Like John was saying this is serious business,

6    you know, and it looks ugly for you right now.  We're going

7    to keep banging away and see where the investigation takes

8    us.  But right now it's taken us to your front door.

9    A    I understand what you guys are saying, but I'm trying

10   to tell you --

11   Q    I know but our evidence takes you -- we're not looking

12   at everybody in Jamaica Plain, we came right down like

13   this, 116 Millett Street.  We had focus and focus is on

14   you.  Why?  Why do you think that happened?  The three of

15   us are here today.

16   A    I don't know.  You guys said that there was a video of

17   the car.

18   Q    Right.  There's at least one video.  Jack did, showed

19   you a lot of his cards, but he didn't show you the whole

20   deck and at some point maybe you'll see it, maybe you

21   won't.  I don't know.  We have a lot of good hands in that

22   deck, and it doesn't look good for you right now anyway.

23        What do you think?

24   A    I don't.

25   Q    Any questions for us?

33

1    A    No.

2    Q    No.

3    BY DETECTIVE CALLAHAN:

4    Q    Charles, we're talking about a murder here.  A

5    person's life.  Somebody with a father a mother, a

6    girlfriend.

7    A    I understand, but I'm trying to tell you guys --

8    Q    Why, why, you can tell us all you want but you're not

9    convincing us.  You're not convincing us.

10   A    I don't know.  Everything I'm saying to you guys, I

11   think there's something behind it, like the cell phone

12   thing.  I'm being honest about the cell phone.  I didn't

13   drive to that area.  I was in Egelston.

14   Q    How'd your car get over there?

15   A    Huh?

16   Q    How's your car get over there?

17   A    (No audible response).

18   Q    Can I ask you something?

19   A    Yeah.

20   Q    If it was just your car that's one element, not only

21   do we have your car over there, we have a black male your

22   height,  your skin color, your build, with dreads.  Very

23   few people -- I mean dreads are common out there, but let's

24   go back.  Your car, the same physical characteristics, same

25   hairstyle, your cell phone.  We've got video, we've got

34

1    witnesses.  We have you telling us that you're the only one

2    that drives that car other than your grandmother.  That

3    you've never given the keys away.  And sometimes people use

4    your phone -- but it's beyond coincidence.

5        It's enough to sink your ship right now and we're not

6    done.  We could have came to you, we could have came to you

7    that Saturday, April 28th but we said nah that's too early.

8    And we still have some things going on.  But at the end of

9    the day Charles, your car on video, described by witnesses

10   to a T, to a T.

11   A    What do you mean to a T?

12   Q    To a T.  We've got your car, your telephone

13   communicating with the guy who's murdered, and we have you

14   on video, we have your physical description 100 percent.

15   We have, at the end of the day, all text messages for a

16   long period of time.  We have cell sites which is going to

17   put you, put you at home, going to school in Jamaica Plain,

18   going up to Westminster, going to Forest Hills, going back

19   to Westminster, going home.  You ever hear of the saying a

20   picture speaks a thousand words.  You ever hear that?

21   A    No.

22   Q    You ever hear that phrase?

23   A    No.

24   Q    Okay.  Well this totality of circumstances speaks of,

25   coupled with the video.  Video speaks a million words.  A

1  picture speaks a thousand, video speaks a million.

2  Totality of circumstances is what we've got here is a

3  billion.

4      I mean the deck is stacked against you Charles.  And

5  you're just -- I don't know if you're being hard headed or

6  if you're just a stone-cold sociopath.  I'm thinking that

7  knowing you, having done -- having looked up your past, all

8  of a sudden you just, you're on the radar.  All of a sudden

9  with everything going on, you pop up on the radar and we

10  look at your past and -- this guy's a sociopath.  It fits

11  you to a T what happened down in Jamaica Plain.  Just going

12  in and blasting this guy, blasting him.  Cold-blooded

13  killing.

14      And hey maybe that's you, and maybe you think you're

15  going to get away with it.  Maybe.  But at the end of the

16  day things are getting done Charles.  Things are getting

17  done.

18      I don't know.  I'm perplexed that you're not giving

19  yourself an out.  I think Richie's perplexed that you're

20  not giving yourself an out.

21  A    Honestly I don't know how the car was there because I

22  told you where I was at.  And then I told you the phone

23  situation.

24  Q    Right.  But you know what it doesn't make sense with

25  the phone.  You never said four o'clock initially when you

1    sat down here.  You said that it was missing, you never

2    even gave us a date.  You never gave us April 27th.  We'll

3    know when you called T-Mobile.

4         But isn't it a coincidence that --

5    A    I mean it is a --

6    Q    Isn't it a coincidence that you canceled it right

7    after the murder and that -- it doesn't matter, I mean.

8    A    I canceled it.

9    Q    Doesn't matter, doesn't matter.

10   A    It was stolen.

11   Q    We'll review phone records and everything is going to

12   come back in your court.  Everything's coming back to you.

13   There's going to be no variation.  We do cell records for a

14   long time.  We're going to get your pattern of life.  And

15   it's not going to show any variance.  We're going to show

16   you at home.  Show you at Westminster, Glen Road and your

17   pattern.  And then there's going to be small deviations,

18   but the number one deviation the scene of the crime, the

19   murder.  And that's going to be presented along with your,

20   who you contacted, your history of setting up drug deals,

21   your history -- history is can be single or plural.  In

22   your case it's plural.

23        Charles Reddicks sets up drug dealers and robs them.

24   And this one, I mean, this one you execute.  You execute in

25   his own home.  And you know what as it stands now he was no

1    threat to you.  He was no threat at all.  He took you into

2    his home and was going to serve you up some stuff and you

3    just, you executed him Charles.

4    A    I didn't do that.

5    Q    You can't even, you can't even offer an excuse or a

6    viable defense.  You can't even defend yourself as to why

7    you did it.

8    A    Because I didn't do it.

9    Q    You're just sitting here saying I didn't do it, I

10   didn't do it.

11   A    Because I'm being honest.  I didn't do it.

12   Q    Did you call Mariano Malave that morning?  Did you

13   text him?  Who texted him with your phone?

14   A    I don't know anyone named Mariano.

15   Q    Mario.  Do you know Mario?  Ever deal with Mario?

16   A    I never dealt with him.  I know he's a dealer.

17   Q    Can I ask you something?  Did you read the papers

18   after the murder, did you see that a kid was killed in

19   Jamaica Plain by the name of Mario.

20   A    Nah.

21   BY SERGEANT DETECTIVE DALEY:

22   Q    You said you knew he was a dealer?

23   A    Huh?

24   Q    How did you know he was a dealer?

25   A    Because I just knew he was a dealer.

1    Q    How did you know that?

2    A    Because people in the streets.

3    Q    Who?

4    A    People in the street.

5    Q    Yeah, who?

6    A    Is Mariano and Mario the same person?  Because I know

7    a Mario.

8    BY DETECTIVE CALLAHAN:

9    Q    How did you know Mario?

10   A    Huh?

11   Q    How did you know Mario?

12   A    I knew a Mario as a dealer.

13   Q    From where, where did he deal out of?

14   A    I don't know.  He'd meet in various places.

15   Q    What did Mario look like?

16   A    He was --

17   Q    Was he white, black, Hispanic?

18   A    I don't know what he was.

19   Q    Huh?

20   A    I don't know what he was.

21   Q    Right.  But you met him though.  You met him in

22   person?

23   A    No.

24   Q    You never met him in person?

25   A    I was supposed to meet him, but I never met him.

1   Q    When were you supposed to meet him?

2   A    From the past.

3   Q    Okay.  You ever go to his house?

4   A    I never met the dude.  I just like I spoke to him

5   about like numbers and stuff.  But like I've never made

6   like a transaction with him.  So is Mario Mariano?

7   Q    You're saying that you spoke to a Mario.  We don't

8   what Mario you spoke to.  Mario's a common name.  But

9   Mariano Malave is the guy that you killed, that's the

10  person you shot.  That's his name.

11       You didn't read about that in the papers after the

12  incident?

13  A    I didn't kill anyone.

14  Q    Huh?

15  A    I didn't kill anyone.

16  Q    Who had your car that night Charles?

17  A    The car?

18  Q    Yeah.  Who was driving the car on April 27th, the day

19  that your phone disappeared?

20  A    I told you what happened.

21  Q    You told us that your car was parked on Westminster.

22  A    Yeah, in the back.

23  Q    In the back.  Okay.  Will cameras from that

24  development put your car there?  Will it put your car

25  leaving at any time on or about the time of the murder?

1    A    (Shaking head).

2    Q    You're shaking your head.  Yes or no?

3    A    No, I'm saying no.

4    Q    Okay.  How confident are you on that?

5    A    I'm confident.

6    Q    Okay.

7    A    I told you where I went.

8    Q    You parked -- earlier you said you parked on the

9    street.

10   A    No, I said I parked in the back.  My aunt doesn't like

11   me parking on the street.

12   Q    Okay.  So you parked in the back lot on Westminster.

13   A    Yeah, that's where I always park.

14   Q    Okay.  Did you, were you in the house with your aunt

15   at any time?

16   A    Yeah.

17   Q    Will she vouch for you?

18   A    Huh?

19   Q    Will she vouch for you?

20   A    Yeah, I was there with her.

21   Q    Will she say you were there, you just left for a few

22   minutes maybe as you said you went to the park to smoke?

23   A    Yeah.

24   BY  SERGEANT DETECTIVE DALEY:

25   Q    Who else was there?  John, Javon, your aunt, and who

41

```
1    else was there?

2    A    Javon, John, my aunt and me.

3    Q    That's it?  Any younger kids or --

4    A    Younger kids?

5    Q    Yes.

6    A    No.  She had a godson, but he wasn't there that day.

7    Q    Okay.  And you're saying you were there from -- what

8    time did you say you got there, you said four-ish?

9    A    Yeah, it was around that area.

10   Q    And you left about midnight?

11   A    Yeah.

12   Q    I think that's what you said, right?

13   A    Yeah.

14   Q    And where did you go from there?

15   A    When I left?

16   Q    Yes.

17   A    At midnight?

18   Q    Yes.

19   A    I went home.

20   Q    To Millett Street?

21   A    Yeah.

22   Q    Okay.  What say 14 Westminster Court?  What's the

23   address that your cousin's --

24   A    Yeah, 14.

25   Q    What apartment?
```

42

1   A    I'm not exactly sure.  I just know what it looks like.

2   Q    All right.  This kid that you mentioned earlier, you

3   said Mario -- first you said I met him different places and

4   then 30 seconds later I never met the guy, I just talked to

5   him on the phone.  Which one is it?  This other Mario --

6   A    Mario --

7   Q    Do you have this Mario's contact with you now on your

8   phone?  This dealer?

9   A    No, because I have a new phone.

10  Q    Oh, but didn't you just transfer the contacts to it?

11  A    Huh?

12  Q    Didn't you just transfer the contacts from the old

13  phone to the new phone?

14  A    I have like some of the contacts that I've got, but

15  like it doesn't bring back all contacts.

16  Q    Oh, okay.  Well you know we're going to follow up on

17  the information you gave us.  Let's hope it rings true for

18  your sake, you know.

19  A    Yeah.

20  Q    Right now it looks ugly for you, for your grandmother

21  and for the victim's family.  But you have to put your head

22  down on the pillow at night, you know that's the -- either

23  dream or have nightmares.  Sometimes it doesn't bother

24  people with what they do, they can sleep through anything.

25  BY DETECTIVE CALLAHAN:

43

1    Q    You want to leave it like that Charles?

2    A    Leave it like that.

3    Q    Huh?

4    A    Leave it like that.

5    Q    Okay.  Anything else, you can defend anything, you can

6    give us any other places that you might have been.  Did you

7    save any receipts?  Maybe you went to Burger King or

8    anything.

9    A    Told you I left after school went home, at the home,

10   got the car, Egelston Square, grabbed my weed, when I got

11   back to my aunt's house I had no phone.  Then we walked to

12   the park.

13   Q    So you didn't have a phone when you left your aunt'S

14   house at four?

15   A    Huh?

16   Q    What time did you leave your aunt's house?

17   A    Like when I went home?

18   Q    When you went over to Westminster?  When did you lose

19   your phone?  Did you lose it after school or did you lose

20   it over at Westminster?

21   A    No, I lost the phone in Egelston Square when I was

22   getting some weed.

23   Q    Okay.  What time is that, give us a rough estimate.

24   A    It's all around four because everything's so close.

25   Like it's all in that area.  About that time.

44

1    Q    The hard thing we're having a hard time with is how

2    does your car end up over at dude's place.  How does it end

3    up there -- not only your car, but you're described to a T

4    and then you're on the phone calling the car right before

5    you meet him.  That's beyond coincidence.

6         So if somebody found your phone or somebody stole your

7    phone how do they know where to go.  That's the hard part.

8    How do they know you text dude all morning.

9         You're in school, and the pattern shows that you're in

10   school.  You have some structure going on.  And then all of

11   a sudden you end up over the place on video.  You're going

12   there from the area of Egelston Square, you're on video

13   you're going to dude's house.  And as you get to dude's

14   house, you're on the jack with him.

15        And then after he's shot and killed you go back to

16   Egelston Square.  And then the other phone calls put you

17   back on, I mean you're back up on Westminster.  It's not

18   going to, the phone don't lie, the records don't lie.  It's

19   beyond --

20   A    It doesn't make sense.

21   Q    If it looks like a duck, quacks like a duck, walks

22   like a duck, it's a duck, right?  Can we agree on that?

23   A    Not in this case because you guys trying to say that I

24   committed a murder.

25   Q    Who did?  Who killed him?

45

1    A    I don't know.

2    Q    Did John?  Did Javon?  Who killed Mario?  You're

3    saying that you had your car, we know where your car was

4    when Mario was killed.

5    A    I told you where the car was.

6    Q    Huh?

7    A    I told you where the car was.

8    Q    But how does it get over to Hyde Park Ave. to Mario's

9    place?  How does it end up there?  Not only is it on video

10   there but people put it there.  How?  How?  How?  How does

11   it get from Westminster to Mario's house when you have the

12   keys in your pocket.  Could Katherine have taken it over

13   there because she's the only other person with a set of

14   keys?

15   A    I let you know what happened.  Told you I was at

16   Westminster, and then after that we walked to the park, we

17   came back and then the only time I left after that was to

18   go home.

19   Q    Okay.  The ignition wasn't tampered with, nothing like

20   that?  You used your key to start the car to go home?

21   A    Do I use my key?

22   Q    No.  When you go back from smoking and you were going

23   home that night at 12, without your cell phone, was the

24   ignition -- the car was never stolen, right?  It never left

25   it's parking spot out in back?

1  A    Not that I know of.  I walked to the park --

2  Q    Charles, how does it get over to Mario's place?

3  A    I don't know it doesn't make sense to me.  I'm trying

4  to tell you guys I'm not a murderer.

5  Q    Can I ask you something, and speak from your heart.

6  You won't insult me, you won't insult him.

7  A    All right.

8  Q    Do you think I'm lying to you?  Honestly, speak from

9  your heart do you think I've been sitting here lying to you

10  for the past hour?  Speak from  your heart.  Say yes, I'm

11  not going to be insulted.

12  A    No, I don't think you're lying.  You must have these

13  facts, but it doesn't make sense.

14  Q    But how do I have the facts when you're denying that

15  your car was over in Forest Hills?  And we have statements

16  putting your car over there and not only do we have

17  statements -- when somebody tells us something that's

18  great, but we want to back their statements up so we go out

19  and look for video.  Now when people tell us something that

20  a car was over in Forest Hills, outside of a murder scene,

21  that's great.  Then we go get video and lo and behold,

22  yeah, they're telling the truth.  Then we go get phone

23  records.  Yeah.  It's starting to look real good and then

24  we sit with you and you say nobody else had my car that

25  night only me.  And I had my phone, but it disappeared the

47

1    day of the murder.

2    A    It didn't disappear.

3    Q    You lost it right or it got stolen over in Jamaica

4    Plain.

5    A    Yeah.

6    Q    You don't have that phone -- do you have that phone

7    anymore?

8    A    No, it was stolen.

9    Q    The T-Mobile.

10   A    They gave me a new one in the mail and I reported it

11   stolen.

12   Q    Okay.  So if it's stolen does that mean it

13   disappeared, it's gone?

14   A    (No audible response).

15   Q    You don't have it anymore, all right?

16   A    Huh?

17   Q    Do you have that phone somewhere?

18   A    No, it's gone.  I didn't get it back.

19   Q    Can I ask you something, the car, your grandmother's

20   car, is there anything in that car that's yours?

21   A    Anything in the car that's mine?

22   Q    Yeah, do you own anything that's in that car right

23   now?

24   A    Some electronic stuff.

25   Q    What kind?

48

```
 1    A    Like a cassette that I listen to music on.

 2    Q    Any phones, any other phones or anything?

 3    A    No.

 4    Q    Yeah.  What's Javon's number?  Do you have his

 5    numbers?  Let me write it down.  Do you have Javon's cell?

 6    A    He doesn't have a cell phone.

 7    Q    No cell?

 8    A    No.

 9    Q    Okay.  How about John?

10    A    John, he didn't have one, he had the girlfriend's

11    number.

12    Q    Do you know her number?

13    A    You want me to check my phone?

14    Q    Yeah, yeah, sure.

15    A    857-

16    Q    857-

17    A    237-

18    Q    237-

19    A    1030.

20    Q    Can I ask you something?

21    A    Yeah.

22    Q    We know that, we know who died -- is there a chance

23    that when we're doing cell records and stuff that it's

24    going to show them over there too?  Over in Forest Hills.

25    A    What do you mean?
```

49

1    Q    The cell sites.  When we do the cell sites.  You know

2    everything, we have Apple iPhones we have GPS chips, all

3    the phones have GPS chips.

4    A    Yeah.

5    Q    And when you make a call if you go out to West Roxbury

6    and make a call it shows up when you're making that call

7    and it shows up you're out in West Roxbury.  If you were on

8    Prince Street out there and there's a cell site at 10

9    Prince Street, it's going to hit off 10 Prince Street.  So

10   we know where you are.  And then if you go back to your

11   grandmother's house, your house, we know that you're out in

12   West Roxbury and you go back to Millett Street.

13        Is there a chance that --

14   A    Is it possible that --

15   Q    -- their cell sites, their phones are going to light

16   up on Westminster, then light up on Forest Hills and then

17   light up back on Westminister?

18   A    No one went there.

19   Q    Did you go back to Westminster after you left Forest

20   Hills?

21   A    I didn't go to Forest Hills.

22   Q    Charles, how does your car get in Forest Hills?

23   A    I honestly don't know, I told you I left it in the

24   back park.  I went to the park that's the only time I left,

25   besides when I went home.

1    Q    When you were smoking with John in the park is there a

2    chance Javon took your car?  To go up to Forest Hills?

3    A    No.

4    Q    How does it end up there brother?  How?

5    A    It doesn't make sense to me.

6    Q    How does a person described as you're sitting here

7    across from us, how does a person in your vehicle with the

8    description that matches the shooter to a tee, and then

9    text messages and cell phone calls match up to the victim's

10   phone, how is that possible when the car's on Westminster

11   and you're in the park smoking?

12   A    I don't know how the car got over there.

13   Q    How?  How?  Come on you're a smart kid.  You're a

14   smart kid.  How?  How do all these things line up and your

15   only answer is that my phone was stolen that day.  Of all

16   the days to be stolen and then my car's in the parking lot.

17   A    Well I told you.

18   A    I don't know.  I'm not being sarcastic or I'm not --

19   I'm just trying to be open minded, but everything's not

20   adding up.  Things just aren't adding up.

21        SERGEANT DETECTIVE :  Can I get the aunt's number too,

22   the home number.

23   DETECTIVE CALLAHAN:

24   Q    Does your aunt have a cell phone that was there too?

25   At 14 Westminster, what's her phone number?  Your aunt.

51

1    (Pause)

2    A    It's 617-708-4211.

3    Q    Can I ask you something.  What kind of phone is that,

4    can you put it on the table for me?

5    A    Sidekick.

6    Q    What kind?

7    A    T-Mobile.

8    Q    T-Mobile.  What's it say on it?  T-Mobile?

9    A    Samsung.

10   Q    T-Mobile Sidekick Samsung make.

11   A    Yeah.

12   BY SERGEANT DETECTIVE DALEY:

13   Q    Once you phone was stolen, or lost or stolen in

14   Egelston Square, whose phone did you use to report it

15   stolen and order the new one?

16   A    When I had got home I told my grandmother and we made

17   the phone call.

18        DETECTIVE CALLAHAN:  Rich, not to interrupt but --

19        SERGEANT DETECTIVE DALEY:  It's all right.

20   BY DETECTIVE CALLAHAN:

21   Q    Charles, in the spirit of the conversation that we're

22   currently having, that's not, that's not the same phone you

23   just changed numbers is it?  That you had.

24   A    What do you mean?

25   Q    Is that the same phone that you reported stolen and

52

```
 1   just wanted a new number?  When we check with T-Mobile --

 2   A    No, it's a different phone.

 3   Q    That's a brand new phone?

 4   A    Yeah.  They sent it in the mail.

 5   Q    Huh?

 6   A    Yeah, it's a brand new phone.  They sent it in the

 7   mail.

 8   Q    Okay, all right.  It's just, you know, it's hard with

 9   all the facts we have and we're not done yet.  It's just

10   hard to try to figure out, you're telling us you have the

11   car, you're telling us you have the phone, but

12   coincidentally the phone disappears that night right before

13   the murder.  Do you see where we're coming from?

14   A    I understand.

15   Q    Yeah.  And you're completely denying that you were

16   ever at Mario Malave's house?

17   A    No, I wasn't.

18   Q    Huh?

19   A    I wasn't there.

20   Q    Okay.  Can I ask you something.  There's text

21   messages, and again Charles I'm just, I'm really -- when I

22   say I, we're in this together.  We're perplexed that

23   knowing you, knowing about you that you had the phone that

24   morning, didn't get stolen and Mario and you were texting

25   about the sale of some weed --
```

53

1 Q Is Mario Mariano?

2 A Mario is Mariano.  He's known as Mario.  So it's the

3 guy you know.  And you and Mario were negotiating the sale

4 of weed, can that be you?  I mean are you saying that can

5 be you?

6 A What?

7 Q Even though you never met him you could be texting him

8 about buying some weed?

9 A Yeah.

10 Q Is that fair to say?

11 A Yeah.

12 Q That morning?

13 A Yeah.

14 Q Okay.  That's all.

15 A But I --

16 Q But then --

17 A -- never met the guy or made a deal with him.

18 Q Okay.

19 A That's what I'm trying to say.

20 Q But you texted, you set up -- you wanted to buy some

21 weed from him, right?

22 A Yeah, we had a conversation before like, the dude

23 Mario about weed.

24 Q How much weed were you looking at to buy from him?

25 A I don't remember.

54

1   Q    Think.  An ounce, couple of ounces, a pound?

2   A    I'm not sure.  I know it was like, it was a lot.

3   Q    Okay.  How much money were you looking at spending?

4   A    I don't know.

5   Q    Think.  A grand, two grand, three grand, four grand,

6   five grand?

7   A    I don't want to say.

8   Q    Mm?

9   A    I don't want to say.

10   Q    Okay.  A lot of money, would you say a lot of money or

11   a little money?

12   A    Not too much.

13   Q    Okay.  But you have a dialogue, you and Mario try to

14   broker a deal and he's killed that night and your phone

15   disappears at four, you're phone is stolen four p.m.

16   Maybe, Charles, maybe?  And you don't want to rat anybody

17   out, maybe one of your friends knew about that and maybe he

18   said, hey I'm going over and taking that shit, you know.

19   Maybe that happened in your presence and, you know, you're

20   afraid.  You don't want to snitch anybody out.  You don't

21   want to be exposed.  You don't want to expose anybody to

22   us.  Could that have happened?  You protecting somebody?

23   A    No (shakes head).

24   Q    No?  You have the text message dialogue with Mariano

25   -- Mario, I'm sorry.  Mariano is his blood name, his birth

1   name.

2   A    Yeah, I was talking to Mario.  And it was about weed,

3   but I never met Mario.

4   Q    Right.  Who told you about Mario?  Who introduced you,

5   who gave you his name?

6   A    I found out from the streets.

7   Q    Does the name Jonathan ring a bell to you?

8   A    No.

9   Q    No?  Ian does?

10   A    Yeah.

11   Q    Ian does.  Did Ian introduce you to Mario or give you

12   his name?

13   A    No.

14   Q    When's the last time you talked to Ian?

15   A    Ian -- not exactly sure.

16   Q    Okay.

17   BY SERGEANT DETECTIVE DALEY:

18   Q    Do you have his number in your phone, we can have it?

19   A    Ian's number?

20   Q    Ian's number.

21   A    Yeah.

22   (Pause)

23   A    I'm checking and that didn't come back.  I don't have

24   that name.

25   BY DETECTIVE CALLAHAN:

1   Q    Okay.  Is there a chance, is there a chance Charles

2   that Ian's number is in your old contact list?

3   A    The old one?

4   Q    Yeah.

5   A    It might be, but the phone was stolen.

6   Q    Okay.  We still, we can get the contact list.

7   A    Oh.

8   Q    So you have a text message, dialogue, to buy some

9   weed, and did you ever -- did Mario ever tell you where he

10  lived?

11  A    No.

12  Q    Were you with anybody that you were going to do the

13  deal with, were you going to split up the weed or were you

14  going to get it for yourself?

15  A    Yeah.

16  Q    To smoke it all?

17  A    Huh?

18  Q    To smoke it all?  We're you going to smoke it all?

19  A    (Nods head).

20  Q    All right.  And nobody's around you that might have

21  overheard your conversation or saw you texting and maybe

22  said -- maybe you don't know, maybe somebody just saw you

23  setting up a deal and they figured hey I'm going to go rip

24  dude knowing that he's got that type of weed.

25  A    I don't know.  I don't think that woulda happen.

57

```
1   BY SERGEANT DETECTIVE :
2   Q    Why didn't you consummate the deal?
3   A    Huh?
4   Q    Why didn't the deal go down?  Why didn't you go buy
5   it?
6   A    Because I never spoke to him.
7   Q    You just said you had a conversation with him, you
8   were lining it up.
9   A    No.  I'm saying I hadn't spoke to him after the fact.
10  Q    After the fact when?
11  A    Like since when we had text messages about it.  When I
12  texted him that's the only time.
13  Q    At the end of the -- the last communications with him,
14  did you set it up say I'll be over there at three or I'll
15  be over there at ten?
16  A    No.
17  Q    Why didn't --
18  A    It was just about prices.
19  Q    Oh, it was just about prices?
20  A    Yeah.
21  Q    So you weren't putting a deal, arranging --
22  A    I was just --
23  Q    -- to get together --
24  A    I was seeing who Mario was working with like if he had
25  good prices and stuff.
```

58

1    Q    If he had good prices?

2        Okay.  So you didn't make any future plans to get

3  together?

4    A    No.

5    Q    The phone records won't contradict that?

6    A    What do you mean?

7    Q    You're telling me that you just had some

8  communications about what your prices are.

9    A    Yeah.

10    Q    But what if our phone records contradict that the

11  communication continued right through the afternoon?  Why

12  is that?

13    A    But I never met him.

14    Q    I know what you're saying, but you guys would be --

15  talked all morning and all afternoon about getting together

16  to put a deal down and then just poof it just vaporized?

17  The communication between -- you guys never got together?

18    A    I mean I lost my phone at four, I had nothing to do.

19    Q    Yeah, it's kinda convenient that you lost -- after you

20  found out we tell you what time the murder was at 6:30,

21  that is, it was after you found that timeframe that you

22  conveniently lost your phone at four o'clock.  It's kind of

23  suspicious to me.

24    A    But I really did.

25    Q    Convenient for you, but suspicious to us.  You

1  remember two weeks ago, you're locking down at a time of

2  the day, two weeks ago conveniently --

3  A    Because I knew I --

4  Q    -- lose, lost your phone.

5  A    Well, I --

6  Q    Where did you lose it in Egelston?  Where do you think

7  you put it down?

8  A    I don't even think I put it down, I think it might

9  have dropped and that's how I lost it.  Then somebody

10  probably picked it up.

11  Q    Whereabouts in Egelston?  Said you went up there to

12  get some weed, I think, didn't you or smoke or some weed?

13  A    Yeah, I got some weed in Egelston.

14  Q    That afternoon?

15  A    Huh?

16  Q    That afternoon?

17  A    Yeah.

18  Q    All right.

19  BY DETECTIVE CALLAHAN:

20  Q    Charles, as Rich is saying when we look at the phone

21  maps, the cell tower sites, when we look at the cell tower

22  sites not only do we have a running dialogue of a

23  transaction, planned transaction, you're asking Mario, the

24  last transaction you're asking Mario is where can we meet

25  at, where do you want me to meet at.  And then all of a

1    sudden your phone, you're saying your phone's cancelled --

2    your phone's stolen or lost or conked out.

3    A    My phone really was stolen.

4    Q    Okay.  But -- and then, what's going to happen though

5    is then your phone whoever found your phone, because

6    somebody picked it up calls Mario back a couple of times.

7    Calls Mario back.  Your phone is the last phone to call

8    Mario before he's killed.  And that's right before he's

9    killed.  And it's right as your phone, your car is -- your

10   car is already, we got you in the area.  We have you

11   arriving in the area, your car.  Then as Mario, as Mario is

12   dead your car is leaving Forest Hills.

13        So you see the cards we're dealing with, it's like an

14   open and shut case.  Defend yourself, Charles, by telling

15   us why you did it?

16   A    I told --

17   Q    Don't go --

18   A    You know I didn't do it though.

19   Q    Don't, did your cousins do it?  Did Hyman get out of

20   the car?

21   A    I don't know anything about a murder.

22   Q    Let me ask you something -- let me tell you something.

23   The driver of your car killed Mario.  The driver of your

24   car with dreads, black male, height, weight consistent with

25   your height and weight killed Mario.  You set up the deal

61

1    with Mario.  You were trying to broker a deal.  That's the

2    motive.  That's the motive you've used in the past Charles

3    to set up deals.

4         And -- defend yourself kid.  Tell me -- don't be a

5    cold-blooded killer.  Don't come across to the woman who

6    raised you and changed your diapers and fed you and goes to

7    work for you every day and fights for you to get into a

8    college and who lies awake in bed every night that you have

9    problems.  This is a big problem, it's not going away.  Big

10   problem.  And we're not going away.  It's in your court.

11   A    I understand, but I didn't do no murder.

12   Q    Don't be a cold-blooded murderer.

13   A    I didn't commit a murder.

14   Q    Defend yourself.  Did Mario point the gun at you?  Did

15   one of his boys point a gun at you?  Did he have a knife on

16   you?  Was he trying to take your money?

17   A    (No audible response).

18   Q    Defend yourself.  There's got to be a reason.  You

19   don't look like a cold-blooded killer.  You don't look like

20   a sociopath.  You're going to school.  You're doing the

21   right things, you know, take responsibility for your

22   actions.  But take responsibility by telling the truth,

23   Charles.

24        You see we've got you, we got our guy.  We got our

25   guy.  We got the guy who killed Mario.  And we have a lot

62

1    of evidence as you –– as you have heard over an hour and

2    it's going to get better.

3         Our case is –– some nights we get called two in the

4    morning we got a body on the street, with sometimes no

5    casings, sometimes we have casings.  We haven't even talked

6    to you yet about ballistics evidence.  Do you know what

7    ballistics evidence is?

8    A    Mmm.

9    Q    Bullets, guns, all that stuff.

10   A    I know.

11   Q    We haven't even talked to you about that.  We haven't

12   even opened up that topic yet, and I'm not gonna open it up

13   because you know we've given you a lot.  And you've given

14   us, you've given us a lot too believe it or not.  But

15   you're not giving us 100 percent, you're giving us 70.  And

16   everything –– we got our guy.  We're convinced of that.

17   Our guy's sitting with us right here.  And our guy is still

18   a cold-blooded sociopath, not a –– right now he's, maybe he

19   has a heart, but he's just so afraid to expose that heart.

20   A    No.

21   Q    But Charles as God is above the three of us here

22   looking down, we got our guy.  And it's all about just

23   putting the cards on the table.  Give us a defense.

24   A    I didn't commit a murder.

25   Q    Who did?  Who did, Charles?  Who shot Mario?

1    A    I don't know.

2    Q    You set up the deal.  You set up the deal.  You broker

3    the deal.  You broker a price.  You ask him, one of the

4    last things you ask him is where do you want to meet at.

5    And then those text messages go to phone calls.  And then

6    those phone calls escalate to the fact where your car is

7    pulling in by Forest Hills, great video -- and bear in mind

8    it's daylight.  It's daylight, it's not night.  Coming into

9    the area, within minutes driver of Charles' 1992 Ford

10   Escort, Mass. Reg. 6738TV, it's television, victor, gets

11   out on the jack and all -- again, records, records, it's on

12   the jack.  And on that jack it's going up to a cell site.

13   Bang.  Murder.  Murder.  Get back in the car, inbound on

14   Washington Street back towards Egelston.  And we're not

15   done here.  Tell us the rest of the story.

16   A    That's not the story.  I didn't commit a murder.

17   Q    What is the story, Charles?  What is the story?  What

18   is the story?

19   A    I don't know.  I told you what I had to say.

20   Q    What about, what about the text messages?  You broker

21   a deal, your phone's missing, and then that -- whoever took

22   your phone is smart enough to call Mario and say, hey I'm

23   coming for the shit.  Doesn't make sense.  You're too smart

24   for that.  You're too smart for that.

25        Your mother deserves the truth, your grandmother

64

1    deserves the truth, your uncle deserves the truth.  They

2    are going to get the truth.  They're going to get our

3    truth.  They're going to get our version.  They're going to

4    get our version.  And our version is ugly.  Our version is

5    very ugly.  There's no prettiness.  There's no sugarcoating

6    it.  We can only be so kind and we can't sugarcoat the

7    truth.  The truth gets exposed.  The truth gets exposed in

8    a court of law.  Where there's a jury sitting there.

9        And either I'm telling the facts, or him, or both of

10   us.  And then people from the phone company come in, our

11   ballistician comes in who recovers the ballistics, and that

12   ballistics gets traced to everything that's been exposed

13   to.  And then other people come in a chemist, and we hire a

14   cell phone specialist to come in and explain to a jury how

15   cell towers work.

16       And then we have, we show them videos, and then they

17   see the video tape that's playing now of Charles, every 15

18   minutes offering a little bit more and telling about text

19   messages, having an ongoing dialogue about brokering the

20   sale of marijuana, but then his phone disappears or it gets

21   stolen or lost --

22   A    It was stolen.

23   Q    But then the person whoever recovered your phone knows

24   to go to Mario's house, and not only do they know how to

25   get there but they use your car.  And the person who

1    recovers your phone and who drives your car looks just like

2    you.  Same build, same height, same age, characteristics,

3    same dreads hairstyle.  I don't know.  Maybe, again I don't

4    mean to come across as insincere or anything but --

5    A    I understand what, I didn't commit a murder.

6    Q    It's ugly.  And I mean there's more to follow.

7    BY SERGEANT DETECTIVE DALEY:

8    Q    And when we get to court we tell the story.  At this

9    stage, in this room, this is where you have a chance to

10   tell it, the story.  When we tell the story we're going to

11   tell it the way we presented it and put it together.  But

12   without your version it looks ugly.  That's why we're going

13   this right now.  An opportunity to get the truth out of

14   what really happened.

15   A    I didn't commit a murder.

16   Q    You did not?

17   A    Did not.

18   Q    Okay.  Okay.  Well we're gonna -- we may have

19   different evidence that comes to a different conclusion

20   than what you're saying.  It's going to involve a lot of

21   people, a lot of witnesses.  Broad daylight, busy Forest

22   Hills area, commuting hour on a Friday evening, cars going

23   by, people living there, cameras.  We're going to present a

24   pretty solid case.  This is your opportunity to present

25   your solid case, or your explanation for your actions or

66

1    actions of your friends.  If you want to take advantage of

2    that, you know.

3    Q    Who killed Mario?

4    A    I don't know.

5    Q    Why do you think he was killed?

6    A    I don't know.

7    Q    Charles, how do we get around all the facts?  Video,

8    cell records --

9    A    I tried to explain what, what I could but you guys

10   aren't hearing me out.

11   Q    What are feeling right now?  What are you feeling?

12   A    Just everything looks bad against me.

13   Q    Right.

14   A    And I didn't murder anyone.  I was -- part that sucks.

15   Q    Right.  Look try to convince us that we have the wrong

16   guy, Charles.  I mean we'd definitely we'll pivot and go in

17   a different direction if you give us a direction, we're

18   just following the evidence right now.  That's why you're

19   sitting here.  Help us out, give us a little something.

20   Another truthful version or a truthful version that we can

21   -- don't waste our time of course we're selfish about out

22   time, but if you have something solid that you can say

23   these guys are barking up the wrong tree.  Why are they

24   coming after me they should be going to -- take us to

25   there.  Do you have any kind of direction you could take us

1   to?

2   A    I don't have anything, I don't know anything.

3   Q    Who else do you buy -- you may not -- Mario was the

4   dealer, supposedly you get information he was selling some

5   weed.  Who else would sell some in JP?

6   A    I get my weed in Egelston.

7   Q    When you went up to the park, is this the park by the

8   school, at the top of the street and across the street from

9   Westminster Court that field there?

10   A    Intersection of Walnut and Westminster, like know

11   where the little basketball court is?

12   Q    Well you were going to that park --

13   A    Playing --

14   Q    -- in Westminster?

15   [simultaneous speech]

16   A    No, it's not --

17   Q    It was the playground.

18   A    No, that's not what I'm saying at all.

19   Q    You talking about the school across the street on

20   Walnut Ave., right?

21   A    I don't even know how to explain it.  I just know that

22   if when you're coming up Westminster there's like a, you'll

23   see it right there.

24   Q    At the top of the hill?

25   A    Yeah.

68

1    Q    Oh, yeah, okay.  Westminster, it intersects with

2    Walnut?

3    A    Yeah.

4    Q    Across the street there's a fenced in park is that

5    what you're talking about?

6    A    Where the basketball court is, right next to the big

7    building.

8    Q    Yeah, the big building, it's a school I think.

9    A    The big building and then there's a court right there

10   then there's like benches and stuff like that.

11   Q    Okay, all right.  Do you smoke a lot?

12   A    Yeah.

13   Q    You do?   Daily?

14   A    Like maybe every other.

15   Q    Does it effect your memory at all?

16   A    Huh?

17   Q    Does it effect your memory?  The weed?

18   A    Not too much, no not really.

19   Q    No?  Who else, who were some of your other friends up

20   in the Egelston area besides your two cousins?  Who are

21   some of your circle of friends that you run with?

22   A    I mean I try to just stay with them because they're

23   cousins.

24   Q    Yeah.

25   A    And just from stuff that's happened in the past I

69

1  don't really hang out with too many people.

2  Q    What's happened in the past?  You have a beef up

3  there?

4  A    Huh?

5  Q    Have you had a beef up there?  In Egelston?

6  A    In Egelston?

7  Q    Yeah.

8  A    No.

9  Q    You free to go further, you had no problems with

10  anybody?

11  A    No problems.

12  Q    No?

13  A    Not really.

14  BY DETECTIVE CALLAHAN:

15  Q    Charles, you've got some problems brother.  You got

16  some problems.  You're looking at a first degree murder.

17  Right now you're looking at a first degree murder.

18  A    I don't understand why.

19  Q    Why?  Murder during the commission of a drug robbery.

20  It's cold blooded.  Right now it looks like you just

21  brokered a deal and you went up there and you said, you

22  know what I'm taking that shit and I'm just blasting them.

23  A    It's not like that.  I never even got a chance to meet

24  Mario.

25  Q    Because he didn't have a -- no, you didn't.  You just

1   took his shit and you shot him.  That's all you did.

2   A    I don't --

3   Q    And you know what right now, right now that's how it

4   is.  First degree murder.  Charles Reddicks.  You brokered

5   a deal and you told us who was with you.  You just told us,

6   you told us tonight who was with you in the car.  You told

7   us a lot tonight believe it or not.

8   A    Told you I was at the park.

9   Q    You told us who you were with on Friday.  You told us

10  that you text messaged Mario to set up the deal and you

11  essentially told us everything.  We're just going to do a

12  little more work and [knocking sound] and come knocking.

13  Because it's -- we got the right guy.  We got the right

14  guy.

15  A    No.

16  Q    You can't --

17  A    The way it looks, it looks like I did it but I didn't,

18  I didn't murder him.

19  Q    It not only it looks like you did it, you did do it.

20  You gave us everything, but you're just not admitting it.

21  You gave us everything.  That's you brother.  It's your

22  mind set, you knew you were coming up here and I ain't

23  saying shit.  I'm gonna listen to what the detectives have

24  to say and I'm not saying shit.

25  A    It's not like that.

1    Q    But then you did.  You gave us little bits of this and

2    that.  You conveniently, you couldn't -- I honestly think

3    that when the phone records come through about you calling

4    in -- I don't think it happened on the 27th.  I think it's

5    a day or two later.

6    A    What did?

7    Q    You're going to be making phone calls, you're going to

8    be making phone calls and texting -- we're going to look at

9    your text messages.  I don't have the warrant with me but

10   we got a search warrant today forensically -- what's the

11   word we use -- electronic, forensically and electronically

12   examine your phone, your old phone number.

13       We don't need the phone.  All we need is your number.

14   T-Mobile is going to give us the cell towers, your text

15   messages and everything that we seek, and we seek that from

16   jump.  We got your number right up front.  We got your car

17   right up front.  But we wanted to do some more work.  And I

18   think that when we look at all your text messages even

19   though you say that the phone was stolen right after the

20   murder that you're going to be texting people that you

21   normally text.

22   A    I don't understand because I let you know that the

23   phone was stolen.

24   Q    Yeah, but you know I got to tell you something.

25   There's no doubt you got a new phone, no doubt.  Do you

72

1    remember being, have you ever seen me before?

2    A    No.

3    Q    Do you remember riding down in an elevator a couple of

4    days ago with your mother?  You don't have to say where, do

5    you remember being in an elevator?

6    A    An elevator with my mother?

7    Q    Yeah.  Monday.

8    A    Yeah.

9    Q    Do you remember who else was in that elevator?

10   A    Was you in the elevator?

11   Q    I was in the elevator.  And I was in there for a

12   reason.  A specific reason.  And I followed out, after you

13   left I followed you out and I did some things that I'm not

14   going to mention, but I think the records Rich are going to

15   say that he still had that phone after the 27th, that he

16   was using it, the text messages and -- you're going to have

17   a big problem there.

18   A    I didn't though.

19   Q    Yeah, well you didn't lose the phone at four because

20   you were outside of Mario's place calling him.

21   A    I wasn't outside his house.

22   Q    You were outside calling him, Charles.  And then you

23   go on the sidewalk and you go in and do what you do.

24   A    I didn't do that, sir.

25   Q    Who did?

73

1    A    I don't know.

2    Q    Who did Charles?  If you didn't do it who did?

3    A    I don't know.

4    Q    Who else had access to your car, your phone, who has

5    dreads?  Who did?  Come on, come on brother, we've been

6    around the block a long time here and again you can tell us

7    ten ways to Sunday that you didn't do it, but we already

8    know you're the guy and we're going to further strengthen

9    that with additional stuff.  And it's a great opportunity

10   now to say why you did it.  To say why you did it as

11   opposed to us sitting in the courtroom telling your mother

12   and your grandmother who are going to be there this is what

13   happened.

14        And mark my words there's going to be a medical

15   examiner in there to show pictures of Mario after he's dead

16   and what killed him, what was his cause of death.  And

17   she's gonna say it was gunshot wounds to the, certain parts

18   of his body.  And then there's gonna be, not only is there

19   going to be homicide detectives there's going to be a whole

20   host of witnesses and there's going to be video.

21   Absolutely 100 percent there's going to be video, and

22   there's going to be people that specialize in phone records

23   and cell sites and we're going to show you with nice

24   charts, huge charts Charles Reddicks in school that day, at

25   home and school, going back home, getting Gramma's car,

1   going over to Westminster, going up Washington Street,

2   straight up Washington Street through Egelston Square, by

3   Forest Hills, on the phone and then after the murder coming

4   down, inbound on Washington Street, outbound on Washington

5   Street to go shot and execute somebody, coming back into

6   Westminster, and then you going home that night.

7       And that we're going to, not only we're going to show

8   the day you killed somebody we're going to show you other

9   days too to show your pattern.  And we're going to show the

10  jurors how you deviate from your pattern to go shot and

11  unarmed guy.  Shot and kill and unarmed guy.

12      And you're going to be sitting there, and you can deny

13  all you want but they're going to hear what a, a little bit

14  of what we talked about today and then a whole lot more.

15  BY SERGEANT DETECTIVE DALEY:

16  Q    Charles -- excuse me, have you ever held a gun?  You

17  possessed a gun before?

18  A    [Shakes head].

19  Q    No?

20  A    No.

21  Q    Have you ever fired a gun?

22  A    No.

23  Q    Do you know what an automatic is and a revolver?  Do

24  you know the difference between an automatic and a

25  revolver?

75

1    A    I know that a revolver holds six and an automatic it

2    can hold like 10 or more.

3    Q    All right.  So you never held a gun before?

4    A    No.

5    Q    And do you have a license to carry a firearm?  Do you

6    have a license?

7    A    [Shakes head]

8    Q    No, you don't have a license.  Okay.

9    BY DETECTIVE CALLAHAN:

10    Q    One thing we're going to do is that's pull some video

11    over in Westminster and we'll see if your car is in the lot

12    over there.

13    A    Yeah.

14    Q    Just to further, based on what you said.  But I know,

15    I know from jump that your car, if there's video your car

16    leaving or not even there because I know your car is in

17    Jamaica Plain.  So one of the things we're going to do is

18    get that video.  That's a nice development and I know they,

19    there's a good chance that they have video in that

20    development covering the parking lot, so.

21        What happens, what happens if we talk to you in a week

22    and tell you that we pulled the video and your car's not

23    even in the lot that night?  What's your answer going to be

24    to that?

25    A    I don't know.

76

1    Q    What should your answer be if your car's not in the

2    lot?

3    A    (No audible response).

4    Q    Your car's not in Westminster where you say it is,

5    what's your answer?

6    A    I don't know.  I let you know it was there.  The only

7    time I ever left was to go to the park besides when I left

8    to go home.

9    BY SERGEANT DETECTIVE DALEY:

10   Q    Charles, you're being selfish.  You're involved, it's

11   just about yourself and your grandmother and your mother

12   right now and your uncle and stuff, but you've involved a

13   lot of people, exposed a lot of people to a lot of drama

14   now by the people you put on the table.  So not only does

15   this involve you, but it involves about a dozen of your

16   close friends and family members.

17       They're all gonna be placed under a lot of pressure in

18   the next year or so because of the stupid act that you

19   impulsively just did something.

20       We all live with regrets.  We all regrets, have

21   regrets.  We try to avoid having regrets.  Sometimes we do

22   stuff and then we say, damn why did I do that, why did I

23   say that, why did I run that red light, you know, and you

24   regret it.  And I think this is what happened today, but

25   you're not showing any regret of what you've done to

1    yourself and all your love ones and your friends.  And it's

2    too bad, you know.

3        But just try to think of the other people that are

4    hurt by this as well.  By something that you did that you

5    probably wish you didn't.  Turn the clock back instead of,

6    you know, wish it was Friday at noon time and you rethink

7    your actions.  We all like to turn that, pull that hand

8    back, the hand of time back and relive something that we

9    regret doing or saying.

10       I get a feeling you're thinking of that right now.  I

11   think you're thinking of that.

12   A    No, I'm just listening to what you guys have to say.

13   BY DETECTIVE CALLAHAN:

14   Q    Okay.  Do you want to do the right thing, Charles.

15   Tell us why you shot and killed Mario?

16   A    I didn't shoot or kill --

17   Q    Did Mario pull a knife on you?  Did he pull the strap

18   on you?  Did he threaten you?  Did his boys threaten you?

19   Did his girls threaten you?

20   A    I was never near Forest Hills.

21   Q    Okay.  Well mark my words, mark Richie's words you

22   will see video of your car in Forest Hills going by, going

23   to victim's house, going from victim's.  Mark our words

24   because we don't speak out of school.  This is a first

25   degree murder.  You're looking at life imprisonment so when

1  we talk to you, we're talking to you with sincerity and,

2  you know, our job is to solicit the truth that's all we

3  want.

4       It's very easy how we do our job.  Two principles; 100

5  percent truth that's all we ask of people that we interview

6  and integrity from ourselves.  We do everything we possibly

7  can for an investigation.  And there's another very, very

8  important guiding light it's our bible, more important than

9  having the right guy in jail is not having the wrong guy in

10 jail.

11      But in this case we're looking at the right guy.

12 We're looking at the right guy.  And this isn't going away.

13 We're going to be sitting down again in the near future.

14 And it's an opportunity.  I'm going to give you my cell

15 number, Sergeant Daley will give you his number.

16 A    Is it the same number?

17 Q    It's the same number.

18 A    Yeah, I have it.

19 Q    Let me give you a card so you don't lose it.  And put

20 your head on the pillow and think about what you want to do

21 because we're going to be sitting with you again one way or

22 the other.

23      DETECTIVE CALLAHAN:  Do you have a card Rich or?

24 Q    Do you want to think for a few minutes here?  Let me

25 give you my -- do you want to talk to your mother for a few

1    minutes?  Do you want to sit here by yourself for a few

2    minutes and think?  You want to -- what are you feeling?

3    A    Nothing.

4    Q    You numb?

5    A    Huh?

6    Q    You numb?

7    A    I just have nothing left to say.

8    Q    Okay.  Charles, 24/7 you can call us.

9    A    All right.

10   Q    If you don't get us leave a message we'll get back to

11   you.  If you want to talk, 100 percent we're here, we're

12   here to listen.  Again, all -- all we're looking for is 100

13   percent truth.  You gave us about 70 today, you just --

14   you're a little off with some other stuff.  But we're going

15   to offset that when all is said and done the records are

16   done and we're going to leave here and go right over and

17   follow up on some things you said.

18   A    Mm-hmm.

19   Q    I think we're going to prove you even more negligent,

20   so.  Think about it.  Put your head in the pillow.  We're

21   going to see you again, no doubt.  Think about how you want

22   to steer this boat.  Because you still have a little bit of

23   control, but very shortly you're not going to have any say

24   in the matter.

25        All right.  Do you want to, you want to sit down for a

1    few minutes by yourself, you want to talk to your mother

2    for a few minutes or you want to let this die here?

3    A    I'll let it die here.

4    Q    Let it die here, okay.  I have 4:37, Charles.  You've

5    got our cards.

6    A    Mm-hmm.

7    Q    All right.

8        SERGEANT DETECTIVE DALEY:  Thank you very much.

9    Q    Think about the card and we're a phone call away,

10   okay.  We're going to get you out of here --

11   (End of audio)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              TRANSCRIBER'S CERTIFICATE

2          I, Nancy B. Gardelli of Acorn Transcriptions,

3    certify that the foregoing is a correct transcription, to

4    the best of my ability, of the audio recording provided by

5    the Law Office of Rosemary Scapicchio of a Boston Police

6    Department, Homicide Unit, interview.

7          Signed under pains and penalties of perjury this

8    15th day of July, 2013.

9

10

11

12          *Nancy B Gardelli*

13

14    _____

15    Nancy B. Gardelli, Notary Public

16    My commission expires: June 28, 2015

17

18

19

20

21

22

23

24

25

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss                                    SUPERIOR COURT DEPARTMENT
                                               DOCKET NO: SUCR2012-10714

COMMONWEALTH

v.

CHARLES REDDICKS

## DEFENDANT'S MOTION IN LIMINE TO PREVENT THECOMMONWEALTH FROM ACCESSING CORI RECORDS OF PROSPECTIVE JURORS

Charles Reddicks respectfully moves this Honorable court, pursuant to the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, to prohibit the District Attorney's office from accessing juror CORI records. Allowing the District Attorney's Office to access these records prior to trial would violate Reddicks's federal constitutional rights to due process and to a jury trial.

Reddicks further objects to the manner in which these records are utilized. On information and belief, the prosecutor obtains the CORI records for all the jurors, and then gives the records to law enforcement. Law enforcement then cross-references the juror records with records of family members and police reports and restraining orders involving either potential jurors or their family members. However, the results of these searches are not turned over to the defense, and the defense has no other means of obtaining that data. This gives the prosecutor a distinct advantage in the jury selection process.[1]

---

[1] Reddicks recognizes the Supreme Judicial Court's decision in Commonwealth v. Joseph Cousin, 449 Mass. 809 (2007). Reddicks files this motion to protect his federal constitutional rights and to request specific procedures to be allowed in the event this motion is denied.

1

## Constitutional Implications

The Supreme Court determined that the Sixth Amendment right to a jury trial is fundamental to the American scheme of justice and hence applicable to the states through the Fourteenth Amendment. Duncan v. Louisiana, 391 U.S. 145, 149 (1968). This right, necessarily, offers defendants protection from oppressive governmental action and prosecutorial misconduct.  Under the Sixth Amendment, a defendant has a constitutional right to a jury drawn from a representative cross-section of the community.

The central principals embodied in the right to a representative jury are random selection and objectivity.  These elements are negated where the District Attorney's office has access to information not available to the defendant because the danger of improper influence or intimidation exists, as well as the possibility that the Commonwealth will skew the jury pool in their favor.  Contrast Commonwealth v. Dougherty, 343 Mass 299 (1961) (holding that there is no improper influence or intimidation of prospective jurors where matters of personal history was made available to *all* counsel) (emphasis added).

Additionally, the due process clause ensures fundamental fairness in all court proceedings.  It is clear that "[a] defendant in a criminal case has a right to be tried according to the substantive and procedural due process requirements of the Fourteenth Amendment." Rogers v. Richmond, 365 U.S. 532, 544-45 (1961); Newhall v. Boyle, 366 F. Supp. 871, 872 (D. Mass. 1973).  "The Constitution guarantees a fair trial through Due Process Clauses. " United States v. Olano, 507 U.S. 25, 28 (1993); Strickland v. Washington, 466 U.S. 668, 684-85 (1984).  The guarantees of due process and a fair trial are also contained in Article I, X, XI, XII of the Massachusetts Declaration of rights.

Moe v. Secretary of Administration and Finance, 382 Mass. 629, 633 n.4 (1981);

Commonwealth v. Geagan, 339 Mass. 487 (1959). Thus, due process mandates that the

District Attorney's Office not gain an unfair advantage, and not disturb the right to a fair

jury made up of a true cross-section of the community.

As such, Reddicks requests that this Honorable Court prohibit the Commonwealth

from accessing juror CORI records at any time during this trial.

### Alternative Requests

In the alternative, without waiving his objection, Reddicks requests that if this

Court allows the Commonwealth to access the prospective jurors' criminal records, then

this Court should order the Commonwealth to immediately provide these records to

defense counsel. The Commonwealth should also provide any other juror information

obtained from the police department as a result of the initial CORI records. See

Commonwealth v. Joseph Cousin, 449 Mass. 809, 818 (2007)"information about

prospective jurors . . . should be as available to the defendant as to the district attorney").

Failure to provide this data to the defense would result in an unfair advantage for

the prosecutor and a violation of Reddicks' constitutional rights to due process and a fair

jury trial pursuant to the Sixth and Fourteenth Amendments. This Court has the authority

to grant this request. Commonwealth v. Joseph Cousin, 449 Mass. 809, 818 (2007)

("[W]e do not set forth a comprehensive set of procedures to be followed in all cases in

which criminal record checks of jurors are requested…Rather, we believe it is most

sensible at this point to leave the matter to the sound discretion of the trial judge…").

3

Further, if this Court does allow the Commonwealth to access the CORI records

of prospective jurors, then Reddicks requests that this Court order the Commonwealth to

also run the jurors' names through the District Attorney's Victim/Witness database.

Right now, the Commonwealth only runs the juror names through a database that

will produce information favorable to the Commonwealth, namely which jurors lied

about having criminal records. The Commonwealth then uses this information to strike

prospective jurors from the pool.

However, the right to due process is at its core a right to fundamental fairness in

court proceedings. As such, if juror CORI records are to be run, then due process

requires that the names of the prospective jurors also be run through the District

Attorney's Victim/Witness database. This information would allow all parties to confirm

whether prospective jurors were truthful in responding to inquiries regarding whether

they or their family members were ever the victims of a crime. On information and

belief, the District Attorney's office has the capability to retrieve this information with

ease, and similar orders have been issued by the Superior Court in the past.

If it is somehow relevant to jury selection to confirm that all the jurors were

truthful when they answered the inquiry about whether they had ever been arrested for a

crime, then it must also be relevant to confirm whether these same jurors were truthful

when they answered the inquiry about whether they were ever the victims of a crime.

A trial, where the end result could possibly be incarceration in state prison, is a

fight for a defendant's liberty. Hicks v. Oklahoma, 447 U.S. 343 (1980). Both the state

and federal constitutions were designed to protect citizen defendants from the

government, not the other way around. As such, it is constitutionally imperative that the

4

district attorney's office not be given any unfair advantages in its attempt to take away a citizen's freedom at trial.

Finally, Reddicks objects to the prosecutor reviewing any juror CORI records after the jurors are already sworn in and the trial has begun. Such prosecutorial conduct would violate due process and is not allowed under the laws of the Commonwealth. See Commonwealth v. Lord Hampton, 457 Mass. 152 (2010)(The prosecutor's independent authority to run juror CORI records ends once the jury are sworn). See also Gomez v. United States, 490 U.S. 858, 876 (1989); Mass.R.Crim.P.20 (peremptory challenges of jurors can only occur before jury is sworn).

WHEREFORE, Reddicks requests that this Court preclude the Commonwealth from running the CORI records of prospective jurors, or alternatively, that the Commonwealth be ordered to provide defense counsel with copies of all documents and information obtained from the police department or probation as a result of the CORI records.

Respectfully Submitted,
CHARLES REDDICKS
By his Attorneys,

Rosemary Curran Scapicchio
107 Union Wharf
Boston, Massachusetts 02109
(617) 263-7400
BBO # 558312

Jillise McDonough
107 Union Wharf
Boston, Massachusetts 02109
(617) 263-7400
BBO # 688694

5

CERTIFICATE OF SERVICE

     I hereby certify that a true copy of the above document was served upon the attorney of record for each party and upon any party appearing pro se by first class mail, postage prepaid or by hand delivery.

Dated:_____ Signed:_____

6

R136

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss                                  SUPERIOR COURT DEPARTMENT
                                             DOCKET NO: SUCR2012-10714

COMMONWEALTH

v.

CHARLES REDDICKS

### DEFENDANT'S MOTION IN LIMINE TO EXCLUDE ALLEGATIONS THAT REDDICKS POSSESSED A FIREARM ON PREVIOUS OCCASIONS

Now comes the defendant, Charles Reddicks, and moves that this Court preclude the Commonwealth from alleging that Reddicks possessed a firearm on a previous occasion. In support thereof, any and all references to Reddicks' alleged possession of a firearm on a previous occasion is irrelevant where the firearm Reddicks was allegedly seen with in the past was a revolver, and where the evidence in this case suggests the murder weapon was a semi-automatic, and the probative value is outweighed by the danger of unfair prejudice. Commonwealth v. Bonds, 445 Mass. 821, 931 (2005); Commonwealth v. Barbosa, 463 Mass. 116 (2012); Commonwealth v. James, 424 Mass. 770, 779 (1997); United States v. Olano, 507 U.S. 725, 734 (1993); Huddleston v. United States, 485 U.S. 681 (1988).

Furthermore, due to the nature of the evidence that the Commonwealth seeks to introduce, it will create a mini trial within this trial, and needlessly confuse the issues and causing undue delay. See Mass. R. Evid. 403; see also Commonwealth v. Rosa, 422 Mass. 18, 25 (1996); Commonwealth v. Beausoleil, 397 Mass. 206, 217 (1986); Commonwealth v. Cruz, Mass. App. Ct. 393, 407-08 (2001); Montana v. Egelhoff, 518 U.S. 37 (1996) (due process requires evidence to be relevant for admission but does not require admission of all relevant evidence).

1

Such admissions would violate Reddicks' rights to due process and a fair trial pursuant to the Fifth and Sixth Amendments to the United States Constitution and Article XII of the Massachusetts Declaration of Rights. See Scales v. United States, 367 U.S. 203, 224-25 (1961); see also Commonwealth v. Spencer, 465 Mass. 32, 48-50 (2013).

**FACTS**

Reddicks is charged with a homicide that occurred on April 27, 2012. The sole issue in this case is whether Reddicks was the individual who shot and killed Mariano Malave.

The Commonwealth seeks to introduce the testimony of Thomas Washington, the driver of a vehicle where Reddicks was allegedly a passenger and fired a weapon out of the vehicle. The incident occurred in December of 2011, several months before the incident in this case. Reddicks was charged with assault and battery with a dangerous weapon and unlawful possession of a firearm stemming from the incident, to which he ultimately pled guilty. The Commonwealth now seeks to present Washington to testify that he saw Reddicks with a firearm during this incident.

Reddicks is alleged to have shot Raymond Johnson in retaliation for Johnson and his friends jumping and beating up Reddicks a month prior. Because Johnson and his friends went onto Northeastern University grounds while Reddicks was there for a pre-college program, Reddicks was suspended from the program. Johnson, the alleged victim of the shooting, testified before the grand jury that when he encountered Reddicks in a pizza shop after jumping Reddicks, Johnson pulled out a knife in the event there was any trouble. Furthermore, his friend "Slinky" had a machete on him. During the encounter, an individual with Reddicks named "Ghost" flashed a firearm. It is unclear whether

2

**R138**

"Ghost" is Thomas Washington, the individual who the Commonwealth seeks to testify

that he saw Reddicks with a firearm during the December 2011 shooting.

The Commonwealth just provided notice to Reddicks that it seeks to introduce

this testimony in mid-December. While the Commonwealth provided a disc to the

defense containing "2011 Case Discovery" on December 4, 2015, which purported to

include the grand jury minutes, the disc contained only the grand jury exhibits, not the

testimony. Therefore, the defense did not receive the grand jury minutes from this case

until December 17, 2015, less than a month prior to the scheduled trial date. As a result,

counsel for Reddicks has not had ample time to investigate this previous alleged incident,

including whether Reddicks was acting in self-defense and whether Washington was the

individual who actually provided Reddicks with the firearm. Furthermore, the

Commonwealth has not produced the plea hearing transcript so counsel can decipher

exactly which facts Reddicks allegedly pled to.

### ARGUMENT

**I.      THE EVIDENCE MUST BE EXCLUDED WHERE THE
        COMMONWEALTH WAITED UNTIL ONE-MONTH PRIOR TO
        TRIAL TO DISCLOSE THE DISCOVERY RELATING TO
        THOMAS' TESTIMONY.**

Mass.R.Crim.P 14(a)(1)(A) states that all discovery shall be turned over the

defense "at or prior to the pretrial conference…"

This includes "statements of persons the [Commonwealth] intends to call as

witnesses."

Mass.R.Crim.P. 14(a)(1)(A)(vii).

Additionally, Mass.R.Crim.P.14(a)(4) states as follows:

3

**Continuing Duty**. If either the defense or the prosecution subsequently learns of additional material which it would have been under a duty to disclose or produce pursuant to any provisions of this rule at the time of a previous discovery order, it shall promptly notify the other party of its acquisition of such additional material and shall disclose the material in the same manner as required for initial discovery under this rule.

In connection with this duty of the prosecutor, Mass.R.Crim.P.14(c)(2) states:

**Exclusion of Evidence**. The court may in its discretion exclude evidence for noncompliance with a discovery order issued or imposed pursuant to this rule. Testimony of the defendant and evidence concerning the defense of lack of criminal responsibility which is otherwise admissible cannot be excluded except as provided by subdivision (b)(2) of this rule.

See Commonwealth v. Nolin, 448 Mass. 207 (2007). See also Revised Superior Court Standing Order 2-86, Criminal Case Management.

There is a clear duty on the prosecutor to continually inquire of police investigators and immediately disclose relevant discovery to the defense. See Kyles v. Whitley, 514 U.S. 419 (1993); Commonwealth v. Tucceri, 412 Mass. 401, 407 (1993). However, that prosecutorial duty and the defendant's constitutional rights are meaningless if they are not enforced. As the Reporter's Notes to Rule 14 observe,"[R]ights and duties are ephemeral indeed without remedies." As such, the Courts have been empowered with the sanctions of dismissal.

Federal courts and Massachusetts courts have both long since recognized that the late disclosure of discovery can violate constitutional rights and thus the exclusion of the late discovery is warranted. See Taylor v. Illinois, 484 U.S. 400 (1988); Chappee v. Vose, 843 F.2d 25 (1st Cir. 1988)(Trial courts may exclude witnesses from trial because of late disclosure); Commonwealth v. Lopez, 433 Mass. 406 (2001)(trial judge properly barred Commonwealth for calling newly discovered witness in its case-in-chief at trial because of late-disclosure by prosecutor); Commonwealth v. Lam Hue To, 391 Mass.

4

301 (1984)(dismissal with prejudice may be appropriate where prosecutor turns over discovery late).

In Massachusetts, "Upon the failure of the Commonwealth to comply with a lawful discovery order, a judge 'may impose appropriate sanctions," which may include exclusion of the late-disclosed evidence.  See Commonwealth v. Cronk, 396 Mass. 194, 198 (1985); see also Commonwealth v. Johnson, 365 Mass. 534 (sanction for unintentional failure to comply with discovery order); Commonwealth v. Gagliardi, 21 Mass.App.Ct. 439 (1986); Commonwealth v. Lopez, 433 Mass. 406 (2001) (where defendant given late notice of new discovery close to trial, trial judge properly barred Commonwealth from calling witness in its case in chief).

Here, the Commonwealth did not notify the defense of its intention to present Thomas Washington as a witness to claim that during a previous shooting where Washington was the driver, Reddicks allegedly possessed a silver firearm, until December of 2015, approximately one-month prior to the scheduled trial date. Furthermore, while the Commonwealth provided disc on December 4, 2015 purporting to contain the grand jury minutes from the previous incident, the disc did not actually contain the grand jury minutes, but rather simply the exhibits.  Therefore, the defense did not receive Washington's grand jury testimony until December 17, 2015, less than one month prior to trial.

The prejudice to Reddicks resulting from this late disclosure is great.  Counsel does not have ample time to investigate the allegations to determine whether Reddicks was acting in self-defense, or whether Washington was the person to actually provide Reddicks with the firearm.

5

According to the grand jury testimony and the Commonwealth's theory, Reddicks shot Johnson in retaliation for Johnson and his friends jumping Reddicks a month prior to the shooting. A week after Johnson and his friends beat up Reddicks, they encountered one another in a pizza shop and according to Johnson's own grand jury testimony, he pulled out his knife because he did not know if there would be problems with Reddicks. Johnson's friend was also carrying a machete. Therefore, it would be necessary for counsel to investigate any self-defense claims and present that evidence at trial if the Commonwealth were permitted to present the offered evidence.

Furthermore, Johnson also testified before the grand jury that during the pizza shop encounter, Reddicks' friend "Ghost" lifted his shirt where he had a firearm. It is unclear whether "Ghost" is a nickname for Thomas Washington as Johnson testified that he saw Reddicks in Washington's car about an hour after seeing Reddicks in the pizza shop. Therefore, counsel would need to investigate and potentially present evidence that it was actually Washington's firearm that Reddicks allegedly shot during the December 1, 2011 shooting, and that Reddicks does not, in fact, have access to firearms.

A. **Unless the Testimony is Excluded, The Late Disclosure Of Discovery On the Eve of Trial Violates the Defendant's Constitutional Sixth Amendment and Article Twelve Rights to Effective Assistance of Counsel and To Due Process and To A Fair Trial And To Present A Complete Defense and to Confront Witnesses.**

"The Constitution guarantees a fair trial through Due Process Clauses." United States v. Olano, 507 U.S. 25, 28 (1993); Strickland v. Washington, 466 U.S. 668, 684-85 (1984). The guarantees of due process and a fair trial are also contained in Article I, X, XI, XII of the Massachusetts Declaration of rights. Moe v. Secretary of Administration

6

and Finance, 382 Mass. 629, 633 n.4 (1981); Commonwealth v. Geagan, 339 Mass. 487 (1959).

The Fifth, Sixth and Fourteenth Amendments of the United States Constitution, as well as Article XII of the Massachusetts Declaration of Rights require that Reddicks be afforded due process and given a full opportunity to prepare and present a complete defense. Holmes v. South Carolina, 547 U.S. 319 (2006). The Supreme Judicial Court has recognized that, while a trial judge has discretion in granting or denying motions, a judge may not exercise that discretion in a way as to impair a defendant's constitutional rights to prepare a defense. Commonwealth v. Miles, 420 Mass. 67, 85 (1995); Commonwealth v. Souza, 379 Mass. 236, 240 (1986).

Additionally, the Compulsory Process Clause of the Sixth Amendment to the United States Constitution, and Article 12 of the Massachusetts Declaration of Rights, guarantee defendants the power to present evidence material and favorable to the defense.

These rights of a criminal defendant to confront witnesses, present a complete defense, and to put evidence before the jury that might influence the determination of guilt has been recognized by the United States Supreme Court and the Massachusetts Supreme Judicial Court. See Taylor v. Illinois, 484 U.S. 400, 408 (1988) (acknowledging Sixth Amendment guarantees defendant right to present evidence, which is essential to adversary system); Commonwealth v. Blaikie, 375 Mass. 601, 608 (1978); Chambers v. Mississippi, 410 U.S. 284, 302 (1973).

In the instant case, while the Commonwealth has had this information since the outset of the case, as the grand jury investigation was completed before the homicide in this case took place, the Commonwealth waited until less than a month before trial to

7

disclose Thomas Washington's grand jury testimony.  As a result, defense counsel does not have sufficient time to adequately and completely investigate the claims and formulate a defense.

Thus, unless the evidence is excluded, the testimony will deprive Reddicks of his constitutional rights to due process, a fair trial, to confront witnesses, and to prepare and present a complete defense, pursuant to the 5th, 6th, and 14th Amendments and Article XII. See Taylor v. Illinois, 484 U.S. 400, 408 (1988); Commonwealth v. Blaikie, 375 Mass. 601, 608 (1978); Chambers v. Mississippi, 410 U.S. 284, 302 (1973).

### C.   **Unless the Testimony is Excluded, Failure to Timely Provide Mandatory Rule 14 Discovery Violates Reddicks' Constitutional Sixth Amendment and Article Twelve Rights to Effective Assistance of Counsel**

A defendant in a criminal case is entitled to effective assistance of counsel pursuant to the Sixth Amendment to the United States Constitution and Article Twelve of the Massachusetts Declaration of Rights.  See Michigan v. Tucker, 535 U.S. 162 (2002); Commonwealth v.  Britto, 433 Mass. 596 (2001).  When the Commonwealth does not turn over vital discovery documents until the eve of trial, that hampers defense counsel's investigation and trial preparation, and as a result the defendant is denied these constitutional rights.  See United States v. Cronic, 466 U.S. 648, 659 (1984); see also United States v. Bailey, 834 F.2d 218 (1st Cir. 1987)(defense counsel has a duty to investigate all sources of evidence, even "long shots"); Powell v. State of Alabama, 287 U.S. 45, 57 (1932)(thorough pretrial investigation and preparation is critical to the constitutional right to counsel); Commonwealth v. Baran, 2009 WL 1333025 (Mass.App.Ct.) (new trial ordered in child molestation case, it is ineffective assistance for defense counsel to fail to fully prepare and investigate based on available discovery).

In the instant case, unless the evidence is excluded, the failure to timely provide Reddicks with witness statements will deprive Reddicks of his constitutional rights to effective assistance of counsel and to present a complete defense and to confront witnesses and to due process and to a fair trial, pursuant to the 5th, 6th, and 14th Amendments and Article XII.

The reason that we have discovery rules is so that a defendant is afforded a fair and speedy trial and is not forced to attend a trial by ambush or sit in jail without a trial. Thus, unless the evidence is excluded, the result would be defense counsel being unable to provide Reddicks with effective assistance of counsel, as required by the United States Constitution, including the Sixth and Fourteenth Amendment, and the Massachusetts Declaration of Rights, Articles I and XII. See Strickland v. Washington, 466 U.S. 668 (1988); Commonwealth v. Saferian, 366 Mass. 89, 96-97 (1974); Commonwealth v. Baran, 74 Mass.App.Ct. 256, 277 (2009).

## II. ANY ALLEGATION THAT REDDICKS POSSESSED A FIREARM ON A PREVIOUS OCCASION MUST BE EXCLUDED BECAUSE ANY PROBATIVE VALUE OF THE EVIDENCE IS OUTWEIGHED BY THE DANGER OF UNFAIR PREJUDICE.

In order for evidence to be admissible at trial, it must be relevant. Mass.R.Evid. 104. If the evidence is of questionable relevance or even deemed relevant, it must be excluded if the probative value of this evidence is outweighed by the danger of unfair prejudice. Mass. R. Evid. 403; Commonwealth v. Crayton, 470 Mass. 228, 249 n. 27 (2014) ("because 'other bad acts' evidence is 'inherently prejudicial,' it makes sense to impose a more exacting standard on its admissibility…We therefore clarify that 'other bad acts' evidence is inadmissible where its probative value is outweighed by the risk of unfair prejudice to the defendant, even if not substantially outweighed by that risk.").

9

Commonwealth v. Sylvia, 456 Mass. 182, 192 (2010), Commonwealth v. Simpson, 434 Mass. 570, 578 (2001); Commonwealth v. Blow, 362 Mass. 196 (1972).

In this case, the Commonwealth was not able to link the firearm from the previous shooting to the incident in this case. The SJC has cautioned that where a firearm could not have been the weapon used during the homicide, any evidence that a defendant was previously seen with the firearm should be excluded. See Commonwealth v. Barbosa, 463 Mass. 116 (2012) ("Where a weapon definitively could not have been used in the commission of the crime, we have generally cautioned against admission of evidence related to it."). While "[t]here need not be proof that the particular instrument was in fact the weapon actually used," the weapon does have to be one that "could have been used in the crime" in order to be admissible. Commonwealth v. James, 424 Mass. 770, 779 (1997); Commonwealth v. McGee, 467 Mass. 141 (2014). As a result, presenting evidence that Reddicks possessed a revolver on a previous occasion would only serve as propensity evidences, which is plainly inadmissible.

Further, any allegation that Reddicks was previously seen with a firearm would be overly prejudicial, and any probative value would be outweighed by the danger of unfair prejudice. Commonwealth v. Crayton, 470 Mass. 228, 249 n. 27 (2014) ("because 'other bad acts' evidence is 'inherently prejudicial,' it makes sense to impose a more exacting standard on its admissibility…We therefore clarify that 'other bad acts' evidence is inadmissible where its probative value is outweighed by the risk of unfair prejudice to the defendant, even if not substantially outweighed by that risk.").

Negative connotations are associated with firearms, and the evidence would impermissibly suggest that because Reddicks unlawfully possessed a firearm on a

10

previous occasion, he is more likely to have committed the homicide in this case.

Allowing the Commonwealth to offer the firearm evidence would diminish the jury's

impartiality, and welcome unwarranted and prejudicial assumptions about Reddicks. As

such, permitting any evidence that Reddicks was allegedly seen with a firearm in the past

would violate the Rules of Evidence and would violate Reddicks' due process and fair

trial rights pursuant to the 5th, 6th, and 14th Amendments and Article XII of the

Massachusetts Declaration of Rights.  Scales v. United States, 367 U.S. 203, 224-25

(1961); United States v. Olano, 507 U.S. 25, 28 (1993); Commonwealth v. Barbosa, 463

Mass. 116 (2012); Commonwealth v. James, 424 Mass. 770, 779 (1997); Commonwealth

v. McGee, 467 Mass. 141 (2014).

**III.    ANY ALLEGATION THAT REDDICKS POSSESSED A FIREARM ON A PREVIOUS OCCASION MUST BE EXCLUDED BECAUSE IT WILL CREATE A MINI TRIAL WITHIN THIS MURDER TRIAL, CAUSING UNDUE DELAY AND A CONFUSION OF THE ISSUES.**

While evidence must be relevant in order to be admissible, the rules of evidence

do not require the admission of all relevant evidence.  See Mass. R. Evid. 403; see also

Montana v. Egelhoff, 518 U.S. 37 (1996) (due process requires evidence to be relevant

for admission but does not require admission of all relevant evidence).  Due to the nature

of the evidence that the Commonwealth seeks to introduce, it will create a mini trial

within this trial, and needlessly confuse the issues causing undue delay.  See Mass. R.

Evid. 403; Commonwealth v. Rosa, 422 Mass. 18, 25 (1996); Commonwealth v.

Beausoleil, 397 Mass. 206, 217 (1986); Commonwealth v. Cruz, Mass. App. Ct. 393,

407-08 (2001).

11

In order to refute the allegations that Reddicks has access to firearms based on Washington's allegation that he saw Reddicks with a firearm on a previous occasion, counsel for Reddicks will need to challenge the circumstances of the previous incident. For example, Reddicks will need to present witnesses from when he was jumped and from the pizza shop to testify that Johnson brandished attacked him then brandished a knife the next time he saw Reddicks. Reddicks will also need to call Raymond Johnson to testify that when he saw Reddicks in the pizza shop, Reddicks was not armed, but that "Ghost" was carrying a firearm to support the assertion that it is not Reddicks that has access to firearms.

Overall, allowing the Commonwealth to present Washington to testify that he saw Reddicks with a firearm during the previous shooting will open the door to a mini-trial within this homicide trial so Reddicks may adequately challenge the allegations. Such circumstances would confuse the issues and cause undue delay. As a result, this evidence must be excluded. See Mass. R. Evid. 403; Commonwealth v. Rosa, 422 Mass. 18, 25 (1996); Commonwealth v. Beausoleil, 397 Mass. 206, 217 (1986); Commonwealth v. Cruz, Mass. App. Ct. 393, 407-08 (2001); see also Montana v. Egelhoff, 518 U.S. 37 (1996) (due process requires evidence to be relevant for admission but does not require admission of all relevant evidence).

## CONCLUSION

Reddicks respectfully requests that this Court preclude the Commonwealth from presenting evidence that Reddicks was allegedly seen with a firearm in the past.

Respectfully Submitted,
CHARLES REDDICKS
By His Attorneys

Rosemary Curran Scapicchio
107 Union Wharf
Boston, Massachusetts 02109
(617) 263-7400
BBO # 588312

Jillise McDonough
107 Union Wharf
Boston, Massachusetts 02109
(617) 263-7400
BBO # 688694

13

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss SUPERIOR COURT DEPARTMENT
DOCKET NO: SUCR2012-10714

COMMONWEALTH

v.

CHARLES REDDICKS

## MOTION IN LIMINE TO PROHIBIT A COMMONWEALTH WITNESS FROM GIVING UNQUALIFIED AND UNCONSTITUTIONAL OPINION TESTIMONY FROM SURVEILLANCE FOOTAGE

Now comes the defendant, Charles Reddicks, and moves this Honorable Court to preclude the Commonwealth from presenting witnesses to identify a car allegedly belonging to Reddicks' grandmother or from identifying any individuals in the surveillance footage in this case. Commonwealth v. Ianello, 401 Mass. 197 (1987); Commonwealth v. Lanigan, 419 Mass. 15 (1994); Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993); Kumho Tire Co. v. Carmichael, 562 U.S. 1 (1999) and their progeny.

During the grand jury investigation, the Commonwealth presented police officer witnesses to testify that the vehicle seen on the MBTA surveillance footage was a car allegedly owned by Reddicks' grandmother. Reddicks requests that this Court preclude the Commonwealth from doing so at trial where the testimony constitutes impermissible opinion evidence. The prejudice of allowing this police officer to give his unqualified opinion is significant. When evidence comes from the mouth of a police officer investigator, it bears an official stamp of approval, and the likelihood for prejudice is great. Commonwealth v. Tanner, 45 Mass.App.Ct. 576, 581 (1998); United States v. Casas, 356 F.3d 104, 118-20 (1st Cir. 2004) (emphasizing that testimony not within

1

officer's personal knowledge especially problematic "because juries may place greater weight on evidence perceived to have the imprimatur of the government").

The party seeking to admit the opinion testimony of an expert witness has the burden of proving that such testimony would be admissible and constitutional. Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993); Commonwealth v. Lanigan, 419 Mass. 15 (1994). Furthermore, a witness may only offer an opinion if he has unique knowledge or expertise in an area. Here, the jury is fully capable of viewing the footage and making an independent assessment as to whether Reddicks' grandmother's vehicle is depicted in the video. See Commonwealth v. Austin, 421 Mass. 357 (1995); United States v. Meises, 645 F.3d 5, 16 (1st Cir. 2011).

Additionally, the probative value of this testimony is substantially outweighed by the danger of unfair prejudice. See Mass. R. Evid. 403; Commonwealth v. Canty, 466 Mass. 535, 543 (2013) ("The danger posed by a witness, especially a police officer witness, offering an opinion regarding a defendant's guilt is 'that the jury might forgo independent analysis of the facts and bow too readily to the opinion of an expert or otherwise influential witness.'"). Where the Commonwealth will likely present a police officer witness to make the identification of the vehicle, the opinion will carry greater weight. See Canty, 466 Mass. at 543 ("The danger posed by a witness, especially a police officer witness, offering an opinion regarding a defendant's guilt is 'that the jury might forgo independent analysis of the facts and bow too readily to the opinion of an expert or otherwise influential witness.'").

As such, permitting the witnesses to testify that Reddicks' grandmother's vehicle can be seen in the surveillance footage would result in a violation of Reddicks' 5th, 6th

and 14th Amendment and Article XII rights.  See Commonwealth v. Helfant, 398 Mass. 214, 224 (1986); Commonwealth v. Lewin (No. 2), 407 Mass. 629, 631 (1990); Huddleston, 485 U.S. at 685; Commonwealth v. Austin, 421 Mass. 357 (1995); United States v. Meises, 645 F.3d 5, 16 (1st Cir. 2011).

## FACTS

The Commonwealth is alleging that Reddicks drove his grandmother's vehicle to Malave's home in Jamaica Plain to purchase marijuana, and that Reddicks allegedly shot Malave during the transaction.  It claims Reddicks vehicle can be seen on the Forest Hills MBTA surveillance footage driving to Malave's home just prior to the shooting and can be seen travelling away from Malave's home just after the shooting.

The Commonwealth obtained the surveillance footage from the Forest Hills MBTA station and also extracted still images from the footage.  Furthermore, the Commonwealth seized Reddicks' grandmother's vehicle and took several photographs of the vehicle from all angles in order to present at trial.  As a result, the jury is in a position to view the surveillance images and stills to compare to the photographs of Reddicks' grandmother's vehicle and make their own determination as to whether the vehicles are the same.

## ARGUMENT

I.     THE TESTIMONY MUST BE EXCLUDED WHERE THE JURORS ARE CAPABLE OF VIEWING THE VIDEO AND DETERMINING WHETHER THE VEHICLE DEPICTED IN THE FOOTAGE IS REDDICKS' GRANDMOTHER'S VEHICLE .

Lay opinion testimony is only admissible under certain circumstances. Commonwealth v. Pleas, 49 Mass. App. Ct. 321, 342 (2000).  Lay opinion testimony will not be helpful to the jury when the jury can readily draw the necessary inferences and

conclusions without the aid of the opinion. See Commonwealth v. Austin, 421 Mass. 357 (1995). The purpose of this requirement is "to exclude testimony where the witness is no better suited than the jury to make the judgment at issue, providing assurance against the admission of opinions which would merely tell the jury what result to reach." United States v. Meises, 645 F.3d 5, 16 (1st Cir. 2011).

"By no means do our cases always admit lay opinion testimony on identification." Commonwealth v. Pleas, 49 Mass. App. Ct. 321, 328 (2000), *citing*, Commonwealth v. Austin, 421 Mass. 357 (1995) (error to admit lay opinion testimony that defendant was individual on surveillance footage); Commonwealth v. Nassar, 351 Mass. 37 (1966) (error to allow witness to testify that police sketch looked like defendant); Commonwealth v. Anderson, 19 Mass. App. Ct. 968, 969 (1985).

Generally, the opinion testimony is admissible only where the testimony could aid the jury in making an identification. Commonwealth v. Vitello, 376 Mass. 426, 460 (1978). A witness' identification opinion is admissible only if there is some basis to conclude that the witness is more likely than the jury to correctly identify the item or person in the surveillance footage. Commonwealth v. Pleas, 49 Mass. App. Ct. 321, 326 (2000); United States v. Farnsworth, 729 F.2d 1158, 1160 (8th Cir. 1984). In other words, "such testimony is admissible…when the witness possessed sufficiently relevant familiarity with the defendant that the jury cannot also possess." Pleas, 49 Mass. App. Ct. at 326-27; United States v. Jackman, 48 F.3d 1, 4-5 (1st Cir. 1995).

Here, the jurors are fully capable of viewing the surveillance footage then determining whether Reddicks' grandmother's car is depicted in the footage. See Vitello, 376 Mass. at 460; Commonwealth v. Austin, 421 Mass. 357 (1995) (error to admit lay

opinion testimony of police officer that man depicted in surveillance footage was defendant where jurors were capable of drawing that conclusion themselves); United States v. Jackman, 48 F.3d 1, 4-5 (1st Cir. 1995).

While most Massachusetts caselaw deals with identifying a person on surveillance footage, the rationale applicable to the identification of a person is equally applicable and provides stronger support for preventing an individual from identifying an object or vehicle.

In Vitello, allowing the witness to identify the defendant in a video was permissible only where the defendant's appearance had changed since the time of the robbery. Vitello, 376 Mass. at 460. Furthermore, while the victim was previously able to identify the victim, the victim did not recognize the defendant at trial due to his change in appearance. Id. As a result, a police officer who had known the defendant for a long period of time and had seen him often was permitted to testify that the man the victim had identified in the photograph was the defendant. Id.; see also Commonwealth v. Gagnon, 16 Mass. App. Ct. 110 (1983) (officer familiar with defendants at time they were arrested permitted to testify defendants were on video where defendants had altered their appearances between time photographs were taken and time of trial).

In this case, the investigating officers took photos of Reddicks' grandmother's vehicle in the days following the homicide. There is no allegation that anything about the vehicle was changed in the period of time between the homicide and when the photographs were taken. Cf. Vitello, 376 Mass. at 460. As a result, the video surveillance is sufficiently clear for the jurors to watch the video, look at the photos of

5

Reddicks' grandmother's vehicle then draw their own conclusions as to whether the vehicles are the same.

Since the jurors are fully capable of viewing the surveillance footage and drawing their own conclusions as to whether Reddicks' grandmother's vehicle is the car seen driving by the MBTA station, the lay opinion testimony must be excluded as it would violate Reddicks' 5th, 6th and 14th Amendment and Article XII rights to due process and a fair trial. See Austin, 421 Mass. 357 (1995) (error to admit identification of police officer that man depicted in surveillance tape was defendant); Commonwealth v. Nassar, 351 Mass. 37 (1966) (officer's testimony that composite sketch looked like defendant inadmissible because jury in position to reach same conclusion); see United States v. Meises, 645 F.3d 5, 17 (1st Cir. 2011) (Agent gained knowledge of transaction by watching surveillance and "was not an eyewitness with unique access to appellants' conduct; his testimony could only have replaced, rather than aided, the jury's assessment of the evidence. It was thus not admissible lay opinion testimony.").

II.   THE EVIDENCE MUST BE EXCLUDED WHERE THE PROBATIVE VALUE OF THE TESTIMONY IS SUBSTANTIALLY OUTWEIGHED BY THE DANGER OF UNFAIR PREJUDICE.

Even where the witness's opinion will aid the jury, the Court must determine whether the prejudicial effect of the testimony outweighs its probative value. See id. at 327. While evidence must be relevant in order to be admissible, the rules of evidence do not require the admission of all relevant evidence. See Mass. R. Evid. 403; see also Montana v. Egelhoff, 518 U.S. 37 (1996) (due process requires evidence to be relevant for admission but does not require admission of all relevant evidence).

6

Here, the probative value of this testimony is substantially outweighed by the danger of unfair prejudice. See Mass. R. Evid. 403; Canty, 466 Mass. at 543 ("The danger posed by a witness, especially a police officer witness, offering an opinion regarding a defendant's guilt is 'that the jury might forgo independent analysis of the facts and bow too readily to the opinion of an expert or otherwise influential witness.'"). Where the Commonwealth will likely present a police officer witness to make the identification of the vehicle, the opinion will carry greater weight, however, the testimony will be based on speculation and conjecture, not personal knowledge. See Canty, 466 Mass. at 543 ("The danger posed by a witness, especially a police officer witness, offering an opinion regarding a defendant's guilt is 'that the jury might forgo independent analysis of the facts and bow too readily to the opinion of an expert or otherwise influential witness.'").

Since any probative value of having a police officer speculate that the vehicle seen on the surveillance footage is outweighed by the danger of unfair prejudice where the jury will likely give a police officer's testimony greater weight, this evidence must be excluded. See Commonwealth v. Canty, 466 Mass. 535, 543 (2013); Commonwealth v. Tanner, 45 Mass.App.Ct. 576, 581 (1998); United States v. Casas, 356 F.3d 104, 118-20 (1st Cir. 2004) (emphasizing that testimony not within officer's personal knowledge especially problematic "because juries may place greater weight on evidence perceived to have the imprimatur of the government"). Failing to do so would result in a violation of Reddicks' 5th, 6th and 14th Amendment and Article XII rights to due process and a fair trial.

7

WHEREFORE, Reddicks requests that this Court exclude the Commonwealth's witnesses from proffering their untested opinion. Whether the vehicle in the surveillance footage is actually Reddicks' grandmother's vehicle is the proper province of the jury and not the province of unqualified expert opinions. Admission of this unqualified opinion would deprive Reddicks of his rights to due process and to a fair trial as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution as well as Article XII of the Massachusetts Declaration of Rights. See Sandstrom v. Montana, 442 US 510 (1979); In re Winship, 397 U.S. 358 (1970).

Respectfully Submitted,
CHARLES REDDICKS
By His Attorneys

Rosemary Curran Scapicchio
107 Union Wharf
Boston, Massachusetts 02109
(617) 263-7400
BBO # 588312

Jillise McDonough
107 Union Wharf
Boston, Massachusetts 02109
(617) 263-7400
BBO # 688694

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK, ss                                    SUPERIOR COURT DEPARTMENT
                                               DOCKET NO: SUCR2012-10714

COMMONWEALTH

v.

CHARLES REDDICKS

## MOTION IN LIMINE TO EXCLUDE THE CONTENTS OF THE CELL PHONE SEARCH IN AN UNRELATED CASE

Now comes the defendant, Charles Reddicks, and respectfully moves in limine to exclude the contents of the cell phone search conducted in an unrelated case. The Commonwealth seeks to use a photograph retrieved from Reddicks' cell phone, which was seized prior to the homicide in this case, in order to show Reddicks had access to a firearm, where Reddicks is allegedly holding a firearm in the photograph. The search warrant, however, requested carte blanche access to Reddicks' phone, and did not particularize the area in the phone to be searched or the contents the investigators were attempting to seize.

This issue is currently before the SJC in Commonwealth v. Denis Dorelas, SJC-11793, and oral argument was held on April 7, 2015. The SJC has not yet rendered a decision, however, the recent cell phone cases support the position that the SJC's decision will be in favor of minimizing access to a suspect's cell phone. See Commonwealth v. Denis Dorelas, SJC-11793; Commonwealth v. Augustine, 467 Mass. 230 (2014); Commonwealth v. Augustine II, 472 Mass. 448 (2015); Commonwealth v. Estabrook, 472 Mass. 852 (2015); Riley v. California, 134 S.Ct. 2473 (2014).

The photograph evidence must be excluded from trial as it was obtained pursuant to an invalid search warrant. The search warrant did not adequately particularize the

1

portions of the cell phone to be searched and the search warrant affidavit failed to specify

why it was necessary to conduct a "general exploratory rummaging" through Reddicks'

cell phone where the police alleged only that "cell phones are often times used by

individuals as a means of communication when planning a crime or used as a means of

communication after the commission of a crime."  (See Attached); see also

Commonwealth v. Dorelas, SJC-11793; Commonwealth v. Balicki, 436 Mass. 1, 7

(2002) *citing* Coolidge v. New Hampshire, 403 U.S. 443, 446 (1971).

    Since the search warrant was not sufficiently particularized, all evidence obtained

from the cell phone must be excluded pursuant to the Fourth Amendment to the United

States Constitution, Article XIV of the Massachusetts Declaration of Rights and in

violation of the provisions of Massachusetts General Laws, chapter 276, § 2.  See

Commonwealth v. Augustine, 467 Mass. 230 (2014); Commonwealth v. Augustine II,

472 Mass. 448 (2015); Commonwealth v. Estabrook, 472 Mass. 852 (2015); United

States v. Calandra, 414 U.S. 338, 354 (1974); Riley v. California, 134 S.Ct. 2473 (2014);

Wong Sun v. United States, 371 U.S. 471 (1963).

    Furthermore, the photograph the Commonwealth seeks to admit must be excluded

as it is not relevant.  The Commonwealth searched the entire contents of the phone dating

back indefinitely.  Since phones are capable of storing a user's contents even when an

account is transferred to a new phone, and where the photograph the Commonwealth

seeks to use does not contain a date stamp, there is no indication as to when the

photograph was allegedly taken.  Since the Commonwealth has not offered any proof that

the photograph was taken in close proximity to the time of the homicide, the photograph

is not relevant.  Moreover, any conceivable probative value of the photograph is

2

outweighed by the danger of unfair prejudice.  See Commonwealth v. Crayton, 470 Mass. 228, 249 n. 27 (2014) ("because 'other bad acts' evidence is 'inherently prejudicial'…it makes sense to impose a more exacting standard on its admissibility…[w]e therefore clarify that 'other bad acts' evidence is inadmissible where its probative value is outweighed by the risk of unfair prejudice to the defendant, even if not substantially outweighed by that risk."); see also Montana v. Egelhoff, 518 U.S. 37 (1996) (due process requires evidence to be relevant for admission but does not require admission of all relevant evidence); United States v. Ritch, 583 F.2d 1179 (1978).

Ultimately, permitting the Commonwealth to introduce the inflammatory photograph would violate Reddicks' rights to due process and a fair trial pursuant to the Fifth, Sixth and Fourteenth Amendments and Article XII, and must be excluded from trial.  See Commonwealth v. Augustine, 467 Mass. 230 (2014); Commonwealth v. Augustine II, 472 Mass. 448 (2015); Commonwealth v. Estabrook, 472 Mass. 852 (2015); Commonwealth v. Crayton, 470 Mass. 228, 249 n. 27 (2014); United States v. Calandra, 414 U.S. 338, 354 (1974); United States v. Meises, 645 F.3d 5 (1st Cir. 2011); Riley v. California, 134 S.Ct. 2473 (2014); Wong Sun v. United States, 371 U.S. 471 (1963).

**FACTS**

On December 1, 2011, Reddicks was arrested and charged with Assault and Battery with a Dangerous Weapon and Carrying a firearm without a license in connection with a shooting that occurred earlier that day on Columbus Avenue in Boston; the shooting is unrelated to this homicide.  During the course of the December 1, 2011 investigation, the Boston Police obtained a search warrant to search Reddicks' cell phone,

3

which was seized at the time of his arrest; the warrant was issued on March 2, 2012,

almost two months prior to the homicide in this case and three months after Reddicks'

arrest.

In support of the search warrant application, the affiant outlined the basic facts

surrounding the shooting, and offered only the following in support of its assertion that

probable cause existed to search the cell phone:

> Seized from Mr. Reddicks at the time of booking was a grey T-Mobile cell phone. Cell phones are often times used by individuals as a means of communication when planning a crime or used as a means of communication after the commission of a crime. Based upon my training and experience and the facts stated above, I believe probable cause exists to forensically examine the grey t-mobile cellular phone seized from Charles Reddicks at the time of his arrest. (See Attached).

None of the facts stated within the affidavit mentioned a cell phone – other than

the fact that one was seized from Reddicks' person at the time of his arrest – or in any

way alleged that a cell phone was used during the commission of the crime, or that

Reddicks communicated with anyone prior to or after the alleged shooting.

## ARGUMENT

### I.   THE MOTION IN LIMINE MUST BE ALLOWED BECAUSE THE PHOTOGRAPH IS NOT RELEVANT AND ANY PROBATIVE VALUE IS OUTWEIGHED BY THE DANGER OF UNFAIR PREJUDICE.

As the SJC recently clarified, prior bad act evidence must be excluded where the

probative value is outweighed by the danger of unfair prejudice, "even if not substantially

outweighed by that risk." See Commonwealth v. Crayton, 470 Mass. 228, 249 n. 27

(2014). This lower standard is in place due to the "inherently prejudicial" nature of prior

bad act evidence. Id.

Here, the photograph simply is not relevant. The Commonwealth searched the

4

entire contents of the phone dating back indefinitely.  Since phones are capable of storing

a user's contents even when an account is transferred to a new phone, and where the

photograph the Commonwealth seeks to use does not contain a date stamp, there is no

indication as to when the photograph was allegedly taken.  Since the Commonwealth has

not offered any proof that the photograph was taken in close proximity to the time of the

homicide, the photograph is not relevant.  United States v. Meises, 645 F.3d 5. (1st Cir.

2011) (irrelevant and prejudicial evidence should be excluded).  Furthermore, there is no

evidence to suggest the firearm was a working firearm that could have been used in the

commission of the homicide, and not a replica or toy gun.  See Commonwealth v.

Garrett, 473 Mass. 257, 258 (2015) ("BB gun does not satisfy the statutory requirement

of  a 'firearm'"); Commonwealth v. Barbosa, 463 Mass. 116, 122 (2012) (firearm

evidence admissible only where "weapon could have been used in the course of a

crime").  Moreover, the Commonwealth turned over the grand jury minutes for the 2011

case on December 17, 2015, less than four weeks prior to trial.  Counsel in this case did

not represent Reddicks in the 2011 case.  Counsel requested the file from the trial

attorney but has not received it to date.

       Moreover, any conceivable probative value of the photograph is outweighed by

the danger of unfair prejudice.  See Commonwealth v. Crayton, 470 Mass. 228, 249 n. 27

(2014) ("because 'other bad acts' evidence is 'inherently prejudicial'…it makes sense to

impose a more exacting standard on its admissibility…[w]e therefore clarify that 'other

bad acts' evidence is inadmissible where its probative value is outweighed by the risk of

unfair prejudice to the defendant, even if not substantially outweighed by that risk."); see

also Montana v. Egelhoff, 518 U.S. 37 (1996) (due process requires evidence to be

relevant for admission but does not require admission of all relevant evidence); United States v. Ritch, 583 F.2d 1179 (1978). The photograph in this case is particularly inflammatory. In the photograph, Reddicks is holding a firearm to his temple, as if he is preparing to shoot himself in the head. Therefore, introducing the photograph would be far more prejudicial than in a case where the Commonwealth simply seeks introduce a firearm found on a defendant, or where a witness testifies to having seen the defendant with a firearm on a previous occasion. Cf. Commonwealth v. James, 424 Mass. 770, 779 (1997) (finding it was proper to introduce knives found at defendant's residence 18 days after stabbing); Commonwealth v. Rosa, 468 Mass. 231 (2014) (shell casings and live rounds found hours after murder in co-defendant's home, along with defendant's driver's license).

The prejudicial effect of this evidence outweighs the probative value because it will make Reddicks appear as a person who would have the propensity to commit a crime, which is plainly impermissible. As such, this evidence is not relevant, would be unduly prejudicial to Reddicks and should be excluded. United States v. Meises, 645 F.3d 5. (1st Cir. 2011) (irrelevant and prejudicial evidence should be excluded); Commonwealth v. DelValle, 443 Mass. 782, 793 (2005); Commonwealth v. Fidalgo, 74 Mass. App. Ct. 130, 133–134 (2009)

For all of these reasons, the photograph depicting Reddicks holding a firearm to his head must be excluded to protect Reddicks's 5th, 6th, and 14th Amendment and Article XII rights to due process and a fair trial. See Commonwealth v. Barbosa, 663 Mass. 116, 122 (2012); United States v. Olano, 507 U.S. 725, 734 (1993); Huddleston v. United States, 485 U.S. 681 (1988).

II.   THIS MOTION IN LIMINE SHOULD BE ALLOWED BECAUSE THE
      SEARCH WARRANT AT ISSUE IS INVALID AS THE WARRANT
      WAS NOT PARTICULARIZED AND PROVIDED THE
      COMMONWEALTH WITH UNFETTERED ACCESS TO HILL'S
      CELL PHONE IN VIOLATION OF G.L. C. 276, § 2, ARTICLE XIV
      AND THE FOURTH AMENDMENT.

The Fourth Amendment to the United States Constitution requires that warrants

"particularly describ[e] the place to be searched, and the person's or things to be seized."

Article XIV of the Massachusetts Declaration of Rights requires warrants to be

"accompanied with a special designation of the persons or objects of search, arrest or

seizure." Massachusetts General Laws chapter 276, section 2 provides that search

warrants "shall particularly describe the property or articles to be searched for."

The particularly requirement limits the scope of a search and seizure and serves as

a safeguard against a general search. Commonwealth v. Frieberg, 405 Mass. 282, 298

(1989) (*citing* Commonwealth v. Pope, 354 Mass. 625, 629 (1968)); Coolidge v. New

Hampshire, 403 U.S. 443, 467 (1971). "[T]he degree of specificity required when

describing the goods to be seized may necessarily vary according to the circumstances

and type of items involved." Frieberg, 405 Mass. at 298 (*quoting* United States v.

Johnson, 541 F.2d 1311, 1314 (8th Cir. 1976)). Where information was available to

police to allow for particularization to be set forth in the warrant, and where the warrant

does not actually set forth with particularity the items to be searched or seized, the

warrant is invalid and all items must be excluded from trial. Commonwealth v. Taylor,

383 Mass. 272 (1981); Commonwealth v. Dorelas, SJC-11793.

In Taylor, the warrant authorized a search for "antique jewelry" in a jewelry store.

Id. at 275. The investigators knew the precise items they were seeking, but did not list

the items in the search warrant or affidavit. Id. As a result, since "the particularization

7

was available but was not used in the warrant," all items seized were ordered excluded. Id.

In McDermott, the investigators were seeking documents relating to the defendant's mental state and mental functioning in the days and weeks leading up to a shooting in order to investigate the defendant's criminal responsibility. Commonwealth v. McDermott, 448 Mass. 750, 775 (2007). The warrant did not set forth a specific timeframe. Id. The Court found the warrant valid otherwise because "[a] commonsense reading of the...warrant permitted the officers to seize only mental state and functioning evidence that related to the defendant's criminal responsibility...in a reasonable time period." Id.

Likewise in Penta, the investigators obtained two separate warrants for an informant to record conversations relating to drug transactions with the defendant. Commonwealth v. Penta, 423 Mass. 546, 548-49 (1996). The warrants permitted the seizure of face-to-face conversations between the defendant and the informant for a period of seven days for the first warrant and a period of fourteen days for the second warrant. Id. at 555. The Court found that the warrants specifically listed conversations relating to illegal transactions and that due to the nature of the situation, "[t]he warrants described the conversations to be seized with the level of specificity that was practical in the circumstances." Id. As such, "a warrant so limited in its scope and application satisfies the requirements of the Fourth Amendment." Id.

Here, the search warrant was invalid under the particularity requirement for failing to adequately describe either the items to be seized or the places to be searched. Neither the warrant nor its supporting documents – the affidavit and the application –

8

contained any limitation on what within the cell phone could be searched. In simply listing the cell phone itself as the item to be searched, the search warrant gave the investigators complete discretion to search the entire contents of Reddicks's phone for an unlimited period of time. The investigators were provided with carte blanche to pick and choose which files to search and what information to seize, without any indication that *any* contents within the phone were connected to the shooting.

As Riley stated, photographs in the "pictures" file alone could contain enough information to allow the reconstruction of an individual's private life "through a thousand photographs labeled with dates, locations and descriptions…" Riley v. California, 134 S.Ct. 2473 (2014). Despite this, the affidavit did not set forth what was being sought among the universe of photographs or any files on the cell phone in a way that excluded irrelevant and private information.

A "warrant authorizing a search of 'any and all information and/or data' stored on a computer fails to satisfy the particularity requirement." United States v. Otero, 563 F.3d 1127 (10th Cir.), cert. denied, 558 U.S. 924 (2009). The increase in use of cell phones as well as the voluminous data that may be stored there, where a cell phone can arguably store more than even the average household, increases the importance of requiring adequate particularity in a search warrant. Id.; In re Application of Lafayette Academy, 610 F.2d 1, 3 (1st Cir. 1979) ("warrant framed to allow seizure of most every sort of book or paper," limited only by a reference to a very broad criminal provision, lacked particularity and was invalid general warrant); compare United States v. Upham, 168 F.3d 532, 536 n. 1 (1st Cir.), cert. denied, 527 U.S. 1011 (1999).

9

Given the significant privacy concerns raised by cell phones, the guidance provided by Riley, and Massachusetts jurisprudence recognizing the need to protect the particularity requirement in the context of computer searches, any information obtained where the specific items and files on a cell phone are not particularly named, and which there is not probable cause to search, must be suppressed.

In Preventative Med. Assocs., 465 Mass. at 831, the Court saw the reasonableness and scope of the search as being related to the particularity requirement. In responding to the Commonwealth's argument that McDermott allowed it to conduct a cursory review of all nonprivileged email as within the scope of two warrants seeking specific material, the Court said that would not necessarily be the case, as the preliminary review of computer files in McDermott was done using preset search terms. The Court also emphasized the "concern that a cursory review of every email undermines the particularity requirement of the Fourth Amendment and Art. 14." Id. at 831. This was especially true where the plain view doctrine would allow the Commonwealth to use inculpatory evidence it found that fell outside the parameters of the warrant. Id. at 832. The Court recognized that due to the nature of computers and the wide breadth of information they store, the particularity requirement could require further limitations to computer searches. Id.

In this case, the investigators did not set forth any reason to search Reddicks' phone, let alone search beyond the contact list and call and text message log, other than a general statement, applicable in *all* cases, that "cell phones are often times used by individuals as a means of communication when planning a crime or used as a means of communication after the commission of a crime." According to this rationale, any time any individual is suspected of committing a crime, the police are entitled to search the

10

entire contents of the person's phone, dating back indefinitely, and may search any file even if there is no reason to believe it is in any way related to the investigation at hand.

Even if there was probable cause to search the phone based on the general statement that individuals use cell phones to carry out a crime, the items to be seized and the places to be searched could have been properly limited within the search warrant. There is no question that the police were able to search the cell phone for text messages, phone calls and callers without searching for photographs in the "pictures" file. The warrant therefore failed to satisfy the Fourth Amendment and Article 14 and G.L. c. 276, §1-2. Commonwealth v. McDermott, 448 Mass. 750, 775 (2007); Riley v. California, 134 S.Ct. 2473 (2014). Instead of limiting the files to be searched and the evidence to be seized to those items that were relevant to the shooting, such as a the phone calls and text messages during the period of time surrounding the shooting, the warrant included every item and file that could be obtained on a cell phone, allowing the officers unfettered discretion in their search.

Since the BPD had information available to allow them to pinpoint the precise information necessary to determine who Reddicks was speaking to in the period of time surrounding the incident, the lack of specificity was *not* "practical in the circumstances." See Penta, 423 Mass. at 555. "[P]articularization was available but was not used in the warrant." Freiberg, 405 Mass. at 299 (*quoting* Taylor, 383 Mass. at 276).

As a result, the warrant violated G. L. c. 276, Section 2, Article XIV of the Massachusetts Declaration of Rights and the Fourth Amendment of the United States Constitution and all evidence must be excluded from trial. See Commonwealth v. Taylor, 383 Mass. 272 (1981); Commonwealth v. Pope, 354 Mass. 625, 629 (1968)); Coolidge v.

11

New Hampshire, 403 U.S. 443, 467 (1971); Wong Sun v. United States, 371 U.S. 471,

486 (1963).  Where the search exceeded the scope of any probable cause offered, all

evidence obtained must be excluded, even where the Commonwealth only seeks to

introduce one photograph from the search.  See Commonwealth v. Estabrook, 472 Mass.

852, 858-59 (2015) (operative inquiry in suppression motion is amount of evidence

seized and whether probable cause existed for *all* evidence sought).

## CONCLUSION

Wherefore, Reddicks respectfully requests that this Court exclude the photograph

obtained from Reddicks' cell phone, which was seized during the course of an unrelated

investigation.

Respectfully submitted,
CHARLES REDDICKS
By his Attorneys

Rosemary Curran Scapicchio
107 Union Wharf
Boston, MA 02109
(617) 263-7400
BBO# 558312

Jillise McDonough
107 Union Wharf
Boston, MA 02109
(617) 263-7400
BBO# 688694

12

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each party and upon any party appearing pro se by first class mail, postage prepaid or by hand delivery.

Dated: ___1|2|16___　　　Signed: _____

13

# SEARCH WARRANT

G.L. c. 276, §§ 1-7

TRIAL COURT OF MASSACHUSETTS

BOSTON MUNICIPAL _____ COURT DEPARTMENT

_____ CRIMINAL _____ DIVISION

SEARCH WARRANT DOCKET NUMBER

# 109 07 2012

## TO THE SHERIFFS OF OUR SEVERAL COUNTIES OR THEIR DEPUTIES, ANY STATE POLICE OFFICER, OR ANY CONSTABLE OR POLICE OFFICER OF ANY CITY OR TOWN, WITHIN OUR COMMONWEALTH:

Proof by affidavit, which is hereby incorporated by reference, has been made this day and I find that there is PROBABLE CAUSE to believe that the property described below:

[ ] has been stolen, embezzled, or obtained by false pretenses.

[ ] is intended for use or has been used as the means of committing a crime.

[ ] has been concealed to prevent a crime from being discovered.

[ ] is unlawfully possessed or concealed for an unlawful purpose.

[X] is evidence of a crime or is evidence of criminal activity.

[ ] other (specify) ...

YOU ARE THEREFORE COMMANDED within a reasonable time and in no event later than seven days from the issuance of this search warrant to search for the following property:

### FORENSIC ANALYSIS



[X] at:

### GREY T-MOBILE IMEI 359116038933249  SERIAL#SH13HR203054

which is occupied by and/or in the possession of:  **BOSTON POLICE DEPARTMENT**

[ ] on the person or in the possession of:

You [ ] are [X] are not  also authorized to conduct the search at any time during the night.

You [ ] are [X] are not  also authorized to enter the premises without announcement.

You [ ] are [X] are not  also commanded to search any person present who may be found to have such property in his or her possession or under his or her control or to whom such property may have been delivered.

YOU ARE FURTHER COMMANDED if you find such property or any part thereof, to bring it, and when appropriate, the persons in whose possession it is found before the _Boston Municipal_ Court Department.
_Criminal_ Division of the ___.

| DATE ISSUED: | SIGNATURE OF JUSTICE CLERK MAGISTRATE OR ASSISTANT CLERK: |
|---|---|
| 3-2-2012 | X _Benjamin_ |
| FIRST OR ADMINISTRATIVE JUSTICE | PRINTED NAME OF JUSTICE CLERK MAGISTRATE OR ASSISTANT CLERK: |
| WITNESS: _Charles R. Johnson_ | BENJAMIN A. NUNEZ |

MAR-21-2013 13:48 LHW OFFICE OF B P WILSON 6175236700 P.05

Case: 25-1048 RETURN OF OFFICER SERVING SEARCH WARRANT Entry ID: 6725215
Document: 00105203513 Page: 172 Date Filed: 06/02/2025
0001201

A search warrant must be executed as soon as reasonably possible after its issuance, and in any case may not be validly executed more than 7 days after its issuance. The executing officer must file his or her return with the court named in the warrant within 7 days after the warrant is issued. G.L. c. 276, §3A.

This search warrant was issued on ___03/02/2012_____ ..... ... _ . , 19 _____ , and I have executed it as follows:
DATE

The following is an inventory of the property taken pursuant to this search warrant:

1. FORENSIC ANALYSIS

2.

3.

4.

5.

6.

7.

8.

9.

10.

11.

12.

13.

14.

15.

16.

17.

18.

19.

20.

(attach additional pages as necessary)

This inventory was made in the presence of: SGT DANIEL KEELER

I swear that this inventory is a true and detailed account of all the property taken by me
on this search warrant.

| SIGNATURE OF PERSON MAKING SEARCH | DATE AND TIME OF SEARCH | SWORN AND SUBSCRIBED TO BEFORE |
|---|---|---|
| X_____ | 03/02/2012 3:00pm | X_____ |
| | | Signature of Justice, Clerk-Magistrate or Assistant Clerk |
| PRINTED NAME OF PERSON MAKING SEARCH | TITLE OF PERSON MAKING SEARCH | DATE PRINTED NAME & SIGNATURE TO |
| | BOSTON DETECTIVE | |

## COMMONWEALTH OF MASSACHUSETTS

### APPLICATION AND AFFIDAVIT IN SUPPORT
### OF SEARCH WARRANT OF DETECTIVE ANDREW J. GAMBON

I, DETECTIVE ANDREW GAMBON, BEING DULY SWORN, DO DEPOSE AND STATE THAT THE FOLLOWING IS TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF.

1) I AM A MEMBER OF THE BOSTON POLICE DEPARTMENT CURRENTLY ASSIGNED TO AREA D-4 , IN THE SOUTH END OF BOSTON WHOSE TERRITORIAL JURISDICTION INCLUDES THE SOUTH END, LOWER ROXBURY, THE FENWAY AND BACK BAY. I HAVE BEEN A BOSTON POLICE OFFICER FOR THE PAST 30 YEARS, THE LAST (16) YEARS OF WHICH HAVE BEEN AT MY CURRENT RANK OF DETECTIVE, ASSIGNED TO AREA D-4.

2) DURING MY CAREER IN LAW ENFORCEMENT , I HAVE PARTICIPATED IN THOUSANDS OF ARRESTS FOR VARIOUS FELONIES, VIOLATIONS OF CONTROLLED SUBSTANCE ACT AND PROSTITUTION. I HAVE RECEIVED TRAINING IN THE INVESTIGATION OF STREET CRIME, INCLUDING VIOLENT ASSAULTS, ROBBERIES, STABBINGS AND SHOOTINGS. I HAVE BEEN THE LEAD INVESTIGATOR AS WELL AS ASSISTED OTHER DETECTIVES IN INVESTIGATING CRIMES OF THIS TYPE. I AM A GRADUATE OF THE BOSTON POLICE ACADEMY, AND HAVE SUCCESSFULLY COMPLETED A SIX-WEEK TRAINING PROGRAM SPECIFICALLY DESIGNED FOR BOSTON POLICE DETECTIVES. I AM ALSO A GRADUATE OF CURRY COLLEGE RECEIVING A BACHELORS DEGREE IN CRIMINAL JUSTICE. I HAVE ALSO ASSISTED AS WELL AS AUTHORED NUMEROUS SEARCH WARRANTS IN MY CAREER.

3) ON 12/02/2011 THE VICTIM RAYMOND JOHNSON WAS WALKING AT ABOUT 624 COLUMBUS AVE. WHEN A SILVER VEHICLE PULLED UP AND A MALE POINTED A GUN OUT OF

THE WINDOW AND FIRED A SHOT WHICH STRUCK RAYMOND JOHNSON IN THE LEFT UPPER ARM.

4) WITNESSES ON SCENE DESCRIBED THE SUSPECT VEHICLE AS A SILVER PONTIAC. OFFICERS MARK WALSH, RICK MORIARTY AND TROOPER SOMERVILLE REPORTED SEEING A GREY PONTIAC WITH 2 BLACK MALES IN IT SEVERAL MINUTES PRIOR TO THE SHOOTING. THE PLATE NUMBER ON THAT VEHICLE WAS MASS 429-MY5. SERGEANT DETECTIVE KEELER AND MYSELF ALONG WITH THE AFOREMENTIONED OFFICERS WENT TO 950 PARKER ST AND SPOKE TO THE REGISTERED OWNER OF THE VEHICLE THOMAS WASHINGTON.

5) THOMAS WASHINGTON VOLUNTARILY CAME HOME AND STATED THAT HE WAS DRIVING HIS VEHICLE WITH HIS FRIEND CHARLES REDDICKS AS THE PASSENGER AND WHEN STOPPED AT INTERSECTION CHARLES REDDICKS POINTED A SILVER FIREARM OUT OF THE VEHICLE AND SHOT THE VICTIM. THOMAS WASHINGTON GAVE A TAPED STAEMENT OF HIS INVOLVEMENT.

6) DETECTIVES THEN WENT TO CHARLES REDDICKS RESIDENCE AND PLACED HIM UNDER ARREST FOR ASSAULT & BATTERY DANGEROUS WEAPON AND UNLAWFUL POSSESSION OF A FIREARM. CHARLES REDDICKS WAS BROUGHT TO AREA D AND BOOKED. SEIZED FROM MR. REDDICKS AT TIME OF BOOKING WAS A GREY T-MOBILE CELL PHONE.

7) CELL PHONES ARE OFTEN TIMES USED BY INDIVIDUALS AS A MEANS OF COMMUNICATION WHNE PLANNING A CRIME OR USED AS A MEANS OF COMMUNICATION AFTER THE COMMISSION OF A CRIME.

8) BASED UPON MY TRAINING AND EXPERIENCE AND THE FACTS STATED ABOVE, I BELIEVE PROBABLE CAUSE EXISTS

TO FORENSICALLY EXAMINE THE GREY T-MOBLIE
CELLULAR PHONE SEIZED FROM CHARLES REDDICKS AT THE
TIME OF HIS ARREST.

DATED:

_____
SIGNATURE OF AFFIANT

SWORN TO AND SUBSCRIBED BEFORE ME ON THE          DAY
OF MARCH, 2012.

_____
CLERK MAGISTRATE OR ASSISTANT CLERK MAGISTRATE

TOTAL P.12

32

Suffolk, ss.            Commonwealth of Massachusetts        Ind. 12-10714
Superior Court
COMMONWEALTH
v.
CHARLES REDDICKS

## MEMORANDUM OF DECISION AND ORDER
## ON MOTION TO SUPPRESS STATEMENTS

### A. Introduction

The defendant is charged with murdering Mariano Malave on Friday, April 27, 2012. He is also charged with armed robbery of Mr. Malave and unlawful possession of a firearm, ammunition and a loaded firearm.

On Thursday, May 10, 2012, two Boston Police Homicide Unit detectives conducted a video-recorded interview with the defendant regarding the armed robbery and killing of Mr. Malave. The interview was at Boston Police Headquarters. The defendant was not under arrest prior to or during the interview. The interview lasted just under two hours. At the end of the interview, the defendant was not arrested. He left Police Headquarters unhindered.

The defendant's motion contends that his statements in the interview were obtained in violation of his Miranda rights. There was no Miranda violation.

The defendant's motion also contends that his statements were not voluntary. During the interview, a detective made an erroneous and improper statement to the defendant. This statement told the defendant in effect that the jury at his trial could consider against him his failure to give the detectives a reason for killing Mr. Malave. Despite this improper statement, the defendant steadfastly denied being involved in the killing. The court is convinced beyond a reasonable doubt that the defendant's limited admissions during the interview were voluntary. The motion to suppress is denied.

### B. Facts

#### (1) An Initial Summary of the Interview

This section will give a preliminary summary of the interview. Section B (2) below will separate and highlight the detective's comments in the interview about what would happen in the courtroom. Section B (3) below will summarize some specific admissions by the defendant during the interview.

The defendant lived at 116 Millett Street, Dorchester. Earlier on May 10, Boston Police Detective John Callahan of the Homicide Unit went to the defendant's residence to execute a search warrant. Detective Callahan spoke with the defendant's mother. He told her that the detectives would like to interview the defendant at Police Headquarters.

The defendant and his mother came to the Homicide Unit at Boston Police Headquarters on the afternoon of May 10. Detective Callahan and Sergeant Detective Richard Daley conducted a video-recorded interview with the defendant. The interview was held in an interview room in the Homicide Unit at Boston Police Headquarters. The two detectives and the defendant were the only persons present in the interview room. The interview began at 2:40 p.m.

2

and ended at 4:37 p.m. [1]

The defendant's date of birth is April 20, 1994. He was eighteen on the date of the interview.

At the start of the interview, Detective Callahan gave the defendant complete Miranda warnings. He showed the defendant a Miranda warnings form. He read each warning aloud to him. The warnings given by the detective included this fifth warning: "If you decide to answer now, you will still have the right to stop answering questions at anytime." The defendant initialed each warning and agreed that he understood each one. The defendant signed the warnings form below this sentence: "I HAVE READ AND UNDERSTAND THE ABOVE RIGHTS AS EXPLAINED TO ME." Ex. 3.

Early in the interview the defendant said that he understood from his mother that the police had said that his grandmother's car had been involved in a shooting and that was why they asked that he come in for an interview. The detectives discussed with the defendant his grandmother's car, a Ford Escort wagon. The defendant said that he drove the car maybe four days out of a week. The defendant gave the telephone numbers for his current phone. When asked, he also gave the number for an older phone that he said had been stolen. He said that that phone was stolen maybe two or three weeks ago. He said that it was a T-Mobile phone and that he lost it somewhere at Egleston Square. He said that he might have dropped the phone and that's how he lost it. He said that somebody probably picked it up. T. 59. The defendant said that he reported that the phone was stolen and they sent him a new phone in the mail.

The defendant said that he hung around with his two cousins, John and Javon. One of his cousins lived with the defendant's aunt at 14 Westminster Court, Roxbury. When asked, the defendant said that he knew a person named Ian, but he did not know Ian's last name or where he is from.

The detectives asked the defendant where he was about two weeks earlier on Friday, April 27. The defendant said that he was at his aunt's house in Westminster Court. He said that he had no idea how long he was there. He said that he usually stays in the area. He said that if he does leave he goes to Egleston Square or to a park near the intersection of Westminster and Walnut and near Egleston Square. He said "we smoke and stuff" in the park, referring to smoking marijuana or "weed." T. 17, 30, 67.

Several times in the interview, Detective Callahan gave talks to the defendant trying to persuade him into admitting that he shot Mr. Malave. T. 11-15, 21-28, 49, 59-65, 73-74. Some of his talks were lengthy. In these talks, Detective Callahan summarized evidence that he said the police had regarding the killing. He tried to talk the defendant into giving some explanation for killing Mr. Malave. He encouraged the defendant to give some reason to justify his actions so that he would not be thought of as a cold-blooded killer and sociopath. See T. 25-27. Sergeant Detective Daly at times added some brief questions.

Detective Callahan said their evidence included video evidence of the defendant's

---

[1]    Ex. 1 and 2 are DVD video recordings of the interview. Ex. 4 is a reliable transcript of the recorded interview. The court will use "T." to cite pages of the Ex. 4 transcript.

3

grandmother's car at the time and place of the killing. He said that they knew that the defendant drives that car. He referred to a description from a witness or witnesses that fit the defendant. He said that they had or would get cellphone records and cell tower location evidence for a cellphone that the defendant had been using. Detective Callahan said that they would get "text messages that we know of now between you and the dude that got killed. . . ." T. 13. He pointed out that targets in murder investigations often cancel their phone right after a murder. He noted that the defendant had lost his phone or shut off the service after the murder. Detective Callahan also spoke of the defendant's love for his grandmother and mother and how they loved him and had raised and cared for him. T. 11-15, 21-28, 49, 59-65.

After his first extended talk, Detective Callahan asked the defendant: "So why Charles? . . . [W]hy did you go over there and pull the trigger?" The defendant replied, "I didn't murder anyone." T. 16. Throughout the two-hour interview, the defendant denied committing a murder. He denied killing or shooting the victim. He never wavered in these denials. T. 16, 17, 18, 20, 28, 37, 39, 60, 61, 62, 63, 65, 70, 72, 77. He said, "I don't know anything about a murder." T. 60.

Detective Callahan asked the defendant what he was doing in the house of the man who was killed. The defendant replied, "I wasn't at his house. . . . I tried to tell you where I was at. That was my story, that's where I was at." T. 16. Detective Callahan referred to the Forest Hills neighborhood as the location of the killing. He asked the defendant how his car got over to Forest Hills. The defendant said, "I honestly don't think the car was at Forest Hills." T. 16.

Detective Callahan told the defendant they "knew before you sat down in here that you were over there that day." He said that they knew that "you went into a residence, and you pulled the trigger." T. 18. The defendant replied, "But you know the car was only in Egleston." T. 18. The defendant said, "I don't understand because I told you that the only time I ever left besides when I went home is when I walked to the park. That's the only time." T. 18.

Detective Callahan said that they knew all about the defendant's conversation with the guy who was killed. He said that there are numerous phone calls between the defendant and the victim. T. 22. He said, "You had no intentions of brokering a deal about the weed. You were just taking the shit and shooting. That's a cold-blooded killer." T. 25.

The detectives told the defendant that the murder occurred at 6:30 p.m. on April 27. The defendant said, "I didn't have my phone around four. . . . I said in Egleston Square I lost my phone." T. 28-29. Detective Callahan told the defendant that he set up and robbed a drug dealer and executed him in his home. The defendant replied, "I didn't do that." T. 36-37.

The defendant's responses to the detectives were always brief. He denied killing anyone. He denied going to Forest Hills. He insisted that at the time of the Forest Hills killing he was at his aunt's house at Westminster, in Egleston buying weed, and at the park. T. 18, 20, 28, 33, 35, 39, 43, 45, 49, 52, 59. He said, "I was never near Forest Hills." T. 77.

The defendant said that he left the car in the back near his aunt's house when he went to the park to smoke. He said that he arrived at his aunt's around four and that he returned to his home on Millett Street around midnight. T. 39-41.

Throughout the interview, the detectives were serious but calm in their voices and

4

demeanor. They did not stand or raise their voices.

### (2) The Detective's Comments About What Would Happen in the Courtroom

In one of his talks to the defendant, Detective Callahan spoke of what it will be like in a courtroom with a jury if the detectives say they gave the defendant an opportunity to give a reason for what he did "as opposed to not saying anything." Detective Callahan said:

> [T]his is a golden opportunity to give your version of the story . . . because a year down the road, two years down the road we're going to be in a courtroom and I'm going to be sitting across from you, maybe both, or Rich Daley and if I'm there, it's me, I'm going to be looking at you. I'm going to be sitting up there in a suit and tie. I'm going to be looking at you, and I'm going to be saying I gave him, Sergeant Daley gave him, the opportunity to offer a reason as to why he did what he did, as opposed to not saying anything and looking over at the jury as I'm looking back to you and everything that is going to come out of our investigation to the jury is going to be that Charles Reddicks is a cold-blooded killer. That he robbed the dude, shot dude over nothing.

> As opposed to you telling us, there's got to be a viable reason you do what you did. You can -- Charles you can deny it all you want but you're there, we've got you there. . . . [Y]ou're there and without saying anything, without defending yourself you can say all you want about I wasn't there and my car I don't know how my car could have been over there. Offer us a viable reason why you shot this kid dead. Offer us -- get it out, get it out because you know we're coming. You know we're coming.

> Let us know that you're not a cold-blooded sociopath killer. Let us know that hey he pulled his gun on me, he threatened me. I mean there's got to be a viable reason. Other than that if you're going to let things lie where you're letting them lie right now, you're just a cold-blooded killer. T. 24-25.

Detective Callahan returned to the courtroom theme near the end of the interview. He said: "[I]t's a great opportunity now to say why you did it. To say why you did it as opposed to us sitting in the court room telling your mother and your grandmother who are going to be there this is what happened." T. 73. Detective Callahan summarized evidence that he said would be shown to the jurors in the courtroom. T. 73-74. At the end of this talk, Detective Callahan said, "And we're going to show the jurors how you deviate from your pattern to go shot an unarmed guy. Shot and kill and unarmed guy. . . . And you're going to be sitting there, and you can deny all you want but they're going to hear what a, a little bit of what we talked about today and then a whole lot more." T. 74.

5

**(3) The Defendant's Admission of His Link to the Victim, His Admission of Some Limited Handgun Knowledge and a Lack of a License, and the End of the Interview**

In the first half of the interview, the detectives asked the defendant if he knew a drug dealer named Mariano Malave and if he called or texted him with his phone. The defendant said he did not know anyone named Mariano. T. 36-37. When the detectives asked him if he knew or dealt with Mario, the defendant said, "I never dealt with him. I know he's a dealer." T. 37. The defendant said that he never met Mario in person. He said that he spoke to him about numbers and that he was supposed to meet him, but he never met him or made a transaction with him. T. 38-39.

In the second half of the interview, Detective Callahan told the defendant that he knew that the defendant had his phone and that he was texting Mario that morning about the sale of some weed. T. 52-53. The defendant admitted that he was texting Mario about buying weed, but he said that he never met him or made a deal with him. T. 53, 69. The defendant said it was a lot of weed. When asked about the price the defendant said, "I don't know" and "I don't want to say." T. 53-54. He said that he was seeing who Mario was working with and if he had good prices. He said that Mario never told him where he lived. T. 56-57. The defendant denied that they had any future plans to get together. T. 58. [2]

Near the end of the interview, Sergeant Detective Daley asked the defendant if he had ever fired or held a gun and if he knew the difference between an automatic and a revolver. He asked if the defendant had a license to carry a firearm. The defendant said that he never held or fired a gun. He said that he knew that a revolver holds six and that an automatic can hold like ten or more. The defendant said that he did not have a license. T. 74-75.

Detective Callahan told the defendant that there's a good chance that there may be video in Westminster where the defendant said he parked his car. He said that he knew the defendant's car was in Jamaica Plain [Jamaica Plain includes the Forest Hills neighborhood]. Detective Callahan said, "Your car's not in Westminster where you say it is, what's your answer?" The defendant stayed with his own earlier version: "I don't know. I let you know it was there. The only time I ever left was to go to the park besides when I left to go to home." T. 75-76.

The defendant again denied shooting or killing anyone. T. 77. He said he "was never near Forest Hills." T. 77. The defendant made no further statements in the interview. The detectives offered the defendant their cards. They told him that he could call them and "If you

---

[2]  In response to a question whether he texted Mario to buy weed, the defendant said, "Yeah, we had a conversation before like, the dude Mario about weed." T. 53. At different points the defendant said that he had spoken with Mario about marijuana and talked to him about it. T. 38-39, 55. He also said that he never spoke to Mario. He said that they had text messages about prices. T. 57.

The court notes that cellphone pages often use the word "conversation" to designate a series of recorded text messages back and forth between two persons. On a cellphone screen, the term "conversation" may mean a series of text messages rather than spoken conversation or voicemails.

6

want to talk, 100 percent we're here, we're here to listen." Detective Callahan asked the defendant if he wanted to sit down by himself for a few minutes or if he wanted to talk to his mother for a few minutes or if he wanted "to let this die here." The defendant said, "I'll let it die here." T. 79-80. The interview ended and the defendant left.

### C. Additional Fact Findings and Conclusions

#### (1) Miranda Requirements

When police officers interrogate a person, they "are required to give *Miranda* warnings only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *California v. Beheler*, 463 U.S. 1121, 1124 (1983). Miranda warnings "are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'" *Id.,* 463 U.S. at 1125; *Commonwealth v. Bly*, 448 Mass. 473, 492-93 (2007).

In considering whether a defendant was in police custody, the court considers several factors including: "(1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that that person is a suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the person being interviewed; and (4) whether, at the time the incriminating statement was made, the person was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with an arrest." *Commonwealth v. Groome*, 435 Mass. 201, 211-212 (2001).

The ultimate inquiry is "whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994).k

In the present case the detectives repeatedly accused the defendant of murdering Mr. Malave. Nevertheless, the detectives never said or suggested to the defendant that he was about to be arrested. The defendant came to police headquarters in his own transportation after learning that the detectives wanted to talk with him about the family car being involved in a shooting. The defendant left when the interview was over. The defendant understood his situation during the interview. He knew he was not under arrest, and he knew that he was suspected of committing a murder. He wanted to tell the detectives that he denied killing anyone and that he denied being in Forest Hills at the time of killing. The Miranda requirements did not apply to this case because the defendant did not believe, and a reasonable person in his position would not have believed, that he was under arrest or in police custody during the interview.[3]

Apart from the custody issue, the court finds beyond a reasonable doubt that the

---

[3]    The Supreme Court in *J.D.B. v. North Carolina*, 131 S.Ct. 2394, 2398-2399 (2011), held that when the person being questioned is a child the child's age must be considered in determining whether the child was in custody for Miranda purposes. Although the defendant in this case was not a child, the court has considered his age in assessing the Miranda issues and the voluntariness issues argued by the defendant.

7

defendant made a knowing, intelligent and voluntary waiver of the Miranda rights. The Miranda warnings were given in a calm, clear manner. The defendant paid attention to each warning. He understood the warnings. He signed the warnings form stating that he understood them. The defendant did not at any time attempt to end the interview. The defendant voluntarily chose to proceed with the interview because he wanted to see what the detectives had to say about the investigation and he wanted to deny being involved in the killing.[4]

### (2) Voluntariness

Apart from the Miranda requirements, the defendant argues that his statements were not voluntary. The test for voluntariness of a defendant's statement is "'whether, in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act.'" *Commonwealth v. Durand,* 457 Mass. 574, 595 (2010); *Commonwealth v. Novo,* 442 Mass. 262, 267 (2004). A statement is voluntary if it is "the product of a rational intellect and a free will." *Novo,* 442 Mass. at 267; *Commonwealth v. Davis,* 403 Mass. 575, 581 (1988).

Factors relevant to the totality of the circumstances include whether promises or other inducements were made to the defendant by the police, as well as the defendant's age, education, and intelligence; experience with the criminal justice system; and his physical and mental condition, including whether the defendant was under the influence of drugs or alcohol. *Commonwealth v. Durand,* 457 Mass. at 596.

As noted earlier, the defendant was eighteen at the time of the interview. At that time the defendant was a student at Community Academy. The defendant's intelligence appears to be average or above average based on what he said and how he behaved in the interview. He asked intelligent questions about the investigation. He understood the nature of the investigation and the detectives' statements and questions. He spoke articulately. He remained alert and attentive throughout the interview.

Of particular concern on the voluntariness issue in this case is Detective Callahan's statement at T. 24 about what would happen in the courtroom if defendant did not give the detectives a reason for the killing. This statement was impermissible. The statement erroneously suggested that the jury could consider against the defendant his unequivocal denial of guilt in the interview and his failure to give the detectives a reason for the killing. In a trial, the jury cannot consider against a defendant an unequivocal denial of an accusation of a crime. *Commonwealth v. Spencer,* 465 Mass. 32, 46 (2013). The jury also cannot consider a defendant's reliance on the

---

[4]    The defendant was not entitled to the special protection applicable to juveniles that requires a meaningful opportunity to consult with a parent or interested adult. *Commonwealth v. A Juvenile,* 389 Mass, 128, 134 (1983). The court must, however, consider the age of an eighteen-year-old suspect as a relevant factor on the Miranda and voluntariness issues, even in cases such as this where the special requirements applicable to juveniles do not apply.

8

constitutional right to remain silent. *Id.*; *see Doyle v. United States,* 426 U.S. 610, 619 (1976). [5]

The detective's improper statement about the courtroom effect of defendant's failure to give a reason for the killing is somewhat similar to a detective's now-or-never comments in *Commonwealth v. Novo,* 442 Mass. 262, 267-268 (2004). In *Novo,* the defendant repeatedly said or suggested that unless the defendant gave the police a reason for injuring the child victim "'a jury's never going to hear a reason.'"

As with any voluntariness issue, the specific improper statement must be considered in determining whether "'the will of the defendant was overborne to the extent that the [defendant's] statement was not the result of a free and voluntary act.'" *Commonwealth v. Durand,* 457 Mass. 574, 595, 596 (2010); *Novo,* 442 Mass. at 267.

Initially it should be observed that the improper statement in the present case was not as offensive to the defendant's rights as the extended now-or-never comments in *Novo.* In *Novo* the detectives repeatedly told the defendant that he would have no other opportunity to explain why he injured the child. The detectives' comments in that case were a "particularly egregious" intrusion on the defendant's Article 12 right to present all proofs that may be favorable to him and to be fully heard in his defense. 442 Mass. at 268-269.

In this case, the defendant's response –and lack of response– to the improper statement is also important. Before the detective's improper statement, the defendant had already given his account of his locations on the offense date. He had already told the detectives where his car was and where he was when his phone was lost or stolen. T. 6-7, 9, 16, 18, 20, 22. He had already denied going to Forest Hills, and he had denied murdering anyone. T. 10, 16-22.

The detective's improper statement was an effort to get the defendant to give some reason for killing Mr. Malave. The effort failed. After the detective's improper comment, the defendant never varied from his statements that he did not kill anyone and that he did not go to

---

[5] It is not impermissible for an officer to refer to evidence of a defendant's guilt and to urge the defendant to give a reason or an explanation for why he shot someone. The impermissible portion of what Detective Callahan said was the statement that the jury would consider against the defendant the opportunity the detectives gave him in the interview to offer a reason for the killing, as opposed to not saying anything. In the detective's words:

"[T]his is a golden opportunity to give your version of the story because . . . a year down the road, two years down the road we're going to be in a courtroom and I'm going to be sitting across from you, maybe both, or Rich Daley and if I'm there, it's me, I'm going to be looking at you. . . . I'm going to be looking at you, and I'm going to be saying I gave him, Sergeant Daley gave him, the opportunity to offer a reason as to why he did what he did, as opposed to not saying anything and looking over at the jury as I'm looking back to you and everything that is going to come out of our investigation to the jury is going to be that Charles Reddicks is a cold blooded killer. That he robbed the dude, shot dude over nothing.

As opposed to you telling us, there's got to be a viable reason you do what you did. T. 24.

9

Forest Hills.

As noted in Part B (3), above, the defendant did make some incriminating admissions. He admitted knowing of a drug dealer named Mario. He admitted that he texted him on the morning of the offense about a possible deal for a lot of marijuana, but he denied that he ever met him. T. 37-39, 53-58, 69. The defendant also admitted that he knew the difference between a revolver and an automatic and that he did not have a license to carry a firearm. T. 74-75. These admissions occurred over the course of an hour and twenty minutes after the detective's improper statement about jury consideration of a failure to offer a reason for the killing. Although these admissions came after the improper statement, they were not in response to or the product of the improper statement.

The defendant's words and his demeanor in the interview show a young man who made limited, carefully chosen responses to the detectives. The defendant's admissions that he texted or spoke with Mario about a possible marijuana deal were directly in response to the detectives' statements that the defendant set up, robbed and executed a drug dealer named Mariano or Mario and their statements that they knew that he had the phone that morning and that he was texting Mario about the sale of weed. T. 36-39, 52-58.

Considering the detective's improper statement together with all the circumstances relevant to voluntariness, the court finds beyond a reasonable doubt that the defendant's statements were voluntary and the product of a rational intellect and free will. The defendant's will was not overborne by the detective's improper comment. The defendant's admissions were his voluntary responses to the specific evidence recited by the detectives about the Malave killing plus a few simple questions about knowledge of handguns and whether he had a license. The detective never yielded to the detective's attempts to have him give a reason for the killing. The defendant's admissions were not the product of the detective's improper statement. *See Commonwealth v. Durand*, 457 Mass. 596-597 (defendant's incriminating statements were not made in response to a variety of improper interrogation techniques used by the officers).

D. Order

The defendant's motion to suppress statements is denied.

October 29, 2014

Charles J. Hely
Justice

VOLUME: I
PAGES: 319
EXHIBITS: ID: B-F

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                    SUPERIOR COURT DEPARTMENT
                               OF THE TRIAL COURT


* * * * * * * * * * * * * * * * * * *
COMMONWEALTH OF MASSACHUSETTS      *
                                   *
-v-                                *    SUCR 2012-10714
                                   *
CHARLES REDDICKS                   *
* * * * * * * * * * * * * * * * * * *


JURY TRIAL
(DAY 1)



BEFORE:  HONORABLE LINDA E. GILES
         Suffolk Superior Courthouse
         Courtroom 907
         Boston, Massachusetts
         Wednesday, January 13, 2016



Gregory Henning, Assistant District Attorney
  For the Commonwealth of Massachusetts

Rosemary Scapicchio and Jillese McDonough
  On behalf of Charles Reddicks



NANCY MCCANN, CVR-C.M.
OFFICIAL COURT REPORTER
SUFFOLK SUPERIOR COURT

2

I N D E X

Motions  ...................................... Page 3

Impanelment ................................... Page 35

Individual Juror Voir Dire .................... Page 58

EXHIBITS MARKED FOR IDENTIFICATION

| EXHIBIT | DESCRIPTION | PAGE |
|---------|-------------|------|
| B - ID | Board of Probation Records of Accepted Jurors | 219 |
| C - ID | Board of Probation Record, Juror Number 5, Seat Number 1 | 220 |
| D - ID | Board of Probation Record of Juror Number 28, Seat Number 2 | 221 |
| E - ID | Board of Probation Record of Juror Number 29, Seat Number 3 | 221 |
| F - ID | Board of Probation Records of Juror Number 47 | 225 |

3

1             P R O C E E D I N G S

2             Wednesday, January 13, 2016

3      (Court in session at 9:15 a.m.)

4      (Defendant present.)

5             THE CLERK:  Your Honor, for the record,

6         before the Court, Commonwealth versus Charles

7         Reddicks, 2012-10714.  Mr. Reddicks is present

8         with his attorneys, Rosemary Scapicchio and

9         Jillise McDonough.  For the  Commonwealth,

10        Assistant District Attorney Gregory Henning.

11             THE COURT:  Mr. Henning, Ms. Scapicchio,

12        Mr. Reddicks, Ms. McDonough, good morning to all

13        of you.  What do we need to address before

14        impanelment?

15             MS. SCAPICCHIO:  Do you want to do yours

16        first?  Because there's witnesses here.  I will

17        wait.

18             MR. HENNING:  There are some witnesses

19        in the courtroom who I believe will be, and

20        correct me if I'm wrong, John Hyman, Javeon Hyman,

21        and Terri Hyman.  Could you just raise your hands

22        as I call your name?

23             So those witnesses, Your Honor, the

24        Commonwealth may be calling.  Obviously, the

25        sequestration order would apply.  As you know, we

4

1          are not going to need them today, but I do want

2          them to be recognized and then I'm happy to

3          contact them in advance of when we would need to

4          do that.  I would just ask for contact information

5          for them so that we can reach out.  Alternatively,

6          if they don't want to provide contact information,

7          I assume we'd have to go day to day with these

8          witnesses; but right now, I'm happy to leave them

9          on call so I can reach out to them.

10                    THE COURT:  All right, let's address

11          that order of business first.  Who are these three

12          witnesses?

13                    COURT OFFICER:  Stand up, please.

14                    THE COURT:  From my left to right, sir,

15          what is your name?

16                    MR. HYMAN:  John Hyman.

17                    THE COURT:  H-Y-M-A-N?

18                    MR. HYMAN:  Yes.

19                    THE COURT:  Next to you, sir, is?

20                    MR. HYMAN:  Javeon Hyman.

21                    MR. HENNING:  Javeon is J-A-V-E-O-N.

22                    MS. HYMAN:  Terri Hyman.  Terri.

23                    THE COURT:  What is your last name,

24          ma'am?

25                    MS. HYMAN:  Hyman.

5

1          THE COURT:  You all have the same last

2     name, okay.

3          Mr. Kalell, can you recognize them.

4          THE CLERK:  As to all three parties who

5     are present here today, the Court recognizes you

6     that you must appear.  If you do not give contact

7     information to the DA, you must appear daily at

8     9 AM.  Is that I understood by all parties?

9     Please answer yes.

10          (All three parties respond in the

11     affirmative.)

12          THE COURT:  Let me explain what

13     Mr. Kalell, our Clerk just told you.  You have

14     been summonsed to be witnesses at this trial.

15     That's a Court order.  That means you have to

16     comply with it or suffer the consequences of not

17     complying with it.  Mr. Henning, the District

18     Attorney, has indicated that he doesn't need your

19     presence today.  We're impaneling today, so the

20     trial is definitely not going to start today.

21          What he needs from you is contact

22     information because then he can call you and let

23     you know when you have to be here.  It may be a

24     question of being here tomorrow or Friday or

25     sometime next week, but you need to give him

6

```
1        contact information.  If you don't give him

2        contact information, then you have to be here

3        every day of trial.  So I'm assuming you'll

4        appreciate that it would be better for your

5        purposes to give him that contact information.

6        All right?

7                    Do all three of you understand that?

8                    (All three parties respond in the

9        affirmative.)

10                   THE COURT:  So you have been what we

11       call recognized.  That means you are ordered to

12       attend this trial.  That's a Court order, that's

13       coming straight from me, all right?  And if you

14       don't show up, please understand that I could

15       issue what we call a capias, it's a civil arrest

16       warrant for your arrest.  I'm assuming you don't

17       want that to happen.  So you need to be present

18       when this District Attorney tells you to be

19       present at this trial here in Courtroom 907.

20                   Do all three of you understand that?

21                   (All three parties respond in the

22       affirmative.)

23                   THE COURT:  And are you willing to give

24       him your contact information?

25                   (All three parties respond in the
```

7

1      affirmative.)

2                 THE COURT:  All three of you, all

3      right.  If you could have a seat for a second, the

4      three of you, when Mr. Henning, the DA, gets a

5      moment, he will get your contact information, and

6      as soon as he or his representative --

7                 MR. HENNING:  Your Honor, Ms. Sears is

8      able to do that, I think.

9                 THE COURT:  All right.  Before you go,

10     please make sure you await Mr. Henning's phone

11     call or a phone call from his representative.

12     That phone call will tell you when you have to be

13     here.  Do all of you understand that?

14                 (All three parties respond in the

15     affirmative.)

16                 THE COURT:  Once Ms. Sears has gotten

17     your contact information, you are free to go and

18     you will be contacted as to when to reappear.

19     All right?  Do you all understand that?

20                 (All three parties respond in the

21     affirmative.)

22                 THE COURT:  Thank you so much for your

23     cooperation.  You're free to go.

24                 MR. HENNING:  Thank you, Your Honor.

25                 Your Honor, the Commonwealth had to

8

```
1     address three things from yesterday and I'm
2     prepared to do that.
3               THE COURT:  Yes, please.
4               MR. HENNING:  The first was regarding
5     the medical examiner.  I spoke with Dr. Lindstrom
6     last night, again using the parameters that the
7     doctor would be testifying to a reasonable medical
8     certainty.  There is not going to be any
9     supplemental report, and therefore, we are not
10    going to be offering as part of our examination an
11    opinion about the wound trajectory, so to speak,
12    that we discussed yesterday.  When I found that
13    out, I called Ms. Scapicchio last night.
14              THE COURT:  All right, so it sounds as
15    if that issue has become moot now.
16              MS. SCAPICCHIO:  I believe it is, Judge.
17    My only issue is that I have spent some time with
18    the medical examiner trying to solve this issue.
19    I did have a motion for funds, I just want to make
20    sure she gets paid.  That's all.
21              THE COURT:  I will, at an appropriate
22    time, no question -- you're talking about your
23    expert.
24              MS. SCAPICCHIO:  Right, my expert.
25              THE COURT:  Absolutely.
```

9

1          MS. SCAPICCHIO:  Assuming the

2     Commonwealth already paid theirs.

3          THE COURT:  I think the ME is on salary.

4     But in any event, at an appropriate time, I will

5     absolutely allow your motion for funds.  Anything

6     else?

7          MR. HENNING:  The second issue was with

8     regard to the ballistician.  The Court had said

9     that if the ballistician was going to testify

10     about the firearm that was used in this case most

11     likely being a revolver, that he produce a report.

12          I spoke with the ballistician last

13     night.  The basis of his opinion is in the notes

14     that he has provided and that we provided to

15     counsel.  Producing a different report is

16     something that he needs to go through his quality

17     control managers in the forensic laboratory,

18     meaning it's something that they check because

19     it's not the protocol that they typically have.

20     I've asked him to do that and to get back to me,

21     and I anticipate reaching out to him at lunchtime.

22          I've also talked with him about the

23     characteristics of the bullets that Ms. Scapicchio

24     inquired about yesterday, and again, I would say

25     that the basis of his opinion is in the report and

1        also the notes that accompany it.  I think it's

2        ripe for cross-examination if Ms. Scapicchio wants

3        to do it, but that is the basis of his opinion

4        that's already been provided.

5                    THE COURT:  Ms. Scapicchio.

6                    MS. SCAPICCHIO:  Judge, it's not, and

7        I can't cross-examine his telling me what the

8        ballistician said.  Just produce a report, it's

9        not that difficult.  It happens every single day

10       in every single homicide.  In fact, this is the

11       only homicide I've ever had that I haven't gotten

12       a single report from the Commonwealth with respect

13       to any of their witnesses, the only one in 26

14       years.

15                    THE COURT:  Mr. Henning, by tomorrow,

16       can't Detective Camper just issue a very short

17       report?

18                    MR. HENNING:  There is a report that

19       we've already turned over where he describes the

20       ammunition as being --

21                    MS. SCAPICCHIO:  He doesn't give his

22       opinion.  It's his opinion that I want.

23                    MR. HENNING:  He does.

24                    MS. SCAPICCHIO:  No, he doesn't.  He

25       doesn't say anything about what you said in your

11

1          disclosure, he doesn't say anything about that.

2          That it's a revolver?  Where does he say that?

3                    MR. HENNING:  May have a moment, Your

4          Honor?  So we can solve the issue right now,

5          I just have to pull the file.

6                    THE COURT:  All right.

7                    (Pause.)

8                    MS. SCAPICCHIO:  He gives me a list

9          17 guns.  He wants me to then infer that I'm

10         supposed to say more likely than not.  More

11         likely than not is not a scientific decision or

12         acceptance in this community.  More likely than

13         not gets you nowhere.

14                   THE COURT:  Well, I disagree with that.

15         You're talking about 15 of the 17 possible

16         firearms from which these bullets could come are

17         revolvers, not semiautomatics.

18                   MS. SCAPICCHIO:  Right.

19                   THE COURT:  I think it's a reasonable

20         and fair inference that this was a revolver then.

21                   MS. SCAPICCHIO:  So put it in a report

22         so I can cross-examine.  That's all I'm asking

23         for.  It's not that difficult.

24                   MR. HENNING:  May I just hand it up to

25         the Court?

12

1            THE COURT:  Sure.

2            MR. HENNING:  There's a column there and

3    it's about two over from the left after the list

4    of the weapons, the column has PERSON and PI.

5    Most  of them are PERSON.  PERSON stands for

6    pistol revolver,  PI stands for pistol

7    semiautomatic.

8            MS. SCAPICCHIO:  And we're supposed to

9    know that how?  Are we just supposed to guess it?

10            MR. HENNING:  I'm happy to provide --

11            THE COURT:  Well, at some point,

12    Ms. Scapicchio, I understand you want to, you

13    know, make a record, but if you understand that

14    PERSON is a revolver, I can see that 15 of the 17

15    listed here are revolvers.

16            MS. SCAPICCHIO:  And they told me last

17    night at 4 o'clock that PERSON was a revolver.

18            THE COURT:  Okay.

19            MS. SCAPICCHIO:  I just want a report.

20    It's not that difficult.

21            THE COURT:  Ms. Scapicchio, I really --

22            MS. SCAPICCHIO:  You ordered them to

23    produce a report.

24            THE COURT:  Ms. Scapicchio, at this

25    point, now that I've seen this page, if I'm

13

1        hearing correctly from Mr. Henning, the sum basis

2        of Detective Camper's opinion is that 15 out of

3        17 are revolvers, so the odds are that it's a

4        revolver.  You don't need a report,

5    Ms. Scapicchio.

6              MS. SCAPICCHIO:  I don't know if that's

7        the sum total of his opinion, Judge.  I have no

8        idea if that's the sum total of his opinion.

9              MR. HENNING:  I spoke to him yesterday

10        and what I'm asking is to have him bring it to

11        lunch so he can speak to a quality control

12        manager.  If there's additional material, I do

13        believe he has to produce a report.  If there's

14        not, I believe that that report is sufficient.

15              THE COURT:  Ms. Scapicchio, this is my

16        ruling.  If the sum total of Detective Camper's

17        report is that this ammunition, these bullets,

18        these spent bullets -- am I misspeaking?

19              MR. HENNING:  Projectiles, yes.

20              THE COURT:  Projectiles.  If these

21        projectiles as identified are one of 17 types of

22        ammunition --

23              MR. HENNING:  If the projectiles from

24        one of these were likely to come from one of these

25        17 firearms.

14

1          THE COURT:  Firearms, I'm sorry,

2     I misspoke.  And 15 of them are revolvers, and

3     therefore, the probability is that this is a

4     revolver, you don't need an additional report.

5     Anybody can get that, Ms. Scapicchio, so I think

6     you're taking this a little out in this regard.

7          MS. SCAPICCHIO:  Judge, that's not all

8     he said in his disclosure.

9          THE COURT:  Okay.  If that's the sum of

10    his opinion, we don't need an additional written

11    report.  This is very rudimentary.  That's the sum

12    of it.  Speak with him again, make sure that he's

13    basing it only on the fact that according to his

14    findings, 15 out of 17 are revolvers.  Ergo, it

15    probably is a revolver.

16          If that's it, Ms. Scapicchio, you are an

17    extremely bright, skilled attorney, you get it,

18    you don't need a written report on this.

19          MS. SCAPICCHIO:  Judge, my concern is if

20    there's any mention of weights of the bullets, any

21    type of striation on the bullets that make it more

22    likely it's a revolver?  I don't know that.

23          MR. HENNING:  The weights on the bullets

24    are on the previous page.

25          THE COURT:  Okay, but it's just based on

15

1      weights of the bullets.

2              MR. HENNING:  The chart you have in

3      front of you --

4              MS. SCAPICCHIO:  Why don't we have a

5      report so we know?  Why are we guessing the day

6      before trial, the day of trial?  Why can't he just

7      produce a report?

8              MR. HENNING:  A report has been produced

9      which is his conclusion about, if you look on the

10     front two pages, that he believes these are all

11     fired from the same weapon.

12             MS. SCAPICCHIO:  Right, I get that

13     conclusion.  I'm not -- I'm disputing that, but

14     I've been aware of that conclusion.  It's all of

15     the other stuff that you put in your disclosure

16     that you said he was going to testify to that we

17     still don't have a report.  It's my job now to go

18     through his report and figure out what he might

19     conclude because he can't write a report that says

20     what his opinion is?  Really?  In a homicide?

21             MR. HENNING:  Judge, I asked him to take

22     a look at it and I will speak with him during the

23     lunch break after he has spoken to the folks that

24     he talked about.

25             THE COURT:  I'm going to look at the

16

1         report and determine whether or not --

2                   MS. SCAPICCHIO:  And the disclosure,

3         Judge.  And their disclosure.  Because the

4         disclosure is different from the report, that's

5         the point.

6                   THE COURT:  All right.  Let me take a

7         look at the disclosure, and I'll see whether

8         Detective Camper needs to give you another written

9         report.

10                  MS. SCAPICCHIO:  And if you look, Judge,

11        at my motion, I spell out what I don't understand

12        from the report.

13                  THE COURT:  Okay.  And whether that's

14        reasonable or unreasonable will be my

15        determination.  Okay?

16                  MS. SCAPICCHIO:  Thank you.

17                  THE COURT:  What else?

18                  MR. HENNING:  The third topic was the

19        T-Mobile engineer.  The Commonwealth spoke with

20        him this morning.  I believe he will be producing

21        something by the end of the day.

22                  What I explained was it should be a

23        report that outlines what he would testify to as

24        to his conclusions regarding the cell towers and

25        what the basis of that conclusion is.  He said

17

1          he'll try to get it to me by the end of the day.

2                    THE COURT:  I'm going to reserve on

3          this one.  I want to see that report and how

4          complicated it is.  Unlike Detective Camper's

5          conclusion, which I perceive at least initially

6          without having looked at his old report, to be

7          fairly rudimentary in its conclusion.  This may be

8          much more complicated, and if so and you're just

9          giving it to Ms. Scapicchio, I may consider

10         excluding it.

11                   MS. SCAPICCHIO:  Judge, just to be safe

12         in the event it comes in, I think I should

13         probably -- I've used Steve Verneau as a cell

14         tower expert before.  I've not consulted him on

15         this case.  I did call him last night.  I haven't

16         received a phone call from him back.  I'd like to

17         add him to the witness list just in case there is

18         an issue.

19                   THE COURT:  Sure.

20                   MS. SCAPICCHIO:  He took over his

21         company from his brother, it used to be Mike

22         Verneau who did all this, but he had a stroke and

23         died, and now Steve Verneau, the brother, is

24         taking over.

25                   THE COURT:  Would it be Stephen with a

18

1        P-H?

2                MS. SCAPICCHIO:  I don't know, Judge,

3        I'm sorry.  I should know that, and I don't.

4                THE COURT:  Spell his last name.

5                MS. SCAPICCHIO:  I think it's V-E-R-N-E-

6        A-U.

7                THE COURT:  Oh, I'm sorry, I thought you

8        said Renault.

9                MS. SCAPICCHIO:  No, V-E-R-N-E-A-U,

10       Verneau.  And like I said, I don't know if he's

11       available, I nothing about him, but I just --

12               THE COURT:  Do you know what community

13       in which he works?

14               MS. SCAPICCHIO:  I think it's on the

15       North Shore, Judge, I want to say I think it's up

16       in Essex.

17               THE COURT:  Essex County?

18               MS. SCAPICCHIO:  Yes.

19               THE COURT:  Well, there's a town of

20       Essex.  You think it's Essex?

21               MS. SCAPICCHIO:  I don't know, Judge.

22       I don't know if he's still in the same building

23       that his brother was in, I just don't know.

24               THE CLERK:  Judge, I can Google it for

25       you.  Spell the last name again?

19

 1              THE COURT:  V-E-R-N-E-A-U?

 2              MS. SCAPICCHIO:  I believe that's it.

 3              THE CLERK:  First name?

 4              MS. SCAPICCHIO:  Stephen.  And it used

 5      to be, the guy that used to own the company was

 6      Michael Verneau.

 7              THE CLERK:  Okay, I'll Google it.

 8              THE COURT:  Great.

 9              MR. HENNING:  Your Honor, just to

10      clarify what you're saying, Counsel has been on

11      notice about the cell towers, themselves, for

12      quite some time.  What we're talking about

13      excluding is the vicinity within a one mile

14      portion which is what we were covering yesterday.

15              THE COURT:  Yes.

16              MR. HENNING:  But not excluding the

17      witness.

18              THE COURT:  No, no, just that portion of

19      it that may be new to Ms. Scapicchio and/or may be

20      so complicated that it is unduly prejudicial to

21      her to come up to speed.

22              MR. HENNING:  Understood.

23              THE COURT:  So I'm going to reserve on

24      that until I see the new report, then we'll have

25      another discussion.

20

1           MR. HENNING:  And then the last open

2     issue from yesterday was we had a motion of the

3     Commonwealth, prior and subsequent bad acts.  The

4     McGee case was one of the --

5           THE COURT:  Why do we need to do this

6     before impanelment?  We've got jurors waiting

7     downstairs.  Is there something that we need to

8     address before impanelment?

9           MS. SCAPICCHIO:  I have something,

10     Judge.

11           THE COURT:  Yes.

12           MS. SCAPICCHIO:  I'm moving to dismiss

13     again for prosecutorial misconduct and late

14     discovery.  I'm not going to go over all the

15     things of yesterday. I'll just give you the

16     highlights.

17           The lack of reports on any scientific

18     expert, the new information on the pathologist,

19     the new information on the ballistics, the new

20     information on the cell tower, the new information

21     on the MBTA.

22           There are four new witnesses that

23     they've just disclosed to me, the information

24     regarding Ian Follette that they didn't disclose

25     to me till yesterday regarding his prior or his

21

1      open and pending case, the information regarding

2      Lucky's conviction which they just disclosed to me

3      last week.

4              I have been asking, Judge, just so the

5      record is clear, for almost two and a half years

6      why it was that the Commonwealth didn't run the

7      victim's cell phone.  We had texts that were

8      allegedly from my client to the victim, and that's

9      all we had in this case.

10             And I've been asking, I've filed motions

11     looking for disclosure of the victim's cell phone

12     because I think that's one of the first things

13     that they would do.

14             Yesterday, Mr. Henning handed me a disc

15     that is a dump of the victim's cell phone and a

16     report -- I think there's two reports on there,

17     from their police department that they dumped it

18     on January 11th of 2016.

19             It's about 4,000 pages of information,

20     some documents I can't even open.  I was looking

21     at it until well after midnight last night.  I do

22     not have a good handle on it.  There is absolutely

23     no excuse whatsoever that this should be so late

24     in the game.

25             I don't know, the Commonwealth has

22

1    said they're not using it, and that's great, but

2    I don't know if there's anything exculpatory on

3    there.  I have to look at every single document

4    and every single page.

5            And the way it's set up, if there are 50

6    photos, you have to click on every single photo.

7    That's what I was doing last night, looking at

8    photos.  There are photos, there are emails, there

9    are texts, there are cell call detail, none of

10   which was turned over until last night.

11           I can't possibly be able to look at

12   4,000 pages and digest it while I'm still on

13   trial.  It's outrageous conduct on behalf of the

14   District Attorney's Office.  There's no excuse for

15   it whatsoever.

16           It could contain exculpatory  evidence

17   for my client which they've withheld till the day

18   of trial, and I say that under all the

19   circumstances, it's a violation of his Sixth

20   Amendment right to be able to prepare a defense.

21           I don't know how this is going to fit

22   into any of the witnesses in this case.  And I

23   can't stay up till midnight every night trying to

24   catch up on stuff they should have given me three

25   years ago.

23

1            THE COURT:  Mr. Henning?

2            MR. HENNING:  The phone that the

3    Commonwealth had from the victim, the defense has

4    known that we've had it for quite some time,

5    obviously since the beginning of the case.

6            When the inspection of the phone was

7    done originally there was no software that he had

8    that could give the equivalent of a phone dump.

9            Ms. Scapicchio mentioned to me, perhaps

10   a week ago or five days ago, that she wanted to

11   look at the text messages and communications from

12   his phone, she said is that all there is.  I said

13   that's all I have.  I can ask them if there's

14   something else they can do with the phone.

15           I went to my inspector or the detective,

16   he brought the phone to our forensic examiner.

17   They now have software to do it.  He asked me

18   whether or not I wanted to have it done.

19           Rather than not having it done, I said

20   put the phone on a disc like we would typically

21   do, and I gave it to counsel.

22           I realize that we're giving that to her

23   late.  I understand that.  The material that we

24   have that we're using from the victim's phone,

25   counsel has known about.  I have not had and did

24

1      not know about until counsel mentioned to me, the

2      ability for us to do the subsequent follow-up on

3      the phone to search it.

4                  THE COURT:  Well, was the request

5      recent?  Ms. Scapicchio, did you just request it?

6                  MS. SCAPICCHIO:  No, I've been

7      requesting it for two and a half years, Judge.

8      It's just when he took over the case, I said

9      I can't believe that you didn't dump the victim's

10     phone.

11                 I've been asking -- I asked Joe Janezic

12     for it.  I even asked the first district attorney

13     who was on the case, Dan Mulhern, where is the

14     dump from the victim's phone.  I've been asking

15     for three years.

16                 It just so happened that he took over

17     the case.  We were talking about the text messages

18     and I said I can't believe you guys didn't dump

19     it.  He's telling me he didn't know we had the

20     technology.

21                 I told him I've tried a number of cases

22     in Suffolk County.  Of course you have the

23     technology to dump the phone.  It's been happening

24     for years you've been dumping phones.

25                 MR. HENNING:  It's not the technology

1      for phones.  It's this particular phone.  It's an

2      older model, a non-regular touchscreen.

3              So I spoke with Sergeant Detective

4      Witherspoon, and he said he thought we may have

5      the technology to do it now, which is why I asked

6      him to do it.

7              THE COURT:  Thank you, both, very much.

8      I'm going to note your objection for the record,

9      Ms. Scapicchio, but I'm not allowing your oral

10     motion to dismiss.

11             MS. SCAPICCHIO:  Then I need to move to

12     continue, Judge.  I need time to look at 4,000

13     pages and figure out in that 4000 pages, whether

14     or not there's anything in there that I can use

15     to cross-examine the Commonwealth's witnesses.

16     I need to understand how that works with respect

17     to all of these witnesses.  It's not my client's

18     fault, it's not my fault that they waited until

19     the day before trial to dump the victim's phone.

20     They've been on notice since the beginning of time

21     that I was looking for this information.  The idea

22     that they're saying here now that they just got

23     the technology, I think, is ludicrous.  They've

24     had this technology forever, Judge.  It's unfair.

25             At some point, you have to say that it's

26

1          unfair to Mr. Reddicks that they're dumping this

2          stuff on us at the last minute.  I'm very good at

3          what I do, but I'm not a miracle worker.  I can't

4          look at 4000 pages.  And now I need a cell phone

5          expert to tell me whether or not he can delete

6          these undeleted files that are on the cell phone.

7          When am I going to do that?

8                    THE COURT:  Thank you, Ms. Scapicchio.

9          Again, I will note your objection for the record,

10         but I'm not going to continue the trial, either.

11         What you're engaging in is pure speculation.  The

12         fact that something on the victim, the alleged

13         victim's phone is going to be at all probative of

14         anything in this case is pure speculation on your

15         part.

16                    MS. SCAPICCHIO:  But I'm not supposed

17         to have to speculate at this point, Judge.  I'm

18         supposed to know.  It's my job to know.  It was

19         their job to give it to me so I do know.  So yes,

20         it speculation because they gave it to me last

21         night.  I need time to be able to make a coherent

22         argument to you as to what's on that phone and why

23         it's important.  I can't do that now because they

24         handed it to me last night and I didn't even put

25         the disk into my computer until 6 o'clock last

27

1    night.

2              THE COURT:  Ms. Scapicchio, if before

3    the end of this trial, you find something of a

4    material nature, I'll consider a mistrial.  If

5    your client is convicted, I'll consider setting

6    aside the verdict.  Believe me, there are remedies

7    that I can take.  But at this point, you are

8    engaging in utter speculation.  All right?  In any

9    event --

10             MS. SCAPICCHIO:  Because of the

11   Commonwealth's conduct.

12             THE COURT:  It's still speculation.

13             MS. SCAPICCHIO:  But Judge, that's not

14   fair.  Because I'm not ready to make an argument

15   because they just gave it to me?  That's a

16   circular argument, how am I supposed to do that?

17   If they had given it to me in time to actually

18   look at it, I could make a coherent argument as

19   to whether or not there's anything on it that's

20   exculpatory and an argument that they should have

21   turned it over earlier and therefore my client

22   should not have to stand trial.  You're saying

23   it's only speculative, so we can't do anything

24   about it.  It's only because I don't have it.

25             THE COURT:  Ms. Scapicchio, again,

28

```
1        I will clearly note your objection for the record.

2        If at some point, and we have a holiday weekend

3        coming up, you look at that disk and something

4        exculpatory comes out to you and you persuade me

5        that you needed this in advance and you are

6        prejudiced somehow by the late, the allegedly late

7        disclosure of this, I'll --

8              MS. SCAPICCHIO:  There's no allegedly

9        about it, Judge, it was yesterday.

10             THE COURT:  All right, thank you, I will

11       consider ordering a mistrial, but until such time,

12       I'm not going to go to that drastic -- I'm not

13       going to resort to that drastic measure.

14             MS. SCAPICCHIO:  So I can't get a

15       continuance you look at 4000 pages of discovery.

16             THE COURT:  That is correct.

17             MS. SCAPICCHIO:  Because the

18       Commonwealth decided to handed to me yesterday.

19       Because I can't tell you what it said because

20       I don't have time to look at it.  Is that what

21       you're saying?

22             THE COURT:  No, Ms. Scapicchio, that's

23       not what I'm saying.  I'm saying that if and when

24       you find something exculpatory on that --

25             MS. SCAPICCHIO:  When am I supposed to
```

1          do that, Judge?  I'm trying a case.  When am I

2          supposed to look at 4000 pages?  And it's not just

3          looking at it, Judge.  It's looking at it and

4          comparing it to all of the other evidence in the

5          case.  When am I supposed to do that?

6                    THE COURT:  Ms. Scapicchio, I also have

7          to put this into a broader context --

8                    MS. SCAPICCHIO:  The broader context is

9          the violation of my client's rights.

10                    THE COURT:  May I speak?  I've allowed

11          you to speak ad infinitum, Ms. Scapicchio.

12          Given the essential defense in your case which if

13          I understand correctly is misidentification --

14                    MS. SCAPICCHIO:  Right.

15                    THE COURT:  -- the chances of finding

16          something exculpatory or even material in the

17          alleged victim's cell phone records is remote, to

18          say the least.

19                    MS. SCAPICCHIO:  I don't believe that,

20          Judge.

21                    THE COURT:  Well, I do, Ms. Scapicchio,

22          and when and if you can prove me incorrect, I'll

23          be the first one to respond.  All right?  So at

24          this point --

25                    MS. SCAPICCHIO:  So my client might have

30

1          to stand trial twice because the Commonwealth was

2          late with discovery.

3                    THE COURT:  Thank you, Ms. Scapicchio.

4          I have noted your objection, but respectfully,

5          I am going to deny your request.

6                    Is there anything else we need to talk

7          about before impanelment?

8                    MS. SCAPICCHIO:  No, Your Honor, note my

9          objection.

10                   THE COURT:  Clearly noted, clearly

11         noted.

12                   In preparation for impanelment, we have,

13         of course, the indictments.  I've got

14         Commonwealth's witness list, as well as your 31

15         witnesses now.

16                   MS. SCAPICCHIO:  Right, and I could cull

17         it down if they would stop giving me discovery,

18         but they won't.  And you won't do anything about

19         it, so there's nothing I can do about it.

20                   THE COURT:  Without the gratuitous

21         remarks, Ms. Scapicchio, that would be very

22         appreciated, I am going to read all of the

23         witnesses on the witness list.

24                   There was also presented to me a

25         proposed statement of the case.  Is this by

31

```
 1        agreement?

 2              MR. HENNING:  If I could just see it?

 3              MS. SCAPICCHIO:  I actually want to see

 4        it, as well, how it ended up, because I was too

 5        busy doing other things.

 6              (Pause.)

 7              MS. SCAPICCHIO:  It's fine with me.

 8              MR. HENNING:  No objection from the

 9        Commonwealth.

10              THE COURT:  I've also handed out to you

11        my proposed voir dire questions.  I gave each of

12        the attorneys a copy.  Does anybody have any

13        problem with the proposed questions?  The first

14        portion, the first four, I'm going to add to the

15        collective questions.  The latter four are for

16        individual voir dire.  Anybody have any concern

17        about the wording of those questions?

18              MS. SCAPICCHIO:  Judge, I would ask, and

19        I don't know if you'll do it, on number three of

20        the second set?

21              THE COURT:  Yes.

22              MS. SCAPICCHIO:  Where you say the

23        defendant in a criminal case has an absolute right

24        not to testify, I'd ask you to ask if Mr. Reddicks

25        chose not to testify, would you hold that against
```

32

```
1              him in any way.
2                        THE COURT:  Sure.  Anything else?
3                        Mr. Henning, Ms. Scapicchio?
4                        MS. SCAPICCHIO:  Not for me, Your Honor.
5                        THE COURT:  Again, to, I think it's
6              Mr. Reddicks' mom and his other relatives, we may
7              need to -- if you want to stay for this
8              preliminary portion of impanelment, we're going to
9              bring in about 70 potential jurors, you're going
10             to need to be put somewhere away from these jurors
11             if you want to stay in the courtroom.  We welcome
12             your presence, it's an open courtroom, but please
13             understand that after the initial portion of
14             impanelment, those 70 jurors are going to be taken
15             to another courtroom and then there will be plenty
16             of room in the back on those benches for you to
17             return and be more comfortable.
18                        But during the initial portion when we
19             have 70 potential jurors, the Court Officers may
20             have to put you over in the corner or someplace
21             slightly away, so if you could comply with their
22             wishes, I very much appreciate it.
23                        MS. SCAPICCHIO:  Could I just have a
24             minute to speak to the family just to explain?
25                        THE COURT:  Of course.  It's going to
```

33

```
1        take a moment to bring all 70 in, so you have

2        plenty of time.

3              And as I've already explained to the

4        attorneys off record, we're going to be sitting at

5        that table back there.  Mr. Henning, I think you

6        agreed to sit at that table.  Ms. Scapicchio, you

7        may want to change seats with Ms. McDonough.

8              MS. SCAPICCHIO:  I will, yes.

9              THE COURT:  I'll be sitting at the end

10        of the table, Mr. Kalell will be to my left, and

11        the jurors are going to be brought down there.

12        I'll be asking my questions and then if the

13        attorneys have follow-up, you may not, but you

14        may, we'll take it, we will see how it goes, and

15        once we have finished that process, I'll ask the

16        juror to step outside, I will declare him or her

17        to be indifferent, and you'll have to exercise

18        your peremptories at that time, Commonwealth

19        always going first.

20              Any questions about the impanelment

21        process?

22              MS. SCAPICCHIO:  Not about the

23        impanelment process, Judge, no.

24              THE COURT:  Is there anything else we

25        need to talk about before impanelment?
```

34

```
1              MR. HENNING:  May I just step out into
2         the hallway for a moment?
3              THE COURT:  Sure.
4              MS. SCAPICCHIO:  The other thing that
5         I would ask, I don't know if it has to do with
6         impanelment, but if we need to approach sidebar
7         for any reason, I'd request that my client be
8         allowed to approach sidebar with me for the
9         duration of the trial.
10             THE COURT:  He has the absolute right
11        to do that.  He will be accompanied by a Court
12        Officer, of course.
13             MS. SCAPICCHIO:  Absolutely.
14             THE COURT:  He's got the absolute right.
15             MS. SCAPICCHIO:  I just wanted
16        permission because some judges say no.  They do,
17        they do.
18             THE COURT:  Really?
19             MS. SCAPICCHIO:  Really.  I know.
20             THE COURT:  I won't say anything more.
21        He has the absolute right under the case law to
22        join us at sidebar.
23             MS. SCAPICCHIO:  Thank you, Your Honor.
24             THE COURT:  One last thing.  I'm going
25        to say it's going to be about nine days.  I know
```

1          you said 10, but it's important because I think

2          how many hands go up or how many people ask for an

3          excuse is a direct function of how long we tell

4          them.  Two days this week if we're lucky, four

5          days next week, that six days.  If I say nine

6          days, we're still talking about another three days

7          into the following week.  So I'm going to say it's

8          going to be approximately nine days.  It could be

9          less than that, it could be more than that, but

10         nine seems more accurate, in my opinion.

11                 MS. SCAPICCHIO:  I think it's going to

12         be 10, but whatever the Court thinks.

13                 THE COURT:  Anything else before

14         impanelment?  Because we do have jurors outside.

15                 MS. SCAPICCHIO:  Judge, the only other

16         thing is I still don't have the NCIC reports for

17         the witnesses.

18                 MR. HENNING:  They were run last night,

19         the detective is bringing them in this morning.

20                 THE COURT:  Okay, let's that get through

21         impanelment and we will clear up any unfinished

22         business after impanelment, all right?

23                 Thanks, everybody.

24    (Venire entering at 9:50 a.m.)

25    IMPANELMENT:

36

1    THE CLERK:  Your Honor, before the

2  Court, Commonwealth versus Charles Reddicks,

3  2012-10714.  Mr. Reddicks is present with his

4  attorneys, Rosemary Scapicchio and Jillise

5  McDonough.  For the Commonwealth, Assistant

6  District Attorney Gregory Henning.

7    Mr. Reddicks, you are now set at the bar

8  to be tried, and these good people whom I shall

9  call are to pass between the Commonwealth and you

10  upon your trial.  You have a right to challenge 16

11  of their number without assigning a reason

12  therefor.  If you do so or if you object to others

13  for cause, you must do so as they are called and

14  before they are sworn.

15    You may be seated.

16    THE COURT:  Well, good morning, ladies

17  and gentlemen.  My name is Judge Linda Giles,

18  that's spelled G-I-L-E-S, and I'm a justice of the

19  Superior Court in whose courthouse you find

20  yourselves here today for a very important public

21  duty which, of course, is jury service.

22    First of all, I want to apologize for

23  the delay in bringing you up here.  As you've

24  already encountered, you needed to go through an

25  orientation process, there is a considerable

37

1          amount of paperwork that needs to be accomplished

2          before we can bring you up here, and very

3          typically on the first day of any trial, I needed

4          to confer with the attorneys to ready the case for

5          this important stage in the proceedings.

6                    You've been brought up here, ladies and

7          gentlemen, for an important stage in this trial

8          which we call impanelment, and in just a moment,

9          I'm going to explain to you this process which we

10         call impanelment, and after that, I'm going to

11         give you a brief overview of what this case is all

12         about, and finally, I'm going to introduce you to

13         the participants in this trial.

14                   Now, in just a moment, I'm going to ask

15         you a series of questions that will assure that

16         you can be a fair and impartial juror in this

17         case.  As I'm asking these questions, if you

18         answer yes to one or more of my questions, please

19         raise that white juror card high until one of the

20         Court Officers has made note of your number.

21                   After I've asked that series of

22         questions, a few things are going to happen.

23         First of all, for your convenience, you're going

24         to be brought, most of you are going to be brought

25         to another empty courtroom elsewhere on this

38

1          floor.  Some of you are going to be asked to be in

2          the hallway, and you're going to be brought in one

3          at a time.  You're going to be brought in through

4          that side door, you're going to be asked to sit at

5          the end of this back table here.  The attorneys

6          and Mr. Reddicks, the defendant, are going to be

7          seated at that long table.  I'm going to have some

8          additional questions that I need to ask you

9          privately, in other words, out of the hearing of

10         the other ladies and gentlemen in this courtroom,

11         and the attorneys may also have some questions

12         that they may want to ask of you.  All right?

13                 During this process, the attorneys may

14         have excuses of you for any reason or no reason at

15         all.  So if you are excused by one of the

16         attorneys from being a juror on this case, first

17         of all, please don't take that personally.  As

18         I've just indicated, the attorneys have the

19         absolute right and prerogative to excuse a certain

20         number of you for absolutely no reason at all.

21         But I do have to tell you that if you are excused

22         from being on this jury today, please do not think

23         you are wiggling off the proverbial hook of jury

24         service.  If you're excused from being on this

25         jury today, you will be sent right back down to

39

1        the second floor jury pool room for possible

2        impanelment on another trial elsewhere in the

3        building.

4              This building, by the way, houses the

5        Suffolk County Superior Court.  The Superior Court

6        is the major trial court here in Massachusetts,

7        its jurisdiction is statewide.  You happen to be

8        in the Suffolk County Division of the Superior

9        Court.  This building houses something like 16

10        active hungry trial sessions, as we call our

11        courtrooms.  On any day, up to 16 trial sessions

12        are in need of your services.  Those sessions hear

13        either criminal cases or civil cases, in other

14        words, noncriminal cases.

15              So if you are excused from being on this

16        jury today, you're going to be directed back to

17        the second floor jury pool room for possible

18        impanelment elsewhere in the building on another

19        unrelated case.  And as with everything else in

20        your life, you won't know what will lie around the

21        corner of your existence in this building today.

22        Those other cases that may be awaiting you

23        elsewhere in the building may not be as

24        interesting as this case, and those other cases

25        may not involve attorneys of the caliber that

40

1        I have before me today, and I have three great

2        attorneys on this case.  This is going to be a

3        very, very interesting trial, I assure you.  So

4        please understand that, that if you are excused

5        from being on this jury, you may be impaneled on

6        another unrelated case elsewhere in the building.

7        All right?

8                So we're going to proceed in this

9        fashion.  I'm going to have some questions of

10       you as a group, after which the Court Officers

11       are going to take you to another courtroom where

12       you're going to spend some time.  Now, I

13       appreciate that this may take a while.  Please

14       understand that yes, this may not be an exciting

15       portion of the day for you, but please understand

16       how important and vital this process called

17       impanelment is for the parties and the attorneys.

18       So when you are in that other courtroom, it's an

19       empty courtroom, you'll be permitted to use your

20       cell phones or reading matter to while away the

21       time.  I'm just going to ask that you don't use

22       those electronic items to do any research or to

23       communicate about any aspect of this case.  I'm

24       also going to admonish you not to communicate with

25       any other potential jurors about any aspect of

41

1       this case, nor allow any other potential juror to

2       communicate with you about any aspect of this

3       case.

4               So we're going to proceed in this

5       fashion.  You're going to be complying with the

6       Court Officer's rules, you're going to be brought

7       as a group, a few at a time, you're going to be

8       sitting out in the corridor outside this

9       courtroom.  You're going to be brought in one at

10      a time.  As you come in, please sit at the chair

11      that's going to be placed at the end of this back

12      table, please have a seat, and I will have a few

13      additional questions of you and the attorneys may

14      also have some additional questions of you.  All

15      right?

16              We're going to proceed in this fashion,

17      and finally when we have 16 good citizens

18      impaneled as jurors in this case, the rest of you

19      will be excused with our thanks for your

20      participation in these proceedings, but you may be

21      again, depending on the time of day, be directed

22      back downstairs to the second floor jury pool room

23      for possible impanelment.  And I'm hearing that

24      other sessions are patiently or perhaps not so

25      patiently awaiting your return.  We got first dibs

42

1          on you, apparently, so I'm very happy to hear

2          that, but there are other judges in the building

3          who are waiting for your return.  So if you are

4          excused from this trial, you may be impaneled in

5          another case, and let me tell you, this is going

6          to be an interesting case and I have three great

7          attorneys here.  So I think you're going to find

8          that this is, if you want to be on a jury, this is

9          the jury to be on.  All right?

10               So that's the process that we call

11          impanelment.  Again, thank you for your patience

12          in this regard.  We'll get through it as soon as

13          we can, but please appreciate how vital this stage

14          in the proceedings is.  All right?

15               Now, let me tell you a little bit about

16          what this case is all about.  This, as I had

17          mentioned earlier, is a criminal trial.  It's the

18          case of the Commonwealth versus Charles Reddicks.

19          Mr. Reddicks spells his last name R-E-D-D-I-C-K-S.

20          Mr. Reddicks is facing five indictments.

21          Mr. Reddicks is charged by the Commonwealth with

22          murder in the first degree, with armed robbery of

23          one Mario Malave.  Mr. Malave spelled his name

24          M-A-L-A-V-E.  Mr. Malave is also the alleged

25          victim in the murder case, as well.

43

1            In addition, in a third indictment, the

2       Commonwealth is charging that Mr. Reddicks was in

3       the unlawful possession of a firearm.  The

4       Commonwealth is also charging Mr. Reddicks with

5       the unlawful possession of ammunition, and

6       finally, he's also charged in a fifth indictment

7       with a different offense called carrying a loaded

8       firearm, in other words, one containing

9       ammunition.

10            So, in sum, Mr. Reddicks is charged in

11       five indictments, murder in the first degree,

12       armed robbery.  In those two indictments, the

13       alleged victim is Mariano Malave.  He's also

14       charged with the unlawful possession of a firearm,

15       the unlawful possession of ammunition, and

16       carrying a loaded firearm.

17            To each and every one of these five

18       indictments, Mr. Reddicks has pled not guilty, and

19       that's why we are all assembled in this room, for

20       the parties to pick a jury to hear evidence to

21       determine whether or not the Commonwealth can

22       prove any or all of these indictments against the

23       defendant beyond a reasonable doubt.

24            Let me give you a little bit more

25       information about what the Commonwealth alleges in

44

1          this case.  The Commonwealth alleges that Charles

2          Reddicks, the defendant in this case, arranged to

3          purchase marijuana from the alleged victim,

4          Mariano Malave -- again, Mr. Malave spells his

5          name M-A-L-A-V-E -- at 132 Hyde Park Avenue in the

6          Jamaica Plain section of Boston on April 27th,

7          2012.  The Commonwealth further alleges that

8          during the transaction, Mr. Reddicks robbed, shot,

9          and killed Mr. Malave.  Mr. Reddicks denies each

10         and every one of these allegations.  So that is a

11         brief overview of what this case is all about.

12              Now, ladies and gentlemen, let me

13         introduce you to the participants in this trial.

14              Mr. Henning, could you introduce

15         yourself and who you represent.

16              MR. HENNING:  Thank you, Your Honor.

17              Good morning, ladies and gentlemen.  My

18         name is Gregory Henning, I work for the Suffolk

19         County District Attorney's Office, and I live in

20         Dorchester.

21              THE COURT:  Thank you, Mr. Henning.

22              Ms. Scapicchio, could you introduce

23         yourself, your colleague, and your client.

24              MS. SCAPICCHIO:  Thank you.

25              Good morning, ladies and gentlemen.  My

45

1          name is Rosemary Scapicchio.  I have a law office

2          here in Boston.  I represent Charles Reddicks.

3                    MR. REDDICKS:  Good morning.

4                    MS. SCAPICCHIO:  He's the defendant in

5          this case.  And with me is Attorney Jillise

6          McDonough.

7                    MS. McDONOUGH:  Good morning, ladies and

8          gentlemen.

9                    THE COURT:  Thank you all.

10                   Now, ladies and gentlemen, I'm going to

11         list for you the potential witnesses in this case.

12         Not all these individuals may be called, but their

13         names could come up and we want to make sure that

14         you're not familiar with any of these potential

15         witnesses in this case.

16                   Leanne Parker of Maine; Rod Meneide,

17         that's M-E-N-E-I-D-E, of Boston; Ronald Theodat,

18         T-H-E-O-D-A-T, of Boston; Officer Robert Cordasco

19         of the Boston Police Department; Paramedic Joe

20         Amaral of Boston EMS; Detective Bernadette

21         Sullivan of the Boston Police Department; Ruth

22         Camille, C-A-M-I-L-L-E, of Boston; Elissa Dennehy

23         of Boston; Edwin Lockhart of Boston; Julio Alex

24         Balbuena, B-A-L-B-U-E-N-A, of Brockton; Pamela

25         Arthur of Boston; Ian Follette, F-O-L-L-E-T-T-E,

46

1    of Boston; Sean Warfield of Boston; Detective

2    Andrew Gambon, G-A-M-B-O-N, of the Boston Police

3    Department; Thomas Washington of Boston; Sergeant

4    Detective Kevin Witherspoon of the Boston Police

5    Department; Raymond McDonald of Boston; Patrick

6    Quinn of Norton; Catherine Reddicks of Boston;

7    Khadijah Warren, Mr. Warren spells his first name

8    K-H-A-D-I-J-A-H, of Boston.

9         Khadijah, is that a man or a woman?

10         I'm sorry, I misspoke, it's a female.

11   Ms. Warren spells her first name K-H-A-D-I-J-A-H.

12   Detective Tyrone Camper of the Boston Police

13   Department; Robert Creedon of Norwell; Detective

14   Bruce Dolloff, D-O-L-L-O-F-F, of the MBTA;

15   Sergeant Detective Richard Daley of the Boston

16   Police Department; Dr. Katherine Lindstrom of the

17   Office of the Chief Medical Examiner; Ioan Truta,

18   T-R-U-T-A, of the Boston Police Department Latent

19   Print Unit; John Biello, B-I-E-L-L-O, of the Mass.

20   State Police Crime Laboratory; Detective John

21   Callahan of the Boston Police Department; Terri

22   Hyman, H-Y-M-A-N, of Boston; Javeon, J-A-V-E-O-N,

23   Hyman of Boston; John Hyman of Boston; as well as

24   Stephen Verneau, that's V-E-R-N-E-A-U -- is that

25   of Essex?

47

1              We believe it's of Essex, Mr. Verneau

2        is a business person up in the Essex, at least in

3        Essex County, possibly from Essex, Massachusetts,

4        and that's spelled V-E-R-N-E-A-U, we believe.

5              The rest of these witnesses are all

6        Boston Police Officers.  Cesar Abreu, A-B-R-E-U;

7        Kenneth Autio, A-U-T-I-O; Robert Boyle; Oscar

8        Calderon; Franklyn Centeio, C-E-N-T-E-I-O; Paul

9        Coffey; Tabatha Coleman; Luis Cruz; Massachusetts

10       State Trooper Duane.  Again Boston Police,

11       Sergeant Detective Daniel Duff; Angel Figueoria;

12       Korey Franklin; Jamila Gales; Officer Giraldo;

13       Officer Haley; Officer Harrigan; Officer Hebard,

14       H-E-B-A-R-D; Wayne Hester; Patrick Rogers; William

15       Moran; Mario Lozano; Robert LaColla, L-A-C-O-L-L-

16       A; Patrick Layden; Christopher MacNeil; Detective

17       Jose Marichal, M-A-R-I-C-H-A-L; Richard Moriarty;

18       John Noberini; N-O-B-E-R-I-N-I; Stephen Parenteau,

19       P-A-R-E-N-T-E-A-U; Sergeant Santry; and Sean

20       Scannell.

21              Counsel, did I miss anybody?

22              MS. SCAPICCHIO:  I don't believe so,

23       Your Honor.

24              THE COURT:  I'm sorry, I apologize.

25       Also continuing with Boston Police Officers,

48

1          Christopher Ross; Molwyn Shaw; Sean Smith; Daniel

2          Sparrow; Jose Texeira; Officer Walsh.

3               The following are civilian witnesses:

4          Valerie Basnight, B-A-S-N-I-G-H-T, of Jamaica

5          Plain; Brendan Deady, D-E-A-D-Y, of Jamaica Plain;

6          Renea Jones of Jamaica Plain; Johnson Laurore,

7          L-A-U-R-O-R-E, of Dorchester; Sam Steeves of

8          Jamaica Plain; Justin Young of Jamaica Plain;

9          Investigator Oneil LeBlanc; and Dr. Jennifer

10         Lipman of Melrose.

11              Now, ladies and gentlemen, I've

12         explained to you this process that we call

13         impanelment.  I've given you a brief overview of

14         what this case is all about, and finally, I've

15         introduced you to the participants in this trial.

16         At this time, our Clerk, Mr. Kalell, is going to

17         ask you to stand so that he can swear you in so

18         that I can ask you this series of questions.

19              THE CLERK:  Jurors, please rise.  Raise

20         your right hands.

21              Do you solemnly swear that you will make

22         true answers to such questions as shall be put to

23         you by the Court in the matter now in hearing, so

24         help you God?

25              (Jurors respond in the affirmative.)

49

```
 1              THE CLERK:  You may be seated.

 2              THE COURT:  First, I'm going to ask

 3       whether you or any member of your immediate family

 4       or a close personal friend know or are you related

 5       to any of the attorneys in this case or anyone who

 6       works for his or her office?

 7              I see no affirmative responses.

 8              Do you or any member of your immediate

 9       family or a close personal friend know or are you

10       related to the defendant, Mr. Reddicks, or any

11       member of his family?

12              Again, I see no affirmative responses.

13              Do you or any member of your immediate

14       family or a close personal friend know or are you

15       related to the alleged victim in this case, Mario

16       Malave, or any member of his family?

17              I think I misspoke, Mariano Malave.

18       First name is M-A-R-I-A-N-O; second name, M-A-L-A-

19       V-E.

20              I see no affirmative responses.

21              Do you or any member of your immediate

22       family or a close personal friend know or are you

23       related to any of the potential witnesses in this

24       case or any member of a witness's family?

25              COURT OFFICER:  If you would be kind
```

50

1        enough to have a seat, sir.  Juror 32, 3-2.

2                    THE COURT:  Anybody else?

3                    I see no further responses.

4                    Do you have an interest or stake of any

5        kind in this case?

6                    I see no affirmative responses.

7                    Do you have any knowledge of this case

8        gained from any source?

9                    COURT OFFICER:  Please keep your card

10       up, ma'am, so I can come to you.  Could I see your

11       card, please?  Juror 25, 2-5.

12                   THE COURT:  Anybody else?

13                   I see no further responses.

14                   To the extent that you've heard anything

15       about this case, have you formed or expressed any

16       opinions about it?

17                   I see no affirmative responses.

18                   Are any of you aware of any bias or

19       prejudice that you may have toward either the

20       prosecution or the defendant?

21                   COURT OFFICER:  Are you raising your

22       card, ma'am?

23                   JUROR:  Yes.

24                   COURT OFFICER:  Juror 32, 3-2.  Juror

25       84, 8-4.  Juror 93, 9-3.

51

1              THE COURT:  Anybody else?

2              I see no further responses.

3              Are any of you an active member of any

4        community crime prevention organization?

5              I see no affirmative responses.

6              Are any of you an active member of any

7        organization whose purpose is to prevent drug

8        dealing or to promote drug education or

9        counseling?

10             COURT OFFICER:  Juror Number 78, 7-8;

11       Juror Number 7, 7.

12             THE COURT:  Anybody else?

13             I see no further responses.

14             Would any of you have the tendency to

15       believe the testimony of a police officer witness

16       over the testimony of a civilian witness just

17       because he or she were a police officer?

18             COURT OFFICER:  Juror Number 125, 1-2-5;

19       Juror Number 37, 3-7.

20             COURT OFFICER:  Juror Number 134, 1-3-4.

21             COURT OFFICER:  Juror Number 52, 5-2.

22             COURT OFFICER:  Juror 55, 5-5; Juror

23       Number 82, 8-2.

24             THE COURT:  Anybody else?

25             I see no further responses.

52

1          Would any of you have the tendency to
2     believe the testimony of a civilian witness over
3     the testimony of a police officer witness just
4     because he or she were a civilian?
5               COURT OFFICER:  Juror 32, 3-2.  Juror
6     130, 1-3-0.  Juror 37, 3-7.  Juror 84, 8-4.
7               THE COURT:  I'm sorry, 37?
8               COURT OFFICER:  37.
9               THE COURT:  Didn't you also answer the
10    previous question, you'd have the tendency to
11    believe the testimony of a police officer?
12              COURT OFFICER:  She raised her hand.
13              THE COURT:  You answered both.
14          JUROR:  Yes.  I --
15              THE COURT:  No, no, thank you, don't say
16    anything.  We'll talk about it when you come back
17    into the courtroom.  You answered both of those
18    questions.
19              JUROR:  Yes.
20              COURT OFFICER:  Juror Number 93, 9-3.
21    Juror Number 95, 9-5.
22              THE COURT:  Anybody else?
23          I see no further responses.
24          Do any of you not understand that in a
25    criminal case, the defendant is presumed innocent

53

```
 1          until proven guilty?
 2                     I see no affirmative responses.
 3                     Do any of you not understand that in a
 4          criminal case, the prosecution has the burden of
 5          proving the defendant is guilty beyond a
 6          reasonable doubt?
 7                     Again, I see no affirmative responses.
 8                     Do any of you not understand that in a
 9          criminal case, the defendant does not have to
10          present any evidence in his own behalf?
11                     Again, I see no affirmative responses.
12                     Is there any reason, such as a physical
13          or medical disability or problem, language
14          difficulties, religious beliefs, hearing
15          impairments or the like, that might make it
16          difficult for you to sit as a juror in this case?
17                     COURT OFFICER:  Please hold your cards
18          up till we get to you.  Juror 37, 3-7.  Juror 61,
19          6-1.  Juror 52, 5-2.  Juror 32, 3-2.  Juror 123,
20          1-2-3.
21                     THE COURT:  I'm sorry?
22                     COURT OFFICER:  123.  Juror 137.  Juror
23          126.  Juror 117.
24                     COURT OFFICER:  Juror Number 43, 4-3.
25          Juror Number 26, 2-6.  Juror Number 25, 2-5.
```

54

1          Juror Number 39, 3-9.

2                    THE COURT:  Anybody else?

3                    I see no further responses.

4                    Finally, do you know of any other reason

5          why you would not be fair and impartial in this

6          case and be able to render a true and just verdict

7          based solely on the evidence and the law presented

8          in the trial of this case?

9                    I see no affirmative responses.

10                   Now, ladies and gentlemen, before the

11         Court Officers take you to the empty courtroom

12         elsewhere on this building, let me explain to you

13         the scheduling of this trial and its expected

14         duration.  First of all, as I told you earlier, we

15         get a late start, very typically, on the first day

16         of any trial, but from hereon in, we're going to

17         start promptly at 9 o'clock.  I'm known around

18         here for my punctuality because the more punctual

19         we are, the sooner the case will be over and in

20         your hands.  So we'll start from hereon in every

21         morning at 9 AM, we go till 1 o'clock in the

22         afternoon, taking a midmorning recess at about

23         11 of about 20, 25 minutes in duration.  We

24         typically take our lunch hour around here from

25         1 to 2, and then we'll resume the trial from 2 to

55

1          4 o'clock in the afternoon.

2                    I promise you, I will never keep you

3          past 4 o'clock on any day of this trial because

4          I know two things very well: number one, that's a

5          long enough day for any juror to be listening and

6          watching evidence in a trial, and ultimately, to

7          be deliberating on that evidence.  Secondly,

8          I also know that some of you may have child care

9          and other commitments that you need to get to.

10         So, I promise you, I will never keep you past 4

11         o'clock on any day of this trial.

12                    We expect to be impaneling today.  So

13         the trial, if we get a jury today, will begin

14         tomorrow, Thursday.  We will continue Thursday,

15         Friday, understanding that Monday is the holiday,

16         we'll continue through next week, the four days

17         next week, and probably spilling over into the

18         following week.  Roughly about, I'm going to say

19         roughly about nine days.  It could be less than

20         that, it could be more than that.  We can never

21         predict with any kind of mathematical precision

22         how long a trial is going to last, because a lot

23         of things can happen, a witness may not be called

24         at all, a witness may testify longer or shorter

25         than expected, I may need to confer with the

56

1          attorneys and the like, but we're expecting it's

2          going to go through this week, through next week,

3          and into part of the following week, roughly about

4          nine days.

5                    As the case evolves, I will give you

6          updates as to the expected duration of the trial

7          because as the trial evolves, I'll get a better

8          sense of that, and I promise you, I will give you

9          updates.  But that's our good faith estimate at

10         this time.

11                    Also, I want to add at this time

12         something that I'm hoping you learned through your

13         orientation process downstairs and possibly

14         through service on a jury in the past, that you

15         good citizens are the cornerstone of our justice

16         system here in the Commonwealth of Massachusetts.

17         As you can see, here in the third co-equal branch

18         of government which, of course, is the judiciary,

19         we just don't function without your participation.

20         In my opinion, being here on jury service is

21         probably one of the most important public services

22         that you can perform on behalf of your

23         Commonwealth.  Being here on jury service is both

24         one of the burdens of citizenship, but

25         undoubtedly, it's one of its benefits.  I hear

57

1          from the jurors in every one of my cases, and I've

2          been a judge for almost 24 years now, I hear on a

3          regular basis from those real life jurors how

4          pleasantly surprised they were at how interesting

5          the experience proved to be, and in many

6          instances, they tell me that it proved to be an

7          outright rewarding life experience.  So I tell you

8          from the lips of those real life jurors in my past

9          trials to your ears that you're going to find this

10         to be at least an extremely interesting

11         experience, and perhaps, a truly rewarding life

12         experience.

13                 So I hope you can take that all to

14         heart.  First, how important you are here to our

15         justice system here in the Commonwealth of

16         Massachusetts, and secondly, how personally

17         interesting this trial is going to prove to you.

18         Take that all to heart and further appreciate that

19         I cannot and I will not excuse you from being on

20         this jury today except on account of a truly

21         compelling hardship, and I don't define that as

22         missing time from home, work, or school, because

23         of course, that would apply to everyone in this

24         room.  Nor do I define it as missing a

25         nonessential event in your life.  So I hope you

58

1          can appreciate that and take that all to heart.

2                    Now, ladies and gentlemen, in just a

3          moment, the Court Officers are going to take you

4          to an empty courtroom.  I appreciate that you are

5          going to have to while away some time.  Please

6          feel free to use your reading matter, cell phones,

7          and the like, if you wish, in that empty

8          courtroom, but please don't use those items to

9          communicate to you or from you about any aspect of

10         this case or to do any outside research about any

11         aspect of this case.  Please follow the directions

12         of the Court Officers and we will get through this

13         process as expeditiously as we possibly can.

14                    Thank you so much, ladies and gentlemen,

15         for your cooperation.

16    (Court in recess at 10:20 a.m.)

17

18    (Court in session at 10:30 a.m.)

19    (Defendant present.)

20    INDIVIDUAL JUROR VOIR DIRE:

21                    THE CLERK:  Juror Number 3.

22    (Juror Number 3 enters courtroom.)

23                    THE CLERK:  Juror Number 3, Raymond

24         Levasseur.

25                    JUROR:  Yes.

59

```
1                    THE COURT:  Good morning, sir.

2                    JUROR:  Good morning.

3                    THE COURT:  Sir, is there anything about

4         the nature of these charges or any of the

5         allegations you've heard that might affect your

6         ability to be fair and impartial?

7                    JUROR:  Citing constant media saturation

8         as far as black on black killing each other and

9         hurting each other, that would probably be about

10        the only thing that would -- I realize that a lot

11        of black people are using marijuana to obtain

12        money, food, clothes, life.  But the fact that

13        they're killing each other to get it is very

14        disturbing.

15                   THE COURT:  I guess I'm going to put the

16        question to you again.  Is there anything that

17        you've learned about this case --

18                   JUROR:  No.

19                   THE COURT:  Let me finish the question.

20        -- that is causing you to question your ability to

21        be fair and impartial in this case?

22                   JUROR:  Not really.  I don't think so.

23                   THE COURT:  It sounds as if you have

24        some feelings about what you've heard in the

25        media.
```

60

```
 1              JUROR:  Right, that would be the only
 2        thing that would, not cloud my judgment, but maybe
 3        lean my judgment towards --
 4              THE COURT:  Towards what?
 5              JUROR:  Making a decision that -- I
 6        understand why it's being used and why it happens,
 7        but like anyone else, don't really like that.
 8        I don't think that that's standing in the way.
 9              THE COURT:  Sir, could you stand outside
10        for just a second, please.
11   (Juror Number 3 exits courtroom.)
12              THE COURT:  Does anybody have any
13        objection to my excusing him for cause?
14              MS. SCAPICCHIO:  None, Your Honor.
15              MR. HENNING:  None, Your Honor.
16              THE COURT:  Bring him back in.
17   (Juror Number 3 enters courtroom.)
18              THE COURT:  Thank you, sir, you are
19        excused.
20              THE CLERK:  Excused.
21   (Juror Number 3, excused.)
22              THE CLERK:  Juror 5, Franki Natasha
23        Turner?
24              JUROR:  Yes.
25              THE COURT:  Hi, Ms. Turner, how are you,
```

61

```
1        ma'am?
2                  JUROR:  Good, how are you?
3                  THE COURT:  Very fine, thank you.
4        Ma'am, is there anything about the nature of these
5        charges or any of the allegations you've heard
6        that might affect your ability to be fair and
7        impartial?
8                  JUROR:  No.
9                  THE COURT:  You may hear alleged
10       evidence that the defendant, the alleged victim,
11       and some witnesses were involved in selling
12       marijuana.  Would that evidence affect your
13       ability to be fair and impartial?
14                 JUROR:  No.
15                 THE COURT:  The defendant in a criminal
16       trial has the absolute right not to testify.  If
17       Mr. Reddicks chose not to testify at this trial,
18       would you hold that against him in any way?
19                 JUROR:  No.
20                 THE COURT:  Is there anything about the
21       length of the trial that poses a hardship for you?
22                 JUROR:  Other than something going on in
23       my personal life, no.
24                 THE COURT:  Okay, well is this something
25       going on in your personal life that would
```

62

1                constitute a hardship?

2                       JUROR:  Of me coming, yeah.  I do

3                visits -- currently, my daughter is involved in

4                the system, so I do visits with her on Thursdays

5                at a certain time.

6                       THE COURT:  And what time of day would

7                that be.

8                       JUROR:  2:30 to 3:30.

9                       THE COURT:  And where are those visits,

10               are they nearby?

11                      JUROR:  In Hyde Park.

12                      THE COURT:  Would it be possible to

13               change them until after 4 o'clock?  You'll be out

14               of here at 4 o'clock every day.

15                      JUROR:  I can see if I can change it.

16                      THE COURT:  Is that a possibility?

17                      JUROR:  Yes.

18                      THE COURT:  If that's not a possibility,

19               because I consider visitation and child care very,

20               very important, would you let me know if you can't

21               change that?

22                      JUROR:  I will.

23                      THE COURT:  Any follow-up questions,

24               Counsel?  Mr. Henning, you go first.

25                      MR. HENNING:  None, Your Honor.

63

1          THE COURT:  Ms. Scapicchio.

2          MS. SCAPICCHIO:  Hi.

3          JUROR:  Hi.

4          MS. SCAPICCHIO:  I saw on your

5     questionnaire that you work for the Mass. General

6     Hospital as a medical assistant?

7          JUROR:  Yes.

8          MS. SCAPICCHIO:  Do you work in a

9     certain unit or do you work in an outpatient unit?

10         JUROR:  Cancer center.

11         MS. SCAPICCHIO:  The cancer center,

12    okay.  And how long have you done that?

13         JUROR:  Six months.

14         MS. SCAPICCHIO:  Great.  That's all the

15    questions I have, thanks.

16         JUROR:  No problem.

17         THE COURT:  Ma'am, would you step

18    outside for just a second.

19         JUROR:  Sure.

20   (Juror Number 5 exits courtroom.)

21         THE COURT:  This juror stands

22    indifferent.

23         MS. SCAPICCHIO:  Judge, the only reason

24    I asked is because I thought she looked familiar,

25    and all of my kids and my husband and I get

64

```
 1          treated at the Mass General.
 2                    THE COURT:  Oh, sure.
 3                    MS. SCAPICCHIO:  My husband has treated
 4          at the cancer center there, but before this.
 5                    THE COURT:  Regardless, I thought that
 6          was an appropriate question.  Again, anything you
 7          see on the questionnaire that you just want to
 8          understand better, that's perfectly proper.
 9                    Mr. Henning?
10                    MR. HENNING:  The Commonwealth's only
11          question is when she would find out about the
12          visitation.
13                    THE COURT:  Well, if we keep her on the
14          jury, I'm going to say why don't you make a phone
15          call now and let us know if you can't change it.
16                    MS. SCAPICCHIO:  I think, Judge, if we
17          keep her on the jury, if the Court made a phone
18          call to wherever the visitation is, I'm sure they
19          would change it.
20                    THE COURT:  I'm hearing that both of you
21          are content with this juror?
22                    MS. SCAPICCHIO:  Can I speak to
23          Mr. Reddicks?
24                    THE COURT:  Absolutely.
25                    MS. SCAPICCHIO:  Mr. Reddicks is
```

65

```
 1              content.
 2                      THE COURT:  All right, will you bring
 3              her back.
 4     (Juror Number 5 enters courtroom.)
 5                      THE COURT:  Ms. Turner, both sides want
 6              you to be a juror on this case.  Are you able to
 7              make a phone call now and let us know if you can
 8              change that?
 9                      JUROR:  Yes, I can make a phone call.
10                      THE COURT:  Is this a court ordered
11              visitation?
12                      JUROR:  It is.
13                      THE COURT:  Because if you get any
14              resistance, I can get involved, if you wish.
15              I don't want to do anything that you don't want me
16              to, but I can also talk to the powers that be.
17              Being a juror on this case is extremely important.
18              If they give you any resistance, I can get
19              involved if you so desire.
20                      JUROR:  Yes, that would be great.
21                      THE COURT:  Well, you're going to go up
22              into the jury room that is affiliated with this
23              courtroom, you are a juror on this case.  If you
24              could make that phone call now and let me know
25              that you can change that time?
```

66

1              JUROR:  Okay, I will.

2              THE COURT:  Excellent, thank you, ma'am.

3              THE CLERK:  Seat 1.

4    (Juror Number 5 exits courtroom.)

5    (Juror Number 7 enters courtroom.)

6              THE CLERK:  Juror Number 7, Hugo Soto.

7              JUROR:  Yes, sir.

8              THE COURT:  Good morning, Mr. Soto.

9              JUROR:  Good morning.

10             THE COURT:  You indicated that you're an

11        active member of a group dealing with or addresses

12        the problem of drug dealing and counseling and

13        education.

14             JUROR:  It's at the health center in

15        East Boston.

16             THE COURT:  Oh, I see, that's where you

17        work, I see.  And you're a patient access

18        representative.  What does that mean, sir?

19             JUROR:  It means basically explaining

20        to the patients the different departments and

21        facilities that the clinic offers to the patients,

22        and at the same time, you know, helping them with

23        anything that they need from seeing a doctor to

24        filling out insurance.

25             THE COURT:  Let me ask you this,

67

1         Mr. Soto.  You may hear alleged evidence that the

2         defendant, the alleged victim, and some witnesses

3         were involved in selling marijuana.  Would that

4         evidence affect your ability to be fair and

5         impartial in this case?

6              JUROR:  No.

7              THE COURT:  Great.  Is there anything

8         about the nature of these charges or any of the

9         allegations you've heard that might affect your

10        ability to be fair and impartial?

11             JUROR:  No.

12             THE COURT:  The defendant in a criminal

13        trial has the absolute right not to testify.  If

14        Mr. Reddicks chose not to testify at this trial,

15        would you hold that against him in any way?

16             JUROR:  No.

17             THE COURT:  Is there anything about the

18        length of the trial that poses a hardship for you?

19             JUROR:  I have a coming appointment with

20        the immigration service.  That's the only thing

21        that I see --

22             THE COURT:  And when is that

23        appointment, sir?

24             JUROR:  It's in February and they can't

25        change it, I'm not sure.

68

1              THE COURT:  Trust me, you will make that

2       appointment in February, I guarantee you, sir.

3       This trial is going to be finished in January.

4       All right?  Rest assured, you will be at that

5       appointment.

6              Any follow-up questions, Counsel?

7              MR. HENNING:  I have no questions for

8       you, sir.

9              MS. SCAPICCHIO:  Hi, I have a couple.

10       The immigration services, what do you need to do

11       for immigration?

12              JUROR:  My wife, we married, so we're

13       going to get her --

14              MS. SCAPICCHIO:  To get her citizenship.

15              JUROR:  Yeah.

16              MS. SCAPICCHIO:  In terms of your

17       questionnaire, you put on the bottom of your

18       questionnaire when it asked you to describe any

19       training, education, knowledge or beliefs that

20       might affect your ability to be fair and

21       impartial, you wrote, "I believe in the death

22       penalty."  Can you tell me how that would affect

23       your ability to be fair and impartial?

24              JUROR:  I put that because when they

25       came from that, I don't know, that case with the

69

1          Boston bombing, a lot of people were conflicted

2          whether or not they should give him the death

3          penalty or keep him in jail.

4                    MS. SCAPICCHIO:  The marathon bombing

5          case?

6                    JUROR:  Yeah, that's why I put that.

7                    THE COURT:  Sir, please understand,

8          first of all, the so-called marathon bombing case

9          was a federal case with federal laws and

10         jurisdiction.  Here in the state courts of

11         Massachusetts, we do not have the death penalty.

12                   JUROR:  Okay.

13                   MS. SCAPICCHIO:  Do you have some

14         feeling that if somebody has been accused of

15         taking a life, that you should take their life?

16                   JUROR:  No.

17                   MS. SCAPICCHIO:  So what did you mean by

18         I believe in the death penalty?

19                   JUROR:  By what I just explained to you.

20                   MS. SCAPICCHIO:  The marathon bombing

21         thing.

22                   JUROR:  Um-hmm.

23                   THE COURT:  You were being specific just

24         to the Boston Marathon case?

25                   JUROR:  Yeah, that's what I had in mind

70

1              when I answered that question.

2                      THE COURT:  Please understand, though,

3              Mr. Soto, the death penalty is not an issue in

4              this case.  Do you understand that?

5                      JUROR:  No, I understand.

6                      MS. SCAPICCHIO:  Will the fact that it's

7              not an issue, would that affect your ability to be

8              fair and impartial?

9                      JUROR:  No.

10                     MS. SCAPICCHIO:  Thank you.

11                     THE COURT:  Sir, would you step outside

12             for just a second.

13        (Juror Number 7 exits courtroom.)

14                     THE COURT:  This juror stands

15             indifferent.

16                     MR. HENNING:  Commonwealth is content.

17                     MS. SCAPICCHIO:  May I just have a

18             moment, Your Honor?

19                     THE COURT:  Yes.

20                     JUROR:  Defendant will challenge.

21        (Juror Number 7 enters courtroom.)

22                     THE COURT:  Thank you, sir, you are

23             excused.

24                     THE CLERK:  Excused.

25        (Juror Number 7 exits courtroom.)

71

1       (Juror Number 11 enters courtroom.)

2                   THE CLERK:  Juror Number 11, Kevin

3           Mitchell.

4                   JUROR:  Yes.

5                   THE COURT:  Hi, Mr. Mitchell.  Sir, is

6           there anything about the nature of these charges

7           or any of the allegations you've heard that might

8           affect your ability to be fair and impartial?

9                   JUROR:  I don't think so.

10                  THE COURT:  Now, you may hear evidence,

11          alleged evidence that the defendant, the alleged

12          victim, and some witnesses were involved in

13          selling marijuana.  Would that evidence affect

14          your ability to be fair and impartial?

15                  JUROR:  Possibly.

16                  THE COURT:  Possibly?  How so?

17                  JUROR:  They're selling marijuana?

18          I mean, that is a criminal act, so I don't know.

19                  THE COURT:  Selling marijuana is a

20          criminal act to be sure.  Would that alleged

21          evidence affect your ability to be fair and

22          impartial?

23                  JUROR:  About murder?

24                  THE COURT:  Yes, anything about this

25          case.

72

1           JUROR:  No, I guess not.  I mean, the
2       only reason I said yes is because it's a criminal
3       act and it leads to that kind of behavior,
4       criminal behavior.  But based on the evidence,
5       I wouldn't be, I wouldn't be biased or anything.
6           THE COURT:  I'm not sure I understand
7       what you're saying.
8           JUROR:  I would have to hear the
9       evidence.  I don't know.  So I guess not.
10          THE COURT:  It's not clear to me.
11      You're going to have this alleged evidence that
12      allegedly, Mr. Reddicks, the alleged victim,
13      Mr. Malave, and some other witnesses may have been
14      involved in drug dealing, marijuana dealing.
15      That's going to be part of this evidence.  Knowing
16      that, sir, do you question your ability to be a
17      fair and impartial juror in this case?
18          JUROR:  No.
19          THE COURT:  The defendant in a criminal
20      trial has the absolute right not to testify.  If
21      Mr. Reddicks chose not to testify at this trial,
22      would you hold that against him in any way?
23          JUROR:  No.
24          THE COURT:  Is there anything about the
25      length of the trial that poses a hardship for you?

73

1          JUROR:  Yeah, because of work.

2          THE COURT:  Sir, I can't excuse you

3     because of work, and understand that there is a

4     statute on the books that says that no employer

5     can interfere with any term or condition of your

6     employment because of your service on a jury.

7     Okay, do you understand that, sir?

8          JUROR:  Yeah.

9          THE COURT:  Great.  Any follow-up

10     questions?

11          MR. HENNING:  I have no questions for

12     you, sir.

13          MS. SCAPICCHIO:  Good morning, I have a

14     few questions.  When you said that marijuana or

15     dealing marijuana leads to that behavior, do you

16     think it's, in your mind, anyhow, do you think

17     it's more likely that if you sell marijuana,

18     you're more likely to have been involved with guns

19     or a robbery or anything like that?

20          JUROR:  Guns, possibly, just because if

21     you're dealing marijuana, you might want to

22     protect it, project your marijuana with a gun,

23     but that's about it.

24          MS. SCAPICCHIO:  Thank you.

25          THE COURT:  Sir, would you step outside

74

1          for a second, please.

2      (Juror Number 11 exits courtroom.)

3              THE COURT:  This juror stands

4          indifferent.

5              MS. SCAPICCHIO:  Judge, he said he'd be

6          more likely to.

7              THE COURT:  It's not an unreasonable

8          belief, Ms. Scapicchio.

9              MS. SCAPICCHIO:  But my client is

10          charged with possession of a firearm.

11              THE COURT:  I know.

12              MS. SCAPICCHIO:  He just said he'd be

13          more likely to convict him because of the

14          marijuana.

15              THE COURT:  I don't think he said that.

16          He said that people who deal in marijuana may be

17          more likely, perhaps, to have guns.  That doesn't

18          necessarily mean that he's unfair or biased.

19              MS. SCAPICCHIO:  Well, then I'm going to

20          question him further, I thought I had it.

21              THE COURT:  Okay, sure.  Bring him back

22          in.

23      (Juror Number 11 enters courtroom.)

24              MS. SCAPICCHIO:  So I guess I have a few

25          follow-up questions.  Sorry to make you go back

75

1          and forth.

2                    JUROR:  That's all right.

3                    MS. SCAPICCHIO:  But when you said that

4          you think that people that deal marijuana are more

5          likely to have guns, does that mean you're more

6          likely to find somebody guilty of a gun possession

7          if they also were dealing marijuana?

8                    JUROR:  I guess so, but I mean, I would

9          have to -- I wouldn't just assume that they had a

10         gun, there would have to be evidence.

11                   MS. SCAPICCHIO:  If all the evidence was

12         equal, would you side on the part of finding him

13         guilty because of the marijuana?

14                   JUROR:  Just the gun thing?

15                   MS. SCAPICCHIO:  Yes.

16                   JUROR:  I guess so.

17                   MS. SCAPICCHIO:  Thank you.

18                   THE COURT:  Thank you, sir, if you could

19         step outside.

20    (Juror Number 11 exits courtroom.)

21                   THE COURT:  Now I'm excusing him for

22         cause.

23                   MS. SCAPICCHIO:  Thank you.

24    (Juror Number 11 enters courtroom.)

25                   THE COURT:  Thank you, sir, you are

76

```
 1          excused.
 2                    THE CLERK:  Excused.
 3      (Juror Number 11 exits courtroom.)
 4      (Juror Number 18 enters courtroom.)
 5                    THE CLERK:  Juror 18, Tracylynn Pagan.
 6                    JUROR:  Yes.
 7                    THE COURT:  Hi, Ms. Pagan.
 8                    JUROR:  Hi.
 9                    THE COURT:  Ma'am, is there anything
10          about the nature of these charges or any of the
11          allegations you've heard that might affect your
12          ability to be fair and impartial?
13                    JUROR:  No.
14                    THE COURT:  You may hear alleged
15          evidence that the defendant, the alleged victim,
16          and some witnesses were involved in selling
17          marijuana.  Would that evidence affect your
18          ability to be a fair and impartial juror in this
19          case?
20                    JUROR:  Maybe.
21                    THE COURT:  How so?
22                    JUROR:  I'm against marijuana.  I don't
23          know, it depends on the debate in the case.
24                    THE COURT:  Are you saying that you
25          might question your ability to be fair and
```

77

```
1          impartial hearing such evidence?

2                    JUROR:  Yes.

3                    THE COURT:  All right, thank you, ma'am,

4          you are excused.

5      (Juror Number 18, excused.)

6      (Juror Number 25 enters courtroom.)

7                    THE CLERK:  Juror 25, Yinette Fuertes.

8                    JUROR:  Yes.

9                    THE COURT:  Good morning, ma'am.  You

10         answered two of my earlier questions.  You have

11         some knowledge about this case?

12                   JUROR:  I heard about it online, but not

13         much.

14                   THE COURT:  Do you remember what you

15         heard?

16                   JUROR:  I remember there was a murder,

17         but I don't remember anything else.

18                   THE COURT:  That's all you remember is

19         something online that it was a murder.  Do you

20         remember anything else that you may have heard or

21         read?

22                   JUROR:  No.

23                   THE COURT:  Is there anything about what

24         you heard or read that would cause you to question

25         your ability to be fair and impartial in this
```

78

1    case?

2                JUROR:  No.

3                THE COURT:  You also answered another

4    question about whether you have a health or

5    language problem that might interfere with your

6    being a juror in this case?

7                JUROR:  Right.  I have type I diabetes,

8    so it's just a little difficult to be, you know,

9    I would have to check my blood sugar every certain

10   amount of time, and if it goes low, I would have

11   to eat something.

12               THE COURT:  Ms. Fuertes-Garcia, I've had

13   a number of diabetics on my jury.  So first of

14   all, you have my permission to snack.  Unlike the

15   other jurors who are only allowed to drink water

16   during the trial, you have my special permission,

17   if you are a juror on this case, to snack as you

18   see fit.  We'll be taking breaks at 11 o'clock,

19   from 1 to 2, you'll be out of here at 4.  But if

20   you need to take more frequent breaks, I'm happy

21   to accommodate you.

22               JUROR:  Okay.

23               THE COURT:  Understanding that, can you

24   sit on this jury?

25               JUROR:  Yes.

79

1                    THE COURT:  Great.  Then let me ask you

2          this.  Is there anything about the nature of these

3          charges or any of the allegations you've heard

4          that might affect your ability to be fair and

5          impartial?

6                    JUROR:  I mean, I do have a relative

7          that was not exactly a murder case, but was in a

8          similar case.

9                    THE COURT:  And that relative, was that

10         a person who was the victim of a murder or charged

11         with the murder?

12                   JUROR:  No, no, they weren't a victim of

13         a murder, they were shot.

14                   THE COURT:  He was shot.

15                   JUROR:  Yes.

16                   THE COURT:  Would the life experience of

17         your relative, would that affect your ability to

18         be a fair and impartial juror in this case?

19                   JUROR:  I would say yes just because of

20         the way that it happened to him, it might affect

21         me to not be impartial in this case.

22                   THE COURT:  I perfectly understand.

23         Thank you, ma'am, you are excused.

24                   THE CLERK:  Excused.

25         (Juror Number 25, excused.)

80

```
 1    (Juror Number 26 enters courtroom.)

 2                  THE CLERK:  Juror 26, Asha Howell.

 3                  JUROR:  Yes.

 4                  THE COURT:  Hi, Ms. Howell.

 5                  JUROR:  Hi.

 6                  THE COURT:  You answered one of my

 7          earlier questions.  Do you have some health or

 8          other issue that might make it difficult for you

 9          to sit as a juror?

10                  JUROR:  Well, my son.

11                  THE COURT:  How old is your son?

12                  JUROR:  He's 18.

13                  THE COURT:  And what is it about your

14          son?

15                  JUROR:  He just had surgery.  He had an

16          ACTUALLY and meniscus surgery, so we just started

17          therapy.  He just got out of the hospital two

18          weeks ago, so we just started therapy on Tuesday.

19          So we have a lot of therapy sessions that we have

20          to get to, and because he's on crutches and he

21          can't get around, you know, I have to take him

22          around and I'm responsible for that.

23                  THE COURT:  And you're the only person

24          who can do that?

25                  JUROR:  Yes.
```

81

```
 1                    THE COURT:  Thank you, ma'am, you're
 2           excused.
 3                    JUROR:  Thank you.
 4      (Juror Number 26, excused.)
 5      (Juror Number 27 enters courtroom.)
 6                    THE CLERK:  Juror 27, Richard McFeeters.
 7                    THE COURT:  Hi, Mr. McFeeters.  First of
 8           all, you didn't put, I'm sorry to ask you this,
 9           but you didn't put how old you are.
10                    JUROR:  68.
11                    THE COURT:  Thank you, sir.  Let me ask
12           you this, sir.  Is there anything about the nature
13           of these charges or any of the allegations you've
14           heard that might affect your ability to be fair
15           and impartial?
16                    JUROR:  No, ma'am.
17                    THE COURT:  Now, you may hear alleged
18           evidence that the defendant, the alleged victim,
19           and some witnesses were involved in selling
20           marijuana.  Would that evidence affect your
21           ability to be fair and impartial?
22                    JUROR:  No, ma'am.
23                    THE COURT:  The defendant in a criminal
24           trial has the absolute right not to testify.  If
25           Mr. Reddicks chose not to testify at this trial,
```

82

1          would you hold that against him in any way?

2                    JUROR:  No, ma'am.

3                    THE COURT:  Is there anything about the

4          length of the trial that poses a hardship for you?

5                    JUROR:  Well, I'm on a very short

6          income, but I'll manage.

7                    THE COURT:  Understand that we provide a

8          $50 per day stipend.  If you have some special

9          financial hardship, I can start the running of

10         that $50 per day stipend from today.  Typically,

11         it starts after the third day.

12                   JUROR:  I understand that, but I could

13         use all the help I've got if possible.

14                   THE COURT:  If you remain a juror on

15         this case, just tell one of the court officers and

16         I'll be happy to provide you that.

17                   JUROR:  I'm sorry, ma'am, what was that?

18                   THE COURT:  If you are a juror on this

19         case, just let one of the court officers know that

20         you have that financial hardship and I'll be happy

21         to authorize the starting of that $50 per day

22         stipend from today.

23                   JUROR:  Thank you very much.

24                   THE COURT:  Any follow-up questions?

25                   MR. HENNING:  Sir, you put on your jury

83

1          questionnaire --

2                    JUROR:  Could you speak up, please?

3                    MR. HENNING:  Certainly.  You put on

4          your jury questionnaire that you're retired.

5                    JUROR:  Yes.

6                    MR. HENNING:  Can you just describe what

7          you're retired from?

8                    JUROR:  I've been in the manufacturing

9          industry and I've been in the restaurant business.

10         Not the business, but I was a cook for many years.

11                   MR. HENNING:  You listed Dorothy Dryden

12         McFeeters as your spouse or partner?

13                   JUROR:  Spouse.  We separated.

14                   MR. HENNING:  What was she retired from,

15         what was her employment?

16                   JUROR:  She never had to work a day in

17         her life.

18                   THE COURT:  Ms. Scapicchio?

19                   MS. SCAPICCHIO:  Hi.  Did you have any

20         children?

21                   JUROR:  I have three boys.

22                   MS. SCAPICCHIO:  Three boys.  How old

23         are your boys?

24                   JUROR:  One is 37, one is 30, and one is

25         27.

84

1          MS SCAPICCHIO:  Did they all grow up in

2     Brighton or is that somewhere you moved down

3     there?

4          JUROR:  No, they all grew up there.

5          MS. SCAPICCHIO:  They all grew up in

6     Brighton.

7          JUROR:  Right.

8          MS. SCAPICCHIO:  Did they go to public

9     school or private school in Brighton?

10         JUROR:  Public.

11         MS. SCAPICCHIO:  In your questionnaire,

12    you had initially made some sort of notation you

13    had been a witness in a case and then you crossed

14    it out?  Am I reading that right?

15         JUROR:  That was a mistake on my part.

16         MS. SCAPICCHIO:  The other one is, "have

17    been seated on a jury." Is that right?

18         JUROR:  Yes, in a civil case.

19         MS. SCAPICCHIO:  How long ago?

20         JUROR:  About five years ago, tops.

21         MS. SCAPICCHIO:  The experience you had

22    in sitting on a jury, was it a positive experience

23    or a negative experience for you?

24         JUROR:  Positive, absolutely.

25         MS. SCAPICCHIO:  And it was a civil

85

1      case?

2                    JUROR:  Yes, it was.

3                    MS. SCAPICCHIO:  Here in Suffolk

4      Superior Court or in District Court?

5                    JUROR:  It was here in this building.

6                    MS. SCAPICCHIO:  In Suffolk Superior.

7                    JUROR:  It was a traffic violation type

8      of thing.

9                    MS. SCAPICCHIO:  Okay, so that's a

10     traffic violation, that's not you with a traffic

11     violation, that's the type of case that you sat

12     on.

13                   JUROR:  Right.

14                   MS. SCAPICCHIO:  Do you remember what

15     type of traffic violation it was?  Was it a

16     homicide, a vehicular homicide?

17                   THE COURT:  Was it a motor vehicle

18     personal injury case?

19                   JUROR:  I believe it may have been

20     personal injury things brought up.  It's been a

21     long time now, my memory is not as sharp as it

22     used to be, but the people couldn't prove

23     themselves not guilty.

24                   THE COURT:  Thank you.

25                   MS. SCAPICCHIO:  I don't have any

86

1          further questions.  Thank you so much, sir.

2                    THE COURT:  Thank you, sir, if you could

3          step outside for a moment.

4                    JUROR:  Sure.

5     (Juror Number 27 exits courtroom.)

6                    THE COURT:  This juror stands

7          indifferent.

8                    MR. HENNING:  May I have one moment,

9          Your Honor?

10                   THE COURT:  Of course.

11                   MS. SCAPICCHIO:  I'm sorry, I didn't

12         hear that, I was speaking to my client.

13                   THE CLERK:  He just asked for one

14         moment.

15                   MS. SCAPICCHIO:  Oh, sure, sorry,

16         I didn't hear it.

17                   MR. HENNING:  I'm going to exercise a

18         peremptory.

19    (Juror Number 27 enters courtroom.)

20                   THE COURT:  Thank you, sir, you are

21         excused.

22                   THE CLERK:  Excused.

23                   JUROR:  I'm sorry?

24                   THE COURT:  You're excused, sir, thank

25         you.

87

1    (Juror Number 27, excused.)

2    (Juror Number 28 enters courtroom.)

3              THE CLERK:  Juror 28, Dania Constant.

4              THE COURT:  Good morning, ma'am.

5              JUROR:  Good morning.

6              THE COURT:  Ma'am, is there anything

7        about the nature of these charges or any of the

8        allegations that you've heard that might affect

9        your ability to be fair and impartial?

10              JUROR:  No.

11              THE COURT:  You may hear alleged

12        evidence that the defendant, the alleged victim,

13        and some witnesses were involved in selling

14        marijuana.  Would that evidence affect your

15        ability to be fair and impartial?

16              JUROR:  No.

17              THE COURT:  The defendant in a criminal

18        trial has the absolute right not to testify.  If

19        Mr. Reddicks chose not to testify at this trial,

20        would you hold that against him in any way?

21              JUROR:  No.

22              THE COURT:  Is there anything about the

23        length of the trial that poses a hardship for you?

24              JUROR:  No.

25              THE COURT:  Any follow-up questions,

88

1          Counsel?

2                    MR. HENNING:  Ma'am, you listed for

3          current employer, N/A, that you're unemployed now.

4          What was the last type of employment that you had?

5                    JUROR:  Working with the elderly.

6                    MR. HENNING:  With the elderly?

7                    JUROR:  Um-hmm.

8                    MR. HENNING:  Where was that you were

9          doing that?

10                   JUROR:  Quincy.

11                   MR. HENNING:  Was it in a home care

12         center?

13                   JUROR:  Nursing home.

14                   MR. HENNING:  Nursing home?  And you

15         listed here that your place of birth is in

16         Florida.

17                   JUROR:  Yes.

18                   MR. HENNING:  When did you come to

19         Massachusetts?

20                   JUROR:  Seven years ago.

21                   MR. HENNING:  I have nothing further,

22         Your Honor.

23                   MS. SCAPICCHIO:  You have four children?

24                   JUROR:  Yes.

25                   MS. SCAPICCHIO:  Your youngest is seven,

89

```
1            your oldest is 16; is that right?
2                    (No audible response.)
3                    MS. SCAPICCHIO:  And they're able to get
4            to school and back on their own?
5                    JUROR:  Yes, my mother and my boyfriend
6            is there.
7                    MS. SCAPICCHIO:  Okay, great.  I have no
8            further questions.
9                    THE COURT:  Ma'am, if you could step
10           outside for just a second, please.
11      Juror Number 28 exits courtroom.)
12                   THE COURT:  This juror stands
13           indifferent.
14                   MR. HENNING:  Commonwealth is content.
15                   MS. SCAPICCHIO:  Just one minute, Your
16           Honor.
17                   Defendant is content.
18                   THE COURT:  Number two.
19                   THE CLERK:  Seat 2.
20      (Juror Number 28 enters courtroom.)
21                   THE COURT:  Ma'am, you have been
22           selected to be a juror on this case.  You're going
23           to go upstairs to the jury room to join the other
24           juror who has been impaneled already.  Please
25           don't discuss this case or any aspect of this case
```

90

1          between the two of you and among any other future

2          jurors.  All right?  Please, if you could go

3          upstairs, ma'am.

4                    THE CLERK:  Seat 2.  29 is next.

5     (Juror Number 28 exits courtroom.)

6     (Juror Number 29 enters courtroom.)

7                    THE CLERK:  Juror 29, Robert Perryman.

8                    JUROR:  How are you doing?

9                    THE COURT:  Hi, Mr. Perryman.  Sir, is

10         there anything about the nature of these charges

11         or any of the allegations you've heard that might

12         affect your ability to be fair and impartial?

13                    JUROR:  No.

14                    THE COURT:  You may hear alleged

15         evidence that the defendant, the alleged victim,

16         and some witnesses were involved in selling

17         marijuana.  Would that evidence affect your

18         ability to be fair and impartial?

19                    JUROR:  No.

20                    THE COURT:  The defendant in a criminal

21         trial has the absolute right not to testify.  If

22         Mr. Reddicks chose not to testify at this trial,

23         would you hold that against him in any way?

24                    JUROR:  No.

25                    THE COURT:  Is there anything about the

91

 1          length of the trial that poses a hardship for you?

 2                    JUROR:  No.

 3                    THE COURT:  Any follow-up questions,

 4          Counsel?

 5                    MR. HENNING:  Sir, on the questionnaire,

 6          you list that you work for Chestnut Hill Realty;

 7          is that right.

 8                    JUROR:  Right.

 9                    MR. HENNING:  It says maintenance.  Do

10          you work in commercial buildings, residential

11          buildings?

12                    JUROR:  Residential homes.

13                    MR. HENNING:  I have no further

14          questions.

15                    THE COURT:  Ms. Scapicchio?

16                    MS. SCAPICCHIO:  I don't have anything

17          further.

18                    THE COURT:  Sir, can you step outside

19          for just a second.

20     (Juror Number 29 exits courtroom.)

21                    THE COURT:  This juror stands

22          indifferent.

23                    MR. HENNING:  Commonwealth is content.

24                    MS. SCAPICCHIO:  One minute, Your Honor.

25                    Defendant is content.

92

1              THE COURT:  Before you bring him back
2         in, Ms. Scapicchio, for future reference, you
3         don't have to ask permission to step aside and
4         discuss this with your client.
5              MS. SCAPICCHIO:  Thank you, Your Honor.
6    (Juror Number 29 enters courtroom.)
7              THE COURT:  Mr. Perryman, you've been
8         selected to be a juror on this case.  You're going
9         to be taken upstairs to the jury room affiliated
10        with this courtroom to join the other jurors
11        already impaneled.  Please don't discuss this case
12        with them or any other jurors who may be impaneled
13        today.  All right?
14             JUROR:  Okay.
15             THE COURT:  Thank you, sir, if you could
16        go upstairs.
17             THE CLERK:  Seat 3.  Juror Number 30 is
18        next.
19   (Juror Number 29 exits courtroom.)
20             THE COURT:  Yes, bring her down.
21             MS. SCAPICCHIO:  What's up?
22             THE COURT:  Number 1 says she can't get
23        it changed at all.  I may have to get involved.
24             MS. SCAPICCHIO:  I'm doubting they would
25        change it for her, anyhow.

93

1              THE COURT:  What?

2              MS. SCAPICCHIO:  I said I'm doubting

3         they'll change it just because she asked.

4              THE COURT:  Right.

5    (Juror Number 5 in Seat Number 1, enters courtroom.)

6              THE COURT:  Hi, Ms. Turner.  What was

7         the result of your call?

8              JUROR:  I called, and she told me that

9         she won't be able to change it tomorrow or the

10        following one because she has a visit right after

11        my visit with me and my daughter, and then the

12        following week, she has an appointment.  But the

13        week after that, she says she can do.

14             THE COURT:  If you don't mind, can we

15        call her?

16             JUROR:  Sure, that's fine.

17             THE COURT:  I think perhaps coming from

18        me through Mr. Kalell might have more of an

19        influence.  Do you mind?

20             JUROR:  No, I don't mind at all.

21             THE COURT:  If you could just be so kind

22        as to give the information to one of the court

23        officers, and as soon as we can, Mr. Kalell or

24        myself will get involved in this.  Tell me, what

25        kind of arrangement is this?  You're visiting with

94

1          your daughter with whom?

2                    JUROR:  A DCF worker.

3                    THE COURT:  And where would the visit

4          take place?

5                    JUROR:  In Hyde Park, 1530 River Street.

6                    THE COURT:  Is that a DCF office?

7                    JUROR:  Yes.

8                    THE COURT:  So we would be talking to a

9          DCF worker.

10                    JUROR:  Yes.

11                    THE COURT:  With your permission, ma'am,

12          we're going to call that DCF worker, and I think

13          coming from us directly as opposed to you, might

14          move that person a little bit more than you may be

15          able to, okay?

16                    JUROR:  That's fine.

17                    THE COURT:  That would be agreeable with

18          you if we could just change it till later in the

19          afternoon?

20                    JUROR:  That's perfect with me.

21                    THE COURT:  Is this DCF worker just a

22          chaperone at the visitation, is that all this is?

23                    JUROR:  I have to have supervised

24          visits.

25                    THE COURT:  I'm sorry, say that again?

95

1              JUROR:  I would have to have supervised

2         visits, so as like a chaperone, per se, yeah.

3              THE COURT:  Right, she's supervising the

4         visitation, correct?

5              JUROR:  Yes, correct.

6              THE COURT:  We would get involved, if

7         you don't mind.

8              JUROR:  Okay, I'll give the information.

9              THE COURT:  If you would go back to the

10        jury room, I'm hopeful that we can make this work.

11             JUROR:  All right, thank you so much.

12             THE COURT:  Thank you.

13   (Juror Number 5 in Seat Number 1 exits courtroom.)

14   (Juror Number 30 enters courtroom.)

15             THE CLERK:  Juror 30, Eric McKenzie.

16             JUROR:  Yes.

17             THE COURT:  Hi, Mr. McKenzie.  Sir, is

18        there anything about the nature of these charges

19        or any of the allegations you've heard that might

20        affect your ability to be fair and impartial?

21             JUROR:  No.

22             THE COURT:  You may hear alleged

23        evidence that the defendant, the alleged victim,

24        and some witnesses were involved in selling

25        marijuana.  Would that evidence affect your

96

1           ability to be fair and impartial?

2                    JUROR:  No.

3                    THE COURT:  The defendant in a criminal

4           trial has the absolute right not to testify.  If

5           Mr. Reddicks chose not to testify at this trial,

6           would you hold that against him in any way?

7                    JUROR:  No, I wouldn't.

8                    THE COURT:  Is there anything about the

9           length of the trial that poses a hardship for you?

10                   JUROR:  No.

11                   THE COURT:  Any follow-up questions,

12          Counsel?

13                   MR. HENNING:  Sir, I have no questions

14          for you.

15                   MS. SCAPICCHIO:  I have a few.  You

16          indicated on your grand jury, I mean on your jury

17          questionnaire, that you served on a grand jury

18          four years ago?

19                   JUROR:  Yes.

20                   THE COURT:  Was that here in Suffolk

21          County?

22                   JUROR:  Yes, this building.

23                   MS. SCAPICCHIO:  And so as part of your

24          duties, you would come in on Wednesdays and you

25          will listen to the district attorneys present

97

1          evidence?

2                    JUROR:  Correct.

3                    MS. SCAPICCHIO:  Approximately that was

4          in 2012, you did that?

5                    JUROR:  That was when it ended.  I think

6          it started in 2011.  Like a year, it ended up

7          being about.

8                    MS. SCAPICCHIO:  Okay, so sometime in

9          2012, it ended.

10                   JUROR:  Yes.

11                   MS. SCAPICCHIO:  Did you get to know the

12         district attorneys in Suffolk County as a result

13         of your grand jury service?

14                   JUROR:  By sight, I guess.

15                   MS. SCAPICCHIO:  By sight.  Did you form

16         any opinions about them?

17                   JUROR:  No.

18                   MS. SCAPICCHIO:  In terms of what you

19         knew?

20                   JUROR:  No.

21                   MS. SCAPICCHIO:  And you also indicated

22         that your brother-in-law is a court officer?

23                   JUROR:  Yes.

24                   MS. SCAPICCHIO:  In what court?

25                   JUROR:  In this building right here.

98

1              MS. SCAPICCHIO:  In this building, okay.

2        Do you think the fact that you have a brother-in-

3        law that's a court officer would affect your

4        ability to be fair and impartial?

5              JUROR:  No.

6              MS. SCAPICCHIO:  Judge, could I just ask

7        you a question if the juror could step out for one

8        minute?

9              THE COURT:  Of course.

10   (Juror Number 30 exits courtroom.)

11             MS. SCAPICCHIO:  The concern I have is

12       it's a 2012 homicide that I think was indicted in

13       2012, but I'm not sure if he was sitting on the

14       grand jury.

15             THE COURT:  Why don't we just ask him

16       directly?

17             MS. SCAPICCHIO:  I didn't want to put

18       him in the mix like that.

19             THE COURT:  Well, I would excuse him if

20       he were a grand juror hearing evidence that may

21       not be adduced at trial.

22             MS. SCAPICCHIO:  That's my concern,

23       Judge.  So if he was a sitting grand juror in

24       2012, this indictment came from 2012 in Suffolk

25       County.

99

1          THE COURT:  Right, but only if he were

2     sitting on that grand jury that returned the true

3     bill would that be a problem.

4          MS. SCAPICCHIO:  Okay, so do you want to

5     ask the follow-up questions?

6          THE COURT:  I'm going to ask them.  It's

7     better coming from me.

8          THE CLERK:  And that was also July 31st,

9     2012.  When it was returned now.

10          THE COURT:  Bring him back in.

11  (Juror Number 30 enters courtroom.)

12          THE COURT:  Mr. McKenzie, were you

13     serving in July 2012 on the grand jury?  What time

14     of the year was it, if you can recall?

15          JUROR:  I think we finished in March.

16          THE COURT:  March, okay.  So it was the

17     early part of the year.

18          JUROR:  That's when it was finished,

19     yes.

20          THE COURT:  And at no time did you -- is

21     Mr. Reddicks' name familiar to you, Charles

22     Reddicks?

23          JUROR:  No.

24          THE COURT:  So you were not a grand

25     juror in the presentation regarding his case.

100

```
1                    JUROR:  No.
2                    THE COURT:  Mr. McKenzie, I'm assuming
3            you appreciate, but I want to make sure for the
4            record, the standard of proof before a grand jury
5            is essentially merely probable cause.  You
6            understand that, sir.
7                    JUROR:  Yes.
8                    THE COURT:  The standard here at trial
9            is the highest standard of proof in the world,
10           it's proof beyond a reasonable doubt.  Do you
11           understand that, sir?
12                   JUROR:  Yes, ma'am.
13                   THE COURT:  And you understand the vast
14           difference in that standard of proof between what
15           is presented to a grand jury and what is presented
16           to, actually, it's called the petit jury, which is
17           the 16 people who are going to hear this case.
18           You appreciate that, sir.
19                   JUROR:  Yes.
20                   THE COURT:  What is the name of your
21           brother?  Is it your brother is a court officer?
22                   JUROR:  Yes, Mark Wedgeworth.
23                   THE COURT:  Brother-in-law.
24                   JUROR:  Brother-in-law.
25                   THE COURT:  What's his name?
```

101

1                    JUROR:  Mark Wedgeworth.

2                    THE COURT:  You understand, sir, that

3        I'm going to be admonishing all jurors who get

4        impaneled in this case that they at no time can be

5        discussing the case even among themselves, but

6        certainly not with anybody else, including

7        friends, relatives, and loves ones, and that would

8        include Officer Wedgeworth.  You understand that,

9        sir.

10                   JUROR:  Yes.

11                   THE COURT:  And you would be able to

12       comply with that admonition?

13                   JUROR:  Yes.

14                   THE COURT:  Okay, if you could step

15       out --

16                   MS. SCAPICCHIO:  I have a few follow-up

17       from those, Judge.

18                   THE COURT:  Oh, of course.

19                   MS. SCAPICCHIO:  Thank you.  Sorry,

20       I don't mean to keep asking you questions.

21                   JUROR:  That's all right.

22                   MS. SCAPICCHIO:  Again, back to your

23       grand jury, and I don't mean to harp on it, but

24       I still have some questions.  Do you remember

25       whether or not ADA Henning ever appeared before

102

1       you?

2                       JUROR:  I don't believe so.

3                       MS. SCAPICCHIO:  Doesn't look familiar?

4                       JUROR:  No.

5                       MS. SCAPICCHIO:  Okay, and in terms of

6         returning true bills for the Commonwealth as part

7         of your grand jury duty, do you have any feelings

8         about once there's an indictment, whether or not

9         that would sway you one way or another as far as

10        guilt or innocence at a trial?

11                      JUROR:  Well, I think it's a different

12        process.  We were just looking at the evidence

13        that they have and saying whether it's enough or

14        not, and this is without a shadow of a doubt, and

15        it's just different.

16                      THE COURT:  Again, going back,

17        Mr. McKenzie, you appreciate, I know you sat as a

18        grand juror, only the prosecution presents

19        evidence, the defense never gets to respond.  You

20        understand that, correct?

21                      JUROR:  Yes.

22                      MS. SCAPICCHIO:  Thank you.

23                      THE COURT:  Thank you, sir, if you could

24        step outside.

25      (Juror 30 exits courtroom.)

103

1             THE COURT:  This juror stands

2     indifferent.

3             MR. HENNING:  And just to verify,

4     I wasn't employed in the office, I quit the job

5     and went on to do something else.

6             MS. SCAPICCHIO:  I know you were here

7     and back, I just didn't keep track of which days

8     were which.

9             MR. HENNING:  2012, I wasn't there.

10            THE COURT:  And the incident was in

11    April, so even the incident was past his service

12    as a grand juror.  But in any event, the juror

13    stands indifferent.

14           MR. HENNING:  Commonwealth is content.

15           MS. SCAPICCHIO:  Defendant would

16    exercise a challenge.

17  (Juror Number 30 enters courtroom.)

18           THE COURT:  Thank you, sir, you are

19    excused.

20           THE CLERK:  Excused.

21  (Juror Number 30, excused.)

22  (Juror Number 31 enters courtroom.)

23           THE CLERK:  Juror 31, Jennifer Anstead.

24           JUROR:  Anstead.

25           THE COURT:  Good morning, ma'am.  Is

104

1          there anything about the nature of these charges

2          or any of the allegations that you've heard that

3          might affect your ability to be fair and

4          impartial?

5                    JUROR:  No.

6                    THE COURT:  You may hear alleged

7          evidence that the defendant, the alleged victim,

8          and some witnesses were involved in selling

9          marijuana.  Would that evidence affect your

10         ability to be fair and impartial?

11                   JUROR:  No.

12                   THE COURT:  The defendant in a criminal

13         trial has the absolute right not to testify.  If

14         Mr. Reddicks chose not to testify at this trial,

15         would you hold that against him in any way?

16                   JUROR:  No.

17                   THE COURT:  Is there anything about the

18         length of the trial that poses a hardship for you?

19                   JUROR:  No.

20                   THE COURT:  Any follow-up questions,

21         Counsel?

22                   MR. HENNING:  Ma'am, in the

23         questionnaire, it says that you work at Mass.

24         General Hospital as an RN.

25                   JUROR:  Correct.

105

1          MR. HENNING:  Can you describe what unit
2      or division you work in?
3          JUROR:  I work in the cardiac cath lab.
4      I used to work in the cardiac surgery OR, so about
5      two months ago, I switched to the cath lab.
6          MR. HENNING:  It says you completed a
7      bachelors degree.  Where was that?
8          JUROR:  University of New Hampshire.
9          MR. HENNING:  In the household section,
10     it says single, married, partner, domestic,
11     separated, you can look at the form if you want,
12     but --
13         JUROR:  I did.  I'm engaged.  He's not
14     a spouse, I chose not to -- but I'm engaged to
15     another man who lives in the same house that
16     I live in, but I just chose not to fill that out
17     because the questionnaire was about me, not about
18     my partner.
19         MR. HENNING:  Understood.  I have
20     nothing further.
21         MS. SCAPICCHIO:  Hi.
22         JUROR:  Hi, how are you?
23         MS. SCAPICCHIO:  Good.  You said you
24     were seated on a jury on a civil case in 2008 or
25     9?

106

1          JUROR:  It was either 2008 or 2009 when

2    I was living in San Francisco.

3          MS. SCAPICCHIO:  Was that a positive

4    experience for you?

5          JUROR:  It was a very positive

6    experience.  I actually was surprised that I was

7    chosen.

8          MS. SCAPICCHIO:  What surprised you

9    about being chosen?

10         JUROR:  Well, it was a mesothelioma

11    case, and being a nurse, I thought that they

12    probably would not have wanted me.  It was

13    actually really, a really interesting trial

14    because it went through the beginning of like OSHA

15    and regulatory standards for hospitals, and this

16    gentleman happened to be in the Navy, so it was a

17    really, quite historic event in my life, like

18    I learned a lot when I was on the jury.

19         MS. SCAPICCHIO:  And then also, at Mass.

20    General, you said you worked in the cardiac --

21         JUROR:  I work in the cardiac cath lab

22    right now.

23         MS. SCAPICCHIO:  And you previously

24    worked in the cardiac OR?

25         JUROR:  Yes.

107

```
 1              MS. SCAPICCHIO:  How long did you do
 2         that in the cardiac OR?
 3              JUROR:  I was at Mass. General in the
 4         cardiac OR for about six years, and I've been at
 5         my new job for about two months.
 6              MS. SCAPICCHIO:  Okay, so on your feet
 7         all day in the OR.
 8              JUROR:  Yes.
 9              MS. SCAPICCHIO:  Thanks.
10              THE COURT:  Ma'am, can you step outside
11         for just a second, please.
12              JUROR:  Sure.
13    (Juror Number 31 exits courtroom.)
14              THE COURT:  That's stamina for you.
15              MS. SCAPICCHIO:  That's why I asked.
16              THE COURT:  This juror stands
17         indifferent.  And durable.
18              MR. HENNING:  Commonwealth exercises a
19         peremptory.
20    (Juror Number 31 enters courtroom.)
21              THE COURT:  Thank you, ma'am, you are
22         excused.
23              THE CLERK:  Excused.
24    (Juror Number 31 exits courtroom.)
25    (Juror Number 32 enters courtroom.)
```

108

 1              THE CLERK:  Juror 32, Elena White.

 2              JUROR:  Yes.

 3              THE COURT:  Hi, Ms. White.  You answered

 4       four of my earlier questions.  Can you tell me

 5       what your concerns are about being on this jury?

 6              JUROR:  Well, in order of the questions

 7       that you asked earlier, Thomas --

 8              THE COURT:  Do you know one of the

 9       witnesses?

10              JUROR:  Maybe.  Thomas Washington is a

11       professional colleague, potentially, but there's a

12       lot of people named Thomas Washington, I presume.

13              THE COURT:  You also said that you would

14       tend to believe the testimony of a civilian

15       witness over the testimony of a police officer

16       witness just because he or she were a civilian.

17              JUROR:  Yeah, I tend to have a bias

18       against the police.

19              THE COURT:  Okay, thank you, ma'am,

20       you're excused.

21    (Juror Number 32, excused.)

22    (Juror Number 36 enters courtroom.)

23              THE CLERK:  Juror 36, Kyle Johnson.

24              JUROR:  Yes.

25              THE COURT:  Hi, Mr. Johnson.  Sir, is

109

1          there anything about the nature of these charges

2          or any of the allegations you've heard that might

3          affect your ability to be fair and impartial?

4                    JUROR:  No.

5                    THE COURT:  You may hear alleged

6          evidence that the defendant, the alleged victim,

7          and some witnesses were involved in selling

8          marijuana.  Would that evidence affect your

9          ability to be fair and impartial?

10                   JUROR:  No.

11                   THE COURT:  The defendant in a criminal

12         trial has the absolute right not to testify.  If

13         Mr. Reddicks chose not to testify at this trial,

14         would you hold that against him in any way?

15                   JUROR:  No.

16                   THE COURT:  Is there anything about the

17         length of the trial that poses a hardship for you?

18                   JUROR:  Yes.

19                   THE COURT:  What is that?

20                   JUROR:  I'm a full-time student at

21         Northeastern.  I just started my second semester

22         of college, and I can't really afford to miss any

23         more days of school, let alone nine days of

24         school.

25                   THE COURT:  Well, did you know that you

110

1          could defer your service for up to a year?

2                    JUROR:  Yes, but the only time -- the

3          court is only open on weekdays, so I'll either be

4          in school or back home in Pennsylvania and won't

5          be able to serve.

6                    THE COURT:  Have you deferred it in the

7          past?

8                    JUROR:  No.

9                    THE COURT:  You just called up and you

10         said, and you were given this date, is that what

11         happened?

12                   JUROR:  Yes.

13                   THE COURT:  You got summonsed and you

14         were given this date.

15                   JUROR:  Um-hmm.

16                   THE COURT:  And you didn't know you

17         could call up -- do you have a co-op program?

18                   JUROR:  Um-hmm.

19                   THE COURT:  Yes?

20                   JUROR:  Yes, but I don't start that till

21         next year.

22                   THE COURT:  I see, so if you're not in

23         classes, you are back at home.

24                   JUROR:  Yeah, or it's the weekend.

25                   THE COURT:  All right, you're excused,

111

```
 1        sir, thank you.
 2                    THE CLERK:  Excused.
 3     (Juror Number 36, excused.)
 4     (Juror Number 37 enters courtroom.)
 5                    THE CLERK:  Juror 37, Irina Holmes.
 6                    JUROR:  Yes.
 7                    THE COURT:  Good morning, Ms. Holmes.
 8        You answered three of my earlier questions.  Do
 9        you have a language difficulty, ma'am?
10                    JUROR:  No, I have hearing difficulty.
11                    THE COURT:  Would your hearing
12        impairment make it difficult for you to hear
13        everything in the courtroom?
14                    JUROR:  Well, no, it's not that I'm
15        deaf, but I'm experiencing increasing difficulty
16        hearing, and it's also my foreign language.
17                    THE COURT:  And it would be difficult in
18        this courtroom to hear everything?
19                    JUROR:  It might.  Not necessarily
20        everything, maybe five percent.
21                    THE COURT:  Well, five percent is more
22        than I would --
23                    JUROR:  Yeah, you know, the tone,
24        something like that.
25                    THE COURT:  I understand, ma'am, you are
```

112

1              excused.

2                        JUROR:  Thank you.

3                        THE CLERK:  Excused.

4          (Juror Number 37, excused.)

5                        THE COURT:  I just wanted to say for

6              the record, she's the one who answered both the

7              police officer question and the civilian question.

8              I think there's also a language problem going on

9              there, too, besides the hearing problem.  I was

10             dying to find out how she could answer both in the

11             affirmative.

12                       MS. SCAPICCHIO:  I think she was just a

13             little confused, I don't think she heard very

14             well.

15                       THE COURT:  It may have been the hearing

16             or the language difficulty.  But in any event, she

17             is excused.

18         (Juror Number 39 enters courtroom.)

19                       THE CLERK:  Juror 39, Jeanmarie Metelus.

20                       JUROR:  Yes.

21                       THE COURT:  Sir, you answered one of my

22             earlier questions.

23                       JUROR:  I did.

24                       THE COURT:  What is your concern about

25             being on the jury?

113

1            JUROR:  I have a very short attention
2       span and I don't think -- for instance, when you
3       were saying the names, I blanked out quite a few
4       times.  I'm not sure that's a good thing.
5            THE COURT:  You're in college, sir.
6            JUROR:  I am, yes.
7            THE COURT:  Are you blanking out with
8       your professors?
9            JUROR:  I do, yeah.  I got through high
10      school, unbelievably, but --
11           THE COURT:  I'm sorry, I didn't hear the
12      last part, you got through high school?
13           JUROR:  I got through high school,
14      thankfully, but it's a concern, yeah.
15           THE COURT:  All right, so do you think
16      you're going to have attention problems at this
17      trial?
18           JUROR:  I do, yes.
19           THE COURT:  All right, you're excused,
20      sir, thank you.
21           JUROR:  Thank you, have a good one.
22           THE CLERK:  Excused.
23  (Juror Number 39, excused.)
24  (Juror Number 41 enters courtroom.)
25           THE CLERK:  Juror 41, Laura Masur.

114

1            JUROR:  Yes.

2            THE COURT:  Hi, Ms. Masur.  Ma'am, is

3       there anything about the nature of these charges

4       or any of the allegations you've heard that might

5       affect your ability to be fair and impartial?

6            JUROR:  I do not think so.

7            THE COURT:  Great.  Now, you may hear

8       alleged evidence that the defendant, the alleged

9       victim, and some witnesses were involved in

10       selling marijuana.  Would that evidence affect

11       your ability to be fair and impartial?

12            JUROR:  I don't think so.

13            THE COURT:  The defendant in a criminal

14       trial has the absolute right not to testify.  If

15       Mr. Reddicks chose not to testify at this trial,

16       would you hold that against him in any way?

17            JUROR:  I would not.

18            THE COURT:  Is there anything about the

19       length of the trial that poses a hardship for you?

20            JUROR:  I'm concerned, because I'm

21       involved in teaching at the university level, that

22       it would be difficult for me to fulfill my

23       obligations.

24            THE COURT:  Well, that's a concern to

25       anybody who's working.  You're working for Boston

115

1       University which is a big institution.

2                   JUROR:  Yes.

3                   THE COURT:  And you're teaching in the

4       education department?

5                   JUROR:  No, I'm in the archaeology

6       department.

7                   THE COURT:  But there are other

8       professors who could cover for you?

9                   JUROR:  It's something that we can

10      probably work out a situation.

11                  THE COURT:  I appreciate it might be a

12      big inconvenience, but you can also appreciate

13      that everybody has the same inconvenience relative

14      to jury service, and I'm confident that Boston

15      University can step up to the plate and help you

16      out performing this important public service.

17      Any follow-up questions, Counsel?

18                  MR. HENNING:  Yes.  You indicated that

19      you do archaeology.  Can you just describe what

20      your job is or what your field is?

21                  JUROR:  I work on historical sites in

22      Eastern North America involved in excavation and

23      analyzing the results.  Specifically, I look at

24      animal bones.

25                  THE COURT:  Cool.  Like old animals,

116

1      like dinosaurs?

2                JUROR:  No, not that old.  The past 500

3      years or so.

4                MS. SCAPICCHIO:  So you're actually the

5      one that goes out and does the helping with the

6      dig?

7                JUROR:  Yes.

8                MS. SCAPICCHIO:  So where have you dug?

9                JUROR:  I've mostly worked in Virginia

10     before, I worked in Western Massachusetts.

11               MS. SCAPICCHIO:  What kind of

12     archaeology things do you find in Virginia and

13     Western Massachusetts?

14               THE COURT:  Jamestown?

15               JUROR:  Jamestown kind of stuff.  I've

16     never worked at Jamestown, but sites nearby.

17               MS. SCAPICCHIO:  All right, and then you

18     indicated that your partner or husband works for

19     the government in the US Patent and Trademark

20     office?

21               JUROR:  Um-hmm.

22               MS. SCAPICCHIO:  Is he a patent

23     examiner?

24               JUROR:  Yes.

25               MS. SCAPICCHIO:  How long has he had

117

1          that job?

2                    JUROR:  Seven years.

3                    MS. SCAPICCHIO:  And then in terms of

4          your work at Boston University, did you get your

5          undergraduate at BASED UPON, as well?

6                    JUROR:  No, I did not.

7                    MS. SCAPICCHIO:  Where did you go

8          undergrad?

9                    JUROR:  William and Mary in Virginia.

10                   MS. SCAPICCHIO:  When you say your job

11         as a graduate student and teaching fellow, do you

12         actually teach classes on behalf of professors?

13         Is that what you do?

14                   JUROR:  I mostly work as a teaching

15         assistant, so I'm involved in some aspects of

16         teaching and then lab, you know, lab aspects of

17         teaching.

18                   MS. SCAPICCHIO:  So you run the labs for

19         the students or for the professors because the

20         students need to be there.

21                   JUROR:  Um-hmm.

22                   MS. SCAPICCHIO:  You also have to have

23         office hours, as well.

24                   JUROR:  Yes.

25                   MS. SCAPICCHIO:  Okay, and how often do

118

1          you have to have office hours a week?

2                    JUROR:  Usually three days a week.

3                    MS. SCAPICCHIO:  Is that a requirement

4          for your job that you have to have office hours

5          three days a week?

6                    JUROR:  Yes.

7                    MS. SCAPICCHIO:  And could somebody else

8          sort of pick up and have those office hours or

9          would you just have to do them after, after court?

10                   JUROR:  I can do some after if need be.

11         It's the beginning of the semester, so everything

12         is a little different, you know, right now.

13                   MS. SCAPICCHIO:  Okay, and then the last

14         question I have is you indicated your father was

15         an expert witness in a federal civil case.

16                   JUROR:  Yes.

17                   MS. SCAPICCHIO:  An expert in what?

18                   JUROR:  Accounting, financial things.

19         He's a professor of accounting.

20                   MS. SCAPICCHIO:  Was that here in

21         Massachusetts?

22                   JUROR:  No.

23                   MS. SCAPICCHIO:  Where was that?

24                   JUROR:  The DECIDE area.

25                   MS. SCAPICCHIO:  The DECIDE area.

119

```
 1                 JUROR:  I'm not sure where exactly.
 2                 MS. SCAPICCHIO:  I have no further
 3          questions, thank you.
 4                 THE COURT:  Thank you, ma'am, if you
 5          could step outside for one second, please.
 6                 JUROR:  Sure.
 7     (Juror Number 41 exits courtroom.)
 8                 THE COURT:  This juror stands
 9          indifferent.
10                 MR. HENNING:  Commonwealth is content.
11                 MS. SCAPICCHIO:  Defendant would
12          challenge.
13     (Juror Number 41 enters courtroom.)
14                 THE COURT:  Thank you, ma'am, you are
15          excused.
16                 THE CLERK:  Excused.
17     (Juror Number 41 exits courtroom.)
18     (Juror Number 42 enters courtroom.)
19                 THE CLERK:  Juror 42, Charles
20          Luckenbill.
21                 JUROR:  Yes.
22                 THE COURT:  Good morning, sir.
23                 JUROR:  Good morning.
24                 THE COURT:  Is there anything about the
25          nature of these charges or any of the allegations
```

120

1          you've heard that might affect your ability to be

2          fair and impartial?

3                    JUROR:  I don't think so.

4                    THE COURT:  You may hear alleged

5          evidence that the defendant, the alleged victim,

6          and some of the witnesses were involved in selling

7          marijuana.  Would that evidence affect your

8          ability to be fair and impartial?

9                    JUROR:  No.

10                    THE COURT:  The defendant in a criminal

11          trial has the absolute right not to testify.  If

12          Mr. Reddicks chose not to testify at this trial,

13          would you hold that against him in any way?

14                    JUROR:  No.

15                    THE COURT:  Is there anything about the

16          length of the trial that poses a hardship for you?

17                    JUROR:  No.

18                    THE COURT:  Inconvenience, yes.

19                    JUROR:  Yes.

20                    THE COURT:  Hardship, no.

21                    JUROR:  No.

22                    THE COURT:  I love hearing that.

23          Mr. Henning, Ms. Scapicchio?

24                    MR. HENNING:  The Boylston Restaurant

25          Group, can you describe what restaurants they're

121

```
 1          in charge of or what they are?
 2                    JUROR:  Pour House Bar and Grill,
 3          Whiskeys, and T-bones in Plymouth.
 4                    MR. HENNING:  Do you manage a particular
 5          restaurant or the whole --
 6                    JUROR:  Pour House.
 7                    MR. HENNING:  The Pour House?  When did
 8          you move from Indianapolis to Massachusetts?
 9                    JUROR:  1981.
10                    MR. HENNING:  Was it for school?
11                    JUROR:  Yes.
12                    MR. HENNING:  Your bachelor's degree,
13          where is that from?
14                    JUROR:  Berklee College.
15                    MR. HENNING:  Did you play an
16          instrument?
17                    JUROR:  I play multiple instruments.
18                    MR. HENNING:  You completed your degree
19          at Berklee.
20                    JUROR:  I did.
21                    MR. HENNING:  I have nothing further,
22          Your Honor.
23                    THE COURT:  Ms. Scapicchio?
24                    MS. SCAPICCHIO:  So now I have to know,
25          what do you play?
```

122

1              JUROR:  Primarily, guitar.

2              MS. SCAPICCHIO:  Guitar, okay.

3              JUROR:  Strings.

4              MS. SCAPICCHIO:  What other instruments,

5        other than guitar, do you play?

6              JUROR:  Banjo, piano.

7              MS. SCAPICCHIO:  As you're working for

8        the Boston Restaurant Group, you manage the Pour

9        House Bar and Grill?

10             JUROR:  I do.

11             MS. SCAPICCHIO:  So you're there as the

12       manager every day or?

13             JUROR:  Bartender, manager.

14             MS. SCAPICCHIO:  Whatever needs to get

15       done.

16             JUROR:  Yes.

17             MS. SCAPICCHIO:  And then you indicated

18       on your jury questionnaire that you were a special

19       grant juror for nine months in 2007?

20             JUROR:  I believe it was '07, yes.

21             MS. SCAPICCHIO:  Was that here in

22       Suffolk County?

23             JUROR:  Yes.

24             MS. SCAPICCHIO:  With the Suffolk County

25       District Attorney's Office or with the Attorney

123

1          General's Office?

2                    JUROR:  Attorney General's Office.

3                    MS. SCAPICCHIO:  The Attorney General's

4          Office.

5                    JUROR:  Martha Coakley.

6                    MS. SCAPICCHIO:  When you say you were a

7          special grand juror, were you investigating just

8          one case?

9                    JUROR:  Multiple cases.

10                   MS. SCAPICCHIO:  Multiple cases from the

11         Attorney General's Office.

12                   JUROR:  Yes.

13                   MS. SCAPICCHIO:  Was that experience as

14         a special grand juror, was that a positive or

15         negative experience for you?

16                   JUROR:  I would say it was positive, but

17         it was an awful long time commitment.

18                   MS. SCAPICCHIO:  How long did you have

19         to sit?

20                   JUROR:  Well, for like, I think eight or

21         nine months.

22                   MS. SCAPICCHIO:  Every day or just one

23         day a week?

24                   JUROR:  About three days a week, give or

25         take, sometimes you would get called off.

124

1          MS. SCAPICCHIO:  Because you sat as a
2     special grand juror, do you think that if
3     everything were equal, that your relationship and
4     knowledge of the District Attorney's Office would
5     sway you one way or the other?
6          THE COURT:  It wasn't the District
7     Attorney's Office.
8          MS. SCAPICCHIO:  I'm sorry, the Attorney
9     General's Office, would sway you one way or the
10     other in terms of deciding a criminal case here?
11          JUROR:  I don't think so.
12          MS. SCAPICCHIO:  When you say you don't
13     think so, what do you mean?
14          JUROR:  I don't even understand the
15     question, really.
16          MS. SCAPICCHIO:  Okay, so it was a bad
17     question then.  Let me ask you another one.  So
18     because you sat with the prosecutorial arm of the
19     Commonwealth for a period of time, would they get
20     an edge here anywhere in terms of deciding this
21     case because of the way that you had to interact
22     with them as a grand juror?
23          JUROR:  No.
24          MS. SCAPICCHIO:  Great, thank you.
25          THE COURT:  And I just want to make sure

125

1          you understand, I'm not telling you anything you
2          don't know, the grand jury presented evidence only
3          from the prosecution side.  You know the defendant
4          doesn't participate in a grand jury.  You
5          understand that.
6                    JUROR:  Sure, yes.
7                    THE COURT:  You also understand that
8          the standard of proof before a grand jury is one
9          of the lowest, it's basically probable cause.
10         Whereas here at trial, it's the highest standard
11         of proof in the world, proof beyond a reasonable
12         doubt.
13                    JUROR:  Okay.
14                    THE COURT:  You understand and can
15         appreciate that difference?
16                    JUROR:  I think I can now that you've
17         explained it that way, yes.
18                    THE COURT:  This is the trial, this is
19         not grand jury.
20                    JUROR:  Sure, sure.
21                    THE COURT:  You understand that.
22                    JUROR:  Yes.
23                    THE COURT:  There's a vast difference in
24         the standard of proof between one and the other.
25                    JUROR:  Okay.

126

```
 1              THE COURT:  And the grand jury is
 2        one-sided.  In other words, it's just a prosecutor
 3        who is presenting evidence.
 4              JUROR:  Okay.
 5              THE COURT:  Defendant doesn't even
 6        participate.  You understand that.
 7              JUROR:  Right, sure.
 8              THE COURT:  Great.  If you could step
 9        outside, please, sir, for a second.
10  (Juror Number 42 exits courtroom.)
11              THE COURT:  This juror stands
12        indifferent.
13              MR. HENNING:  Commonwealth is content.
14              MS. SCAPICCHIO:  Defendant is content.
15  (Juror Number 42 enters courtroom.)
16              THE COURT:  Mr. Luckenbill, you have
17        been chosen to be a juror on this case.  I can
18        assure you, however, this trial is going to last
19        a lot less time than you served on a grand jury,
20        I assure you that, so thank you again for your
21        willingness to serve.  You're going to join the
22        other impaneled jurors upstairs.  Please don't
23        discuss the case with them or allow them to
24        discuss the case with you.
25              JUROR:  Okay.
```

127

1                    THE COURT:  Thank you, sir.

2                    THE CLERK:  Seat 4.

3        (Juror Number 42 exits courtroom.)

4        (Juror Number 43 enters courtroom.)

5                    THE CLERK:  Juror 43, David Tierney.

6                    THE COURT:  Mr. Tierney, first and

7           foremost, you indicated you're 72.

8                    JUROR:  Yes, I'm 72.

9                    THE COURT:  By law in Massachusetts, you

10          cannot serve on a jury in Massachusetts past the

11          age of 70 unless you agree to.  Do you want to

12          serve on this jury?

13                   JUROR:  And I agreed to.

14                   THE COURT:  Great, then let me ask you

15          this, sir.  Well, you did answer one of my earlier

16          questions.  Do you have some concern about being

17          on this jury?

18                   JUROR:  Not really.  The one where

19          I answered was you asked about hearing.

20                   THE COURT:  Yes.

21                   JUROR:  When the clerk was speaking and

22          the defendants were standing, that was garbled.

23                   THE COURT:  Because their back was to

24          you?

25                   JUROR:  Because I was sitting behind

128

```
 1              them.  And when you were speaking, it was just
 2              barely into my hearing range.
 3                       THE COURT:  So you could barely hear me?
 4                       JUROR:  I could barely hear you.
 5                       THE COURT:  I'm going to have to excuse
 6              you, Mr. Tierney, because I think I speak pretty
 7              loudly, and the acoustics in this room, I grant
 8              you, are not very good, but if you couldn't hear
 9              me when I was facing you and speaking fairly
10              loudly, you may have problems hearing this trial.
11              So I'm going to have to excuse you, sir.
12                       JUROR:  Okay.
13                       THE COURT:  Thank you for your
14              willingness to serve.
15                       THE CLERK:  Excused.
16       (Juror Number 43, excused.)
17       (Juror Number 47 enters courtroom.)
18                       THE CLERK:  Juror 47, Denise Jawando.
19                       JUROR:  Yes.
20                       THE COURT:  Good morning, ma'am.
21                       JUROR:  Good morning.
22                       THE COURT:  Ma'am, is there anything
23              about the nature of these charges or any of the
24              allegations you've heard that might affect your
25              ability to be fair and impartial?
```

129

1              JUROR:  No, ma'am.

2              THE COURT:  You may hear alleged

3      evidence that the defendant, the alleged victim,

4      and some of the witnesses were involved in selling

5      marijuana.  Would that evidence affect your

6      ability to be fair and impartial?

7              JUROR:  No, ma'am.

8              THE COURT:  The defendant in a criminal

9      trial has the absolute right not to testify.  If

10     Mr. Reddicks chose not to testify at this trial,

11     would you hold that against him in any way?

12             JUROR:  No, I would not.

13             THE COURT:  Is there anything about the

14     length of the trial that poses a hardship for you?

15             JUROR:  No.

16             THE COURT:  Any follow-up questions,

17     Counsel?

18             MR. HENNING:  Ma'am, there's a couple of

19     spots here that ask for your place of birth.  Are

20     you originally from here?

21             JUROR:  No, Bronx, New York.

22             MR. HENNING:  Bronx, New York.  The

23     Presentation Rehab facility, it says -- I can't

24     quite read what you do for a job.

25             JUROR:  A nurse.

130

1              MR. HENNING:  A nurse?

2              JUROR:  Um-hmm.

3              MR. HENNING:  Is there a particular type

4        of patient that you work with or a particular

5        unit?

6              JUROR:  Rehab.

7              MR. HENNING:  Is it rehab for traumatic

8        injuries or?

9              JUROR:  Traumatic, hip surgeries, knee

10       surgeries, yeah.  Strokes.

11             MR. HENNING:  And it lists that you have

12       an 11-year-old child.

13             JUROR:  Yes.

14             MR. HENNING:  Is it a boy or a girl?

15             JUROR:  Girl.

16             MR. HENNING:  Is she able to take care

17       of herself if you were doing jury duty?

18             JUROR:  My 24-year-old and my boyfriend

19       help.

20             MR. HENNING:  Nothing further.

21             THE COURT:  Ms. Scapicchio?

22             MS. SCAPICCHIO:  You indicated that

23       you're divorced?

24             JUROR:  Yes.

25             MS. SCAPICCHIO:  What did your spouse

131

1          do when you were married?

2                    JUROR:  Navy.

3                    MS. SCAPICCHIO:  He was in the Navy.

4                    JUROR:  Navy, just retired, yes.

5                    MR. HENNING:  So were you stationed like

6          all over the place traveling around?

7                    JUROR:  Except for out of the country.

8          The last place we were stationed in Georgia and

9          Yuma, Arizona.

10                   MS. SCAPICCHIO:  And those are all three

11         or four month commitments and then you moved on?

12                   JUROR:  Well, a year to two years.

13                   MS. SCAPICCHIO:  A year to two years,

14         okay.  I don't have any further questions, thank

15         you.

16                   THE COURT:  Ma'am, if you could step

17         outside for just a moment, please.

18    (Juror Number 47 exits courtroom.)

19                   THE COURT:  This juror stands

20         indifferent.

21                   MR. HENNING:  Commonwealth is content.

22                   MS. SCAPICCHIO:  Defendant is content.

23                   THE CLERK:   Seat 5.

24    (Juror Number 47 enters courtroom.)

25                   THE COURT:  Ma'am, you've been chosen

132

1          to be a juror on this case.  You're going to go

2          upstairs and join the other impaneled jurors.

3          Please don't discuss this case among yourselves or

4          allow anyone to discuss it with you, all right?

5                          JUROR:  Okay.

6                          THE COURT:  Thank you, ma'am.

7     Juror Number 47 exits courtroom.).

8                          THE COURT:  Do you want to take a break,

9          five-minute break?  Five-minute humanitarian

10         break?

11                         Five-minute humanitarian break.

12    (Court in recess at 11:30 a.m.)

13    (Court in session at 11:40 a.m.)

14                         THE COURT:  All right, we're up to

15         number 50.

16                         COURT OFFICER:  5-0?

17                         THE COURT:  5-0.

18    (Juror Number 50 enters courtroom.)

19                         THE CLERK:  Juror 50, Christopher

20         Cintron.

21                         JUROR:  Present.

22                         THE COURT:  Hi, Mr. Cintron.

23                         JUROR:  How are you doing?

24                         THE COURT:  Sir, is there anything about

25         the nature of these charges or any of the

133

1          allegations you've heard that might affect your

2          ability to be fair and impartial?

3                    JUROR:  No.

4                    THE COURT:  You may hear alleged

5          evidence that the defendant, the alleged victim,

6          and some of the witnesses were involved in selling

7          marijuana.  Would that evidence affect your

8          ability to be fair and impartial?

9                    JUROR:  No.

10                    THE COURT:  The defendant in a criminal

11          trial has the absolute right not to testify.  If

12          Mr. Reddicks chose not to testify at this trial,

13          would you hold that against him in any way?

14                    JUROR:  No, I wouldn't.

15                    THE COURT:  Is there anything about the

16          length of the trial that poses a hardship for you?

17                    JUROR:  No.

18                    THE COURT:  Any follow-up questions,

19          Counsel?

20                    MR. HENNING:  It says student here and

21          the last grade you finished was 12th grade.

22                    JUROR:  Yes.

23                    MR. HENNING:  Where was that?

24                    JUROR:  North Cambridge Catholic High

25          School.

134

1              MR. HENNING:  North Cambridge Catholic

2         High School?

3              JUROR:  Yeah.

4              MR. HENNING:  And have you ever worked

5         anyplace prior to Enterprise since you've

6         graduated from high school?

7              JUROR:  Yeah, Price Rite.

8              MR. HENNING:  Price Rite?

9              JUROR:  Yeah.

10             MR. HENNING:  Nothing further.

11             MS. SCAPICCHIO:  When you worked for

12        Price Rite, what did you do for them?

13             JUROR:  Worked in the meat department.

14             MS. SCAPICCHIO:  In the meat department.

15        Like in the meat room cutting meat and stuff?

16             JUROR:  No, I just stocked the shelves.

17             MS. SCAPICCHIO:  When you went to school

18        at North Cambridge Catholic High School?

19             JUROR:  Yes.

20             MS. SCAPICCHIO:  Did you play any sports

21        while you were there?

22             JUROR:  Yes, I played basketball.

23             MS. SCAPICCHIO:  Basketball.  And how

24        did your team do?

25             JUROR:  We did, we had good and bad

135

1          years, both sides of the --
2                    MS. SCAPICCHIO:  And you played all four
3          years?
4                    JUROR:  I played three.
5                    MS. SCAPICCHIO:  Okay, great.  Thank
6          you.
7                    THE COURT:  Sir, if you could step
8          outside for just a second, please.
9     (Juror Number 50 exits courtroom.)
10                   THE COURT:  This juror stands
11         indifferent.
12                   MR. HENNING:  Commonwealth is going to
13         exercise a peremptory.
14    (Juror Number 50 enters courtroom.)
15                   THE COURT:  Thank you, sir, you are
16         excused.
17                   THE CLERK:  Excused.
18    (Juror Number 50, excused.)
19    (Juror Number 52 enters courtroom.)
20                   THE CLERK:  52, Matthew Fillion.
21                   THE COURT:  Hi, Mr. Fillion.
22                   JUROR:  Hi.
23                   THE COURT:  You answered two of my
24         earlier questions.  Would you have the tendency to
25         believe the testimony of a police officer witness

136

1          over that of a civilian witness just because he or

2          she were a police officer?

3               JUROR:  Yes.

4               THE COURT:  Thank you, sir, you are

5          excused.

6               THE CLERK:  Excused.

7     (Juror Number 52, excused.)

8     (Juror Number 54 enters courtroom.)

9               THE CLERK:  54.  Juror 54, Meaghan Lyon.

10               JUROR:  Yes.

11               THE COURT:  Hi, Ms. Lyon.

12               JUROR:  Hi.

13               THE COURT:  Ma'am, is there anything

14          about the nature of these charges or any of the

15          allegations you've heard that might affect your

16          ability to be fair and impartial?

17               JUROR:  I don't think so, no.

18               THE COURT:  Great.  You may hear alleged

19          evidence that the defendant, the alleged victim,

20          and some of the witnesses were involved in selling

21          marijuana.  Would that evidence affect your

22          ability to be fair and impartial?

23               JUROR:  No.

24               THE COURT:  The defendant in a criminal

25          trial has the absolute right not to testify.  If

137

1          Mr. Reddicks chose not to testify at this trial,
2          would you hold that against him in any way?
3                    JUROR:  No.
4                    THE COURT:  Is there anything about the
5          length of the trial that poses a hardship for you?
6                    JUROR:  A little bit, yes.
7                    THE COURT:  What is that?
8                    JUROR:  I have a business trip.
9                    THE COURT:  What kind of business trip
10         are we talking about?
11                   JUROR:  A partnership dealing with my
12         company.
13                   THE COURT:  You're the director of
14         marketing, yes?
15                   JUROR:  Yes.
16                   THE COURT:  When is this business trip?
17                   JUROR:  Tonight through Friday.
18                   THE COURT:  Of next week.
19                   JUROR:  Of this week.
20                   THE COURT:  Oh, so it's just a three day
21         business -- is it something that can be postponed
22         or is it something that somebody else can cover
23         for you?
24                   JUROR:  I would just have to be absent.
25                   THE COURT:  From the meeting.

138

1              JUROR:  Yes.

2              THE COURT:  So other people from your

3     company could attend?

4              JUROR:  Yes.

5              THE COURT:  And the meeting could go on

6     in your absence?

7              JUROR:  Yes, I think so.

8              THE COURT:  Without any detriment to

9     your employer, it could go on?

10             JUROR:  I guess so, kind of.

11             THE COURT:  Please understand, I don't

12    want to make life hard for you, but I can't

13    necessarily assess that as a hardship.  All right?

14             JUROR:  Okay.

15             THE COURT:  If you can say that the

16    meeting can go on without you, then I can't excuse

17    you because of that.  All right?  I hope you

18    understand.

19             JUROR:  I do.

20             THE COURT:  That's my decision.  Any

21    follow-up questions?

22             MR. HENNING:  You got a BUSINESS in

23    marketing, it says.  Where was that?

24             JUROR:  Bentley.

25             MR. HENNING:  And you were born in

139

1        Maine?

2                    JUROR:  Yes.

3                    MR. HENNING:  When did you come to

4        Massachusetts?

5                    JUROR:  When I went to Bentley, so 2007.

6                    MR. HENNING:  I have nothing further.

7                    MS. SCAPICCHIO:  I have a few questions.

8        You indicated that your half-brother is a police

9        officer?

10                    JUROR:  Um-hmm.

11                    MS. SCAPICCHIO:  Where does he work?

12                    JUROR:  In Oregon.

13                    MS. SCAPICCHIO:  In Oregon, okay.  Does

14        the fact that your brother is a police officer,

15        when you're evaluating a police officer's

16        testimony, would that give an edge to the police

17        officers because of your brother's job?

18                    JUROR:  I don't think so, I don't know

19        him that well.

20                    MS. SCAPICCHIO:  You say you don't think

21        so.  Do you discuss cases with him at all?  How

22        often do you see him?

23                    JUROR:  Very rarely, twice ever.

24                    MS. SCAPICCHIO:  Okay, and then you said

25        you uncle is a lawyer in real estate?

140

```
1            JUROR:  Yes.

2            MS. SCAPICCHIO:  Is that here in

3      Massachusetts or somewhere else?

4            JUROR:  Also in Oregon.

5            MS. SCAPICCHIO:  Also in Oregon, okay.

6      And then you indicated at some point that you have

7      this meeting that's supposed to go from today

8      through Friday, and you've indicated -- is there

9      someone that's directly under you that you could

10     call and make sure that the meeting is going to go

11     off without a hitch or is it something that would

12     ultimately, if you don't show up, the partners are

13     going to notice?

14           THE COURT:  Can you step outside for

15     just a second, please?

16  (Juror Number 54 exits courtroom.)

17           THE COURT:  Ms. Scapicchio, this is

18     where I'm going to have to draw the line.

19     Hardship determination is my province.  You're

20     handing her up on a silver platter a reason to

21     weasel out of jury service just because of the way

22     you're putting it.

23           MS. SCAPICCHIO:  I'm not looking for her

24     to weasel out of anything, Judge.  What I'm doing

25     is she said things that were very unequivocal or
```

141

1          equivocal in terms of, "I think so, I hope so,
2          I guess so."  I'm trying to get her to say yes,
3          it would, because --
4                    THE COURT:  Yes, it would what?
5                    MS. SCAPICCHIO:  Yes, it would or no, it
6          -- yes, somebody could take over and it wouldn't
7          be a problem.
8                    THE COURT:  She told me that she could,
9          that's why I follow up.  Hardship determination is
10         my province.  And may I also point out, women do
11         that all the time, they put qualifiers on, and
12         that's a very honest answer, "I think, I believe."
13         They do it a lot more than men.  Lots of studies
14         show that.  That doesn't make it an equivocal
15         answer, it's just the way women talk, "I believe,
16         I think."  So is there some concern you have?
17         I mean, all the answers she gave me about
18         hardship, that's why I follow up on it.
19                   MS. SCAPICCHIO:  I was just trying to
20         get her to say yes or no, Judge, so the record is
21         clear.
22                   THE COURT:  Yes or no to what?
23                   MS. SCAPICCHIO:  Yes or no as to whether
24         or not this is going to affect her ability to be
25         able to sit here and listen to the evidence.

142

1              THE COURT:  That's the kind of question

2        where she's going to say, you're giving her a

3        perfect out, and that's not fair that you're

4        handing her up a way to say, oh, yeah, it's going

5        to bother me.  I've asked her, can somebody take

6        over for her, and she said yes.  I'll put that

7        question to her again if you want me to.

8              MS. SCAPICCHIO:  I just want to make

9        sure it's not going to be distracting.  She

10       brought a giant suitcase in for jury duty?

11       I don't know what she's doing with the giant

12       suitcase, but it seems like she's got a lot going

13       on.  I'm just trying to make sure that once, if

14       we're going to put her in that box, that she's

15       going to be able to concentrate on this case,

16       Judge, and not be worried about someone trying to

17       take her place for three days in a conference with

18       partners.

19              THE COURT:  All right.

20              MS. SCAPICCHIO:  That's what I'm worried

21       about.

22              THE COURT:  Bring her back in.

23   (Juror Number 54 enters courtroom.)

24              THE COURT:  Hi, Ms. Lyon.  I just want

25       to put it to you again -- have a seat, please.

143

1          How many people from your firm are going to go to
2          this conference?
3                    JUROR:  Five to ten.  I'm not sure of
4          the number.
5                    THE COURT:  Will other people from the
6          marketing department go?
7                    JUROR:  My subordinates will go.
8                    THE COURT:  So it is something that can
9          go on in your absence?
10                   JUROR:  Yeah, we just won't have the
11         head of marketing, that's the only difference.
12                   THE COURT:  Which would be preferable,
13         I understand, but that conference can continue and
14         take place in your absence.
15                   JUROR:  Yes.
16                   THE COURT:  Anything else,
17         Ms. Scapicchio?
18                   MS. SCAPICCHIO:  There was one more
19         indication on your jury questionnaire that
20         I wanted to ask you a question about, and it's
21         certainly not to embarrass you, but you indicate
22         you got a citation for underage drinking in 2009?
23                   JUROR:  Um-hmm.
24                   MS. SCAPICCHIO:  Is that when you were
25         at Bentley?

144

```
 1                    JUROR:  It was in the state of Maine,
 2          but yes, I was attending Bentley.
 3                    MS. SCAPICCHIO:  Were you treated fairly
 4          by the District Attorney's Office and by whatever
 5          lawyer represented you at the time during that?
 6                    JUROR:  It was just a civil citation, so
 7          I didn't have, I had like a public defender or
 8          something, I didn't have a lawyer.
 9                    MS. SCAPICCHIO:  But you were treated
10          fairly by the public defender and fairly by the
11          District Attorney's Office?
12                    JUROR:  I think so, yes.
13                    MS. SCAPICCHIO:  Okay, and the case got
14          resolved.
15                    JUROR:  Yes.
16                    MS. SCAPICCHIO:  Great, thank you.
17                    THE COURT:  Ma'am, if you could step
18          outside for just a second.
19       (Juror Number 54 exits courtroom.)
20                    THE COURT:  This juror stands
21          indifferent.
22                    MR. HENNING:  Commonwealth is content.
23                    MS. SCAPICCHIO:  Defendant would
24          challenge.
25       (Juror Number 54 enters courtroom.)
```

145

```
1              THE COURT:  Thank you, ma'am, you are
2         excused.
3              THE CLERK:  Excused.
4    (Juror Number 54, excused.)
5    (Juror Number 55 enters courtroom.)
6              THE CLERK:  Juror 55, Robert Diaz.
7              JUROR:  Yes.
8              THE COURT:  Hi, Mr. Diaz.  You answered
9         one of my earlier questions.  Would you have the
10        tendency to believe the testimony of a police
11        officer witness over that of a civilian witness
12        just because he or she were a police officer?
13             JUROR:  Yes.
14             THE COURT:  Thank you, sir, you are
15        excused.
16             THE CLERK:  Excused.
17   (Juror Number 55, excused.)
18   (Juror Number 56 enters courtroom.)
19             THE CLERK:  Juror 56, Mangel Zhu.
20             THE COURT:  Hi, Mr. Zhu.  Sir, is there
21        anything about the nature of these charges or any
22        of the allegations you've heard that might affect
23        your ability to be fair and impartial?
24             JUROR:  Not particularly.
25             THE COURT:  Not particularly?
```

146

1              JUROR:  No.

2              THE COURT:  Now, you may hear alleged

3       evidence that the defendant, the alleged victim,

4       and some of the witnesses were involved in selling

5       marijuana.  Would that evidence affect your

6       ability to be fair and impartial?

7              JUROR:  No.

8              THE COURT:  The defendant in a criminal

9       trial has the absolute right not to testify.  If

10      Mr. Reddicks decided not to testify at this trial,

11      would you hold that against him in any way?

12             JUROR:  Would you repeat that?  Sorry.

13             THE COURT:  Sure, of course.  The

14      defendant in a criminal trial has the absolute

15      right not to testify.  If Mr. Reddicks chose not

16      to testify at this trial, would you hold that

17      against him in any way?

18             JUROR:  No.

19             THE COURT:  Is there anything about the

20      length of the trial that poses a hardship for you?

21             JUROR:  You said nine days, about?

22             THE COURT:  Approximately.  It could be

23      less than that, it could be more than that.

24             JUROR:  No.

25             THE COURT:  Any follow-up questions?

147

1           MR. HENNING:  No, I have no follow-up
2     questions.
3           MS. SCAPICCHIO:  I have a few.  How are
4     you doing?  Where did you go to college?
5           JUROR:  BASED UPON.
6           MS. SCAPICCHIO:  And what year did you
7     graduate?
8           JUROR:  2014.
9           MS. SCAPICCHIO:  2014, okay.  What did
10    you major in?
11          JUROR:  Information systems and
12    operations.
13          MS. SCAPICCHIO:  I'm sorry, say that
14    again?
15          JUROR:  Information systems and
16    operations.
17          MS. SCAPICCHIO:  You've indicated when
18    the Judge asked you whether or not there was
19    anything about the charges that would concern you,
20    you said not particularly.  What did you mean by
21    that?
22          JUROR:  Was that question two?
23          MS. SCAPICCHIO:  I'm sorry?
24          JUROR:  What question number was that
25    when she asked me that?

148

```
1              MS. SCAPICCHIO:  That was the very first
2       question that she asked you.
3              THE COURT:  I asked is there anything
4       about the nature of these charges or any of the
5       allegations that you've heard that might affect
6       your ability to be fair and impartial.
7              MS. SCAPICCHIO:  And you said not
8       particularly.  I'm just trying to follow up, what
9       does that mean, not particularly?  Is there one
10      charge that you might be more concerned about than
11      the other?
12             JUROR:  No.
13             MS. SCAPICCHIO:  So why did you answer
14      not particularly?
15             JUROR:  I feel really indifferent.
16             MS. SCAPICCHIO:  You feel really
17      indifferent.
18             JUROR:  Yeah.
19             MS. SCAPICCHIO:  And then the other
20      concern I had is that when the Judge asked you
21      about Mr. Reddicks not testifying, you hesitated a
22      minute.  Were you just thinking about your answer
23      or do have some concern in your head?
24             JUROR:  I wasn't really paying
25      attention, to be honest.
```

149

1          MS. SCAPICCHIO:  You weren't paying
2     attention.
3          THE COURT:  Let me put the question to
4     you again.  This is a very important issue.  The
5     defendant in a criminal trial has the absolute
6     right not to testify because the entire burden of
7     proof in this case is on the prosecution.  The
8     defendant doesn't have to say a word.
9          JUROR:  Right.
10          THE COURT:  If Mr. Reddicks chose not to
11     testify at this trial, would you hold that against
12     him in any way?
13          JUROR:  No, since he doesn't have to.
14          THE COURT:  What?
15          JUROR:  No, since he doesn't have to.
16          THE COURT:  Exactly.  He has no
17     obligation.  Everything is on the shoulders of
18     the prosecution, the entire burden of proof is on
19     them.  Do you understand that bedrock
20     constitutional principle?
21          JUROR:  Yeah.
22          THE COURT:  Is that a yes?
23          JUROR:  Yeah.
24          THE COURT:  Ms. Scapicchio, anything
25     further?

150

1           MS. SCAPICCHIO:  I don't have any
2       follow-up, thank you, Your Honor.
3           THE COURT:  Thank you, sir, if you could
4       step out, please, for a second.
5   (Juror Number 56 exits courtroom.)
6           THE COURT:  This juror stands
7       indifferent.
8           MR. HENNING:  Judge, the Commonwealth is
9       going to ask you to excuse the juror for cause.
10      Since he came into the room, he was in here
11      probably four minutes, he was laughing the whole
12      time, which I understand sometimes is a reaction
13      to nervousness, but he did admit that he wasn't
14      paying attention to at least two of the questions.
15          And I do have concerns about whether or
16      not he'd be able to pay attention as a juror,
17      either because he doesn't understand the value of
18      the case or because he doesn't understand what's
19      going on.  So I'm going to ask you to reconsider.
20          MS. SCAPICCHIO:  Judge, I would join
21      because I have some serious concerns about him not
22      paying attention to four questions.
23          THE COURT:  I'm going to bring him back
24      in and put it to him.
25  (Juror Number 56 enters courtroom.)

151

1            THE COURT:  Mr. Zhu, when you came in
2      before, you had a smile on your face from time to
3      time and you also said to me you weren't paying
4      attention to some of my questions.  Are you having
5      a hard time focusing on this?
6            JUROR:  No.
7            THE COURT:  Can you explain to me, you
8      know, why you're smiling?  Is it from nervousness
9      or what is it from?
10           JUROR:  I couldn't tell you.
11           THE COURT:  Are you taking this
12      seriously, sir?
13           JUROR:  Not really.
14           THE COURT:  Why not, sir?
15           JUROR:  I really don't want to be here
16      to be honest.
17           THE COURT:  Mr. Zhu, that's one of the
18      most disheartening things I've heard coming out of
19      a potential juror's mouth.  I'm ashamed of you to
20      come in here and make a laughing stock of this?
21      This man is on trial for murder and you come in
22      here with a smile on your face and telling me, oh,
23      I just don't want to?  I don't appreciate your
24      attitude, I don't appreciate your unwillingness to
25      focus on this important task.  You are excused,

152

```
 1          sir, but please have those words ringing in your
 2          ears, how ashamed I am of you and how you have
 3          approached this important civic duty.  Next time
 4          maybe, sir, you can take this a little bit more
 5          seriously.  Get out of here, please.
 6     (Juror Number 56, excused.)
 7     (Juror Number 60 enters courtroom.)
 8               THE CLERK:  Juror 60, Paul Langat.
 9               THE COURT:  Good morning, sir.
10               JUROR:  Good morning.
11               THE COURT:  Sir, is there anything about
12          the nature of these charges or any of the
13          allegations you've heard that might affect your
14          ability to be fair and impartial?
15               JUROR:  No.
16               THE COURT:  You may hear alleged
17          evidence that the defendant, the alleged victim,
18          and some of the witnesses were involved in selling
19          marijuana.  Would that evidence affect your
20          ability to be fair and impartial?
21               JUROR:  No.
22               THE COURT:  The defendant in a criminal
23          trial has the absolute right not to testify.  If
24          Mr. Reddicks chose not to testify at this trial,
25          would you hold that against him in any way?
```

153

1              JUROR:  No.

2              THE COURT:  Is there anything about the

3       length of the trial that poses a hardship for you?

4              JUROR:  No.

5              THE COURT:  Any follow-up questions,

6       Counsel?

7              MR. HENNING:  Sir, the questionnaire

8       asks you for your place of birth.  Where were you

9       born?

10             JUROR:  I was born in Kenya.

11             MR. HENNING:  When did you come to the

12      United States?

13             JUROR:  2007, around September, 2007.

14             MR. HENNING:  It says that you completed

15      college; is that right?

16             JUROR:  Correct.

17             MR. HENNING:  Was that in the United

18      States or in Kenya?

19             JUROR:  Bunker Hill.

20             MR. HENNING:  Bunker Hill?  How long

21      have you been working for Secure America?

22             JUROR:  I have been with Secure America

23      immediately when I got to this country, 2007,

24      around October, but also now, I'm working as an

25      RN.

154

1              MR. HENNING:  As an RN?

2              JUROR:  Correct.

3              MR. HENNING:  Can you tell us a little

4       bit about the RN job?

5              JUROR:  I work with a Jewish foundation

6       where I take care of long-term patients.

7              MR. HENNING:  Long-term health care

8       patients?

9              JUROR:  Long-term health care patients,

10      correct.

11             MR. HENNING:  Does that mean older

12      patients?

13             JUROR:  Yeah, older patients and

14      patients with dementia and Alzheimer's.

15             MR. HENNING:  I have nothing further.

16             MS. SCAPICCHIO:  Hi, how are you?  When

17      you worked as a security officer for Secure

18      America, what types of things did you do?

19             JUROR:  Access control.

20             MS. SCAPICCHIO:  What does that mean?

21             JUROR:  I usually make sure that the

22      people who come to the building are authorized to

23      be in the building.  If they are not authorized,

24      I have to call the tenant or the clients to make

25      sure that they are all set to proceed.

155

1                MS. SCAPICCHIO:  So they would have to

2         pass by you in order to get access to the

3         building.

4                JUROR:  Correct.

5                MS. SCAPICCHIO:  If somebody didn't have

6         authority and they didn't want to leave, would you

7         be the person who would call the police?

8                JUROR:  I usually call my manager.  I'm

9         not the final person who can --

10               MS. SCAPICCHIO:  So the manager then

11        would call the police.

12               JUROR:  Yeah, yeah.

13               MS. SCAPICCHIO:  How many times do you

14        think in the course since 2007 -- when did you

15        leave that job or are you still there?

16               JUROR:  I'm still there.

17               MS. SCAPICCHIO:  Okay, from 2007 to now,

18        how many times do you think you needed to call the

19        police to assist in removing someone who didn't

20        belong there?

21               JUROR:  Around five percent.  The

22        incidents that I've seen is very minimal.

23               MS. SCAPICCHIO:  Okay, and then when the

24        police come, do you have interaction with them

25        where you give them a statement about what

156

1          happened?

2                    JUROR:  No, I usually call -- if I am

3          the person who faced the incident, just like if

4          I was there when that incident happened and I'm

5          the witness, yeah, I have to give them a report.

6          But in most cases, the manager usually is with me.

7                    MS. SCAPICCHIO:  And that interaction

8          that you had with the police, what police

9          department is that?

10                   JUROR:  I'm actually at 11 Federal

11         Street in Boston.

12                   MS. SCAPICCHIO:  So would it be the

13         Boston Police Department that you would call?

14                   JUROR:  It would be Boston.

15                   MS. SCAPICCHIO:  And they would come and

16         respond?

17                   JUROR:  Yeah.

18                   MS. SCAPICCHIO:  Given that you have

19         this interaction through your job with the Boston

20         Police Department, if a police officer was

21         testifying and a civilian witness testified to

22         something different, would you give the edge to

23         the police officer because of your job and your

24         interaction with them in terms of calling them?

25                   JUROR:  No.

157

```
 1              MS. SCAPICCHIO:  Thank you.
 2              THE COURT:  Sir, if you could step
 3         outside for just a second, please.
 4    (Juror Number 60 exits courtroom.)
 5              THE COURT:  This juror stands
 6         indifferent.
 7              MR. HENNING:  Commonwealth is content.
 8              MS. SCAPICCHIO:  Defendant is content.
 9    (Juror Number 60 enters courtroom.)
10              THE COURT:  Sir, you've been chosen to
11         be a juror on this case.  You're going to be taken
12         upstairs and join the other jurors who have been
13         impaneled.  I'm just going to ask that you not
14         discuss this case among yourselves or allow anyone
15         to discuss any aspect of this case with you.
16              Thank you, sir, if you could go with the
17         Court Officer, please.
18              THE CLERK:  Seat 6.
19    (Juror Number 60 exits courtroom.)
20    (Juror Number 61 enters courtroom.)
21              THE CLERK:  Juror 61, Christopher
22         Freire.
23              THE COURT:  Mr. Freire, you answered one
24         of my earlier questions, and I believe it's
25         reflected in your response at the bottom of the
```

158

1          questionnaire, "my religious belief as a Christian

2          of not putting judgment on others."  So you

3          cannot, because of your religious beliefs, you

4          are not allowed to sit in judgment on others.

5                    JUROR:  Yes.

6                    THE COURT:  Thank you, sir, you are

7          excused.

8                    THE CLERK:  Excused.

9     (Juror Number 61, excused.)

10    (Juror Number 62 enters courtroom.)

11                   THE CLERK:  Juror 62, Wilgie Augustin?

12                   JUROR:  Yes, sir.

13                   THE COURT:  Good morning, sir.

14                   JUROR:  Good morning, Your Honor.

15                   THE COURT:  Is there anything about the

16         nature of these charges or any of the allegations

17         you've heard that might affect your ability to be

18         fair and impartial?

19                   JUROR:  Can you repeat that question,

20         please?

21                   THE COURT:  Of course.  Is there

22         anything about the nature of the charges against

23         Mr. Reddicks or any of the allegations you've

24         heard so far today that might affect your ability

25         to be fair and impartial in this case?

159

1              JUROR:  No, Your Honor.

2              THE COURT:  You may hear alleged

3      evidence that the defendant, the alleged victim,

4      and some of the witnesses were involved in selling

5      marijuana.  Would that evidence affect your

6      ability to be fair and impartial?

7              JUROR:  No, Your Honor.

8              THE COURT:  The defendant in a criminal

9      trial has the absolute right not to testify.  If

10     Mr. Reddicks chose not to testify at this trial,

11     would you hold that against him in any way?

12             JUROR:  Can you please -- I'm trying to

13     perceive that.

14             THE COURT:  That's quite all right.  The

15     defendant in a criminal trial has the absolute

16     right not to testify because the entire burden of

17     proof is on the Commonwealth.  He doesn't have to

18     say a word.  If Mr. Reddicks chose not to testify

19     at this trial, would you hold that against him in

20     any way?

21             JUROR:  No, Your Honor.

22             THE COURT:  Is there anything about the

23     length of the trial that poses a hardship for you?

24             JUROR:  Repeat that again, Your Honor,

25     please?

160

```
 1                    THE COURT:  Sure.  The acoustics in this
 2          room are such and the wind is howling out there,
 3          so I'll speak up.  Is there anything about the
 4          length of the trial that poses a hardship for you?
 5                    JUROR:  No, Your Honor.
 6                    THE COURT:  Any follow-up questions,
 7     Counsel?
 8                    MR. HENNING:  Good morning, sir.
 9                    JUROR:  Good morning, Counsel.
10                    MR. HENNING:  It says you got an
11     associate's degree.  Where did you get the
12     associate's degree?
13                    JUROR:  Roxbury Community College.
14                    MR. HENNING:  Is there a particular
15     focus of the degree?
16                    JUROR:  Yes, musical arts.
17                    MR. HENNING:  Musical arts?
18                    JUROR:  Yes.
19                    MR. HENNING:  Do you play an instrument?
20                    JUROR:  Yes.
21                    MR. HENNING:  Which instrument do you
22     play?
23                    JUROR:  Piano and keyboard.
24                    MR. HENNING:  Do you still play?
25                    JUROR:  Yes, I do.
```

161

1              MR. HENNING:  The security job that you

2       have here, how long have you been working at it?

3              JUROR:  More than five months.

4              MR. HENNING:  More than five months?

5              JUROR:  Yes, Counsel.

6              MR. HENNING:  And the three-year-old

7       child that you have, is it a boy or a girl?

8              JUROR:  Boy, Counsel.

9              MR. HENNING:  Are you responsible for

10      the child primarily?

11             JUROR:  The child does not live with

12      father, Counsel.

13             MR. HENNING:  I have nothing further.

14             THE COURT:  Ms. Scapicchio.

15             MS. SCAPICCHIO:  How are you?

16             JUROR:  Good morning, ma'am.

17             MS. SCAPICCHIO:  It indicates that you

18      work as a security officer?

19             JUROR:  Yes, ma'am.

20             MS. SCAPICCHIO:  What specifically do

21      you do?  Is it a building, is it a store?

22             JUROR:  Over at Walgreens.

23             MS. SCAPICCHIO:  Over at Walgreens.

24             JUROR:  Yes.

25             MS. SCAPICCHIO:  So are you a person who

162

```
 1          would look for people that might be shoplifting or
 2          anything like that?
 3                   JUROR:  Possibly, but only just to make
 4          sure that safety and public safety matters are
 5          safely measured in the facility of Walgreens,
 6          making sure people don't slip and fall, that's a
 7          public safety issue, and we're making sure that
 8          shelves are not too empty, although I don't work
 9          for Walgreens, but I work in Walgreens.
10                   MS. SCAPICCHIO:  So you're a private
11          security company that Walgreens hired to --
12                   JUROR:  Yes.
13                   MS. SCAPICCHIO:  You're not an employee
14          of Walgreens, you're an employee of the security
15          company.
16                   JUROR:  Yes, correct, yes.
17                   MS. SCAPICCHIO:  Is one of your jobs to
18          watch people to see whether or not they're taking
19          items without paying for them?
20                   JUROR:  Yes.
21                   MS. SCAPICCHIO:  How often do you engage
22          in that type of activity?
23                   JUROR:  I engage in it at the moment
24          that I step in, the moment that I clock in.
25                   MS. SCAPICCHIO:  And when you find
```

163

1          somebody who may have taken something or you think

2          someone has taken something without paying for it,

3          do you detain them in some way?

4                    JUROR:  To professionally answer that

5          question, ma'am, I don't have the right to

6          approach someone say, are you stealing.  I have

7          just the right to observe and do, to the best of

8          my knowledge, the best that I can.  If any other

9          thing furthers that Walgreens would like to take

10         kind of verbally, I would be pulled to the side

11         and possibly write a report or possibly not write

12         a report.

13                   MS. SCAPICCHIO:  But you wouldn't

14         actually stop the customer from leaving the store.

15                   JUROR:  No, because that is currently

16         not my job to stop.

17                   MS. SCAPICCHIO:  So there are other

18         people who actually stop the customer.

19                   JUROR:  Well, to professionally answer

20         that question, from the time that I've worked at

21         Walgreens, it's only about people coming in and

22         people buying.  The other hand is that, you know,

23         when someone steals, your job is to observe them,

24         you know, to watch what they take and so forth.

25                   MS. SCAPICCHIO:  Okay, so --

164

```
1                JUROR:  But, you know, correct.  Go
2           ahead, please, I'm sorry.
3                MS. SCAPICCHIO:  Are you done? I'm
4           sorry, I didn't mean to interrupt.
5                JUROR:  Yes, I am, yes.
6                MS. SCAPICCHIO:  So is part of your job,
7           when you say you write a report, do you turn that
8           over to the police department?
9                JUROR:  No.
10               MS. SCAPICCHIO:  Where does that report
11          go, just to Walgreens?
12               JUROR:  Yes.
13               MS. SCAPICCHIO:  And as part of your
14          job, did you ever have to go to court and be a
15          witness to testify against anyone that you may
16          have stopped or --
17               JUROR:  No, ma'am.
18               MS. SCAPICCHIO:  Did you have to
19          interact with the police at all in terms of what
20          your observations were?
21               JUROR:  No, ma'am.
22               MS. SCAPICCHIO:  Okay, and how many
23          times would you say you had to write reports about
24          people that you thought were, in your opinion,
25          based on your profession, that you thought were
```

165

1              taking things that they weren't paying for?

2                        JUROR:  Zero.

3                        MS. SCAPICCHIO:  None.

4                        JUROR:  Yes.

5                        MS. SCAPICCHIO:  And then is there any

6            other job that you do in terms of any type of

7            credit card fraud or anything like that?

8                        JUROR:  No, ma'am.

9                        MS. SCAPICCHIO:  Okay, so it's just

10           observations.

11                       JUROR:  Yes.

12                       MS. SCAPICCHIO:  Thank you.

13                       THE COURT:  Sir, could you step outside

14           for just a second, please.

15                       JUROR:  Yes, Your Honor.

16      (Juror Number 62 exits courtroom.)

17                       THE COURT:  This juror stands

18           indifferent.

19                       MR. HENNING:  Commonwealth is content.

20                       MS. SCAPICCHIO:  Defendant is content.

21                       THE CLERK:  Seat 7, Your Honor.

22      Juror Number 62 enters courtroom.)

23                       THE COURT:  Sir, you have been chosen to

24           be a juror on this case and you're going to be

25           taken upstairs to join your fellow jurors.  I'm

166

1          just going to ask that you not discuss any aspect

2          of this case with them, nor allow anyone to

3          discuss any aspect of this case with you.

4                    Thank you, sir, if you'll go with one of

5          the Court Officers, please.

6   (Juror Number 62 exits courtroom.)

7   (Juror Number 66 enters courtroom.)

8                    THE CLERK:  66, Gerard Tice?

9                    JUROR:  Yes.

10                   THE COURT:  Good morning, Mr. Tice.

11                   JUROR:  Good morning, Your Honor.

12                   THE COURT:  Sir, is there anything about

13         the nature of these charges or any of the

14         allegations you've heard that might affect your

15         ability to be fair and impartial?

16                   JUROR:  No.

17                   THE COURT:  You may hear alleged

18         evidence that the defendant, the alleged victim,

19         and some of the witnesses were involved in selling

20         marijuana.  Would that evidence affect your

21         ability to be fair and impartial?

22                   JUROR:  No.

23                   THE COURT:  The defendant in a criminal

24         trial has the absolute right not to testify.  If

25         Mr. Reddicks chose not to testify at this trial,

167

1          would you hold that against him in any way?

2                    JUROR:  No.

3                    THE COURT:  And finally, sir, is there

4          anything about the length of the trial that poses

5          a hardship for you?

6                    JUROR:  No.

7                    THE COURT:  And finally, Mr. Tice, you

8          forgot to put how old you were on your

9          questionnaire.

10                   JUROR:  I'm sorry, 53.

11                   THE COURT:  Great.  Any follow-up

12         questions, Counsel?

13                   MR. HENNING:  I have no questions for

14         you, sir.

15                   MS. SCAPICCHIO:  I have a few.

16                   JUROR:  Sure.

17                   MS. SCAPICCHIO:  So you are an executive

18         chef for Omni Hotels?

19                   JUROR:  Yes.

20                   MS. SCAPICCHIO:  Do you work in just one

21         specific restaurant?

22                   JUROR:  The Parker House across the

23         street.

24                   MS. SCAPICCHIO:  The Parker House, okay,

25         and how long have you worked for the Parker House?

168

1                    JUROR:  15 years.

2                    MS. SCAPICCHIO:  Always in the position

3          of executive chef?

4                    JUROR:  Yes.

5                    MS. SCAPICCHIO:  It also indicates that

6          your father was a policeman?

7                    JUROR:  My father was a policeman, yeah,

8          Boston Police.

9                    MS. SCAPICCHIO:  Can you tell me which

10         Police Department he worked for?

11                   JUROR:  He worked at Headquarters for

12         36 years.

13                   MS. SCAPICCHIO:  Boston Police

14         Department?

15                   JUROR:  Yes, he's deceased.

16                   MS. SCAPICCHIO:  I'm sorry to hear that,

17         sir.  Your father, did you ever have the occasion

18         to discuss with him what was going on with his job

19         or anything like that?

20                   JUROR:  No, he always left work at work

21         and home at home.

22                   MS. SCAPICCHIO:  Okay.  Your brother was

23         an immigration officer?

24                   JUROR:  Yes.

25                   MS. SCAPICCHIO:  The fact that your

169

1          father was a police officer for 37 years, all

2          things being equal, if a police officer testified

3          and a civilian witness testified, because of your

4          father's commitment to the Boston Police for 37

5          years, would you give the edge to the police

6          officer?

7                    JUROR:  No, not necessarily, no.

8                    MS. SCAPICCHIO:  Thank you, sir.

9                    JUROR:  You're welcome.

10                   THE COURT:  Sir, could you step outside

11         for just a moment, please.

12                   JUROR:  Sure.

13    (Juror Number 66 exits courtroom.)

14                   THE COURT:  This juror stands

15         indifferent.

16                   MR. HENNING:  Commonwealth is content.

17                   MS. SCAPICCHIO:  Defendant would

18         challenge.

19    (Juror Number 66 enters courtroom.)

20                   THE COURT:  Thank you, sir, you are

21         excused.

22                   THE CLERK:  Excused.

23    (Juror Number 66, excused.)

24    (Juror 74 enters courtroom.)

25                   THE CLERK:  Juror 74, Cathy Burger.

170

1            JUROR:  Here.

2            THE COURT:  Hi, Ms. Burger.  Ma'am, is

3     there anything about the nature of these charges

4     or any of the allegations you've heard that might

5     affect your ability to be fair and impartial?

6            JUROR:  No.

7            THE COURT:  You may hear alleged

8     evidence that the defendant, the alleged victim,

9     and some witnesses were involved in selling

10    marijuana.  Would that evidence affect your

11    ability to be fair and impartial?

12           JUROR:  No.

13           THE COURT:  The defendant in a criminal

14    trial has the absolute right not to testify.  If

15    Mr. Reddicks chose not to testify at that trial,

16    would you hold that against him in any way?

17           JUROR:  No.

18           THE COURT:  Is there anything about the

19    length of the trial that poses a hardship for you?

20           JUROR:  You said it was through next

21    week and into the following?

22           THE COURT:  And into the following week,

23    so roughly nine days.  It could be less than that,

24    it could be more than that.  I can't predict with

25    any kind of mathematical precision how long it's

171

1          going to be.  That's a rough estimation.

2                    JUROR:  It would impact my work

3          schedule, obviously, but is it really a hardship?

4          No.

5                    THE COURT:  I love hearing that.  Thank

6          you.  Any follow-up questions?

7                    MR. HENNING:  It lists here that you're

8          self-employed?

9                    JUROR:  Yes.

10                   MR. HENNING:  Can you describe the type

11         of work that you do?

12                   JUROR:  I do consulting and I'm an

13         independent contractor.

14                   MR. HENNING:  Are there particular types

15         of companies that you consult for or a specific

16         type of industry?

17                   JUROR:  Any, really, but primarily, I've

18         been working with healthcare pairs.  Tufts Health

19         Plan is my client right now.

20                   MR. HENNING:  The college that you went

21         to, where did you go?

22                   JUROR:  Northeastern University.

23                   MR. HENNING:  Did you graduate from

24         there?

25                   JUROR:  Yes.

172

1              MR. HENNING:  What was the degree in?

2              JUROR:  It was a bachelor of science in

3         management information systems.

4              MR. HENNING:  Down in the section here

5         for your husband, it says he works at Verite; is

6         that right?

7              JUROR:  Yes.

8              MR. HENNING:  What is that exactly?

9              JUROR:  They're a distribution company,

10        they are a subsidiary -- well, they're not a

11        subsidiary anymore, they're a separate company,

12        but work with International Paper, and they

13        deliver paper products around to companies.

14             MR. HENNING:  Thank you very much.

15             MS. SCAPICCHIO:  Hi, how are you?

16             JUROR:  Good.

17             MS. SCAPICCHIO:  It indicates you have

18        two children, 12 and 14?

19             JUROR:  Yes.

20             MS. SCAPICCHIO:  Are they able to get to

21        school and from school on their own --

22             JUROR:  Yes.

23             MS. SCAPICCHIO:  -- and you don't have

24        to worry about them not being able to get home on

25        their own.

173

1           JUROR:  That is correct, they come home

2     themselves, yes.

3           MS. SCAPICCHIO:  Great.  And then it

4     also indicates that your husband had been on a

5     jury a couple of times.  Is that regarding a theft

6     of a laptop or is that separate that you also

7     experienced a theft of a laptop?

8           JUROR:  Oh, yeah, our house, we were

9     doing a construction project, and while the

10     construction project was going on, we had some

11     laptop and jewelry stolen during that.  But his,

12     the jury thing, had nothing to do with that.

13           MS. SCAPICCHIO:  I just wasn't sure

14     because it seemed like it was two separate things,

15     but I just wanted to make sure.

16           JUROR:  It was two separate things, yes.

17           MS. SCAPICCHIO:  So when your laptop and

18     jewelry got stolen from your home in 2001, did you

19     fill out a police report?

20           JUROR:  Yes.

21           MS. SCAPICCHIO:  And contact the

22     insurance company?

23           JUROR:  Yes.

24           MS. SCAPICCHIO:  Did you ever figure

25     out -- did anyone ever get arrested?

174

```
 1              JUROR:  No.

 2              MS. SCAPICCHIO:  Did you ever get the

 3         laptop back?

 4              JUROR:  No.

 5              MS. SCAPICCHIO:  Or the jewelry?

 6              JUROR:  No.  And the laptop was more

 7         important because it had all my pictures.

 8              MS. SCAPICCHIO:  All right, and then you

 9         also indicated that your nephew is a policeman in

10         Plymouth?

11              JUROR:  Um-hmm.

12              MS. SCAPICCHIO:  How long has he been a

13         policeman?

14              JUROR:  Just a couple of years.

15              MS. SCAPICCHIO:  Are you close to him?

16         Do you talk to him on a regular basis?

17              JUROR:  Now, family, holiday.

18              MS. SCAPICCHIO:  Christmas, Thanksgiving

19         type thing?

20              JUROR:  Yeah.

21              MS. SCAPICCHIO:  The fact that he is a

22         police officer, if all things were equal in terms

23         of testimony and there was a police officer that

24         said one thing and a civilian witness that said

25         another, because of your relationship with your
```

175

```
1          nephew and the fact that he was a police officer,
2          would you give the edge to the police officer?
3                    JUROR:  No.
4                    MS. SCAPICCHIO:  And then you said your
5          sister works for the Federal Courthouse in Boston.
6          What does she do?
7                    JUROR:  She's in, I think, their IT
8          department.  She's in administration of the court.
9          She's not a legal person or anything.
10                   MS. SCAPICCHIO:  Okay, great.  Thank you
11         so much.
12                   THE COURT:  Ma'am, could you step
13         outside for just a second, please.
14                   JUROR:  Sure.
15    (Juror Number 74 exits courtroom.)
16                   THE COURT:  This juror stands
17         indifferent.
18                   MR. HENNING:  Commonwealth is content.
19                   MS. SCAPICCHIO:  Defendant is content.
20                   THE CLERK:  Seat 8.
21    (Juror Number 74 enters courtroom.)
22                   THE COURT:  Ms. Burger, You have been
23         chosen to be on this jury.
24                   JUROR:  Oh, great.
25                   THE COURT:  You're going to be taken
```

176

1          upstairs to join your fellow jurors.  I'm going to

2          ask you not to discuss this case with anyone,

3          including them, nor should you allow anyone,

4          including them, to discuss the case with you.

5          I also am going to release the impaneled jurors a

6          little early for lunch because there's no reason

7          that you guys have to sit up there.  So go with

8          the Court Officer.  If you're released for lunch,

9          though, they'll explain to you you need to be back

10          in that jury room by 2 o'clock.

11                    JUROR:  All right, thank you.

12                    THE COURT:  Thank you so much, ma'am.

13                    THE CLERK:  Seat 8.

14     (Juror Number 74 exits courtroom.)

15     (Juror Number 75 enters courtroom.)

16                    THE CLERK:  Juror 75, Ryan Higgins.

17                    THE COURT:  Hi, Mr. Higgins.  Sir, is

18          there anything about the nature of these charges

19          or any of the allegations you've heard that might

20          affect your ability to be fair and impartial?

21                    JUROR:  My only concerns -- well,

22          I actually have a couple of concerns, Your Honor,

23          I didn't know when the right time to bring it up

24          was.  I do have actually travel plans, I don't

25          know if that has anything to do with this or if

177

1          that comes afterwards.

2                    THE COURT:  When are your travel plans?

3                    JUROR:  Actually, January 27th, I'm

4          actually flying out.  So it's right around the

5          timing.  I'm also supposed to be traveling on

6          Friday.

7                    THE COURT:  Your flight plans, are they

8          nonrefundable tickets?

9                    JUROR:  Yes, ma'am.

10                    THE COURT:  You're excused, sir.

11                    JUROR:  Thank you.

12                    THE CLERK:  Excused.

13     (Juror Number 75, excused.)

14     (Juror Number 77 enters courtroom.)

15                    THE CLERK:  Juror 77, Karen Oldoni.

16                    JUROR:  Yes.

17                    THE COURT:  Hi, Ms. Oldoni.

18                    JUROR:  Hi.

19                    THE COURT:  Ma'am, is there anything

20          about the nature of these charges or any of the

21          allegations you've heard that might affect your

22          ability to be fair and impartial?

23                    JUROR:  No.

24                    THE COURT:  You may hear alleged

25          evidence that the defendant, the alleged victim,

178

1          and some of the witnesses were involved in selling

2          marijuana.  Would that evidence affect your

3          ability to be fair and impartial?

4                    JUROR:  No.

5                    THE COURT:  The defendant in a criminal

6          trial has the absolute right not to testify.  If

7          Mr. Reddicks chose not to testify at this trial,

8          would you hold that against him in any way?

9                    JUROR:  No.

10                   THE COURT:  Is there anything about the

11         length of the trial that poses a hardship for you?

12                   JUROR:  I work with learning disabled

13         young adults, I go and visit them in their homes,

14         so I would not be able to see them next week, and

15         that, not for me, but I think it might be hard for

16         them.

17                   THE COURT:  You do this through Lesley

18         University.

19                   JUROR:  Lesley University.

20                   THE COURT:  Are there other instructors

21         there who could take over for you?

22                   JUROR:  There is one other instructor,

23         so it would double what she would need to do.  So

24         there is one.

25                   THE COURT:  But she is available to do

179

1      that?

2             JUROR:  I don't know, I would ask her.

3      I've never been in this situation before.

4             THE COURT:  If you asked her and she

5      could cover for you through the end of the trial,

6      then you could serve?

7             JUROR:  Yes, there's no other reason.

8             THE COURT:  Well, I'll give you that

9      opportunity to call her at some point.

10            JUROR:  Okay.

11            THE COURT:  Any follow-up questions,

12     counsel?

13           MR. HENNING:  This says you were born

14     in New York?

15            JUROR:  Yes.

16            MR. HENNING:  Whereabouts?

17            JUROR:  Long Island, Roslyn.

18            MR. HENNING:  When did you come to

19     Massachusetts?

20            JUROR:  Well, I lived here in high

21     school, '80 to '84, and then in college, after

22     college, I moved here in 1990.

23           MR. HENNING:  Where did you live here

24     when you were in high school?

25           JUROR:  Plymouth.

180

1          MR. HENNING:  And when you came back --
2     sorry.  It says you got a BACKGROUND.  Where did
3     you get that degree?
4          JUROR:  Colgate University, Upstate New
5     York.
6          MR. HENNING:  What was the degree in?
7          JUROR:  English and political science.
8          MR. HENNING:  Then you came here after
9     college to work?
10          JUROR:  Yes.
11          MR. HENNING:  What was the last job you
12     had before you were working as the instructor with
13     Lesley?
14          JUROR:  I worked at the New England
15     Legal Foundation.
16          MR. HENNING:  What is the New England
17     Legal Foundation?
18          JUROR:  It's a nonprofit law firm that
19     does work for -- the attorneys primarily do friend
20     of the court briefs for like the Supreme Court on
21     land cases and things like that, and I helped them
22     do development fund raising.
23          MR. HENNING:  Thank you, I have nothing
24     further.
25          THE COURT:  Ms. Scapicchio.

181

1              MS. SCAPICCHIO:  So your job at Lesley

2        University, is there a specific grant or a program

3        that allows you to go out into the community?

4              JUROR:  Yes, it's called the Threshold

5        Program.

6              MS. SCAPICCHIO:  Can you tell me a

7        little bit about that?

8              JUROR:  It's a program for highly

9        motivated young adults with learning and physical

10       challenges.  They do two years on campus at Lesley

11       in their own dorms where they will learn life

12       skills, and then if they are a candidate in the

13       third year, I work with them, it's called the

14       transition year where they actually get their own

15       apartments and get jobs and learn how to cook and

16       do their, you know, checkbooks and all of those

17       kinds of things.

18             MS. SCAPICCHIO:  And you help them try

19       to get from their apartment to school?  Is that

20       something that --

21             JUROR:  No, I don't.  No, we teach them

22       how to use the T and how to get to and from where

23       they need to go.

24             MS. SCAPICCHIO:  And about how many

25       clients do you have at one given time?

182

1           JUROR:  Well, right now, it's about
2      16 people.
3           MS. SCAPICCHIO:  So you're out every
4      day.
5           JUROR:  Every day.
6           MS. SCAPICCHIO:  Okay, five days a week.
7           JUROR:  Some days, I schedule around so
8      I can have a day if I need to go to the doctors or
9      something, but I make the schedule based on their
10     schedules so that I can see them.  So sometimes it
11     works out that I'm seeing a lot of people on
12     Monday, Tuesday, Wednesday, and not many people on
13     Thursday, Friday.  So it kind of varies a little
14     bit, but it's not consistent.
15          MS. SCAPICCHIO:  And how many clients
16     have you helped graduate?
17          JUROR:  Probably 200.  I've been there
18     for like almost 15 years.
19          MS. SCAPICCHIO:  And then you also
20     indicated prior to working for 15 years at this
21     foundation, you worked for New England Legal
22     Foundation.
23          JUROR:  Yes.
24          MS. SCAPICCHIO:  And you said it had to
25     do with land disputes?

183

1              JUROR:  Yeah, land rights.  I didn't
2        really pay too much attention to what they did
3        because I was just kind of doing fund raising for
4        them, but the people or different law firms would
5        contact them to help them prepare, and they did
6        send a lot of their briefs to the Supreme Court
7        and things.
8              MS. SCAPICCHIO:  Were the lawyers good
9        to you?
10             JUROR:  Yeah.
11             MS. SCAPICCHIO:  No bias against lawyers
12       for working for lawyers?
13             JUROR:  No.
14             MS. SCAPICCHIO:  Thank you.
15             THE COURT:  Ma'am, could you step
16       outside for just a second, please.
17   (Juror Number 77 exits courtroom.)
18             THE COURT:  This juror stands
19       indifferent.
20             MR. HENNING:  The Commonwealth exercises
21       a peremptory.
22   (Juror Number 77 enters courtroom.)
23             THE COURT:  Thank you, ma'am, you are
24       excused.
25             THE CLERK:  Excused.

184

1    (Juror Number 77, excused.)

2    (Juror Number 78 enters courtroom.)

3              THE CLERK:  Juror 78, Thomas Weihing?

4              JUROR:  Correct.

5              THE COURT:  Sir, you answered one of my

6         earlier questions.  Have you been active in some

7         organization that deals with drug prevention or

8         drug counseling or education?

9              JUROR:  I work for a vendor agency of

10        the Department of Mental Health, and many of our

11        clients have addiction problems, so frequently

12        we'll be --

13             THE COURT:  Oh, you work with Vinfen.

14             JUROR:  Yeah, collaborating with

15        detoxes, things like that.

16             THE COURT:  Well, you may hear alleged

17        evidence that the defendant, the alleged victim,

18        and some of the witnesses were involved in selling

19        marijuana.  Would that evidence affect your

20        ability to be fair and impartial?

21             JUROR:  No.

22             THE COURT:  Is there anything about the

23        nature of these charges or any of the allegations

24        you've heard so far that might affect your ability

25        to be fair and impartial?

185

```
 1              JUROR:  No, I don't think so.  I was a

 2      long time employee of Common Purpose, it's a

 3      certified virus intervention program.  I mean,

 4      you know, I'm trained to kind of look for victim

 5      blaming, minimization, denial, but you know,

 6      that's mostly in domestic context, so I don't

 7      think so.

 8              THE COURT:  The defendant in a criminal

 9      trial has the absolute right not to testify.

10              JUROR:  Sure.

11              THE COURT:  If Mr. Reddicks chose not to

12      testify at this trial, would you hold that against

13      him in any way?

14              (No audible response.)

15              THE COURT:  You have to say yes or no.

16              JUROR:  No, no, I'm sorry.

17              THE COURT:  That's all right.  And

18      finally, sir, is there anything about the length

19      of the trial that poses a hardship for you?

20              JUROR:  Not any more than for anybody.

21              THE COURT:  I never get tired of that

22      response.  Thank you, sir.

23              Any follow-up questions, Counsel?

24              MR. HENNING:  Where did you get your

25      bachelor's degree?
```

186

1              JUROR:  Boston College.

2              MR. HENNING:  And it says you were born,

3      is that --

4              JUROR:  Bridgeport, Connecticut.

5              MR. HENNING:  Oh, Bridgeport, okay.

6      When did you come from Connecticut to

7      Massachusetts?

8              JUROR:  I came for school in 1990 and

9      I've lived here since.

10             MR. HENNING:  Down at the bottom here,

11     you said you're unable to be impartial in cases

12     involving domestic violence, and then you said,

13     comma, or violence.

14             JUROR:  Yeah, I mean I think, I think

15     particularly domestic violence.  I think I'm able

16     to be impartial about, you know, if somebody says

17     something happened and someone else said it

18     didn't, but if people look to explain violence, it

19     happened because of this reason or I was provoked,

20     things like that, I don't think I -- you know,

21     we're trained there's no excuse for violence, but

22     I think whether or not it occurred is not

23     something I would be biased against.

24             MR. HENNING:  Okay, you don't have a

25     question about your impartiality -- do you have

187

1          any question about your impartiality in a case

2          where there will be allegations of violence?

3                    JUROR:  I don't think so, no, no.

4                    THE COURT:  Well, you've heard the

5          allegations in this case and you know what the

6          charges are.

7                    JUROR:  Correct, yes.

8                    THE COURT:  Bearing in mind they are

9          mere allegations now --

10                   JUROR:  Right.

11                   THE COURT:  -- until the Commonwealth

12         proves them beyond a reasonable doubt.

13                   JUROR:  Yes.

14                   THE COURT:  But is there anything you've

15         heard about the case so far that would cause you

16         to question your ability to be fair and impartial?

17                   JUROR:  I don't think so, no.

18                   THE COURT:  Anything else, Mr. Henning?

19                   MR. HENNING:  No.

20                   THE COURT:  Ms. Scapicchio.

21                   MS. SCAPICCHIO:  I have a few follow-ups

22         from some of the questions Mr. Henning asked you.

23                   JUROR:  Sure.

24                   MS. SCAPICCHIO:  You had indicated on

25         your questionnaire about the violence, and I think

188

1          you said that you were trained to recognize victim

2          blaming?

3                    JUROR:  Yes.

4                    MS. SCAPICCHIO:  What does that mean?

5          I don't know what that means.

6                    JUROR:  So, you know, I did X, Y, or Z,

7          but it was because I was provoked in this other

8          way, so therefore, it was excused or even caused

9          by the other person.

10                    MS. SCAPICCHIO:  So if there was a

11          question of self-defense or if there was a

12          question -- you don't believe in that?

13                    JUROR:  Well, I mean, it would depend on

14          the circumstances, but I think on a gut emotional

15          level, I feel like there isn't, no, you're

16          responsible for your actions.

17                    MS. SCAPICCHIO:  So if the Commonwealth

18          alleged that there was a robbery in this case, you

19          would tend to believe that there is no excuse for

20          that?

21                    JUROR:  For a robbery?

22                    MS. SCAPICCHIO:  Yes.

23                    JUROR:  If it was, if people -- yes,

24          I mean, if someone is saying I did this but it was

25          for this reason --

189

1           MS. SCAPICCHIO:  What if they didn't say

2      anything at all?

3           JUROR:  Well, no, I wouldn't assume it

4      had occurred if there was no kind of --

5           MS. SCAPICCHIO:  So I guess my question

6      is what did you mean when the question was is

7      there anything else in your background or

8      experience, employment, training, education,

9      knowledge, or beliefs that might affect your

10      ability to be fair and impartial, and you said,

11      "unable to be impartial on violence cases."  And

12      I'm not suggesting you did anything wrong, I'm

13      just trying to figure out what you meant when you

14      wrote that down.

15           JUROR:  What I meant is that I think

16      that, you know, what we saw were people who would

17      say, well, you know, I'm here for this reason,

18      but, you know, I shouldn't be here because it

19      wasn't my fault, this whole other thing happened

20      that led me to do this.  Or that people would say,

21      you know, people who kind of would own up to

22      things that, you know, took several weeks in the

23      program to kind of own up to.  So I think, you

24      know, if people say, well, this happened, but it

25      was for this reason, you know, I would try to be

190

1              impartial, I'm just saying that this is kind of my

2              orientation that if people say that this happened,

3              but it was for this reason, you know, my

4              inclination is to hold people responsible for

5              their behavior.  But not to assume there was

6              behavior if people say that there wasn't, if that

7              makes sense.

8                        MS. SCAPICCHIO:  It does and it doesn't.

9              So in terms of allegations, if you were involved

10             in a group therapy, whatever you do --

11                       JUROR:  Yes, yes.

12                       MS. SCAPICCHIO:  -- and someone was

13             saying, you know, I used drugs, but it wasn't my

14             fault because my mother didn't like me, or

15             whatever the situation is, you try to make that

16             person take accountability for their actions; is

17             that what you're saying?

18                       JUROR:  Yes.

19                       MS. SCAPICCHIO:  And if that person

20             didn't take accountability for their actions, you

21             would think that they would be less credible; is

22             that right?

23                       JUROR:  Would I think?  I would ask, you

24             know, sometimes we would say, well, geez, there's

25             this other, how do you explain this, you know, and

191

1          kind of ask people to kind of expand on kind of,

2          you know, why other people might be thinking other

3          things.  But I understand that there's always,

4          I mean, it's hard to know, you know, what

5          occurred.

6                    MS. SCAPICCHIO:  I'm not asking you to

7          know, I'm just saying would you give an edge to

8          somebody if they didn't come forward and give you

9          an explanation and there's an allegation out there

10         of whatever it is, X, Y, and Z.

11                   JUROR:  No, I don't have an assumption

12         that something happened.

13                   MS. SCAPICCHIO:  And then you had

14         indicated that you work in a psychiatric rehab in

15         Cambridge?

16                   JUROR:  Correct.

17                   MS. SCAPICCHIO:  And that's mainly

18         focused on addiction; is that right?

19                   JUROR:  Well, no, it's primarily for

20         individuals with psychiatric disabilities, but

21         I mean, there's a huge overlap between that

22         population and people who struggle with addiction.

23                   MS. SCAPICCHIO:  So you're interacting

24         with people who struggle with addiction on a daily

25         basis.

192

1              JUROR:  Yes.

2              MS. SCAPICCHIO:  So would, in this case,

3      allegations of drug dealing, would that cause you

4      any concern in terms of your ability to be fair

5      and impartial when you interact with addicts -- I

6      don't know if that's the right word --

7              JUROR:  Right, no.

8              MS. SCAPICCHIO:  -- addicts on a daily

9      basis or people who have substance abuse problems.

10             JUROR:  No, I mean we try to get people

11     help, people that need it.

12             MS. SCAPICCHIO:  And then you indicated

13     on your questionnaire, was it you or somebody in

14     your family was a victim of an assault and

15     battery, breaking and entering?

16             JUROR:  Two separate instances, but

17     yeah.

18             MS. SCAPICCHIO:  Was that you?

19             JUROR:  Yes.

20             MS. SCAPICCHIO:  Both times?

21             JUROR:  Yes.

22             MS. SCAPICCHIO:  Okay, so the assault

23     and battery, can you tell me a little bit about

24     that?

25             JUROR:  I was at a party in college and

193

```
 1        I was assaulted for essentially no reason.  There
 2        was no argument or anything.
 3                 MS. SCAPICCHIO:  A bunch of drunk
 4        people?
 5                 JUROR:  Um-hmm, yeah.
 6                 MS. SCAPICCHIO:  And did you report that
 7        to the police?
 8                 JUROR:  Campus police, but I didn't
 9        press charges or anything like that, no.
10                 MS. SCAPICCHIO:  Okay, so they didn't
11        get expelled or suspended or anything.
12                 JUROR:  No.
13                 MS. SCAPICCHIO:  And as far as the
14        breaking and entering is concerned, was that in
15        college, as well?
16                 JUROR:  No, that was, my apartment was
17        just broken into.
18                 MS. SCAPICCHIO:  And how long ago was
19        that?
20                 JUROR:  2007 or 8.
21                 MS. SCAPICCHIO:  Is that when you lived
22        in Jamaica Plain?
23                 JUROR:  Yup.
24                 MS. SCAPICCHIO:  And did you report that
25        to the police?
```

194

1            JUROR:  Yes.

2            MS. SCAPICCHIO:  Were the police

3        responsive, did they come and take a report?

4            JUROR:  Yup.

5            MS. SCAPICCHIO:  Was anything stolen

6        from you?

7            JUROR:  Lots was stolen, yup.

8            MS. SCAPICCHIO:  What was stolen from

9        you?

10           JUROR:  Jewelry, computers, some other

11       miscellaneous items.

12           MS. SCAPICCHIO:  Was anyone ever

13       arrested as a result --

14           JUROR:  No.

15           MS. SCAPICCHIO:  -- or did they find out

16       who did it?

17           JUROR:  No.

18           MS. SCAPICCHIO:  Did you ever get your

19       stuff back?

20           JUROR:  No.

21           MS. SCAPICCHIO:  And then you had

22       indicated that your father was an attorney?

23           JUROR:  Yes.

24           MS. SCAPICCHIO:  I'm not sure, law

25       something in Connecticut?  Oh, Bridgeport,

195

1              Connecticut.

2                      JUROR:  Yeah, sorry.

3                      MS. SCAPICCHIO:  I'm sorry, I didn't

4              understand the abbreviation for Bridgeport.

5                      THE COURT:  BPT, is that the way people

6              refer to Bridgeport?

7                      JUROR:  It's just the abbreviation,

8              yeah, sorry.

9                      MS. SCAPICCHIO:  What type of law did he

10             practice?

11                     JUROR:  He does still, but general

12             practice.

13                     MS. SCAPICCHIO:  General practice.

14                     JUROR:  Um-hmm.

15                     MS. SCAPICCHIO:  So does he do any

16             criminal cases?

17                     JUROR:  Yes.

18                     MS. SCAPICCHIO:  Does he ever discuss

19             them with you?

20                     JUROR:  Not really, not in depth.

21                     MS. SCAPICCHIO:  Have you ever gone to

22             watch him?

23                     JUROR:  I think once when I was like 10

24             or something like that.

25                     MS. SCAPICCHIO:  I don't think that

196

1      counts.  Okay, and then in terms of former
2      employee and board member of --
3                JUROR:  Oh, it's the batterer's
4      intervention program, Common Purpose.
5                MS. SCAPICCHIO:  Common Purpose.
6                JUROR:  Um-hmm.
7                MS. SCAPICCHIO:  So you're not just an
8      employee, you're a board member.
9                JUROR:  Well, I was for a brief period
10     of time after I was no longer an employee, but not
11     since 2008 or 9.
12               MS. SCAPICCHIO:  And Common Purpose
13     deals with offenders who are sent there through
14     the court --
15               JUROR:  Primarily, yeah.
16               MS. SCAPICCHIO:  -- to complete the
17     batterers program as a condition of probation?
18               JUROR:  Correct, almost exclusively.
19     I mean, occasionally, there are volunteers, but --
20               MS. SCAPICCHIO:  So did you run groups
21     or you just --
22               JUROR:  Um-hmm.
23               MS. SCAPICCHIO:  You did.
24               JUROR:  Yup.
25               MS. SCAPICCHIO:  You ran batterers

197

1    groups.

2            JUROR:  I ran batterers groups, yes.

3            MS. SCAPICCHIO:  Oh, okay, I didn't

4    realize that.  How often did you do that, you ran

5    batterers groups?

6            JUROR:  I was doing it anywhere from 15

7    to almost 40 hours a week for about eight years.

8            MS. SCAPICCHIO:  Wow.  So would you have

9    to report back to the court, this one finished,

10   this one didn't?

11           JUROR:  Yeah, I was the program director

12   for a period of time.  I mean, I was regularly in

13   contact with probation officers.

14           MS. SCAPICCHIO:  And were there people

15   who got kicked out of your group that you had to

16   notify the court?

17           JUROR:  Yes.

18           MS. SCAPICCHIO:  Do you know what

19   happened to them?

20           JUROR:  I mean, any variety of things.

21   I mean, some people serve sentences, some people

22   are ordered back to the program.

23           MS. SCAPICCHIO:  Thank you very much.

24           JUROR:  Sure.

25           THE COURT:  Sir, if you could step out

198

1     for a second, please.

2  (Juror Number 78 exits courtroom.)

3              THE COURT:  This juror stands

4        indifferent.

5              MR. HENNING:  Commonwealth exercises a

6        peremptory.

7  (Juror Number 78 enters courtroom.)

8              THE COURT:  Thank you, sir, you are

9        excused.

10             THE CLERK:  Excused.

11 (Juror Number 78, excused.)

12 (Juror Number 79 enters courtroom.)

13             THE CLERK:  Juror 79, Kathryn Canavan.

14             JUROR:  Yes.

15             THE COURT:  Good afternoon, ma'am.  Is

16       there anything about the nature of these charges

17       or any of the allegations you've heard that might

18       affect your ability to be fair and impartial?

19             JUROR:  No.

20             THE COURT:  You may hear alleged

21       evidence that the defendant, the alleged victim,

22       and some of the witnesses were involved in selling

23       marijuana.  Would that evidence affect your

24       ability to be fair and impartial?

25             JUROR:  Yes.

199

1          THE COURT:  It would.  Thank you, ma'am,
2      you are excused.
3          THE CLERK:  Excused.
4  (Juror Number 79, excused.)
5  (Juror Number 80 enters courtroom.)
6          THE CLERK:  Juror 80, Carolyn Hodges.
7          JUROR:  Yes.
8          THE COURT:  Hi, Ms. Hodges.
9          JUROR:  Hi.
10          THE COURT:  Ma'am, is there anything
11      about the nature of these charges or any of the
12      allegations you've heard that might affect your
13      ability to be fair and impartial?
14          JUROR:  I don't think so.
15          THE COURT:  You may hear alleged
16      evidence that the defendant, the alleged victim,
17      and some of the witnesses were involved in selling
18      marijuana.  Would that evidence affect your
19      ability to be fair and impartial?
20          JUROR:  I don't think so.
21          THE COURT:  The defendant in a criminal
22      trial has the absolute right not to testify.  If
23      Mr. Reddicks chose not to testify at this trial,
24      would you hold that against him in any way?
25          JUROR:  No.

200

```
 1                    THE COURT:  Is there anything about the
 2          length of the trial that poses a hardship for you?
 3                    JUROR:  No.
 4                    THE COURT:  Any follow-up questions,
 5          Counsel?
 6                    MR. HENNING:  Good afternoon, ma'am.
 7          You got a PhD is your highest level of education.
 8          Can you just explain a little bit about your
 9          educational background?
10                    JUROR:  I don't know what level of
11          detail, I have a masters in psychology, a PhD in
12          biological anthropology.  I'm a professor at your
13          Boston University in anthropology.
14                    MR. HENNING:  Can you talk to me a
15          little bit about the masters in psychology?  Is
16          there a particular focus on that?  Did you get to
17          do clinical work for it?
18                    JUROR:  No, it was not clinical, it's
19          evolutionary psychology.
20                    MR. HENNING:  Evolutionary, okay, as
21          part of the program that you do now.
22                    JUROR:  Yes.
23                    MR. HENNING:  So you teach anthropology
24          now?
25                    JUROR:  Yes.
```

201

```
 1              MR. HENNING:  To undergraduate or
 2         graduate students?
 3              JUROR:  Both.
 4              MR. HENNING:  Where did you go for
 5         undergraduate?
 6              JUROR:  Colorado College.
 7              MR. HENNING:  And then for graduate
 8         school?
 9              JUROR:  And then University of
10         California, Santa Barbara.
11              MR. HENNING:  How long have you been in
12         Massachusetts?
13              JUROR:  A year and a half.
14              MR. HENNING:  I have nothing further.
15              MS. SCAPICCHIO:  So you came to Boston
16         and work for BASED UPON.
17              JUROR:  Um-hmm.
18              MS. SCAPICCHIO:  How many classes do
19         have a week?
20              JUROR:  It depends, usually six, four to
21         six.
22              MS. SCAPICCHIO:  Four to six classes and
23         you have office hours after that?
24              JUROR:  Right.
25              MS. SCAPICCHIO:  And is it a requirement
```

202

1          that you're available for office hours a certain

2          number of hours a week?

3                    JUROR:  Um-hmm, two hours.

4                    MS. SCAPICCHIO:  Do you have teaching

5          assistants that can fill in for you?

6                    JUROR:  Not at the moment, no, but

7          I suppose I could -- I'm not sure yet.

8                    MS. SCAPICCHIO:  You teach everything

9          yourself, you have no teaching assistants?

10                   JUROR:  I have teaching assistants, but

11         they're assigned from a different area, so they're

12         not really capable of teaching.  They grade my

13         multiple-choice exams for this class in

14         particular.  Normally, actually, I have teaching

15         assistants from my department, but not for this

16         semester.

17                   MS. SCAPICCHIO:  Okay, and this semester

18         just started?

19                   JUROR:  It starts on Wednesday.

20                   MS. SCAPICCHIO:  It hasn't even started

21         yet.

22                   JUROR:  No.

23                   MS. SCAPICCHIO:  Okay.  In terms of your

24         masters, you said you got it in evolutionary

25         psychology.

203

```
 1            JUROR:  Um-hmm.

 2            MS. SCAPICCHIO:  Help me understand what

 3       that is, I have no idea.

 4            JUROR:  It's a field of study trying to

 5       figure out how our minds were shaped by evolution

 6       by natural selection.  So our mating behavior, who

 7       we like and why we like them or don't like them,

 8       you know, why we form friendships, why we

 9       cooperate.

10            MS. SCAPICCHIO:  Did you do a thesis?

11            JUROR:  Yes.

12            MS. SCAPICCHIO:  What did you do it on?

13            JUROR:  I did it on the evolution of sex

14       differences or differences between men and women

15       and the voice, so why men have lower voices than

16       women.

17            MS. SCAPICCHIO:  And I'll have to ask

18       why.

19            JUROR:  Well, we did some studies on a

20       attractiveness, ratings of voices, and obviously,

21       women find lower voices more attractive, but only

22       to a certain point.  But when it comes to ratings

23       of dominance and physical size, men find other men

24       who have lower voices as very intimidating and

25       give them deference.  And so we hypothesize that
```

204

1           lower voices in men evolve by natural selection,

2           by sexual selection, that men with lower voices

3           were selected because they were able to attain

4           higher status, and therefore, have more matings

5           and have more children as a result.

6                   MS. SCAPICCHIO:  That's interesting.

7           Thank you.  I don't have any further questions.

8                   THE COURT:  Ma'am, if you could step

9           outside, please.

10     (Juror Number 80 exits courtroom.)

11                  THE COURT:  We learn so much in this

12          process.

13                  MS. SCAPICCHIO:  I had no idea what it

14          was.

15                  THE COURT:  Fascinating.  Anyway, this

16          juror stands indifferent and interesting.

17                  MR. HENNING:  Commonwealth is content.

18                  MS. SCAPICCHIO:  Defendant is content.

19          Just because she's interesting, I like the

20          interesting nature of her.

21     (Juror Number 80 enters courtroom.)

22                  THE COURT:  Hi, Ms. Hodges, you have

23          been chosen to be a juror on this case.

24                  JUROR:  Oh, really?  Okay.

25                  THE COURT:  You're going to be going

205

1          with the Court Officer.  You may be allowed to go

2          to lunch now.  Please be back -- they're going to

3          show you where to return which is the jury room

4          one flight up.  Please be back by 2 o'clock.  And

5          at that time, you're going to join your other

6          impaneled jurors.  Please don't discuss any aspect

7          of this case with them, nor allow them to discuss

8          any aspect with you, all right?

9                    JUROR:  Okay.

10                    THE COURT:  Have a good lunch hour, see

11          you back here at two.  Go with the Court Officer.

12                    THE CLERK:  Seat 9.

13     (Juror Number 80 exits courtroom.)

14     (Juror Number 81 enters courtroom.)

15                    THE CLERK:  81, Adrienne Turnbull-

16          Reilly?

17                    JUROR:  Yes.

18                    THE COURT:  Good afternoon, ma'am.

19          Ma'am, is there anything about the nature of these

20          charges or any of the allegations you've heard

21          that might affect your ability to be fair and

22          impartial?

23                    JUROR:  No, nothing I've heard so far.

24                    THE COURT:  You may hear alleged

25          evidence that the defendant, the alleged victim,

206

1          and some of the witnesses were involved in selling

2          marijuana.  Would that evidence affect your

3          ability to be fair and impartial?

4                    JUROR:  No, I don't think so.

5                    THE COURT:  The defendant in a criminal

6          trial has the absolute right not to testify.  If

7          Mr. Reddicks chose not to testify, would you hold

8          that against him in any way?

9                    JUROR:  No.

10                    THE COURT:  Is there anything about the

11          length of the trial that poses a hardship for you?

12                    JUROR:  Not undue hardship, no.

13                    THE COURT:  No more than anybody else.

14                    JUROR:  Not other than this, yeah.

15                    THE COURT:  I love hearing that.

16                    Any follow-up questions, Counsel?

17                    MR. HENNING:  It says here that you're a

18          museum teacher?

19                    JUROR:  Yes.

20                    MR. HENNING:  What does that mean

21          exactly?

22                    JUROR:  That means I work at a historic

23          house museum, so when school groups come for field

24          trips, I'm the one who's teaching.

25                    THE COURT:  What house?

207

1          JUROR:  It's called the Pierce House,

2      it's in Dorchester.

3          THE COURT:  What is it famous for?

4          JUROR:  Well, it's not famous.

5          THE COURT:  It's just a historic house.

6          JUROR:  It is, yeah, it was lived in

7      for over 300 years by the Pierce family, so lots

8      of long history.

9          THE COURT:  Interesting.

10         MR. HENNING:  You're originally from

11     Missouri?

12         JUROR:  Yes.

13         MR. HENNING:  Whereabouts in Missouri?

14         JUROR:  Springfield, Missouri.

15         MR. HENNING:  When did you come to

16     Massachusetts?

17         JUROR:  I came to an Massachusetts in

18     April of 2014.

19         MR. HENNING:  Did you move to Dorchester

20     when you got here?

21         JUROR:  Yes.

22         MR. HENNING:  So you've been in

23     Dorchester the whole time.

24         JUROR:  Yes.

25         MR. HENNING:  Where did you get your

208

1          masters degree?

2                    JUROR:  University of Denver.

3                    MR. HENNING:  And did you get an

4          undergraduate degree before that?

5                    JUROR:  Yes.

6                    MR. HENNING:  Where was that?

7                    JUROR:  It was in Wheaton, Illinois,

8          Wheaton College.

9                    MR. HENNING:  I have nothing further.

10                   THE COURT:  Ms. Scapicchio?

11                   MS. SCAPICCHIO:  So now I have to ask,

12         who is the Pierce family, who are they?

13                   JUROR:  Like I said, they're not

14         particularly famous, but they've lived, they moved

15         to Dorchester in the 1640's and lived in the

16         Pierce house, which is where I work, since 1690.

17         So they were just colonial people living in

18         Dorchester and they moved out of the house in

19         1968.

20                   MS. SCAPICCHIO:  So it's been a museum

21         since 1968?

22                   JUROR:  It's been a museum since,

23         I believe, 2001, but my organization has owned it

24         since 1968.

25                   MS. SCAPICCHIO:  You indicated that you

209

1          did your masters at the University of Denver; is

2          that right?

3                    JUROR:  Yes.

4                    MS. SCAPICCHIO:  In what?

5                    JUROR:  Anthropology and museum studies.

6                    MS. SCAPICCHIO:  So was it a dual major?

7                    JUROR:  Um-hmm.

8                    MS. SCAPICCHIO:  In terms of your

9          husband, he works for -- I don't even how to say

10         the name.

11                   JUROR:  Woostier (phonetically).

12                   MS. SCAPICCHIO:  What does he do for

13         them?

14                   JUROR:  He's a software engineer for

15         them.

16                   MS. SCAPICCHIO:  Does he design

17         software?

18                   JUROR:  Yes, that's correct.

19                   MS. SCAPICCHIO:  And how long has he

20         worked there?

21                   JUROR:  He's worked there for about a

22         year and a half, since April of 2014 when we moved

23         here.

24                   MS. SCAPICCHIO:  And did you move here

25         because you got the job at the museum or he got

210

1        the job at the software company?

2                    JUROR:  Both, we got our jobs at the

3        same time.

4                    MS. SCAPICCHIO:  Oh, that's lucky.

5                    JUROR:  Yeah, it was.

6                    MS. SCAPICCHIO:  I have no further

7        questions.

8                    THE COURT:  Ma'am, if you could step

9        outside for just a moment, please.

10   (Juror Number 81 exits courtroom.)

11                   THE COURT:  This juror stands

12       indifferent.

13                   MR. HENNING:  The Commonwealth is

14       content.

15                   MS. SCAPICCHIO:  Defendant would

16       challenge.

17   (Juror Number 81 enters courtroom.)

18                   THE COURT:  Thank you, ma'am, you are

19       excused.  You're free to go.

20                   THE CLERK:  Excused.

21   (Juror Number 81, excused.)

22   (Juror Number 82 enters courtroom.)

23                   THE CLERK:  82, Thomas Courteau.

24                   JUROR:  Correct.

25                   THE COURT:  Mr. Courteau, you answered

211

1          one of my earlier questions.  Would you have the

2          tendency to believe the testimony of a police

3          officer witness over that of a civilian witness

4          just because he or she were a police officer?

5                    JUROR:  I did.

6                    THE COURT:  Thank you, sir, you are

7          excused.

8                    THE CLERK:  Excused.

9     (Juror Number 82, excused.)

10    (Juror Number 83 enters courtroom.)

11                   THE CLERK:  83, Thomas Avery.

12                   THE COURT:  Hi, Mr. Avery.

13                   JUROR:  Hello.

14                   THE COURT:  Sir, is there anything about

15         the nature of these charges or any of the

16         allegations you've heard that might affect your

17         ability to be fair and impartial?

18                   JUROR:  I don't think so, no.

19                   THE COURT:  You may hear alleged

20         evidence that the defendant, the alleged victim,

21         and some of the witnesses were involved in selling

22         marijuana.  Would that evidence affect your

23         ability to be fair and impartial?

24                   JUROR:  No, it wouldn't.

25                   THE COURT:  The defendant in a criminal

212

1          trial has the absolute right not to testify.  If

2          Mr. Reddicks chose not to testify at this trial,

3          would you hold that against him in any way?

4                    JUROR:  No.

5                    THE COURT:  Is there anything about the

6          length of the trial that poses a hardship for you?

7                    JUROR:  No.

8                    THE COURT:  Any follow-up questions,

9          Counsel?

10                   MR. HENNING:  It says here you work for

11         the Department of Developmental Services as an

12         occupational therapist?

13                   JUROR:  Um-hmm.

14                   MR. HENNING:  What type of therapy do

15         you do?

16                   JUROR:  I work with people with

17         intellectual disabilities and provide services for

18         them.

19                   MR. HENNING:  Is it an adult population?

20                   JUROR:  It's an adult population, yes.

21                   MR. HENNING:  Is it people who get it

22         through government assistance only?

23                   JUROR:  They live in group homes that

24         are run by the state, yeah, so it's through

25         Medicaid, Medicare.

213

1          MR. HENNING:  What type of developmental

2     disabilities do you usually deal with?

3          JUROR:  Well, it's intellectual

4     disabilities, but they also have a lot of physical

5     disabilities, as well, they tend to.

6          MR. HENNING:  It says you were born in

7     Wilmington, Indiana?

8          JUROR:  Um-hmm.

9          MR. HENNING:  When did you come to

10     Massachusetts?

11          JUROR:  1985.

12          MR. HENNING:  And where have you lived

13     in terms of the neighborhoods since you got here?

14          JUROR:  Well, I live, the past 20 years,

15     I've lived in Back Bay, I lived in Dorchester for

16     a part of the time, I've lived in Brighton.

17          MR. HENNING:  It says 25 years ago, you

18     were held up at gunpoint.

19          JUROR:  Yes.

20          MR. HENNING:  Can you tell us where that

21     was?

22          JUROR:  That was in Indiana.

23          MR. HENNING:  Was someone charged in

24     that case?

25          JUROR:  No.

214

1           MR. HENNING:  Did you call the police

2     when it happened?

3           JUROR:  No.

4           MR. HENNING:  Without getting into the

5     details of it, did you know the person that held

6     you up?

7           JUROR:  No.

8           MR. HENNING:  But you chose not to

9     report it.

10          JUROR:  That's correct.

11          THE COURT:  Ms. Scapicchio?

12          MS. SCAPICCHIO:  I'm going to need a

13    little bit more information about the 25 years

14    ago.  You were held up at gunpoint by one or more

15    than one person?

16          JUROR:  One person.

17          MS. SCAPICCHIO:  Was that person of the

18    same race as you or a different race?

19          JUROR:  The same race.

20          MS. SCAPICCHIO:  Same race, okay.  Did

21    they take anything from you?

22          JUROR:  Yeah, they took -- I can't

23    remember how much money it was, but I had money in

24    my wallet and they took the money in my wallet.

25          MS. SCAPICCHIO:  Did they take your

215

```
1          identification, too?
2                    JUROR:  No, just the money.
3                    MS. SCAPICCHIO:  Was this like on the
4          street or was it in your apartment building?
5                    JUROR:  I was in a car with a friend, we
6          were sitting in the car, the car was parked, and
7          the person came up to the car window and the
8          window was down and approached us in that way.
9                    MS. SCAPICCHIO:  And in terms of your
10         work as an occupational therapist, you had
11         indicated, I think, that your clients are
12         developmentally disabled and live in group homes?
13                   JUROR:  That's right, yes.
14                   MS. SCAPICCHIO:  Is that because their
15         disability is so great that they are not able to
16         live independently?
17                   JUROR:  That's correct.
18                   MS. SCAPICCHIO:  Are they long-term
19         residents?  Is it like a short-term place or a
20         long-term place?
21                   JUROR:  Long-term.
22                   MS. SCAPICCHIO:  So their group home is
23         sort of their home.
24                   JUROR:  Exactly.
25                   MS. SCAPICCHIO:  And you help them
```

216

1          figure out how to get through the day.  Are they

2          able to get employment and attend school or are

3          they too disabled --

4                   JUROR:  It runs the gamut.  It's folks

5          that a very, very, intellectually very low-level

6          and aren't employed, they may go to day programs.

7          Some of the people actually do have employment.

8          But in general, it's mostly folks that are not

9          employed that go to day habs.

10                  MS. SCAPICCHIO:  The fact that you were

11         held up at gunpoint 25 years ago and this case

12         involves an allegation that there was a robbery

13         with a gun, do you think given your personal

14         circumstances 25 years ago, you would be able to

15         put that aside and remain fair and impartial or do

16         you think you would associate more with the person

17         who got robbed?

18                  JUROR:  I think I could be impartial.

19                  MS. SCAPICCHIO:  When you say you think,

20         what is the hesitation there?

21                  JUROR:  I don't know that I have a big

22         hesitation.

23                  MS. SCAPICCHIO:  Do you have any

24         hesitation?

25                  JUROR:  I don't think so.  I mean, no.

217

```
 1              MS. SCAPICCHIO:  So the answer is you
 2         wouldn't necessarily associate with the victim in
 3         this case if there was evidence that there was
 4         actually a robbery.  You wouldn't feel sorry for
 5         him, you wouldn't relate it back to your own
 6         personal circumstances, you wouldn't give that any
 7         more credibility because of your own personal
 8         circumstances.
 9              JUROR:  I don't think I would give that
10         any more credibility because of what happened to
11         me, no.
12              MS. SCAPICCHIO:  Thank you.
13              THE COURT:  Sir, could you step outside
14         for just a second, please.
15              JUROR:  Sure.
16    (Juror Number 83 exits courtroom.)
17              THE COURT:  This juror stands
18         indifferent.
19              MR. HENNING:  I'm going to exercise a
20         peremptory.
21    (Juror Number 83 enters courtroom.)
22              THE COURT:  Thank you, sir, you are
23         excused.
24              THE CLERK:  Excused.
25    (Juror Number 83, excused.)
```

218

1              THE COURT:  The next guy answered a

2         question which I think is going to disqualify him,

3         and then we'll stop for lunch.

4    (Juror Number 84 enters courtroom.)

5              THE CLERK:  Juror 84, David Charnuska.

6              THE COURT:  Sir, good afternoon.  You

7         answered one of my earlier questions.  Can you

8         tell me what your concern is about being on this

9         jury?

10             JUROR:  Well, I think I said yes to two

11        questions and they were kind of related, and

12        actually, I was hesitant to say yes to some other

13        questions because I didn't have a hundred percent

14        confidence in them, and it all kind of ties

15        together.  But a few years ago, I had an incident

16        where I was charged with a crime and I was in a

17        very lengthy process that was pretty burdensome,

18        and it sort of diminished my feelings about the

19        court system and whatnot.

20             THE COURT:  Are you saying that because

21        of this life experience of yours --

22             JUROR:  Yes.

23             THE COURT:  -- that you would question

24        your ability to be fair and impartial in this

25        case?

219

1              JUROR:  Yes.

2              THE COURT:  Thank you for your candor,

3        sir, you are excused.

4              JUROR:  Thank you.

5              THE CLERK:  Excused.

6    (Juror Number 84, excused.)

7              THE COURT:  All right, let's suspend at

8        this time and we'll return at 2 o'clock.  Thanks,

9        everybody.

10   (Court in recess at 1:00 p.m.)

11

12          A F T E R N O O N   S E S S I O N

13   (Court in session at 2:00 p.m.)

14   (Defendant present.)

15   CONTINUED INDIVIDUAL VOIR DIRE:

16             THE COURT:  Welcome back, everybody.  We

17       have some CORI results from the impaneled jurors.

18       There were reported back no hits on Juror Hodges,

19       Juror Burger, Juror Augustin, Juror Langat, L-A-N-

20       G-A-T, and Juror Luckenbill, and that group will

21       be marked for identification.

22             (Exhibit B was marked for

23       Identification, Board of Probation Records of

24       Impaneled Jurors.)

25             THE COURT:  There were hits on four of

220

1        the other jurors.  It is my understanding that as

2        to the first three, the parties don't have any

3        concern about that.  First of all, Juror Turner

4        reported having a restraining order against her,

5        and I understand the parties have no issue with

6        this.  Is that my understanding?

7                    MS. SCAPICCHIO:  None for the defendant.

8                    MR. HENNING:  None for the Commonwealth.

9                    THE COURT:  That also will be marked for

10       identification, however.

11                   (Exhibit C was marked for

12       identification, Board of Probation Record, Juror

13       Number 5, Seat Number 1.)

14                   THE COURT:  Jurors Perryman and

15       Constant, C-O-N-S-T-A-N-T, came back with

16       relatively innocuous matters, at least with

17       Ms. Constant.  It's arguable that she said nothing

18       wrong on her questionnaire because it's merely a

19       failure to use, failure to use a stolen Registry

20       of Motor Vehicle's signature, whatever the heck

21       that is.

22                   MR. HENNING:  It's usually a charge for

23       either having a fake ID if the person is a minor

24       or a charge for operating a car that has an

25       inspection or a registration the belongs to

221

1          another car.  Without knowing more, there's
2          nothing to really glean.
3                  THE COURT:  Does anybody want me to
4          inquire of her?
5                  MS. SCAPICCHIO:  No, Your Honor.
6                  MR. HENNING:  No, Your Honor.
7                  THE COURT:  All right, that also will be
8          marked for identification.
9                  (Exhibit D was marked for
10          identification, Board of Probation Record of
11          Juror Number 28, Seat Number 2.)
12                  THE COURT:  And then finally, Juror
13          Perryman has an operating to endanger that was
14          dismissed.  Does anybody want me to inquire of
15          him?
16                  MR. HENNING:  No, Your Honor.
17                  MS. SCAPICCHIO:  We're fine.
18                  THE COURT:  All of those will be marked
19          for identification.
20                  (Exhibit E was marked for
21          identification, Board of Probation Record of
22          Juror Number 29, Seat Number 3.)
23                  THE COURT:  There is, though, Juror
24          Denise Jawando, J-A-W-A-N-D-O, who presented,
25          although on her questionnaire as saying she had no

222

1           prior charges or convictions, et cetera, she does

2           present with a two-page record, most of which are

3           relatively innocuous motor vehicle offenses,

4           operating without a license, insurance violation,

5           attaching wrong plates, operating after

6           suspension.  But she does have a possession of

7           Class B which was dismissed back in the year 2000.

8           Does anybody want me to inquire of her about that?

9                    MR. HENNING:  The Commonwealth would

10          request that you inquire.

11                   THE COURT:  Officer Loperari, bring down

12          Ms. Jawando.

13                   Also for the benefit of Counsel, that

14          issue that the juror in Seat Number 1 had,

15          Mr. Kalell has used his magic, it's all been

16          settled, it's all been resolved, and he has

17          already talked to the juror and she's happy about

18          it.

19                   MR. HENNING:  Great.

20                   THE COURT:  That was the woman who had

21          visitation through DCF.

22                   MS. SCAPICCHIO:  Yes.

23                   THE COURT:  And again, he used his magic

24          and it's all settled.

25      (Juror Number 47 enters courtroom.)

223

1          THE CLERK:  Juror 47 in Seat 5, Denise

2     Jawando.

3          THE COURT:  Hi, Ms. Jawando.  Sorry to

4     bring you back again, but it's come to my

5     attention that even though on your questionnaire,

6     you indicated that you had never been convicted or

7     charged with any crime, you do have some criminal

8     matters.

9          JUROR:  I wasn't convicted, I was

10    arrested.

11         THE COURT:  Yes, one of the questions on

12    the questionnaire is have you ever been charged

13    with anything.  The first set of cases were in

14    South Boston District Court back in 2001, they're

15    all motor vehicle related, operating without a

16    license, insurance violation, attaching wrong

17    plates, and operating after suspension.  Those

18    matters basically were dismissed or filed.  Is

19    there some reason that you didn't put them on the

20    questionnaire?

21         JUROR:  I forgot about that one.

22    I never attached, I don't remember that, but no,

23    if it was dismissed, I didn't feel it was

24    important.

25         THE COURT:  All right.

224

1              JUROR:  It was dismissed.

2              THE COURT:  You also had another matter

3         in Roxbury District Court in the year 2000, and

4         that was possession of a Class B controlled

5         substance.

6              JUROR:  Right.

7              THE COURT:  Do you remember that one?

8              JUROR:  I do, but it was dismissed, and

9         again --

10             THE COURT:  You thought you didn't have

11        to put it because it was dismissed.

12             JUROR:  Right.

13             THE COURT:  Well, for future reference,

14        on the questionnaire, it actually asks you have

15        you ever been charged with a crime, and also, have

16        you ever been arrested.  Arrested, charged, or

17        convicted.  Now, granted, you weren't convicted of

18        that, but the other two questions asked you if you

19        were arrested or charged with a crime.  So,

20        technically, you probably should have answered

21        that.

22             JUROR:  I should have answer that.

23             THE COURT:  Does anybody want to ask

24        any follow-up questions, Mr. Henning or

25        Ms. Scapicchio?

225

```
 1                    MR. HENNING:  No.
 2                    MS. SCAPICCHIO:  No, Your Honor.
 3                    THE COURT:  Ma'am, could you just step
 4           right outside and wait for just a second?
 5                    JUROR:  Sure.
 6       (Juror Number 47 exits courtroom.)
 7                    THE COURT:  Counsel, I see no reason to
 8           excuse her for cause.  I encounter this quite
 9           often, they think a dismissal means that they
10           don't have to put it down, and it was dismissed.
11           But does anybody want to exercise a peremptory
12           challenge on her?
13                    MR. HENNING:  Can I have 30 seconds?
14                    THE COURT:  Of course.
15                    MR. HENNING:  Commonwealth is going to
16           exercise a peremptory challenge.
17                    MS. SCAPICCHIO:  Just note my objection,
18           Judge.  I objected to the Commonwealth's ability
19           to run the records, and I just want to preserve
20           that objection.
21                    THE COURT:  Sure.
22       (Juror Number 47 enters courtroom.)
23                    THE COURT:  Thank you, ma'am, you are
24           excused.  You're free to go.
25                    COURT OFFICER:  No, she has things
```

226

1          upstairs.

2                    THE CLERK:  Excused.

3          (Juror Number 47, excused.)

4                    THE COURT:  That one will also be marked

5          for identification.

6                    (Exhibit F was marked for

7          Identification, Board of Probation Records,

8          Juror Number 47.)

9                    THE COURT:  I want to wait for Officer

10          Loperari to come back relative to the next one.

11                    (Pause.)

12                    Counsel, I've been alerted to a

13          situation with Juror Number 62.

14                    THE CLERK:  In Seat 7.

15                    THE COURT:  His name is Mr. Augustin,

16          A-U-G-U-S-T-I-N.  Officer Loperari, can you

17          explain to me your experience with him this

18          morning and then recently.

19                    COURT OFFICER:  This morning while

20          giving instructions to other jurors, he constantly

21          interrupted me.  He was concerned about losing his

22          headphones.  Several times, I tried to give other

23          jurors instructions on putting their contact

24          information on our sheets, and he just

25          continuously interrupted me several times on that

227

```
 1              issue.

 2                     The second issue was lunch, asking for

 3              free lunch, and then turning to the rest of the

 4              jurors trying to elicit a response from them when

 5              I told him we didn't give them free lunch, just

 6              being really interruptive.  I was unable to give

 7              instructions on exiting and entering the building,

 8              which we have the jurors do by the back stairway.

 9              I had to repeat myself between four or five times

10              to get the message across.

11                     THE COURT:  Have you have encounters

12              with him recently after lunch?

13                     COURT OFFICER:  Since, he hasn't said

14              anything since.

15                     THE COURT:  Counsel, does anybody want

16              me to bring him down and inquire of him, and if

17              so, what do you want me to ask him?

18                     MR. HENNING:  The Commonwealth's request

19              earlier, just to put it on the record, I think if

20              you ask him if since he's been seated, if he's

21              felt that this has caused him any anxiety or

22              stress.  I think based on the descriptions of what

23              we heard from his actions before lunch, I'm just

24              concerned about general affect and demeanor as a

25              juror.
```

228

1                   THE COURT:  Ms. Scapicchio?

2                   MS. SCAPICCHIO:  I don't have any

3          objection to inquiring.

4                   THE COURT:  Bring him down, please.

5                   MR. HENNING:  May I also ask Your Honor

6          if you can perhaps inquire with him about

7          understanding that the court staff and --

8                   THE COURT:  I'll ask him about his

9          ability to comply with orders of the Court

10         Officers.

11   (Juror Number 62 enters courtroom.)

12                  THE CLERK:  Juror 62 in Seat 7,

13         Mr. Augustin.

14                  THE COURT:  Hi, Mr. Augustin.

15                  JUROR:  Good evening, Your Honor.

16                  THE COURT:  I just wanted to ask you,

17         has your experience here this morning, and

18         especially after you were impaneled on this case,

19         has that caused you any kind of anxiety or stress?

20                  JUROR:  Repeat that question?  I'm

21         trying to perceive that, Your Honor.

22                  THE COURT:  Has any part of your

23         experience here today in court, especially after

24         you were impaneled as a juror on this case, has

25         that caused you any kind of stress or anxiety?

229

1            JUROR:  Yes, Your Honor.

2            THE COURT:  Can you explain that to me?

3            JUROR:  A little lightheaded,

4    understanding I had to get up early and stuff like

5    that to come to jury duty.

6            THE COURT:  There's quite a wind

7    outside, sir, if you could keep your voice up.

8            JUROR:  Understanding that I had to get

9    up early, although I felt lightheaded, you know.

10           THE COURT:  Is it because today you're

11   lacking in sleep?

12           JUROR:  Yes, Your Honor.

13           THE COURT:  Did you have to work last

14   night, sir?

15           JUROR:  Yes, Your Honor.

16           THE COURT:  Do you understand that as an

17   impaneled juror, you can't work nights.  Do you

18   understand that, sir?

19           JUROR:  Um-hmm.

20           THE COURT:  In other words, you need to

21   get a full night's sleep.  Do you understand that,

22   sir?

23           JUROR:  Yes.

24           THE COURT:  Are you typically working

25   the night shift?

230

```
 1              JUROR:  I work evenings.
 2              THE COURT:  What does that mean,
 3         evenings?
 4              JUROR:  6:30 to 12:30.
 5              THE COURT:  You can't do that, sir,
 6         while you're a juror on this case.  Do you
 7         appreciate that?  You're going to have to tell
 8         your employer, because that would interfere with
 9         your ability to get enough rest to show up in
10         court every day at 9 o'clock fresh and alert.  Do
11         you understand that, sir?
12              JUROR:  Yes, Your Honor.
13              THE COURT:  And are you going to be able
14         to do that?
15              JUROR:  Yes, Your Honor.
16              THE COURT:  Am I hearing that any
17         emotions that you've manifested today are because
18         you worked last night and you feel sleepy today?
19              JUROR:  Repeat that again?
20              THE COURT:  Maybe I worded that
21         terribly.  It sounds as if you're a little sleep
22         deprived today.
23              JUROR:  Yes.
24              THE COURT:  Is it your expectation that
25         if you get a full night's sleep, you won't be
```

231

1          exhibiting any signs of anxiety or stress as a

2          juror?

3                    JUROR:  If I get a full night's sleep,

4          I'll be awesome, Your Honor.

5                    THE COURT:  You'll be fine.

6                    JUROR:  Yes, Your Honor.

7                    THE COURT:  All right, I just want to

8          understand that any issues that you may have had

9          after you were impaneled, you think are coming

10         from your lack of sleep.

11                   JUROR:  Repeat that again, Your Honor?

12                   THE COURT:  Do you think that any

13         anxiety or stress that you may have experienced

14         today comes from a lack of sleep last night?

15                   JUROR:  I don't understand.  I'm trying

16         to find a way to understand, Your Honor, although

17         I know it's a question you asked.

18                   THE COURT:  Sir, it's been reported to

19         me that you've been exhibiting symptoms of stress

20         and anxiety as a juror.  And you admitted to that,

21         correct?

22                   JUROR:  Yes.

23                   THE COURT:  All right.  Are you anxious

24         and stressed because you were impaneled as a

25         juror, generally, or is it coming from the lack of

232

1          sleep that you had last night?

2                    JUROR:  I would say the lack of sleep,

3          Your Honor.

4                    THE COURT:  Well, I guess the other way

5          of putting it, if you get a full night's sleep,

6          because I'm ordering you, you can't go to work

7          tonight, you understand that, sir.  You can't work

8          till 12:30.  Do you appreciate that, sir?

9                    JUROR:  Yes.

10                   THE COURT:  And your employer, by the

11         way, cannot interfere with any term and condition

12         of your employment, and if your employer gives you

13         a hassle, you come to me.  You understand that?

14                   JUROR:  Yes, Your Honor.

15                   THE COURT:  But with a full night's

16         sleep, will you be able to fully perform your

17         functions as a juror in this case?

18                   JUROR:  Yes, Your Honor.

19                   THE COURT:  Does anybody have any

20         follow-up questions?

21                   MR. HENNING:  Sir, when the Judge asked

22         you in the beginning if being impaneled on a jury

23         had caused you stress, the impanelment process is

24         what we've been through this morning.  Is the fact

25         that you got selected for this jury, has that

233

1       cause you any anxiety or stress?

2                   JUROR:  Well, I'm trying to find a way

3               to understand that question.  Can you break that

4               word impanel down?

5                   THE COURT:  Chosen as a juror on the

6               case.

7                   JUROR:  Okay, okay.

8                   MR. HENNING:  After you were chosen as a

9               juror and you went up to the jury room with your

10              fellow jurors, did you feel anxiety or stress as a

11              result of being chosen for the jury?

12                  JUROR:  I did, sir.  Yes, Counselor.

13                  MR. HENNING:  Has that anxiety or stress

14              made it difficult at all to pay attention and to

15              focus on things?

16                  JUROR:  Yes, Counselor.

17                  MR. HENNING:  Is the prospect or the

18              idea of being a juror on this case something that

19              causes you continued anxiety?

20                  JUROR:  Yes, Counselor.

21                  THE COURT:  So when I asked you about

22              lack of sleep, you're saying that you're going to

23              be anxious and distressed, no matter what.  Is

24              that what you're telling me, Mr. Augustin?

25                  JUROR:  I'm trying to understand, Your

234

1          Honor.

2                    THE COURT:  I'm trying to understand

3          you, sir.  Are you telling me that you can't be a

4          juror because you're experiencing too much stress

5          and anxiety and it doesn't matter how much sleep

6          you get?

7                    JUROR:  Yes, Your Honor.

8                    THE COURT:  You're excused, thank you.

9                    THE CLERK:  Excused.

10     (Juror Number 62, excused.)

11                   THE COURT:  All right, let's start with

12         Number 85.

13                   MS. SCAPICCHIO:  The last juror wants to

14         see us, Seat 9, Carolyn Hodges.

15                   THE COURT:  All right, bring her in.

16     (Juror Number 80 enters courtroom.)

17                   THE CLERK:  Juror in Seat 9, Juror

18         Number 80, Carolyn Hodges.

19                   THE COURT:  Ms. Hodges, did you want to

20         say something else to me?

21                   JUROR:  Yes, I have remembered something

22         at lunch and I don't know if it's important.  The

23         fact that I forgot about it may say that it's not,

24         but I had a friend, a good friend in middle

25         school, we were not friends as adults, but she was

235

1          murdered in a drug deal.  So I thought that that

2          was relevant, obviously, so I thought you might

3          want to know about it.

4                    THE COURT:  It's relevant if you examine

5          your head and your heart and you tell me because

6          of your friend's experience -- I'm assuming this

7          was some years ago.

8                    JUROR:  It was two years ago.

9                    THE COURT:  I'm sorry, I apologize, it

10         was two years ago.  If your friend's experience

11         would affect your ability to be a fair and

12         impartial juror in this case.

13                   JUROR:  I don't think so.  I can't think

14         of a reason why it would.

15                   THE COURT:  Counsel, do you want any

16         follow-up with that?

17                   MR. HENNING:  I have no follow-up.

18                   THE COURT:  Ms. Scapicchio?

19                   MS. SCAPICCHIO:  So you were at lunch

20         and you just remembered that you should probably

21         bring it to our attention and that's why you

22         notified the Court Officer.

23                   JUROR:  Um-hmm.

24                   MS. SCAPICCHIO:  Was it one of your good

25         friends?

236

1              JUROR:  We were good friends in middle
2        school, but we drifted apart and then we weren't
3        friends as -- I mean, Facebook friends, but not
4        after that.
5              MS. SCAPICCHIO:  Where did this homicide
6        take place?
7              JUROR:  Baltimore.
8              MS. SCAPICCHIO:  And you said it was
9        regarding drugs?  Do you know anything more about
10        it?  I'm not trying to pry, I'm just trying to get
11        a sense.
12              JUROR:  No, no.  Well, actually, it
13        wasn't reported that it was a drug deal, but those
14        who knew her assumed that that was the case
15        because she had dealt drugs for most of her young
16        life and she had also been severely beaten in a
17        drug deal earlier, like two or three years before
18        that.  So I assumed that in that situation, she
19        was found in a car, she and her boyfriend were
20        shot in the head and the car was burned, and it
21        was in an alleyway in Baltimore.  So, I mean,
22        those of us who knew her assumed that that was
23        the case.
24              MS. SCAPICCHIO:  Do you know if anyone
25        was ever charged with --

237

1          JUROR:  I don't think they ever found
2      anyone, no.  Not that I've heard.
3          MS. SCAPICCHIO:  And the idea that you
4      had a good friend that was the victim of a
5      homicide involving drugs, this case involves
6      allegations of a homicide and drugs, do you think
7      that experience, your personal experience with
8      your friend, would cause you to sympathize more
9      with the victim in this case?
10          JUROR:  I don't think so because it was
11      a completely different situation, different
12      people.
13          MS. SCAPICCHIO:  Do you have any
14      hesitation when you say you don't think so or are
15      you just saying that because that's the way you
16      want to word it?
17          JUROR:  No, I can't think of any reason.
18      Maybe something subconsciously that I'm not aware
19      of, but no, I don't think so.
20          MS. SCAPICCHIO:  Thank you.
21          THE COURT:  Ma'am, could you just step
22      outside for one second, please.
23          JUROR:  Sure.
24   (Juror Number 80 exits courtroom.)
25          THE COURT:  I think this juror is being

238

1          scrupulously honest.  I think she just remembered

2          this, and I think she prefaced it by saying, well,

3          that probably suggests that it wasn't an important

4          issue for her.  I trust her answers.  She's told

5          me it won't affect her ability to be fair and

6          impartial, so I won't excuse her for cause.

7          Nevertheless, this is new information that just

8          got revealed, so if either side wants to exercise

9          a peremptory challenge, you're entitled to do

10          that.

11                    MR. HENNING:  Commonwealth is content.

12                    MS. McDONOUGH:  May I speak to my

13          client?

14                    THE COURT:  Of course.

15                    MS. SCAPICCHIO:  Defendant is content,

16          Your Honor.

17                    THE COURT:  All right, let me bring her

18          back in and advise her of a few things.

19      (Juror Number 80 enters courtroom.)

20                    THE COURT:  Ms. Hodges, thank you so

21          much for being so candid.  Both sides want to

22          continue to keep you on this jury.  I'm just going

23          to ask that you not share this conversation with

24          any of your fellow jurors, all right?

25                    JUROR:  Okay.

239

```
 1              THE COURT:  Thank you for your candor
 2         and your scrupulousness.
 3              THE CLERK:  Still Seat 9.
 4    (Juror Number 80 exits courtroom.)
 5    INDIVIDUAL JURY VOIR DIRE: (Resumed)
 6    (Juror Number 85 enters courtroom.)
 7              THE CLERK:  Juror 85, Kathleen Geigley.
 8              THE COURT:  How do you pronounce it,
 9         ma'am?
10              JUROR:  Geigley.
11              THE COURT:  Ms. Geigley, is there
12         anything about the nature of these charges or any
13         of the allegations that might affect your ability
14         to be fair and impartial?
15              JUROR:  No.
16              THE COURT:  You may hear alleged
17         evidence that the defendant, the alleged victim,
18         and some of the witnesses were involved in selling
19         marijuana.  Would that evidence affect your
20         ability to be fair and impartial?
21              JUROR:  No.
22              THE COURT:  The defendant in a criminal
23         trial has the absolute right not to testify.  If
24         Mr. Reddicks chose not to testify at this trial,
25         would you hold that against him in any way?
```

240

1                    JUROR:  No.

2                    THE COURT:  Is there anything about the

3          length of the trial that poses a hardship?

4                    JUROR:  Just for school.

5                    THE COURT:  All right, and what school

6          are you going to?

7                    JUROR:  Northeastern University.

8                    THE COURT:  Are you on a co-op right

9          now?

10                   JUROR:  No.

11                   THE COURT:  When do classes start?

12                   JUROR:  Monday.

13                   THE COURT:  If that was a concern of

14         yours, did you know you could defer your service

15         to another time?

16                   JUROR:  Yes, but I didn't expect to be

17         on one that was going to be this long, and I'm not

18         sure of my schedule.

19                   THE COURT:  So you don't know yet.  When

20         do classes start?

21                   JUROR:  Monday.

22                   THE COURT:  Not Monday, Monday is a

23         holiday, I'm assuming.

24                   JUROR:  This Monday, they started.

25                   THE COURT:  Oh, this past Monday.

241

1              JUROR:  This past Monday, I'm sorry.

2              THE COURT:  But you don't know your

3      classes yet, you don't know your schedule?

4              JUROR:  I don't know them for the

5      future, so I didn't know when I could defer it in

6      the next couple of months.  This would be the

7      easiest time this semester to have done jury duty,

8      but I'm not sure what I'm doing over the summer or

9      next.

10              THE COURT:  I'm sorry, I don't

11      understand.  Have you deferred your service in the

12      past?

13              JUROR:  No.

14              THE COURT:  You just got assigned to

15      this date.

16              JUROR:  Yes.

17              THE COURT:  But your classes started --

18              JUROR:  The 11th.

19              THE COURT:  On the 11th.

20              JUROR:  Yes.

21              THE COURT:  Two days ago.

22              JUROR:  Yes.

23              THE COURT:  So you're saying you could

24      serve, just not for such a long trial; is that

25      what you're saying?

242

```
 1              JUROR:  Yes.
 2              THE COURT:  All right, you're excused,
 3         ma'am.
 4              THE CLERK:  Excused.
 5    (Juror Number 85, excused.)
 6    (Juror Number 88 enters courtroom.)
 7              THE CLERK:  Juror 88, Sara Lashway.
 8              THE COURT:  Hi, Ms. Lashway.
 9              JUROR:  Hi.
10              THE COURT:  Ma'am, is there anything
11         about the nature of these charges or any of the
12         allegations that might affect your ability to be
13         fair and impartial?
14              JUROR:  No, besides -- well, I live in
15         Dorchester.
16              THE COURT:  Is there anything -- why do
17         you -- this alleged --
18              JUROR:  It's in Jamaica Plain, just as
19         close, similar neighborhoods.
20              THE COURT:  Well, is there anything
21         about you living in Dorchester, which is another
22         section of Boston, that means that you can't be
23         fair and impartial?
24              JUROR:  No, it's just I see a lot of the
25         same stories in the news in Dorchester, as well.
```

243

1          THE COURT:  And what have you read about

2     Dorchester that might affect your ability to be

3     fair and impartial?

4          JUROR:  There's just a lot of gun

5     violence in Dorchester, as well.  So I see a lot

6     of it in my neighborhood, as well.

7          THE COURT:  And is there anything that

8     you've seen about this gun violence around where

9     you live that would cause you to question your

10    ability to be a fair and impartial juror in this

11    case?

12         JUROR:  Not unfair, just nervous.

13         THE COURT:  Okay, well is there

14    something about your being nervous that might

15    cause you to question your ability to be fair and

16    impartial?

17         JUROR:  Not yet.

18         THE COURT:  When you say nervous, why

19    are you nervous?

20         JUROR:  I don't know, just gun violence

21    in my neighborhood and this is a gun violence

22    case, it makes me nervous.

23         THE COURT:  Ma'am, would you step

24    outside, please.

25    (Juror Number 88 exits courtroom.)

244

 1                    THE COURT:  Any problem with my excusing

 2         her for cause?

 3                    MR. HENNING:  None, Your Honor.

 4                    MS. SCAPICCHIO:  No.

 5                    THE COURT:  Excused for cause.

 6     (Juror Number 88 enters courtroom.)

 7                    THE COURT:  Thank you, ma'am, you are

 8         excused.

 9                    THE CLERK:  Excused.

10     (Juror Number 88, excused.)

11     (Juror Number 89 enters courtroom.)

12                    THE CLERK:  Juror 89, Abraham Colb.

13                    THE COURT:  Is it Dr. Colb?

14                    JUROR:  Yes.

15                    THE COURT:  Sir, is there anything about

16         the nature of these charges or any of the

17         allegations that might affect your ability to be

18         fair and impartial?

19                    JUROR:  No.

20                    THE COURT:  You may hear alleged

21         evidence that the defendant, the alleged victim,

22         and some of the witnesses were involved in selling

23         marijuana.  Would that evidence affect your

24         ability to be fair and impartial?

25                    JUROR:  No.

245

1          THE COURT:  The defendant in a criminal
2     trial has the absolute right not to testify.  If
3     Mr. Reddicks chose not to testify at this trial,
4     would you hold that against him in any way?
5          JUROR:  No.
6          THE COURT:  Is there anything about the
7     length of the trial that poses a hardship for you?
8          JUROR:  Not an extreme hardship.
9          THE COURT:  You've made my day, thank
10    you.  You've made my afternoon, anyway.  Thank
11    you, sir.
12         JUROR:  Oh, there are other questioners.
13         THE COURT:  There's still more.  The
14    attorneys may have some follow-up questions.
15         MR. HENNING:  Doctor, it says for type
16    of business, something of SSA and I just can't
17    read the handwriting.
18         JUROR:  That's the Quality Assurance
19    Branch of the Social Security Administration.
20         MR. HENNING:  Okay, so when it says
21    medical consultant, what is it exactly that you do
22    for work?
23         JUROR:  These are adjudications of
24    medical disability cases, so I review medical
25    histories and make judgments based on that and

246

1          according to the rules of the program.

2                    MR. HENNING:  Before you were a medical

3          consultant with SSA, did you practice any other

4          type of medicine.

5                    JUROR:  Yeah.  Well, I trained in

6          hematology, oncology, I did that, and I also did

7          molecular biology for a few years at Tufts

8          University Medical Center.

9                    MR. HENNING:  That was my next question.

10         The medical work that you've done in the past,

11         that's in Boston?

12                   JUROR:  Yes.

13                   MR. HENNING:  Which hospitals have you

14         worked at in Boston?

15                   JUROR:  I did my residency at Brigham

16         and Women's Hospital and I did my fellowship at

17         Tufts New England Medical Center, and I was on

18         staff there for a few years.

19                   MR. HENNING:  Have you ever worked in

20         any other parts of medicine other than the

21         oncology and hematology, have you done any

22         rotations in other sections?

23                   JUROR:  In clinical medicine, you mean.

24                   MR. HENNING:  Yes.

25                   JUROR:  No.

247

```
 1              MR. HENNING:  And you were born in New
 2       York City, correct?
 3              JUROR:  Yes.
 4              MR. HENNING:  Which medical school did
 5       you go to?
 6              JUROR:  Albert Einstein College of
 7       Medicine.
 8              MR. HENNING:  I have nothing further.
 9       Thank you, Doctor.
10              MS. SCAPICCHIO:  Hi, Doctor, good
11       afternoon.  It looks like you have five children?
12              JUROR:  Yes.
13              MS. SCAPICCHIO:  Did you raise them all
14       here in Boston or in New York?
15              JUROR:  Well, we moved into Boston when
16       my eldest was two years old, and the others were
17       born here and we've been here continuously since
18       then.
19              MS. SCAPICCHIO:  And have you always
20       lived in -- is there a certain section of the city
21       that you live in?
22              JUROR:  We live in West Roxbury.  We've
23       lived there since 1980.  My first year, we lived
24       in Brookline.
25              MS. SCAPICCHIO:  Did your children go to
```

248

1          the public school in West Roxbury, whatever that

2          was?

3                         JUROR:  No, they went to Boston Latin.

4                         MS. SCAPICCHIO:  Boston Latin, okay,

5          great.  I don't have any further questions,

6          thanks.

7                         THE COURT:  Sir, could you step outside

8          for just a second, please.

9                         JUROR:  Of course.

10   (Juror Number 89 exits courtroom.)

11                        THE COURT:  This juror stands

12         indifferent.

13                        MR. HENNING:  The Commonwealth is

14         content.

15                        MS. SCAPICCHIO:  Defendant will

16         challenge.

17   (Juror Number 89 enters courtroom.)

18                        THE COURT:  Thank you, Doctor, you are

19         excused.

20                        JUROR:  Oh, okay.

21                        THE CLERK:  Excused.

22   (Juror Number 89, excused.)

23   (Juror Number 90 enters courtroom.)

24                        THE CLERK:  Juror 90, Cornelia Sullivan.

25                        THE COURT:  Hi, Ms. Sullivan.

249

```
 1                 JUROR:  Hi, how are you?
 2                 THE COURT:  Ma'am, is there anything
 3       about the nature of these charges or any of the
 4       allegations you've heard that might affect your
 5       ability to be fair and impartial?
 6                 JUROR:  I don't think so.
 7                 THE COURT:  You may hear alleged
 8       evidence that the defendant, the alleged victim,
 9       and some of the witnesses were involved in selling
10       marijuana.  Would that evidence affect your
11       ability to be fair and impartial?
12                 JUROR:  I don't think so.
13                 THE COURT:  Are you sure about that?
14                 JUROR:  Just selling marijuana, no.
15                 THE COURT:  It is.  Would anything about
16       that alleged evidence cause you to question your
17       ability to be fair and impartial?
18                 JUROR:  I don't think so, no.  No, it
19       wouldn't.
20                 THE COURT:  The defendant in a criminal
21       trial has the absolute right not to testify.  If
22       Mr. Reddicks chose not to testify at this trial,
23       would you hold that against him in any way?
24                 JUROR:  No.
25                 THE COURT:  Is there anything about the
```

250

1          length of the trial that poses a hardship for you?

2                    JUROR:  Yes.

3                    THE COURT:  What is that?

4                    JUROR:  I have a six month old daughter

5          and I'm her primary care given, so I'm a little

6          bit concerned about that, and I have been

7          experiencing some postpartum anxiety, so I'm not

8          sure, I mean I'm not sure if that would get in the

9          way at all.

10                   THE COURT:  And your daughter was born

11         six months ago.  Has that interfered with your

12         ability to work?

13                   JUROR:  I have an at-home business and

14         I'm a stay-at-home mom.

15                   THE COURT:  You're excused, ma'am.

16                   THE CLERK:  Excused.

17    (Juror Number 90, excused.)

18    (Juror Number 93 enters courtroom.)

19                   THE CLERK:  93, Joel Sanchez.

20                   THE COURT:  Mr. Sanchez, is there

21         anything about the nature -- oh, I take that back,

22         I'm sorry.  You answered two of my earlier

23         questions, including the question about tending to

24         believe the testimony of a civilian witness over

25         the testimony of a police officer witness just

251

1          because he or she were a civilian.  Is that true?

2                    JUROR:  Um-hmm.

3                    THE COURT:  You have to say yes or no.

4                    JUROR:  Yes.  Yes, ma'am.

5                    THE COURT:  Thank you, sir, you are

6          excused.

7                    THE CLERK:  Excused.

8     (Juror Number 93, excused.)

9     (Juror Number 94 enters courtroom.)

10                    THE CLERK:  Juror 94, Dayana Valerio.

11                    THE COURT:  Hi, Ms. Valerio.

12                    JUROR:  Hi, how are you?

13                    THE COURT:  Ma'am, is there anything

14          about the nature of these charges or any of the

15          allegations that might affect your ability to be

16          fair and impartial?

17                    JUROR:  No.

18                    THE COURT:  You may hear alleged

19          evidence that the defendant, the alleged victim,

20          and some of the witnesses were involved in selling

21          marijuana.  Would that evidence affect your

22          ability to be fair and impartial?

23                    JUROR:  No.

24                    THE COURT:  The defendant in a criminal

25          trial has the absolute right not to testify.  If

252

1              Mr. Reddicks chose not to testify at this trial,

2         would you hold that against him in any way?

3                   JUROR:  Somewhat.

4                   THE COURT:  Somewhat?  You're excused,

5         ma'am.

6                   THE CLERK:  Excused.

7    (Juror Number 94, excused.)

8    (Juror Number 95 enters courtroom.)

9                   THE CLERK:  95, Jacob Rump.

10                  THE COURT:  Mr. Rump, you answered one

11        of my earlier questions.  Would you have the

12        tendency to believe a civilian witness, the

13        testimony of a civilian witness over the testimony

14        of a police officer witness just because he or she

15        were a civilian?

16                  JUROR:  Yes.

17                  THE COURT:  Thank you, sir, you are

18        excused.

19                  THE CLERK:  Excused.

20   (Juror Number 95, excused.)

21   (Juror Number 96 enters courtroom.)

22                  THE CLERK:  96, Jennifer Bolivar.

23                  THE COURT:  Good afternoon, ma'am.  Is

24        there anything about the nature of these charges

25        or any of the allegations you've heard that might

253

1           affect your ability to be fair and impartial?

2                    JUROR:  Kind of.  I get anxious very

3           easily, so I don't know if --

4                    THE COURT:  Are you anxious now?

5                    JUROR:  Yeah.

6                    THE COURT:  You think you're going to be

7           anxious being a juror on this case?

8                    JUROR:  I could, possibly.

9                    THE COURT:  I can't hear you, ma'am.

10                   JUROR:  Possibly.

11                   THE COURT:  Thank you, ma'am, you're

12          excused.

13                   THE CLERK:  Excused.

14     (Juror Number 96, excused.)

15     (Juror Number 97 enters courtroom.)

16                   THE CLERK: Juror 97, Amber Weigel.

17                   THE COURT:  Good afternoon, ma'am.  Is

18          there anything about the nature of these charges

19          or any of the allegations you've heard that might

20          affect your ability to be fair and impartial?

21                   JUROR:  No.

22                   THE COURT:  You may hear alleged

23          evidence that the defendant, the alleged victim,

24          and some of the witnesses may have been involved

25          in selling marijuana.  Would that evidence affect

254

1          your ability to be fair and impartial?

2                    JUROR:  No.

3                    THE COURT:  The defendant in a criminal

4          trial has the absolute right not to testify.  If

5          Mr. Reddicks chose not to testify at this trial,

6          would you hold that against him in any way?

7                    JUROR:  I might.

8                    THE COURT:  You're excused, ma'am.

9                    THE CLERK:  Excused.

10    (Juror Number 97, excused.)

11    (Juror Number 102 enters courtroom.)

12                    THE CLERK:  Juror 102, Katherine

13         Abgrego?

14                    JUROR:  Yes.

15                    THE COURT:  Ms. Abgrego, good afternoon.

16                    JUROR:  Good afternoon.

17                    THE COURT:  You didn't answer any of my

18         questions, but on the bottom of your

19         questionnaire, you say, "I have strong Christian

20         beliefs; however, this might not affect my ability

21         to serve."

22                    JUROR:  Correct.

23                    THE COURT:  Is there anything about your

24         beliefs or your religious principles that would

25         prevent you from sitting as a juror in this case?

255

1          JUROR:  No.  I was brought up Christian,
2     but I haven't practiced for a couple of years.
3          THE COURT:  All right, but you mentioned
4     it down below, so you have strong Christian
5     beliefs.  Would anything about your strong
6     Christian beliefs affect your ability to be a fair
7     and impartial juror in this case?
8          JUROR:  No, it should not affect my
9     ability.
10          THE COURT:  Is there anything about the
11     nature of these charges or any of the allegations
12     you've heard so far that might affect your ability
13     to be fair and impartial?
14          JUROR:  No, ma'am.
15          THE COURT:  Now, you may hear alleged
16     evidence that the defendant, the alleged victim,
17     and some of the witnesses were involved in selling
18     marijuana.  Would that evidence affect your
19     ability to be fair and impartial?
20          JUROR:  No, ma'am.
21          THE COURT:  The defendant in a criminal
22     trial has the absolute right not to testify.  If
23     Mr. Reddicks chose not to testify at this trial,
24     would you hold that against him in any way?
25          JUROR:  No.

256

1              THE COURT:  Is there anything about the

2       length of the trial that poses a hardship for you?

3              JUROR:  Other than not going to work,

4       no.

5              THE COURT:  Understand, there's a

6       statute on the books that protects jurors.

7              JUROR:  Yes.

8              THE COURT:  Your employer can't give you

9       any kind of hassle.  If you get a hassle, you come

10      to me.

11             JUROR:  Okay.

12             THE COURT:  Any follow-up questions,

13      Counsel?

14             MR. HENNING:  I'm just going to ask you

15      about, looking at the bottom of the questionnaire,

16      the question was is there anything in your

17      background, experience, employment, training,

18      education or knowledge that might affect your

19      ability to be a fair and impartial juror, and you

20      did say it may not affect, but when you put down

21      you have strong Christian beliefs, are there

22      particular beliefs or things about your beliefs

23      that made you think of that when you were reading

24      that answer?

25             JUROR:  Well, there's a part there that

257

1　　　says religion, no?

2　　　　　　　　MR. HENNING:  No, it's experience,

3　　　employment, background, training --

4　　　　　　　　JUROR:  Well, in my background --

5　　　　　　　　THE COURT:  Or beliefs.

6　　　　　　　　JUROR:  Well, in my background, so

7　　　I took it as beliefs, so I thought I should

8　　　mention it because it did ask it.  Other than

9　　　that, I don't think, like I said, I don't think it

10　　should affect me in any way because I was brought

11　　up Christian, but I haven't practiced for about

12　　six years now.

13　　　　　　　　MR. HENNING:  Where in Boston, just

14　　which neighborhood, not the address.

15　　　　　　　　JUROR:  East Boston.

16　　　　　　　　MR. HENNING:  How long have you lived in

17　　East Boston?  Were you born there?

18　　　　　　　　JUROR:  I lived there when I was

19　　younger, moved to Lynn, came back when I was 14,

20　　been there since then.

21　　　　　　　　MR. HENNING:  You have a five-year-old

22　　child now?

23　　　　　　　　JUROR:  I do.

24　　　　　　　　MR. HENNING:  Would being seated on a

25　　jury in any way cause problems with --

258

1              JUROR:  No, she'd be fine.

2              MR. HENNING:  Nothing further, Your

3      Honor.

4              THE COURT:  Ms. Scapicchio?

5              MS. SCAPICCHIO:  I noticed on your

6      questionnaire that you work for City Dental.

7              JUROR:  Yeah.

8              MS. SCAPICCHIO:  You work at the front

9      desk?

10             JUROR:  Um-hmm.

11             MS. SCAPICCHIO:  And how long have you

12     had that job?

13             JUROR:  Well, I've been working with

14     City Dental for two years.  Previously, I was

15     working for Doctor Dental, same location, for

16     three.

17             MS. SCAPICCHIO:  Okay, so they just

18     changed the name and you stayed there.

19             JUROR:  Yes, it was just a management

20     change.

21             MS. SCAPICCHIO:  You indicated that

22     your, either partner or significant other works in

23     construction?

24             JUROR:  Yes.

25             MS. SCAPICCHIO:  Is there a specific

259

1        company that he works for.
2                 JUROR:  No, it's just whatever comes up,
3        basically.
4                 MS. SCAPICCHIO:  So whatever they need
5        him, he'll go and do.
6                 JUROR:  Whatever, like, painting,
7        drywall, roofing, whatever it is, he's there.
8                 MS. SCAPICCHIO:  In terms of your
9        Christian belief, are you able to sit in judgment
10       of someone even though you have these strong
11       Christian beliefs?
12                JUROR:  I believe I could because
13       there's one thing judging somebody with evidence
14       and all that and then there's another thing in my
15       personal beliefs or how I grew up that shouldn't
16       have anything to do.
17                MS. SCAPICCHIO:  Is there something
18       about your personal beliefs, the way that you grew
19       up, that prevented you from judging people?  That
20       you've sort of just put it to the side because you
21       don't accept it, is that what it is?
22                JUROR:  I was brought up Christian, and
23       sometimes they tend to be a little more judgmental
24       of people, and I don't think that's correct.  It's
25       basically I was brought up that way, but I'm not

260

1          completely involved in that situation because

2          it's been six years without practicing it, so it's

3          like -- how can I explain this?  Yes, I was

4          brought up Christian, but no, I don't completely

5          believe in everything that is done in

6          Christianity.

7                    MS. SCAPICCHIO:  So you would describe

8          yourself as more independent.

9                    JUROR:  Correct.

10                    MS. SCAPICCHIO:  So you'd more

11          independent than whatever the Christian beliefs

12          are.  That religion wasn't more dependent.

13                    JUROR:  Correct, in the judgmental way

14          that they have, I don't have that.

15                    MS. SCAPICCHIO:  I don't have any

16          further questions.

17                    THE COURT:  Ma'am, could you step

18          outside for just a second, please.

19     (Juror Number 102 exits courtroom.)

20                    THE COURT:  This juror stands

21          indifferent.

22                    MR. HENNING:  Commonwealth is content.

23                    MS. SCAPICCHIO:  The defendant is

24          content.

25                    THE CLERK:  That would be Seat 5, Your

261

```
1        Honor.
2   (Juror Number 102 enters courtroom.)
3            THE COURT:  Ms. Abrego, you've been
4        chosen to be on this jury, so you're going to be
5        taken upstairs to join your fellow jurors.  Please
6        don't discuss any aspect of this case with them
7        and please don't allow them to discuss any aspect
8        of this case with you.
9            Thank you, ma'am, please go with the
10       Court Officer.
11           THE CLERK:  Seat 5.
12  (Juror Number 102 exits courtroom.)
13  (Juror Number 103 enters courtroom.)
14           THE CLERK:  103, Damean Vlasak.
15           THE COURT:  Hi, Mr. Vlasak.
16           JUROR:  Hello.
17           THE COURT:  Sir, is there anything about
18       the nature of these charges or any of the
19       allegations you've heard so far that might affect
20       your ability to be fair and impartial?
21           JUROR:  No.
22           THE COURT:  You may hear alleged
23       evidence that the defendant, the alleged victim,
24       and some of the witnesses may have been involved
25       in selling marijuana.  Would that evidence affect
```

262

```
 1              your ability to be fair and impartial?
 2                   JUROR:  No.
 3                   THE COURT:  The defendant in a criminal
 4              trial has the absolute right not to testify.  If
 5              Mr. Reddicks chose not to testify at this trial,
 6              would you hold that against him in any way?
 7                   JUROR:  No.
 8                   THE COURT:  Is there anything about the
 9              length of the trial that poses a hardship for you?
10                   JUROR:  No.
11                   THE COURT:  Counsel, any follow-up?
12                   MR. HENNING:  I have no follow-up.
13                   MS. SCAPICCHIO:  You've indicated that
14              you work for Boston University?
15                   JUROR:  Yes.
16                   MS. SCAPICCHIO:  And you're a systems
17              analyst?
18                   JUROR:  Systems administrator.
19                   MS. SCAPICCHIO:  What does that mean?
20                   JUROR:  IT.
21                   MS. SCAPICCHIO:  IT, okay.  Did you,
22              when you came into the courtroom today, did you
23              recognize anyone else from BASED UPON?
24                   JUROR:  No.  It's a very large
25              organization.
```

263

```
 1              MS. SCAPICCHIO:  I know it's huge,
 2         I just want to make sure.  You got your bachelor
 3         of science, was that at BASED UPON or somewhere
 4         else?
 5              JUROR:  UMass Boston.
 6              MS. SCAPICCHIO:  UMass Boston, okay.  In
 7         terms of the IT, is it your job if a professor has
 8         some problem with their computer, that you just go
 9         and fix it?
10              JUROR:  Amongst other things, yeah.
11         I maintain a number of systems, I help the
12         professors with their computers, students with
13         their computers, a variety of servers.  Anything
14         the astronomy department needs, I do, basically.
15              MS. SCAPICCHIO:  So you're the go-to guy
16         if anything is wrong with the computers.
17              JUROR:  Um-hmm.
18              MS. SCAPICCHIO:  I don't have any
19         further questions.
20              THE COURT:  You're a very desired guy,
21         I guess.  Sir, could you step outside for just a
22         second.
23    (Juror Number 103 exits courtroom.)
24              MS. SCAPICCHIO:  May I say something
25         before you --
```

264

```
1              THE COURT:  Of course.

2              MS. SCAPICCHIO:  My only concern is we

3    have that other professor from BASED UPON that he

4    says he doesn't know, but when they get in the

5    jury room, I'm just concerned that somebody might

6    know somebody, or that he might have worked on a

7    computer for the guy.

8              THE COURT:  Well, let's see if he's

9    impaneled and then you can let me know what you

10   want me to say to him if he's impaneled.

11             MS. SCAPICCHIO:  I just think it's --

12             THE COURT:  It's a huge university.

13             MS. SCAPICCHIO:  I understand that, but

14   if his job is to go fix professor's computers and

15   we have a professor from BASED UPON on the jury.

16             THE COURT:  I can ask him if he's

17   impaneled on this jury, to go up and see if he

18   recognizes any of the other jurors, and if he

19   does, tell the Court Officer.

20             MS. SCAPICCHIO:  That's fine.

21             THE COURT:  This juror stands

22   indifferent.

23             MR. HENNING:  Commonwealth is content.

24             MS. SCAPICCHIO:  Defendant will

25   challenge.
```

265

1                 THE CLERK:  That's eight.

2                 MS. SCAPICCHIO:  Yes, thank you.

3       (Juror Number 103 enters courtroom.)

4                 THE COURT:  Thank you, sir, you are

5           excused.

6                 THE CLERK:  Excused.

7       (Juror Number 103, excused.)

8       (Juror Number 104 enters courtroom.)

9                 THE CLERK:  104, Evan Dean.

10                THE COURT:  Hi, Mr. Dean.

11                JUROR:  Hello.

12                THE COURT:  Sir, is there anything about

13          the nature of these charges or any of the

14          allegations you've heard that might affect your

15          ability to be fair and impartial?

16                JUROR:  No, ma'am.

17                THE COURT:  You may hear alleged

18          evidence that the defendant, the alleged victim,

19          and some of the witnesses were involved in selling

20          marijuana.  Would that evidence affect your

21          ability to be fair and impartial?

22                JUROR:  No, ma'am.

23                THE COURT:  The defendant in a criminal

24          trial has the absolute right not to testify.  If

25          Mr. Reddicks chose not to testify, would you hold

266

1          that against him in any way?

2                    JUROR:  No.

3                    THE COURT:  Is there anything about the

4          length of the trial that poses a hardship for you?

5                    JUROR:  Yes.

6                    THE COURT:  What is that?

7                    JUROR:  I have the intention of closing

8          on a house this Friday, my first home.

9                    THE COURT:  And when is the closing?

10                    JUROR:  This Friday at 1 PM.

11                    THE COURT:  You're excused, sir.

12                    JUROR:  Thank you.

13                    THE CLERK:  Excused.

14     (Juror Number 104, excused.)

15     (Juror Number 106 enters courtroom.)

16                    THE CLERK:  Juror 106, Shannon Zolper.

17                    JUROR:  Yes.

18                    THE COURT:  Good afternoon, ma'am.  Is

19          there anything about the nature of these charges

20          or any of the allegations you've heard that might

21          affect your ability to be fair and impartial?

22                    JUROR:  No, I don't think so.

23                    THE COURT:  Now, you may hear alleged

24          evidence that the defendant, the alleged victim,

25          and some of the witnesses were involved in selling

267

```
 1          marijuana.  Would that evidence affect your
 2          ability to be fair and impartial?
 3                   JUROR:  I don't think so.
 4                   THE COURT:  The defendant in a criminal
 5          trial has the absolute right not to testify.  If
 6          Mr. Reddicks chose not to testify at this trial,
 7          would you hold that against him in any way?
 8                   JUROR:  Possibly.
 9                   THE COURT:  Thank you, ma'am, you are
10          excused.
11                   THE CLERK:  Excused.
12     (Juror Number 106, excused.)
13     (Juror Number 107 enters courtroom.)
14                   THE CLERK:  107, Alyssa Yogel?
15                   JUROR:  Yes.
16                   THE CLERK:  Have a seat, please.
17                   THE COURT:  Hi, Ms. Yogel.
18                   JUROR:  Hi.
19                   THE COURT:  Ma'am, is there anything
20          about the nature of these charges or any of the
21          allegations you've heard that might affect your
22          ability to be fair and impartial?
23                   JUROR:  No.
24                   THE COURT:  You may hear alleged
25          evidence that the defendant, the alleged victim,
```

268

1          and some witnesses were involved in selling

2          marijuana.  Would that evidence affect your

3          ability to be fair and impartial?

4                    JUROR:  I don't think so.

5                    THE COURT:  The defendant in a criminal

6          trial has the absolute right not to testify.  If

7          Mr. Reddicks chose not to testify at this trial,

8          would you hold that against him in any way?

9                    JUROR:  I guess it would depend on what

10         the case, how it goes.  I don't know if that's a

11         proper answer.  I guess it depends upon the

12         information provided.

13                   THE COURT:  So it might?

14                   JUROR:  Perhaps if I want to know what

15      he would say?

16                   THE COURT:  Thank you, ma'am, you are

17         excused.

18                   THE CLERK:  Excused.

19   (Juror Number 107, excused.)

20   (Juror Number 108 enters courtroom.)

21                   THE CLERK:  108, Carl Purdy.

22                   THE COURT:  Hi, Mr. Purdy.

23                   JUROR:  Hello.

24                   THE COURT:  Sir, is there anything about

25         the nature of these charges or any of the

269

1          allegations you've heard that might affect your

2          ability to be fair and impartial?

3                    JUROR:  No.

4                    THE COURT:  You may hear alleged

5          evidence that the defendant, the alleged victim,

6          and some of the witnesses were involved in selling

7          marijuana.  Would that evidence affect your

8          ability to be fair and impartial?

9                    JUROR:  No.

10                   THE COURT:  The defendant in a criminal

11         trial has the absolute right not to testify.  If

12         Mr. Reddicks chose not to testify at this trial,

13         would you hold that against him in any way?

14                   JUROR:  No.

15                   THE COURT:  Is there anything about the

16         length of the trial that poses a hardship for you?

17                   JUROR:  No.

18                   THE COURT:  Any follow-up, Counsel?

19                   MR. HENNING:  Good afternoon, sir, how

20         you?

21                   JUROR:  Good afternoon.

22                   MR. HENNING:  On the jury questionnaire,

23         there's a section up top where it lists the

24         employment, and you have self-employed.  Can you

25         just describe what you do for work?

270

1              JUROR:  I'm a landscaper, but I just had

2         knee surgery, so I'm out for a while.

3              MR. HENNING:  Do you do commercial

4         buildings, residential?

5              JUROR:  Residential.

6              MR. HENNING:  Do you run a business,

7         yourself, or do you work with somebody?

8              JUROR:  I work with someone.

9              MR. HENNING:  Where is the business

10        located?

11             JUROR:  It's located at 270 Huntington

12        Avenue, my home.  I do a lot of houses in Weston.

13             MR. HENNING:  In Weston?

14             JUROR:  Yeah.

15             MR. HENNING:  The five children that you

16        have listed, how many of them are you responsible

17        for in the house now?

18             JUROR:  None of my children are with me

19        right now, they're with their mothers, I pay child

20        support.

21             MR. HENNING:  There's the experience

22        with the law section.

23             JUROR:  Yes.

24             MR. HENNING:  You have some of them

25        checked off, and then there's a section that says

271

1          just to describe.  I can give you the sheet if you
2          want, but can you just describe, you checked off
3          that you or someone in your household or family
4          had been arrested, charged with a crime,
5          convicted, and been a crime victim.  Can you just
6          give us a little more information on those?
7               JUROR:  Yeah, I was arrested, I was
8          charged with a crime.  I was convicted of
9          possession of Class D when I was 19 years old.
10         Also I had a -- well, it was a continuance without
11         a finding in 2001 for possession of Class B, but
12         something happened with my probation, so it was a
13         time served with that.  And I've also had to
14         witness, but it wasn't in a criminal case, just
15         like with my building because I've been there for
16         15 years, incident happened, I had to show up in
17         court, but it didn't even go to trial, so I never
18         had to testify.
19              MR. HENNING:  You said it wasn't
20         criminal.  Was it a civil case over money or was
21         it where you were a witness to something?
22              JUROR:  I was a witness to an action
23         that happened with property damage.
24              MR. HENNING:  Then there's something
25         here where it's checked off that you're a crime

272

```
1        victim, you or someone in your family has been a
2        victim of a crime?
3                 JUROR:  Yeah, I've been a victim of a
4        crime, I've had my bike stolen before.  I live on
5        Huntington Ave. by Northeastern, so that's common,
6        you know?
7                 MR. HENNING:  Other than the bike theft,
8        are there other instances where --
9                 JUROR:  No.
10                MR. HENNING:  And other than the
11       possession of Class D and the possession of Class
12       B, are there any other instances of things that
13       would trigger you to check the box?
14                JUROR:  No.
15                MR. HENNING:  Prior to being involved in
16       landscaping, what was the last job that you had
17       before that?
18                JUROR:  I was a chef, cook.
19                MR. HENNING:  In the city?
20                JUROR:  Yeah.
21                MR. HENNING:  I have nothing further,
22       Your Honor.
23                MS. SCAPICCHIO:  Where did you cook?
24                JUROR:  I cooked at the Top of the Hub
25       in Boston, I cooked for Sudexo up at the Federal
```

273

1           Reserve Bank.  I've cooked at the Museum of

2           Science.  I was also, like, did a lot of road work

3           out on the 128 belt for Sodexo.

4                   THE COURT:  Nice places.

5                   MS. SCAPICCHIO:  Nice place.

6                   THE COURT:  Top of the Hub.

7                   MS. SCAPICCHIO:  You indicated that you

8           have five children?

9                   JUROR:  Um-hmm.

10                  MS. SCAPICCHIO:  Were they all raised in

11          Boston?

12                  JUROR:  One was raised in South

13          Carolina.  The oldest is in South Carolina, all

14          the rest were raised in Boston.

15                  MS. SCAPICCHIO:  Do they go to Boston

16          Public Schools?

17                  JUROR:  No, no.  The youngest one does,

18          the other ones, they're out of school now.

19          They're in college, and one's in the military, the

20          22-year-old.

21                  MS. SCAPICCHIO:  And in terms of your

22          spouse or partner, what did she do?

23                  JUROR:  I don't have one, I'm single.

24          I'm single right now, that's why I left that

25          blank.

274

1          MS. SCAPICCHIO:  So the mother of your

2    children --

3          JUROR:  Oh, the mother of my children?

4          MS. SCAPICCHIO:  Yes.

5          JUROR:  She was a homemaker, she stayed

6    at home.

7          MS. SCAPICCHIO:  Okay, she stayed home

8    and then you worked.

9          JUROR:  Right.

10         MS. SCAPICCHIO:  You were the chef, you

11    were the one making money and bring it home.

12         JUROR:  Um-hmm.

13         MS. SCAPICCHIO:  I don't have any

14    further questions.

15         THE COURT:  Sir, would you stand outside

16    for just a moment, please.

17         JUROR:  Thank you.

18  (Juror Number 108 exits courtroom.)

19         THE COURT:  This juror stands

20    indifferent.

21         MR. HENNING:  Judge, I'd just ask -- my

22    issue is with the prior charges and who the

23    organizations are that he was charged by.

24    I didn't ask the follow-up, perhaps I should.

25    I thought that you may excuse based on what he

275

1          described.

2                    THE COURT:  I don't understand what you

3          just said.

4                    MR. HENNING:  I'd ask to inquire again

5          if he was arrested by the Boston Police.

6                    THE COURT:  Oh, sure.  Do you want to

7          inquire more?  That's perfectly fine.

8     (Juror Number 108 enters courtroom.)

9                    THE COURT:  Mr. Purdy, The attorneys may

10         have some additional questions of you.

11                   JUROR:  Okay.

12                   MR. HENNING:  Sorry, just a couple of

13         questions.  On the prior instances where you were

14         involved in the system, even when you were 19, do

15         you remember where it took place?

16                   JUROR:  The original case was in

17         Dorchester District Court, and the other case was

18         in West Roxbury.

19                   MR. HENNING:  Do you remember which

20         police department was involved.

21                   JUROR:  Dorchester District Court would

22         have been B-2 and West Roxbury would have been

23         D-4.

24                   MR. HENNING:  Based on your experiences

25         with the criminal justice system in those two

276

```
1          cases, do you have any feelings one way or another
2          towards the Boston Police Department?
3                    JUROR:  I got a fair trial.  I got a
4          fair trial.
5                    MR. HENNING:  Thank you.
6                    THE COURT:  Ms. Scapicchio, anything
7          further?
8                    MS. SCAPICCHIO:  I don't have anything.
9                    THE COURT:  Sir, if you could step
10         outside one more time, please.
11                    JUROR:  All right, thank you.
12    (Juror Number 108 exits courtroom.)
13                    THE COURT:  This juror stands
14         indifferent
15                    MR. HENNING:  I'm going to exercise a
16         peremptory.
17    (Juror Number 108 enters courtroom.)
18                    THE COURT:  Thank you, sir, you are
19         excused.
20                    THE CLERK:  Excused.
21    (Juror Number 108, excused.)
22    (Juror Number 109 enters courtroom.)
23                    THE CLERK:  109, Nicholas McKiel?
24                    JUROR:  Correct.
25                    THE COURT:  Mr. McKiel, is there
```

277

```
1              anything about the nature of these charges or any
2              of the allegations you've heard that might affect
3              your ability to be fair and impartial?
4                      JUROR:  No.
5                      THE COURT:  You may hear alleged
6              evidence that the defendant, the alleged victim,
7              and some of the witnesses may have been involved
8              in selling marijuana.  Would that evidence affect
9              your ability to be fair and impartial?
10                     JUROR:  It might.
11                     THE COURT:  Thank you, sir, you're
12             excused.
13                     THE CLERK:  Excused.
14     (Juror Number 109, excused.)
15     (Juror Number 110 enters courtroom.)
16                     THE CLERK:  110, Michael Coffey.
17                     THE COURT:  Hi, Mr. Coffey.  Sir, is
18             there anything about the nature of these charges
19             or any of the allegations you've heard that might
20             affect your ability to be fair and impartial?
21                     JUROR:  I don't think so.
22                     THE COURT:  You may hear alleged
23             evidence that the defendant, the alleged victim,
24             and some of the witnesses may have been involved
25             in selling marijuana.  Would that evidence affect
```

278

1          your ability to be fair and impartial?

2                    JUROR:  No.

3                    THE COURT:  The defendant in a criminal

4          trial has the absolute right not to testify.  If

5          Mr. Reddicks chose not to testify at this trial,

6          would you hold that against him in any way?

7                    JUROR:  I think he should testify.

8                    THE COURT:  Thank you, sir, you are

9          excused.

10                    THE CLERK:  Excused.

11     (Juror Number 110, excused.)

12     (Juror Number 111 enters courtroom.)

13                    THE CLERK:  Juror 111, Vanessa Neves.

14                    JUROR:  Yes.

15                    THE COURT:  Are we pronouncing that

16          correctly?

17                    JUROR:  Neves.

18                    THE COURT:  Ms. Neves, is there anything

19          about the nature of these charges or any of the

20          allegations you've heard that might affect your

21          ability to be fair and impartial?

22                    JUROR:  No.

23                    THE COURT:  You may hear alleged

24          evidence that the defendant, the alleged victim,

25          and some of the witnesses were involved in selling

279

```
 1              marijuana.  Would that evidence affect your

 2              ability to be fair and impartial?

 3                    JUROR:  No.

 4                    THE COURT:  The defendant in a criminal

 5              trial has the absolute right not to testify.  If

 6              Mr. Reddicks chose not to testify at this trial,

 7              would you hold that against him in any way?

 8                    JUROR:  No.

 9                    THE COURT:  Is there anything about the

10              length of the trial that poses a hardship for you?

11                    JUROR:  Kind of, yes.

12                    THE COURT:  I'm sorry?

13                    JUROR:  Yes.

14                    THE COURT:  What is that?

15                    JUROR:  Just it being, you said about

16              nine days, right?

17                    THE COURT:  Approximately, it could be

18              less than that, it could be more than that.

19                    JUROR:  Somewhat, yes.

20                    THE COURT:  What?

21                    JUROR:  Just being long.

22                    THE COURT:  Ma'am, I can't consider that

23              a hardship.

24                    JUROR:  Oh, no, no, I'm sorry, then

25              there isn't any.
```

280

1              THE COURT:  It's not the shortest of

2       trials, but it certainly not the longest of

3       trials.

4              JUROR:  Yes.

5              THE COURT:  Is there anything that poses

6       a hardship for you?

7              JUROR:  No.

8              THE COURT:  So you can serve.

9              JUROR:  Yes.

10             THE COURT:  I'll give the jury updates,

11      but it's going to be approximately nine days.

12             JUROR:  Okay.

13             THE COURT:  The rest of this week, all

14      of next week, there are four days next week,

15      Monday being a holiday, and it's going to spill

16      over into the following week.  Okay?

17             JUROR:  Yes.

18             THE COURT:  Great.  Any follow-up

19      questions, counsel?

20             MR. HENNING:  Hi, how you?

21             JUROR:  Good.

22             MR. HENNING:  Where did you go to high

23      school?

24             JUROR:  I went to East Boston High.

25             MR. HENNING:  Did you graduate from East

281

1      Boston?

2                  JUROR:  Yes.

3                  MR. HENNING:  Do you have any siblings?

4                  JUROR:  Yes.

5                  MR. HENNING:  How old are they?

6                  JUROR:  I have a brother that's 23 and a

7      sister that's 29.

8                  MR. HENNING:  Where do they live?

9                  JUROR:  In Roxbury, Dorchester.

10                 MR. HENNING:  How long have you been

11     working at Bank of America?

12                 JUROR:  Eight months now.

13                 MR. HENNING:  Did you have any other

14     jobs after you finished high school before you

15     went to Bank of America?

16                 JUROR:  Yes.

17                 MR. HENNING:  Where did you work before?

18                 JUROR:  I used to work at Legal Seafood

19     and I used to work at Stop and Shop.

20                 MR. HENNING:  I have nothing further at

21     this point.

22                 THE COURT:  Ms. Scapicchio?

23                 MS. SCAPICCHIO:  Hi, how are you?

24                 JUROR:  Good.

25                 MS. SCAPICCHIO:  It indicates on your

282

1          juror questionnaire that you also checked the box

2          for student?

3                    JUROR:  Yes.

4                    MS. SCAPICCHIO:  Are you a student right

5          now?

6                    JUROR:  Yes.

7                    MS. SCAPICCHIO:  Where do you go to

8          school?

9                    JUROR:  RCC.

10                   MS. SCAPICCHIO:  Roxbury Community

11         College?

12                   JUROR:  Yes.

13                   MS. SCAPICCHIO:  So do you do that days,

14         nights?

15                   JUROR:  Nights.

16                   MS. SCAPICCHIO:  Okay, so you're a full-

17         time teller during the day?

18                   JUROR:  Um-hmm.

19                   MS. SCAPICCHIO:  And then you go to

20         class at night.

21                   JUROR:  Yes.

22                   MS. SCAPICCHIO:  How many nights a week

23         do you do that?

24                   JUROR:  School starts on Monday, so

25         I still have to pick my classes and see what could

283

 1          work around my schedule.

 2                    MS. SCAPICCHIO:  So you haven't even

 3          been to your first class yet.

 4                    JUROR:  Well, I have -- not this

 5          semester, but this will be my third semester

 6          there.

 7                    MS. SCAPICCHIO:  But for this semester,

 8          you haven't even been to your classes.

 9                    JUROR:  No.

10                    MS. SCAPICCHIO:  So what happens if you

11          don't show up for two weeks?

12                    JUROR:  To school?

13                    MS. SCAPICCHIO:  Right.

14                    JUROR:  They'll probably take me out.

15                    THE COURT:  But these are night classes,

16          correct?

17                    JUROR:  Yeah.

18                    MS. SCAPICCHIO:  From what time to what

19          time?

20                    JUROR:  They usually start around like

21          5:30 to 8.

22                    MS. SCAPICCHIO:  Okay, so you usually

23          work during the day, go to school from 5:30 to 8,

24          and then when do you do your homework?

25                    JUROR:  The school, the one I'm going to

284

1          set up is two days a week, so it would be Mondays

2          and Wednesdays or I could pick Tuesdays and

3          Thursdays.

4                    MS. SCAPICCHIO:  You have other days

5          that you won't be in school and you could get your

6          homework done.

7                    JUROR:  Yes.

8                    MS. SCAPICCHIO:  It's not going to be

9          too stressful to be here all day, going to school,

10         doing your homework.

11                   JUROR:  It could be a challenge, yes.

12                   MS. SCAPICCHIO:  But you could do it.

13                   JUROR:  Yeah.

14                   MS. SCAPICCHIO:  I don't have anything

15         further.

16                   THE COURT:  Ms. Neves, would you step

17         outside for just a second, please.

18                   JUROR:  Sure.

19    (Juror Number 111 exits courtroom.)

20                   THE COURT:  Again, Ms. Scapicchio, the

21         hardship determinations are mine.  Of course, it's

22         going to be a challenge to her.  I don't think

23         that that's an appropriate inquiry for you.  I've

24         been extremely generous to you two asking

25         questions about things like siblings and things

285

1          that I don't think are terribly relevant, but this
2          is my call, and of course, it's going to be a
3          challenge to her, but she does it throughout her
4          life.  She's a teller during the day, she goes to
5          school at night.  All she's going to change is
6          she's going to be a juror during the day and she's
7          going to go to school at night.  So please don't
8          give her the ability to find an excuse.  That's
9          the only line that I'm drawing.  I've been
10         extremely generous and charitable otherwise.
11                  That being said, I declare her to be
12         indifferent.
13                  MR. HENNING:  Commonwealth is content.
14                  MS. SCAPICCHIO:  Defendant is content.
15                  THE COURT:  Okay, bring her back in.
16     (Juror Number 111 enters courtroom.)
17                  THE COURT:  Ms. Neves, You have been
18         chosen to be on this jury.
19                  JUROR:  Okay.
20                  THE COURT:  You're going to go upstairs
21         and join the other jurors who have been impaneled
22         during the day.
23                  JUROR:  All right.
24                  THE COURT:  I want to remind you, please
25         don't discuss this case in any way with anyone,

286

1              including them, nor allow anyone, including them,

2              to discuss anything about the case with you.  All

3              right?

4                        JUROR:  Okay.

5                        THE COURT:  Thank you, go with the

6              Court Officer.

7                        THE CLERK:  Seat 7.

8        (Juror Number 111 exits courtroom.)

9        (Juror Number 116 enters courtroom.)

10                       THE CLERK:  Juror 116, Joshua Steiner.

11                       JUROR:  Yes.

12                       THE COURT:  Hi, Mr. Steiner.  Sir, is

13             there anything about the nature of these charges

14             or any of the allegations that might affect your

15             ability to be fair and impartial?

16                       JUROR:  No.

17                       THE COURT:  You may hear alleged

18             evidence that the defendant, the alleged victim,

19             and some witnesses were involved in selling

20             marijuana.  Would that evidence affect your

21             ability to be fair and impartial?

22                       JUROR:  No.

23                       THE COURT:  The defendant in a criminal

24             trial has the absolute right not to testify.  If

25             Mr. Reddicks chose not to testify at this trial,

287

1          would you hold that against him in any way?

2                    JUROR:  No.

3                    THE COURT:  Is there anything about the

4          length of the trial that poses a hardship for you?

5                    JUROR:  No.

6                    THE COURT:  Counsel?

7                    MR. HENNING:  Thank you.  Can you

8          explain what Thoughtbot, Inc. is and what you do

9          with them?

10                    JUROR:  We're a software consultancy.

11          We develop apps for other companies.

12                    MR. HENNING:  Do you do programming?

13                    JUROR:  Yes.

14                    MR. HENNING:  You do, okay.  When did

15          you come from Connecticut to Boston?

16                    JUROR:  Oh, that's where I was born.

17          I only lived there for like a month.

18                    MR. HENNING:  You grew up in Boston?

19                    JUROR:  No, upstate New York.

20                    MR. HENNING:  And then did you come to

21          Boston for college?

22                    JUROR:  No, for this job.

23                    MR. HENNING:  For this job, okay.

24          Where did you go to college?

25                    JUROR:  RPI.

288

1           MR. HENNING:  Nothing further.

2           MS. SCAPICCHIO:  When you indicated that

3      you develop apps, any good ones we know?

4           JUROR:  No, probably not.

5           MS. SCAPICCHIO:  Just curious.  I have

6      no further questions.

7           THE COURT:  Sir, could you step outside

8      for just a second, please.

9           JUROR:  Sure.

10   (Juror Number 116 exits courtroom.)

11          THE COURT:  This juror stands

12      indifferent.

13          MR. HENNING:  Content.

14          MS. SCAPICCHIO:  Defendant is content,

15      Your Honor.

16          THE CLERK:  That will be Seat 10, Your

17      Honor.

18   (Juror Number 116 enters courtroom.)

19          THE COURT:  Hi, Mr. Steiner.  You've

20      been chosen to be on this jury.  You're going to

21      go upstairs in a moment to join the other

22      impaneled jurors.  I'm going to ask you not to

23      discuss this case in any way with anyone,

24      including them, nor allow anyone to discuss any

25      part of the case with you.  All right?

289

```
 1                    JUROR:  Okay.

 2                    THE COURT:  Thank you, sir, if you could

 3           go with the Court Officer, please.

 4                    THE CLERK:  Seat 10.

 5      (Juror Number 116 exits courtroom.)

 6      (Juror Number 117 enters courtroom.)

 7                    THE CLERK:  Juror 117, Yudi Quintero.

 8                    THE COURT:  Ms. Quintero, you answered

 9           one of my earlier questions.  Can you tell me what

10           your concern is about being on this jury?

11                    JUROR:  I don't speak English very well,

12           so when you speak --

13                    THE COURT:  You're from Columbia.

14                    JUROR:  Correct.

15                    THE COURT:  How long have you been in

16           the United States?

17                    JUROR:  Six years.

18                    THE COURT:  Do you think that you're

19           going to have trouble understanding everything

20           that's said at this trial?

21                    JUROR:  Correct.

22                    THE COURT:  All right, thank you, ma'am,

23           for bringing this to our attention.  Because of

24           that, I'm going to excuse you.  Thank you, ma'am,

25           you're free to go.
```

290

1              THE CLERK:  Excused.

2      (Juror Number 117, excused.)

3      (Juror Number 118 enters courtroom.)

4              THE CLERK:  Juror 118, Yuan Lin?

5              JUROR:  Yes.

6              THE COURT:  Hi, Mr. Lin.  Sir, is there

7          anything about the nature of these charges or any

8          of the allegations you've heard that might affect

9          your ability to be fair and impartial?

10             JUROR:  No.

11             THE COURT:  You may hear alleged

12         evidence that the defendant, the alleged victim,

13         and some of the witnesses were involved in selling

14         marijuana.  Would that evidence affect your

15         ability to be fair and impartial?

16             JUROR:  No.

17             THE COURT:  The defendant in a criminal

18         trial has the absolute right not to testify.  If

19         Mr. Reddicks chose not to testify at this trial,

20         would you hold that against him in any way?

21             JUROR:  No.

22             THE COURT:  Is there anything about the

23         length of the trial that poses a hardship for you?

24             JUROR:  Yes.

25             THE COURT:  What is that?

291

```
 1              JUROR:  I'm actually scheduled to sell
 2         my house and move out of Massachusetts in the next
 3         two weeks.  I have a wife and eight month old
 4         baby, so we are scheduled to close selling my
 5         house on the 22nd, and my wife and the kids and
 6         I are flying out to California.
 7              THE COURT:  You've got a lot on your
 8         plate, Mr. Lin, you're excused.  Good luck.
 9              JUROR:  Thank you.
10              THE CLERK:  Excused.
11    (Juror Number 118, excused.)
12    (Juror Number 119 enters courtroom.)
13              THE CLERK:  Juror 119, John Maynard.
14              THE COURT:  Good afternoon, Mr. Maynard.
15              JUROR:  Good afternoon.
16              THE COURT:  Sir, I notice that you're
17         72.  By law in Massachusetts, I can't force you to
18         be on a jury unless you agree to be on a jury.
19              JUROR:  I'm here by choice.
20              THE COURT:  You're here by choice?
21              JUROR:  I'm here by choice.
22              THE COURT:  That's great, Mr. Maynard.
23         Sir, is there anything about the nature of these
24         charges or any of the allegations you've heard
25         that might affect your ability to be fair and
```

292

1          impartial?

2                    JUROR:  Not at all, no.

3                    THE COURT:  You may hear alleged

4          evidence that the defendant, the alleged victim,

5          and some of the witnesses were involved in selling

6          marijuana.  Would that evidence affect your

7          ability to be fair and impartial?

8                    JUROR:  No.

9                    THE COURT:  The defendant in a criminal

10         trial has the absolute right not to testify.  If

11         Mr. Reddicks chose not to testify at this trial,

12         would you hold that against him in any way?

13                   JUROR:  That's his right.

14                   THE COURT:  I love to hear that, thank

15         you.  That's his absolute right.

16                   Finally, sir, is there anything about

17         the length of the trial that poses a hardship for

18         you?

19                   JUROR:  I have a couple of doctor's

20         appointments, but they're easily postponed.

21                   THE COURT:  More music to my ears,

22         thank you, sir.  Any follow-up?

23                   MR. HENNING:  I don't have any

24         questions.

25                   MS. SCAPICCHIO:  Hi, sir.

293

1                    JUROR:  Hi.

2                    MS. SCAPICCHIO:  You worked for Delta

3          Airlines?

4                    JUROR:  I did.

5                    MS. SCAPICCHIO:  How long did you work

6          for Delta?

7                    JUROR:  Well, I'm actually still a

8          contractor with them, so 47 years.

9                    MS. SCAPICCHIO:  You had checked

10         retired.

11                   JUROR:  I am retired.  I am retired as

12         an employee, I'm a contractor.

13                   MS. SCAPICCHIO:  Okay, so what do you

14         do --

15                   JUROR:  I just do charity work now.

16                   MS. SCAPICCHIO:  What do you do as a

17         contractor?

18                   JUROR:  Charity work.  I work with an

19         organization which is a 501(c)(3) which assists

20         employees that have problems with hurricanes,

21         tornadoes, floods, cancer, if they can't make

22         their payments, we're there to assist them.

23                   MS. SCAPICCHIO:  Employees of Delta

24         Airlines.

25                   JUROR:  All retirees or employees of

294

1          Delta Airlines, yes.

2                    MS. SCAPICCHIO:  So you're like the

3          squad that goes in to help them if there's --

4                    JUROR:  You got it, yeah.

5                    MS. SCAPICCHIO:  -- something going on.

6          So you're like right there with the Red Cross?

7                    JUROR:  Not like the Red Cross, but

8          we're there for them.

9                    MS. SCAPICCHIO:  Is there a certain

10         program that's run by Delta?

11                   JUROR:  It's not run by Delta, we're

12         totally independent.  We are 501(c)(3), as I said.

13         We are totally separate from Delta, but we're made

14         up by 13 Delta employees and retirees.

15                   MS. SCAPICCHIO:  Okay, so you guys

16         decided to try to help each other out after you

17         retired.

18                   JUROR:  Exactly, yes.

19                   MS. SCAPICCHIO:  And so there's a team

20         of you who go in and try to help people out if

21         there's tornadoes or fires or anything like that.

22                   JUROR:  Exactly, world-wide, yeah.

23                   MS. SCAPICCHIO:  How long have you done

24         that type of charity work?

25                   JUROR:  Since I retired in 2002.

295

1        I really don't want to give up, you know.  I want
2        to keep busy.
3              MS. SCAPICCHIO:  I don't blame you.
4              THE COURT:  I don't blame you, sir.
5              MS. SCAPICCHIO:  Thank you very much.
6        I have no further questions.
7              THE COURT:  Would you step outside for
8        just a second, sir.
9              JUROR:  Yes.
10   (Juror Number 119 exits courtroom.)
11              THE COURT:  This juror stands
12       indifferent.
13              MR. HENNING:  Commonwealth is going to
14       exercise a peremptory.
15   (Juror Number 119 enters courtroom.)
16              THE COURT:  Thank you, sir, you are
17       excused.
18              THE CLERK:  Excused.
19              JUROR:  Excused?
20              THE COURT:  You are.  Go figure, sir.
21       I don't get it, either.
22              JUROR:  Thank you, all.
23   (Juror Number 119, excused.)
24   (Juror Number 122 enters courtroom.)
25              THE CLERK:  122, Dexter Taylor.

296

1                JUROR:  Correct.

2                THE COURT:  Hi, Mr. Taylor.  Sir, is

3        there anything about the nature of these charges

4        or any of the allegations you've heard that might

5        affect your ability to be fair and impartial?

6                JUROR:  No.

7                THE COURT:  You may hear alleged

8        evidence that the defendant, the alleged victim,

9        and some of the witnesses were involved in selling

10       marijuana.  Would that evidence affect your

11       ability to be fair and impartial?

12               JUROR:  No.

13               THE COURT:  The defendant in a criminal

14       trial has the absolute right not to testify.  If

15       Mr. Reddicks chose not to testify at this trial,

16       would you hold that against him in any way?

17               JUROR:  No, I would not.

18               THE COURT:  Is there anything about the

19       length of the trial that poses a hardship for you?

20               JUROR:  No.

21               THE COURT:  Counsel, any follow-up?

22               MR. HENNING:  Good afternoon, sir, how

23       are you?

24               JUROR:  Good afternoon, sir.

25               MR. HENNING:  The place of birth on your

297

1          sheet here wasn't listed.  Are you born in Boston?
2                    JUROR:  Oh, yes, I forgot to mark that,
3          my apologies.
4                    MR. HENNING:  That's okay, no big deal.
5          So you were born in Boston.
6                    JUROR:  Yes.
7                    MR. HENNING:  Where did you go to high
8          school?
9                    JUROR:  Dorchester High.
10                   MR. HENNING:  Dorchester High, okay.
11         Were your children raised in the city?
12                   JUROR:  Yes, they were.
13                   MR. HENNING:  Down in the experience
14         with the law section, it says were you or anyone
15         in your household ever arrested, charged with a
16         crime, or convicted of a crime.  Can you identify
17         who the person was that you listed the assault and
18         battery for?
19                   JUROR:  That's for myself.
20                   MR. HENNING:  Can you just explain what
21         you remember about the case?
22                   JUROR:  That case was back in 2009.
23         I had a stepson that swung one of them old iron
24         snow shovels at me, and I basically defended
25         myself, but I still caught a charge for defending

298

1     myself at the time, so I said whatever's whatever.

2     And then down the road, I ended up getting rid of

3     the ex-wife, too, along with him.  Canned them

4     both.  Hey, you know what they say, the first one

5     to put his cards on the table, like Kenny Loggins.

6     Know when to fold them, get rid of them.

7               THE COURT:  Can we move this on, please?

8     Thank you.

9               MR. HENNING:  In that particular

10    incident, do you remember what the result of the

11    case was?

12              JUROR:  I caught a one year probation,

13    I had to go through a domestic violence batterers

14    program which was for nine months out of Roxbury

15    District Court.

16              MR. HENNING:  Was that by Boston Police,

17    was it an arrest by Boston Police?

18              JUROR:  Boston Police.

19              MR. HENNING:  The experience that you

20    had through that case, does that make you have any

21    feelings toward the Boston Police Department or

22    the Suffolk County District Attorney's Office?

23              JUROR:  I don't so much as blame them

24    for that because I had a house that was completely

25    out of control.  So, basically, it's a two-sided

299

1          coin.  The police came there to deal with a

2          situation that was already out of control, so

3          I basically had to rectify to say look, I'll take

4          the hit and go on about my business and file for

5          the divorce and leave it at that.

6                    MR. HENNING:  Nothing further, Your

7          Honor.

8                    THE COURT:  Ms. Scapicchio?

9                    MS. SCAPICCHIO:  I hate to bring up the

10         subject, but what did your ex-wife do for a living

11         before you got rid of her?

12                   JUROR:  Oh, she works right down the

13         street at Mass General Hospital down there in the

14         admin department.

15                   MS. SCAPICCHIO:  Okay, and that's where

16         she worked when you were married?

17                   JUROR:  Yes.

18                   MS. SCAPICCHIO:  I think you told the

19         prosecutor you have two kids that you raised in

20         the city; is that right?

21                   JUROR:  I have a daughter that is 26 and

22         I have a son that is 22 going to Northeastern

23         University, whom will graduate next year for

24         engineering.

25                   MS. SCAPICCHIO:  What is he studying?

300

```
 1                    JUROR:  He's going to be an engineer.
 2                    MS. SCAPICCHIO:  Great.  That's all.
 3                    JUROR:  And my daughter is a school
 4          teacher in the Walpole School System.
 5                    MS. SCAPICCHIO:  Perfect.  I don't have
 6          any further questions.
 7                    THE COURT:  Sir, would you mind stepping
 8          outside for just a moment, please.
 9                    JUROR:  Sure.
10     (Juror Number 122 exits courtroom.)
11                    THE COURT:  This juror stands
12          indifferent.
13                    MR. HENNING:  Commonwealth is content.
14                    MS. SCAPICCHIO:  Defendant is content.
15     (Juror Number 122 enters courtroom.)
16                    THE COURT:  Mr. Taylor, you've been
17          chosen to be on this jury.  You're going to be
18          taken up to join the other jurors who have been
19          impaneled.  Please don't discuss anything about
20          this case with them, nor allow them to discuss
21          anything about the case with you.  All right?
22                    JUROR:  Thank you, ma'am.
23                    THE COURT:  Thank you, sir.  Go with
24          the Court Officer.
25                    THE CLERK:  Seat 11.
```

301

1          JUROR:  This is the first time I've ever
2     been picked for a panel in all my years of coming
3     for jury service, no matter where it is in the
4     city, sent home after lunch.
5          THE COURT:  Well, you are not being sent
6     home, sir, you are on this jury.  Congratulations.
7  (Juror Number 122 exits courtroom.)
8  (Juror Number 123 enters courtroom.)
9          THE CLERK:  123, Natividad Figueroa.
10          JUROR:  Yes, sir.
11          THE COURT:  Ms. Figueroa, you answered
12     one of my earlier questions.  Can you tell me what
13     your concern is?  Is it a language problem?
14          JUROR:  Not really.  English is my
15     second language.
16          THE COURT:  Okay, so why did you raise
17     your hand, is it because of a language problem?
18          JUROR:  Yeah.
19          THE COURT:  Where were you born?
20          JUROR:  Puerto Rico.
21          THE COURT:  Do you think you might have
22     problems understanding everything that's said at
23     this trial?
24          JUROR:  Yes.
25          THE COURT:  Thank you, ma'am, you are

302

1          excused.

2                          JUROR:  Thank you.

3                          THE CLERK:  Excused.

4      (Juror Number 123, excused.)

5      (Juror Number 125 enters courtroom.)

6                          THE CLERK:  125, Robert Mullally.

7                          THE COURT:  Good afternoon,

8          Mr. Mullally.  Would you have the tendency to

9          believe the testimony of a police officer over

10         that of a civilian just because he was a police

11         officer?

12                         JUROR:  Yes.

13                         THE COURT:  Thank you, sir, you are

14         excused.

15                         THE CLERK:  Excused.

16     (Juror Number 125, excused.)

17     (Juror Number 126 enters courtroom.)

18                         THE CLERK:  126, Walter Rincon.

19                         JUROR:  Yes, sir.

20                         THE COURT:  Mr. Rincon, you answered one

21         of my earlier questions.  Can you tell me what

22         your concern is about being on this jury?

23                         JUROR:  The thing is that I'm not very

24         fluid in my English.

25                         THE COURT:  You're from Columbia,

303

1          correct?

2                    JUROR:  Yes, ma'am.

3                    THE COURT:  But you also indicated

4          you've been seated as a juror before.

5                    JUROR:  I did, but that's why I raised

6          my --

7                    THE COURT:  You had trouble at the last

8          trial?

9                    JUROR:  Yeah, the last.

10                    THE COURT:  All right, thank you, sir,

11          you are excused.

12                    THE CLERK:  Excused.

13      (Juror Number 126, excused.)

14      (Juror Number 127 enters courtroom.)

15                    THE CLERK:  127, Gisell Delacruz.

16                    THE COURT:  Hi, Ms. Delacruz.

17                    JUROR:  Hi.

18                    THE COURT:  Ma'am, is there anything

19          about the nature of these charges or any of the

20          allegations you've heard that might affect your

21          ability to be fair and impartial?

22                    JUROR:  No.

23                    THE COURT:  You may hear alleged

24          evidence that the defendant, the alleged victim,

25          and some of the witnesses were involved in selling

304

1          marijuana.  Would that evidence affect your

2          ability to be fair and impartial?

3                    JUROR:  No.

4                    THE COURT:  The defendant in a criminal

5          trial has the absolute right not to testify.  If

6          Mr. Reddicks chose not to testify at this trial,

7          would you hold that against him in any way?

8                    JUROR:  No.

9                    THE COURT:  Is there anything about the

10         length of the trial that poses a hardship for you?

11                   JUROR:  It's just I have two little

12         ones.

13                   THE COURT:  Well, you work at Boston

14         Children's Hospital.

15                   JUROR:  Yes, I do.

16                   THE COURT:  What hours do you work

17         there?

18                   JUROR:  I work there from 8:30 to 5.

19                   THE COURT:  Well, you'd be here from 9

20         to 4 which is fewer hours.  Who takes care of your

21         babies when you're at work?

22                   JUROR:  I work three days a week.  I'm a

23         part-time person.

24                   THE COURT:  I see.  Would you not have

25         daycare for the other two days?

305

```
 1                    JUROR:  No, I do, I do, I can get
 2          daycare.
 3                    THE COURT:  You can do this?
 4                    JUROR:  Um-hmm.
 5                    THE COURT:  All right, great.  So you
 6          would be willing to get daycare for the other two
 7          days?
 8                    JUROR:  I can try, yes.
 9                    THE COURT:  Excellent.  Any follow-up
10          questions?
11                    MR. HENNING:  I don't have any follow-up
12          questions.  Thank you.
13                    THE COURT:  Ms. Scapicchio?
14                    MS. SCAPICCHIO:  I have a few.  You said
15          Boston Children's Hospital and then?
16                    JUROR:  Nephrology.
17                    MS. SCAPICCHIO:  Can you tell me what
18          that is?
19                    JUROR:  Sure, it's the kidney
20          department, deal with kidneys.
21                    MS. SCAPICCHIO:  So kidney problems.
22                    JUROR:  Yes.
23                    MS. SCAPICCHIO:  And in terms of your
24          job at Boston Children's Hospital, how long have
25          you worked for them?
```

306

1                    JUROR:  Eight years.

2                    MS. SCAPICCHIO:  Eight years, okay.

3          You went to college?

4                    JUROR:  Some college.

5                    MS. SCAPICCHIO:  Where did you go to

6          college?

7                    JUROR:  I went to Bunker Hill.

8                    MS. SCAPICCHIO:  And how long ago was

9          that?

10                   JUROR:  A couple of years ago.

11                   MS. SCAPICCHIO:  Okay, you're not still

12         trying to go to Bunker Hill and work and take care

13         of kids.

14                   JUROR:  I try, yeah.  I want to, yeah.

15         That's my plans right now.

16                   MS. SCAPICCHIO:  All right, thank you.

17                   THE COURT:  Ma'am, could you step

18         outside for just a second, please.

19                   JUROR:  Sure.

20     (Juror Number 127 exits courtroom.)

21                   THE COURT:  This juror stands

22         indifferent.

23                   MR. HENNING:  Commonwealth is going to

24         exercise a peremptory.

25     (Juror Number 127 enters courtroom.)

307

```
 1                    THE COURT:  Thank you, ma'am, you are
 2         excused.
 3                    THE CLERK:  Excused.
 4    (Juror Number 127, excused.)
 5    (Juror Number 130 enters courtroom.)
 6                    THE CLERK:  130, Brian Donnelly.
 7                    THE COURT:  Mr. Donnelly, would you have
 8         the tendency to believe the testimony of a
 9         civilian witness over a police officer witness
10         just because he or she were a civilian?
11                    JUROR:  Yes.
12                    THE COURT:  Thank you, sir, you are
13         excused.
14                    THE CLERK:  Excused.
15    (Juror Number 130, excused.)
16    (Juror Number 134 enters courtroom.)
17                    THE CLERK:  134, Keva Phillips.
18                    THE COURT:  Hi, Ms. Phillips.
19                    JUROR:  Hi.
20                    THE COURT:  You answered one of my
21         earlier questions.  Would you have the tendency to
22         believe the testimony of a police officer witness
23         over the testimony of a civilian witness just
24         because he or she were a police officer?
25                    JUROR:  Yes.
```

308

```
 1                    THE COURT:  Thank you, ma'am, you are
 2          excused.
 3                    THE CLERK:  Excused.
 4      (Juror Number 134, excused.)
 5      (Juror Number 135 enters courtroom.)
 6                    THE CLERK:  135, Brian Quinn.
 7                    THE COURT:  Hi, Mr. Quinn.
 8                    JUROR:  Hi, how are you?
 9                    THE COURT:  Sir, is there anything about
10          the nature of these charges or any of the
11          allegations you've heard that might affect your
12          ability to be fair and impartial?
13                    JUROR:  No.
14                    THE COURT:  You may hear alleged
15          evidence that the defendant, the alleged victim,
16          and some of the witnesses were involved in selling
17          marijuana.  Would that evidence affect your
18          ability to be fair and impartial?
19                    JUROR:  No.
20                    THE COURT:  The defendant in a criminal
21          trial has the absolute right not to testify.  If
22          Mr. Reddicks chose not to testify at this trial,
23          would you hold that against him in any way?
24                    JUROR:  No.
25                    THE COURT:  Is there anything about the
```

309

1        length of the trial that poses a hardship for you?

2                    JUROR:  No.

3                    THE COURT:  Any follow-up, Counsel?

4                    MR. HENNING:  Sir, you were born in

5        Ireland?

6                    JUROR:  Yes.

7                    MR. HENNING:  When did you come to the

8        United States?

9                    JUROR:  In '85, I think it was.  '84,

10       '85.

11                   MR. HENNING:  Did you come right to

12       Boston after that?

13                   JUROR:  No, I was in Seattle first and

14       then Holyoke and then here.

15                   MR. HENNING:  How long have you lived in

16       Boston?

17                   JUROR:  I think about 22 years or so.

18                   MR. HENNING:  Nothing further.

19                   THE COURT:  Ms. Scapicchio?

20                   MS. SCAPICCHIO:  You indicated that you

21       worked at a capital management firm as a

22       treasurer?

23                   JUROR:  Yes.

24                   MS. SCAPICCHIO:  What do you do for them

25       exactly?

310

```
1                   JUROR:  I manage their money.
2                   MS. SCAPICCHIO:  You manage their money?
3                   JUROR:  Yes.
4                   MS. SCAPICCHIO:  And how long have you
5          done that?
6                   JUROR:  17 years.  Before that, I was at
7          Harvard.
8                   MS. SCAPICCHIO:  I'm sorry?
9                   JUROR:  Before that, I was at Harvard
10         Management.
11                  MS. SCAPICCHIO:  Harvard University?
12                  JUROR:  No, the management company.
13                  MS. SCAPICCHIO:  Harvard Management
14         Company, okay.  And then you indicated that you
15         were married and you have a stay-at-home wife; is
16         that right?
17                  JUROR:  Yes.
18                  MS. SCAPICCHIO:  And she attended
19         college.  What college did she attend?
20                  JUROR:  College in Ireland.
21                  MS. SCAPICCHIO:  Oh, she went to school
22         in Ireland.
23                  JUROR:  Yes.
24                  MS. SCAPICCHIO:  And you both came over
25         together.
```

311

 1              JUROR:  No, she just recently came over.

 2              MS. SCAPICCHIO:  And then you indicated

 3         you had served on a jury before?

 4              JUROR:  Yeah, I can't remember how many

 5         years ago, it could have been two, time seems to

 6         slip by.  It was in Dorchester and it makes me

 7         feel like -- I felt like it was yesterday.

 8              MS. SCAPICCHIO:  Does that mean it was

 9         not a good experience, was it a bad experience, or

10         you didn't really take it either way?

11              JUROR:  It was three days.  This one

12         seems like it's going to go for a little bit

13         longer.

14              THE COURT:  Oh, yes.

15              MS. SCAPICCHIO:  But the experience that

16         you had on the three day trial in Dorchester --

17              JUROR:  Well, it's an inconvenience,

18         right?  But not a hardship.

19              THE COURT:  But was it a good experience

20         for a bad experience for you?

21              JUROR:  It was a different experience,

22         I wouldn't rank it as one of the top experiences

23         of my life.

24              MS. SCAPICCHIO:  Did you come away with

25         a feeling that it was a waste of time or that --

312

```
 1                    JUROR:  It wasn't a waste of time for
 2          the people there, but I felt like it could have
 3          been a waste of time for me.  I mean, it was a
 4          petty, stupid situation that I don't think they
 5          should have wasted anyone's time with.  That was
 6          the situation of that trial.  Plus, it was around
 7          the holiday, so I thought, why are they here?
 8                    MS. SCAPICCHIO:  Thank you, I have
 9          nothing further.
10                    THE COURT:  Sir, could you step outside
11          for just a second.
12     (Juror Number 135 exits courtroom.)
13                    THE COURT:  This juror stands
14          indifferent.
15                    MR. HENNING:  Commonwealth is content.
16                    MS. SCAPICCHIO:  Defendant would
17          challenge.
18     (Juror Number 135 enters courtroom.)
19                    THE COURT:  Thank you, sir, you are
20          excused.
21                    THE CLERK:  Excused.
22     (Juror Number 135, excused.)
23     (Juror Number 137 enters courtroom.)
24                    THE CLERK:  137, Entela Arapi.
25                    JUROR:  Yes.
```

313

1                    THE COURT:  Ma'am, you answered one of

2          my earlier questions.  Do you have some concern

3          about health or language difficulties?

4                    JUROR:  Language.

5                    THE COURT:  Are you from Albania?  Is

6          that a yes?

7                    JUROR:  Yes.

8                    THE COURT:  And would you have trouble

9          understanding everything that's said at this

10         trial?

11                   JUROR:  A lot.

12                   THE COURT:  Okay, thank you, ma'am, you

13         are excused.

14                   JUROR:  I can say I don't understand

15         anything.

16                   THE COURT:  I understand.  Thank you,

17         ma'am.

18                   THE CLERK:  You're excused.

19                   JUROR:  So am I all set?

20                   THE COURT:  You're all set.

21                   JUROR:  Free to go home?

22                   THE COURT:  You are.

23                   JUROR:  Thank you.

24      (Juror Number 137, excused.)

25                   THE COURT:  We have 11, we need five.

314

```
 1              I have to get going very quickly to get to my
 2         dental appointment.  I need to bring the jury
 3         down.  When should we tell these jurors to come
 4         back, what time in the morning, 10:30?
 5                   THE CLERK:  I would say 10:30.
 6                   MS. SCAPICCHIO:  I would say 11 because
 7         we probably have a half hour after we impanel the
 8         jury to deal with all the issues.  I think 11.
 9         Just so they're not sitting.
10                   THE COURT:  All right, let's tell them
11         to come back at 11.  Hand in your jury
12         questionnaires, please.
13                   Bring them right down, Michael.
14                   COURT OFFICER:  I will.
15    (Jurors entering.)
16                   COURT OFFICER:  This Honorable Court is
17         now back in session, you may be seated.
18                   THE COURT:  Well, members of the jury,
19         I know it's been a long day, especially from right
20         to left in the back row and right to left in the
21         front row, you can tell how long you've been here.
22         Number one has been here the longest and the
23         gentleman on the far left in the front row has
24         been here the least.  But it's been a long day for
25         all of you.
```

315

1          We have exhausted the jury pool this

2     afternoon and we have not yet impaneled the

3     requisite number of 16 jurors.  So we're going to

4     do this again tomorrow and get the last five.  We

5     have 11 of you, so you can do the math, we're

6     going to do the five in a lot less time tomorrow.

7     But I don't want to inconvenience you more than

8     I have to, so I'm going to ask that you report

9     back here, report directly to that jury room which

10    is your home away from home for the next little

11    while, at 11 o'clock in the morning.  So you get

12    to sleep in or do whatever you want to do, but

13    I don't want to inconvenience you.  By 11 o'clock,

14    we expect that we will be able to hit the ground

15    and start the trial at 11 o'clock tomorrow

16    morning, but I don't want you to be sitting up

17    there unnecessarily.

18          So please report by 11 o'clock right to

19    that jury room.  If you're delayed, you're going

20    to delay the trial, so please try to be here on

21    time.  If we're delayed down here, you'll know

22    why, because we haven't finished getting the last

23    five jurors.

24          Before I let you go, members of the

25    jury, I'm going to ask you for a few things.

316

1        Number one, we're going to start the trial

2        tomorrow.  I don't impose any dress code on my

3        jurors, but I just want you to think about coming

4        back for the rest of this trial dressed as if

5        you're going to court, however you define that.

6                Number two, and more importantly, as

7        I've been telling you along the way, please do not

8        communicate with anyone, including yourselves,

9        about any aspect of this trial, nor allow anyone

10       to communicate with you about any aspect of this

11       trial.  And I mean no verbal, written, or

12       electronic communication to you or from you about

13       the trial.

14               In addition, please don't engage in any

15       outside research about the case, so no legal or

16       medical research, Internet or web surfing,

17       Googling or the like.  Please have no contact with

18       any of these trial participants or anyone

19       associated with either side.  They're under strict

20       orders that they can't approach you in any way,

21       shape or form, but we try to avoid inadvertent

22       overhearing of conversations in the elevators,

23       lunch line downstairs, corridors, and the like.

24       Please don't visit any locations that have been

25       mentioned very briefly at the outset of this

317

1          proceeding, and please, of course, always continue

2          to keep an open mind.

3                    With that being said, members of the

4          jury, you are impaneled members of the jury,

5          I just want to let you know that.  Please be back

6          here by 11 o'clock tomorrow morning, report

7          directly to that jury room, not to the second

8          floor, not to this courtroom, to the jury room,

9          and we expect that we're going to start the trial

10         around 11 o'clock.

11                   Yes, sir?

12                   JUROR:  That's the one marked 907,

13         correct?

14                   THE COURT:  Officer Loperari will give

15         you all that information, okay?  So if you need to

16         write down the name of the room, this is courtroom

17         907, but you're going to report up one floor, the

18         mezzanine floor, to the jury room affiliated with

19         this courtroom.  Okay?

20                   JUROR:  Thank you.

21                   THE COURT:  Thank you so much, ladies

22         and gentlemen.  I know it's been a long slog for

23         you, but please understand how important this part

24         of the proceeding is to the parties involved.

25         Have a lovely afternoon, we'll see you back here

318

1          by 11 o'clock tomorrow morning.

2                    COURT OFFICER:  All rise.  Jurors, step

3          down and follow me, please.

4      (Jury excused.)

5                    THE COURT:  Thanks, everybody.  I'll see

6          you all back here at 9 o'clock tomorrow morning.

7

8

9      (Court adjourned at 3:45 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

319

C E R T I F I C A T E

    I, Nancy McCann, do hereby certify that the
foregoing 318 pages is a complete, accurate and true
recording of the proceedings held before the Honorable
Linda E. Giles in the aforesaid matter on Wednesday,
January 13, 2016 to the best of my knowledge, skill
and ability.


_____

Nancy McCann, CVR-C.M.

Official Court Reporter

```
                                        VOLUME: II
                                        PAGES: 302
                                     EXHIBITS: 1-21
                                           ID: G-K
```

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                    SUPERIOR COURT DEPARTMENT
                               Of THE TRIAL COURT


* * * * * * * * * * * * * * * * * * *
COMMONWEALTH OF MASSACHUSETTS       *
                                    *
-v-                                 *    SUCR 2012-10714
                                    *
CHARLES REDDICKS                    *
* * * * * * * * * * * * * * * * * * *


                      JURY TRIAL
                       (DAY 2)




              BEFORE: HONORABLE LINDA E. GILES
                      Suffolk Superior Courthouse
                      Courtroom 907
                      Boston, Massachusetts
                      Thursday, January 14, 2016



Gregory Henning, Assistant District Attorney
  For the Commonwealth of Massachusetts

Rosemary Scapicchio, Esquire
Jillese McDonough, Esquire
  On behalf of the defendant Charles Reddicks.


                  NANCY MCCANN, CVR-C.M.
                 OFFICIAL COURT REPORTER
                 SUFFOLK SUPERIOR COURT

2

<u>I N D E X</u>

Impanelment (Continued) ....................... Page 7

Individual Jury Voir Dire..................... Page 28

Motions......................................Page 126

Judge's Instructions.........................Page 163

Opening Statements:

  By Mr. Henning..............................Page 179

  By Ms. Scapicchio...........................Page 193

<u>I N D E X</u>

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| ROD MENEIDE | | | | |
| (By Mr. Henning) | 208 | | 252 | |
| (By Ms. Scapicchio) | | 229 | | 255 |
| RUTH CAMILLE | | | | |
| (By Mr. Henning) | 257 | | | |
| (By Ms. Scapicchio) | | 283 | | |

3

E X H I B I T S

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1-5 | Photographs of building at 132 Hyde Park Ave. | 211 |
| 6 | Photograph of Mariano Malave | 221 |
| 7-8 | Photographs of bedroom | 224 |
| 9-10 | Photographs of bedroom | 225 |
| 11-13 | Photographs of bedroom | 226 |
| 14-18 | Photographs of bedroom | 228 |
| 19 | Photograph of cat | 230 |
| 20 | Photograph of bathroom | 271 |
| 21 | Map | 278 |

EXHIBITS MARKED FOR IDENTIFICATION

| G | Board of Probation Records, Juror Number 102, Seat Number 5 | 4 |
|---|---|---|
| H | Board of Probation Records, Juror Number 116, Seat Number 10 | 5 |
| I | Board of Probation Records, Juror Number ~~122,~~ Seat Number 11 | 7 |
| J | Board of Probation records, Jurors 42 and 48 | 129 |
| K | Chalk/photos of revolver | 146 |

4

```
 1                  P R O C E E D I N G S
 2                Thursday, January 14, 2016
 3       (Court in session at 9:25 a.m.)
 4       (Defendant is present.)
 5                THE CLERK:  Your Honor, once again
 6          before the Court, Commonwealth versus Charles
 7          Reddicks, 2012-10714.  Defendant is present with
 8          his attorneys, Ms. Scapicchio and Ms. McDonough.
 9          For the Commonwealth, ADA Henning.
10                THE COURT:  Good morning, everybody.  We
11          got a couple of hits on jurors that were seated
12          yesterday.  The first one is Katherine Abrego,
13          A-B-R-E-G-O.  I'm assuming both of you have seen
14          the response?  It seems like a suspended license
15          that was dismissed upon the payment of court
16          costs.  Does anybody have any concerns about
17          Ms. Abrego and the response that came back on her
18          CORI record?
19                MR. HENNING:  No, Your Honor.
20                MS. SCAPICCHIO:  No, Your Honor.
21                THE COURT:  That may be marked for
22          identification.
23                (Exhibit G was marked for
24          Identification, Board of Probation Record, Juror
25          Number 102, Seat Number 5.)
```

5

1          THE COURT:  There was no hit on Joshua

2     Steiner, but that may be marked for

3     identification.

4          (Exhibit H was marked for

5     Identification, Board of Probation Record, Juror

6     Number 116, Seat Number 10.)

7          THE COURT:  However, we may have a

8     problem with the last juror seated in Seat 11.

9          MS. SCAPICCHIO:  Who was so glad to

10     serve.

11          THE COURT:  Who was very glad to serve

12     and he was very amusing, as I recall.  Dexter

13     Taylor comes back with a three-page record, and on

14     his questionnaire, he only put down assault and

15     battery.  The jurors impaneled yesterday aren't

16     coming in till 11, so we're going to proceed.

17     Unfortunately, because we're competing with

18     another session, we're only getting 45 venire

19     people today.  So I'm going to press on, we're

20     going to impanel, if we can, we're going to

21     impanel six.  We only need five today, but I have

22     a concern that once we talked to Mr. Taylor, there

23     may be an exercise of a peremptory by either one

24     of you.

25          MS. SCAPICCHIO:  Not by me.

6

1          THE COURT:  I'm anticipating that
2      Mr. Henning may want to exercise a peremptory when
3      you see that it's a three-page record.
4          MS. SCAPICCHIO:  Judge, I just want to
5      inquire, I haven't gotten anything back from the
6      victim database, I just want to make sure it's
7      already been run and nothing came back.
8          MR. HENNING:  No, I have it here, it was
9      run, the only thing that came back is a defendant
10     situation, so people who come back as defendants,
11     but nothing has been listed as a victim or a
12     witness.
13         MS. SCAPICCHIO:  Okay, I just wanted to
14     make sure.
15         THE COURT:  So let's press on.  As
16     I say, we only have the 45 today, but I'm going to
17     impanel, if we can, six, by 11 o'clock.  But at
18     some point when Mr. Taylor comes in, we will bring
19     him down and have an inquiry of him and then we'll
20     know whether we need to go forward with six today.
21         Just for your edification, if we get 15
22     with or without the challenge to Mr. Taylor, I'm
23     going to be happy to go forward with 15 and we
24     will go forward with 15.  We're not going to
25     impanel again on Friday.  All right?  I just want

7

```
1          to let you all know that.
2                      (Exhibit I was marked for
3          identification, Board of Probation Record, Juror
4          Number 122, Seat Number 11.)
5                      COURT OFFICER:  Jurors are on the way
6          up, Your Honor.
7                      THE COURT:  Okay, everybody is lined up,
8          ready to come in.  Anything we need to talk about?
9                      MS. SCAPICCHIO:  Not right now, but at
10         the end of the day, if I could have a few minutes
11         of your time.
12                     THE COURT:  Absolutely.
13                     All right, thanks, everybody.
14     (Venire entering at 9:40 a.m.)
15                     THE CLERK:  Your Honor, before the
16         Court, Commonwealth versus Charles Reddicks,
17         2012-10714.  Mr. Reddicks is present with his
18         attorneys, Rosemary Scapicchio and Jillise
19         McDonough.  For the Commonwealth, Assistant
20         District Attorney Gregory Henning.
21     IMPANELMENT (Continued)
22                     THE COURT:  Good morning, ladies and
23         gentlemen.  My name is Judge Linda Giles, that's
24         spelled G-I-L-E-S, and I'm a justice of the
25         Superior Court in whose courthouse you find
```

1        yourselves here today for a very important public

2        service which, of course, is jury service.

3               First of all, I want to apologize for

4        the delay in bringing you up here.  We've all been

5        here since first thing this morning, but as you

6        might imagine, you had to go through an

7        orientation process, plus there's a considerable

8        amount of paperwork that needs to be accomplished

9        before we can bring you up here.  But we are ready

10        to proceed with a very important stage in these

11        proceedings which is called impanelment, and in

12        just a moment, I'm going to explain to you that

13        procedure in which you're going to participate.

14        After that, I'm going to give you a brief overview

15        of what this case is all about, and finally, I'm

16        going to introduce you to the participants in this

17        particular trial.

18               Now, let me explain to you the

19        impanelment process in case none of you has been

20        involved in one in the past.  In just a moment,

21        I'm going to ask you a series of questions that

22        will assure that you can be a fair and impartial

23        juror in this case.  As I'm asking these

24        questions, if you answer yes to one or more of my

25        questions, please raise that white juror card high

9

1    until one of the court officers has made note of

2    your number.

3          After I've asked that series of

4    questions, a few things are going to happen.

5    First of all, the Court Officers are going to take

6    you to an empty courtroom elsewhere in the

7    building and you're going to be brought in here,

8    back into the courtroom through that side door,

9    and the attorneys and the defendant and I are all

10   going to be sitting at that back table there.

11   You're going to come in through that side door and

12   sit at that chair right at the end of the table.

13   I'm going to have a few additional questions to

14   ask you privately, in other words, out of the

15   hearing of the other ladies and gentlemen in the

16   courtroom now, and the attorneys may have some

17   follow-up questions of you, too.

18          Now, along the way, during this process,

19   the attorneys have the right to exercise a certain

20   number of excuses of you for any reason or no

21   reason at all.  And let me say at this juncture

22   that if you are excused from being on this jury

23   today, please don't take it personally.  As I just

24   indicated, the attorneys have the absolute right

25   and prerogative to excuse a certain number of you

1          for no reason at all.

2                    But I also have to add that if you are

3          excused from being on this jury today, please

4          don't think you're wiggling off the proverbial

5          hook of jury service.  If you're excused from

6          being on this jury today, you're going to be

7          directed right back down to the second floor jury

8          pool room for possible impanelment on another

9          trial, another unrelated trial elsewhere in the

10         building.

11                   This building, by the way, is the home

12         to the Suffolk County Superior Court.  The

13         Superior Court is the major trial court here in

14         Massachusetts.  Its jurisdiction is statewide.

15         You are in the Suffolk County Division of the

16         Superior Court.  This building houses something

17         like 16 active trial sessions, as we call our

18         courtrooms, hearing either civil, that is

19         noncriminal cases, or criminal cases on a daily

20         basis.  So every day that this building is open,

21         up to 16 active hungry trial sessions could be in

22         need of your services.  So if you are excused

23         from being on this jury today, you're going to be

24         directed back down to the second floor jury pool

25         room for possible impanelment elsewhere in the

11

1    building.

2              And as with everything else in your

3         life, you will not know what will lie around the

4         corner of your existence in this building if

5         you're excused from this trial.  Those other

6         trials that may be waiting you elsewhere in the

7         building may not involve, may not be as

8         interesting as this case is, and I can assure you

9         that this is a very interesting case for a juror

10        to be observing.  And plus, those other cases may

11        not involve attorneys of the caliber that I have

12        before me today, and I have three great attorneys.

13        This is going to be a great trial and a wonderful

14        one for any juror to want to observe, I can assure

15        you that.  So I just want to let you know that if

16        you are excused from this jury, you may be

17        impaneled elsewhere on another unrelated case

18        elsewhere in the building.

19              We're going to proceed in this

20        fashion.  As I said, I have some questions of you

21        initially as a group, then we're going to bring

22        you in one at a time and I have couple of

23        additional questions of you and the attorneys also

24        may have some additional questions of you.  The

25        attorneys will exercise whatever excuses they have

12

1       of you, and once we have the number of required

2       jurors for this trial, the rest of you will be

3       excused with our thanks for your participation in

4       these proceedings, but of course, you'll be

5       directed right back down to the jury pool room

6       for possible impanelment elsewhere on another

7       unrelated trial going on in this building.

8              So now, let me explain to you what

9       this case is all about.  This is the trial of a

10      criminal case.  Specifically, it's the trial of

11      the Commonwealth versus Charles Reddicks.

12      Mr. Reddicks spells his last name R-E-D-D-I-C-K-S.

13      Mr. Reddicks is facing five indictments, in

14      other words, five charges.  First of all, the

15      Commonwealth is charging him with the crime of

16      murder in the first degree.  The alleged victim

17      in that indictment is one Mariano Malave.

18      Mr. Malave spells his name M-A-L-A-V-E.

19              In addition to murder in the first

20      degree, Mr. Reddicks is also charged with armed

21      robbery, also of Mr. Malave.  He's charged in

22      addition with the unlawful possession of a

23      firearm, the unlawful possession of ammunition,

24      and finally, a separate charge of the carrying of

25      a loaded firearm.  All of these charges alleged

13

1        to have occurred on April 27, 2012 in the Jamaica

2        Plain section of Boston.

3              Let me give you a further idea of what

4        the allegations are in this case.  The

5        Commonwealth alleges that the defendant,

6        Mr. Reddicks, arranged to purchase marijuana from

7        the alleged victim, Mariano Malave, at 132 Hyde

8        Park Avenue in the Jamaica Plain section of Boston

9        on April 27th, 2012.  The Commonwealth alleges

10       that during the transaction, Mr. Reddicks robbed,

11       shot, and killed Mr. Malave.  Mr. Reddicks denies

12       each and every one of these allegations and has

13       pled guilty to each of these five indictments,

14       and that's why we're all assembled in this

15       courtroom --

16             MS. SCAPICCHIO:  Objection, Your Honor.

17       You just said the defendant pled guilty to each

18       and every one of these indictments.

19             THE COURT:  Oh, I apologize, please.

20       Thank you, Ms. Scapicchio, I absolutely misspoke

21       in that regard.  Let me make it perfectly clear.

22       I apologize.  I apologize, Mr. Reddicks.

23             Mr. Reddicks has pled not guilty, not

24       guilty to each and every one of these five

25       indictments, and he denies each and every one of

14

1       these allegations.  So let me make that perfectly

2       clear again.  Mr. Reddicks has pled not guilty to

3       each of these five charges and denies each and

4       every one of these allegations, and that, in turn,

5       is why we're all assembled in this room, for the

6       parties to pick a jury, to hear evidence, to

7       determine whether or not the Commonwealth can

8       prove any or all of these charges against

9       Mr. Reddicks beyond a reasonable doubt.

10              Thank you, Ms. Scapicchio, for

11      correcting me in that regard.

12              Now, let me introduce you now to the

13      participants in this trial.  Ms. Henning, could

14      you introduce yourself and who you represent.

15              MR. HENNING:  Thank you, Your Honor.

16              Good morning, ladies and gentlemen.  My

17      name is Gregory Henning, I'm a prosecutor in the

18      Suffolk County District Attorney's Office, and

19      I live in Dorchester.  Thank you for being here.

20              THE COURT:  Ms. Scapicchio, could you

21      introduce yourself, your colleague, and your

22      client, please.

23              MS. SCAPICCHIO:  Thank you very much,

24      Your Honor.

25              Good morning, ladies and gentlemen.  My

15

1          name is Rosemary Scapicchio, I have a law office

2          here in Boston.  I represent Charles Reddicks.

3                    MR. REDDICKS:  Good morning.

4                    MS. SCAPICCHIO:  He's the defendant in

5          the case.  And with me is Attorney Jillise

6          McDonough.

7                    MS. McDONOUGH:  Good morning, ladies

8          and gentlemen.

9                    THE COURT:  Thank you, all.

10                    Now, ladies and gentlemen, I'm going to

11          list for you the potential witnesses in this case.

12          Not all these individuals may be called, but their

13          names could come up, and we want to make sure that

14          you're not associated with any of these

15          participants, the attorneys, the defendant, or

16          any of the potential witnesses in this case.

17                    Leanne Parker of Maine; Rod Meneide,

18          M-E-N-E-I-D-E, of Boston; Ronald Theodat, T-H-E-O-

19          D-A-T, of Boston; Boston Police Officer Robert

20          Cordasco; Boston EMS Paramedic Joe Amaral; Boston

21          Police Detective Bernadette Sullivan; Ruth Camille

22          of Boston; Elissa Dennehy of Boston; Edwin

23          Lockhart of Boston; Julio Alex Balbuena, B-A-L-B-

24          U-E-N-A, of Brockton; Pamela Arthur of Boston;

25          Ian Follette, F-O-L-L-E-T-T-E, of Boston; Sean

16

1       Warfield of Boston; Boston Police Detective Andrew
2       Gambon; Thomas Washington of Boston; Boston Police
3       Sergeant Detective Kevin Witherspoon; Raymond
4       McDonald of Boston; Patrick Quinn of Norton.
5               Except where otherwise indicated, these
6       are all Boston Police Officers:  Cesar Abreu;
7       Kenneth Autio, A-U-T-I-O; Robert Boyle; Oscar
8       Calderon; Franklyn Centeio, C-E-N-T-E-I-O; Paul
9       Coffey; Tabatha Coleman; Detective Luis Cruz;
10      State Police Trooper Duane; Sergeant Detective
11      Daniel Duff; Angel Figueoria; Korey Franklin;
12      Jamila Gales; Officer Giraldo; Officer Haley;
13      Officer Harrigan; Officer Hebard, H-E-B-A-R-D.
14              Again, all these are officers at the
15      Boston Police Department:  Wayne Hester; Patrick
16      Rogers; William Moran; Mario Lozano; Robert
17      LaColla; Patrick Layden; Christopher MacNeil;
18      Detective Jose Marichal; Richard Moriarty; John
19      Noberini; N-O-B-E-R-I-N-I; Stephen Parenteau, P-A-
20      R-E-N-T-E-A-U; Sergeant Santry; and Officer Sean
21      Scannell.
22              In addition, a civilian witness by the
23      name of Steven Verneau, V-E-R-N-E-A-U, of Essex,
24      Massachusetts.
25              My second mistake and hopefully my last

17

1          mistake, ladies and gentlemen, today.  I wasn't
2          looking on the back side.  Thank you for bringing
3          that to my attention.

4                    In addition, Catherine Reddicks of
5          Boston; Khadijah, K-H-A-D-I-J-A-H, Warren of
6          Boston; Boston Police Detective Tyrone Camper;
7          Robert Creedon of Norwell; MBTA Detective Bruce
8          Dolloff, D-O-L-L-O-F-F; Boston Police Sergeant
9          Detective Richard Daley; Dr. Katherine Lindstrom
10         of the Office of the Chief Medical Examiner; Ioan
11         Truta, T-R-U-T-A, of the Boston Police Latent
12         Print Unit; Massachusetts State Police Crime
13         Laboratory employee, John Biello, B-I-E-L-L-O;
14         Boston Police Detective John Callahan; Terri Hyman
15         of Boston; Javeon, J-A-V-E-O-N, Hyman of Boston;
16         John Hyman of Boston.

17                   As well as the following Boston Police
18         Officers:  Christopher Ross; Detective Molwyn
19         Shaw; Sergeant Sean Smith; Daniel Sparrow; Jose
20         Texeira; Officer Walsh, and Officer Paul Wright.

21                   In addition, the following civilians:
22         Valerie Basnight, B-A-S-N-I-G-H-T, of Jamaica
23         Plain; Brendan Deady, D-E-A-D-Y, of Jamaica Plain;
24         Renea Jones of Jamaica Plain; Johnson Laurore,
25         L-A-U-R-O-R-E, of Dorchester; Sam Steeves of

18

1          Jamaica Plain; Justin Young of Jamaica Plain;

2          Investigator Oneil LeBlanc; and Dr. Jennifer

3          Lipman of Melrose.

4                    Counsel, have I missed anybody now?

5                    MS. SCAPICCHIO:  I don't believe so, no,

6          Your Honor.

7                    THE COURT:  Great, thank you.

8                    Now, ladies and gentlemen, I've

9          explained to you the process which we call

10         impanelment, I've given you a brief overview of

11         what this case is all about, and finally, I've

12         introduced you to the trial participants in this

13         case.

14                   At this point, Mr. Kalell, our Clerk,

15         who's seated in front of me, is going to ask you

16         to stand so that he can swear you in so that I can

17         ask you that series of questions.

18                   THE CLERK:  Jurors, please rise.  Please

19         raise your right hand.

20                   Do you solemnly swear that you will make

21         true answers to such questions as shall be put to

22         you by the Court in the matter now in hearing, so

23         help you God?

24                   (Jurors respond affirmatively.)

25                   THE CLERK:  You may be seated.

19

1              THE COURT:  First, I'm going to ask

2        whether you or any member of your immediate family

3        or a close personal friend know or are you related

4        to any of the attorneys in this case or anyone who

5        works for his or her office.

6              I see no affirmative responses.

7              Do you or any member of your immediate

8        family or a close personal friend know or are you

9        related to the defendant, Mr. Charles Reddicks, or

10       any member of his family?

11             I see no affirmative responses.

12             Do you or any member of your immediate

13       family or a close personal friend know or are you

14       related to the alleged victim in this case,

15       Mariano Malave, or any member of his family?

16             Again, I see no affirmative responses.

17             Do you or any member of your immediate

18       family or a close personal friend know or are you

19       related to any of the potential witnesses in this

20       case or any member of a witness's family?

21             COURT OFFICER:  Juror 8, 0-8.

22             THE COURT:  Anybody else?  I see no

23       further responses.

24             Do you have an interest or stake of any

25       kind in this case?

20

```
1                    I see no affirmative responses.
2                    Do you have any knowledge of this case
3         gained from any source?
4                    Again, I see no affirmative responses.
5                    To the extent that you have heard
6         anything about this case, have you formed or
7         expressed any opinions about it?
8                    Again, I see no affirmative responses.
9                    Are any of you aware of any bias or
10        prejudice that you have toward either the
11        prosecution or the defendant?
12                   COURT OFFICER:  08, 0-8.
13                   THE COURT:  Anybody else?  I see no
14        further responses.
15                   Are any of you an active member of any
16        community crime prevention organization?
17                   I see no affirmative responses.
18                   Are any of you an active member of any
19        organization whose purpose is to prevent drug
20        dealing or to promote drug education or
21        counseling?
22                   I see no affirmative responses.
23                   Would any of you have the tendency to
24        believe the testimony of a police officer witness
25        over the testimony of a civilian witness just
```

21

1    because he or she were a police officer?

2                I see no affirmative responses.

3                Would any of you have the tendency to

4    believe the testimony of a civilian witness over

5    the testimony of a police officer witness just

6    because he or she were a civilian?

7                I see no affirmative responses.

8                Do any of you not understand that in a

9    criminal case, the defendant is presumed innocent

10   until proven guilty?

11               I see no affirmative responses.

12               Do any of you not understand that in a

13   criminal case, the prosecution has the burden of

14   proving the defendant is guilty beyond a

15   reasonable doubt?

16               Again, I see no affirmative responses.

17               Do any of you not understand that in a

18   criminal case, the defendant does not have to

19   present any evidence in his or her own behalf?

20               Again, I see no affirmative responses.

21               Is there any reason, such as a physical

22   or medical problem or disability, language

23   difficulties, religious beliefs, hearing

24   impairments or the like, that might make it

25   difficult for you to sit as a juror in this case?

22

1                    I see no affirmative responses.

2                    Finally, do any of you know of any other

3          reason why you would not be fair and impartial in

4          this case and be able to render a true and just

5          verdict based solely on the evidence and the law

6          presented in the trial of this case?

7                    Again, I see no affirmative responses.

8                    Now, ladies and gentlemen, in just a

9          moment, the Court Officers are going to take you

10         to an empty courtroom nearby, and I just want to

11         ask you for a few things.  First of all, I ask you

12         for your patience, we're going to get through this

13         process as expeditiously as we can.  In addition,

14         I'm going to ask that you not communicate with

15         anybody or allow anyone to communicate with you

16         about any aspect of this case.  If you have access

17         to cell phones, PDAs, and other electronic items,

18         please don't use them to research any aspect of

19         this case.  All right?

20                   Now, last and certainly not least,

21         you're entitled to know the scheduling of this

22         trial and its expected duration.  As soon as we

23         get the required number of jurors that we need

24         today, we're going to start this trial today.

25         All right?  It's going to continue -- let me just

23

1        explain to you that typically when we are

2        impaneling, we sometimes get a late start because

3        of the orientation process you need to go through

4        downstairs, but from hereon in, we're going to

5        start promptly at 9 AM every morning.

6        Parenthetically, I'm noted for my punctuality out

7        of respect for jurors because the more punctual we

8        are, the sooner the case will be over and the case

9        will be in your hands and you will begin your

10       deliberations.

11              So I'm noted for my punctuality, we're

12       going to start promptly at 9 o'clock every

13       morning, going to 1 o'clock in the afternoon,

14       taking a midmorning recess at about 11 of about

15       20, 25 minutes duration.  We typically take our

16       lunch hour around here from 1 to 2.  You'll be

17       free to go out and leave the building during that

18       hour as you see fit.  Then we're going to resume

19       the trial from 2 to 4 o'clock.  I promise you that

20       I will never keep you past 4 o'clock on any day

21       of this trial because I'm aware of two things:

22       number one, sitting here from 9 to 4 with two

23       breaks along the way is a long enough time for

24       jurors to be listening and watching evidence

25       intently during a trial and then finally

24

1        deliberating on that evidence at the conclusion of

2        the trial.  Moreover, I also appreciate that some

3        of you may have child care and other commitments

4        that you may need to get to.  So that will be our

5        schedule from hereon in, 9 to 4 with a break in

6        the midmorning and a lunch break from 1 to 2, and

7        I won't ever keep you past 4 o'clock, I assure

8        you.

9              Given that schedule, given the issues

10       in this case, the number of witnesses, we're

11       expecting that the trial will start today,

12       continue into tomorrow.  Of course, I'm sure

13       you're aware that Monday is Martin Luther King

14       day, it's a state and federal holiday, so we're

15       going to be off on Monday.  We're going to

16       continue through the following week, the four days

17       of the following week, and it's going to spill

18       over into the next week.  So probably,

19       approximately, nine days.  It could be less than

20       that, it could be more than that.  I can never

21       predict with any kind of mathematical certainty

22       the length of any trial because lots of things can

23       happen.  A witness may testify longer or shorter

24       than expected, a witness may not testify at all,

25       I may need to confer with the attorneys and the

1       like, but our good faith estimate, it's going to

2       be approximately nine days.  Through the remainder

3       of this week, four days next week, and spilling

4       over into part of the following week.

5              As the trial evolves, I promise you

6       I will give you updates and give you a sense of

7       how long the trial is going to last as I get a

8       better sense of that.  But we're guessing that

9       it's going to be approximately nine days, and

10      I promise you, I will give you updates when I see

11      how the trial is progressing.

12             But beyond that, I want to stress

13      something that, hopefully, you learned through

14      your orientation process, and possibly through

15      service on a jury in the past.  That you good

16      citizens are the cornerstone of our justice system

17      here in the Commonwealth of Massachusetts.  As

18      you can see here in the third co-equal branch of

19      government which, of course, is the judiciary,

20      without you good people, we don't function.  In my

21      opinion, being here on jury service is probably

22      one of the most important public services that you

23      can perform on behalf of your Commonwealth.  Being

24      here on jury service is both one of the burdens of

25      citizenship, but undoubtedly, it's also one of its

26

1    benefits.  And I can tell you that I talk to the

2    jurors at the conclusion of every one of my

3    trials, and I've been a judge now for about 24

4    years, and I'm struck by how often I hear, truly

5    on a regular basis from those real life jurors,

6    how pleasantly surprised they were at how

7    interesting the experience proved to be, and in

8    many instances, they tell me it was a rewarding

9    life experience.  So, please, with those words

10   from real life jurors, from their lips to your

11   ears, I suggest you're going to find it to be at

12   least a very interesting experience, if not an

13   outright rewarding life experience.

14        So I hope you can take that all to heart

15   and further appreciate how vital your role here is

16   in the criminal justice system of the Commonwealth

17   of Massachusetts and further appreciate that

18   I cannot and I will not excuse you from being on

19   this jury today except on account of a truly

20   compelling hardship, and I don't define that as

21   missing time from home, work, or school, because

22   of course, that would apply to everyone in this

23   room, nor do I define it as missing a nonessential

24   event in your life.

25        So, ladies and gentlemen, please comply

27

1           with my instructions from a moment ago, don't talk

2           to anyone or allow anyone to talk to you about

3           any aspect of this case.  If you have access to

4           electronic items, please don't do any research

5           about any aspect of this case.  We're going to get

6           through this as expeditiously as we possibly can,

7           so I thank you in advance for your patience and

8           understanding.

9                   Please comply now with the instructions

10          of the Court Officers.

11     (Court in recess at 10:20 a.m.)

12

13     (Court in session at 10:30 a.m.)

14     (Defendant present.)

15                  THE COURT:  Just to recap, counsel, the

16          Commonwealth has exercised 10 peremptory

17          challenges and defense has exercised nine.

18                  MS. SCAPICCHIO:  Yes.

19                  THE COURT:  We're going to impanel, if

20          we can, even though right now on paper, we only

21          need five, I'm going to impanel six because of the

22          potential of a challenge to Mr. Taylor from the

23          Commonwealth.  If we don't need that additional

24          juror, he or she will be excused.  But just to be

25          safe because Mr. Taylor is not expected to be

28

1          here for another hour.  So let's press on and

2          when and if -- by the way, Officer Loperari, when

3          Mr. Taylor comes in, we'll suspend and we'll bring

4          him down to have a conversation with him.

5                    COURT OFFICER:  Are we going to use

6          Seat 11 or are we going to skip it?

7                    THE CLERK:  Well, that's Mr. Taylor.

8                    THE COURT:  We're going to keep on

9          going, we're going to start with 12 through 16,

10         and then as soon as Mr. Taylor is in, we will have

11         a conversation with him.

12    INDIVIDUAL JUROR VOIR DIRE:

13    (Juror Number 1 enters courtroom.)

14                    THE CLERK:  Juror Number 1, William

15         Harris?

16                    JUROR:  Yes.

17                    THE CLERK:  Have a seat, please.

18                    THE COURT:  Good morning, Mr. Harris.

19                    JUROR:  Hi, how are you?

20                    THE COURT:  Fine, thank you, sir.  Sir,

21         is there anything about the nature of these

22         charges or any of the allegations you've heard

23         that might affect your ability to be fair and

24         impartial?

25                    JUROR:  No, ma'am.

29

1              THE COURT:  You may hear alleged
2         evidence that the defendant, the alleged victim,
3         and some of the witnesses may have been involved
4         in selling marijuana.  Would that evidence affect
5         your ability to be fair and impartial?
6              JUROR:  Maybe a little bit.  I mean,
7         I'll be honest, I smoke marijuana.
8              THE COURT:  So you think that that
9         would affect your ability to be fair and
10         impartial?
11              JUROR:  Yes.
12              THE COURT:  Thank you for your candor,
13         sir, you're excused.
14              THE CLERK:  Excused.
15    (Juror Number 1, excused.)
16    (Juror Number 3 enters courtroom.)
17              THE CLERK:  Juror Number 3, Vaunzella
18         Hillaire.
19              THE COURT:  Good morning, Ms. Hillaire.
20              JUROR:  Good morning.
21              THE COURT:  Ma'am, is there anything
22         about the nature of these charges or any of the
23         allegations you've heard that might affect your
24         ability to be fair and impartial?
25              JUROR:  No.

30

1              THE COURT:  You may hear evidence,
2      alleged evidence, rather, that the defendant, the
3      alleged victim, and some of the witnesses were
4      involved in selling marijuana.  Would that
5      evidence affect your ability to be fair and
6      impartial?
7              JUROR:  No.
8              THE COURT:  The defendant in a criminal
9      trial has the absolute right not to testify.  If
10     Mr. Reddicks chose not to testify at this trial,
11     would you hold that against him in any way?
12             JUROR:  No.
13             THE COURT:  Is there anything about the
14     length of the trial that poses a hardship for you?
15             JUROR:  The 27th of this month, I have
16     to have surgery.
17             THE COURT:  That's a long way off.
18             JUROR:  Okay.
19             THE CLERK:  That's cutting it close.
20             MS. SCAPICCHIO:  It is, yes.
21             THE CLERK:  It's two weeks from
22     yesterday.
23             MS. SCAPICCHIO:  Nine days of testimony,
24     Judge.  There would be no time to waste.
25             THE COURT:  Ms. Hillaire, is it any

31

```
 1            kind of surgery that can be postponed?
 2                      JUROR:  No.
 3                      THE COURT:  All right, you're excused,
 4            ma'am.
 5                      THE CLERK:  Excused.
 6       (Juror Number 3, excused.)
 7       (Juror Number 5 enters courtroom.)
 8                      THE CLERK:  Juror 5, Jamie Mercurio.
 9                      JUROR:  Yes.
10                      THE COURT:  Hi, Ms. Mercurio.
11                      JUROR:  Hi.
12                      THE COURT:  Ma'am, is there anything
13            about the nature of these charges or any of the
14            allegations you've heard that might affect your
15            ability to be fair and impartial?
16                      JUROR:  No.
17                      THE COURT:  You may hear alleged
18            evidence that the defendant, the alleged victim,
19            and some of the witnesses were involved in selling
20            marijuana.  Would that evidence affect your
21            ability to be fair and impartial?
22                      JUROR:  No.
23                      THE COURT:  The defendant in a criminal
24            trial has the absolute right not to testify.  If
25            Mr. Reddicks chose not to testify at this trial,
```

32

```
1          would you hold that against him in any way?

2                    JUROR:  No.

3                    THE COURT:  Is there anything about the

4          length of the trial that poses a hardship for you?

5                    JUROR:  Yes.

6                    THE COURT:  What is that?

7                    JUROR:  I've never taken more than two

8          days off work.  I run an entire team.  I know

9          work is not an excuse.  And I also have travel

10         booked in two weeks.

11                   THE COURT:  Where is the travel to?

12                   JUROR:  Austin, Texas.

13                   THE COURT:  And for what purpose?

14                   JUROR:  For work.

15                   THE COURT:  When you say for work --

16         I can't excuse you because of --

17                   JUROR:  I understand.

18                   THE COURT:  You understand that?  And

19         Athena Health, I'm assuming, is a fairly large

20         organization.

21                   JUROR:  It is.  I run our entire

22         corporate social responsibility program, so I'm

23         constantly working with nonprofits and our

24         leadership at different offices.  So I have

25         meetings scheduled with about 10 nonprofits down
```

33

1          in Austin.

2                    THE COURT:  Can anybody take your place?

3                    JUROR:  Unfortunately not.

4                    THE COURT:  All right, you're excused,

5          ma'am.

6                    JUROR:  Thank you.

7                    THE CLERK:  Excused.

8     (Juror Number 5, excused.)

9     (Juror Number 7 enters courtroom.)

10                   THE CLERK:  Juror 7, Viviano Cantu.

11                   THE COURT:   Good morning, Mr. Cantu.

12                   JUROR:  Good morning.

13                   THE COURT:  Is there anything about the

14         nature of these charges or any of the allegations

15         that might affect your ability to be fair and

16         impartial?

17                   JUROR:  No.

18                   THE COURT:  You may hear alleged

19         evidence that the defendant, the alleged victim,

20         and some witnesses were involved in selling

21         marijuana.  Would that evidence affect your

22         ability to be fair and impartial?

23                   JUROR:  No.

24                   THE COURT:  The defendant in a criminal

25         trial has the absolute right not to testify.  If

34

1          Mr. Reddicks chose not to testify at this trial,

2          would you hold that against him in any way?

3                    JUROR:  No.

4                    THE COURT:  Is there anything about the

5          length of the trial that poses a hardship for you?

6                    JUROR:  Yes.

7                    THE COURT:  What is that?

8                    JUROR:  I'm a full-time student and

9          I  have two jobs.

10                   THE COURT:  You're at Northeastern.

11         Are you on co-op right now?

12                   JUROR:  No.

13                   THE COURT:  Have your classes started?

14                   JUROR:  Yes.

15                   THE COURT:  Did you know that you could

16         defer your service until a more convenient time?

17                   JUROR:  I mean, I tried to reschedule,

18         but no, I didn't know that.

19                   THE COURT:  You tried to reschedule last

20         time?

21                   JUROR:  Yeah, but I mean, co-op,

22         I wouldn't be in Boston.

23                   THE COURT:  What do you mean, you

24         wouldn't be in Boston?

25                   JUROR:  There's no convenient time

35

1          because my permanent address isn't here.

2                    THE COURT:  But during co-op, aren't

3          you around for co-op?

4                    MS. SCAPICCHIO:  Might go out of state.

5                    JUROR:  I can go out of state.

6                    THE COURT:  All right, you're excused.

7                    JUROR:  Thank you.

8                    THE CLERK:  Excused.

9     (Juror Number 7, excused.)

10    (Juror Number 8 enters courtroom.)

11                   THE CLERK:  Number 8, Christopher

12         Donlon.

13                   THE COURT:  Mr. Donlon, you answered two

14         of my earlier questions.  Would you have the

15         tendency to believe a police officer witness over

16         a civilian witness just because he or she were a

17         police officer?

18                   JUROR:  Yes.

19                   THE COURT:  And I notice that you're an

20         aspiring police officer, yourself.

21                   JUROR:  I am, yes.  My father's been a

22         police officer in Boston.

23                   THE COURT:  Thank you, Mr. Donlon, you

24         are excused.

25                   JUROR:  Thank you.

36

```
1                    THE CLERK:  Excused.
2       (Juror Number 8, excused.)
3       (Juror Number 11 enters courtroom.)
4                    THE CLERK:  Juror Number 11, Diana Lau?
5                    JUROR:  Yes.
6                    THE COURT:  Hi, Ms. Lau.
7                    JUROR:  Hello.
8                    THE COURT:  Ma'am, is there anything
9           about the nature of these charges or any of the
10          allegations you've heard that might affect your
11          ability to be fair and impartial?
12                   JUROR:  No.
13                   THE COURT:  You may hear alleged
14          evidence that the defendant, the alleged victim,
15          and some witnesses were involved in selling
16          marijuana.  Would that evidence affect your
17          ability to be fair and impartial?
18                   JUROR:  No.
19                   THE COURT:  The defendant in a criminal
20          trial has the absolute right not to testify.  If
21          Mr. Reddicks chose not to testify at this trial,
22          would you hold that against him in any way?
23                   JUROR:  No.
24                   THE COURT:  Is there anything about the
25          length of the trial that poses a hardship for you?
```

37

```
 1                    JUROR:  No.
 2                    THE COURT:  Counsel, any follow-up
 3          questions?
 4                    MR. HENNING:  Good morning, ma'am, how
 5          are you?  It says you're a student, full time,
 6          now.  Have you completed high school and you're in
 7          college?
 8                    JUROR:  I'm in college.
 9                    MR. HENNING:  Can you describe where
10          you're studying and what you're doing?
11                    JUROR:  I just take classes at Bunker
12          Hill, biology major.
13                    MR. HENNING:  Which high school did you
14          go to.
15                    JUROR:  Latin Academy, Boston Latin
16          Academy.
17                    MR. HENNING:  And you graduated from
18          Boston Latin Academy?
19                    JUROR:  Yes.
20                    MR. HENNING:  What year did you
21          graduate?
22                    JUROR:  2009.
23                    MR. HENNING:  I have nothing further.
24                    THE COURT:  Ms. Scapicchio?
25                    MS. SCAPICCHIO:  In addition to going to
```

38

```
 1          Bunker Hill, do you have any part-time jobs or do
 2          you work anywhere else?
 3                    JUROR:  No, just full-time student.
 4                    MS. SCAPICCHIO:  So you go to school
 5          four or five days a week.
 6                    JUROR:  Yes.
 7                    MS. SCAPICCHIO:  Full load.
 8                    JUROR:  Yes, five days a week.
 9                    MS. SCAPICCHIO:  You said you were
10          studying -- what is your focus or major at school
11          right now?
12                    JUROR:  Biology.
13                    MS. SCAPICCHIO:  Biology.  Is this your
14          first year or second year?
15                    JUROR:  It's my first year, so I just
16          started last semester.
17                    MS. SCAPICCHIO:  And this would be the
18          first, first sort of time with your second
19          semester; is that what it is?
20                    JUROR:  Yes.
21                    MS. SCAPICCHIO:  Do you go days or
22          nights?
23                    JUROR:  Daytime.
24                    THE COURT:  Have classes started yet?
25                    JUROR:  It starts next week, actually.
```

39

```
1              THE COURT:  But you think you can be a
2         juror on this case, notwithstanding the fact that
3         you have classes next week?
4              JUROR:  Yup.
5              THE COURT:  And by the way, I've called
6         professors, if any of your professors give you a
7         hard time, I'm happy to get involved.
8              JUROR:  Okay, that's great.
9              THE COURT:  Because this is such an
10        important public service that if you're willing to
11        serve, notwithstanding the fact that your classes
12        start next week, any of your professors give you a
13        hard time, you come to me.
14             JUROR:  Okay.
15             THE COURT:  Anything else,
16   Ms. Scapicchio?
17             MS. SCAPICCHIO:  So what do you want to
18        do with your biology degree?
19             JUROR:  I was thinking about the medical
20        field, maybe nursing.
21             MS. SCAPICCHIO:  I have no further
22        questions, thanks.
23             THE COURT:  Ma'am, could you step
24        outside for just a second.
25   (Juror Number 11 exits courtroom.)
```

40

1           THE COURT:  This juror stands
2      indifferent.
3           MR. HENNING:  May I have one moment just
4      to look at one thing?
5           THE COURT:  Of course.
6           MR. HENNING:  Your Honor, I know we
7      called all the witnesses' names.  The only
8      question I have is there's several witnesses who
9      attended Latin Academy during the same time period
10     that she did.  I know that it's not a small
11     school, but --
12          THE COURT:  Are you suggesting that
13     because she went to Latin Academy, that somehow
14     she's going to be disqualified because she's going
15     to recognize a witness?
16          MR. HENNING:  Because it's the same time
17     period.  The year that she graduated would overlap
18     with a few of the witnesses.
19          THE COURT:  If you want to exercise a
20     peremptory, you've got five left.  The chances of
21     her doing that are so remote, I'm not excusing her
22     for cause --
23          MR. HENNING:  I understand.
24          THE COURT:  -- on the off chance that
25     she might recognize -- who's coming from Latin

41

1          Academy?

2                    MR. HENNING:  One of the witnesses

3          that the Commonwealth has, two of the witnesses,

4          would be Latin Academy former students.  The

5          Commonwealth is content.

6                    MS. SCAPICCHIO:  Defendant is content.

7                    THE COURT:  Before we bring her back in,

8          just to assuage any concern you have, Mr. Henning,

9          you can remind me, and if I think of it, I tell

10         jurors, anyway, because sometimes they don't

11         recognize a witness just by name, and this happens

12         inadvertently sometimes, and I'll tell them,

13         please let us know if somebody gets on the stand

14         and all of a sudden you realize, oh, I do know

15         that person.

16                   MR. HENNING:  Yes.

17                   THE COURT:  So remind me, Mr. Henning,

18         I'll be happy to instruct the jury accordingly.

19                   MR. HENNING:  Thank you, Your Honor.

20    (Juror Number 11 enters courtroom.)

21                   THE COURT:  Ms. Lau, you've been chosen

22         to be on this jury.  You're going to be taken

23         upstairs to the jury room, and others who were

24         impaneled yesterday will be joining you in a short

25         while.  They were told to come back at 11.  I'm

42

```
 1            just going to remind you, please, at no time

 2            should you be discussing this case with anyone,

 3            including your fellow jurors, nor allowing them to

 4            discuss the case with you.

 5                      JUROR:  Okay.

 6                      THE COURT:  If you'll go upstairs and be

 7            patient, we'll get back to you as soon as we can.

 8                      THE CLERK:  Seat 12.

 9   (Juror Number 11 exits courtroom.)

10   (Juror Number 12 enters courtroom.)

11                      THE CLERK:  Juror 12, Kathleen Pedersen?

12                      JUROR:  Yes.

13                      THE COURT:  Hi, Ms. Pedersen.

14                      JUROR:  Hi, how are you?

15                      THE COURT:  Fine, thank you, ma'am.  Is

16            there anything about the nature of these charges

17            or any of the allegations you've heard that might

18            affect your ability to be fair and impartial?

19                      JUROR:  No.

20                      THE COURT:  You may hear alleged

21            evidence that the defendant, the alleged victim,

22            and some witnesses were involved in selling

23            marijuana.  Would that evidence affect your

24            ability to be fair and impartial?

25                      JUROR:  No.
```

43

1              THE COURT:  The defendant in a criminal

2        trial has the absolute right not to testify.  If

3        Mr. Reddicks chose not to testify at this trial,

4        would you hold that against him in any way?

5              JUROR:  No.

6              THE COURT:  Is there anything about the

7        length of the trial that poses a hardship for you?

8              JUROR:  No.

9              THE COURT:  Any follow-up questions,

10       Counsel?

11             MR. HENNING:  Good morning, ma'am, how

12       are you?

13             JUROR:  Good morning, I'm doing well,

14       how are you?

15             MR. HENNING:  It lists that you have a

16       juris doctorate.

17             JUROR:  I do.

18             MR. HENNING:  Can you describe where you

19       went to school?

20             JUROR:  University of Baltimore.

21             MR. HENNING:  When you graduated, did

22       you practice law in any particular fields?

23             JUROR:  Real estate.

24             MR. HENNING:  Just real estate?

25             JUROR:  Yes.  I haven't passed the bar,

44

1      though.

2              MR. HENNING:  When did you graduate from

3      law school?

4              JUROR:  2002.

5              MR. HENNING:  Have you ever worked at or

6      practiced with any other type of law other than

7      real estate?

8              JUROR:  No.

9              MR. HENNING:  It says down at the middle

10      section, you were seated on a jury in 1992 or '93?

11              JUROR:  Yes.

12              MR. HENNING:  Do you remember where that

13      was?

14              JUROR:  It was here.

15              MR. HENNING:  In Suffolk County?

16              JUROR:  Yes.

17              MR. HENNING:  Was it in this courthouse?

18              JUROR:  Yes.

19              MR. HENNING:  Just reflecting back on

20      that, would you say that you had a positive or

21      negative experience in any way based on your jury

22      service?

23              JUROR:  Positive.

24              MR. HENNING:  Nothing further, Your

25      Honor.

45

1                    THE COURT:  Ms. Scapicchio?

2                    MS. SCAPICCHIO:  Thank you so much.  Hi,

3          how are you?

4                    JUROR:  I'm doing well, how are you?

5                    MS. SCAPICCHIO:  Fine, thank you.  So

6          you work for Boston Redevelopment Authority?

7                    JUROR:  Yes.

8                    MS. SCAPICCHIO:  What you do for them

9          specifically?

10                   JUROR:  Environmental review of

11         projects, development projects, in the City of

12         Boston.

13                   MS. SCAPICCHIO:  So if somebody wanted

14         to build something, you would go out and make sure

15         that --

16                   JUROR:  They submit all of their

17         development plans for a project, yes.

18                   MS. SCAPICCHIO:  So you would go out

19         and make sure environmentally it was safe for the

20         neighborhood?

21                   JUROR:  Yes, among other things.

22                   MS. SCAPICCHIO:  How long have you

23         worked for the Boston Redevelopment Association?

24                   JUROR:  Nine years in March.

25                   MS. SCAPICCHIO:  Did you grow up in

46

1          Boston?

2                    JUROR:  I did.

3                    MS. SCAPICCHIO:  Where did you go to

4          high school?

5                    JUROR:  Fontbonne.

6                    MS. SCAPICCHIO:  It indicated on your

7          juror questionnaire that your father was a retired

8          Suffolk County probation officer?

9                    JUROR:  Yes.

10                   MS. SCAPICCHIO:  Was that here in

11         Boston?

12                   JUROR:  Yes, it was.

13                   MS. SCAPICCHIO:  In this courthouse?

14                   JUROR:  No, in South Boston, Municipal

15         Court.

16                   MS. SCAPICCHIO:  And "my grandfather was

17         deputy superintendent of BPD"?

18                   JUROR:  Um-hmm.

19                   MS. SCAPICCHIO:  That's Boston Police

20         Department?

21                   JUROR:  Yes.

22                   MS. SCAPICCHIO:  What was your

23         grandfather's name?

24                   JUROR:  Joseph Rowan, R-O-W-A-N.

25                   MS. SCAPICCHIO:  Is he still working for

47

1          the BPD or did he retire?

2                   JUROR:  No, he died in 1977.

3                 MS. SCAPICCHIO:  Sorry about that.  So

4          while he was working as a deputy superintendent at

5          BPD, did you ever have occasion to discuss any of

6          his cases with him or anything he was working on?

7                 JUROR:  He died when I was three.

8                 MS. SCAPICCHIO:  Okay, so you were too

9          young.  The fact that your grandfather was a

10         deputy superintendent of Boston Police Department,

11         all things being equal, if there was a police

12         officer who said one thing and a civilian witness

13         who said something else, would the police officer

14         get the edge because of your grandfather?

15               JUROR:  No.

16              MS. SCAPICCHIO:  Thank you.

17              THE COURT:  Ma'am, could you step

18         outside for just a moment, please.

19     (Juror Number 12 exits courtroom.)

20              THE COURT:  This juror stands

21         indifferent.

22             MR. HENNING:  Commonwealth is content.

23             MS. SCAPICCHIO:  Defendant is content,

24         Your Honor.

25     (Juror Number 13 enters courtroom.)

48

1          THE COURT:  Ms. Pedersen, you have been
2     chosen to be on this jury.  You're going to be
3     going up to the jury room which is affiliated
4     with this courtroom to join another juror who was
5     just impaneled, and in the course of the next
6     35 minutes or so, jurors who were impaneled
7     yesterday will be joining you.  So I'm just going
8     to ask that you not discuss any aspect of this
9     case with anyone, including your fellow jurors,
10    nor allow anybody, including your fellow jurors,
11    to discuss the case with you.
12          Thank you, ma'am, would you go with the
13    Court Officer, please.
14          THE CLERK:  Seat 13.
15    (Juror Number 12 exits courtroom.)
16    (Juror Number 15 enters courtroom.)
17          THE CLERK:  Juror 15, Gregory Anderson.
18          JUROR:  Yes, sir.
19          THE CLERK:  Have a seat, please.
20          THE COURT:  Good morning, Mr. Anderson.
21    Sir, is there anything about the nature of these
22    charges or any of the allegations you've heard
23    that might affect your ability to be fair and
24    impartial?
25          JUROR:  No, Your Honor.

49

1           THE COURT:  You may hear alleged

2      evidence that the defendant, the alleged victim,

3      and some of the witnesses were involved in selling

4      marijuana.  Would that evidence affect your

5      ability to be fair and impartial?

6           JUROR:  No, Your Honor.

7           THE COURT:  The defendant in a criminal

8      trial has the absolute right not to testify.  If

9      Mr. Reddicks chose not to testify at this trial,

10     would you hold that against him in any way?

11          JUROR:  No, Your Honor.

12          THE COURT:  Is there anything about the

13     length of the trial that poses a hardship for you?

14          JUROR:  My boss might be upset, but

15     that's not --

16          THE COURT:  But that's Northeastern,

17     that's a big university, and please understand

18     that there's a law on the books that prevents any

19     employer from interfering with any term or

20     condition of your employment.  So if Northeastern

21     give you a hassle, you let me know, okay?

22          JUROR:  No problem.

23          THE COURT:  Any follow-up questions,

24     Counsel?

25          MR. HENNING:  Good morning, sir, how are

50

1          you doing?

2                    JUROR:  I'm all right, thanks.

3                    MR. HENNING:  Can you describe what your

4          master's degree is in?

5                    JUROR:  Masters degree in political

6          science.

7                    MR. HENNING:  Where did you get that?

8                    JUROR:  Binghamton University, sir.

9                    MR. HENNING:  Where did you go to

10         undergraduate?

11                   JUROR:  Colgate University.

12                   MR. HENNING:  When you left Binghamton,

13         did you go directly to Northeastern?

14                   JUROR:  No, sir.

15                   MR. HENNING:  How long have you been

16         working for Northeastern?

17                   JUROR:  Two years and about a month,

18         sir.

19                   MR. HENNING:  It mentions down at the

20         bottom that either you or somebody in your

21         household has had internships with certain

22         offices?

23                   JUROR:  Yes, sir, myself.

24                   MR. HENNING:  Can you describe when you

25         did those internships and what it was for?

51

1            JUROR:  From January 2006 to August

2       2006, I was employed by the Department of

3       Justice's Office of Consumer Litigation in

4       Washington DC.  I was working with attorneys in

5       that office for trial preparation.  And in June

6       2006, I think, through August 2006, I was employed

7       as an intern by the King's County District

8       Attorney's Office in Brooklyn, New York.  That was

9       arraignment preparation.

10           MR. HENNING:  Thank you.  I have nothing

11      further.

12           THE COURT:  Ms. Scapicchio?

13           MS. SCAPICCHIO:  Hi, how are you?  So at

14      Northeastern as an IT support person, you're the

15      one that goes in and fixes the computers.

16           JUROR:  That's the basics, yeah.

17           MS. SCAPICCHIO:  And you fix both

18      students' computers and professors' computers?

19           JUROR:  Yes.

20           MS. SCAPICCHIO:  Staff members, whoever

21      needs that.

22           JUROR:  And/or back room service, all

23      of it.

24           MS. SCAPICCHIO:  And you had indicated

25      your interaction with any law enforcement or law

52

1          related employers.  Did you pick the internship at

2          the Department of Justice?

3                    JUROR:  Yes.

4                    MS. SCAPICCHIO:  Something you applied

5          for, you wanted to do?

6                    JUROR:  It was part of Colgate

7          University's political science study abroad

8          program.  Well, not abroad, but you know, outside

9          of the University.

10                   MS. SCAPICCHIO:  Kind of like a co-op

11         program?

12                   JUROR:  Yes, exactly.

13                   MS. SCAPICCHIO:  And you're the one who

14         chose to work for the Department of Justice.

15                   JUROR:  Yes, ma'am.

16                   MS. SCAPICCHIO:  And then you also

17         chose the King County District Attorney's Office

18         in Brooklyn?

19                   JUROR:  Yes, ma'am.

20                   MS. SCAPICCHIO:  Why did you choose

21         that?

22                   JUROR:  At the time, I was still

23         undergraduate and I was preparing for a

24         possibility of attending law school when

25         I graduated.  I ended up not going to law school

53

1          and choosing to pursue a master's in political

2          science instead.

3                    MS. SCAPICCHIO:  And when you worked

4          for both the Department of Justice and the King's

5          County District Attorney's Office, is it fair to

6          say you were leaning more towards the prosecution

7          than --

8                    JUROR:  At the time, I was mostly just

9          interested in the law and getting more experience

10         working with like-minded individuals.  I wouldn't

11         necessarily say it was for one side or the other,

12         just getting experience working with folks.

13                   MS. SCAPICCHIO:  So when you worked for

14         King's County and you were preparing for

15         arraignments, what types of things did you do to

16         help?

17                   JUROR:  Mostly, we got packets of

18         information from the police officers and organized

19         it and determined what charges to recommend to the

20         on-site Assistant District Attorney who was going

21         to review each case and figure out exactly what

22         charges would be filed at arraignment.

23                   MS. SCAPICCHIO:  So you made

24         recommendations as to what charges should be made.

25                   JUROR:  Yes, we reviewed the evidence

54

1          packets provided from the police, interviewed

2          witnesses, and spoke with the police officer who

3          was in charge of the case, and then based on the

4          recommendations from our group, the supervising

5          Assistant District Attorney determined what

6          charges they wanted to file.

7                    MS. SCAPICCHIO:  But you would do all

8          the legwork, basically, in conjunction with the

9          police department; is that fair to say?

10                   JUROR:  That was the arrangement, yes.

11                   MS. SCAPICCHIO:  And so your interaction

12         with the police department for that three month

13         period during that summer, I think you said in

14         2006?

15                   JUROR:  I think so.

16                   MS. SCAPICCHIO:  Would that interaction

17         with the police department, all things being

18         equal, if a police officer testified and a

19         civilian witness testified, because of your

20         background, because of your history, because you

21         know what happens at an arraignment session, would

22         any of that affect your ability if you were going

23         to decide between a police officer and a civilian,

24         would the police officers get any edge at all

25         because of your interaction with them?

55

1              JUROR:  No, ma'am.

2              THE COURT:  Why?

3              JUROR:  Because I want to judge the

4        credibility of each witness individually.  If you

5        prejudge someone, that's kind of saying that your

6        judgment is better than theirs, which isn't true.

7        You want to make sure that you evaluate the facts

8        based on what's presented to you.

9              MS. SCAPICCHIO:  Great, thank you.

10             THE COURT:  Sir, could you step outside

11       for just a moment, please.

12             JUROR:  Yes, Your Honor.

13    (Juror Number 15 exits courtroom.)

14             THE COURT:  This juror stands

15       indifferent.

16             MR. HENNING:  Content.

17             MS. SCAPICCHIO:  Defendant will

18       challenge.

19    (Juror Number 15 enters courtroom.)

20             THE COURT:  Thank you, sir, you are

21       excused.

22    (Juror Number 15, excused.)

23    (Juror Number 18 enters courtroom.)

24             THE CLERK:  Juror 18, Patrick Canney.

25             JUROR:  Good morning.

56

1          THE COURT:  Good morning.  Sir, is there

2     anything about the nature of these charges or any

3     of the allegations you've heard that might affect

4     your ability to be fair and impartial?

5          JUROR:  I don't think so.

6          THE COURT:  You may hear alleged

7     evidence that the defendant, the alleged victim,

8     and some of the witnesses were involved in selling

9     marijuana.  Would that evidence affect your

10     ability to be fair and impartial?

11          JUROR:  No.

12          THE COURT:  The defendant in a criminal

13     trial has the absolute right not to testify.  If

14     Mr. Reddicks chose not to testify at this trial,

15     would you hold that against him in any way?

16          JUROR:  I don't -- no.

17          THE COURT:  Well, you hesitated there.

18          JUROR:  I mean, I suppose it depends on

19     what the other testimony is.

20          THE COURT:  So whether you, whether

21     Mr. Reddicks testified or not and how that would

22     affect you and your view of the evidence would

23     depend on what the other evidence was?  That's

24     probably terribly worded.  I'm hearing you say it

25     depends.

57

```
 1                    JUROR:  Exactly, yes.
 2                    THE COURT:  It would depend on the
 3          evidence.
 4                    JUROR:  Yes.
 5                    THE COURT:  All right, thank you, sir,
 6          you're excused.
 7                    THE CLERK:  Excused.
 8      (Juror Number 18, excused.)
 9      (Juror Number 19 enters courtroom.)
10                    THE CLERK:  Juror 19, Yotam Mendlinger.
11                    THE COURT:  How do you pronounce it,
12          sir?
13                    JUROR:  Yotam.
14                    THE COURT:  Mendlinger?
15                    THE CLERK:  How do you pronounce it, we
16          want to get it right.
17                    JUROR:  The last name is not an issue,
18          the first name, Yotam.
19                    THE COURT:  Sir, is there anything about
20          the nature of these charges or any of the
21          allegations you've heard that might affect your
22          ability to be fair and impartial?
23                    JUROR:  No.
24                    THE COURT:  You may hear alleged
25          evidence that the defendant, the alleged victim,
```

58

1          and some of the witnesses were involved in selling

2          marijuana.  Would that evidence affect your

3          ability to be fair and impartial?

4                    JUROR:  Nope.

5                    THE COURT:  The defendant in a criminal

6          trial has the absolute right not to testify.  If

7          Mr. Reddicks chose not to testify at this trial,

8          would you hold that against him in any way?

9                    JUROR:  No.

10                   THE COURT:  Is there anything about the

11         length of the trial that poses a hardship for you?

12                   JUROR:  Not that much.

13                   THE COURT:  Great.  Any follow-up,

14         Counsel?

15                   MR. HENNING:  Good morning, sir, how are

16         you?

17                   JUROR:  Good, how are you doing?

18                   MR. HENNING:  Good, thank you.  It lists

19         taxes and finance as your type of business?

20                   JUROR:  I do asset management, taxes,

21         and finance, basically, consulting.

22                   MR. HENNING:  Do you work for one

23         particular company?

24                   JUROR:  No.

25                   MR. HENNING:  You work --

59

1              JUROR:  Myself, I'm an independent.

2              MR. HENNING:  Taxes and investment, do

3         you have a background in that?

4              JUROR:  Yes, I do.

5              MR. HENNING:  Can you describe the

6         background related to your work?

7              JUROR:  Basically, I've spent five years

8         doing taxes, consulting businesses, and I have a

9         degree in finance.

10             MR. HENNING:  Where was the degree from?

11             JUROR:  BU.

12             MR. HENNING:  Did you do those

13        consulting jobs in Massachusetts or elsewhere?

14             JUROR:  Mostly Massachusetts.

15             MR. HENNING:  How long have you lived

16        in Massachusetts?

17             JUROR:  Since last, I came here for

18        college in 2005, and then I lived here from 2007.

19             MR. HENNING:  What part of Boston do

20        you live in now?

21             JUROR:  Now, I live in Kenmore.

22             MR. HENNING:  Kenmore, okay.  The bottom

23        section here, it just has a section on experience

24        with the law and asks about whether anyone in your

25        household or your family has ever had any of those

60

1      experiences.  Did anyone in your household or your
2      family ever have the experiences listed here?
3                THE JUROR:  What was listed there again?
4                THE COURT:  You forgot to answer the
5      first two questions in part three, sir.
6                THE CLERK:  Below the black line there.
7                THE JUROR:  Have you ever been arrested,
8      sued --
9                THE COURT:  Sir, just read it to
10      yourself carefully and answer questions one and
11      two in part three.
12                THE JUROR:  Nope.
13                THE COURT:  Okay, check that box no
14      then.  And there's another question that you
15      didn't answer about whether you or anyone in your
16      household or family has ever had any involvement
17      with law enforcement, et cetera.
18                THE JUROR:  My sister is a lawyer.
19                THE COURT:  Okay, check yes.
20                THE JUROR:  Okay.
21                THE COURT:  Where is she a lawyer?
22                THE JUROR:  She does her own stuff, she
23      doesn't work with anybody in particular.
24                THE COURT:  She's self-employed?
25                THE JUROR:  Self-employed and, actually,

61

1          right after, she took time to take care of the

2          kids.

3                    THE COURT:  Okay, great.  Anything

4          further, Mr. Henning?

5                    MR. HENNING:  No, Your Honor.

6                    THE COURT:  Ms. Scapicchio?

7                    MS. SCAPICCHIO:  On that second

8          question, other than your sister being a lawyer,

9          no one else has worked for any court systems,

10         police departments, anything like that?

11                   JUROR:  Not even close.

12                   MS. SCAPICCHIO:  I don't have any

13         further questions.

14                   THE COURT:  Sir, could you step outside

15         for just a moment, please.

16    (Juror Number 19 exits courtroom.)

17                   THE COURT:  This juror stands

18         indifferent.

19                   MR. HENNING:  Commonwealth is content.

20                   MS. SCAPICCHIO:  Defendant will

21         challenge.

22    (Juror Number 19 enters courtroom.)

23                   THE COURT:  Thank you, sir, you have

24         been excused.

25                   THE CLERK:  Excused.

62

1    (Juror Number 19, excused.)

2    (Juror Number 21 enters courtroom.)

3                    THE CLERK:  21, Morgan Parmeter.

4                    THE COURT:  Good morning, Ms. Parmeter.

5                    JUROR:  Good morning.

6                    THE COURT:  Ma'am, is there anything

7        about the nature of these charges or any of the

8        allegations you've heard that might affect your

9        ability to be fair and impartial?

10                   JUROR:  No.

11                   THE COURT:  You may hear alleged

12       evidence that the defendant, the alleged victim,

13       and some of the witnesses were involved in selling

14       marijuana.  Would that evidence affect your

15       ability to be fair and impartial?

16                   JUROR:  No.

17                   THE COURT:  The defendant in a criminal

18       trial has the absolute right not to testify.  If

19       Mr. Reddicks chose not to testify at this trial,

20       would you hold that against him in any way?

21                   JUROR:  No.

22                   THE COURT:  Is there anything about the

23       length of the trial that poses a hardship for you?

24                   JUROR:  No.

25                   THE COURT:  Counsel?

63

```
 1              MR. HENNING:  Good morning, ma'am, how
 2         are you?
 3              JUROR:  Good, how are you?
 4              MR. HENNING:  Good.  I'm just looking at
 5         the bottom part of your questionnaire.  It asks if
 6         there's anything that might affect your ability to
 7         be fair and impartial, and you said, "I'm a full-
 8         time college student, science major, who cannot
 9         afford to miss a day of school.  I also need to be
10         working."
11              JUROR:  Yes, I go back on Sunday, so
12         I have school full-time next week.
13              MR. HENNING:  Would you be able to miss
14         any class?
15              JUROR:  No, I cannot, I have labs that
16         I need to attend to.
17              THE COURT:  Did you hear me say that it
18         was going to be nine days, ma'am?
19              JUROR:  Oh, yes, sorry.
20              THE COURT:  You didn't get that part of
21         it?
22              JUROR:  No.
23              THE COURT:  It would continue through
24         next week and into the following week.
25              JUROR:  Yeah, I cannot make any.
```

64

1              THE COURT:  Did you know that you could

2       defer your service until some more convenient

3       time?

4              JUROR:  Yes.  I was scheduled for June

5       and then I delayed it till January.

6              THE COURT:  Well, why did you delay it

7       to January when you're about to start classes,

8       ma'am?

9              JUROR:  I wasn't aware that trials were

10      nine, approximately nine days.

11             THE COURT:  If I'm hearing you

12      correctly, ma'am, you deferred it to two days

13      before your classes start.

14             JUROR:  I wasn't aware of when my

15      classes started.

16             THE COURT:  You didn't know that they

17      were going to start next week?

18             JUROR:  Not at the time, no.

19             THE COURT:  So you just picked the

20      Thursday before -- you had no idea your classes

21      were going to start the week after Martin Luther

22      King Day.

23             JUROR:  No.

24             THE COURT:  And what were you doing in

25      June that you needed to defer your service?

65

1              JUROR:  I was working full-time.

2              THE COURT:  Ma'am, I'm going to declare

3         you to be unavailable.  Students have to serve.

4         You stay in town, you need to serve, and you can't

5         get out of jury service just because you're

6         working at one point and then you defer it to a

7         time when you're about to start classes.  I'm

8         sending you down to the jury pool room, ma'am,

9         and pick a date that you can serve.

10             JUROR:  Okay.

11             THE COURT:  Students do not get a

12        deferral just because they're students or you're

13        working full-time.  Go down and pick a date that's

14        more convenient to you.  All right?  I'm declaring

15        you to be unavailable.  Send her down to the

16        second floor, and pick another date, ma'am.

17             JUROR:  Okay.

18   (Juror Number 21, unavailable.)

19   (Juror Number 22 enters courtroom.)

20             THE CLERK:  Juror 22, Darlene Savarese.

21             THE COURT:  Ms. Savarese, is there

22        anything about the nature of these charges or any

23        of the allegations you've heard that might affect

24        your ability to be fair and impartial?

25             JUROR:  No, nothing I can think of.

66

```
 1              THE COURT:  You may hear alleged
 2         evidence that the defendant, the alleged victim,
 3         and some of the witnesses were involved in selling
 4         marijuana.  Would that evidence affect your
 5         ability to be fair and impartial?
 6              JUROR:  I think so because I've dealt
 7         with children in the past who have become --
 8              THE COURT:  Thank you, ma'am, you are
 9         excused.
10              THE CLERK:  Excused.
11    (Juror Number 22, excused.)
12    (Juror Number 23 enters courtroom.)
13              THE CLERK:  Juror 23, Paul Banks.
14              THE COURT:  Hi, Mr. Banks.
15              JUROR:  Hi.
16              THE COURT:  Sir, is there anything about
17         the nature of these charges or any of the
18         allegations you've heard that might affect your
19         ability to be fair and impartial?
20              JUROR:  No, ma'am.
21              THE COURT:  You may hear alleged
22         evidence that the defendant, the alleged victim,
23         and some of the witnesses were involved in selling
24         marijuana.  Would that evidence affect your
25         ability to be fair and impartial?
```

1                    JUROR:  No.

2                    THE COURT:  The defendant in a criminal

3          trial has the absolute right not to testify.  If

4          Mr. Reddicks chose not to testify at this trial,

5          would you hold that against him in any way?

6                    JUROR:  No.

7                    THE COURT:  Is there anything about the

8          length of the trial that poses a hardship for you?

9                    JUROR:  No, ma'am.

10                   THE COURT:  Counsel?

11                   MR. HENNING:  Good morning, sir, how are

12         you?

13                   JUROR:  Good.

14                   MR. HENNING:  It says you were born in

15         Loving, Texas?

16                   JUROR:  Yes.

17                   MR. HENNING:  When did you move out of

18         Texas?

19                   JUROR:  In 1990.

20                   MR. HENNING:  Where did you move to

21         after that?

22                   JUROR:  To New Jersey.

23                   MR. HENNING:  The college, next to it

24         has the number 16.

25                   JUROR:  That means I graduated, sorry.

68

1          I'm in education business.  It said grade levels.

2                    MR. HENNING:  What college did you go

3          to?

4                    JUROR:  Baylor University.

5                    MR. HENNING:  And then when did you come

6          to Massachusetts?

7                    JUROR:  A year ago for work.  From New

8          York, actually.

9                    MR. HENNING:  From New York.

10                    JUROR:  Yes.

11                    MR. HENNING:  It says language learning

12          for some sort of public business?

13                    JUROR:  Yes.  Cengage Learning.

14                    MR. HENNING:  Can you describe that?

15                    JUROR:  It's an educational publisher.

16          We focus on book print and technology for teaching

17          college students college courses.

18                    MR. HENNING:  And are you primarily

19          involved in the technology side or the development

20          of the material?

21                    JUROR:  Both, actually.  I'm responsible

22          for print and digital products in the humanities,

23          history, philosophy, political science.

24                    MR. HENNING:  I have nothing further,

25          Your Honor.

69

1                THE COURT:  Ms. Scapicchio?

2                MS. SCAPICCHIO:  Hi, how are you?

3                JUROR:  Hi.

4                MS. SCAPICCHIO:  So you moved to Boston

5        for this job.

6                JUROR:  Yes.

7                MS. SCAPICCHIO:  It's something you

8        really want to do.  You interact with the students

9        or you interact with other people who are trying

10       to develop this --

11               JUROR:  Both.  I manage a team of

12       product managers and development content

13       specialists, and I also work with authors who are

14       mostly professors, and students, as well, and

15       instructors who use the products.

16               MS. SCAPICCHIO:  And they're used

17       throughout the different colleges and universities

18       in Massachusetts?

19               JUROR:  All over the country.

20               MS. SCAPICCHIO:  Great.  And then you

21       also indicated your experience with the law, you

22       had an employment discrimination?

23               JUROR:  Yes.

24               MS. SCAPICCHIO:  Did you file a suit or

25       someone filed suit against you?

70

```
 1              JUROR:  I filed the suit.

 2              MS. SCAPICCHIO:  What was that all

 3         about?

 4              JUROR:  It was based on a wrongful

 5         dismissal that was related to a couple of

 6         different things, not the least of which I had a

 7         medical condition that wasn't considered when they

 8         released me, and so because they didn't consider

 9         that, I brought a lawsuit.  There was also age

10         discrimination alleged, but that was secondary.

11              MS. SCAPICCHIO:  Was that when you were

12         in Texas, New Jersey, New York?

13              JUROR:  In New York.

14              MS. SCAPICCHIO:  In New York, okay, and

15         about how long ago was that?  The discrimination.

16              JUROR:  It was two years ago.

17              MS. SCAPICCHIO:  Were you represented by

18         an attorney at that time?

19              JUROR:  Yes.

20              MS. SCAPICCHIO:  The interaction that

21         you had with your attorney, did that leave you

22         with a bad feeling against attorneys for any

23         reason?

24              JUROR:  No, not at all.  Actually, just

25         the opposite.
```

71

1              MS. SCAPICCHIO:  All right, great,

2         thanks.

3              THE COURT:  Sir, could you step outside

4         for just one second, please.

5    (Juror Number 23 exits courtroom.)

6              THE COURT:  This juror stands

7         indifferent.

8              MR. HENNING:  Commonwealth is content.

9              MS. SCAPICCHIO:  Defendant will

10        challenge.

11   (Juror Number 23 enters courtroom.)

12             THE COURT:  Thank you, sir, you are

13        excused.

14             THE CLERK:  Excused.

15   (Juror Number 23, excused.)

16   (Juror Number 24 enters courtroom.)

17             THE CLERK:  Juror 24, Javier Heinsen.

18             JUROR:  Yes.

19             THE COURT:  Hi, Mr. Heinsen.

20             JUROR:  Hi.

21             THE COURT:  Sir, is there anything about

22        the nature of these charges or any of the

23        allegations you've heard that might affect your

24        ability to be fair and impartial?

25                  JUROR:  No.

72

```
1              THE COURT:  You may hear alleged
2      evidence that the defendant, the alleged victim,
3      and some of the witnesses were involved in selling
4      marijuana.  Would that evidence affect your
5      ability to be fair and impartial?
6              JUROR:  No.
7              THE COURT:  The defendant in a criminal
8      trial has the absolute right not to testify.  If
9      Mr. Reddicks chose not to testify at this trial,
10     would you hold that against him in any way?
11             JUROR:  No.
12             THE COURT:  Is there anything about the
13     length of the trial that poses a hardship for you?
14             JUROR:  Not really, just a lot of work.
15             THE COURT:  I didn't hear you.
16             JUROR:  Just a lot of work, basically.
17             THE COURT:  You mean it's a lot of days?
18             JUROR:  Yeah.
19             THE COURT:  But other than that?
20             JUROR:  No.
21             THE COURT:  You can serve.
22             JUROR:  Yes.
23             THE COURT:  Great.  Any questions,
24     Counsel?
25             MR. HENNING:  Good morning, sir, how
```

73

1         are you?

2                    JUROR:  Good morning.

3                    MR. HENNING:  It lists here that you're

4         a current senior in college?

5                    JUROR:  Yes.

6                    MR. HENNING:  Can you tell us where you

7         go to school and what you're studying?

8                    JUROR:  I go to Wentworth Institute of

9         Technology and I'm studying civil engineering.

10                   MR. HENNING:  Have your classes started

11        yet for the semester?

12                   JUROR:  Yes, they have.

13                   MR. HENNING:  When did they start?

14                   JUROR:  Last Wednesday.

15                   MR. HENNING:  Are you a full-time

16        student?

17                   JUROR:  Yes, I am.

18                   MR. HENNING:  You go to school during

19        the day and then you work at night?

20                   JUROR:  I go to school during the day

21        and then I have Thursday till 8 PM.  No work.

22                   MR. HENNING:  Do you have to do labs or

23        any sort of clinical work as part of your civil

24        engineering degree?

25                   JUROR:  No.

74

1          MR. HENNING:  How many days a week do
2      you have class?
3          JUROR:  All five days a week.
4          MR. HENNING:  Would your class schedule
5      be affected by you being a juror?
6          JUROR:  Yes.  All my classes are usually
7      between 8 and 3 except for one class.
8          THE COURT:  Could you step outside,
9      please.
10  (Juror Number 24 exits courtroom.)
11          THE COURT:  Mr. Henning, as I've told
12      Ms. Scapicchio, it is my province to determine
13      hardship.  I asked him, is there anything about
14      the length of the trial that poses a hardship.
15      He's a college student.  He's able to tell me, no,
16      I've got classes.  Please, Counsel, this is my
17      call.
18          MR. HENNING:  Understood.
19          THE COURT:  He's told me he can still
20      do it, so please.  If you have other questions,
21      that's fine, but the hardship determination is
22      mine.  I give them every opportunity to say to me
23      no, I can't do it.  He didn't.  So let's press on
24      some other area.
25  (Juror Number 24 enters courtroom.)

75

```
1              MR. HENNING:  I have no further
2        questions, Your Honor.
3              THE COURT:  Ms. Scapicchio?
4              MS. SCAPICCHIO:  Just so I understand
5        it, you put down that you have an employer, a
6        current employer?
7              JUROR:  It's not a -- when they call me
8        in, I'll go in.  Like, they called me in for
9        tomorrow, but I don't really work full-time or
10       part-time for them, it's just when they need me.
11             MS. SCAPICCHIO:  So it's just like a
12       per diem.  When they call you, if you're
13       available, you go; if you're not available, you
14       don't go.
15             JUROR:  Exactly.
16             MS. SCAPICCHIO:  How long have you been
17       working in that capacity for this company?
18             JUROR:  I did a co-op with them last
19       semester.
20             MS. SCAPICCHIO:  Okay, so that's how
21       they have your information.
22             JUROR:  Yes.
23             MS. SCAPICCHIO:  And you did a good job
24       and they call you back when they need you.
25             JUROR:  Exactly.
```

76

1              MS. SCAPICCHIO:  What type of company

2         is it?

3              JUROR:  It's interior sheetrock, so they

4         do interior divisions in buildings.

5              MS. SCAPICCHIO:  Is it a like

6         demolition, construction?

7              JUROR:  Construction.

8              MS. SCAPICCHIO:  Construction, okay.

9         So if they need someone extra, they'll just call

10        you, and if you're available, you show up.

11             JUROR:  Yeah, I'm more of an assistant

12        project manager, so I help with the data

13        management if they need help.

14             MS. SCAPICCHIO:  So you work in the

15        office.

16             JUROR:  Yes.

17             MS. SCAPICCHIO:  And you did that for

18        co-op?

19             JUROR:  Yes, I did.

20             MS. SCAPICCHIO:  For how long did you do

21        your co-op?

22             JUROR:  For three months.

23             MS. SCAPICCHIO:  Did you like working

24        there?

25             JUROR:  Yes.

77

1          MS. SCAPICCHIO:  You said they called
2      you tomorrow.  Did you tell them you weren't
3      available?
4          JUROR:  I haven't told them.  If I get
5      called to be on the jury, I'll tell them no.
6          MS. SCAPICCHIO:  Thank you, I don't have
7      any further questions.
8          THE COURT:  Sir, could you step outside
9      one more time, please.  Thank you.
10  (Juror Number 24 exits courtroom.)
11          THE COURT:  This juror stands
12      indifferent.
13          MR. HENNING:  The Commonwealth will
14      exercise a challenge.
15  (Juror Number 24 enters courtroom.)
16          THE COURT:  Thank you, sir, you are
17      excused.
18          THE CLERK:  Excused.
19  (Juror Number 24, excused.)
20  (Juror Number 25 enters courtroom.)
21          THE CLERK:  Juror 25, Angelo Manero.
22          JUROR:  Here.
23          THE COURT:  Hi, Mr. Manero.  Sir, is
24      there anything about the nature of these charges
25      or any of the allegations you've heard that might

78

1          affect your ability to be fair and impartial?

2                    THE CLERK:  You have to answer yes or

3          no, we're recording.

4                    THE COURT:  You have to say yes or no,

5          sir.

6                    JUROR:  No.

7                    THE COURT:  Sir, you may hear alleged

8          evidence that the defendant, the alleged victim,

9          and some witnesses were involved in selling

10         marijuana.  Would that evidence affect your

11         ability to be fair and impartial?

12                   JUROR:  No.

13                   THE COURT:  The defendant in a criminal

14         trial has the absolute right not to testify.  If

15         Mr. Reddicks chose not to testify at this trial,

16         would you hold that against him in any way?

17                   JUROR:  No.

18                   THE COURT:  Is there anything about the

19         length of the trial that poses a hardship for you?

20                   JUROR:  No.

21                   THE COURT:  Counsel, any follow-up

22         questions?

23                   MR. HENNING:  Good morning, sir, how

24         are you?

25                   JUROR:  How are you doing?

79

1            MR. HENNING:  It says here in the past,

2       work and school, you have, it looks like a check

3       next to employed and then unemployed.

4            JUROR:  I just got laid off, but I'm

5       doing a part-time job right now, and I watch my

6       son in the morning.  And I live all the way out

7       in Stoneham, I'm not in Revere anymore.

8            THE COURT:  Where are you living now?

9            JUROR:  In Stoneham.

10           THE COURT:  You're excused, sir.  You

11      have to be a Suffolk County resident to be on this

12      jury.  Thank you, sir.

13           THE CLERK:  Excused.

14  (Juror Number 25, excused.)

15  (Juror Number 27 enters courtroom.)

16           THE CLERK:  Juror 27, Christian Chavez.

17           JUROR:  Here.

18           THE COURT:  Good morning, Mr. Chavez.

19           JUROR:  Good morning.

20           THE COURT:  Sir, is there anything

21      about the nature of these charges or any of the

22      allegations you've heard that might affect your

23      ability to be fair and impartial?

24           JUROR:  No.

25           THE COURT:  You may hear alleged

80

1      evidence that the defendant, the alleged victim,

2      and some of the witnesses were involved in selling

3      marijuana.  Would that evidence affect your

4      ability to be fair and impartial?

5                    JUROR:  No.

6                    THE COURT:  The defendant in a criminal

7      trial has the absolute right not to testify.  If

8      Mr. Reddicks chose not to testify at this trial,

9      would you hold that against him in any way?

10                    JUROR:  No.

11                    THE COURT:  Is there anything about the

12      length of the trial that poses a hardship for you?

13                    JUROR:  Well, I go to school and work.

14                    THE COURT:  Where do you go to school,

15      sir?

16                    JUROR:  JVS.

17                    THE COURT:  I'm sorry, where?

18                    JUROR:  JVS.  Adult diploma program.

19                    THE COURT:  I'm sorry, I can't hear you.

20                    MR. HENNING:  JVS, adult diploma

21      program.

22                    THE COURT:  How often do you attend that

23      program?

24                    JUROR:  I go from Monday through

25      Thursday at 9 AM to 11:30.

81

```
 1              THE COURT:  If you are in school, did
 2         you know you could defer your service to some --
 3         is there a time when you're out of school?
 4              JUROR:  Well, I don't go to school on
 5         Fridays and the weekends.
 6              THE COURT:  When do your classes end?
 7              JUROR:  Till spring.
 8              THE COURT:  Did you know that you could
 9         have deferred your service until the spring when
10         you're out of school?
11              JUROR:  No, I didn't know that.
12              THE COURT:  You didn't know that?
13              JUROR:  No.
14              THE COURT:  Thank you, sir, you're
15         excused.
16              THE CLERK:  Excused.
17    (Juror Number 27, excused.)
18    (Juror Number 28 enters courtroom.)
19              THE CLERK:  Juror 28, Pamela Ross-Kung.
20              JUROR:  Yes.
21              THE COURT:   Good morning, ma'am.  Is
22         there anything about the nature of these charges
23         or any of the allegations you've heard that might
24         affect your ability to be fair and impartial?
25              JUROR:  No.
```

82

1           THE COURT:  You may hear alleged
2      evidence that the defendant, the alleged victim,
3      and some of the witnesses were involved in selling
4      marijuana.  Would that evidence affect your
5      ability to be fair and impartial?
6           JUROR:  No.
7           THE COURT:  The defendant in a criminal
8      trial has the absolute right not to testify.  If
9      Mr. Reddicks chose not to testify at this trial,
10     would you hold that against him in any way?
11          JUROR:  No.
12          THE COURT:  You hesitated for a moment.
13     Are you sure about that?
14          JUROR:  I need to think, that's all, to
15     process the question.  Sorry.
16          THE COURT:  Perfectly understand, and
17     I don't mean to embarrass you.  Some people do
18     need to think about the question.  But you're
19     saying definitively that that would not affect
20     your ability to be fair and impartial if he chose
21     not to testify.
22          JUROR:  Yes.
23          THE COURT:  Great.  Finally, ma'am, is
24     there anything about the length of the trial that
25     poses a hardship for you?

83

1           JUROR:  No.

2           THE COURT:  Great.  Any follow-up,

3   Counsel?

4           MR. HENNING:  Ma'am, good morning, how

5   are you?

6           JUROR:  Good morning.  I'm fine.

7           MR. HENNING:  This sheet here lists that

8   you've got a master's degree.

9           JUROR:  Yes.

10          MR. HENNING:  Can you describe where you

11  got it and what the degree was in?

12          JUROR:  My degree is in training and

13  development from Lesley University.

14          MR. HENNING:  Where did you go to

15  college before that?

16          JUROR:  Northeastern University, and

17  before that, Essex Agee.

18          MR. HENNING:  Essex what?

19          JUROR:  Essex Agricultural and Technical

20  Institute.

21          MR. HENNING:  Have you lived in

22  Massachusetts your whole life?

23          JUROR:  Yes.

24          MR. HENNING:  Down here in the

25  experience with the law section, it says that your

84

1          brother had some experience with the law for

2          carrying an unlicensed firearm.

3                    JUROR:  Correct.

4                    MR. HENNING:  Can you describe where

5          that was and when it was?

6                    JUROR:  It was here in Massachusetts.

7          When?  Probably going back over 10 years, for

8          sure.  What else would you like to know?

9                    MR. HENNING:  Do you remember which

10         location, which courthouse, or which county it

11         was in?

12                   JUROR:  It was definitely here in

13         Suffolk County.

14                   MR. HENNING:  Do you remember anything

15         else about the case and what happened with it?

16                   JUROR:  He was found guilty, he went to

17         prison.

18                   MR. HENNING:  Do you remember which

19         police department was responsible for the case?

20                   JUROR:  I'm thinking maybe Cambridge,

21         I'm not sure.  I can't remember that far back.

22                   MR. HENNING:  Based on that experience

23         with your brother, does that cause you to have any

24         feeling one way or another towards law enforcement

25         or police officers?

85

1          JUROR:  That's a -- well, yes, of

2     course, it does.

3          MR. HENNING:  Can you describe or

4     elaborate on how it makes you feel in that regard?

5          JUROR:  I actually felt they were pretty

6     fair to tell you the truth.  You know, you have

7     mixed feelings when you sit through all of that

8     and hear it, also.  I don't know what else to say.

9     It was a very emotional time, so very difficult.

10          THE COURT:  Ms. Ross-Kung, let me ask a

11     question then.  You understand one of the charges

12     against Mr. Reddicks is the unlawful possession

13     of a firearm.  Knowing that your brother was

14     convicted of that very same charge some years ago,

15     would that cause you to question your ability to

16     be a fair and impartial juror in this case?

17          JUROR:  I wouldn't like to think so,

18     but maybe, I just don't know what that would be.

19     I don't know what --

20          THE COURT:  But you think it might

21     affect you.

22          JUROR:  Maybe.

23          THE COURT:  All right, thank you, ma'am,

24     you're excused.

25          THE CLERK:  Excused.

86

1    (Juror Number 28, excused.)

2    (Juror Number 30 enters courtroom.)

3              THE CLERK:  Juror 30, HENNING Rich.

4              THE COURT:  Good morning, Mr. Rich.

5         Sir, is there anything about the nature of these

6         charges or any of the allegations you've heard

7         that might affect your ability to be fair and

8         impartial?

9              JUROR:  No.

10             THE COURT:  You may hear alleged

11        evidence that the defendant, the alleged victim,

12        and some witnesses were involved in selling

13        marijuana.  Would that evidence affect your

14        ability to be fair and impartial?

15             JUROR:  No.

16             THE COURT:  The defendant in a criminal

17        trial has the absolute right not to testify.  If

18        Mr. Reddicks chose not to testify at this trial,

19        would you hold that against him in any way?

20             JUROR:  No.

21             THE COURT:  Is there anything about the

22        length of the trial that poses a hardship for you?

23             JUROR:  No.

24             THE COURT:  Counsel, any follow-up?

25             MR. HENNING:  Good morning, sir, how are

87

1          you?

2                    JUROR:  Good morning.

3                    MR. HENNING:  Can you describe where you

4          got your degree and what you studied?

5                    JUROR:  Ithaca College, studied

6          integrated marketing communication.

7                    MR. HENNING:  What does that mean

8          exactly?

9                    JUROR:  Business, sales, marketing,

10         advertising.

11                   MR. HENNING:  You grew up in Boston?

12                   JUROR:  I grew up north of Boston.

13                   MR. HENNING:  In Massachusetts.

14                   JUROR:  Yes.

15                   MR. HENNING:  Where did you go to high

16         school?

17                   JUROR:  Swampscott High School.

18                   MR. HENNING:  I have nothing further,

19         Your Honor.

20                   THE COURT:  Ms. Scapicchio?

21                   MS. SCAPICCHIO:  Hi, how are you?  You

22         say you work for Harmony Healthcare --

23                   JUROR:  International.

24                   MS. SCAPICCHIO:  -- International.  And

25         you're director of business development?

88

```
 1                    JUROR:  Yes.
 2                    MS. SCAPICCHIO:  What does that actually
 3          mean?  What is your job?
 4                    JUROR:  Sales.
 5                    MS. SCAPICCHIO:  You do sales.
 6                    JUROR:  Yes.
 7                    MS. SCAPICCHIO:  Okay, and how long have
 8          you worked for Harmony?
 9                    JUROR:  Just about a year.
10                    MS. SCAPICCHIO:  Where did you work
11          before Harmony.
12                    JUROR:  A company called Geriatric
13          Medical.
14                    MS. SCAPICCHIO:  Same thing, you did
15          sales for them?
16                    JUROR:  Yes.
17                    MS. SCAPICCHIO:  I have no further
18          questions, thank you.
19                    THE COURT:  Sir, could you step outside
20          for just a moment, please.
21        (Juror Number 30 exits courtroom.)
22                    THE COURT:  This juror stands
23          indifferent.
24                    MR. HENNING:  Commonwealth is content.
25                    MS. SCAPICCHIO:  Defendant is content.
```

89

1              THE COURT:  All right, bring Mr. Rich

2        back in.

3              THE CLERK:  That will be Seat 14.

4     (Juror Number 30 enters courtroom.)

5              THE COURT:  Mr. Rich, you've been chosen

6        to be on this jury.  You're going to be going up

7        to the jury room affiliated with this courtroom

8        and joining other people who have been impaneled

9        both yesterday and today.  I'm just going to ask

10       that you not discuss any aspect of this case with

11       anyone at any time, including your fellow jurors,

12       nor allow anyone, including your fellow jurors, to

13       discuss the case with you, all right?

14              We'll be back with you in just a little

15       while.  If you could go with the Court Officer,

16       sir.

17              THE CLERK:  Seat 14.

18     (Juror Number 30 exits courtroom.)

19              THE CLERK:  Is that Mr. Taylor?

20              COURT OFFICER:  Yes.

21              THE COURT:  Let's bring him in.

22     (Juror in Seat 11, Dexter Taylor, enters courtroom.)

23              THE COURT:  Good morning, Mr. Taylor,

24        how are you today, sir?

25              JUROR:  Pretty good.  I can't complain.

90

1           THE COURT:  Mr. Taylor, on your

2     questionnaire, you had indicated that you had been

3     either arrested, charged, or convicted of a crime,

4     and the only crime you put down was assault and

5     battery, correct?

6           JUROR:  Yes, assault and battery was the

7     charge.  Yeah, it was assault and battery against

8     my stepson.

9           THE COURT:  Thank you, sir, that's all

10    I need to know.  It has come to my attention, sir,

11    however, that you've been charged with many other

12    crimes --

13          JUROR:  Which I was in the process of

14    sealing the cases.

15          THE COURT:  Mr. Taylor, please listen

16    to me.  In 2009, an abuse prevention act case that

17    was dismissed; in 2007, resisting arrest; 2002,

18    malicious destruction of property; in 1999, the

19    possession of marijuana, also operating to

20    endanger; in 1998, again possession of marijuana;

21    assault and battery in '97; forgery in '95, along

22    with trespassing and disorderly conduct in '95,

23    and another assault and battery on a public

24    employee, along with assault and battery by means

25    of a dangerous weapon.  Are those your

91

1          convictions, Mr. Taylor?

2                    JUROR:  Basically, these are the cases

3          that I went through to get sealed.  Ever since

4          then, I've been back and forth to court, and the

5          judge in each court has moved to move each case,

6          put it as, you know, pretty much seal the case,

7          but the only one have tied up is the Roxbury one

8          for assault and battery right now which I can't

9          get rid of till 2019.

10                   THE COURT:  I notice that your record is

11         sealed.  Did you think, sir, that you didn't have

12         to put down the other offenses --

13                   JUROR:  I thought it --

14                   THE COURT:  Let me finish the question,

15         sir.

16                   JUROR:  Okay.

17                   THE COURT:  Did you think that you

18         didn't have to put these other offenses down

19         because they had been sealed?

20                   JUROR:  Yes, ma'am.

21                   THE COURT:  And the only one you put

22         down is assault and battery because it has not

23         been sealed.

24                   JUROR:  Correct, because the whole

25         package can't be sealed because that one is still

92

1          open till 2019, but the others, they sealed.
2          I really didn't recognize the fact that I had to
3          write down every charge that I ever went through
4          in life.
5                    THE COURT:  Thank you.
6                    Any follow-up, Counsel, regarding this?
7                    MR. HENNING:  No.
8                    THE COURT:  Ms. Scapicchio?
9                    MS. SCAPICCHIO:  None from me.
10                    THE COURT:  Sir, could you step outside
11          for just a minute.
12                    JUROR:  Sure.
13     (Juror in Seat 11 exits courtroom.)
14                    THE COURT:  I accept his explanation
15          and I've heard this before, and I think it's
16          absolutely reasonable for him to think that
17          because his case was sealed, all the other
18          offenses were sealed, and note that he
19          scrupulously put the assault and battery because
20          that hadn't been sealed.  So I credit what he's
21          telling me.  He's incorrect in interpreting the
22          questionnaire, but I think it's a reasonable
23          interpretation.  I think a layperson wouldn't
24          understand that notwithstanding the fact that it's
25          been sealed, he still has to disclose it for the

93

1      purposes of the questionnaire.

2            So for that reason, I'm not going to

3      excuse him for cause, but as I've indicated, if

4      the Commonwealth wants to exercise a peremptory

5      challenge, they're entitled to do that.

6            MR. HENNING:  I'm going to exercise a

7      peremptory challenge.

8            MS. SCAPICCHIO:  Your Honor, I would

9      object.  At this point, if you've accepted the

10     explanation of this juror in terms of the sealed

11     record, allowing the Commonwealth at this point to

12     strike him from the jury based on something that

13     you found was a mistake of his that was

14     unintentional in terms of what happened.

15           THE COURT:  Well, that's an excuse for

16     cause, and I clearly said I credit his

17     explanation, but that didn't mean that he

18     shouldn't have disclosed it.

19           MS. SCAPICCHIO:  I'm not saying he

20     wasn't wrong, Judge, I'm not saying that at all.

21           THE COURT:  Because he, I think

22     innocently, made a mistake, I'm not excusing him

23     for cause.  That being said, however, this is a

24     piece of information that was not available to

25     Mr. Henning at the time of his vetting of this

94

1       juror.  Because of that, he's entitled to exercise

2       a peremptory.

3              MS. SCAPICCHIO:  Just so the record is

4       clear, Judge, everyone so far that Mr. Henning has

5       run, and I'm not blaming him, that's come back

6       with a record has been African-American, and so

7       it appears to me that the running of records of

8       potential jurors, in Suffolk County, anyhow,

9       leads to the disclosure of criminal records and

10      exclusion of African American individuals or

11      potential jurors.  My client is an African-

12      American.  I would object at this point, Judge.

13             THE COURT:  Duly noted.  Nevertheless,

14      the record is what the record is, and I think in

15      the two instances that Mr. Henning has done that,

16      I've accepted the jurors' explanations, but that

17      doesn't excuse them from fully revealing their

18      criminal history, and in both of those situations,

19      neither juror faithfully disclosed their criminal

20      history.  Therefore, I'm going to allow

21      Mr. Henning to exercise a peremptory challenge.

22             MS. SCAPICCHIO:  Note my objection.

23             THE COURT:  Duly noted.

24  (Juror in Seat 11 enters courtroom.)

25             THE COURT:  Thank you, Mr. Taylor, you

95

1       are excused from this jury.  You're free to go.

2                    THE CLERK:  Excused.

3                    THE COURT:  In the future, sir, you need

4       to put down all of your convictions or anything

5       that you were arrested for.  Even though it's

6       sealed, that means that other members of the world

7       and the public can't look at it; some can, some

8       can't, but please, for future reference, on your

9       questionnaire, you have to reveal it all.  All

10      right?

11                   JUROR:  Okay, my apologies.

12                   THE COURT:  That's all right,

13      I understand.

14                   JUROR:  I was unaware, this was my first

15      time going through it, so I thought I had to list

16      whatever was still open that I couldn't seal yet.

17                   THE COURT:  Thank you, Mr. Taylor,

18      I understand.

19                   THE CLERK:  You're excused, sir.

20      (Juror in Seat 11, excused.)

21      (Juror Number 31 enters courtroom.

22                   THE CLERK:  Juror 31, Michael Kelleher.

23                   THE COURT:  Good morning, Mr. Kelleher.

24                   JUROR:  Good morning.

25                   THE COURT:  Sir, is there anything about

96

1          the nature of these charges or any of the
2          allegations you've heard that might affect your
3          ability to be fair and impartial?
4                    JUROR:  No.
5                    THE COURT:  You may hear alleged
6          evidence that the defendant, the alleged victim,
7          and some witnesses were involved in selling
8          marijuana.  Would that evidence affect your
9          ability to be fair and impartial?
10                   JUROR:  No.
11                   THE COURT:  The defendant in a criminal
12         trial has the absolute right not to testify.  If
13         Mr. Reddicks chose not to testify at this trial,
14         would you hold that against him in any way?
15                   JUROR:  I don't think so, no.
16                   THE COURT:  Are you sure about that?
17                   JUROR:  Yeah, I'm sure.
18                   THE COURT:  Great.  Is there anything
19         about the length of the trial that poses a
20         hardship for you?
21                   JUROR:  No.
22                   THE COURT:  Great.  Counsel?
23                   MR. HENNING:  Good morning, sir, how
24         are you?
25                   JUROR:  Good morning.

97

1           MR. HENNING:  It says you have a

2      bachelor's degree and a four-year college degree.

3           JUROR:  That's correct.

4           MR. HENNING:  Where did you go to

5      school?

6           JUROR:  LaSalle College.

7           MR. HENNING:  And what did you get a

8      degree in?

9           JUROR:  Finance.

10          MR. HENNING:  Did you go directly from

11     there to Brown Brothers?

12          JUROR:  I did, yeah.

13          MR. HENNING:  So you've been working

14     there for a total of --

15          JUROR:  Almost five years.

16          MR. HENNING:  What high school did you

17     go to?

18          JUROR:  Weymouth High School.

19          MR. HENNING:  Nothing further, Your

20     Honor.

21          THE COURT:  Ms. Scapicchio?

22          MS. SCAPICCHIO:  Hi, how are you?

23          JUROR:  Great.

24          MS. SCAPICCHIO:  It indicates on the

25     bottom, your experience with the law, disorderly

98

1           conduct, pretrial probation, case expunged?

2                     JUROR:  Yes.

3                     MS. SCAPICCHIO:  What was that all

4           about?

5                     JUROR:  I was arrested in college for

6           calling a police officer a name and I got

7           disorderly conduct, I got community service, 20

8           hours.

9                     MS. SCAPICCHIO:  You accepted

10          responsibility for it and it was resolved.

11                    JUROR:  Correct.

12                    MS. SCAPICCHIO:  Was it just one of

13          those college things that happen?

14                    JUROR:  Yes.

15                    THE COURT:  Was alcohol involved?

16                    JUROR:  Yeah, a little bit.

17                    THE COURT:  What a surprise.

18                    MS. SCAPICCHIO:  And in terms of your

19          job at Brown Brothers, what do you do specifically

20          as a supervisor of funding services?

21                    JUROR:  I supervise a small trades team

22          for various clients with their investments, trade

23          section of it.

24                    MS. SCAPICCHIO:  At some point, you said

25          you went to Weymouth High; is that right?

99

```
 1                    JUROR:  Yes.
 2                    MS. SCAPICCHIO:  Did you play sports for
 3          them?
 4                    JUROR:  Yeah, lacrosse and football.
 5                    MS. SCAPICCHIO:  What year did you
 6          graduate from Weymouth?
 7                    JUROR:  2007.
 8                    MS. SCAPICCHIO:  '07, thank you.  I have
 9          no further questions.
10                    THE COURT:  Sir, could you step outside
11          for just a second.
12                    JUROR:  Sure.
13     (Juror Number 31 exits courtroom.)
14                    THE COURT:  This juror stands
15          indifferent.
16                    MR. HENNING:  The Commonwealth is
17          content.
18                    MS. SCAPICCHIO:  Defendant is content.
19                    THE CLERK:  That will be seat 11 for
20          Mr. Kelleher.
21     (Juror Number 31 enters courtroom.)
22                    THE COURT:  Mr. Kelleher, you've been
23          chosen to be on the jury.  You're going to go
24          upstairs to the jury room affiliated with this
25          courtroom and meet other jurors who have already
```

100

1    been impaneled.  Please at no time should you be

2    discussing any aspect of this case with them or

3    anyone else, nor allow them or anyone else to

4    discuss the case with you.

5              JUROR:  Okay.

6              THE COURT:  Thank you, sir, if you could

7    go upstairs.

8              THE CLERK:  That will be Seat 11, and

9    hold off on the next one, please.

10   (Juror Number 31 exits courtroom.)

11             THE CLERK:  Just for the record, both

12   counsel have used 12 challenges.

13             MR. HENNING:  14 seated?

14             THE CLERK:  And now 14 seated.

15             Okay, 34, please.

16   (Juror Number 34 enters courtroom.)

17             THE CLERK:  Juror 34, David Benevides.

18             JUROR:  Yes.

19             THE COURT:  Mr. Benevides, is there

20   anything about the nature of these charges or any

21   of the allegations you've heard so far that might

22   affect your ability to be fair and impartial?

23             JUROR:  No.

24             THE COURT:  You may hear alleged

25   evidence that the defendant, the alleged victim,

101

1       and some of the witnesses were involved in selling

2       marijuana.  Would that evidence affect your

3       ability to be fair and impartial?

4               JUROR:  No, Your Honor.

5               THE COURT:  The defendant in a criminal

6       trial has the absolute right not to testify.  If

7       Mr. Reddicks chose not to testify at this trial,

8       would you hold that against him in any way?

9               JUROR:  No, Your Honor.

10              THE COURT:  Is there anything about the

11      length of the trial that poses a hardship for you?

12              JUROR:  No, Your Honor.

13              THE COURT:  Counsel?

14              MR. HENNING:  Good morning, sir, how are

15      you?  You've got a bachelor's degree.  Where did

16      you go to college?

17              JUROR:  U-Mass Dartmouth.

18              MR. HENNING:  When did you begin your

19      involvement with the armed services?

20              JUROR:  During college, I joined the

21      ROTC program, graduated from Providence College

22      with an associate's in conjunction with my

23      bachelor's degree.

24              MR. HENNING:  Did you go into full-time

25      active duty at any point?

102

```
 1                    JUROR:  I did.

 2                    MR. HENNING:  What did you do with the

 3         Army at that point?

 4                    JUROR:  I've been deployed to Cuba, to

 5         Guantanamo Bay, and then I've been activated on a

 6         few occasions for state and federal disaster

 7         relief.

 8                    MR. HENNING:  What does operations

 9         officer do specifically?

10                    JUROR:  It's logistics at a battalion

11         and regimen level, so we just coordinate the

12         activity for the lower supporting units and we

13         deal with the other supporting units in a joint

14         command environment with other divisions.

15                    MR. HENNING:  Thank you very much.

16                    MS. SCAPICCHIO:  With respect to the

17         ROTC training, when you graduated from U-Mass,

18         you got commissioned?

19                    JUROR:  I did.

20                    MS. SCAPICCHIO:  And then you went to

21         officers base force?

22                    JUROR:  I did.

23                    MS. SCAPICCHIO:  Where did you do that?

24                    JUROR:  In Fort Leonard Wood, Missouri,

25         for engineering.
```

103

1        MS. SCAPICCHIO:  And right from there,

2   you were activated and went where?

3        JUROR:  I was not activated, I just

4   served in the National Guard, and I had been

5   activated four separate times.  I also have a

6   civilian job, as well.

7        MS. SCAPICCHIO:  What do you do for your

8   civilian job?

9        JUROR:  I work for John Hancock in

10  finance.

11       MS. SCAPICCHIO:  And how long have you

12  done that?

13       JUROR:  For four years now.

14       MS. SCAPICCHIO:  And then you said one

15  of the places that you served was in Guantanamo

16  Bay?

17       JUROR:  Yes, it was.

18       MS. SCAPICCHIO:  Was that as security?

19  Or what did you do for Guantanamo --

20       JUROR:  That was in the prison facility.

21       MS. SCAPICCHIO:  Was that Operation

22  Iraqi Freedom?

23       JUROR:  Yes, it was.

24       MS. SCAPICCHIO:  One, two, or three?

25  I don't know what it's up to now.

104

1          JUROR:  I think it's Operation Enduring

2     Freedom now.

3          MS. SCAPICCHIO:  It is, okay, and that's

4     what you served, under Enduring Freedom.

5          JUROR:  I did.

6          MS. SCAPICCHIO:  When was that?

7          JUROR:  That was from September 2009 to

8     October 2010.

9          MS. SCAPICCHIO:  I don't know that you

10     even answered this question, so I apologize.  What

11     did you do for Guantanamo Bay specifically?  Were

12     you a security officer, were you --

13          JUROR:  I did oversee a platoon of

14     security officers.

15          MS. SCAPICCHIO:  And what did that

16     entail, overseeing a platoon of security officers?

17          JUROR:  I can't really go into it, but

18     it's basically the external/internal security for

19     what they Camp America which is the outer

20     perimeter for the detention facility and then the

21     inner perimeter for each separate detention

22     facility.

23          MS. SCAPICCHIO:  In your job as managing

24     those or overseeing those security officers, did

25     you work together with any military police

105

1          departments?
2                    MR. HENNING:  No, it was all federal
3          agencies, so US Marshals, FBI, and other law
4          enforcement, but it was all at, I believe, the
5          federal level.
6                    MS. SCAPICCHIO:  And you interacted
7          with law enforcement on a daily basis.
8                    JUROR:  I did, it was a joint
9          environment.
10                   MS. SCAPICCHIO:  Your experience with
11         law enforcement in your service in the Army
12         National Guard, would your experience in your
13         interaction with law enforcement, if a law
14         enforcement officer testified here, whether it be
15         a police officer or somebody from the federal
16         government, if they testified to one thing and a
17         civilian testified to something else, would they
18         get the edge because of your experience and your
19         interaction with them?
20                   JUROR:  No, ma'am, I've seen all kinds.
21                   MS. SCAPICCHIO:  What do you mean by
22         that?
23                   JUROR:  I mean as far as you're dealing
24         with different members of the military and federal
25         as far as there's all different types of people

106

1          that work there.  Because they're in a government

2          agency or a municipal agency doesn't immediately

3          give them, in my mind, that they're automatically

4          correct in any opinion they have.

5                    MS. SCAPICCHIO:  So you would wait to

6          hear the evidence and then you would make a

7          decision.

8                         JUROR:  Correct.

9                    MS. SCAPICCHIO:  Were you involved in

10         any of the interrogation or anyone in your unit

11         or that you directly supervised involved in the

12         interrogation or the gathering of information in

13         the anticipation for interrogation?

14                         JUROR:  No.

15                    MS. SCAPICCHIO:  I don't have anything

16         further.

17                    THE COURT:  Sir, would you step outside

18         for just a moment please.

19     (Juror Number 34 exits courtroom.)

20                    THE COURT:  This juror stands

21         indifferent.

22                    MR. HENNING:  Commonwealth is content.

23                    MS. SCAPICCHIO:  Defendant will

24         challenge.

25     (Juror Number 34 enters courtroom.)

107

1            THE COURT:  Thank you, sir, you are

2       excused.

3            THE CLERK:  Excused.

4    (Juror Number 34, excused.)

5    (Juror Number 37 enters courtroom.)

6            THE CLERK:  37, Renato Pisano.

7            JUROR:  Here.

8            THE COURT:  Hi, Mr. Pisano.  Is there

9       anything about the nature of these charges or any

10      of the allegations you've heard that might affect

11      your ability to be fair and impartial?

12            JUROR:  No.

13            THE COURT:  You may hear alleged

14      evidence that the defendant, the alleged victim,

15      and some of the witnesses may have been involved

16      in selling marijuana.  Would that evidence affect

17      your ability to be fair and impartial?

18            JUROR:  I would say no.

19            THE COURT:  You hesitated, though.

20            JUROR:  Yeah.

21            THE COURT:  Are you unsure of that

22      answer?

23            JUROR:  Yeah, I'd say I'm unsure.

24            THE COURT:  All right, thank you, sir,

25      you're excused.

108

1                    THE CLERK:  Excused.

2        (Juror Number 37, excused.)

3        (Juror Number 41 enters courtroom.)

4                    THE CLERK:  41, Brigette Arsenault.

5                    JUROR:  Yes.

6                    THE COURT:  Good morning, ma'am.  Is

7        there anything about the nature of these charges

8        or any of the allegations that might affect your

9        ability to be fair and impartial?

10                   JUROR:  No.  The only thing is I have

11       panic disorder, I don't know if that can come into

12       play.

13                   THE COURT:  Sure.

14                   JUROR:  So I do have that, and I have an

15       upcoming knee surgery.

16                   THE COURT:  When is that knee surgery?

17                   JUROR:  I actually have the orthopedic

18       appointment next week, but I have it on March 7th.

19                   THE COURT:  This trial will be well over

20       by March.  It's going to be over by the end of

21       January.  But you have an orthopedic appointment

22       next week?

23                   JUROR:  Yes.

24                   THE COURT:  In preparation for the

25       surgery?

109

1                    JUROR:  Yes.

2                    THE COURT:  You're excused, ma'am.

3                    THE CLERK:  Excused.

4          (Juror Number 41, excused.)

5          (Juror Number 42 enters courtroom.)

6                    THE CLERK:  42, Timothy, is it Teixeira?

7                    JUROR:  Teixeira.

8                    THE COURT:  Mr. Teixeira, is there

9          anything about the nature of these charges or any

10         of the allegations you've heard that might affect

11         your ability to be fair and impartial?

12                   JUROR:  No.

13                   THE COURT:  You may hear alleged

14         evidence that the defendant, the alleged victim,

15         and some of the witnesses were involved in selling

16         marijuana.  Would that evidence affect your

17         ability to be fair and impartial?

18                   JUROR:  No.

19                   THE COURT:  The defendant in a criminal

20         trial has the absolute right not to testify.  If

21         Mr. Reddicks chose not to testify at this trial,

22         would you hold that against him in any way?

23                   JUROR:  No.

24                   THE COURT:  Is there anything about the

25         length of the trial that poses a hardship for you?

110

1              JUROR:  Yes, I'm actually unemployed two
2      weeks ago, so I didn't know if that was --
3              THE COURT:  Why would being unemployed
4      prevent you from sitting on this jury?
5              JUROR:  For the length of it?
6              THE COURT:  Yes.
7              JUROR:  I'm trying to, you know, get a
8      job as of, you know --
9              THE COURT:  Okay, but you're not working
10     right now.
11             JUROR:  Yeah, correct.
12             THE COURT:  We also pay a stipend of $50
13     a day which I can start from today, but if you're
14     unemployed, it presents even a better opportunity
15     for you to be on this jury.
16             JUROR:  All right.
17             THE COURT:  I mean, I understand you're
18     looking for work, but I can't excuse you because
19     you're unemployed.
20             JUROR:  Okay.
21             THE COURT:  That would make all the
22     employed jurors very unhappy.
23             JUROR:  Absolutely.
24             THE COURT:  I hope you understand.
25             JUROR:  No, I understand.

111

1                    THE COURT:  And after the third day of

2          jury service, the Commonwealth pays you a $50 a

3          day stipend.  I can start that $50 from today so

4          you'll have an extra $150 in your pocket.

5                    JUROR:  Okay.

6                    THE COURT:  All right?

7                    JUROR:  Absolutely.

8                    THE COURT:  Any follow-up questions?

9                    MR. HENNING:  Sir, it says you finished

10         11th grade.  What school was that in?

11                   JUROR:  Winthrop High School.

12                   MR. HENNING:  Winthrop High School?

13                   JUROR:  Yes.

14                   MR. HENNING:  Down in the bottom section

15         here, it says your uncle is what you describe as a

16         convicted felon.

17                   JUROR:  Yes.

18                   MR. HENNING:  Can you tell us what you

19         remember about the case, where it was?

20                   JUROR:  It was in Winthrop and I believe

21         he was caught selling prescription drugs.

22                   MR. HENNING: Do you know what happened

23         in the case?

24                   JUROR:  No, I was young, I was high

25         school, freshman year.

112

1           MR. HENNING:  Did you have a
2     relationship with your uncle before that happened?
3           JUROR:  Yeah.
4           MR. HENNING:  Were you close with him?
5           JUROR:  Yeah.
6           MR. HENNING:  What was the result of the
7     case?
8           JUROR:  I believe he did five years in
9     prison.
10          MR. HENNING:  Do you know which office
11    was responsible for prosecuting him?
12          JUROR:  I don't.  Like I said, I was
13    young, I wasn't told much.
14          MR. HENNING:  I have nothing further.
15          THE COURT:  Ms. Scapicchio?
16          MS. SCAPICCHIO:  Hi, how are you?
17          JUROR:  Pretty good, how are you doing?
18          MS. SCAPICCHIO:  You also indicated that
19    your grandfather is a retired police officer?
20          JUROR:  Yes.
21          MS. SCAPICCHIO:  From which department
22    does he work?
23          JUROR:  Winthrop Police Department.
24          MS. SCAPICCHIO:  Winthrop.  Did you have
25    discussions with your grandfather about his work

113

1        or any of his cases at all?

2                    JUROR:  No.

3                    MS. SCAPICCHIO:  Is your grandfather

4        currently working?

5                    JUROR:  No.

6                    MS. SCAPICCHIO:  How long ago did he

7        retire?

8                    JUROR:  He's 90 now, so some time.

9                    MS. SCAPICCHIO:  I don't have any

10       further questions.

11                   THE COURT:  Sir, could you step outside

12       for a second, please.

13   (Juror Number 42 exits courtroom.)

14                   THE COURT:  This juror stands

15       indifferent.

16                   MR. HENNING:  Commonwealth is content.

17                   MS. SCAPICCHIO:  Defendant is content.

18   Juror Number 42 enters courtroom.)

19                   THE COURT:  Mr. Teixeira, you've been

20       chosen to be on this jury, okay?

21                   JUROR:  Okay, yes.

22                   THE COURT:  A couple of things.  You're

23       going to go up and join other jurors who have been

24       impaneled both yesterday and today.

25                   JUROR:  Okay.

114

1          THE COURT:  At no time should you be

2      discussing this case with anyone, including them,

3      nor should anyone, including them, discuss any

4      aspect of this case with you.

5          Also, Mr. Teixeira, I'm happy to start

6      the $50 per day stipend from today because of your

7      financial situation.  Just tell one of the Court

8      Officers and I'll sign that authorization.  Don't

9      share this information with the other jurors, if

10     you don't mind.

11         JUROR:  All right.

12         THE COURT:  I just want to let you know

13     that because of your situation, I can't excuse you

14     from jury service, but I can provide you with

15     another $150 in your pocket, okay?

16         JUROR:  Yes.

17         THE COURT:  Employers are obligated to

18     pay you for the first three days.  After that,

19     some employers do pay you for the duration of your

20     service, but in your circumstances, the best I can

21     do is give you that extra $150.  I hope that makes

22     it sound a little sweeter now.

23         JUROR:  All righty, thank you.

24         THE COURT:  Don't share that with

25     anybody else.

115

1               JUROR:  I won't.

2               THE CLERK:  Seat 15.

3               THE COURT:  Thank you, sir.

4   (Juror Number 42 exits courtroom.)

5   (Juror Number 46 enters courtroom.)

6               THE CLERK:  46, Amelita Francois.

7               JUROR:  Yes.

8               THE CLERK:  Have a seat, please.  Please

9   keep your voice up.

10              THE COURT:  Hi, Ms. Francois.

11              JUROR:  Hi.

12              THE COURT:  Ma'am, is there anything

13   about the nature of these charges or any of the

14   allegations you've heard that might affect your

15   ability to be fair and impartial?

16              JUROR:  No.

17              THE COURT:  You may hear alleged

18   evidence that the defendant, the alleged victim,

19   and some of the witnesses were involved in selling

20   marijuana.  Would that evidence affect your

21   ability to be fair and impartial?

22              JUROR:  No.

23              THE COURT:  No?  The defendant in a

24   criminal trial has the absolute right not to

25   testify.  If Mr. Reddicks chose not to testify at

116

1          this trial, would you hold that against him in any
2          way?
3                    JUROR:  No.
4                    THE COURT:  Is there anything about the
5          length of the trial that poses a hardship for you?
6                    (No audible response.)
7                    THE COURT:  You have to make a verbal
8          response.
9                    JUROR:  Oh, no.
10                    THE COURT:  No, thank you, ma'am.  Any
11          follow-up questions?
12                    MR. HENNING:  Good morning, how are you?
13                    JUROR:  Good.
14                    MR. HENNING:  It says you have a high
15          school diploma.  Where did you graduate from?
16                    JUROR:  Brighton High School, 2013.
17                    MR. HENNING:  Brighton High School?
18                    JUROR:  Yes.
19                    MR. HENNING:  The work that you do, is
20          the company called Professional Profiles?
21                    JUROR:  Yes.
22                    MR. HENNING:  Can you describe what you
23          do at work on a daily basis?
24                    JUROR:  Yeah, I do home aid, I work with
25          people at home.  I show them, like cook for them,

117

1          go shopping with them.

2                    MR. HENNING:  Nothing further, Your

3          Honor.

4                    THE COURT:  Ms. Scapicchio?

5                    MS. SCAPICCHIO:  How long have you

6          worked for home healthcare -- I'm sorry, for the

7          company that you work for right now, Professional

8          Profiles?

9                    JUROR:  A year.

10                   MS. SCAPICCHIO:  A year, okay.  Do you

11         have your own client base?

12                   JUROR:  Yes.

13                   MS. SCAPICCHIO:  You see the same

14         clients all the time?

15                   JUROR:  Yes.

16                   MS. SCAPICCHIO:  And you help them on a

17         daily basis.

18                   JUROR:  Yes.

19                   MS. SCAPICCHIO:  I have no further

20         questions.

21                   THE COURT:  Ma'am, could you step

22         outside for just a second.

23    (Juror Number 46 exits courtroom.)

24                   THE COURT:  This juror stands

25         indifferent.

118

1              MR. HENNING:  The Commonwealth exercises
2       a challenge.
3  (Juror Number 46 enters courtroom.)
4              THE COURT:  Thank you, ma'am, you are
5       excused.
6              THE CLERK:  Excused.
7  (Juror Number 46, excused.)
8  (Juror Number 48 enters courtroom.)
9              THE CLERK:  Juror 48, Carl Richemond.
10             JUROR:  Yes.
11             THE COURT:  Good morning, Mr. Richemond.
12             JUROR:  Good morning.
13             THE COURT:  Sir, is there anything about
14      the nature of these charges or any of the
15      allegations you've heard that might affect your
16      ability to be fair and impartial?
17             JUROR:  No.
18             THE COURT:  You may hear alleged
19      evidence that the defendant, the alleged victim,
20      and some of the witnesses were involved in selling
21      marijuana.  Would that evidence affect your
22      ability to be fair and impartial?
23             JUROR:  No.
24             THE COURT:  The defendant in a criminal
25      trial has the absolute right not to testify.  If

119

```
1            Mr. Reddicks chose not to testify at this trial,
2       would you hold that against him in any way?
3                   JUROR:  No.
4                   THE COURT:  Is there anything about the
5       length of the trial that poses a hardship for you?
6                   JUROR:  No.
7                   THE COURT:  Counsel?
8                   MR. HENNING:  Good morning, sir, how are
9       you?
10                  JUROR:  I'm well.
11                  MR. HENNING:  If you can just tell me,
12      the age was left off of your --
13                  JUROR:  Oh, I'm sorry, 29.
14                  MR. HENNING:  29.  Did you go to high
15      school in Boston?
16                  JUROR:  Yes.
17                  MR. HENNING:  Where did you go?
18                  JUROR:  I'm sorry, I went to North
19      Cambridge Catholic High School.
20                  MR. HENNING:  North Cambridge Catholic.
21                  JUROR:  Yes.
22                  MR. HENNING:  Did you graduate?
23                  JUROR:  Yes.
24                  MR. HENNING:  What year did you
25      graduate?
```

120

1           JUROR:  In 2005.

2           MR. HENNING:  And was there any school

3      that you did after that?

4           JUROR:  Yes, I'm at Quincy College now.

5           MR. HENNING:  Do you have any focus or

6      major at Quincy College?

7           JUROR:  Yes, in biology.

8           MR. HENNING:  Biology?

9           JUROR:  Yes.

10          MR. HENNING:  How long have you been a

11     student at Quincy?

12          JUROR:  For three years.

13          MR. HENNING:  The job at Andrews

14     International, can you describe where you work and

15     what you do?

16          JUROR:  I work security at a government

17     facility.

18          MR. HENNING:  What facility is that?

19          JUROR:  Miter.

20          MR. HENNING:  Miter?

21          JUROR:  Miter.

22          MR. HENNING:  And then down at the

23     bottom, it says for experience with the law, has

24     anyone in your family had any of the following,

25     and you listed larceny.

121

1                        JUROR:  Yes.

2                        MR. HENNING:  Can you describe who that

3              was and what you remember about the case?

4                        JUROR:  That was my brother and myself,

5              also, in 2010, I believe.

6                        MR. HENNING:  Do you remember what

7              happened in the case?

8                        JUROR:  Well, my friends had stolen

9              goods in the vehicle that we were all in, and then

10             we were just detained for a few hours.

11                       MR. HENNING:  Do you remember where the

12             case happened?

13                       JUROR:  In Cambridge, Cambridge,

14             Massachusetts.

15                       MR. HENNING:  Was it the Cambridge

16             Police Department?

17                       JUROR:  Yes.

18                       MR. HENNING:  Do you remember from that

19             experience having any feelings one way or another

20             toward the Cambridge Police Department or law

21             enforcement in general as a result?

22                       JUROR:  No.

23                       MR. HENNING:  Nothing further.

24                       THE COURT:  Ms. Scapicchio.

25                       MS. SCAPICCHIO:  Hi, how are you?

122

```
 1                    JUROR:  I'm well.
 2                    MS. SCAPICCHIO:  As a security officer,
 3            you secure a commercial building; is that what it
 4            is?
 5                    JUROR:  Yes.
 6                    MS. SCAPICCHIO:  Are you somebody who
 7            walks around and does the security or do you
 8            screen people who come in?
 9                    JUROR:  Both.
10                    MS. SCAPICCHIO:  You do both.
11                    JUROR:  Yes.
12                    MS. SCAPICCHIO:  When did you start that
13            job, how long ago?
14                    JUROR:  In 2012.
15                    MS. SCAPICCHIO:  So you've worked there
16            for a while?
17                    JUROR:  Yes.
18                    MS. SCAPICCHIO:  And you work days and
19            then you go to school at night.
20                    JUROR:  School at night, correct.
21                    MS. SCAPICCHIO:  How many classes are
22            you taking at Quincy?
23                    JUROR:  Two classes.
24                    MS. SCAPICCHIO:  Two classes.
25                    JUROR:  Yes.
```

123

1           MS. SCAPICCHIO:  And what days do you
2       usually take those classes?
3           JUROR:  Monday through Thursday.
4           MS. SCAPICCHIO:  From when to when?
5           JUROR:  From 6 to 10:30.
6           MS. SCAPICCHIO:  So you work during the
7       day and then you go to school till 10:30 at night.
8           JUROR:  Correct.
9           MS. SCAPICCHIO:  But it's only two days
10      a week.
11          JUROR:  Well, one class is for two
12      months, the next class is for two months.  It's
13      from January through April.
14          MS. SCAPICCHIO:  And in terms of your
15      job as a security officer, did you ever have to
16      interact with the police department as a result of
17      your job?  In other words, call them because
18      there's some problem in the building?
19          JUROR:  Yes.
20          MS. SCAPICCHIO:  What department would
21      you call?
22          JUROR:  The Bedford Police Department.
23          MS. SCAPICCHIO:  The Bedford Police
24      Department.  How often do you interact with the
25      Bedford Police Department?

124

1              JUROR:  Once in a while, once or twice a

2        year.

3              MS. SCAPICCHIO:  And then would you have

4        to write a report about what you saw happen?

5              JUROR:  No, my supervisors do.

6              MS. SCAPICCHIO:  Did you ever have to go

7        to court and testify about anything?

8              JUROR:  No.

9              MS. SCAPICCHIO:  I have no further

10       questions.

11             THE COURT:  Sir, would you mind stepping

12       outside for just a moment, please.

13             JUROR:  Sure.

14  (Juror Number 48 exits courtroom.)

15             THE COURT:  This juror stands

16       indifferent.

17             MR. HENNING:  Commonwealth is content.

18             MS. SCAPICCHIO:  Defendant is content.

19  (Juror Number 48 enters courtroom.)

20             THE COURT:  Mr. Richemond, you have been

21       chosen to be on this jury.  You're going to be

22       taken up in just a moment to the jury room

23       affiliated with this courtroom and you're going to

24       meet your other fellow jurors.  I'm going to ask

25       that you not discuss this case in any way with

125

1          anyone, including your fellow jurors, nor allow

2          anyone to discuss the case with you, including

3          your fellow jurors.  All right, sir?

4                    JUROR:  Okay.

5                    THE COURT:  If you'll go up with one of

6          the Court Officers now.

7     (Juror Number 48 exits courtroom.)

8     (END OF INDIVIDUAL JURY VOIR DIRE)

9                    THE COURT:  Let's hold onto them right

10         now because we still need to run the last two

11         records.  Apparently, everybody but the last two

12         have been run, no hits, no problems.

13                   MR. HENNING:  On either of the --

14                   MS. SCAPICCHIO:  Victim witness and

15         the --

16                   MR. HENNING:  Correct.

17                   THE COURT:  Right.  Let's finish up our

18         discussion about any unfinished business, and

19         meanwhile, you'll let me know if there are any

20         hits.

21                   MR. HENNING:  Yes, I just need the last

22         two.

23                   THE COURT:  Hold onto your

24         questionnaires.  I'm hoping that there are no

25         problems with the last two jurors.  Hold onto them

126

1          for a moment in case there is.  All right?

2                    MR. HENNING:  We just need to wait for

3          their information, so I haven't quite sent that

4          out yet.

5                    THE COURT:  Right, so let's discuss

6          unfinished business right now.

7                    MS. SCAPICCHIO:  Judge, can we take a

8          five-minute bathroom break?

9                    THE COURT:  Of course.

10                    MS. SCAPICCHIO:  Thank you.

11                    COURT OFFICER:  All rise, please.

12     (Court in recess at 11:30 a.m.)

13

14     (Court in session at 11:50 a.m.)

15     (Defendant present.)

16                    THE COURT:  Counsel.

17                    MS. SCAPICCHIO:  Judge, before we start,

18          *Dorelas* just came down from the SJC.

19                    THE COURT:  Yes, and I was just about to

20          mention it to you, you took the wind out of my

21          sails.

22                    MS. SCAPICCHIO:  I didn't get a chance

23          to read it, I just saw that it came down.

24                    THE COURT:  I'm afraid it was agin you.

25                    MS. SCAPICCHIO:  It was what?

127

1              THE COURT:  It's against you.

2              MS. SCAPICCHIO:  Oh, what does it say?

3              THE COURT:  It's in favor of the

4     Commonwealth about photos that were seized from a

5     defendant's cell phone.  It's a split decision,

6     I was just reading it on my computer because I get

7     these e-blasts from both the *SJC Reporter of*

8     *Decisions* and also the *Mass Lawyers Weekly*, and

9     *Dorelas*, D-O-R-E-L-A-S, just came down.  It is a

10    split decision, four to seven, however --

11             MS. SCAPICCHIO:  Four to three.

12             THE COURT:  What?

13             MS. SCAPICCHIO:  Four to three.

14             THE COURT:  Four to three, I'm sorry,

15    I apologize.  But the SJC, the majority of the SJC

16    ruled in favor of the Commonwealth and against the

17    defendant with regard to pictures found on that

18    defendant's cell phone.

19             MS. SCAPICCHIO:  Judge, could I have a

20    minute to read it to be able to figure out what

21    the argument would be?

22             THE COURT:  I want to proceed,

23    Ms. Scapicchio.  I've read it.

24             MS. SCAPICCHIO:  I understand that, but

25    I haven't, and I have a job to advocate for my

128

1    client.

2                    THE COURT:  We're going to be taking a

3    lunch recess soon.  I can tell you I've read it,

4    it was found in a split decision in favor of the

5    Commonwealth and against the defendant.  You'll

6    have plenty of time to look at that decision, but

7    it doesn't change my determination if we want to

8    get back to that issue.

9                    But first, as to the jurors, any hits

10   that have come back as to the impaneled jurors?

11                   MR. HENNING:  Judge, the first

12   individual, Mr. Teixeira, there was no hit.  On

13   Mr. Richemond, the individual who disclosed that

14   he had some issue with a larceny, the Board of

15   Probation record shows a continuance without a

16   finding from 2009 in the Cambridge District Court

17   with fees and a dismissal in the end.

18                   THE COURT:  Which is what he mentioned.

19                   MS. SCAPICCHIO:  He did.

20                   THE COURT:  He was a passenger in a car,

21   as I recall.

22                   MS. SCAPICCHIO:  That's what he said.

23                   THE COURT:  Anybody have any problem

24   with any of these recently impaneled jurors?

25                   MR. HENNING:  No, Your Honor.

129

1              MS. SCAPICCHIO:  No, Your Honor.

2              THE COURT:  Can you hand those to

3    Ms. McCann, and they can be mark for

4    identification.

5              MR. HENNING:  Your Honor, just for the

6    record, the Teixeira Board of Probation record, we

7    didn't bring down because it doesn't exist.  The

8    one from Mr. Richemond is here.

9              THE COURT:  Excellent, all right.

10             (Exhibit J was marked for

11   identification, Board of Probation records,

12   Jurors 42 and 48.)

13             THE COURT:  We have a few issues of

14   unfinished business.  Have a seat, Mr. Reddicks.

15             MR. REDDICKS:  Thank you.

16             THE COURT:  In no particular order,

17   I think there was an issue with Detective Camper's

18   proposed testimony?

19             MR. HENNING:  The Commonwealth reached

20   out to Detective Camper.  There's not going to be

21   an additional report that he creates that talks

22   about the firearm, that the firearm in this case

23   is more likely than not to be a revolver.

24             I would still elicit testimony from him

25   about the characteristics of revolvers versus a

R632

130

1    semiautomatics, but I won't be asking for him to

2    reach a conclusion or to opine on whether the gun

3    used in this case is more likely than not a

4    revolver.

5              THE COURT:  So it's a moot point.

6              MS. SCAPICCHIO:  It is, Your Honor.

7              THE COURT:  All right, so all these

8    issues of alleged expert testimony late disclosed,

9    two have now become moot.  The one about the

10   pathologist has become moot.

11             MS. SCAPICCHIO:  Right.

12             THE COURT:  The one about Detective

13   Camper has become moot.

14             MS. SCAPICCHIO:  Right, but it hasn't

15   stopped me from having to investigate them, Judge.

16             THE COURT:  I understand, thank you, but

17   it's all a moot point now.  There is also an issue

18   with the MBTA timing issue, the missing two

19   minutes.

20             MS. SCAPICCHIO:  Two and a half.

21             THE COURT:  I stand corrected, two and

22   a half.

23             MR. HENNING:  So, Your Honor, what I

24   would propose to do is Your Honor had asked be

25   able to have an expert available for a voir dire.

131

1      I intend to have that witness or those witnesses

2      be available for the beginning of next week.

3              What I can do is, Mr. Creedon is a

4      witness, I can just have him  come in.  We were

5      scheduling the view for Tuesday morning.  What I

6      would intend to do is have him come in after

7      Tuesday morning and then we can have that.

8              THE COURT:  All right, that issue was

9      going to be, and as I recall, I ruled, was going

10      to be resolved by way of a voir dire at which --

11      obviously, you need to give Ms. Scapicchio advance

12      notice so that she can have her witness here, too.

13              MR. HENNING:  The witness I have,

14      Mr. Creedon, I haven't reached out to him yet.

15      I assume he's available, but I will let

16      Ms. Scapicchio know if that changes.

17              MS. SCAPICCHIO:  I'll talk to

18      Mr. LeBlanc as soon as the break happens.

19              THE COURT:  Great.

20              MS. SCAPICCHIO:  Still over my

21      objection, Judge, just so it's clear.

22              THE COURT:  Noted.

23              MR. HENNING:  The T-Mobile expert, we'll

24      be calling Patrick Quinn, produced a report and

25      I provided it to Counsel.  I just don't have an

132

1      extra copy because I did not print it out,

2      I apologize.  I believe the Court Officer was

3      going to assist me with a copy, but I don't have

4      a copy in my hand right now.

5                  THE COURT:  Have you seen the report?

6                  MS. SCAPICCHIO:  I did.  I got it

7      actually yesterday afternoon.  It indicates as far

8      as the technology is concerned, something about

9      ground clutter, something about field antennas,

10     stuff I don't know about that somehow restrict

11     this coverage to less than one mile.  So I've

12     sent this to my cell tower expert, I have not

13     heard back from him.  I haven't even had a

14     conversation with him because I was busy reading

15     the discovery that they sent yesterday or the day

16     before.  I can't say that I'm ready to cross-

17     examine on this, Judge, I can't say that.

18                 THE COURT:  Let's put this aside until

19     you've heard back from your fellow.

20                 MR. HENNING:  That witness would likely

21     not testify until the middle of next week.

22                 THE COURT:  Okay, and clearly, as to any

23     of these that I'm reserving on, you can't mention

24     it in an opening, obviously.  And then after you

25     talk to your expert, Ms. Scapicchio, let's have

133

1       another conversation about this.

2                   MR. HENNING:  Just to clarify, in the

3       openings, Commonwealth does intend to elicit

4       testimony about what cell towers are.  But the

5       vicinity issue of the towers, I'm not going to

6       say anything.

7                   THE COURT:  That's the part, I think,

8       that is concerning to me.  That's a big issue.

9                   MR. HENNING:  Yes.

10                  THE COURT:  The technology of cell

11      towers is not new to Ms. Scapicchio and I'm sure

12      you've supplied some discovery about that.  It's

13      this particular issue, under a mile, that is

14      concerning to me.

15                  MR. HENNING:  I'm not mentioning it.

16                  THE COURT:  Don't mention that at all,

17      all right?  Were there any other pieces of

18      unfinished business?

19                  MS. SCAPICCHIO:  McGee, the photos and

20      the testimony.

21                  THE COURT:  Yes.  Let me get the motion

22      itself.

23                  Yes, it was the Commonwealth's motion in

24      limine to admit certain evidence of prior and

25      subsequent acts of the defendant to demonstrate

134

1       access to firearms and motive.  You've now

2       reviewed McGee.  Is there anything else you want

3       to say, Ms. Scapicchio?

4               MS. SCAPICCHIO:  Yes, Your Honor.

5       I think in McGee, they took pains to identify

6       when, in fact, the photo had been taken, and just

7       so the Court is clear, in McGee, it was unobjected

8       to in terms of what was happening, and clearly

9       here, there's an objection.  In McGee, also, there

10      wasn't an issue as to the photograph in and of

11      itself.  So I'd suggest, Judge, because they were

12      able to date the photograph, I think it was within

13      a day of when it was taken, and I think the Court

14      did some sort of voir dire to try to date the

15      photograph, in this case, despite what *Dorelas*

16      says, although I don't know what it says right

17      now, if there's no ability to date the

18      photographs, we don't know from -- and there was

19      testimony that it actually was a gun.  In other

20      words, people had seen the person in the photo who

21      happened to be the defendant with a gun.  There

22      was no question it was a gun.  In this case, we

23      don't know if it's a toy gun, we don't know if

24      it's an operating gun, we don't know what it is,

25      and we don't know when it was taken.  For all we

135

1          know, he could have been 15 years old when it was

2          taken.

3                    THE COURT:  Mr. Henning, paragraphs

4          number four and five deal with photographs

5          allegedly taken from the defendant's cell phone.

6                    MS. SCAPICCHIO:  That's correct.

7                    THE COURT:  One is upon his arrest in

8          December 2011 for an offense for which he pled

9          guilty.

10                    MS. SCAPICCHIO:  You've made that clear,

11          Judge.

12                    THE COURT:  But the second one is also

13          upon his arrest in May of 2012.

14                    MR. HENNING:  Yes.

15                    THE COURT:  First of all, are either of

16          those -- can we identify either the time of the

17          photograph in either of those instances?

18                    MR. HENNING:  I don't believe there's a

19          time on the photograph that he identified,

20          although I'd have to check to see if the metadata

21          shows a date.  The metadata is when you click on

22          the properties of the photo.  I can certainly do

23          it, but I don't believe that it's relevant for

24          admissibility, I think it's ripe for cross-

25          examination.  It's certainly something Counsel can

136

1          inquire about, but I don't believe that the McGee

2          holding says we need to be able to identify with

3          specificity when it was taken.  I think it has to

4          be when it was taken in the sense that, when it

5          was accessed.

6                    THE COURT:  Is this the same alleged gun

7          or they're two different guns?

8                    MR. HENNING:  I can show you the

9          pictures if you'd like.

10                   MS. SCAPICCHIO:  They can't say it's the

11         same, Judge.  Or if they have, they haven't told

12         me about it yet.

13                   MR. HENNING:  No.

14                   THE COURT:  Mr. Kalell.

15                   MR. HENNING:  The guns on the left are

16         from 2011-2012.

17                   MS. SCAPICCHIO:  Can I see it?

18                   THE COURT:  The offense in December

19         2011, that was a revolver, correct?

20                   MR. HENNING:  The testimony from a

21         witness was it's a revolver.  I don't believe that

22         there was any specifics on charging of the type,

23         but yes, the witness testimony was silver

24         revolver.

25                   THE COURT:  And that was seized upon

137

1          his arrest in December.

2                    MR. HENNING:  December 2nd, 2011.

3                    MS. SCAPICCHIO:  Judge, we don't know if

4          this was a picture someone sent to him and it just

5          ended up on his phone, we don't know if it's a

6          picture he took.  That's the difference between

7          this case and McGee.  In McGee, they were sure

8          that the defendant was standing in the room, the

9          gun was in the room, and the picture was taken.

10         In this case, for all we know, someone sent him

11         that picture and he saved it for some reason, but

12         it doesn't have anything to do with whether or not

13         he actually possessed the gun or didn't possess

14         the gun.  And he was a juvenile at the time,

15         Judge.

16                   THE COURT:  Do you have anything to

17         support, to rebut the concern that Ms. Scapicchio

18         raises?

19                   MR. HENNING:  Yes, that's why we intend

20         to call a live witness for the 2011 gun because

21         the live witness will corroborate that this was a

22         gun that this defendant actually possessed.  He

23         can't point at this picture and say that the gun

24         that's in this picture is the same, but he can

25         describe it, it's a silver colored revolver, and

138

1    say that the defendant possessed it.

2       THE COURT:  Mr. Washington.

3       MR. HENNING:  Correct.

4       MS. SCAPICCHIO:  But Mr. Washington

5    can't say that that's the gun, the same as the

6    Collins cases and the other cases in terms of --

7       MR. HENNING:  The McGee case described

8    people talking about a gun, but none of the

9    witnesses in that case pointed in the same

10   photograph that was entered into evidence and

11   said I'm saying it's the same.

12      THE COURT:  Have you shown

13   Mr. Washington the pictures from 2011 and asked

14   him if it --

15      MR. HENNING:  Absolutely not, because

16   I don't believe -- I can do it, but he did not

17   access the photos, himself.

18      THE COURT:  No, I know, but have you

19   taken the time to show him these photographs?

20      MR. HENNING:  I would assume that

21   Counsel would object to it.  I'd be happy to do

22   it, but --

23      MS. SCAPICCHIO:  I would, Judge.

24   I don't know how it's relevant.  If he can't

25   identify that photo as the gun, how is it

139

1          relevant?

2                    THE COURT:  Because circumstantially,

3          arguably, Mr. Washington is going to say it's a

4          silver revolver.  This is a silver revolver.

5                    MS. SCAPICCHIO:  That's my question,

6          Judge, we don't know when that picture was taken

7          or what -- we don't even know if someone sent him

8          that.

9                    THE COURT:  I'm going to note your

10          objection as to the 2011 picture.  There's case

11          law, by the way, that says if a witness says it

12          looks like the gun, that's admissible.

13                    MS. SCAPICCHIO:  But that's connecting

14          the gun to the defendant.  In this case, all we

15          have is a picture on a phone, we don't know how

16          old it is, of a gun that doesn't have him involved

17          in it.  So we don't even know if he saw it, if he

18          possessed it, if anything happened with it.

19                    THE COURT:  Ms. Scapicchio, I will

20          clearly note your objection for the record, but

21          there is clear circumstantial evidence.

22          Mr. Washington was apparently with Mr. Reddicks at

23          the time that he possessed a gun for which he

24          pled guilty.  That is sufficient circumstantial

25          evidence by which Mr. Washington, who is a

140

1      percipient witness to an offense for which your

2      client has already been convicted, can say it was

3      a silver revolver.  The pictures from 2011 depict

4      a silver revolver.

5                MS. SCAPICCHIO:  But, Judge, that

6      assumes that that silver revolver was in my

7      client's possession sometime after he saw him

8      with it.  What if that silver revolver was in his

9      possession five years before that?

10               THE COURT:  Thank you --

11               MS. SCAPICCHIO:  Or the picture was in

12     his possession five years before that?

13               THE COURT:  Because there's sufficient

14     circumstantial evidence.  He's found with a gun,

15     Mr. Washington sees him with a gun in 2011, and

16     upon his arrest, he has a picture on his cell

17     phone of a silver revolver.  That is a sufficient

18     nexus to these pictures.  So I will note your

19     objection, but respectfully, I disagree with you

20     as to that picture.  There's sufficient

21     circumstantial evidence to support the admission

22     of that.

23               But this 2012 picture, even if you could

24     relate it, I'm not going to allow a picture with

25     somebody pointing a gun to somebody's head.

141

1               MR. HENNING:  That's the defendant.

2               THE COURT:  I know, but still --

3               MR. HENNING:  That's the defendant in --

4               MS. SCAPICCHIO:  And it's not a

5     revolver, Judge, they can't tell if it's a

6     revolver, so what difference does it make?

7               MR. HENNING:  Well, I think the jurors

8     could very easily infer what it looks like and

9     also witnesses can testify.

10              MS. SCAPICCHIO:  It's not silver, it's

11    not the one that they say he possessed, it's not

12    even capable of saying it's a revolver.

13              THE COURT:  You can only see part of the

14    gun.

15              MR. HENNING:  Yes.

16              THE COURT:  It kind of looks like a

17    revolver, but it's not clear, unlike these other

18    two pictures from 2011.

19              MR. HENNING:  The case law on this is

20    actually stronger because of the proximity in

21    time.  Also, number one, there was no gun

22    recovered in this case.  Number two, this shows

23    the defendant, himself, in vivid color in

24    possession of a gun.  So I respectfully -- perhaps

25    if there are any of those photos that you would

142

1      argue potentially could be excluded, it would be

2      the top right-hand corner one which shows an

3      object that looks like a gun in some location.

4      That was still on the defendant's phone.  But the

5      photos of the gun in his hands pointing up to his

6      head, yes, they're egregious, but they're very

7      admissible under the case law.

8             THE COURT:  Well, they're admissible

9      under McGee if it's potentially the murder weapon,

10     and the murder weapon by your theory is a

11     revolver.

12            MR. HENNING:  Yes.

13           THE COURT:  The pictures showing

14     Mr. Reddicks, and putting aside the inflammatory

15     nature of these pictures --

16           MS. SCAPICCHIO:  The inflammatory nature

17     outweighing the probative value.

18           THE COURT:  Thank you, Ms. Scapicchio.

19     I know Rule of Evidence 403 pretty well.  It's not

20     absolutely clear to me that that's a revolver.

21     I think it's a revolver, but given the --

22           MR. HENNING:  I have to confess, Your

23     Honor, I find -- I don't have that lack of

24     clarity, to the point where the lack of clarity

25     wasn't something I actually anticipated because

143

1          it's so obvious.  What I'd like to ask of the

2          Court, on that one picture, we can do a voir dire

3          of a witness, perhaps.

4                    THE COURT:  No, Mr. Henning.  I grant

5          you, it's Mr. Reddicks holding a gun to his head.

6          Nevertheless, the very provocative nature of this

7          makes me agree with Ms. Scapicchio.  As to this

8          2012 picture, it's probative value is far

9          outweighed by its potential prejudice to

10         Mr. Reddicks.  Holding a gun to somebody's head?

11         Especially considering that the alleged victim in

12         this case got shot in the head?  That goes too

13         far, Mr. Henning.

14                   Now, I've already put Ms. Scapicchio on

15         notice, and I'll say it again.  Depending on how

16         much she cross-examines Mr. Washington could open

17         the door for rebuttal evidence, knowing that we

18         have pictures here of Mr. Reddicks, himself,

19         holding a gun.

20                   MS. SCAPICCHIO:  Judge, the top left-

21         hand corner, I don't know if I ever focused on

22         that photo.

23                   THE COURT:  Is that from the same

24         seizure?

25                   MR. HENNING:  Yes.

144

1          MS. SCAPICCHIO:  I mean, how many

2     pictures of a gun do we need?

3          THE COURT:  I have the two pictures on

4     the left side on the lower half of the photograph

5     depicting what appears to be the same gun, clearly

6     a revolver in profile, from 2011.  The one in the

7     upper left-hand corner, 2011, is that also from

8     his cell phone at the time of arrest?

9          MR. HENNING:  Same phone, same gun.

10          THE COURT:  I agree with Ms. Scapicchio,

11     you don't need three photographs, you've got these

12     two right here.

13          MR. HENNING:  What I'd like to do is to

14     at least have a moment.  If Your Honor is saying

15     they have to knock one out, I'd like to be able to

16     choose which one goes in and and which one

17     doesn't.

18          THE COURT:  Well, I'm concerned again,

19     the provocative nature of this, it's somebody with

20     a finger on the trigger.

21          MR. HENNING:  Your Honor is saying

22     provocative, I'm also saying probative because

23     it's somebody's -- I understand what you're saying

24     and --

25          THE COURT:  I'm not saying it's not

145

1        probative, sir.  What I am saying, though, that

2        the potential prejudicial effect of having it in

3        somebody's hand with a finger on the trigger, the

4        prejudicial effect of that outweighs its probative

5        nature.  Clearly, it's probative, but you also

6        have these two photographs.

7                MR. HENNING:  What I would ask to do is

8        to remove the one on the bottom left-hand corner

9        and have the other two remain.

10               THE COURT:  I don't know what you're

11       talking about.

12               MR. HENNING:  If you slide over to the

13       left with the money and the phone, the one with

14       the money on it.

15               THE COURT:  Yes.

16               MR. HENNING:  I'd like to remove that

17       and leave the other two.  It still does not have a

18       photo of Mr. Reddicks holding it, it doesn't have

19       a photo of it being held to anyone's head, but it

20       does have someone's hand there.

21               MS. SCAPICCHIO:  It still has the finger

22       on the trigger, it doesn't solve that problem.

23               THE COURT:  Mr. Henning, really, you're

24       trying to show that he's got access and

25       familiarity with a gun.

146

1            MS. SCAPICCHIO:  And you have live

2      witnesses.

3            THE COURT:  And you have a live witness,

4      and quite frankly, I put Ms. Scapicchio on plenty

5      of notice, he's pled guilty to this.  If she

6      starts attacking Mr. Washington's credibility, she

7      knows, she's a very experienced attorney, this

8      could be opening the door to other pictures coming

9      in.  You can have either of these two pictures,

10     Mr. Henning.  I'll note your objection for the

11     record.  You can have both or you can have one or

12     the other, but that's all, those two pictures.

13     I don't want the finger on the trigger.  That, to

14     me, is over the line.

15            MS. SCAPICCHIO:  Thank you, Your Honor.

16            MR. HENNING:  Note the Commonwealth's

17     objection.

18            THE COURT:  Clearly noted.  This, if

19     you don't mind, I'm going to have this marked for

20     identification so any appellate court, if

21     necessary, can see what we were talking about.

22            (Exhibit K was marked for

23     identification, chalk/photos of revolver.)

24            MS. SCAPICCHIO:  Judge, the only other

25     concern I have about -- hold on, let me think,

147

1       Your Honor, for a minute because I don't want to

2       say it until I look at it.  Let me look at it at

3       lunch.  If I have another issue, I will bring it

4       to the Court's attention.

5              THE COURT:  Okay.  Any other outstanding

6       business?

7              MR. HENNING:  Yes.  We have a question

8       about the witness coming in tomorrow?

9              MS. SCAPICCHIO:  Yes, Judge.  I was

10      provided with the NCIC of Ronald Theodat, the

11      individual from Maine who is coming here who

12      claims he doesn't want to testify.  That NCIC

13      indicates that he's got a number of arrests and/or

14      convictions for robbery and armed robbery.  I'm

15      not going to have the time to run and get

16      certified copies.  I'm looking --

17             THE COURT:  I'm relieving you of that.

18             MS. SCAPICCHIO:  Thank you.

19             THE COURT:  If it's on the NCIC, I don't

20      see any reason why we need to slavishly adhere to

21      the case law that says you've got to run out to a

22      foreign jurisdiction to get that.  Just tell

23      Mr. Henning what you wish to impeach him with.

24             MS. SCAPICCHIO:  I am, Judge.  The

25      problem is it seems like he's been continuously in

148

1     trouble since 1993, so I think each one of his

2     arrests triggers a new 10 year period, although

3     I haven't had the opportunity to actually do those

4     numbers in my head.  He's not testifying, my

5     understanding, till tomorrow.

6               THE COURT:  Talk to Mr. Henning, and if

7     there's a disagreement as to what can be used for

8     impeachment purposes, we'll have another

9     discussion.

10              MS. SCAPICCHIO:  My suggestion, Judge,

11    and I'm not looking to overstep my bounds here, is

12    that we try and do a voir dire with Mr. Theodat

13    first thing in the morning to determine what, if

14    anything, his issues are as far as testifying in

15    this case.

16              THE COURT:  Well, yes, that remains to

17    be seen.  Thank you for reminding me.  Is a CPCS

18    attorney going to be here?

19              MR. HENNING:  Yes, I've spoken with the

20    assignment attorney, who Counsel apparently knows.

21    She responded back to my email a short time ago.

22    She said that she will have somebody on board by

23    the end of today.

24              THE COURT:  Okay.  I just want to tell

25    you, Mr. Henning, please have other witnesses

149

1    ready because what's going to happen is he's going

2    to be brought in tomorrow, we hope, an attorney is

3    going to be talking to him, and then we'll get a

4    report back at some point tomorrow morning about

5    his desires regarding the Fifth Amendment.  So

6    let's --

7            MR. HENNING:  He also does have to be

8    transported from New Hampshire to here.

9            THE COURT:  Okay, just have other

10   witnesses available.

11           MR. HENNING:  Yes.

12           THE COURT:  When Mr. Theodat is going to

13   be testifying remains to be seen, if at all.

14           MS. SCAPICCHIO:  Judge, just for the

15   record, I'm still trying to contact his main

16   lawyer, I think her name is Churchill.  I can say

17   for the record, I've placed more than 15 calls to

18   her office trying to get more information about

19   the federal case, and I'm still in the process of

20   trying to gather that.  The minute I get it,

21   I will turn it over.

22           Just for the Court's information, we did

23   get certified copies of Massachusetts convictions

24   for all of the witnesses this morning.  We turned

25   that over to Mr. Henning as soon as it came to the

150

1          courtroom.  I think one of my other lawyers in the

2          office brought it up around 9:30 or 10 o'clock

3          this morning and I turned it over.  I haven't read

4          it all yet, but he has what I have.

5                    THE COURT:  Thank you.

6                    MS. SCAPICCHIO:  The final issue, Judge,

7          in terms of -- we don't have to do it right this

8          second, as long as you're not calling

9          Mrs. Reddicks tomorrow?

10                    MR. HENNING:  No.

11                    MS. SCAPICCHIO:  Okay.  The issue with

12         Mrs. Reddicks, as far as I understand in speaking

13         to my client's mother, is -- and I didn't

14         represent anyone at the time, so I didn't know

15         this was an issue.  Apparently, last time she came

16         in to testify in front of the grand jury, on her

17         way out of the courthouse, I don't know that there

18         was a courtroom, it was a courthouse, she had

19         some sort of, I don't want to say heart attack,

20         but issue with her heart which resulted in her

21         going into the hospital and getting a pacemaker

22         put in as a result of the stress.  That was the

23         concern from the family in terms of what was

24         happening to her physically as a result of coming

25         in and testifying.  That was the reason that his

151

1      mother asked for a letter, because she was

2      concerned about the medical health because there

3      was an actual incident where she had to be taken

4      to the hospital by ambulance.

5                THE COURT:  I have nothing before me to

6      prevent the Commonwealth from bringing in this

7      woman for trial.  If that changes, if a doctor

8      shows up and says she can't appear, I'll

9      reconsider.  But right now, she's going to be

10     subpoenaed to testify.

11               MS. SCAPICCHIO:  I understand that

12     completely.

13               THE COURT:  And we will keep a close

14     look on her, and if she experiences any kind of

15     difficulty, we will respond quickly accordingly.

16               MS. SCAPICCHIO:  I just wanted to let

17     the Court be aware of that situation because I was

18     not aware of it.

19               THE COURT:  Thank you.

20               MS. SCAPICCHIO:  I didn't represent

21     Mr. Reddicks at the time, so I wasn't aware that

22     that was happening.

23               THE COURT:  Then if she's experiencing

24     any kind of distress, please let Officer Loperari

25     know immediately and we will call the necessary

152

```
1        medical personnel, if necessary.  All right?

2                  MS. SCAPICCHIO:  Thank you, Your Honor.

3                  THE COURT:  All right, just some final

4        housekeeping matters.  There is the defendant's

5        motion to exclude firearm identification testimony

6        in evidence or alternatively for a Daubert

7        hearing.  We've had several discussions about

8        this, this is Detective Camper's testimony, and

9        especially because he is not going to be

10       testifying about his opinion as to the type of

11       gun -- there was also this issue about the

12       striations, his opinion as to whether they all

13       came from the same gun.

14                 MR. HENNING:  Yes.

15                 THE COURT:  What is he going to testify

16       as to that?

17                 MR. HENNING:  He's going to testify as

18       to the substance of his report and he's going to

19       be using the notes as part of the basis for that,

20       and Counsel is able to cross-examine on that.

21                 THE COURT:  We've had this discussion

22       before, I'm going to note the defendant's

23       objection, but I'm going to deny that motion.

24       This is the subject for cross-examination.  All

25       right?
```

153

1              There's a defendant's motion in limine

2      to exclude Commonwealth's experts.  I think this

3      included the cell tower person.

4              MS. SCAPICCHIO:  Right.

5              THE COURT:  So I'm going to hold that

6      aside yet because I think that's the one open

7      issue still, and we'll have a further discussion

8      about the cell tower fellow.  So that is left in

9      abeyance.

10             There was a motion to advance and

11     continue, I think that that's --

12             MS. SCAPICCHIO:  Denied?

13             THE COURT:  Denied.

14             MS. SCAPICCHIO:  Note my objection.

15             THE COURT:  Duly noted, but again --

16             MS. SCAPICCHIO:  Judge, just so the

17     record is clear, I did have the opportunity to

18     print out a report, at least one of the reports in

19     the 4000 pages that I got from the Commonwealth on

20     the 12th of January.  The report appears to be

21     over 500 pages long.  I've had the opportunity to

22     go through about a fourth of the report at this

23     time.  It doesn't include emails of the victim in

24     this case, so I haven't had the opportunity to do

25     that.  It doesn't include photos on the victim's

154

1     phone.  So I want to reserve my right to

2     introduce any of that in the event that it

3     becomes pertinent.

4          THE COURT:  Absolutely.  We've had this

5     discussion, I've made a ruling, I've noted your

6     objection.  This is the victim's cell phone.  The

7     chances of finding exculpatory evidence on the

8     victim's cell phone, especially if I understand

9     correctly, and correct me if I'm wrong,

10    Mr. Henning, Ms. Malave had never met Mr. Reddicks

11    before, correct?

12         MR. HENNING:  No.

13         THE COURT:  Okay, so the chances of

14    finding exculpatory evidence relative to

15    Mr. Reddicks is highly remote.  But if and when

16    you find something, Ms. Scapicchio, I remain

17    open-minded about it.  All right?  I've noted

18    your objection.

19         The motion to continue, because almost

20    all of the issues about experts have been resolved

21    either because they've become moot or I've ruled,

22    as with regard to Detective Camper, I've ruled

23    against the defendant regarding Detective Camper's

24    disclosure, and the one remaining issue is the

25    cell tower fellow, that's being kept in abeyance,

155

1          there's no need to continue the trial, so that

2          motion is denied.

3                    MS. SCAPICCHIO:  Note my objection.

4                    THE COURT:  Noted.

5                    And finally, I just had to look up your

6          federal cases regarding overview evidence.

7                    MS. SCAPICCHIO:  Yes.

8                    THE COURT:  And I have come to

9          appreciate it's only a concept known in federal

10         jurisprudence.  No Massachusetts case has ever

11         raised this issue.

12                   MS. SCAPICCHIO:  I --

13                   THE COURT:  Let me just -- before you

14         say anything, Ms. Scapicchio, please.  I've

15         endorsed the motion as follows, and I quote, "as

16         used in federal jurisprudence, overview testimony

17         is impermissible when it consists of a law

18         enforcement officer's credibility assessments,

19         inadmissible hearsay, or a preview of the

20         government's case."  See U.S. versus Etienne,

21         E-T-I-E-N-N-E, and U.S. versus Brooks.  Citations

22         are included for both of them.  As such, the

23         motion is allowed.  However, the Commonwealth is

24         entitled to elicit testimony as to how the police

25         investigation evolved and what investigative

156

1          techniques were used, and I rely on one of those

2          federal cases, U.S. v. Brooks.

3                    So that's the parameters.  I think both

4          of you know what the parameters are there.  In

5          essence, based on federal jurisprudence, that

6          motion is allowed.

7                    MS. SCAPICCHIO:  Thank you, Your Honor.

8                    THE COURT:  I think that's about it.

9          I have a motion for funds, I will allow that,

10         don't worry about it.

11                   MS. SCAPICCHIO:  Thank you, and I have

12         one that I forgot to bring this morning for the

13         cell tower, I'll get that up this afternoon.

14                   THE COURT:  Just hand it to Mr. Kalell,

15         you will get that allowed.  I think that's all of

16         the motions.  Anything else?

17                   MS. SCAPICCHIO:  Not right now.

18                   THE COURT:  What I'm going to suggest,

19         because the jurors have been sitting up there for

20         so long and from yesterday to today, I'm going to

21         propose that we bring them down, swear them in,

22         read the indictments, and I'll just do the pre-

23         charge and then we'll go to lunch.

24                   MS. SCAPICCHIO:  Yes, Your Honor.

25                   THE COURT:  At whatever time that may

157

1          be, but before 1 o'clock.  And then we come back

2          and we hear opening statements.  How long do you

3          want for your opening statements?

4                    MS. SCAPICCHIO:  I can't imagine I'll be

5          more than 30 minutes, I never am.

6                    THE COURT:  How about 15 minutes?

7                    MS. SCAPICCHIO:  On a murder, Judge?

8                    THE COURT:  Sure.

9                    MS. SCAPICCHIO:  No, I can't do it in

10         15 minutes.  That's crazy.

11                    THE COURT:  No, it's not.

12                    MS. SCAPICCHIO:  Judge, on a homicide?

13         I need more than 15 minutes to explain to the jury

14         what my theory is, and I'm sure the Commonwealth

15         needs more than 15 minutes.

16                    THE COURT:  Mr. Henning, how much do you

17         want?

18                    MR. HENNING:  I think I'm right around

19         the 15 minute mark.

20                    THE COURT:  How about 20 minutes,

21         Ms. Scapicchio?

22                    MS. SCAPICCHIO:  I'm asking for 30,

23         Judge.

24                    THE COURT:  Okay, you'll have 20.

25                    MS. SCAPICCHIO:  Note my objection.

158

1          THE COURT:  Noted.  It doesn't mean
2     you have to stop on a dime, but when you get to
3     20 minutes, I'll get your attention and that will
4     be your cue to start wrapping up.
5          Let's bring the jury down and at least
6     do those first steps so that the jury feels that
7     we're getting underway, then we'll take a lunch
8     hour.
9          MS. SCAPICCHIO:  Is there any
10    possibility of getting a copy of *Dorelas*?  I'm
11    trying to read it on my phone.
12         THE COURT:  I can print it out.
13         MS. SCAPICCHIO:  Thank you, Your Honor,
14    I appreciate it.
15         THE COURT:  I wanted to mention to you
16    the Bob Sheketoff rule.  Do you know the Bob
17    Sheketoff rule?
18         MS. SCAPICCHIO:  Which one of Bob
19    Sheketoff's rules?  I've tried many cases with
20    him.  I have a tremendous amount of respect for
21    Mr. Sheketoff.
22         THE COURT:  I have much admiration for
23    him, as I'm sure you do.  Bob Sheketoff takes the
24    position that you can say everything you need in
25    a closing argument, even in a murder case, in

159

 1          30 minutes.

 2                    MS. SCAPICCHIO:  But you're not even

 3          giving me 30, so --

 4                    THE COURT:  We're talking a closing

 5          argument.

 6                    MS. SCAPICCHIO:  I get that, Judge.

 7                    THE COURT:  He says that he only needs

 8          30 minutes in a closing argument even in a murder

 9          case.  I refer to it as the Sheketoff rule, and

10          you can check with him in that regard.

11                    MS. SCAPICCHIO:  I don't have any doubt

12          that he can do it in 30 minutes.  He's got about

13          20 years on me, Judge.

14     (Jury entering at 12:25 p.m.)

15                    COURT OFFICER:  This Honorable Court is

16          now in session.  You may be seated.

17                    THE COURT:  Well, members of the jury,

18          I'm sorry for the delay in bringing you down here,

19          but I hope you understood that up until very

20          recently, we got the last of the 16 jurors.  For

21          those of you who were impaneled today, we started

22          this process yesterday, got about two-thirds of

23          the necessary jurors, and we had to repeat this

24          process today.  I appreciate that that can be a

25          source of frustration for jurors that we can't

<pre>
                                        VOLUME: III
                                         PAGES: 269
                                      EXHIBITS: 22-94
                                            ID: L



                    COMMONWEALTH OF MASSACHUSETTS

    SUFFOLK, SS.                    SUPERIOR COURT DEPARTMENT
                                    Of THE TRIAL COURT


         * * * * * * * * * * * * * * * * * * *
    COMMONWEALTH OF MASSACHUSETTS          *
                                           *
    -v-                                    *   SUCR 2012-10714
                                           *
    CHARLES REDDICKS                       *
         * * * * * * * * * * * * * * * * * * *


                          JURY TRIAL
                           (DAY 3)




                 BEFORE: HONORABLE LINDA E. GILES
                         Suffolk Superior Courthouse
                         Courtroom 907
                         Boston, Massachusetts
                         Friday, January 15, 2016



    Gregory Henning, Assistant District Attorney
      For the Commonwealth of Massachusetts

    Rosemary Scapicchio, Esquire
    Jillese McDonough, Esquire
      On behalf of the defendant Charles Reddicks.


                    NANCY MCCANN, CVR-C.M.
                   OFFICIAL COURT REPORTER
                   SUFFOLK SUPERIOR COURT
</pre>

2

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

VOIR DIRE EXAMINATION
RUTH CAMILLE..................... Page 15


RUTH CAMILLE

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| (By Mr. Henning) | | | 22 | |
| (By Ms. Scapicchio) | | 5 | | 26 |


LEANNE PARKER

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| (By Mr. Henning) | 31 | | | |
| (By Ms. Scapicchio) | | 66 | | |


ROBERT CORDASCO

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| (By Mr. Henning) | 121 | | | |
| (By Ms. Scapicchio) | | 145 | | |


JOSEPH AMARAL

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| (By Mr. Henning) | 147 | | | |


VOIR DIRE EXAMINATION
ELISSA DENNEHY................... Page 168


ELISSA DENNEHY

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| (By Mr. Henning) | 155 | | 212 | |
| (By Ms. Scapicchio) | | 195 | | 213 |


THOMAS WASHINGTON

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| (By Mr. Henning) | 224 | | | |


BERNADETTE SULLIVAN

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| (By Mr. Henning) | 237 | | | |

215

1    Q    But your memory was better on April 27th of 2012

2         than it was on December 18th of 2015, right?

3    A    It could have been.

4              MS. SCAPICCHIO:  I have no further

5         questions.

6              THE COURT:  Thank you, ma'am, you may

7         step down.

8              THE WITNESS:  Thank you.

9              THE COURT:  Can I see counsel at

10        sidebar, please.

11             Seventh inning stretch, members of the

12        jury.  You got your afternoon mints, I understand.

13        Now you can stretch and work them off.

14   SIDEBAR CONFERENCE:

15             THE COURT:  I was told you needed to see

16        me before this next witness.

17             MR. HENNING:  Sure.  This next witness

18        is Thomas Washington, and we haven't described in

19        detail how the testimony will go in, I haven't

20        had a chance to meet with Mr. Washington since

21        your post motion in limine ruling.  Just for

22        clarification, this witness testified in the grand

23        jury on the 2011 incident and described a

24        shooting.  I'd like to have an opportunity to

25        proscribe his testimony, meaning to tell him that

1          we're going to get into only details of the gun,

2          itself, and not a shooting, and I'd like to do it

3          in person.  I spoke with him last night and began

4          to explain this, but understood that it would be

5          better to do it, obviously, when he's here.

6                    The other thing, and this is something

7          I told Counsel today --

8                    MS. SCAPICCHIO:  At 11:30.

9                    MR. HENNING:  During our conversation

10         last night with Mr. Washington, he said that --

11         I asked him if he could describe --

12                    MS. SCAPICCHIO:  Would you lower your

13         voice?

14                    THE COURT:  Yes.

15                    MR. HENNING:  I asked him if he could

16         describe the gun, and he did, and I said -- and

17         during the end of his description, he said it was

18         probably a .357.  And I said how do you know that

19         and why would you know that, and he said, "I have

20         a license to carry a firearm, I got it after this

21         incident, I've shot that gun or a gun just like

22         it, and I'm guessing, I think it looked like," in

23         his opinion, a .357.  He also said it was a Smith

24         and Wesson in his opinion.

25                    I understand he's not an expert, but

217

1      I'm going to try to elicit that testimony because

2      I think it's relevant and also, if he does have a

3      license to carry, we can establish a basis for his

4      concluding that.  I would like to be able to offer

5      that as testimony.

6                  MS. SCAPICCHIO:  Judge, had I known

7      about this before I opened, I would have addressed

8      it.

9                  THE COURT:  Well, let's remember that

10     your client pled guilty to the possession of a

11     firearm, specifically --

12                 MS. SCAPICCHIO:  It does not matter,

13     Judge.

14                 THE COURT:  Ms. Scapicchio, please, I'm

15     trying to be as respectful as I can and I don't

16     interrupt you, please don't interrupt me.  What

17     was the firearm to which your client pled guilty?

18                 MS. SCAPICCHIO:  No idea, I did not

19     represent him on it.

20                 THE COURT:  Do you have a copy of the

21     indictment in that case?

22                 MR. HENNING:  I can get it, but I don't

23     have it in my hand right now.  I can go print it

24     out.

25                 THE COURT:  Do you have any knowledge of

218

1      what the gun was?

2              MR. HENNING:  The gun was, based on the

3      description of this witness, the gun was a silver

4      colored revolver.  It was used out the window of

5      the car.  The gun was never recovered and no

6      ballistic matching was done, but the witness

7      described the gun that was used.

8              THE COURT:  Do you know whether -- and

9      this was a Superior Court indictment, not a

10     complaint.

11             MR. HENNING:  Yes, correct.

12             THE COURT:  In the indictment, it just

13     said a revolver?

14             MR. HENNING:  I think it said a firearm

15     which is all it has to say.

16             MS. SCAPICCHIO:  It doesn't say

17     revolver.

18             THE COURT:  It doesn't say a revolver,

19     it just says firearm?

20             MS. SCAPICCHIO:  Yes.  It doesn't say

21     .357, it doesn't say anything like that.

22             THE COURT:  So it doesn't mention the

23     type of gun it was, either a semiautomatic or a

24     revolver, and it doesn't give the caliber.

25             MR. HENNING:  I can't say that it gives

219

1   revolver versus semi.  I know -- well, I don't

2   know, but I'm guessing it didn't say the caliber

3   because no gun was recovered.

4           THE COURT:  We are, in my opinion,

5   beating a dead horse here.  Mr. Reddicks pled

6   guilty to possession of a firearm.  That's all we

7   need to get into and we don't really need to get

8   into the caliber.  You don't know the caliber of

9   the murder weapon in this case, correct?

10          MR. HENNING:  Specifically, no.

11          THE COURT:  What is Detective Camper

12  going to say?

13          MR. HENNING:  He's going to say it's

14  likely a .38, .357, and possibly a .9.  Those are

15  three different types of calibers.

16          THE COURT:  You're just telling

17  Ms. Scapicchio now that Mr. Washington is going

18  to come in and offer an expert opinion?

19          MR. HENNING:  No, he's not offering an

20  expert opinion.

21          MS. SCAPICCHIO:  That sounded like an

22  expert opinion to me.

23          MR. HENNING:  No, it's not.

24          THE COURT:  Well, he's going to offer

25  an opinion as to what the caliber was.

220

1              MR. HENNING:  Yes.

2              THE COURT:  That's too late.  Okay?

3              MR. HENNING:  I understand.

4              THE COURT:  This is an open and shut

5        issue, he's pled guilty to it.  He's pled guilty

6        to possessing a firearm and the picture is going

7        to show --

8              MR. HENNING:  Well, that's my second

9        question is that Counsel can allege later that

10       whatever he saw, meaning whatever Mr. Washington

11       saw, was not a firearm, but was just a toy or

12       replica gun, because we're not getting into the

13       shooting.  So my issue here is I need to somehow

14       elicit that the gun he saw was an operable weapon.

15             MS. SCAPICCHIO:  She already said I

16       can't.

17             THE COURT:  There's no way that she's

18       going to argue that it's a toy gun because it she

19       does, I will enter the conviction.  She's a smart

20       woman, she's not going to do that.

21             MR. HENNING:  I don't mean in cross,

22       I mean in closing.

23             THE COURT:  She's not going to say it in

24       closing.

25             MR. HENNING:  Okay.

221

1          THE COURT:  Because I would cure that.

2     He pled guilty to possessing a firearm.  You've

3     got pictures of the revolver.  At this late stage,

4     I'm not going to let you ask Mr. Washington what

5     caliber it was.

6          MR. HENNING:  I just meant on that

7     second issue.  I understand the Court's ruling on

8     the first one.

9          MS. SCAPICCHIO:  Judge, can I have a

10    continuing objection to his testimony in its

11    entirety?  Because I think it's not relevant and

12    it shouldn't be before the jury.

13          THE COURT:  I understand.

14          MS. SCAPICCHIO:  It's more prejudicial

15    than probative and he was a juvenile at the time

16    and all the other arguments that I made.

17          THE COURT:  Duly noted.  But he can say

18    that it was the silver colored revolver, period,

19    the end.

20          MR. HENNING:  I think he describes it in

21    a little more detail.  I think he describes it had

22    a black handle, but he says a silver colored

23    revolver.

24          THE COURT:  I don't want the caliber in.

25          MR. HENNING:  No, understood.

222

1                THE COURT:  That's too late in

2        disclosure.

3                MR. HENNING:  I understand.  I want just

4        an opportunity to give him these instructions

5        outside of the courtroom.

6                THE COURT:  Just go out and tell him

7        right now.

8                MR. HENNING:  May I step out?

9                THE COURT:  Yes.  I don't want anything

10       else about anything other than the possession.

11               MR. HENNING:  Understood.

12               MS. SCAPICCHIO:  Not that he was in a

13       car, not that they were driving around, none of

14       that.

15               MR. HENNING:  Well, the context --

16               THE COURT:  Well, you have to put some

17       context, you know, he didn't fall from the sky.

18       Put some relatively innocuous context in as a

19       backdrop, but beyond that, nothing about the

20       arrest, nothing about any other criminal activity.

21               MR. HENNING:  Understood.

22               THE COURT:  Just that he possessed a

23       silver revolver with a black handle.

24               MS. SCAPICCHIO:  And Judge, just so the

25       record is clear, your ruling is that if I cross

223

1      examine him at all regarding that revolver,

2      everything comes in.  I just want the record to

3      be clear.

4              THE COURT:  I can't prejudge what

5      you're going to do, Ms. Scapicchio.  I warned you,

6      though --

7              MS. SCAPICCHIO:  I understand the

8      warning,, I just want to make the record clear.

9              THE COURT:  I can only speak in general

10     terms.  It is patently unfair to me for you to

11     suggest to this jury --

12             MS. SCAPICCHIO:  I'm not going to,

13     Judge.

14             THE COURT:  -- that he is not to be

15     believed when we have a record of your client's

16     conviction for possessing a firearm.

17             MS. SCAPICCHIO:  I have no intentions of

18     doing it.

19             THE COURT:  Okay.

20             MS. SCAPICCHIO:  I just want to make the

21     record clear, and I have no intention of doing it

22     because you won't let me.

23             THE COURT:  I will call you up if I see

24     you crossing the line.

25             MS. SCAPICCHIO:  I'm sure you will.

224

1          THE COURT:  But I've given you fair

2      warning because to me, it's patently unfair for

3      you to suggest that Mr. Washington is lying about

4      this gun when your client pled guilty to it.  If

5      you cross that line, however you perceive that to

6      be, you may be opening up the door to admitting

7      the conviction.  We don't want to see that happen,

8      I'm sure.

9          MS. SCAPICCHIO:  I think we've said

10      that.

11          MR. HENNING:  Can I just have three

12      minutes outside?

13          THE COURT:  Do it quickly.

14  END OF SIDEBAR CONFERENCE.

15          THE COURT:  You had some other pictures

16      that were marked by agreement, correct?

17          MS. SCAPICCHIO:  No.

18          THE COURT:  No?  I was told it was by

19      agreement.

20          MS. SCAPICCHIO:  Some of them were by

21      agreement, some of them I had objections to,

22      Judge.

23          COURT REPORTER:  I have those set aside.

24          MS. SCAPICCHIO:  Okay, as long as

25      they're separated.

225

1              THE COURT:  Okay, are we using it for

2         the next witness?

3              MR. HENNING:  No.

4              THE COURT:  Okay, I apologize,

5         I misheard.  Call you next witness.

6              MR. HENNING:  Thank you.  Commonwealth

7         calls Thomas Washington.

8              COURT OFFICER:  Stand right here, face

9         the Clerk, raise your right hand.

10             THE CLERK:  Do you solemnly swear the

11        testimony you shall give to the Court and the jury

12        in the issues now pending between the Commonwealth

13        and the defendant at the bar shall be the truth,

14        the whole truth, and nothing but the truth, so

15        help you God?

16             THE WITNESS:  Yes.

17             THE CLERK:  Sir, have a seat, please,

18        and keep your voice up.

19             COURT OFFICER:  Have a seat right there,

20        watch your step.

21             THE COURT:  Good afternoon, sir.

22             THE WITNESS:  Good afternoon.

23             THOMAS WASHINGTON, Sworn

24                  DIRECT EXAMINATION

25   (BY MR. HENNING)

226

```
 1    Q    Good afternoon, sir, how are you?

 2    A    Good.

 3    Q    If you could, please state your name for the

 4         jurors and spell out your first and last name.

 5    A    Thomas Washington, T-H-O-M-A-S, W-A-S-H-I-N-G-T-O-

 6         N.

 7    Q    How old are you?

 8    A    22.

 9    Q    You had to check?

10    A    Yeah.

11    Q    What do you do now?

12    A    I work in investments.

13    Q    Do you also go to school?

14    A    Yes.

15    Q    Someplace outside of the city?

16    A    Yes.

17    Q    When you say you work in investments, without

18         getting into the specifics of the company, what

19         sort of company is it, what do they do?

20    A    Investment firms, wealth management.

21    Q    When did you get the job?

22    A    Last year, last June.

23    Q    Upon your graduation from school, do you have a

24         job lined up?

25    A    Yes.
```

227

| | | |
|---|---|---|
| 1 | Q | What is that job going to be? |
| 2 | A | Wealth management. |
| 3 | Q | Where did you grow up, sir? |
| 4 | A | In Jamaica Plain. |
| 5 | Q | Specifically, where did you grow up? |
| 6 | A | Bromley Heath. |
| 7 | Q | Bromley Heath, is that in the Jamaica Plain area? |
| 8 | A | Yes. |
| 9 | Q | Where did you go to high school? |
| 10 | A | Boston Latin School. |
| 11 | Q | Is that Boston Latin School or Boston Latin |
| 12 | | Academy? |
| 13 | A | School. |
| 14 | Q | And at some point during your school -- excuse me, |
| 15 | | at some point when you were growing up, did you |
| 16 | | meet an individual named Charles Reddicks? |
| 17 | A | Yes. |
| 18 | Q | Can you describe, as you were growing up, your |
| 19 | | relationship with Mr. Reddicks? |
| 20 | A | Went to school together, hung out, we also went to |
| 21 | | a Northeastern program together. |
| 22 | Q | When you say a Northeastern program, is that part |
| 23 | | of high school? |
| 24 | A | No. |
| 25 | Q | Was it a separate program outside of school? |

228

```
1    A    Yes.

2    Q    Were you friends with him?

3    A    At one point in time, yes.

4    Q    And your testimony here today, do you want to be

5         here today?

6    A    No, not at all.

7    Q    How is it that you came into court today, meaning

8         what caused you to come to court?

9    A    Subpoena.

10   Q    I'm going to turn your attention to a date in

11        December of 2011, specifically December 2nd, 2011,

12        okay?

13   A    Yes.

14   Q    On December 2nd, 2011, at some point in the

15        evening, were you with Mr. Reddicks?

16   A    Yes.

17   Q    I'd ask you if you could to just identify an

18        article of clothing he's wearing and point,

19        gesture toward him.

20   A    Vest and red tie.

21            MR. HENNING:  I'd ask that the record

22        reflect the witness has identified the defendant.

23            THE COURT:  It may so reflect.

24   Q    Mr. Washington, on that evening, where were you

25        and Mr. Reddicks?
```

229

| | | |
|---|---|---|
| 1 | A | In a car. |
| 2 | Q | Whose car was it? |
| 3 | A | My car. |
| 4 | Q | Who was driving the car? |
| 5 | A | Me. |
| 6 | Q | Who was in the passenger seat? |
| 7 | A | Mr. Reddicks. |
| 8 | Q | Was anyone else in the car? |
| 9 | A | No. |
| 10 | Q | During the time that you were driving that car, |
| 11 | | did you have an opportunity to make certain |
| 12 | | observations of Mr. Reddicks? |
| 13 | A | Yes. |
| 14 | Q | Can you tell the members of the jury what you |
| 15 | | observed with Mr. Reddicks that evening on |
| 16 | | December 2nd, 2011? |
| 17 | A | A silver revolver, the cylinder, black handle. |
| 18 | Q | And the gun that you saw in his hands, was he |
| 19 | | actually holding it? |
| 20 | A | Yes. |
| 21 | Q | You said cylinder.  Can you describe for the |
| 22 | | jurors what you mean by cylinder? |
| 23 | A | I don't really know how to describe it, but it's |
| 24 | | where the ammunition goes. |
| 25 | Q | Would that be in the middle, the front, or the |

230

1        back of the gun?

2   A   Towards the back.

3   Q   And you said it had what color grip?

4   A   Black.

5   Q   And you also described the color of the overall

6        gun; is that correct?

7   A   Yes, silver.

8   Q   Silver?

9   A   Yes.

10   Q   Did you see at some point that gun in

11        Mr. Reddicks's possession?

12   A   Yes.

13   Q   And did you see him place it at some point on his

14        body?

15   A   Yes.

16   Q   Where did he place it?

17   A   Towards his hip.

18   Q   Excuse me?

19   A   Towards his hip.

20   Q   And if you would just stand up, and I'd ask you

21        to just gesture for the jurors where you were

22        pointing to, if you can stand from the witness

23        stand.

24   A   (Witness complies.)

25   Q   And for the record, you're putting your finger

231

```
 1        inside of your waistband on the right side of your
 2        body underneath your rib cage area.
 3    A   Yes.
 4    Q   And when you were with Mr. Reddicks that evening
 5        on December 2nd, 2011, did you see him
 6        continuously in possession of that gun?  Meaning
 7        did you see it for more than a moment.
 8    A   Yes.
 9             MR. HENNING:  Nothing further, Your
10        Honor.
11             THE COURT:  Members of the jury, I want
12        to instruct you on something.  You may consider
13        this evidence of the defendant's possession of a
14        firearm in the past as some evidence showing the
15        defendant's familiarity with or access to
16        firearms.  However, there is no evidence in this
17        case that that firearm in the past was the weapon
18        in this case.  All right?
19             Ms. Scapicchio.
20             MS. SCAPICCHIO:  Judge, based on your
21        ruling, I can't cross-examine this witness.
22             THE COURT:  Thank you, sir, you may step
23        down.
24             THE CLERK:  Sidebar, Counsel.
25             MS. SCAPICCHIO:  I'm sorry, I didn't
```

232

1          hear that, Judge.

2                    THE COURT:  It was a gesture, I'm sorry.

3          Mr. Henning gestured.

4     SIDEBAR CONFERENCE:

5                    MR. HENNING:  Counsel just put on the

6          record, "because of your ruling, I can't cross-

7          examine," which suggests to the jury that the

8          Court is somehow hamstringing the defense from

9          doing its job.

10                    I understand that's what is the defense

11         objection, but I think it's completely

12         inappropriate to be saying that in front of the

13         jury.  And I'd ask that the -- I don't even know

14         if a limiting instruction will fix it.

15                    But it's egregious because if I did the

16         same sort of thing, people would be all over me.

17         What counsel said out loud, essentially, was that

18         she's not able to defend her client because of a

19         Court ruling, and us opining on Court rulings in

20         front of the jury is specifically what we have

21         sidebar for.

22                    THE COURT:  Ms. Scapicchio.

23                    MS. SCAPICCHIO:  Judge, I've said it

24         before, based on your ruling, I don't have any

25         further questions.  I can't ask him any questions.

233

1          I've said it before in the trial and nobody

2          objected to it.

3                    THE COURT:  I agree with Mr. Henning.

4          It was a gratuitous comment.  You just said no

5          questions, and I think there is a suggestion that

6          I am preventing you from eliciting evidence that

7          could be helpful to your defense.

8                    Quite frankly, just the opposite has

9          occurred.  I have kept out a conviction for the

10         firearm, I have done everything possible to

11         preserve your client's rights.

12                   The only thing I'm going to do,

13         Mr. Henning, is just say I'm going to strike last

14         comment by Ms. Scapicchio.  I don't think we need

15         to do anything more.

16                   MR. HENNING:  No, that might even draw

17         more attention to it, so I don't know that --

18                   THE COURT:  If you're not asking me to

19         strike the last comment, I won't do anything then.

20                   MR. HENNING:  I think I'd ask you to

21         strike it.  While we're here, I was going to ask

22         about the next witness and timing.  I can wait to

23         have you make the correction or --

24    END OF SIDEBAR CONFERENCE.

25                   THE COURT:  Members of the jury, I'm

234

1    going to strike Ms. Scapicchio's last comment.  So

2    I'm going to ask that you disregard what she just

3    said.

4    SIDEBAR CONFERENCE:

5                THE COURT:  Now, what else do you want

6         to tell me?

7                MR. HENNING:  What I'd like to do,

8         I understand the Court wants to press ahead, is

9         I'd like to suspend for the day because the next

10        witness I have is the CSRU detective.  She's the

11        one that does all the crime scene photos and the

12        sketches.

13               My preference is to have her done

14        immediately after the view because the view is

15        going to allow the jurors to understand the scene,

16        and then she's going to be able to place the

17        evidence on the scene.

18               THE COURT:  I don't want to blow away

19        an hour.  Ms. Scapicchio has asked me, for good

20        reason, to suspend an hour early on Tuesday.

21               MS. SCAPICCHIO:  An hour and a half,

22        sorry, Judge.

23               THE COURT:  I stand corrected, an hour

24        and a half.  I know it would be ideal for you to

25        have her afterwards, but why don't you just start

235

1          her, at least, and get it close to 4 o'clock.

2                    MR. HENNING:  Okay.

3                    THE COURT:  If there's some reasonable

4          time, and you can have her afterwards, too.

5          I know what your preference would be, and

6          I appreciate it.

7                    MR. HENNING:  I'd like to do one, sort

8          of batch of it, which is before the evidence

9          markers go down, and then I can stop at the end of

10         the first batch because then the evidence markers

11         will be more relevant for when they see it.

12                   THE COURT:  I apologize, too, I thought

13         all of those photographs were admitted and marked

14         by agreement.  Do you have some objection to them?

15                   MS. SCAPICCHIO:  I just want to preserve

16         -- it's not a big objection, Judge.  It's

17         preserving my objections with the dead body.

18         There's like six pictures in there now of the

19         body.

20                   THE COURT:  Can I see those pictures?

21                   MS. SCAPICCHIO:  Just the number, Judge,

22         we're getting a little over-the-top.

23                   THE COURT:  So these have not been

24         marked.

25                   THE CLERK:  That's correct.

236

1               MS. SCAPICCHIO:  I thought they were,
2          so that was my fault.
3               THE COURT:  I thought we already had a
4          picture --
5               MS. SCAPICCHIO:  We do.
6               THE COURT:  -- showing a view into the
7          kitchen with the dead body.
8               MR. HENNING:  It's a different angle.
9          This is to show the bullet hole and area where the
10         bullet went.  So the bullet goes to the top left-
11         hand corner of that picture just to the right of
12         the cabinet, it goes in there.
13              THE COURT:  All right, that may be
14         marked.
15              MS. SCAPICCHIO:  Just note my objection.
16              THE COURT:  Why do you need this
17         picture?
18              MR. HENNING:  This is the view from the
19         hallway when the CSRU detective will describe this
20         is the last bedroom, the view when you come out of
21         that bedroom.  If the foot traffic in the
22         apartment is going to become relevant based on
23         cross examination, I think it's relevant.
24              THE COURT:  This seems to be the same
25         view, but from farther away.

237

1          MR. HENNING:  We can pick one if you'd
2     like.
3          THE COURT:  Which one do you want?
4          MS. SCAPICCHIO:  Farther away.
5          MR. HENNING:  The farther away one,
6     I agree.
7          THE COURT:  From farther away?
8          MS. SCAPICCHIO:  Yes.
9          MR. HENNING:  Yes, I agree.
10         THE COURT:  That may be marked for ID.
11         MS. SCAPICCHIO:  Preserving my
12    objections, Judge.
13         THE COURT:  Of course.  And then this
14    final one?
15         MR. HENNING:  There's a different angle
16    here, plus the blood splatter on the ground, and
17    it shows the relationship between the hallway and
18    the bathroom and the kitchen.
19         THE COURT:  I'll note the defendant's
20    objection, but these three can be marked.  This
21    fourth one will be marked for identification.
22         MS. SCAPICCHIO:  Thank you, Your Honor.
23 END OF SIDEBAR CONFERENCE.
24         (Exhibit Numbers 92 through 94 were
25    marked in evidence, photographs of crime scene.)

238

```
 1              (Exhibit L was marked for
 2          Identification, photograph of crime scene.)
 3              MR. HENNING:  Your Honor, the
 4          Commonwealth calls the next witness, Detective
 5          Bernadette Sullivan.
 6              THE CLERK:  Raise your right hand,
 7          please.  Do you solemnly swear the testimony you
 8          shall give to  the Court and the jury in the
 9          issues now pending between the Commonwealth and
10          the defendant at the bar shall be the truth, the
11          whole truth, and nothing but the truth, so help
12          you God?
13              THE WITNESS:  Yes.
14              THE CLERK:  Please have a seat,
15          Detective, and please keep your voice up.
16              THE COURT:  Good afternoon, Detective.
17              THE WITNESS:  Good afternoon, Judge.
18          DETECTIVE BERNADETTE SULLIVAN, sworn
19                  DIRECT EXAMINATION
20     (BY MR. HENNING)
21     Q    Good afternoon, Detective.
22     A    Good afternoon.
23     Q    Can you introduce yourself to the jurors and spell
24          out your first name?
25     A    Detective Bernadette Sullivan, B-E-R-N-A-D-E-T-T-
```

```
                                        VOLUME: VII
                                         PAGES: 204
                                      EXHIBITS: 131-156
                                            ID: Y



                    COMMONWEALTH OF MASSACHUSETTS

        SUFFOLK, SS.                 SUPERIOR COURT DEPARTMENT
                                     Of THE TRIAL COURT


        * * * * * * * * * * * * * * * * * * * *
        COMMONWEALTH OF MASSACHUSETTS        *
                                             *
        -v-                                  *   SUCR 2012-10714
                                             *
        CHARLES REDDICKS                     *
        * * * * * * * * * * * * * * * * * * *


                              JURY TRIAL
                               (DAY 7)




                    BEFORE: HONORABLE LINDA E. GILES
                            Suffolk Superior Courthouse
                            Courtroom 907
                            Boston, Massachusetts
                            Friday, January 22, 2016



        Gregory Henning, Assistant District Attorney
          For the Commonwealth of Massachusetts

        Rosemary Scapicchio, Esquire
        Jillese McDonough, Esquire
          On behalf of the defendant Charles Reddicks.


                         NANCY MCCANN, CVR-C.M.
                         OFFICIAL COURT REPORTER
                         SUFFOLK SUPERIOR COURT
```

2

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| SGT. BRUCE DOLLOFF, RESUMED. | | | | |
| (By Mr. Henning) | | | 7 | |
| (By Ms. Scapicchio) | | 6 | | 7 |
| SGT. DETERMINE. KEVIN WITHERSPOON | | | | |
| (By Mr. Henning) | 10 | | 63 | |
| (By Ms. Scapicchio) | | 18 | | |
| SGT. DETERMINE. RICHARD DALEY | | | | |
| (By Mr. Henning) | 71 | | | |

71

1          Detective, please keep your voice up.

2                    THE COURT:  Good morning, Sergeant

3          Detective.

4                    THE WITNESS:  Good morning.

5               SERGEANT DETECTIVE RICHARD DALEY, Sworn.

6                       DIRECT EXAMINATION

7     (BY MR. HENNING)

8     Q    Good morning, sir, how are you?

9     A    I'm well.  Good morning.

10    Q    Can you introduce yourself for the jury and spell

11         out your last name?

12    A    My name is Richard Daley, D-A-L-E-Y.

13    Q    Where do you work?

14    A    I work in the Boston Police homicide unit.

15    Q    Can you tell the members of the jury about your

16         history as a police officer, when you started and

17         what you've done?

18    A    I've been on the police department 32 years.  The

19         last 11 years have been in the homicide unit.  The

20         seven years prior to that, I was a supervisor in

21         the drug control unit, and the 14 years before

22         that, I was in uniform patrol, both as a uniform

23         sergeant and a patrol officer.

24    Q    When did you become a detective?

25    A    18 years ago.

72

| | | |
|---|---|---|
| 1 | Q | When did you go into the homicide unit? |
| 2 | A | 11 years ago. |
| 3 | Q | And when did you take over your own squad? |
| 4 | A | When I went in the homicide unit. |
| 5 | Q | I want to talk to you first about the structure of |
| 6 | | a homicide unit now versus back in 2012, okay? |
| 7 | A | Sure. |
| 8 | Q | Now, what is the structure of a homicide unit |
| 9 | | today? |
| 10 | A | Today, each squad has one supervisor and three |
| 11 | | detectives. |
| 12 | Q | Back in 2012, what was the structure? |
| 13 | A | Back in 2012, there was one supervisor and two |
| 14 | | detectives.  They bumped up each squad by one |
| 15 | | detective. |
| 16 | Q | Back in 2012, specifically around April, do you |
| 17 | | recall who was in your squad? |
| 18 | A | Yes, it was me and Detective John Callahan.  There |
| 19 | | was another detective, a Dennis Harris, who I was |
| 20 | | processing and retiring, and he was not working |
| 21 | | with us the night this incident happened. |
| 22 | Q | And so you were the lead investigator into the |
| 23 | | homicide of Mariano Malave. |
| 24 | A | Correct. |
| 25 | Q | Who worked on that investigation with you from |

73

```
 1           your squad?
 2    A      Detective John Callahan.
 3    Q      I want to talk to you about the response that
 4           night to begin with.  First, do you know based on
 5           your investigation when the 911 phone call was
 6           that was placed to the operator?
 7    A      6:27 PM.
 8    Q      When and how do you get notified to go to a crime
 9           scene?
10    A      We have pagers, beepers, and operations division
11           at headquarters gets a request from the officers
12           in the street, the uniform sergeants or someone on
13           the scene will call for a full notification, and
14           that triggers the operations division to call us
15           on the beeper.  I get the beep, I call them at
16           operations, and they tell us where to go.
17    Q      When did you go to the scene?
18    A      Excuse me?
19    Q      When did you go to the scene?
20    A      I got paged around 6:47 p.m. and I got to the
21           scene a little after 7:00 p.m..
22    Q      Did Detective Callahan join you there?
23    A      Yes, he traveled in his own vehicle and we met
24           each other there.
25    Q      Describe what you saw when you got on scene at
```

74

```
1              132 Hyde Park Ave.
2      A     Police cars, some tape up, a lot of uniform
3            officers, and I made my way to the first floor
4            hallway, the front door first floor hallway.
5      Q     And what happened when you got to that area?
6      A     I spoke to a uniform sergeant, Smith, on scene and
7            debriefed him or he debriefed me on what the
8            situation was, and I stood by in the hallway while
9            a SWAT team cleared the third floor apartment.
10     Q     Can you explain to the members of the jury why a
11           SWAT team had been called to the scene?
12     A     The information that I had from the first
13           responding officers, that when they arrived they
14           observed a deceased male in the kitchen, and the
15           hallway that leads to the kitchen, there were
16           bedroom doors that were closed.
17                    They were concerned that there could be
18           a shooter or suspect behind those closed doors, so
19           that we were reluctant to go out to the hallway to
20           the body.  So they backed out and called for a gun
21           car, a SWAT team, and they responded shortly
22           thereafter.
23                    They staged with the supervisor, and
24           then they went room to room and cleared the
25           apartment and then backed out and said it was all
```

75

```
 1            clear and we made our way in.
 2     Q      When you say they staged, what does that mean
 3            exactly?
 4     A      The SWAT team?
 5     Q      Yes.
 6     A      They staged at the beginning up in the apartment
 7            by the front door and entered in.  I stayed
 8            downstairs on the first floor, I stayed away
 9            during that operation.
10     Q      After the SWAT team cleared the building, what did
11            you do?
12     A      I went inside the apartment.
13     Q      When you go inside the apartment at this point,
14            what is the purpose?
15     A      Just to take a quick look around, see what the
16            scene involves.
17     Q      Where did you go, the front or the back?
18     A      I went in the front door, took a left, looked
19            down the hallway to the back of the house, and
20            I traveled down the hallway.
21     Q      I'm showing you Exhibit 59.  When you took a look
22            in this hallway, did you have a chance to walk to
23            the edge of the bedroom and look in toward the
24            kitchen?
25     A      Yes.  Yeah, when you walk in, it's a living room,
```

76

| | | |
|---|---|---|
| 1 | | but converted to a bedroom, so yes. |
| 2 | | MR. HENNING:  I'm going to publish |
| 3 | | Exhibit 59 and just ask you a couple of questions |
| 4 | | about it. |
| 5 | Q | Sergeant Detective Daley, when you were in that |
| 6 | | area, did you notice anything, any evidentiary |
| 7 | | items that you made note of? |
| 8 | A | Yes.  When I first entered, there was a projectile |
| 9 | | in the middle of the hallway floor. |
| 10 | Q | Approximately where my pointer is? |
| 11 | A | Approximately right in that area by that bedroom |
| 12 | | on the right. |
| 13 | Q | And later, just to orient the members of the jury, |
| 14 | | did you find the projectile item closer to where |
| 15 | | this doorframe was? |
| 16 | A | Yes, it was right at the threshold at the bottom |
| 17 | | of that doorframe. |
| 18 | Q | So it had apparently moved. |
| 19 | A | Yes. |
| 20 | Q | Was there anything you could see on the ground or |
| 21 | | in the area of the kitchen that led you to believe |
| 22 | | how it had been moved? |
| 23 | | MS. SCAPICCHIO:  Objection. |
| 24 | | THE COURT:  Overruled. |
| 25 | A | Yes, a kitty cat.  A cat. |

77

| | | |
|---|---|---|
| 1 | Q | When you say kitty cat -- |
| 2 | A | A kitten, small kitten. |
| 3 | Q | What did you see on the ground that made you think |
| 4 | | that? |
| 5 | A | Kitty paws, cat paws in the blood area of the |
| 6 | | kitchen, and there was some toilet paper that had |
| 7 | | been played with, a roll of toilet paper was |
| 8 | | obviously played with, you could see it was played |
| 9 | | with by the cat. |
| 10 | Q | And were there cat prints lightly visible on this |
| 11 | | floor? |
| 12 | A | Yes, in the hallway, yeah. |
| 13 | Q | When you make these initial observations, do you |
| 14 | | go all the way into the kitchen?  When you're |
| 15 | | first there, did you go all the way into the |
| 16 | | kitchen? |
| 17 | A | I went to kitchen entry, I did not go into the |
| 18 | | kitchen. |
| 19 | Q | What did you notice in the kitchen entry area? |
| 20 | A | A deceased body of a black male and the room was |
| 21 | | disheveled and a mess.  After about 30 seconds to |
| 22 | | a minute, we backed out. |
| 23 | Q | So why do you leave immediately, why does that |
| 24 | | happen? |
| 25 | A | Because we were going to seek a search warrant to |

78

```
 1          do a thorough search and process the scene because
 2          we didn't know what we had, what happened, who was
 3          there.
 4                    So I spoke to the uniform sergeant on
 5          scene and asked them to put uniform officers at
 6          the front and back door and secure the scene.  We
 7          call it freezing it, freeze the scene until we can
 8          apply for and get a search warrant and return and
 9          process it.
10     Q    Were police officers stationed there?
11     A    Yes.
12     Q    Was the scene frozen?
13     A    Yes.
14     Q    Did you eventually apply for a search warrant for
15          that location?
16     A    Yes.  Detective Callahan was the affiant, he
17          applied for a search warrant.
18     Q    At some point, did you ask crime scene services to
19          take photographs before the search warrant was
20          actually done?
21     A    Yes, after myself and Detective Callahan backed
22          out of the apartment, froze the apartment,
23          Sergeant Detective Dan Duff from our crime scene
24          response unit which comes out and photographs and
25          collects and documents items, I asked him to take
```

79

1          photographs of the exterior and the common

2          hallways of the building that evening, which he

3          did.

4     Q    After the photographs, the overalls were taken,

5          what did you move to next?

6     A    Myself and Detective Callahan went down to the

7          first floor apartment and took a statement from

8          Pamela Arthur.

9     Q    What did you do after you spoke with Ms. Arthur?

10    A    We went back to headquarters to assist and

11         coordinate interviews of witnesses that have been

12         transported from the scene back to headquarters.

13    Q    Describe for the members of the jury what's going

14         on at headquarters and what you did.

15    A    Well, I wasn't there when the first witnesses were

16         transported back there, but there are other

17         detectives that are working in the homicide unit

18         that are not on call.  They usually step up and

19         help us with the interviews if there's a lot of

20         witnesses.  So four other detectives helped us

21         with some witnesses that had been transported from

22         the scene.  Myself and Detective Callahan then

23         also began, interviewed two people at

24         headquarters, as well.

25    Q    Who did you interview at headquarters?

80

1    A    Ruth Camille and Ronald Theodat.

2    Q    When you interviewed them, was it audio or video

3         recorded?

4    A    Audio recorded.

5    Q    Did you learn of nicknames during the course of

6         your investigation for Ronald Theodat?

7    A    Lucky.

8    Q    Did you also hear him go by a different name?

9    A    Luch.

10   Q    Who else was interviewed at headquarters by the

11        members of the homicide unit?

12   A    Renee Jones, Rod Meneide.

13   Q    Is it fair to say that there were a number of

14        civilians from the scene that were interviewed?

15   A    There was about a half a dozen people that were

16        asked to come.

17   Q    Can you describe what happened at the conclusion

18        of your interview with Ronald Theodat?

19   A    He left the building.  Leanne Parker, I'm sorry,

20        Leanne Parker also gave a statement at

21        headquarters.  He left the building with

22        Detective Callahan and I stayed upstairs.

23   Q    So you said that you had spoken with Mr. Theodat,

24        correct?

25   A    Yes.

81

```
 1    Q    At some point, did he depart the area and go
 2         downstairs to the front of Boston Police
 3         Headquarters?
 4    A    Yes.
 5    Q    Where there other police down in the front of
 6         Boston Police Headquarters?
 7    A    Yes, the victim from 132 Hyde Park Ave., the
 8         father was in the lobby of headquarters.
 9    Q    What happened at that point?
10    A    He had an emotional breakdown and we had to call
11         an ambulance to come and take him from
12         headquarters.
13              MS. SCAPICCHIO:  Objection, Your Honor.
14              THE COURT:  I'll allow it.
15    Q    Did it take some time to take care of that?
16    A    Yes.
17    Q    At some point, did you learn that Detective
18         Callahan had had a conversation with Ronald
19         Theodat downstairs at Boston Police Headquarters?
20    A    Yes.
21    Q    As a result of that conversation, did you and
22         Detective Callahan do anything?
23    A    Yes, we made arrangements to have a meeting with
24         Leanne Parker later on.
25    Q    When you say later on, this is on the evening of
```

82

```
 1            the 27th, correct?
 2    A     Correct.
 3    Q     When were you or when did you schedule to have
 4            that meeting with Leanne Parker?
 5    A     As soon as we settled the family issue in the
 6            lobby, we headed out to a location that we both
 7            agreed upon and met Ms. Parker.
 8    Q     I want to talk to you a little bit about going to
 9            do that.  Where did you meet Ms. Parker?
10    A     The VFW Parkway in West Roxbury.
11    Q     Who went to the meeting?
12    A     Myself and Detective Callahan.
13    Q     Where did you actually do the interview?
14    A     It was in Bertucci's parking lot, there's a
15            Garry's liquors, there's a little strip mall on
16            the parkway.  We just parked in there.  Ms. Parker
17            was there, and we asked her to get in the back
18            seat of our car.
19    Q     And you recorded this interview, as well?
20    A     Yes.
21    Q     During the course of that interview, did you learn
22            some information from Ms. Parker?
23    A     Yes.
24    Q     Specifically, what piece of information did you
25            learn?
```

83

| | | |
|---|---|---|
| 1 | A | A license plate of a motor vehicle. |
| 2 | Q | And is it fair to say, without going into details |
| 3 | | of what she said, that Ms. Parker talked to you |
| 4 | | about what she saw regarding that license plate? |
| 5 | A | Yes. |
| 6 | Q | What did you do with that information and what was |
| 7 | | your next step? |
| 8 | A | The interview lasted about 15, 12 to 15 minutes, |
| 9 | | we went our separate ways, and myself and |
| 10 | | Detective Callahan traveled to Brockton to try |
| 11 | | and speak to an individual we believed was in the |
| 12 | | kitchen at the time of the shooting. |
| 13 | Q | Who was that individual? |
| 14 | A | Julio Alex Balbuena. |
| 15 | Q | And you're still now on the evening of the 27th, |
| 16 | | the evening that this occurred. |
| 17 | A | Yes, this is about 11 o'clock, we headed down to |
| 18 | | Brockton.  Yes, this is the evening of the 27th. |
| 19 | Q | When you got out to Brockton, what happened? |
| 20 | A | We met Mr. Balbuena and his family in the kitchen |
| 21 | | and we made arrangements to speak to him at a |
| 22 | | later date. |
| 23 | Q | Fair to say that you informed him about what would |
| 24 | | be happening at the grand jury? |
| 25 | A | I don't think we got that far, but yes. |

84

| | | |
|---|---|---|
| 1 | Q | What did you do after you spoke with Mr. Balbuena? |
| 2 | A | We went back to headquarters to follow up on some |
| 3 | | of the information that we had collected so far. |
| 4 | Q | So this is now the evening of the 27th going into |
| 5 | | the 28th. |
| 6 | A | Yes. |
| 7 | Q | Tell me what happened when you got back to |
| 8 | | headquarters. |
| 9 | A | Detective Callahan took the information on the |
| 10 | | plate number that Leanne had provided to us in the |
| 11 | | parking lot in West Roxbury and went into the |
| 12 | | Registry of Motor Vehicles database, and in their |
| 13 | | database, there's a prompt where you can put |
| 14 | | partial plates in and see what cars are registered |
| 15 | | to the plate, and that's what Detective Callahan |
| 16 | | did. |
| 17 | Q | At some point, did you see the results of that |
| 18 | | plate or partial plate query? |
| 19 | A | Yes. |
| 20 | Q | And what information came back from that query? |
| 21 | A | It came back to a Mass. registration, 6738 T as in |
| 22 | | Thomas, V as in Victor.  It was in 1992 blue |
| 23 | | Escort station wagon. |
| 24 | Q | Did you learn some information about who the |
| 25 | | registered owner of that vehicle was? |

85

```
1    A    Yes, it was registered to Catherine Reddicks of
2         116 Millet Street.
3    Q    So once you had the registration and the address,
4         what was your next step?
5    A    Detective Callahan ran the address, 116 Millet
6         Street, to see if there's any licensed, anyone
7         registered with a driver's license there.
8    Q    Did you get back some information about registered
9         drivers at that address?
10   A    Yes, there were six people that had licenses at
11        that location, three males and three females.
12   Q    Without getting into details of who said it, did
13        you have a description that you were working with
14        or thinking about as you were doing this query?
15   A    Yes, from Leanne Parker, yes, we did.
16   Q    Based on that, what was your next step?
17             MS. SCAPICCHIO:  Objection, Your Honor.
18             THE COURT:  I'm sorry, repeat the
19        question?
20   Q    Based on that, what was your next step?
21             THE COURT:  Overruled.
22             MS. SCAPICCHIO:  Judge, can we be seen?
23   SIDEBAR CONFERENCE:
24             MS. SCAPICCHIO:  Judge, I'm just
25        concerned, I think what he's going to say, and you
```

86

1    can correct me if I'm wrong, but I think what he's

2    going to say is they went to attempt to speak to

3    my client.

4                MR. HENNING:  No.

5                MS. SCAPICCHIO:  Oh, he's not, all

6    right.  That's what I thought was coming.  So what

7    is he going to say?

8                MR. HENNING:  He's going to say that he

9    looked at a database, not booking photo, and that

10   your client's photograph matched a description or

11   was similar to a description that had been

12   provided.

13               MS. SCAPICCHIO:  I would have a huge

14   problem with him saying matched anything.

15               THE COURT:  I'm not clear on what

16   description we're talking about and from who.

17               MR. HENNING:  Leanne Parker provided a

18   description.  They're going to explain how they

19   narrow down the list of six licensed, RMV licensed

20   people at that address, down to one person.

21               It has to be explained how they end up

22   focusing on him, and there's a description that

23   they're working with that they received from

24   Leanne Parker.

25               MS. SCAPICCHIO:  That's an

87

1          identification through the back door, that's in

2          violation of *Collins* and *Gomes* and everything

3          else, Judge.

4                    THE COURT:  I respectfully disagree.

5          They have to explain how they connected the dots.

6                    MS. SCAPICCHIO:  What he's going to say

7          is Leanne Parker said this, and the next person

8          that they interview or they focus on is my client.

9          That's an identification, Judge.

10                    THE COURT:  I respectfully disagree.

11          I'm going to overrule any objection.  If you want

12          me to give a limiting instruction, I will.

13                    MR. HENNING:  I'm not asking for an ID.

14          What I'm saying --

15                    MS. SCAPICCHIO:  It is an ID, though,

16          Judge.

17                    MR. HENNING:  It's not.

18                    MS. SCAPICCHIO:  It's an identification.

19          I wouldn't have any problem if he said the next

20          thing I did in the investigation was to focus on

21          Charles Reddicks.  I don't think he gets to say

22          based on Leanne Parker's description, because

23          that's what makes it identification.  She never

24          ID'd him.  It doesn't matter why he did it.

25                    THE COURT:  What do you expect this

88

1      witness to say?

2              MR. HENNING:  That she provided some

3      information about a physical description, but no

4      one ever ID's --

5              THE COURT:  And then, based on that

6      physical description, what did you do next?  We

7      focused on Mr. Reddicks.

8              MR. HENNING:  By looking at a

9      photograph.

10              MS. SCAPICCHIO:  That's an

11      identification, Judge.

12              THE COURT:  I respectfully disagree.

13      Based on what she told him, that they focused on

14      Mr. Reddicks, that's perfectly permissible.  They

15      have to explain how they ended up focusing on your

16      client.  The case law is quite clear.  They can't

17      just say out of nowhere, they zeroed in on your

18      client.

19              MS. SCAPICCHIO:  I think they can say

20      that the next thing they did was focus on my

21      client.  The part that I have a problem with is

22      based on what Leanne Parker said.  If Leanne

23      Parker didn't identify my client, this is a

24      backdoor way of having them ID my client at the

25      scene.  Nobody has identified him, Judge, nobody.

89

1          MR. HENNING:  I'm going to ask, did she

2     look at a photo array?  No.  Did she give a

3     physical description?  Yes.  Based on that

4     description, did you look at some photographs of

5     license holders?

6          MS. SCAPICCHIO:  It's Leanne Parker's

7     description.

8          THE COURT:  I clearly have noted your

9     objection, but they have to and they are entitled

10    to explain how they took the steps, and especially

11    how they focused on your client.

12          And without telling them that as a

13    result of the description, they're left with this

14    incredible void that they somehow just, you know,

15    fell from the sky and landed on your client.

16    That's improper, and the case law is against you.

17    So I will note your objection, but they're

18    entitled to it.

19          MS. SCAPICCHIO:  Can I have a continuing

20    objection to this witness and any testimony

21    regarding identification and connecting to Leanne

22    Parker, or do you want me to object to each --

23          THE COURT:  You're begging the question

24    because in that proposition, you're assuming it's

25    identification, which I respectfully have

90

1          disagreed with.  It is not identification.

2                    It does not violate to *Crayton* and

3          *Collins*.  It is merely explaining.  As the case

4          law is well-settled and says, they're entitled to

5          explain how they ended up focusing on your client.

6                    MS. SCAPICCHIO:  Then Judge, I would ask

7          for a limiting instruction saying exactly that.

8          It's not an identification of my client by Leanne

9          Parker or anyone else.

10                    MR. HENNING:  I can do it through a

11          leading question or else the Court can give the

12          instructions.

13                    THE COURT:  Let me see how he handles

14          this and then I'll decide.

15                    MS. SCAPICCHIO:  If you don't, note my

16          objection, Judge.

17                    THE COURT:  Noted.

18     END OF SIDEBAR CONFERENCE.

19     Q    Sergeant Detective Daley, after finding six

20          registered license holders at that address at

21          116 Millet Street, did you have access to driver's

22          license photos and photographs from police

23          databases?

24     A    Yes.

25                    MS. SCAPICCHIO:  Objection, Your Honor.

91

1           THE COURT:  Overruled.

2           MS. SCAPICCHIO:  Can we be seen?

3           THE COURT:  No.  Overruled.

4           MS. SCAPICCHIO:  Judge, I need to make

5      a record.

6  SIDEBAR CONFERENCE:

7           THE COURT:  What is it now?

8           MS. SCAPICCHIO:  It's the police

9      databases.  Why did he need police databases?

10      What is that all about?

11           MR. HENNING:  Because they didn't use --

12           THE COURT:  I apologize, I didn't hear

13      the police part of it.  Now I understand.

14           MR. HENNING:  They didn't use the RMV

15      photo, so I need to be able to establish it's

16      another --

17           MS. SCAPICCHIO:  I don't care what photo

18      they used.  You don't have to put in police

19      databases, that should be stricken from the

20      record.  That's an indication that my client had a

21      prior record.

22           THE COURT:  Well, I can give a standard

23      instruction, which I have, that police departments

24      collect pictures from many people.  I'm assuming

25      that's what you're talking about.

92

1          MS. SCAPICCHIO:  Judge, he never ever

2     told us he was going to say police database.  That

3     was the reason I came over in the beginning.  He

4     never said that, and now it's before the jury.

5     I'd ask that it be stricken.

6          MR. HENNING:  Well, it's a lie to say

7     it's the RMV --

8          MS. SCAPICCHIO:  It can be a database,

9     you don't have to say a police database.

10          MR. HENNING:  So I apologize for

11     misspeaking.  I don't think it's anything that

12     can't be easily fixed.  I can ask the question or

13     ask that the Judge give an instruction.

14          MS. SCAPICCHIO:  I'd ask that it be

15     stricken, Judge.

16          THE COURT:  Well, wait a minute.  It

17     happens to be the truth that it's from a police

18     database.

19          MS. SCAPICCHIO:  Judge, that's not the

20     point.

21          THE COURT:  Well, we hear about this all

22     the time, photograph of defendant.  We have the

23     standard instruction.

24          MS. SCAPICCHIO:  Right.

25          THE COURT:  And I tell them that police

93

1  departments collect photographs of people from

2  many different sources and for many different

3  reasons.  I'm not going to say it's not the police

4  database because it is the police database.

5           MS. SCAPICCHIO:  Judge, it doesn't have

6  to be police; it has to be just database.  Why

7  does it need to be police?  Because the "police"

8  indicates that he's got some connection with the

9  police department, Judge.  And you've already let

10  in the fact that he had a firearm, you already let

11  in the fact that there's photos.  It won't take

12  the jury long to figure out, if you allow a

13  picture from a police database --

14           THE COURT:  At this point, it's un-

15  ringing the bell.  Number two, it's absolutely the

16  fact that they did get it from the police

17  database, and then you know we give the standard

18  limiting instruction.

19           MS. SCAPICCHIO:  Judge, I'm not asking

20  for the instruction.  I'm asking at this point for

21  the database, police database, to be stricken, and

22  have him use the word database.

23           MR. HENNING:  I'll ask a different

24  question.  I don't think he answered the question.

25           THE COURT:  I'm not striking anything.

94

1            If you want me to have him re-ask the question and
2       leave out the word police, I'm happy to do that.
3                  MR. HENNING:  Happy to, sure.
4                  THE COURT:  But I'm not striking that
5       because it happens to be the truth and it's not
6       impermissible, and that's why we give this
7       limiting instruction because that's -- police
8       departments do have people's pictures, and that's
9       how they got it.
10                 MS. SCAPICCHIO:  Judge, there was no
11      need to say police department or police database
12      at this point.  And they knew it.
13                 THE COURT:  Well, I'm not sure I agree
14      with you.  I hear it all the time, and that's
15      exactly why in my trial bench book.  I have this
16      standard instruction.  We're spending a lot of
17      time on this.  Put the question again, eliminate
18      the word police.  Do you want me to give this?
19                 MS. SCAPICCHIO:  Yes, Judge.  If you're
20      not going to strike it, you have to do something
21      with it.
22                 THE COURT:  I'm not striking it because
23      it's the truth.
24                 MS. SCAPICCHIO:  Judge, whether it's the
25      truth, there's a separate evaluation as to whether

95

1          or not it's prejudicial and whether or not it's

2          more prejudicial than probative for my client.

3          That's what I'm asking you to make the

4          determination on right now.

5                    THE COURT:  Do you want me to give this

6          limited instruction?

7                    MS. SCAPICCHIO:  Yes, Judge.

8                    THE COURT:  Okay.

9     END OF SIDEBAR CONFERENCE.

10                   MS. SCAPICCHIO:  Never mind, Judge, no.

11                   THE COURT:  Okay.

12                   MR. HENNING:  May I inquire, Your Honor?

13                   THE COURT:  Please.

14    Q    Sergeant Detective Daley, let me go back a step.

15         After speaking with Ms. Parker, did you have some

16         physical characteristics or descriptions that you

17         received during the interview?

18    A    Yes.

19    Q    After that conversation with Ms. Parker, you said

20         Detective Callahan did the license plate query,

21         correct?

22    A    Correct.

23    Q    And the next thing after the license plate query

24         that you said was to find six licensed drivers at

25         that address.

96

| 1 | A | Yes. |
|---|---|---|

1    A    Yes.

2    Q    Three male and three female.

3    A    Yes.

4    Q    Based on that information and your conversation

5         with Ms. Parker, did you look at other photographs

6         in order to narrow down the list of the six

7         licensed people at 116 Millet Street?

8    A    Yes.

9    Q    How many people from those six licensed people

10        fit the physical characteristics that had been

11        provided to you during the conversation with

12        Ms. Parker?

13              MS. SCAPICCHIO:  Objection, Your Honor.

14              THE COURT:  Noted, but overruled.

15   A    One.

16   Q    Were any of them close other than that one?

17   A    No.

18   Q    And who was the one person that fit that physical

19        description from Ms. Parker's description?

20              MS. SCAPICCHIO:  Judge, can I have a

21        continuing objection?

22              THE COURT:  Noted.

23              MS. SCAPICCHIO:  And a limiting

24        instruction?

25              THE COURT:  Let him finish.  Go ahead.

97

1    A    Charles Reddicks.

2    Q    If you could just identify him and point to --

3         point to him and describe something he's wearing.

4    A    The male with the light purple shirt and the

5         dreadlocks and the glasses.

6              THE COURT:  Members of the jury, you're

7         not to construe the testimony just now of Sergeant

8         Detective Daley as any identification of the

9         defendant by Ms. Parker.

10              It is offered merely for the limited

11         purpose of helping you understand what steps the

12         police took in this investigation and why they

13         took them, and for no other reason.

14    Q    Sergeant Detective Daley, this is now early

15         morning on the 28th of April, a Saturday, correct?

16    A    Yes, it is.

17    Q    After getting the information on the license plate

18         and on Mr. Reddicks, what did you do next?

19    A    I headed home to get some sleep.

20    Q    On the way home to get some sleep, did you do

21         anything else?

22    A    I drove by 116 Millet Street.

23    Q    What did you see when you drove by 116 Millet

24         Street?

25    A    The blue Ford Escort station wagon in the

98

| | | |
|---|---|---|
| 1 | | driveway. |
| 2 | Q | I'd ask you to take a look at this and tell me if |
| 3 | | you recognize what it is. |
| 4 | A | That's a photograph of 116 Millet Street in |
| 5 | | Dorchester. |
| 6 | Q | And this is a Google image, correct? |
| 7 | A | Yes. |
| 8 | Q | Not actually a photograph that you took. |
| 9 | A | No, it is not. |
| 10 | Q | But coincidentally, is there something in the |
| 11 | | driveway? |
| 12 | A | It appears to be the same blue station wagon in |
| 13 | | the driveway. |
| 14 | | MR. HENNING: I'd ask that this be |
| 15 | | offered. |
| 16 | | THE COURT: Any objection? |
| 17 | | MS. SCAPICCHIO: No, Your Honor. |
| 18 | | THE COURT: That may be marked. |
| 19 | | (Exhibit Number 135 was marked in |
| 20 | | evidence; Google Image of 116 Millet Street.) |
| 21 | Q | Did you stop and go anywhere at that point? |
| 22 | A | No, I just rolled by twice. |
| 23 | Q | Why? |
| 24 | A | I didn't want to tip anyone off that we were onto |
| 25 | | the car -- |

99

| | | |
|---|---|---|
| 1 | | MS. SCAPICCHIO:  Objection, Your Honor. |
| 2 | | THE COURT:  Overruled. |
| 3 | | MS. SCAPICCHIO:  Tip anyone off? |
| 4 | | THE COURT:  Overruled. |
| 5 | Q | I'm sorry, Sergeant Detective Daley, why didn't |
| 6 | | you go into the house or do anything at that |
| 7 | | point? |
| 8 | A | Because I had no reason to.  It was very early in |
| 9 | | the investigation and this was an early car of |
| 10 | | interest. |
| 11 | Q | And later on once you could get to it, there were |
| 12 | | some photographs taken of that car, correct? |
| 13 | A | Yes. |
| 14 | Q | Is this the same car? |
| 15 | A | Yes. |
| 16 | | MR. HENNING:  I'd offer these two. |
| 17 | | THE COURT:  Any objection, |
| 18 | | Ms. Scapicchio? |
| 19 | | MS. SCAPICCHIO:  I haven't seen them. |
| 20 | | No objection. |
| 21 | | Exhibit Numbers 136 and 137 were marked |
| 22 | | in evidence; Photographs of blue Ford Escort.) |
| 23 | Q | Sergeant Detective Daley, we're on the 28th.  So |
| 24 | | that Saturday, you said you went home, correct? |
| 25 | A | Yes. |

100

1    Q    What happened on the next day?

2    A    Detective Callahan obtained a search warrant to

3         return to 132 Hyde Park Ave. to search and process

4         the scene.

5    Q    Did you go to 132 Hyde Park Ave. to be part of

6         that process?

7    A    Yes, at 2:34, we began the process.  In the

8         afternoon.

9    Q    Say again?

10   A    2:34 in the afternoon.

11   Q    Tell the members of the jury what happened in this

12        case when you are searching a location under a

13        search warrant.

14   A    We can look for anything that we ask to look for.

15   Q    What is the actual process of searching?  Who

16        does the searching and what were you doing?

17   A    Me and Detective Callahan do most of the

18        searching, since it's our case.  We're with the

19        crime scene response team, the photographer, as

20        well, they come back and we begin processing by

21        photographs initially, make our way in, document

22        and collect eventually.

23   Q    At some point, were you in the back yard area of

24        the house at 132 Hyde Park Ave.?

25   A    Yes.

101

1    Q    What did you do in the back yard?

2    A    My attention was directed to a blue recycling

3         barrel.

4    Q    I'm showing you what's been marked previously as

5         Exhibit 70 and Exhibit 71.  Would you take a look

6         at those?  Is that the barrel that you had looked

7         at?

8    A    Yes, it is.

9    Q    Did you find anything of interest in that barrel?

10   A    Yes, a stash of marijuana in a white walnut --

11        excuse me -- Walmart shopping bag.

12             MR. HENNING:  Publishing 70.

13   Q    This is what it looked like when you viewed into

14        that recycling bin?

15   A    When you opened the lid, correct.

16   Q    Eventually, was that recovered?

17   A    (Witness reviews evidence bag.)  Yes.

18             THE COURT:  Am I being called again?

19             MS. SCAPICCHIO:  Sorry, Judge.  We had

20        decided, we just forgot to tell you, sorry.

21             THE COURT:  Sometimes I'm the last to

22        know, members of the jury.

23   SIDEBAR CONFERENCE:

24             MS. SCAPICCHIO:  I don't have an

25        objection to this.  My only concern is I don't

102

1          know if this has my client's name on it or the

2          word homicide.  That would be my objection.

3                    THE COURT:  I would be telling them not

4          to open it.

5                    MS. SCAPICCHIO:  That's fine.

6                    THE COURT:  Are we going to have a drug

7          analysis of this?

8                    MR. HENNING:  No.  Mostly, it smells.

9          You're going to be able to smell it.

10                   THE COURT:  If it smells like it, it

11         does.

12                   MR. HENNING:  We don't need to be drug

13         tested.

14    END OF SIDEBAR CONFERENCE:

15                   THE COURT:  If you want to lay a

16         foundation, that's fine.

17    Q    Detective, can you tell me what's in that heat

18         sealed bag?

19    A    The marijuana taken out of that blue barrel in the

20         back of 132 Hyde Park Ave.

21    Q    Do you remember how many separate bags were inside

22         of that trash bag?

23    A    Sixteen.

24    Q    Sixteen in that location.

25    A    Yes.

103

1          MR. HENNING:  I'd offer this as the next
2       exhibit.
3          MS. SCAPICCHIO:  Subject to what we said
4       at sidebar, Judge.
5          THE COURT:  All right, that may be
6       marked.
7          (Exhibit Number 138 was marked in
8       evidence;  Heat-sealed evidence bag of marijuana.)
9          THE COURT:  Members of the jury, I just
10      want to also add relative to exhibits, any exhibit
11      that is presented in a heat sealed bag, please do
12      not open that heat sealed bag.
13          That might be for obvious reasons,
14      members of the jury, but needless to say, I have
15      to tell you that.  Please do not open any heat
16      sealed bags containing any exhibits in this case.
17   Q  Sergeant Detective Daley, I'm just going to place
18      in front of you for some guidance here Exhibits
19      41, 42, 43, the sketches from Detective Sullivan
20      and ask you about some other items that were
21      found, okay?
22   A  Yes.
23   Q  Approaching you with Exhibit 75 which is marked by
24      cone, excuse me, inside this picture is cone 3 and
25      cone 4.  So when you walk inside of that house,

104

1       you walked up the back at one part of the search,

2       correct?

3   A   Yes, this is the back stairwell.

4               MR. HENNING:   Publishing Exhibit 5.

5   Q   For the record, the recycling bins would be over

6       to the right of where this exhibit is, correct?

7   A   Correct.

8   Q   Now, if you went up these steps and you came to a

9       landing, is that where the second floor

10      apartment's landing is, essentially?

11  A   Top of those steps?

12  Q   Yes.  If you go up one flight.

13  A   You've got to go through the door, then there's

14      one flight up, that's the second floor landing.

15  Q   On the second floor landing in that location, did

16      you see any items of evidentiary value that you

17      stopped at?

18  A   Yes.

19  Q   What did you stop at?

20  A   A Starbucks cup and a black cylindrical container.

21              MR. HENNING:   Publishing 75.

22  Q   Now, sir, the black cylindrical container, for the

23      record, has been submitted previously as Exhibit

24      115, correct?

25  A   Yes.

105

1  Q  With regard to the Starbucks cup, did you have

2     anything done with it?

3  A  It was photographed, collected, and the rim was

4     swabbed for a DNA sample.

5  Q  And with regard to the black canister, what did

6     you do?

7  A  It was photographed, documented, collected, and

8     forwarded to the latent print division to be

9     processed.

10 Q  Now, the black canister when you originally or

11    when officers had originally been on scene, is it

12    fair to say that they informed you based on your

13    investigation that it was in a different

14    location?

15             MS. SCAPICCHIO:  Objection.

16             THE COURT:  Sustained.

17 Q  Did you learn at some point in the investigation

18    that the black canister had been viewed in a

19    different location?

20             MS. SCAPICCHIO:  Objection.

21             THE COURT:  I'm going to sustain the

22    objection.

23 Q  Have you seen some photographs showing the black

24    canister in a different location?

25 A  I personally viewed the black canister on a stair,

106

1          about four stairs down from the top on the

2          stairwell.

3     Q    And the place that you found it, four stairs down

4          from the top, was that on the night of the

5          incident?

6     A    Yes.

7     Q    Between the night of the incident when you viewed

8          it there and the next day, was there anybody in

9          the back hallway area?

10    A    Only uniform officers.

11    Q    And those would be police officers who were

12         guarding the location.

13    A    Yes.

14    Q    Showing you what's been marked as Exhibit 78.

15         Upstairs in the kitchen area, did you make

16         observation of an item that was collected?

17    A    Yes, cone number 9, an opaque plastic container.

18    Q    And some of those cat paw prints that you were

19         describing, is that what's depicted in this

20         photograph?

21    A    Yes.

22              MR. HENNING:  May I break, Your Honor,

23         briefly?

24              THE COURT:  Why don't you go for about

25         five more minutes.

107

1                    MR. HENNING:  Okay, understood.

2    Q    Sir, did you also notice ballistic evidence that

3         you had collected?

4    A    Yes.

5    Q    Where were those ballistic items?

6    A    As I previously testified to, there was one in the

7         hallway that was now by the threshold to bedroom

8         three, I believe, on the floor, and another

9         projectile was found in the kitchen corner on the

10        floor.

11   Q    Looking at Exhibit 62, is that the projectile

12        that's now depicted at the threshold of the door?

13   A    Yes.

14   Q    And looking at Exhibit 90 which has the green cone

15        11 next to it, is that the one you said was found

16        in the kitchen?

17   A    Yes.

18                   MR. HENNING:  Publishing 62 and

19        publishing 90.

20   Q    In addition to these ballistic items, when you

21        looked in the bedrooms of the house, did you

22        notice anything that you collected?

23   A    Ballistically?

24   Q    No, not ballistically, in terms of drugs.  Was

25        there any drug evidence that you recovered inside

108

1           of the apartment?

2    A    Yes, I recovered three plastic bags of marijuana

3         in bedroom one, the victim's bedroom.

4    Q    Bedroom one, just for the record, that would be

5         the first room you walk in once you enter the

6         apartment?

7    A    Yes.

8    Q    From the front.

9    A    Yes.

10   Q    Showing you Exhibit 57 and 58, is this the front

11        door to the apartment and bedroom one or what is

12        also the living room?

13   A    Yes.

14            MR. HENNING:  Publishing 57 and 58.

15   Q    You said three bags?

16   A    Yes, they were inside a backpack in the bedroom.

17   Q    The backpack was in this bedroom?

18   A    Yes.

19   Q    Do you know what this is?

20   A    That's the three bags I seized from the backpack

21        in that bedroom.

22            MR. HENNING:  I'd offer this as the next

23        exhibit.

24            MS. SCAPICCHIO:  No objection, Judge.

25            THE COURT:  All right.

109

1    (Exhibit Number 139 was marked in

2    evidence;  Three bags of marijuana.)

3    THE COURT:  Again, members of the jury,

4    reminding you, no opening of heat sealed bags.

5    Q    And at some point, did you have an opportunity to

6    go into what's described as bedroom number two or

7    the first bedroom to the left after you come into

8    that main room?

9    A    Yes.

10   Q    Showing you Exhibit 63.  Is that bedroom number

11   two?

12   A    Yes.

13   MR. HENNING:  Publishing 63.

14   Q    What did you find in this room, sir?

15   A    More marijuana in small glass vials in a paper bag

16   inside the dresser.

17   Q    Does that bag contain what you just described?

18   A    Yes.

19   MR. HENNING:  I'd offer this as the next

20   exhibit.

21   MS. SCAPICCHIO:  May I see it?

22   No objection, Judge.

23   THE COURT:  All right, that may be

24   marked.

25   (Exhibit Number 140 was marked into

110

1        evidence; Paper bag containing glass vials of

2        marijuana.)

3  Q   Showing you 104.  Is this a picture of the

4      backpack and the way that you found the drugs

5      that are Exhibit 104, I believe?

6  A   Yes.

7  Q   Does this show what's in Exhibit 139 in that bag?

8  A   Yes, it does.

9  Q   Plastic bags are actually in the bottom of that

10     backpack?

11  A   Correct.

12  Q   And this backpack, again, was in the room that you

13     walk into when you first go in the apartment.

14  A   Yes.

15          MR. HENNING:  Your Honor, now is a good

16     time to break.

17          THE COURT:  Members of the jury, this

18     seems like a good time to take our mid-morning

19     recess.  Please be back to resume the trial at

20     high noon.

21  (Court in recess at 11:35 a.m.)

22

23  **THE FOLLOWING PORTION OF THIS TRANSCRIPT IS IMPOUNDED**

24  **AND UNDER SEPARATE COVER:**

25  **IN CAMERA HEARING WITH RONALD THEODAT, ACCOMPANIED BY**

111

1      **HIS ATTORNEY, MR. MATTHEW FEINBERG.**

2

3      (Court in session at 12:23 p.m.)

4      (Defendant present.)

5      (Jury not present.)

6      SIDEBAR CONFERENCE:

7                   THE COURT:  Counsel, now that

8            Mr. Reddicks has joined us, I wanted to put on

9            the record -- actually, Sergeant Detective  --

10           thank you, Mr. Henning.

11                  MR. HENNING:  My apologies, sir.

12                  THE COURT:  Sergeant Detective Daley

13           can wait outside.

14                  THE WITNESS:  Yes, Your Honor.

15                  THE COURT:  I had another Martin hearing

16           with Mr. Theodat and we were joined by his

17           attorney, Mr. Feinberg.

18                  After a relatively lengthy hearing and

19           also giving Mr. Theodat additional time to speak

20           with Mr. Feinberg privately, although initially he

21           thought he might want to testify without a grant

22           of immunity, ultimately he chose not to.

23                  I did ask Mr. Henning in the presence of

24           defense counsel if he did want to seek immunity

25           for Mr. Theodat at this late juncture and --

112

1                    MS. SCAPICCHIO:  I think you said

2          defense counsel, Judge, not --

3                    MR. HENNING:  In the presence of defense

4          counsel.

5                    MS. SCAPICCHIO:  Okay, I'm sorry.

6                    THE COURT:  And Mr. Henning, you decided

7          otherwise.

8                    MR. HENNING:  For the record, the

9          Commonwealth chose, after consultation in the past

10          couple of weeks with senior members in my office

11          and in consultation again today with members of

12          the homicide squad, to not seek immunity and

13          would note for the record that we have filed --

14          I previously filed a motion to preclude any

15          reference or negative inference argument from

16          counsel about so-called missing witness or absent

17          witness.

18                    And after research on it, I believe the

19          case law is very much in our favor.  So at this

20          point, knowing that, I'm just making sure that the

21          Court is aware that we anticipated that issue.

22                    THE COURT:  I'm aware of Commonwealth's

23          motion to preclude defense from arguing the so-

24          called missing witness inference to the jury and

25          for an instruction on the absence of Ronald Lucky

113

1    Theodat.

2            Ms. Scapicchio, did you want to respond

3    to that motion?

4            MS. SCAPICCHIO:  I will, Judge.  I don't

5    think I need to do it right now.

6            THE COURT:  Well, I think that the

7    Commonwealth needs to hear this ruling before they

8    make their ultimate decision.

9            MS. SCAPICCHIO:  They've made their

10   ultimate decision, Judge, didn't they?

11           THE COURT:  They're entitled to this

12   ruling.  Did you want to be heard on the motion?

13           MS. SCAPICCHIO:  Yes, Judge.  It would

14   be my position that if the Commonwealth doesn't

15   seek immunity for Mr. Theodat as it did for Ian

16   Follette, that it would be a missing witness.

17   I don't have the ability to seek immunity for him.

18   The only one who can seek immunity is the

19   Commonwealth.

20           They have the ability to get immunity

21   for him, and he's indicated he would testify if he

22   was given immunity.  They've opted not to do that,

23   and it's not because of anyone who said they won't

24   give it to him.  It's the Commonwealth not even

25   asking.  So I think that in my mind anyhow, it

114

1       warrants a missing witness instruction.

2                   THE COURT:  Do you have any authority

3       for that proposition, Ms. Scapicchio?

4                   MS. SCAPICCHIO:  I said I would respond,

5       Judge, but I don't have it on me right now.  I'm

6       happy to look it up and give it to you.

7                   MR. HENNING:  The authorities that are

8       cited in the Commonwealth's motion and the case

9       law is that the witness, if made unavailable, we

10      have to make every effort to bring him here or to

11      make him available.  We've done that.

12                  I would note that the Commonwealth has

13      sought two separate habes to bring this witness

14      here.  We coordinated with federal authorities two

15      different times between the United States

16      Attorney's Office and --

17                  THE COURT:  Close the door.

18                  MR. HENNING:  United States Attorney's

19      Office in Maine, the Marshal Service in Maine, the

20      Marshal Service in Boston.  We've also sent two

21      different transports to get them here.

22                  So in terms of the case law, we've made

23      efforts.  He has made himself unavailable by his

24      assertion of the Fifth.

25                  The case law is very clear.  Immunity is

115

1　　　　　not something we are expected, required, or

2　　　　　obligated to do in any of these things.  It is a

3　　　　　function of the executive that we're allowed to do

4　　　　　that in certain situations, but it's our option.

5　　　　　　　　　And the case law says that if he is

6　　　　　unavailable, including by the Fifth Amendment, we

7　　　　　should not have any negative inference found

8　　　　　against our case for that.

9　　　　　　　　　THE COURT:  I agree with him,

10　　　　Ms. Scapicchio, the case law is against you in

11　　　　this regard.  Mr. Theodat clearly has asserted his

12　　　　Fifth Amendment privilege.

13　　　　　　　　Mr. Feinberg, he has asserted his Fifth

14　　　　Amendment privilege; has he not?

15　　　　　　　　MR. FEINBERG:  He has.

16　　　　　　　　THE COURT:  All right, that makes him

17　　　　unavailable.  That makes him unavailable to either

18　　　　side.  I may also add that the additional

19　　　　rationale is that the grant of immunity is never

20　　　　guaranteed.

21　　　　　　　　Mr. Henning would have to seek the

22　　　　permission of every district attorney in the

23　　　　Commonwealth, along with the Attorney General.

24　　　　That's not a given.

25　　　　　　　　So the grant of immunity is never a sure

116

1        thing.  But in any event, the case law just says

2        once a witness has asserted a valid Fifth

3        Amendment privilege, which I deem that he had,

4        then he is unavailable to both sides.  Therefore,

5        neither side can rely on a missing witness

6        argument, and because you can't rely on a missing

7        witness argument, I will not be instructing on

8        that.  All right?

9                MS. SCAPICCHIO:  Just note my objection,

10       Judge.

11               THE COURT:  Duly noted.  Let's bring the

12       jury down.

13               Thank you, Mr. Feinberg, thank you for

14       your assistance.

15     (Jury present at 12:30 p.m.)

16               THE COURT:  Members of the jury, welcome

17       back.  Thank you for your patience.

18               Again, please understand that when

19       there's any delay in bringing you down here, it's

20       always for a good cause.

21               So I have been very busy since before

22       noontime dealing with issues in this case and also

23       needing to confer with the attorneys.  So we were

24       just able to bring you down now.

25               THE COURT:  Any time you're ready,

117

1      Mr. Henning.

2                    MR. HENNING:  Thank you.

3           SERGEANT DETECTIVE RICHARD DALEY, Resumed.

4                 CONTINUED DIRECT EXAMINATION

5      (BY MR. HENNING)

6      Q    Sergeant Detective Daley, when we broke off, you

7           were talking about the collection of some evidence

8           up in the apartment and some requests that you

9           made to have things processed; is that correct?

10     A    Yes.

11     Q    I'm going to approach you with a couple of other

12          items and just ask about your decision to have

13          these items collected.  Showing you Exhibit Number

14          76 and 73, can you tell me what these show?

15     A    These other doorknobs, the locksets for two doors.

16          Cone number 2 is the lockset on the first floor

17          back exterior door.

18     Q    And for the record, this is Exhibit 73, so this

19          would be the exterior door, meaning at the back of

20          the house?

21     A    Correct.

22                    MR. HENNING:  Publishing 73.

23     Q    So when you say the doorknob set, what ended up

24          happening with the doorknob set here on Exhibit

25          73?

118

1    A    We removed them from the door and submitted them
2         to the latent prints.
3    Q    And the other exhibit that you have in front of
4         you, if you can read off the exhibit number and
5         tell us what that is?
6    A    Exhibit Number 76.
7    Q    What is that?
8    A    It's another door.  This is the apartment door
9         onto the third floor of 132 that's in the open
10        position.  Also, it's identifying the lockset, the
11        doorknob, as well.  That also was removed from the
12        door, itself, and submitted to latent prints.
13             MR. HENNING:  Publishing this exhibit.
14   Q    So in order to do that, you actually had somebody
15        come to unlock or unsecure those and you take them
16        and you send them to the latent print unit?
17   A    Yes, the crime scene response unit has the tools
18        to remove the locks.
19   Q    Showing you Exhibit 91.  Do you see the top piece
20        to something there?
21   A    Yes.
22   Q    What is that?
23   A    It's a black plastic cover to the container that
24        was found on the second floor landing, and this is
25        on the third floor landing.

119

| 1 | | MR. HENNING:  Publishing this exhibit, |
| 2 | | 91. |
| 3 | Q | For the record, does Exhibit 116 show the piece |
| 4 | | that you would have collected? |
| 5 | A | Yes. |
| 6 | Q | Now, Sergeant Detective Daley, did you make any |
| 7 | | requests of items that were collected on scene to |
| 8 | | be processed? |
| 9 | A | Yes, I did. |
| 10 | Q | What request did you make? |
| 11 | A | I requested all the items in the exterior of the |
| 12 | | building, in the back stairwell, in the back yard. |
| 13 | | In addition to the two doorknobs, there were two |
| 14 | | digital scales inside the kitchen area on the |
| 15 | | floor, as well as that opaque plastic container. |
| 16 | | All of those items were forwarded at my |
| 17 | | direction to the latent print unit to be processed |
| 18 | | for fingerprints. |
| 19 | Q | Were there any results that were relevant to your |
| 20 | | investigation? |
| 21 | A | Yes. |
| 22 | Q | What were the results? |
| 23 | A | The black container that was recovered from the |
| 24 | | second floor landing had seven fingerprints |
| 25 | | belonging to the victim, Mariano Rivera, and there |

120

| | | |
|---|---|---|
| 1 | | was one fingerprint of the victim, Mario Rivera, |
| 2 | | on one of the digital scales on the kitchen floor. |
| 3 | Q | Do you mean Mr. Malave? |
| 4 | A | I apologize, Mr. Malave, Mariano Malave. |
| 5 | Q | So you said one of the prints was on a scale? |
| 6 | A | Yes, there's two digital scales on the floor |
| 7 | | behind the victim in the kitchen.  One print was |
| 8 | | taken from one of those scales, and the additional |
| 9 | | seven prints were recovered from the black |
| 10 | | container on the second floor. |
| 11 | Q | With regard to the digital scales, you've been in |
| 12 | | the drug control unit in the past, correct? |
| 13 | A | Yes. |
| 14 | Q | Are you familiar with what those scales are used |
| 15 | | for? |
| 16 | A | To weigh drugs. |
| 17 | Q | Were there any other results from the latent print |
| 18 | | unit that was relevant to your investigation? |
| 19 | A | The white Walmart plastic shopping bag that was in |
| 20 | | the trash barrel in the back that had the 16 bags |
| 21 | | of marijuana in it, the white bag, itself, was |
| 22 | | submitted to latent prints to be processed. |
| 23 | | Two prints were recovered from that |
| 24 | | plastic bag, but there was not enough detail, |
| 25 | | ridge detail on the print to make an |

121

| | | |
|---|---|---|
| 1 | | identification. |
| 2 | Q | So, essentially, nothing could be reviewed with |
| 3 | | that print? |
| 4 | A | Correct. |
| 5 | Q | Any other latent print information that was |
| 6 | | relevant to your investigation? |
| 7 | A | No. |
| 8 | Q | Did you make any submissions -- excuse me.  Did |
| 9 | | you submit those items that you described there |
| 10 | | that were collected all to latent prints? |
| 11 | A | Yes. |
| 12 | Q | So they followed the latent print processing |
| 13 | | procedure and you got those results back at some |
| 14 | | point? |
| 15 | A | Yes, I did. |
| 16 | Q | Let me ask you a question about DNA.  Why wasn't |
| 17 | | any DNA testing done on the items that you're |
| 18 | | describing? |
| 19 | A | The only item that appeared to be probative was |
| 20 | | the Starbucks cup on the second floor landing on |
| 21 | | the floor because it's the way the killer entered |
| 22 | | and exited, but we collected that just to see, |
| 23 | | just in case the investigation went in that |
| 24 | | direction, but we had no evidence that the killer |
| 25 | | arrived with a Starbucks beverage or fled with a |

122

1           Starbuck's beverage.

2    Q   And you took a swab and you said you kept it; is

3        that correct?

4    A   Yes, it's still in storage at our crime lab.

5    Q   What happens with -- if you wanted to do a

6        submission for DNA, what is the process involved

7        with that?

8    A   You'd ask them to examine the swab, itself, and

9        see if it collected enough cells to make a DNA

10       profile, and then they would ask for some

11       comparisons to the profile that they raised from

12       the cup.

13   Q   Do you have any requirements or obligations about

14       what you need to demonstrate in order to make a

15       DNA request?

16   A   I don't understand the question.

17   Q   Meaning in your department and in your unit, is

18       there any showing or demonstration you have to

19       make before you say I want to get this tested for

20       DNA?

21   A   Yes, we usually have a forensic review with a

22       criminalist from the crime lab and we go over the

23       proposed and constituents and the probative value

24       of actually doing it before they actually start

25       the process.

123

1   Q   I want to talk to you a little bit about what you

2       personally observed at the end of the search or

3       near the end of the search of 132 Hyde Park Ave.,

4       okay?

5   A   Okay.

6   Q   Did you have an opportunity near the end of the

7       search after the items had been collected to

8       actually go over and inspect the body of Mariano

9       Malave?

10  A   Yes, I did.

11  Q   Can you tell the members of the jury what, if

12      anything, you noticed and what you collected?

13  A   I reached into his pants pockets, his front left

14      front pocket was a white cell phone, in his right

15      front pocket was a folded butterfly knife in the

16      closed position.

17  Q   When you say in the closed position, can you

18      describe, was there any part of the blade showing?

19  A   No.

20  Q   And you said it was in his pocket, correct?

21  A   Correct.

22  Q   You also said that there was a cell phone.

23  A   Yes, in his front left pocket.

24  Q   Describe what you did with the cell phone.

25  A   I collected it and took it back to my office

124

1          after we cleared from the scene.

2     Q    When you say collected it, you take it, put it in

3          a bag?

4     A    I took it, put it in a bag, correct.

5     Q    Is there some procedure or thing that you do with

6          the phone to make sure that you can view it later

7          or make sure it's charged -- do you have chargers

8          back at the office in order to --

9     A    Yes.  If you can find one that's compatible, yes.

10    Q    At some point that evening when you went back to

11         the office, did you have an opportunity to try to

12         get into that phone?

13    A    I did.

14    Q    Describe what you did when you tried to get into

15         that phone?

16    A    I powered it up, it powered right up, and I was

17         able to access the device.

18    Q    What did you do on that evening in order to, or as

19         part of your review of the phone?

20    A    I went right to the text messages and last

21         incoming calls.

22    Q    What did you physically do in order to check those

23         things?

24    A    Swipe it.  It did not have a passcode, swiped it,

25         it opened up, and I went to the icons that said

125

1          messages, recent calls, call logs, call history,

2          went to those two areas in the phone.

3     Q    What were you looking for?

4     A    Last communication.  I knew it was a drug

5          murder --

6                    MS. SCAPICCHIO:  Objection, Your Honor.

7                    THE COURT:  Overruled.

8                    MS. SCAPICCHIO:  Can we be seen?

9                    THE COURT:  Sure.

10    SIDEBAR CONFERENCE:

11                   MS. SCAPICCHIO:  Judge, it's for the

12         jury to determine whether or not it's a murder.

13         That's the ultimate issue here.  I'd move to

14         strike that.  His opinion as to whether or not it

15         was a murder does not come in.

16                   THE COURT:  Overruled.  Is there really

17         going to be a contest that it's a murder?  It's

18         just who did the murder.

19                   MS. SCAPICCHIO:  Judge, I don't think he

20         gets, as a police officer, to testify to that.

21                   THE COURT:  Okay, I'll strike the last

22         answer.

23                   MS. SCAPICCHIO:  Thank you.

24                   MR. HENNING:  May I rephrase the

25         question?

126

```
 1              THE COURT:  Sure.
 2      END OF SIDEBAR CONFERENCE.
 3              THE COURT:  Members of the jury, I'm
 4          going to strike that last answer.  You're told to
 5          disregard it.
 6              But you may rephrase, Mr. Henning.
 7      Q   Sergeant Detective Daley, at that point, did you
 8          have a sense of what the nature of the incident
 9          was, meaning what the background of the incident
10          might be?
11      A   Yes.
12      Q   Based on what at that point?
13      A   My viewing of the scene, the collection of the
14          evidence, interviews at headquarters, and my
15          knowledge and background in the drug unit and my
16          years as a police officer.
17      Q   So when you were flipping through that phone, were
18          you looking for anything in particular?
19      A   Yes, last communications with the victim.
20      Q   Did you have your attention drawn to any
21          particular communications that stood out to you?
22      A   Yes.
23      Q   At that point, did you make a decision to do some
24          follow-up with the phone?
25      A   Yes.
```

127

1    Q    What was the decision?

2    A    In the next day or two, I reached out to Kevin

3         Witherspoon from our forensic unit to see if he

4         could take a snapshot of a text message that I had

5         interest in, as well as download the contact

6         information in the phone and asked for the call

7         history and the call records of the phone through

8         the telephone company.

9    Q    Now, when you were looking at the phone, you said

10        you were drawn to some particular text messages,

11        correct?

12   A    Yes.

13   Q    After you saw those particular text messages, did

14        you continue to look at the phone?

15   A    Yes.

16   Q    What did you do when you were looking through the

17        phone after you saw those first few text messages?

18   A    I saw the text message that peaked my interest and

19        I saw the number that it was calling, 857-277-

20        8189, and then I checked the recent calls into the

21        phone in another area in the phone, and the last

22        call coming in is this same number as those text

23        messages from earlier.

24   Q    Did you look at any other numbers coming in

25        through either text or phone other than the 857-

128

```
1           277-8189?
2     A     I looked at all the text messages that evening on
3           the 27th, coming and going into the phone,
4           correct.
5     Q     Did you have an opportunity, also, to look at the
6           incoming and outgoing calls that evening?
7     A     Yes.
8     Q     I'm going to show you these three in order and ask
9           you to identify them collectively, then I'm going
10          to publish them so we can read them together.
11          Looking at these three, I guess, photographs, do
12          you recognize these three?
13    A     Yes, I do.
14    Q     What do you recognize them from?
15    A     These are the text messages that I saw in the
16          victim's phone that evening and that I requested
17          from Sergeant Witherspoon to capture a screenshot
18          of them.
19                MR. HENNING:  I'd offer these in this
20          order, Your Honor.
21                MS. SCAPICCHIO:  Same objection, Judge.
22                THE COURT:  Noted, but they may be
23          marked.
24                (Exhibit Numbers 141 through 143 were
25          marked in evidence;  Screenshots of text
```

129

1           messages.)

2      Q    Showing you Exhibit 141, and if you would,

3           Sergeant Detective Daley, can you read out the

4           part of 8189, and I'm going to be "Me" the phone

5           from Mario, okay?

6      A    I'm sorry, could you repeat that again?

7      Q    Yes.  You're the blue phone number and I'm "Me".

8      A    Okay.

9      Q    Can you read it out loud?

10     A    "Yo."

11     Q    "Who told you -- excuse me -- "Yo."

12     A    "Yo, what's going on, Mario.  Some boys of mine in

13          JP let me know that you move weight of dank, and

14          I'm looking to cop if the price is right."

15     Q    And your next response is question mark.

16     A    Question mark -- I'm sorry, I have a question mark

17          then.

18     Q    "Who's this?"

19     A    "My name's Jonathan."

20     Q    "Who told you to hit me up?"

21     A    "My boy Ian and some other boys in JP that said

22          you had loud."

23     Q    "Yeah, what do you want to do?"

24     A    "Can you do a P for less than 44 and what kind of

25          bud is it?"

130

```
 1    Q    "It's going to be just about that, but it's some
 2         good sour."
 3    A    "Word, I was hoping you would have some sour.
 4         I'm in class right now, but later on today      I
 5         definitely want to grab that."
 6    Q    "Aight."
 7    A    "Where do you want me to meet you?"
 8    Q    In that last text, do you see the time here of
 9         11:25?
10    A    11:25 a.m.
11    Q    So I'm going to ask to go back to that first one
12         and ask you some questions about it, okay?
13    A    Yes, sir.
14              MR. HENNING:  This is, for the record,
15         Exhibit 141.
16    Q    First, in this first major section here, do you
17         see in the middle of it, there's a term, it says,
18         "I heard you move weight of dank."  Do you
19         understand or have any understanding of what
20         weight of dank might mean?
21              MS. SCAPICCHIO:  Objection, Your Honor.
22              THE COURT:  I'll allow it with a better
23         foundation.
24              MR. HENNING:  Sure.
25              MS. SCAPICCHIO:  Can we be seen, Judge?
```

131

1    SIDEBAR CONFERENCE:

2              MS. SCAPICCHIO:  Judge, if he's going to

3         testify as an expert in terms of interpreting drug

4         terms, they didn't notify me that that's what he

5         was testifying to in terms of expertise.

6              MR. HENNING:  I don't need an expert to

7         interpret if I can lay a foundation.  He's already

8         laid it, but I'll do it again.  He was a detective

9         in the drug unit, I believe he said he was eight

10         years in the drug unit.  So I can ask if in his

11         training and experience, he's ever used that term

12         used.  It doesn't require expertise.

13              THE COURT:  He's being used as more or

14         less an interpreter.  I'm going to allow it.  I'll

15         note your objection.

16              MS. SCAPICCHIO:  Thank you.

17    END OF SIDEBAR CONFERENCE.

18    Q    Sir, that section, "some boys of mine in JP let me

19         know you move weight of dank."  How long were you

20         in the drug control unit?

21    A    Seven years.

22    Q    And you've been a police officer 32 years.

23    A    Yes.

24    Q    During the time you've been on the job, have you

25         ever heard those terms used, weight and dank?

132

```
 1    A    Yes.
 2    Q    What does it refer to?
 3    A    Marijuana.
 4    Q    And in terms of weight, what does it mean for a
 5         person to move weight?
 6    A    More than a dime bag, a large amount.
 7              MS. SCAPICCHIO:  Objection, Your Honor.
 8              THE COURT:  Overruled.
 9    Q    This second one here in the middle, "My boy Ian
10         and some other boys in JP that said you had loud."
11              Have you ever heard during your time is
12         a police officer the term loud used?
13    A    Yes.
14    Q    What does loud mean?
15    A    Quality marijuana.
16    Q    And then down at the bottom here, "Can you do a P
17         for less than 44 and what kind of bud is it?"
18         First, what is the term P for less than 44
19         referring to?
20    A    A pound for less than 4400.
21    Q    Based on your --
22    A    Training and experience.
23    Q    Based on your training and experience back then,
24         was this, roughly speaking, the market rate, so to
25         speak, for marijuana in a pound?
```

133

```
 1              MS. SCAPICCHIO:  Objection, Your Honor.
 2              THE COURT:  Overruled.
 3    A    I don't know.
 4    Q    Down to this part, "What kind of bud is it," what
 5         is that referring to?
 6    A    Bud is slang for marijuana.
 7    Q    Third page, this one from Mario's cell phone,
 8         "It's going to be just about that, but it's some
 9         good sour."  What is good sour referring to?
10    A    Another slang for marijuana.
11    Q    And this one, "I was hoping you would have some
12         sour."  It appears based on the context to be
13         referring to the same thing?
14    A    Yes.
15    Q    And this last text from 8189 saying, "Where do you
16         want me to meet you," again, that's 11:25 a.m.,
17         correct?
18    A    Yes.
19    Q    What else did you do with the information that you
20         had gotten from Mr. Malave's phone?  Meaning the
21         phone number that you were dealing with.
22    A    We got the call records.
23    Q    So with regard to call records, how is it that you
24         go about getting call records?
25    A    I have to send a subpoena through your office, the
```

134

1          DA's office, to the compliance division of the
2          phone company.
3      Q   So did you have that done for the 857-277-8189
4          number?
5      A   Yes.
6      Q   And at some point a little bit later in the
7          investigation, did you do the same thing for the
8          Malave cell phone, the 266-0950?
9      A   Yes.
10     Q   I want to talk about the subscriber information
11         for a minute.  At some point in the beginning part
12         of May of 2012, did you receive back some
13         information from the T-Mobile subscriber request
14         that you had sent?
15     A   Yes.
16     Q   Showing you Exhibit 121, have you had a chance to
17         look at that?
18     A   Yes.
19     Q   And this is the subscriber sheet that came back
20         from T-Mobile after the phone number information
21         was requested for 277-8189?
22     A   Yes.
23     Q   Who did it list as the registered owner of that
24         cell phone?
25     A   Catherine Reddicks.

135

1    Q    Was there an address given there?

2    A    116 Millet Street in Dorchester, Mass.

3    Q    Why was that information important to you in your

4         investigation?

5    A    Because that's the same address that the car that

6         we identified leaving the scene, it's the same

7         address of the car to the phone number calling

8         Mr. Malave at the time of his death.

9    Q    So the person who was the registered owner of the

10        car was Ms. Reddicks?

11   A    Yes, Catherine Reddicks.

12   Q    And do you remember what the registered address

13        was for the car registration?

14   A    116 Millet Street.

15   Q    Up until that time, had you had any piece of

16        information that connected 857-277-8189 to the

17        6738TV license plate?

18   A    No, that was the first connection.

19   Q    I want to turn your attention to now the next step

20        after the search warrant.  Did you have an

21        opportunity to conduct some canvassing in the area

22        around 132 Hyde Park Ave.?

23   A    Yes, the next afternoon, myself and Detective

24        Callahan went back up to the area and went door

25        to door in the houses to the left and right of

136

1          132 Hyde Park Ave., the three houses in the back

2          of the house up on the hill, as well as there's

3          several houses up on Walk Hill Street towards the

4          pizza shop.

5     Q    Did you also have an opportunity to make some

6          requests for video?

7     A    Yes.

8     Q    Who did you request video from?

9     A    The MBTA Police.

10    Q    Do you know the detective that assisted you

11         eventually with that?

12    A    Detective Dolloff.

13    Q    And did you also request video from a different

14         location?

15    A    The Dunkin' Donuts at Walk Hill and Hyde Park Ave.

16    Q    Have you had a chance to take a look at the

17         contents of this thumb drive?

18    A    Yes.

19    Q    Does this contain two of the cameras from the

20         Dunkin' Donuts video?

21    A    Yes.

22    Q    Is it fair to say that there's probably 10 cameras

23         inside, but there's two outside that show the two

24         sides of Dunkin' Donuts?

25    A    That's fair to say.

137

1           MR. HENNING:  I'd offer this thumb drive

2      as the next exhibit.

3           THE COURT:  Any objection?

4           MS. SCAPICCHIO:  No objection.

5           THE COURT:  So marked.

6           (Exhibit Number 144 was marked in

7      evidence; Thumb drive containing Dunkin Donuts

8      surveillance video.)

9   Q   Sergeant Detective Daley, while we're here, I just

10      want to orient the jurors using this example,

11      excuse me, this exhibit.  Do you see inside of

12      this, there's two cameras, it lists camera 10 and

13      camera 11?

14  A   Yes, I do.

15  Q   Opening up camera 10, I'm just going to ask you to

16      describe the perspective for the members of the

17      jury.  Making this a full-screen, sir, do you see

18      something that's familiar in this area?

19  A   Yes.

20  Q   What is this gray spot in the middle?

21  A   That's the parking lot of the Dunkin' Donuts.

22  Q   And the Dunkin' Donuts store would actually be to

23      our right?

24  A   Yes.

25  Q   What is this place up here?

138

1    A    That's the pizza shop on Walk Hill Street.

2    Q    And down to the left, would that be Hyde Park

3         Avenue?

4    A    Yes, it is.

5    Q    This street here that goes right to left in front

6         of the jurors, what street is that?

7    A    Walk Hill Street.

8    Q    And you see a timestamp down at the bottom here?

9    A    Yes, I do.

10   Q    Listing April 27, 2012?

11   A    Yes.

12   Q    Going to the camera 11, same parking lot?

13   A    Yes, it is.

14   Q    What street are we looking at here in this left

15        angle?

16   A    That's looking in the opposite direction from the

17        previous video camera.  Hyde Park Ave. is to your

18        left at an angle, and that's the parking lot going

19        out to Hyde Park Ave.

20   Q    So Hyde Park Avenue would be this street here?

21   A    Yes, it is.

22   Q    And if you follow this street from the bottom

23        left-hand corner of the image to the top of the

24        image, is that heading toward or away from the

25        Forest Hills T Station?

139

1    A    Toward.

2    Q    Sir, did you have an opportunity to review the

3         Dunkin' Donuts video that we just put in as the

4         last exhibit?

5    A    Yes.

6    Q    And when you reviewed that, did you ever look

7         during the time frame that's captured on the video

8         for the blue 6738TV Ford Escort that you had seen?

9    A    I did.

10   Q    And did you look at it from the -- or did you look

11        for it from those two angles at the Dunkin' Donuts

12        at Walk Hill and Hyde Park Ave.?

13   A    Yes.

14   Q    At any time during the video, does that blue Ford

15        Escort pass by the Dunkin' Donuts on either side?

16   A    I did not see it.

17   Q    Did you also have an opportunity to look at some

18        video that had been retrieved by the MBTA?

19   A    Yes.

20   Q    Sir, turning on this video to the front of the

21        MBTA station at Forest Hills, did you have a

22        chance at some point early in the investigation to

23        go through this, as well?

24   A    Yes.

25   Q    I'm going to zoom in on the time here at 6:12 PM.

140

1          Now, sir, at this point, had you personally

2          observed the car belonging to Mrs. Reddicks?

3     A    Yes.

4     Q    How many times had you seen it around the time you

5          got the video if you remember?

6     A    Just twice, that night I rolled by on the way

7          home.

8     Q    Okay, so those two times that you went by.

9     A    Yes.

10    Q    And during this time, in reviewing this MBTA

11         video, did it help you focus your time frame

12         regarding the investigation?

13    A    Yes.

14    Q    In what way?  How did it help you focus that?

15    A    Because the time that is appearing in the video

16         closely corresponds to the 911 call at 132 Hyde

17         Park Ave.

18    Q    And with regard to the exiting or the departure of

19         this car, do you remember looking at the video at

20         approximately 6:24 -- excuse me, 6:22 on the

21         timestamp?

22    A    Yes.

23    Q    And during the time you retrieved the video, did

24         you have a chance to look at the front of it and

25         also speak to the detective that had retrieved it?

141

1   A   I just had looked at the front of the disk and

2       made an adjustment of two and a half minutes.

3   Q   And so the two and a half minute adjustment that

4       we're looking at here -- I apologize.  This two

5       and a half minute time adjustment from 6:22:02,

6       this would be approximately 6:24:30 something,

7       correct?

8   A   Yes.

9   Q   To remind the jurors, what was the time of the 911

10      telephone call?

11  A   6:27.

12  Q   So this is approximately, according to the

13      timestamp differential there, that would be about

14      two and a half minutes off.

15  A   Yes.

16  Q   At some point after retrieving this initial

17      information and making the connection between the

18      phone and the car, did you go and do any

19      additional surveillance or review for that blue

20      car?

21  A   Yes, I went on May 4th and followed that car from

22      116 Millet Street.

23  Q   Who was driving the car when you followed it?

24  A   Catherine Reddicks.

25  Q   Can you describe just briefly where you followed

142

```
1           it?
2     A     I followed it from her house on Millet Street to
3           the area through Brookline, and I lost her in
4           Cleveland Circle by Brookline/Brighton line.
5     Q     Did you make any observations of the rear window
6           area?
7     A     Yes, and I took a photograph of it.
8     Q     We'll get to that photo probably just after the
9           lunch break, but with regard to the observations,
10          did you notice anything about the back window of
11          that blue Escort?
12    A     It was clear glass, you could see from the front
13          to the -- from the back to the front windshield.
14                THE COURT:  Mr. Henning, it's about one
15          o'clock.
16                MR. HENNING:  Yes, Your Honor.
17                THE COURT:  Thank you, Sergeant
18          Detective, you can step down.
19                Members of the jury, I know you may not
20          have been on trial for the past two hours, but we
21          have been busy here.  Everyone is entitled to that
22          lunch hour, we're going to take it now.  Please be
23          back by two o'clock to resume the trial.
24    (Luncheon recess taken at 1:00 p.m.)
25                A F T E R N O O N   S E S S I O N
```

143

1    (Court in session at 2:10 p.m.)

2    (Defendant present.)

3    (Jury present.)

4              THE COURT:  Members of the jury, welcome

5         back, and may I just make an editorial comment

6         about our Clerk, Mr. Kalell.  I daresay, of the

7         16 sessions in this building, this is the only one

8         that hands out afternoon peppermints as far as I'm

9         aware.

10             MS. SCAPICCHIO:  And morning.

11             THE COURT:  And morning.  Morning and

12        afternoon peppermints.  You're in a very good

13        session here.

14             Any time you're ready, Mr. Henning.

15             MR. HENNING:  Thank you very much, Your

16        Honor.

17      SERGEANT DETECTIVE RICHARD DALEY, Resumed.

18             CONTINUED DIRECT EXAMINATION

19    (BY MR. HENNING)

20    Q    Good afternoon, Detective.

21    A    Good afternoon.

22    Q    I want to talk to you about the days around

23        May 10th, 2012.  So roughly, two weeks after the

24        shooting.  On May 10th, 2012, were some search

25        warrants executed in this case?

144

1    A    Yes.

2    Q    Was the affiant of the search warrant one of the

3         detectives in your squad?

4    A    Detective John Callahan.

5    Q    And what were those three search warrants that

6         were done?

7              MS. SCAPICCHIO:  Objection.  May we be

8         seen?

9    SIDEBAR CONFERENCE:

10             THE COURT:  I didn't hear the end of

11        your question.  What is the search warrant about,

12        for what?

13             MR. HENNING:  For the guy's house, car,

14        and the cell tower records.

15             MS. SCAPICCHIO:  Judge, I'm just making

16        sure that they don't know that my guy was a target

17        and at some point, some judge signed off on it.

18        That's all I'm objecting to.

19             MR. HENNING:  Well, I'm not going into

20        it more, I just need to be able to establish that

21        they somehow had legal authority to get in, but

22        I'm not going to ask any more questions about the

23        search warrant, I'm just saying did you search his

24        house.

25             MS. SCAPICCHIO:  Okay, nothing about

145

1          judges signing off?

2                    MR. HENNING:  No.

3                    MS. SCAPICCHIO:  Okay, just want to make

4          sure.

5                    THE COURT:  Just that they had the right

6          to go into your client's home and car.

7                    MR. HENNING:  That they didn't raid the

8          house.

9                    MS. SCAPICCHIO: That's fine.

10    END OF SIDEBAR CONFERENCE.

11    Q    So, Detective, those three search warrants on the

12         10th, what were they search warrants for?

13    A    The residence of 116 Millet Street, the motor

14         vehicle, the blue Ford Escort station wagon, Mass.

15         regulation. 6738TV, and the cell phone, 617-857-

16         8189.

17    Q    Just to clarify those numbers, the 857-277-8189?

18    A    277-8189, I'm sorry.

19    Q    And when you say a search warrant for that, do you

20         need a search warrant in order to obtain cell

21         tower record information?

22    A    Yes, you need a search warrant to obtain cell

23         tower.

24    Q    Where do you send that search warrant in order to

25         have the information sent back?

146

1    A    To T-Mobile.

2    Q    Now, with regard to 116 Millet Street, who

3         searched the house?

4    A    Myself and Detective Callahan and a couple of

5         other detectives.

6    Q    Was anything taken that was tested or relevant to

7         your investigation?

8    A    Two items were seized, two black jackets with

9         small bubbles on them from the front foyer hallway

10        area of 116 Millet Street.

11   Q    And why did you seize those?

12   A    They closely fit the description that Leanne

13        Parker gave.

14             MS. SCAPICCHIO:  Objection again, Your

15        Honor.

16             THE COURT:  I'm going to allow it.

17             MS. SCAPICCHIO:  Limiting instruction?

18             THE COURT:  Again, members of the jury,

19        this piece of information about what was allegedly

20        found at the defendant's residence is being

21        offered for a limited purpose, specifically to

22        explain to you what steps the police took in this

23        investigation and why they took them.

24   Q    Did you have those two items tested for gunshot

25        residue?

147

1    A    Yes.

2    Q    And if you can briefly, not in any level of

3         detail, but briefly explain what gunshot residue

4         testing is?

5    A    Gunshot residue is the chemical explosion that

6         emanates from a firearm when it's shot.  There's a

7         small cloud of chemicals that can get on clothing,

8         hands, or near somebody.

9              To capture that, there's a small -- we

10        have our crime lab will come out, we submit it to

11        our crime lab, and it's like a little eraser head

12        with a sticky pad on it and they go around the

13        collars of each, the sleeves -- the cuffs, I'm

14        sorry, the cuffs of each sleeve for the bullet

15        jackets and they're collected, and then they were

16        sent to the state police crime lab for testing.

17   Q    Did you know that those jackets or either of those

18        jackets was, in fact, a jacket that had been worn

19        by Mr. Reddicks on the 27th?

20   A    I don't know.

21   Q    When it was sent off, were there any results that

22        came back?

23   A    It came back negative for gunshot residue.

24   Q    And how many weeks after this incident had you

25        seized those jackets?  From the 27th to the 10th,

148

```
 1          approximately?
 2     A    Yes, 13 days.
 3     Q    With regard to the search warrant of the blue
 4          motor vehicle, is that where the photographs were
 5          taken that we've seen and have been entered into
 6          evidence so far?
 7     A    Yes, the photographs were taken in the back of
 8          headquarters after we seized it and towed it back
 9          to headquarters.
10     Q    And at some point, you said you got the cell tower
11          data information back, correct?
12     A    Yes.
13     Q    When you got that back, are you able to look at it
14          and do any kind of rudimentary review of what it
15          means?
16     A    Yes.  Each call has a line that has many numbers
17          on it, it's a matrix, but it also gives latitude
18          and longitude of where that call is made.  I was
19          able to enter that information into Google Maps
20          and get a rudimentary idea of the location on the
21          map where that latitude and longitude met.
22               MS. SCAPICCHIO:  Judge, I just object to
23          where that call is made.  That wasn't any of the
24          testimony.  I'd move to strike that.
25               THE COURT:  Objection is overruled, the
```

149

1    motion is denied.

2  Q   So, sir, you also mentioned on that date that it

3      was three total search warrants and that those are

4      being executed on the same day, correct?

5  A   Yes.

6  Q   Can you talk to the members of the jury a little

7      bit about how you and Detective Callahan went

8      about doing that and who you met on that day?

9  A   I went to 116 Millet Street and sat and saw the

10     car in the driveway.  Mrs. Reddicks again got in

11     the blue station wagon and traveled to the

12     Brighton area.

13          Detective Callahan had obtained the

14     search warrants.  He met me and we followed Ms.

15     Reddicks for a short period of time in Brighton.

16     At one point, she was out of her car on Priscilla

17     Road.

18          We approached her, identified ourselves,

19     showed her the search warrant and explained what

20     was going on.  As a result of  that, I called a

21     tow truck, a department tow, seized her car in

22     Brighton, and towed it back to headquarters.

23     Detective Callahan gave her a ride back to Millet

24     Street where I followed him, and then we went back

25     and executed the search warrant on Millet Street.

150

1    Q    At some point on the 10th, did you have any

2         encounter or did you have any communication with

3         the defendant's mother?

4    A    Yes, she was home at the time of the search

5         warrant.  Detective Callahan spoke to her, and as

6         a result of a conversation, we asked her, we'd

7         like to speak to Charles.

8              After we finished the search warrant and

9         made some arrangements, and  Mrs. Reddicks

10        brought Charles to headquarters later on that day.

11   Q    And during that time, did you engage in an

12        interview with Mr. Reddicks?

13   A    We did.

14   Q    I'm going to cover that in a little bit, but that

15        took place on May 10th; is that correct?

16   A    Yes.

17   Q    At some point after May 10th, did you also follow

18        up on some telephone information in the records of

19        857-277-8189?

20   A    Yes.

21   Q    Did any of that information lead to -- let me

22        rephrase that.  How did you come about contacting

23        or finding out who Ian Follette is?

24   A    From the call records of 8189, we went back to see

25        who Mr. Reddicks was speaking to that afternoon.

151

1      MS. SCAPICCHIO:  Objection as to
2      Mr. Reddicks.  They don't know who had the phone,
3      Judge.
4          THE COURT:  Objection is overruled.
5  Q   So you said you went back to see who that phone
6      number was speaking to.
7  A   Correct, in the phone of Mr. Reddicks.  We did a
8      reverse lookup on the phone that you can do on any
9      open website, put the phone number in, and it came
10     back to a Doug Follette.
11 Q   What did you do with the information on Doug
12     Follette?
13 A   We put that information into the Registry of Motor
14     Vehicles database and saw that a Doug Follette
15     lived in Jamaica Plain on 31 Seaverns Ave.  Myself
16     and Detective Callahan went out to 31 Seaverns
17     Ave., rang the doorbell.
18          Mr. Doug Follette came to the door.  We
19     identified ourselves and we asked, does anyone
20     named Ian live here, and he said, yeah, that's my
21     son, and within 30 seconds, Ian comes walking in
22     the door and he says, here he is now.  So we
23     introduced ourselves, explained what was going on,
24     and he gave us a brief statement.
25 Q   And later on during the course of the

152

```
1          investigation, did you do follow-up at the grand
2          jury with Mr. Follette?
3    A     Yes.
4    Q     So this is approximately May 18th, 2012; is that
5          correct?  The interview happens before --
6    A     16th, we spoke to Mr. Follette on the 16th.
7    Q     Okay, and within a couple of days, did you speak
8          with members of the Suffolk County District
9          Attorney's Office?
10   A     Yes.
11   Q     And what did you do at that point?
12   A     After I spoke to my supervisors and spoke to the
13         members of the Suffolk County DA's office,
14         I sought an arrest warrant for murder against
15         Mr. Charles Reddicks?
16   Q     And what was that based off of?
17                   MS. SCAPICCHIO:  Objection, Your Honor.
18                   THE COURT:  I'm sorry, what was the
19         question?
20   Q     What was the application for the warrant based off
21         of?
22                   THE COURT:  I'll allow it.
23   A     The interview with Ms. Parker, the videos, the
24         cell phone, the cell towers, and the information
25         of the cell towers putting that phone --
```

153

```
1    Q    The information of the cell towers.

2    A    Correct.

3                    THE COURT:  Members of the jury,

4           I remind you that all of the conclusions that

5           you've been hearing from Sergeant Detective Daley

6           are offered for you to evaluate, if you accept or

7           reject them in whole or in part, as to what the

8           officers did in furthering this investigation and

9           why they took them.  What Mr. Reddicks or any of

10          the other people involved in this alleged incident

11          may or may not have done is for you to decide.

12                   MS. SCAPICCHIO:  Judge, can we be seen?

13                   THE COURT:  Sure.

14   SIDEBAR CONFERENCE:

15                   MS. SCAPICCHIO:  Judge, I'm going to

16          ask whether or not the Court would be willing to

17          go further than what you said in terms of

18          identification.

19                   One of the first things he said was the

20          reason that he issued the arrest warrant was based

21          on Leanne Parker's description.  And again, my

22          concern is that it's an identification, and I know

23          you've ruled on it, Judge, but I want to know if

24          the Court is willing to tell the jury that that

25          doesn't mean Leanne Parker identified him or that
```

154

1          there was any identification of him.

2                    THE COURT:  Mr. Henning?

3                    MR. HENNING:  I think actually doing

4          that is going to be drawing more attention to it.

5          I understand Counsel's request, but the witness

6          testified and it was very obvious that she did not

7          to any ID procedure.

8                    THE COURT:  I can say that, you know,

9          the Commonwealth is not vouching for any

10         description of Mr. Reddicks.  It's being offered

11         for the limited purpose of explaining, once again,

12         the steps the police allegedly took in furthering

13         their investigation.

14                   MS. SCAPICCHIO:  I'm looking for in

15         instruction that says that Ms. Parker never made

16         an identification of my client.

17                   THE COURT:  She merely made a

18         description of a person.

19                   MS. SCAPICCHIO:  Right.  But the idea

20         now that they have said, and I think I have to

21         move for a mistrial on this, as well, the idea

22         that they've now said in front of this jury that

23         they issued an arrest warrant based on her

24         description is an identification, Judge.

25                   THE COURT:  I respectfully disagree,

155

1          once again.  Mr. Henning?

2                    MR. HENNING:  I don't think that an

3          instruction pointing out an absence of a piece of

4          evidence from our case is appropriate.  She

5          testified.

6                    No instruction was needed then  because

7          she didn't do an identification.  More

8          importantly, he listed six things.  One of them

9          was the description because he had to establish

10         how it was that he came upon Mr. Reddicks as a

11         suspect.

12                   If he didn't say that, we would be

13         looking at jumping from something to something

14         with a missing piece, as Counsel has a very

15         effectively done in cross-examination.  The nature

16         of the investigation is at issue, so he has to be

17         able to establish the steps he took.

18                   THE COURT:  I can say to the jury, if

19         you want, Ms. Scapicchio, that anything that

20         they've learned from witnesses in this case,

21         including but not limited to descriptions, is not

22         for them to say -- I'm putting this terribly.

23         They cannot vouch for the truthfulness of any

24         evidence that they receive from any witnesses,

25         including but not limited to descriptions.  It is

156

1        for them to decide the weight and credibility of

2        those witnesses.

3                    MS. SCAPICCHIO:  With respect to

4        identification.

5                    THE COURT:  I'm not mentioning the word

6        identification.  You keep on wanting to make me

7        say that.  It's not, it's a description, and they

8        are entitled to explain how they went further in

9        the investigation based on Ms. Parker's

10        description.  If you want me to say that they're

11        not vouching for any witness here --

12                    MS. SCAPICCHIO:  They can't.

13                    THE COURT:  What do you want me to say

14        to them, Ms. Scapicchio?

15                    MS. SCAPICCHIO:  I want you to tell them

16        that the fact that they made an arrest based on

17        their investigation is in no way vouching for the

18        credibility of any of the witnesses in this case.

19        Because they basically vouched for the credibility

20        of all the witnesses.

21                    THE COURT:  That is not true,

22        Ms. Scapicchio, that's a far cry from vouching.

23        They've been explaining how they arrived at the

24        arrest of your client, that happens in every

25        criminal case.

157

1          MS. SCAPICCHIO:  At a minimum, it's
2      vouching for Leanne Parker.
3          THE COURT:  It is not.
4          MS. SCAPICCHIO:  It is.  Based on her
5      description, they issued his arrest warrant.
6          THE COURT:  It's a far cry from
7      vouching.  Anything else?  What do you want me to
8      say to them?
9          MS. SCAPICCHIO:  I just told you, Judge.
10          THE COURT:  Well if that's what you want
11      me to say to them, I'm not going to say that.
12          MS. SCAPICCHIO:  So what are you willing
13      to say to them then?
14          THE COURT:  What I said to you, that
15      just because they have, any of these officers have
16      testified to information that they received from
17      witnesses, including but not limited to
18      descriptions, is not to say that they are vouching
19      for the credibility of those witnesses.
20          MS. SCAPICCHIO:  If that's all I can
21      get, Judge, then I'll take it.
22          THE COURT:  That they're limited to --
23      the evidence is being offered for the limited
24      purposes of explaining to the jury the steps they
25      took in their investigation.

158

1          MS. SCAPICCHIO:  If that's what I get,

2      if that's all I can get, then I will take it,

3      Judge, but would you just rule on my motion for a

4      mistrial/

5          THE COURT:  Denied.

6          MS. SCAPICCHIO:  Note my objection.

7  END OF SIDEBAR CONFERENCE.

8          THE COURT:  Members of the jury, I just

9      want to make it clear to you, any of the testimony

10     of Sergeant Detective Daley or anyone testifying

11     for the Commonwealth in that regard, again, if you

12     have heard evidence relative to any information

13     from witnesses in this case, including but not

14     limited to descriptions, again, the police

15     officers cannot vouch for the credibility of those

16     witnesses.  The Commonwealth can't vouch for the

17     credibility of those witnesses.

18          The assessment of credibility is totally

19     in your hands.  All right?  It's being offered for

20     the limited purpose, once again, of explaining to

21     you, if you accept this evidence, of the steps

22     that the police took in this investigation and the

23     reasons for why they took those steps.

24  Q   Detective, one of the things I forgot to ask you

25     earlier is whether or not you actually kept

159

1        custody of Mariano Malave's phone.

2    A    Yes, I did.

3    Q    I'm going to approach you and ask you if you can

4         take a look at this.  Is that the phone?

5    A    Yes.

6    Q    And is this able to be powered up and you can

7         actually review it, correct?

8    A    Yes.

9              MR. HENNING:  I'd offer this as the next

10        exhibit.

11             MS. SCAPICCHIO:  No objection, Judge.

12             THE COURT:  So marked.

13             (Exhibit Number 145 was marked in

14        evidence; Cell phone of Mariano Malave.)

15   Q    Sergeant Detective Daley, you said that you

16        applied for an arrest warrant for Charles

17        Reddicks, correct?

18   A    Yes.

19   Q    And was Mr. Reddicks, in fact, arrested?

20   A    I'm sorry, I didn't hear you.

21   Q    Was Mr. Reddicks, in fact, arrested?

22   A    Yes, he was.

23   Q    On what day was that?

24   A    May 18th.

25   Q    Were some photographs taken of Mr. Reddicks on

160

1        May 18th?

2    A    Yes.

3    Q    Approaching you with these four photographs,

4         I just ask you to take a look at those.  Do those

5         four photos show the way that Mr. Reddicks

6         appeared on May 18th when he was arrested?

7    A    Yes.

8              MR. HENNING:  I'd offer these as the

9         next four exhibits.

10             THE COURT:  Any objection?

11             MS. SCAPICCHIO:  No objection, Your

12        Honor.

13             THE COURT:  So marked.

14             (Exhibit Numbers 146 through 149 were

15        marked in evidence; Photographs of Mr. Reddicks.)

16             MR. HENNING:  Publishing Exhibit 148.

17   Q    Did you have an opportunity on May 18th to make

18        physical observations of Mr. Reddicks?

19   A    Yes.

20   Q    Did you also do that on May 10th when you

21        conducted the interview of Mr. Reddicks?

22   A    Yes.

23   Q    Does he appear the same today as he did back in

24        May of 2012?

25   A    No.

161

1    Q    How would you say he is different in appearance
2         today than he was back in May of 2012?
3    A    He's bigger physically, more poundage, and his
4         dreadlocks are longer.
5    Q    Sir, did you also take a cellular telephone from
6         Mr. Reddicks on the 18th of May?
7    A    Yes.
8    Q    And it's previously been entered into evidence
9         through Sergeant Detective Witherspoon, but as
10        part of that, have you had a chance to review the
11        address book of that cell phone?
12   A    Yes.
13   Q    Have you also had a chance to review the address
14        book of a different cell phone of Mr. Reddicks
15        from December of 2011?
16   A    Yes.
17   Q    Approaching you with this item, four pages.  Are
18        these the calls records from 12 noon on the 27th
19        of April, 2012 for 857-277-8189?
20   A    Yes, they are.
21   Q    And what has been added along the right-hand
22        column, the far right-hand side?
23   A    The contact list of both the 2011 phone and the
24        2012 phone have been added and assigned to the
25        numbers that were in the contact list.

162

1    Q    And in addition to that, is there a phone number

2         listed here as 857-266-0950?

3    A    Yes.

4    Q    And next to that number, what name has been

5         entered?

6    A    Mariano Malave.

7    Q    And lastly, is there a phone number here of 617-

8         416-7751?

9    A    Yes.

10   Q    And what name has been added for that?

11   A    Ian.

12             MR. HENNING:  I'm just going to publish,

13        after offering this as the next exhibit.

14             MS. SCAPICCHIO:  Same objection, Judge.

15             THE COURT:  Noted.  That may be marked.

16             (Exhibit Number 150 was marked in

17        evidence; Cell phone records from 4/27/12.)

18             MR. HENNING:  Publishing 150, referring

19        to page number 2.

20   Q    Sir, the right-hand column here with the names, is

21        this essentially the summary of the address book

22        information you just described?

23   A    Yes.

24   Q    You spoke earlier about an interview that was

25        conducted with Mr. Reddicks on May 10th, 2012; is

163

1          that correct?

2    A    Yes.

3    Q    Who conducted the interview with you?

4    A    Detective John Callahan.

5    Q    So what I'd like to do for the next few moments is

6          to speak about that interview, and we'll start

7          with just asking, where did the interview take

8          place?

9    A    At the Boston Police Headquarters, homicide unit,

10         in an interview room that we have in our office.

11   Q    What do you do at the start of the interview?

12   A    After introductions, we provide Miranda.

13   Q    Is this the Miranda sheet from that interview?

14   A    Yes.

15   Q    And did Mr. Reddicks sign that and put his

16         initials next to it?

17   A    He did.

18   Q    What's the date on the bottom?

19   A    5/10/2012.

20              MR. HENNING:  I'd offer this as the next

21         exhibit.

22              THE COURT:  Any objection?

23              MS. SCAPICCHIO:  No, Your Honor.

24              THE COURT:  So marked.

25              (Exhibit Number 151 was marked in

164

1          evidence; Miranda warning signed by Mr. Reddicks,

2          5/10/12.)

3    Q   Sir, during that interview, you and Detective

4          Callahan asked some questions of Mr. Reddicks and

5          talked to him for a while; is that correct?

6    A   Yes.

7    Q   Approximately how long did that interview last?

8    A   Two hours.

9    Q   First, I want to start with some biographical

10         information.  Is it fair to say you and I have

11         jotted some notes down here regarding the time

12         sequence in this interview?

13    A   Yes, we have.

14    Q   For biographical information, did you ask

15         Mr. Reddicks where he lived?

16    A   Yes, I did, and he responded 116 Millet Street.

17    Q   Is that the address that you had known Catherine

18         Reddicks's grandmother to live at, as well?

19    A   Yes.

20    Q   Did you ask him during the interview to describe

21         how he would call or describe his own hairstyle?

22    A   He described them as dreads.

23    Q   Did you ask him during that interview whether or

24         not he had been involved at all in the sale of

25         marijuana?

165

1    A    Yes, I did, or we did, and he said he used to sell

2         marijuana, but he stopped, and he used to get it

3         up in Eggleston Square.

4    Q    Did you talk to him about names of people that had

5         come up in the investigation up to that point?

6    A    Yes.

7    Q    And do you recall from the text messages that

8         we've looked at earlier that the name came up,

9         Jonathan?

10   A    Yes.

11   Q    Did you ask Mr. Reddicks if he knew a Jonathan?

12   A    I did, and he shook his head no.

13   Q    Did you ask Mr. Reddicks if he knew somebody named

14        Ian?

15   A    I did.  He paused, and he said yes, I know an Ian.

16   Q    Did you follow up with any questions?

17   A    Yes, I asked him what's his last name.  He said,

18        huh?  I said what's his last name, I don't know.

19        Where is Ian from?  He said, huh?  Where is Ian

20        from?  He said, I don't know where he's from.

21   Q    Did you ask him when the last time he had seen Ian

22        was?

23   A    He did not know when the last time he saw him.

24   Q    Did you ask him about some background information

25        regarding the address that you learned of

166

1          14 Westminster Avenue?

2     A    Yes.

3     Q    Tell us what Mr. Reddicks said about that address

4          and about who he knew there?

5     A    He said he goes over there and hangs over there at

6          his aunt's house with his two cousins, John Hyman,

7          Javeon Hyman, and his aunt, Terri Hyman.

8     Q    Did he say how he would usually get over to that

9          address?

10    A    He would drive over.

11    Q    Did you ask him where he would park when he would

12         drive over there?

13    A    A parking lot in the back of the address, he said

14         he'd park.

15    Q    Did you ask him about the race or ethnicity of

16         John Hyman and Javeon Hyman?

17    A    Yes.

18    Q    And what did he say?

19    A    They're black males.

20    Q    Did you ask him some questions about the area

21         around Forest Hills?

22    A    Yes.

23    Q    So I'd like to ask you first, did you ask him if

24         he had been in the area of Forest Hills on the

25         27th of April, 2012?

167

1    A    We did ask him that, and he said, no, I don't

2         think so.

3    Q    Did you ask him if he had any familiarity or had

4         previously gone to the area around Forest Hills?

5    A    Yes, he said, he told us that he used to go to

6         Forest Hills to cop tobacco at a small variety

7         store down there, but now that he's 18, he has a

8         license, he doesn't go down there anymore, he cops

9         his tobacco in Dorchester and Eggleston.

10   Q    Now, during this interview, did you ask him at

11        all, just point blank put it on him, if he had

12        committed this crime?

13   A    Yes.

14   Q    Did you ask him that several times?

15   A    Yes.

16   Q    And during the times you asked him that, how did

17        he respond?

18   A    I didn't murder anybody, I didn't do it.

19   Q    Did you ask him some information about telephone

20        numbers?

21   A    Yes.

22   Q    So I'd like to focus for a few moments on

23        telephone numbers.  Did you ask him what his

24        current telephone number was, meaning the number

25        that he had on May 10th when you were interviewing

168

```
 1        him?
 2    A   Yes.
 3    Q   What number did he give?
 4    A   He gave 857-277-2448.
 5    Q   So the last six would be or the last seven would
 6        be 277-2448?
 7    A   2448.
 8    Q   Was that the number that had come up on the
 9        Mariano Malave text message exchange?
10    A   No.
11    Q   Did you ask him about additional phone numbers?
12    A   Yes, he gave us another number of 857-205-2687.
13    Q   Slowly, 857-205-2687?
14    A   Yes.
15    Q   And at that point, those are the two phone numbers
16        he had given.
17    A   Correct.
18    Q   Did Detective Callahan ask a follow-up question?
19    A   Yes.
20    Q   What did he ask him?
21    A   What phone did he have on May 27th.
22    Q   May 27th?
23    A   I'm sorry, April 27th.
24    Q   And did Detective Callahan specifically give a
25        phone number in that case?
```

169

1    A    Yes.

2    Q    What phone number?

3    A    857-277-8189.

4    Q    When Detective Callahan named that phone number

5         out, what did the defendant say?

6    A    He said, that was the phone that was taken away

7         from me and it's gone.  A long time ago, it was

8         taken.

9    Q    Did you ask how long ago it had been taken?

10   A    Yes, he said about two to three weeks ago.

11   Q    So at that point with the phone conversation

12        beginning, did you ask follow-up conversations

13        about the telephones?

14   A    Yes.

15   Q    Did you ask him again a few minutes later about

16        the 277-8189 number?

17   A    Yes, we asked about that phone, and he said, that

18        phone was stolen and I ordered and got a new one.

19   Q    He said it had been stolen?

20   A    Yes.

21   Q    Did he say who he had called or how he had called

22        in order to get a new one?

23   A    T-Mobile.

24   Q    Did you ask him on what day he had called T-

25        Mobile?

170

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | What did he say? |
| 3 | A | That night when he got home. |
| 4 | Q | When you say that night, are you referring to |
| 5 | | April 27th? |
| 6 | A | Yes. |
| 7 | Q | A few minutes later in the interview after saying |
| 8 | | that the phone had been taken away and that it had |
| 9 | | been stolen, did you ask him a separate time about |
| 10 | | that cell phone? |
| 11 | A | We did, and he said, I think I lost that up in |
| 12 | | Eggleston Square.  I was checking it and then it |
| 13 | | was gone. |
| 14 | Q | Now, had you confirmed with him that you and he |
| 15 | | were speaking about the same date? |
| 16 | A | Yes. |
| 17 | Q | And is it fair to say he had identified to you |
| 18 | | this particular date as the date he had lost or |
| 19 | | had his cell phone stolen? |
| 20 | A | Yes. |
| 21 | Q | Did you ask him at any point if other people used |
| 22 | | his cell phone? |
| 23 | A | Yes. |
| 24 | Q | And what did he say? |
| 25 | A | He says, I let other people always use my cell |

171

1    phone.

2  Q  I'd like to turn to ask some questions about what

3     you asked Mr. Reddicks regarding the motor

4     vehicle.  Regarding the motor vehicle, sir, did

5     you ask him about the car that he drove?

6  A  Yes.

7  Q  What did he say?

8  A  He said he drives his grandmother's car.

9  Q  Did he describe the car or did you describe the

10     car?

11  A  I think we may have described the car for him.

12  Q  Did he say who drove the car during the day and

13     evening and who was allowed to drive the car?

14  A  He said his grandmother drives the car during the

15     daytime and working.  Sometimes she gets home

16     late, but he gets to use it at nighttime, and he

17     drives it about every other day.

18  Q  Did you ask him if he had his grandmother's car on

19     April 27th, 2012?

20  A  Yes, we did, and he said he did have that car.

21  Q  Now, regarding that car, you said he identified

22     himself and Catherine Reddicks, the grandmother,

23     as a driver, correct?

24  A  Correct.

25  Q  Did you ask him if he ever let any other person

172

1          drive the car?

2     A    I did, and he said, I never let anyone drive the

3          car.

4     Q    Did you ask him about giving consent or allowing

5          other people to borrow the car?

6     A    We did, we asked him did you give anyone, anyone

7          else use the car; did you allow anyone else to use

8          the car.  He said no, just me, I'm the sole

9          driver, in addition to my grandmother, we're the

10         only ones that use the car.

11    Q    Did you specifically pinpoint the date of April

12         27th, 2012, which is about, as you said, 13 days

13         before the interview and the day he had this issue

14         with the phone, did you pinpoint that when asking

15         him about the car?

16    A    We did.  Detective Callahan -- the interview was

17         on a Thursday.  Detective Callahan said the next

18         day is Friday, go two weeks back from that day,

19         that would be the 27th of April.  Just trying to

20         get a timeframe of what we're talking about.  And

21         that was the way he was able to place it that it

22         was two weeks ago Friday.

23    Q    During that time, you also said that you asked him

24         about where he had brought the car when he went to

25         Westminster Avenue, correct?

173

| | | |
|---|---|---|
| 1 | A | Correct. |
| 2 | Q | And you said that he parked it in the rear? |
| 3 | A | Yes. |
| 4 | Q | Have you ever been to Westminster Avenue? |
| 5 | A | Yes. |
| 6 | Q | Have you ever seen the house at 14 Westminster |
| 7 | | Ave.? |
| 8 | A | Yes. |
| 9 | Q | Sir, these two items, can you take a look at these |
| 10 | | and tell me if you recognize what they are? |
| 11 | A | Yes, these are two printouts, one is a map of the |
| 12 | | Eggleston Square area denoting 14 Westminster |
| 13 | | Ave., and the second one is a satellite printout |
| 14 | | of 14 Westminster Ave. |
| 15 | | MR. HENNING:  I'd offer them in that |
| 16 | | order. |
| 17 | | THE COURT:  Any objection. |
| 18 | | MS. SCAPICCHIO:  No objection, judge, |
| 19 | | THE COURT:  So marked. |
| 20 | | (Exhibit Number 152 was marked in |
| 21 | | evidence; Map of Eggleston Square area.) |
| 22 | | (Exhibit Number 153 was marked in |
| 23 | | evidence; Satellite photo of 14 Westminster Ave.) |
| 24 | | MR. HENNING:  Publishing Exhibit 153. |
| 25 | Q | Sir, when you went to Westminster Avenue, did you |

174

1        have an opportunity to look at the front and rear

2        of the house?

3   A    Yes.

4   Q    And in the rear of 14 Westminster Ave., what do

5        you see?

6   A    In the back, there's a small parking lot for six

7        to eight motor vehicles.

8   Q    Sir, I'd like to talk to you for a few minutes

9        about questions that you asked Mr. Reddicks

10       regarding contact with Mariano Malave, okay?

11  A    Yes, sir.

12  Q    First, did you ask him, before mentioning the name

13       Mariano Malave, about whether or not he had texted

14       anybody or contacted anybody about purchasing

15       marijuana on the 27th of April, 2012?

16  A    Yes.

17  Q    What did he say?

18  A    He said he did speak to a guy named Mario about

19       weed, but he never met him.

20  Q    Before he got into the communications about Mario,

21       did you ask him around 3:16 during this interview

22       if he had ever had any textile log at all with

23       anyone about marijuana?

24  A    Yes, we did, and he shook his head no.

25  Q    And then at some point, you asked about the name

175

 1          Mariano, correct?

 2     A    Correct.

 3     Q    What did he say?

 4     A    He said, I never dealt with him, I know he's a

 5          dealer.

 6     Q    Did you ask Mr. Reddicks how he knew the

 7          Mr. Malave was a dealer?

 8     A    He heard from people in the street.

 9     Q    Did you ask any follow-up questions about

10          Mr. Malave?

11     A    Yes.

12     Q    Did you ask Mr. Reddicks if he knew what

13          Mr. Malave looked like?

14     A    We did.

15     Q    Can you describe what Mr. Reddicks did when you

16          asked that question?

17     A    Yes, we asked him what does he look like.  He

18          paused and looked up in the ceiling, and

19          Detective Callahan asked him, well, is he white,

20          is he black, is he Hispanic, and he says, I don't

21          know, I never met the guy.

22     Q    And when that came up, did you ask about a plan to

23          meet Mr. Malave, meaning if Mr. Reddicks had

24          scheduled to meet Mr. Malave?

25     A    Yes, he had scheduled -- he had talked to him, but

176

```
1              he had never met him.  He talked about a deal, but
2              he never met the guy to do the deal, but he did
3              state that he had some communication with Mario
4              about weed.
5     Q    And did you ask whether those communications were
6              via text message or cell phone?
7     A    I'm not sure.
8     Q    Did you ask him about what he had specifically
9              requested or negotiated with Mr. Malave about?
10    A    Yes, he was asked, what are you going to buy, are
11             you going to buy an ounce, two ounces, a pound?
12             He said he's not sure, but it was going to be a
13             lot.
14    Q    After that, did you or Detective Callahan ask a
15             question about payment or amounts of money?
16    A    Yes, how much were you expecting to pay for this
17             deal, this marijuana, a thousand, 2000, 5000?  He
18             said not that much.
19    Q    So at about 4:05, closer to the end of the
20             interview, did you ask him, using the word
21             consummate, did you ask him why he hadn't
22             consummated the deal?
23    A    Yes.
24    Q    And what was his response to those questions?
25    A    He said, since when we had the text message about
```

177

1    it when we text, that's the only time, I haven't

2    spoken to him after that.

3  Q So Mr. Reddicks said that he hadn't spoken to

4    Mr. Malave after texting him.

5  A Correct.

6  Q Did you ask him what he had talked to Mr. Malave

7    about when he had those text message exchanges?

8  A Yes, about what he was working with and what are

9    his prices.

10  Q And sir, I want to follow up for a minute about

11    the cell phone that you had said Mr. Reddicks was

12    talking about, specifically, the 857-277-8189.

13    Did you have an opportunity earlier to review the

14    T-Mobile records that came in regarding the

15    subscriber information?

16  A On the seized phone?

17  Q Yes.

18  A Yes.

19  Q Sir, we won't even get into hearing it, but let me

20    ask you this question.  Do you recall from the

21    communications with Mr. Reddicks, what date he

22    said that he canceled the cell phone?

23  A On the 27th when he got home that night.

24  Q And on Exhibit 121 from T-Mobile, what date does

25    this say that the account was actually canceled?

178

```
 1    A    May 1st, 2012.
 2    Q    Did you have an opportunity during that interview
 3         to listen to Mr. Reddicks's voice for a
 4         substantial period of time?
 5    A    Yes.
 6    Q    And you also had an opportunity to speak with him
 7         on May 18th, 2012?
 8    A    Yes, for about 20 minutes, yes.
 9    Q    Showing you a disk here marked May 1st, 2012,
10         phone cancellation.  Have you seen that before?
11    A    Yes.
12    Q    Have you listened to this before?
13    A    Yes.
14    Q    With the assistance of the District Attorney's
15         office, were you able to obtain a recording from
16         the T-Mobile company?
17    A    Yes.
18    Q    And was this recording from May 1st, 2012?
19    A    Yes.
20    Q    Whose voice is on this recording?
21    A    Charles Reddicks.
22              MS. SCAPICCHIO:  Same objection, Judge.
23              THE COURT:  Noted, overruled.
24    Q    Whose voice is on this recording?
25    A    Charles Reddicks.
```

179

1              MR. HENNING:  I'd offer this, Your
2      Honor.
3              MS. SCAPICCHIO:  Same objection.
4              THE COURT:  Your objection is noted, but
5      overruled.
6              (Exhibit Number 154 was marked in
7      evidence; CD, recording from T-Mobile.)
8              MR. HENNING:  Permission to publish?
9              THE COURT:  Yes.
10             Had you spoken with Mr. Reddicks before
11     this interview face-to-face?
12             THE WITNESS:  No.  This is a phone call
13     canceling the phone.
14             THE COURT:  I know, but before this
15     phone call, had you spoken to Mr. Reddicks?
16             THE WITNESS:  No, first time I spoke to
17     him was on the 10th -- May 10th.
18   Q   You heard this disk before, though, correct?
19   A   Yes, I have.
20   Q   And the voice that's on this disk, it's an
21       operator and somebody else.
22   A   Yes.
23   Q   The somebody else, whose voice is that?
24   A   Charles Reddicks.
25             MS. SCAPICCHIO:  Same objection, Judge.

180

1           THE COURT:  How much time have you spent
2       listening to Mr. Reddicks' voice?
3           THE WITNESS:  Two hours in the interview
4       on the 10th and about 20 minutes on the 18th when
5       he was arrested.
6           THE COURT:  Objection is overruled.
7   (Exhibit Number 154, audio was played for jury.)
8   Q   Now, Sergeant Detective Daley, with regard to how
9       the phone ended up no longer being in
10      Mr. Reddicks's possession, you heard in this call,
11      Mr. Reddicks's voice saying the phone was stolen,
12      correct?
13  A   Yes.
14  Q   During the course of the interview, did
15      Mr. Reddicks give additional or different
16      explanations for what had happened to his phone
17      on the 27th of April?
18  A   Yes.  Initially, he said it was taken, stolen, and
19      lost.
20  Q   Regarding it being lost, what did he say about it
21      being lost?
22  A   He lost it up in Eggleston Square.
23  Q   I'd like to ask you some questions about the time
24      line that you attempted to establish on  April
25      27th, 2012.

181

1                  Did you ever ask Mr. Reddicks directly
2          to explain where he had been on the afternoon and
3          early evening of the 27th of April, 2012?
4     A    Yes.
5     Q    The first time you asked him this question, what
6          did he say?
7     A    He said, I got out of school, I went home to
8          Millet Street, I grabbed the car.  And I asked
9          him, well, how did you get to Westminster Ave.
10         He said, I went Millet Street to Harvard Street,
11         took a left on Harvard, and then I took a right
12         and made my way up to Blue Hill Ave., took a small
13         street, a right.  I followed Blue Hill Ave. to
14         Seaver Street, I took a left on Seaver, followed
15         Seaver to Walnut Ave., took a right on Walnut, and
16         then there's a left on Westminster Ave. and right
17         down the hill on the right is Westminster Ave., is
18         14 Westminster.
19    Q    During the time he was explaining this to you, was
20         he also using hand motions like you were using?
21    A    No, that's me.
22    Q    Okay, and during that time, did he give you, just
23         laid out that description of the route?
24    A    Yes.
25    Q    At some point later on during that conversation,

182

1        did you ask him -- strike that.  At some point

2        later on during the conversation, did he ask you

3        questions about the homicide?

4   A   Yes.

5   Q   What question did he ask you about the homicide?

6   A   What time did the homicide happen.

7   Q   And at that point in the interview, what did you

8        and Detective Callahan do?

9   A   We told him 6:30.

10   Q   6:30 PM?

11   A   Correct.

12   Q   About 10 or 12 minutes later, did you ask him for

13        the time line for his activities on the 27th of

14        April a second time?

15   A   Yes.

16   Q   What did he say the second time when you asked

17        him?

18   A   He said, I left school, I went home to Millet

19        Street, grabbed the car, I drove up to Eggleston,

20        I got some weed, I made my way back to Westminster

21        around 4 o'clock, and I didn't have my phone with

22        me.

23   Q   Had he explained that about the missing phone

24        during the first time that you had asked him?

25   A   No.

183

1    Q    And at that point after telling him the time of
2         the homicide, did he give you a specific time when
3         he believes he had lost or left or had his phone
4         stolen?
5    A    Yes, he stuck with around 4 o'clock in Eggleston.
6    Q    So he said after 4 o'clock, he did not have his
7         phone.
8    A    Yes.
9    Q    Did you ask him what he did -- let me back up.
10        Did you ask him when he arrived at Westminster
11        Avenue, where he parked the car?
12   A    He said he parked it in the back parking lot.
13   Q    Did you ask him who was with him at 14 Westminster
14        Avenue when he arrived that evening?
15   A    When he arrived there, John, Javeon, and his aunt
16        were there, and that's it.
17   Q    Did you ask him if any girls were there?
18   A    Yes, we asked him if there's any women with him,
19        and he said no.
20   Q    Sir, finally, I'm going to ask you about an area
21        near the end of the interview, about 4:30,
22        regarding weapons.  Did you ever directly ask
23        Mr. Reddicks whether he had held a gun before?
24   A    Yes.
25   Q    What did he say?

184

1   A   He said no.

2   Q   Did you ask him if he had ever possessed a gun

3       before?

4   A   Yes, and he said no again.

5   Q   Did you ask him if he had ever fired a gun?

6   A   Yes, and he said no again.

7   Q   Did you ask him if he knew the difference between

8       a semiautomatic and a revolver?

9   A   Yes, I did, and he said, yeah, a revolver has six

10      and an automatic has 10 or more.

11  Q   Detective, last couple of points.  Do you remember

12      having an opportunity to look at the MBTA video

13      from this incident?

14  A   Yes.

15  Q   And did you have a chance at all to look at the

16      area in front of the MBTA bus station after

17      speaking to Edwin Lockhart?

18  A   Yes.

19  Q   Do you remember what Edwin Lockhart's description

20      was of the clothing that he was wearing on the

21      evening of the incident?

22  A   Yeah, I believe he had an Abercrombie shirt on

23      and blue jeans.

24  Q   And the shirt, did he describe that as a shirt or

25      a hoodie?

185

```
1    A    Like a hoodie, a hoodie.
2                    MR. HENNING:  For the record, I'm
3         publishing Exhibit 130.
4    Q    Sir, when you watched the video, did you see
5         anything around 6:31:11 p.m. on the timestamp of
6         the video?
7    A    Yes.
8    Q    Who were you focused on when you looked at the
9         video?
10                   MS. SCAPICCHIO:  Objection, Your Honor.
11                   THE COURT:  Overruled.
12                   MS. SCAPICCHIO:  May we be seen?
13   SIDEBAR CONFERENCE:
14                   MS. SCAPICCHIO:  Judge, I'm going to
15        object if this witness is going to identify
16        anybody from the video.
17                   MR. HENNING:  I'm not going to ask him
18        to.  I just asked who he's focused on.  I'm going
19        to stop the video and I think it's going to be
20        apparent, but I'm not asking him to identify who
21        the person is.
22                   THE COURT:  You certainly may ask him
23        if there's anybody of evidentiary value in this
24        picture.
25                   MR. HENNING:  Okay.
```

186

|    |   |                                                           |
|----|---|-----------------------------------------------------------|
| 1  |   | THE COURT:  And that's it.                                |
| 2  |   | MS. SCAPICCHIO:  I would object to that,                  |
| 3  |   | Judge.                                                    |
| 4  |   | THE COURT:  Duly noted, overruled.                       |
| 5  |   | MS. SCAPICCHIO:  Thank you.                               |
| 6  |   | END OF SIDEBAR CONFERENCE.                                |
| 7  | Q | Sergeant Detective Daley, is there anyone of              |
| 8  |   | evidentiary value that you can see in this                |
| 9  |   | video?                                                    |
| 10 | A | Yes, the gentleman with the white sneakers right          |
| 11 |   | there.                                                    |
| 12 | Q | And based on the timestamp here, 6:31:17, with            |
| 13 |   | the two and a half minute time differential, that         |
| 14 |   | puts it at roughly 6:33 or 6:34; is that correct?         |
| 15 | A | Yes, it does.                                             |
| 16 | Q | And you said that the 911 call came in at what            |
| 17 |   | time?                                                     |
| 18 | A | 6:27.                                                     |
| 19 | Q | Detective, last question here regarding Exhibit           |
| 20 |   | 144.  In Exhibit 144, opening this up to the              |
| 21 |   | camera angle 10 which you discussed earlier.              |
| 22 |   | Sir, I'm going to turn this to 6:24:45 on the             |
| 23 |   | timestamp of this video.  And just to orient the          |
| 24 |   | members of the jury, what is this store in the top        |
| 25 |   | left-hand corner?                                         |

187

1    A    That's a pizza shop.

2    Q    And in a moment, are you going to see anybody of

3         evidentiary value or see anything of evidentiary

4         value?

5    A    Yes.

6    Q    Can you describe what we're about to see, not

7         identifying anybody, but just describing.

8    A    A person believed to be a female come up along the

9         sidewalk and go into the pizza shop.

10   Q    To the left-hand side of this red car, is that the

11        person you're describing?

12   A    Yes.

13   Q    And at about 6:26 and change, are we going to see

14        something else of evidentiary value?  Excuse me,

15        6:25:39.

16   A    Yes, another figure appears coming from the same

17        direction with a black sweatshirt and a white

18        shirt underneath, it appears.

19   Q    Do you remember the clothing description of Julio

20        Balbuena?

21   A    Yes.

22   Q    What was it?

23   A    Black hoodie.

24   Q    Is it fair to say that the video jumps due to lack

25        of motion on the screen?

188

1   A   Yes, it's motion activated, so it stops and

2       starts.

3               MR. HENNING:  May I have one moment,

4       Your Honor.

5               THE COURT:  Of course.

6               (Pause.)

7   Q   Sir, as part of your follow-up to the

8       investigation, did you visit a location up on a

9       roof near the Hyde Park Forest Hills T station?

10  A   Yes, I did.

11  Q   Approaching you with these two photographs.  Do

12      you recognize this first one?

13  A   Yes.

14  Q   What is this?

15  A   This is from the top, the Casey Overpass, which

16      has just been taken down in the Forest Hills area

17      looking outbound on Hyde Park Ave. towards Walk

18      Hill.  The MBTA station is on the right.

19  Q   I'll get to this in one second.

20              MR. HENNING:  Offering this as the next

21      exhibit.

22              THE COURT:  Any objection?

23              MS. SCAPICCHIO:  No objection, Judge.

24              THE COURT:  So marked.

25              (Exhibit Numbers 155 was marked in

189

1       evidence; Photograph of Casey Overpass.)

2                    MR. HENNING:   Publishing 155.

3    Q   You said the Casey Overpass, correct?

4    A   Yes.

5    Q   Where all the terrible construction was going on

6        around Forest Hills?

7    A   Yes.

8    Q   This is what?

9    A   Forest Hills T Station.

10   Q   Were you able to visit a roof somewhere on this

11       side of the street?

12   A   Yes, it's right at the intersection of Tower

13       Street and Hyde Park Ave.  It's a brick building,

14       four-story brick building.

15   Q   What were you doing visiting the roof of that

16       building?

17   A   To take photographs and document the cell towers

18       of the location that Mr. Reddicks' phone hits off

19       of.

20   Q   This street here, what is this?

21   A   It's Hyde Park Ave. turning into Washington

22       Street.

23   Q   And down here on the left, is that where 132 Hyde

24       Park Ave. would be?

25   A   Yes.

190

1    Q    That next exhibit picture, what is that a picture
2         of?
3    A    It's a picture of -- I walked up Tower Street away
4         from the Forest Hills train station, turned
5         around, and took a picture back of the building
6         with the tower, with the cell site up on the roof
7         of the building and the MBTA station right across
8         the way.
9              MR. HENNING:  I'd offer this as the next
10        exhibit.
11             THE COURT:  Any objection?
12             MS. SCAPICCHIO:  No objection.
13             THE COURT:  So marked.
14             (Exhibit Number 156 was marked in
15        evidence; Photograph of brick building with cell
16        tower.)
17             MR. HENNING:  Publishing 156.
18   Q    What's in the background here?
19   A    Forest Hills MBTA Station.
20   Q    Where is the cell tower?
21   A    That little nub at the top of the building.
22   Q    Up here?
23   A    Yes, that's one of the towers up there.  There's
24        two towers on that rooftop.
25             MR. HENNING:  I have nothing further,

191

1    Your Honor.

2                    THE COURT:  Ms. Scapicchio?

3                    MS. SCAPICCHIO:  Judge, can we be seen

4        just briefly?

5                    THE COURT:  Sure.

6                    MS. SCAPICCHIO:  I have a question about

7        a question.

8                    THE COURT:  Stretch, seventh inning.

9    SIDEBAR CONFERENCE:

10                   MS. SCAPICCHIO:  Judge, I had a question

11       before I ask this witness any questions regarding,

12       there are 17 times in this statement that he calls

13       my client a psychopath.  If I was to ask just the

14       number of times he called him a psychopath, does

15       that open any doors as far as the Court is

16       concerned?

17                   MR. HENNING:  I strongly object to it.

18       I filed a motion on the 4th of January to have

19       somebody give me examples of edits that we wanted

20       out of the video.  I asked that it be done within

21       about a week and a half, I think by the 13th.

22       None were provided to me.

23                   So what we did today is our best effort

24       at putting in the statements while also saying

25       that he denied responsibility.  To cherry pick

192

1      statements where the police make accusations of

2      the defendant is to take things out of context and

3      it's an attempt to make the police officers look

4      bad, especially using that terminology.  It's the

5      same type of terminology I would have specifically

6      edited out of the video, so I strongly object to

7      that request.

8                  THE COURT:  I'm going to overrule -- I'm

9      going to sustain --

10                 MS. SCAPICCHIO:  I was getting excited

11     there for a minute.

12                 THE COURT:  I'm sorry, I misspoke.

13     I agree with Mr. Henning in this regard.  That's

14     inappropriate under the circumstances of this

15     dispute.  You are not to ask that question.

16                 MS. SCAPICCHIO:  Just note my objection,

17     Judge.

18                 THE COURT:  Noted.

19                 MR. HENNING:  Just to clarify, they call

20     him many other names.  I would ask that that

21     ruling cover the other things, as well.

22                 MS. SCAPICCHIO:  Oh, no, no, I'm not

23     going into any of them.  It was just did I get

24     into it or not.  That was it.

25                 MR. HENNING:  Understood.

193

1   END OF SIDEBAR CONFERENCE.

2                    MS. SCAPICCHIO:  I don't have any

3          questions, Judge.

4                    THE COURT:  All right.  Thank you,

5          Sergeant Detective, you may step down.

6                    MR. HENNING:  May we approach?

7                    THE COURT:  Okay.

8   SIDEBAR CONFERENCE:

9                    MR. HENNING:  She has no questions and

10         I have no witnesses.

11                   THE COURT:  I thought as much.  I think

12         your last witness is coming in on Monday, correct?

13                   MR. HENNING:  Correct.

14                   THE COURT:  And that's the ME.

15                   MR. HENNING:  We have her being picked

16         up at 8:15 in the city.  She'll be here for the

17         nine o'clock call.  She'll testify, and then at

18         that point, the Commonwealth, with the exception

19         of a rebuttal witnesses that we may need, we would

20         be resting.

21                   MS. SCAPICCHIO:  My plan is to speak to

22         my expert tonight and let Mr. Henning know

23         tomorrow morning whether or not I'm going to call

24         him so he's not spending all weekend prepping if

25         I'm not going to call him.  And then the only

```
                                        VOLUME: IX
                                        PAGES: 151
                                        EXHIBITS:
                                             ID: Z - DD
```

<u>COMMONWEALTH OF MASSACHUSETTS</u>

SUFFOLK, SS.                         SUPERIOR COURT DEPARTMENT
                                     Of THE TRIAL COURT


```
* * * * * * * * * * * * * * * * * *
COMMONWEALTH OF MASSACHUSETTS        *
                                     *
-v-                                  *   SUCR 2012-10714
                                     *
CHARLES REDDICKS                     *
* * * * * * * * * * * * * * * * * *
```

JURY TRIAL
(MORNING SESSION)
(DAY 9)



BEFORE: HONORABLE LINDA E. GILES
        Suffolk Superior Courthouse
        Courtroom 907
        Boston, Massachusetts
        Tuesday, January 26, 2016



Gregory Henning, Assistant District Attorney
  For the Commonwealth of Massachusetts

Rosemary Scapicchio, Esquire
Jillese McDonough, Esquire
  On behalf of the defendant, Charles Reddicks


NANCY MCCANN, CVR-C.M.
OFFICIAL COURT REPORTER
SUFFOLK SUPERIOR COURT

2

<u>I N D E X</u>

CLOSING ARGUMENTS:

        By Ms. Scapicchio....................... Page
        By Mr. Henning......................... Page


JURY CHARGE.................................. Page

JURY DELIBERATING............................ Page

3

## E X H I B I T S

### MARKED FOR IDENTIFICATION

| EXHIBIT | DESCRIPTION | PAGE |
|---------|-------------|------|
| Z - ID | Jury Charge. | |
| AA - ID | Defendant's Jury Instruction Re: Miller. | |
| BB - ID | Note from Court Officer. | |
| CC - ID | Original, unredacted Exhibit Number 134. | |
| DD - ID | Original, unredacted Exhibit Number 133. | |

4

```
 1                    P R O C E E D I N G S
 2                   Tuesday, January 26, 2016
 3      (Court in session at 9:15 a.m.)
 4      (Defendant present.)
 5      (Jury not present.)
 6                  THE CLERK:  Your Honor, for the record
 7           before the Court, Commonwealth versus Charles
 8           Reddicks, 2012-10714.  Mr. Reddicks is present, as
 9           are all of the parties.
10                  THE COURT:  Good morning, everyone.
11                  I understand, Ms. Scapicchio, you wanted
12           to put something on the record?
13                  MS. SCAPICCHIO:  I did, Your Honor.
14                  THE COURT:  For something new and
15           completely different then.
16                  MS. SCAPICCHIO:  It is.  Well, you asked
17           me yesterday for any cite in the model jury
18           instructions that deals with mere presence.  On
19           page 16 of the model jury instructions dealing
20           with joint venture, there's an issue of mere
21           presence, and then there's a case, *Commonwealth v.*
22           *Cordle*, C-O-R-D-L-E, 404 Mass. 733, 1989:
23                  "Where there was evidence that the
24           defendant was in the area, a neighborhood of
25           Sandwich, in light of the closeness of the
```

5

1    evidence, the judge should have instructed the

2    jury that presence alone was insufficient to

3    establish guilt.

4            "The judge's emphasis on the proof of

5    the defendant being present near the scene of the

6    crime may have misled the jury to think that the

7    defendant's proximity to the scene of the crime

8    alone could be a basis for a guilty verdict."

9            So based on that, I would ask that the

10   Court at least read the case, and I would ask

11   again to reconsider the presence alone, based on

12   *Commonwealth v. Cordle*, and the idea that presence

13   alone is the theory of the defense under the due

14   process clause of the federal constitution, we

15   have a right to an instruction on our theory of

16   the defense.

17           In addition, Judge, yesterday the

18   Supreme Court decided *Montgomery v. Louisiana*.  In

19   that case, basically, the Supreme Court said that

20   *Miller v. Alabama* applies retroactively to all

21   juveniles.

22           And in the case it seems to talk about

23   how to preserve that issue for all juveniles.  I

24   think it may apply at some point to -- because it

25   now says it applies to procedural due process as

6

1        opposed to just substantive due process.

2    ]            There was a case, *Commonwealth v.*

3        *Rashidi J. Smith*, which dealt with the issue of an

4        interested adult being present while a juvenile

5        was being interrogated.  We raised this issue in

6        the motion to suppress saying that because Mr.

7        Reddicks was three days past his 18th birthday,

8        that it should be applied to him.

9            I want to make sure I'm preserving that

10        objection now under *Montgomery v. Louisiana.*  I'm

11        asking the Court to strike my client's statement

12        in light of this decision.

13            In addition to which, the decision also

14        seems to suggest that you have to ask for

15        instructions -- in order to preserve your

16        procedural due process and substantive due process

17        rights, you have to ask for what you would want

18        the Court to say in terms of instructions.

19            So I'm submitting to the Court a request

20        under *Miller* for an instruction that says the

21        reasonable person should actually be a reasonable

22        juvenile, a reasonable 17 or 18 year old, because

23        *Miller* has said that juveniles think differently.

24            To compare a juvenile's conduct to

25        someone who is non-juvenile, I think is a

7

1          violation of due process and a right to fair

2          trial.

3                    So I want to preserve those issues for

4          the record and make sure that the Court

5          understands that that's what I'm looking to do is

6          preserve those issues for the record.

7                    And I'm asking the Court to strike the

8          statement of Mr. Reddicks to also explain to the

9          jury that the reasonable person standard should

10         actually be a reasonable 18 year old, with all of

11         the infirmities that an 18 year old may have.

12                   And I'm the Court with respect to the

13         mere presence to look at the *Cordle* case and give

14         us a mere presence instruction because it's our

15         theory of the defense.

16                   THE COURT:  Thank you, Ms. Scapicchio.

17                   Mr. Henning, did you want to replay?

18                   MR. HENNING:  With regard to preserving

19         the rights on the other issues, I'm not going to

20         reply.  The Commonwealth is not taking a position.

21                   But with regard to the jury

22         instructions, the joint venture is a completely

23         different situation than what we have here.  The

24         reason those jury instructions apply is so that

25         the actions of one defendant coupled with the mere

8

1          presence of his co-venturer automatically

2          inculpates the co-venturer, and that's not what we

3          have here.

4                    In addition, there is testimony in this

5          case and evidence that you're going to describe to

6          the jury about circumstantial versus direct.  I'm

7          sure counsel will describe and emphasize all of

8          that in her closing.

9                    The instructions on possession of a

10         firearm talk about mere presence already, and I've

11         already explained to the Court yesterday I don't

12         think it's appropriate to have jury instructions

13         aimed at the defense theory of the case when all

14         of the other model instructions suggest that that

15         is not appropriate in a case like this.

16                   THE COURT:  Thank you, Mr. Henning.

17                   MS. SCAPICCHIO:  Judge, just with

18         respect to *Commonwealth v. Cordle*, that wasn't a

19         joint venture case.  That's a case that basically

20         says if the theory of the case is mere presence,

21         we were entitled to an instruction; that they

22         can't convict alone on mere presence.

23                   THE COURT:  All right.  Thank you, both.

24         I agree with Mr. Henning's analysis in this

25         regard.  Mere presence is not appropriate under

9

1          the state of the evidence in this case.  Again,

2          the model jury instruction uses that language in

3          joint venture only in the model homicide

4          instruction.

5                    This is not a mere presence case in any

6          event.  I clearly note the defendant's objection.

7          And with regard to all the other issues you

8          raised, your client's rights are preserved.

9                    MS. SCAPICCHIO:  Judge, if I could just

10         submit the case *Rashidi J. Smith*, a Supreme Court

11         case; *Montgomery v. Louisiana*, and the

12         instructions that I would be looking for under

13         Miller, just to mark for identification.

14                    THE COURT:  Well, I don't think we need

15         to mark a case, but certainly your request for

16         jury instructions.  Is that different than what

17         you submitted the other day?

18                    MS. SCAPICCHIO:  It is, Judge.  It is

19         because at the time that I submitted the jury

20         instructions this was a procedural versus a

21         substantive issue, and now the Supreme Court says

22         you have to protect them both.

23                    THE COURT:  I understand.  There's no

24         necessity to mark case law.  But certainly your

25         additional request for jury instructions will be

10

1          marked for identification.

2                    (Exhibit Z was marked for

3          identification; Supplemental Jury Instructions,

4          submitted by the defendant re *Miller*.)

5                    THE COURT:  Anything else, counsel?

6                    MS. SCAPICCHIO:  Yes, one additional

7          issue, Judge.  This is the chart that I used in

8          Mr. Solomon's case that you had approved of.  I'm

9          looking to use it again in Mr. Reddicks case.

10                   THE COURT:  Mr. Henning, have you seen

11         this?

12                   MR. HENNING:  Yes, I've seen the chart.

13         I would object to the chart for a variety of

14         reasons, not the least of which is the color-coded

15         graphics that counsel has.

16                   We've done the best we can with all our

17         exhibits to avoid that type of things, with the

18         exception of highlighting Excel spreadsheets.

19         It's not showing a gradation of inculpation.

20                   This is something that's suggesting both

21         by the coloring and the structure some sort of

22         gradation, and it's also asking for counsel to be

23         able to essentially give jury instructions to the

24         jury because it's defining levels of doubt.

25         That's the Court's province, not counsel's

11

1          province.

2                    You're going to give an instruction on

3          reasonable doubt.  The instructions already now

4          redefine what to a moral certainty is, and I don't

5          think this chart is appropriate.

6                    THE COURT:  I do agree with you.  I'm

7          not sure that all of those levels of proof are

8          recognized, at least in our jurisprudence.

9          However, we all can accept the premise that the

10         burden of proof in this case is the highest in the

11         land, and that's guilt beyond a reasonable doubt.

12                   So, I'll note the Commonwealth's

13         objection, but I have no serious problem with that

14         chalk.

15                   (Exhibit AA was marked for

16         identification; Chalk used in defendant's

17         closing.)

18                   MS. SCAPICCHIO:  Thank you, Your Honor.

19                   MR. HENNING:  Your Honor, you do give

20         that instruction orally, and now you're going to

21         be providing a written copy to every member of the

22         jury.

23                   THE COURT:  Correct.

24                   MR. HENNING:  To have a chart --

25                   MS. SCAPICCHIO:  I'm not looking to

12

1          introduce it, just use it in my closing.

2                    MR. HENNING:  I know.  To have a chart

3          or a chalk provided to the jury during the closing

4          I think is still doing the Court's job and also

5          doing it in a way that is different from what the

6          jury instructions say.

7                    THE COURT:  I appreciate your concerns,

8          and I respect them.  However, I see nothing wrong

9          with Ms. Scapicchio graphically representing the

10         high level of proof that is upon the Commonwealth

11         in this kind of case.

12                   So, I'll note again the Commonwealth's

13         objection, but I'll allow her to use that chalk at

14         the appropriate time in her closing.

15                   Obviously, when you have finished that

16         subject matter, you will take that down.

17                   MS. SCAPICCHIO:  Absolutely.  I have

18         other pictures that I want to show.  I just wanted

19         to make sure this is on when I need it to be.

20                   THE COURT:  Are they exhibits?

21                   MS. SCAPICCHIO:  Yes, they're all

22         exhibits.  We went through them this morning.

23                   THE COURT:  Absolutely.

24                   MS. SCAPICCHIO:  I just want to make

25         sure I have the opportunity to --

13

1                    THE COURT:  Great.  All right.

2                    MS. SCAPICCHIO:  And I think once the

3          jury comes in, I want to pull this over, Judge, so

4          it's in the middle while I'm doing my closing.

5                    THE COURT:  Sure.

6                    Let's bring the jury down.

7                    THE COURT OFFICER:  Your Honor, we're

8          still down one.

9                    THE COURT:  I'm sorry.  I misunderstood.

10         I thought we had everybody.  Okay.  If everybody

11         could stand by, I think we have another Red Line

12         problem, and my guess is that last person has been

13         delayed once again.

14                    So, as soon as that last juror comes in,

15         we will bring the jury down.

16                    Thanks, everybody.

17         (Court in recess at 9:25 a.m.)

18         (Court in session at 9:35 a.m.)

19         (Defendant present.)

20         (Jury present.)

21                    THE CLERK:  Your Honor, once again

22         before the Court, the Commonwealth versus Charles

23         Reddicks, Docket Number 12-10714.  Mr. Reddicks is

24         present with his attorneys, Rosemary Scapicchio

25         and Jillise McDonough.  For the Commonwealth,

14

1        Assistant District Attorney Gregory Henning.

2                THE COURT:  Members of the jury, good

3        morning and welcome back.  Once again, I see we

4        had some Red Line victims.  Apparently the same

5        problem that delayed you all -- those who rode on

6        the Red Line yesterday -- delayed you again today.

7                But we're all here and we're ready now

8        for those last two events, the closing arguments

9        of counsel followed by instructions on the law.

10                First we'll hear from Ms. Scapicchio and

11        then from Mr. Henning.  As I also told you,

12        there's a time limit to openings and closings.  If

13        the attorney gets to his or her time limit, I'll

14        get his or her attention and that just means that

15        he or she has to start thinking about wrapping up.

16                Ms. Scapicchio, anytime you're ready,

17        ma'am.

18                MS. SCAPICCHIO:  Thank you, Your Honor.

19    CLOSING ARGUMENT ON BEHALF OF MR. REDDICKS

20    BY MS. SCAPICCHIO:

21                MS. SCAPICCHIO:  Ladies and gentlemen,

22        this case is about reasonable doubt.  It was the

23        Commonwealth's burden to prove to you beyond a

24        reasonable doubt that Charles Reddicks was the

25        person in that hallway that had a motive, an

15

1    opportunity, and in fact did kill the victim in

2    this case.  And my suggestion is that they have

3    failed miserably, miserably.

4         Now, if you look at the concept of

5    reasonable doubt in this case, we don't have a

6    burden to prove Mr. Reddicks not guilty.  If he's

7    proven not guilty, certainly it's a not guilty.

8    It's highly unlikely that he's guilty is a not

9    guilty.

10         Less than likely, it's a not guilty.

11    Probably not, it's a not guilty.  Unlikely, it's a

12    not guilty.  Possibly not, it's a not guilty.  May

13    not be is a not guilty.  Even perhaps is still a

14    not guilty.

15         Suspecting, still a not guilty.

16    Possibly guilty, still a not guilty.  Probably

17    guilty, still a not guilty.  Guilt likely, still a

18    not guilty.  Guilt highly likely, still a not

19    guilty.

20         The only time that you can convict him

21    is if there is guilt beyond a reasonable doubt.

22    And here's what the Commonwealth wants you to

23    believe.

24         The Commonwealth wants you to believe

25    that Mr. Reddicks' car or his grandmother's car

16

1    was seen going by that train station at 6:14:30.

2    That's what they say, 6:14:30 because they say

3    there was that two-minute lag at the MBTA.  Even

4    though they spent all that money on the equipment,

5    they say 6:14:30.

6          They want you to believe from there that

7    car went all the way around, parked outside the

8    house, had the opportunity then to make a phone

9    call, go up to that house, commit a robbery for no

10   apparent reason, go back downstairs, and still get

11   past that train station by 6:24:30.  That's their

12   evidence.

13         And they want you to believe because

14   they have cell tower records, they have phone

15   records that put Mr. Reddicks in the area, he must

16   have been the killer.

17         But here's what you didn't hear.  When I

18   cross-examined each and every one of those phone

19   -- people that came in for the phone records, we

20   didn't see the phone records of anyone else in

21   that house.

22         We don't know what Lucky was doing then.

23   We don't know where his phone records put him.

24   That's reasonable doubt.  We don't know where

25   Edwin's phone records put him.  Certainly they

1        would have put him in the area, just like they say

2        Reddicks was in the area.  Just like that.  And

3        they're not claiming he did anything wrong.

4                Even the cousin who came in from

5        Brockton with all the marijuana according to him,

6        if they had looked at his phone records, they

7        would have seen him coming up from Brockton and he

8        would have been in the area.  And that's not

9        enough.

10                Then they're looking at Ian Follette.

11        We don't even know where Ian Follette was that day

12        because they never checked it out.  He gave them

13        the name of two people who he said he was with

14        that night.  Did you hear any testimony that any

15        police officer went to either of those people to

16        check out his story?  No.

17                They gave Ian Follette immunity.  That's

18        what they did.  And still, ladies and gentlemen,

19        he lied.  He came in here.  He swore to tell the

20        truth, and he lied.

21                And let me tell you about his lie.  He

22        swears to God that he was buying marijuana from my

23        client sometime in August of 2011.  There's no

24        evidence.  There's no proof.  But that's what he

25        says.  Believe him because he says so.

18

1          Then he said sometime in September he
2     was buying off of his friends, none of whose names
3     he could remember, but that's what he was doing to
4     get his marijuana in September.

5          And then all of a sudden in October of
6     2011, he was buying off th victim, Mariano Malave.
7     He says it was October, and either November or
8     December he stopped buying off the victim and
9     never contacted him again.

10          Remember what he said about that?  He
11     said one of his friends had gotten stopped outside
12     of Malave's house by the police, and the police
13     were looking for guns and drugs.  And Follette
14     became concerned that the house was being watched,
15     and he didn't want to deal with Malave anymore.
16     That's what he said.

17          And he told us from that witness stand
18     he in fact didn't deal with him anymore.  And it
19     wasn't until we exposed that lie that we showed
20     him that text that happened on April 12th of 2012
21     when he says, "Yo, you around," to Mario Malave.

22          Now, why would he need to do that if his
23     story was true, ladies and gentlemen?  If his
24     story was sometime in march or April he bought a
25     fourth of a pound or he got fronted a fourth of a

19

1        pound off of Charles Reddicks for $1,000, why

2        would he need to contact Mario Malave in April of

3        2012?

4               He couldn't have had money to buy more

5        drugs because his story was that he was fronting

6        the marijuana off of Mr. Reddicks and he couldn't

7        pay him back, and that's why he had to -- he was

8        forced to give him Mario Malave's telephone

9        number.

10             How does that make sense, ladies and

11       gentlemen?  Because he told us he wasn't even

12       buying off of Mario at the time.  So what do you

13       think that text means, "Yo, you around?"  Do you

14       think they were going to watch the Amazing Race

15       together?

16             They weren't friends.  He was a customer

17       and Malave was a dealer.  So why did he lie about

18       that April contact?  For the same reason he lied

19       about everything else.  He doesn't want to put

20       himself in the middle of a homicide.

21             And he had immunity, ladies and

22       gentlemen.  He had immunity to tell the truth.

23       That's what he told you he was going to do with

24       his immunity.  And you heard him lie, and what

25       happened?  He still got his immunity.

20

1           So how do you trust him?  How do you
2      know what he said is true?  You don't.  And that's
3      reasonable doubt.
4           Now, they want you to believe in this
5      case that my client was somehow on a rampage to
6      rob someone.  And the way that they want you to
7      believe that is you remember the kid from
8      Dorchester who came in, the one who can tell
9      someone's color of their skin by their skin tone
10     -- I mean, by their voice when they talk low.
11          Remember him, the drug dealer for five
12     years who didn't get charged with anything?  His
13     story is that when Mr. Reddicks contacted him,
14     that he was trying to set up a robbery.  Where is
15     that evidence?  That's just their theory.  That's
16     all it is is their theory.
17          There's no evidence about that.  They
18     want you to believe because he said the name
19     Jonathan that somehow Jonathan is code for
20     robbery.  What if Mr. Reddicks just didn't want
21     people to know his real name when he was buying
22     marijuana?  What if that's all it was?  That's
23     reasonable doubt.
24          But they want you to believe there's
25     something sinister with the name Jonathan, except

21

1      there was no evidence produced to support that at

2      all.  It's just their allegation.

3             And look at the facts here.  Look at

4      what happened here.  Look at the people in that

5      apartment and how each and every one of them lied.

6      And they're going to tell you Mr. Reddicks lied

7      during his statement and therefore you should find

8      that he's guilty of murder.

9             Seriously?  If that's the case, then

10     every witness who took that stand lied, and let's

11     go through them.  Every witness who took that

12     stand had something inconsistent about what they

13     said, every, single one.

14            And so let's take Edwin Lockhart, for

15     instance, his best friend in the apartment that

16     night.  You remember Mr. Lockhart.  He's the one

17     who claims that he had to have known the person;

18     that he wouldn't have let anyone up there unless

19     he knew them.  That was the story Edwin Lockhart

20     told.

21            And what does Mr. Lockhart do when his

22     best friend is shot?  He runs away.  Does he go to

23     the police and say, hey, I just saw I my best

24     friend get shot, let me tell you what happened?

25            No, he doesn't do that at all.  He runs

22

1      away and he hides until the police find him. And

2      when the police find him, they bring him before

3      the grand jury.

4              That's what happened in this case,

5      ladies and gentlemen.  How do you know what he's

6      saying is correct?  How do you know?  Who would

7      leave their best friend on the floor and not make

8      a single phone call?

9              And he's the one who told you, the

10     reason that I ran is that I didn't want them to

11     think I had anything to do with it.  Don't you

12     think his cell phone records put him at that

13     house?

14             Don't you think he's going to be on the

15     video of the MBTA, the same things that they're

16     saying Mr. Reddicks you should consider and find

17     him guilty of murder?

18             Well, Mr. Lockhart was in the same

19     position, the same exact position, ladies and

20     gentlemen.  And his story does not have the ring

21     of truth.

22             And then you can go to the cousin, Alex,

23     the drug-dealer, who wouldn't even speak to the

24     police without his lawyer.  You remember that

25     testimony, he needed Marty Leppo before he spoke

23

1    to the police.  This was his cousin who was dead,

2    and he left the scene and he went to his

3    grandmother's house, and he never even called, he

4    said, to check on is cousin for days.

5         Do you believe him or do you think he

6    had something to hide?  Because if you do, if you

7    think he's got something to hide, that's

8    reasonable doubt.

9         Now, why does it take him all of this

10   time to finally admit that he was the one who

11   produced the drugs that day?  He was the one who

12   brought the drugs from Brockton.  That's what he

13   said.  And he said he met them either at the

14   sister's house or somewhere near his house, and he

15   wanted a pound.

16        And again he said it must have been

17   someone that he knew because he wouldn't let

18   anyone that he didn't know in that stairwell that

19   day.  He wouldn't have let anyone who he didn't

20   know up to his house.

21        And you know what they're going to say

22   about that?  Because Edwin references that it was

23   a white boy who was coming to do the drug deal

24   that day, and Alex references that it was a white

25   boy who was going to do the drug deal that day,

24

1      you know what they're going to say about that?

2              All Ian's friends were white, and Mr.

3      Reddicks was the only friend of Ian's that was

4      black.  So it was reasonable, they're going to

5      say, to infer that what they thought was a white

6      person, because they thought all Ian's friends

7      were white.

8              How in the world would they know?

9      That's pure speculation.  But they want you to

10     believe that because that's the step you have to

11     take in order to convict Mr. Reddicks.  And how do

12     you take that step with absolutely no evidence,

13     none whatsoever?

14             They're saying white boy, and they want

15     you to say white boy means Ian's friend.  What if

16     it doesn't?  What if it means white boy?  Because

17     you remember what Ian Follette told us in his

18     story, if you believe it, his story was he knew

19     Mr. Malave the longest.  He is the one who had the

20     initial connection with Mr. Malave.

21             Then he wants you to believe that he was

22     buying drugs to sell to his friends, and instead

23     of selling them directly to his friends to make

24     money in his drug-dealing business, he says

25     instead he introduced his friends directly to the

25

1    source.

2              Well, isn't that going to cut off his

3    ability to make money?  If you're going to give

4    your customers the actual source, how are you

5    going to make any money?  How is that going to

6    happen?

7              And then he said he never went upstairs

8    to buy any drugs.  He was never invited upstairs.

9    He bought his drugs while Mr. Malave was walking

10   his dog.  He had never been on the back stairs.

11             But he wants you to believe that his

12   friends were on the back stairs and that they did

13   do drug deals.  But did you hear from any one of

14   them?  Any single friend who came in and said,

15   yeah, I've been a drug dealer on the back stairs?

16   No, you didn't.  And that's reasonable doubt.

17             And why is it that Ian is so desperate

18   to distance himself from that apartment and that

19   person?  It's because he doesn't want to end up

20   where Mr. Reddicks is right now.  Reasonable

21   doubt.

22             Now, they're also going to tell you,

23   well, you can also consider the fact that Mr.

24   Reddicks changed his phone number sometime after

25   this.  He canceled his phone.  But you have the

26

1    records.  He canceled his phone on March 1st --

2    I'm sorry, May 1st.  He's still calling his

3    girlfriend up to that time.  And so what?

4         Alex got a new phone.  Lucky got a new

5    phone.  Other people in the case got a new phone.

6    It doesn't make him a murderer.

7         And so what if you believe he was there

8    to do a drug deal that day?  What if you believe

9    the text and you say, okay, they proved that he

10   was there to do the drug deal.  It still doesn't

11   make him a murderer.

12        He was there to do a drug deal, ladies

13   and gentlemen.  Where is the motive to murder?

14   Where is it?  And if you look at those texts, he

15   is negotiating a price, "Can you do a pound for

16   44?"

17        Well, if you're going to rob someone,

18   are you going to negotiate a price?  What do you

19   care what the price is?  You're not paying for it

20   anyhow.  Why would it matter to you that you got a

21   good deal if you were just going to rob him?

22        And then the Commonwealth is going to

23   say, wait a minute, he had Mr. Malave's number in

24   his contacts, his name, Mario Malave and his

25   telephone number in his phone.

27

1          Well, think about that, ladies and

2     gentlemen, think about that.  If he was actually

3     going to rob him, do you think he'd put his number

4     in his contact information in his phone?  How does

5     that make sense?

6          If you're going to rob someone, don't

7     you distance yourself from them in some way?

8     Isn't that what happens here?  And instead, he

9     puts the number in his phone because it's his drug

10    supplier, because it was an actual deal not

11    because he was going to murder anyone.  It doesn't

12    make sense.  It's just their theory.

13         You have to believe the Jonathan name.

14    You have to believe there's something sinister

15    about the fact that he put this name in his

16    contacts.  And I suggest there's nothing sinister

17    at all because he intended to have a long-standing

18    relationship with Mr. Malave, if you believe the

19    drug deal issue.  That's what's happening there.

20    And that's not murder.

21         And let's look at the witnesses who did

22    testify who were there.  The first floor apartment

23    woman, do you remember Pamela Arthur, the one with

24    the bopping and the scurrying?  And you remember

25    the second floor apartment woman who testified?

28

1           And let's listen to what their testimony

2      was.  Their testimony was that there was some

3      conversation on the back porch.  There was some

4      conversation and it appeared that the people knew

5      each other.  And both of them said that they heard

6      some conversation in which it appeared that the

7      people -- at least they believed that the people

8      knew each other.

9           Well, you know that that's not Mr.

10     Reddicks.  You know he had never met him before,

11     didn't even know who he was according to the

12     texts.  So who is that?  Who is making those

13     conversation with Mario Malave in the minutes

14     before he died?

15          And where did those people go?  The

16     testimony from the first floor and the second

17     floor is they heard people walking up the stairs

18     after they heard that friendly conversation.

19          But the Commonwealth wants you to

20     believe, wait, there were two separate

21     conversations; one for earlier, 20 minutes

22     earlier, and then one later.

23          Well, where did the people go?  How come

24     nobody in that apartment talked about people

25     entering before this whole thing happened?  Did

29

1          they just disappear, those friendly people

2          downstairs?

3                    Because if you're wondering where they

4          went, how they disappeared into thin air, that's

5          reasonable doubt, ladies and gentlemen, because

6          there was no doubt in those witnesses' minds that

7          there was a friendly conversation there.

8                    And we know it couldn't have been Mr.

9          Reddicks because he didn't know this guy from a

10         whole in the wall, not from a whole in the wall.

11         And that's reasonable doubt.

12                   And let's think about what they had to

13         say.  Now, these witnesses that were there, Edwin,

14         Alex and Lucky and the girlfriend Pam, they all

15         say this happened very quickly.  That's their

16         story.  It happened very quickly.

17                   And if anyone here believe it either was

18         that they came up with the canister or that he

19         took a bag and went back out, that's the story

20         that they want you to believe.  But what they

21         don't know is who was in that hallway at that

22         time.

23                   Now, they're going to say believe Leanne

24         Parker.  Leanne Parker is the key to the case.

25         Did you see her testify?  Could she remember a

30

1      single bit about anything?  Had she told different

2      stories?

3             And this is what you should ask yourself

4      about Leanne Parker.  How did she know she was

5      supposed to lie to the police?  Her very first

6      statement to the police:  Lucky never went in.

7             She said she had no conversation with

8      Lucky.  They never discussed what happened.  How

9      did she know she was supposed to have that -- she

10     was supposed to tell that lie?  How did she know?

11            If her whole role was just to come down

12     from Maine as a favor because she likes to drive

13     and she was going to rent a car and pay for it

14     herself and drive all the way down, two and a half

15     hours from Lewiston, Maine to Boston so he could

16     buy two ounces of marijuana, because apparently

17     there's nowhere else from Lewiston, Maine to

18     Boston where he could buy two ounces of marijuana.

19            But if you believe that, if you believe

20     that's why he was there that night, then why is he

21     lying?  Why is he saying to the brother -- you

22     remember the brother's testimony.  He told the

23     brother he never went inside the apartment, the

24     same, exact thing Leanne Parker told the police.

25            But they never spoke.  Do you think it's

31

1       just a coincidence that they both have the same,

2       exact story?  And then Leanne Parker says to the

3       police originally, "I had no idea why he was

4       coming down to Boston.  I was just going to drop

5       him off."

6              So why doesn't she drive away?  If she

7       was just going to drop him off, why doesn't she

8       drive away?  Why is she sitting outside waiting?

9       Her story now is, "Well, I was supposed to drop

10      him at his mother's, and then he said he wanted to

11      make this pit stop here first."

12             And you remember her telling me he was

13      passed out next to her the whole time.  Well, look

14      at Mr. Malave's phone records.  There are calls

15      and texts to Lucky.  And so either she was taking

16      them or he wasn't sleeping the way she said he

17      was.

18             But why would she lie, ladies and

19      gentlemen?  Why would she lie about that?  Why is

20      she trying to distance Lucky and herself from what

21      happened in that apartment?

22             And her story is that Lucky came flying

23      down right after the guy with the curly hair came

24      flying down.  Remember that?  That's what she

25      said.  Then you have other witnesses say he's

32

1      hiding in a closet -- well, they didn't say that

2      originally.  Now they're saying that.

3              But that's the story, he came flying

4      down.  So if he came flying down, who's still up

5      in that apartment at that point?  How do you

6      explain that?  That's reasonable doubt, ladies and

7      gentlemen.  That's how you explain it.  Reasonable

8      doubt.

9              Now, if you get to the time line in this

10     case, and I suggest the time line is important,

11     because if you get to the time line in this case,

12     you will remember that the very first witness who

13     testified, the victim's brother Rod, he testified

14     that he received a phone call, four phone calls,

15     frantic phone calls from Lucky.

16             And when did the phone calls first

17     start?  6:16.  6:16, that's what he said.  And he

18     said not only did I say that, but I showed the

19     police my cell phone.  The first call came in at

20     6:16, and there were frantic messages left by

21     Lucky that his brother had died.

22             But, of course, he lied about it and

23     said he saw him upstairs -- outside on the street

24     being shot.  But that's a different story.  The

25     phone call came in at 6:16, and there's no

1    dispute.  The Commonwealth didn't dispute that at

2    all.  No contrary evidence at all to the 6:16.

3          So, if it's 6:16 and he's calling the

4    brother, Lucky is calling the brother, frantically

5    telling him his brother is shot and killed, then

6    how could the murder happen later on?

7          Wouldn't it have had to have happened

8    before 6:16?  And according to them, my client in

9    his grandmother's car is driving by the train

10   station at 6:14:30.

11         So you think in the 90 seconds that he

12   had that he would have been able to drive by the

13   train station, turn around, park the car, sit

14   there for a few minutes, according to Leanne

15   Parker, and then look back and forth five or six

16   times, get out of the car, walk upstairs, ask for

17   a sample, talk to the victim, ask for more,

18   negotiate something, fire three shots, go back

19   down the stairs and get back in the car?

20   Impossible. Couldn't have happened.

21         And then if you look at it from the

22   other side, the Commonwealth will tell you, well,

23   wait a minute, there's this 6:20 call that we know

24   is on Reddicks phone.  It's a 6:20 call to Malave.

25   And they want you to believe that's when he's

34

1       pulling up, at 6:20.  How do you know that?  Who

2       says that?  We don't know that.

3             But let's just assume for the sake of

4       argument that it's a 6:20 call.  Then he would

5       have four minutes, four minutes to sit in the car,

6       look back, according to Leanne Parker, five or six

7       times or somebody in the back looked back five or

8       six times, get out of the car, walk up the stairs,

9       negotiate the sale, look for the sample, get the

10      product and then run away, and still be by that

11      train station by 6:24.

12             So that means that Mr. Malave had to

13      have been killed before 6:24.  And how do you know

14      that?  Because if you look at the Dunkin Donuts

15      video, the one that isn't time lagged, they say

16      that Ruth, the girlfriend -- Camille is running to

17      the Dunkin Donuts.  At 6:24:22 she's at the Dunkin

18      Donuts.

19             So, if she's at the Dunkin Donuts at

20      6:24:22 and she said she heard the shots before

21      she ran, and she said she heard them as she was

22      running down th stairs, how in the world could it

23      be Mr. Reddicks if he's driving by the train

24      station at 6:24:30?

25             How does that happen, ladies and

1        gentlemen?  It can't.  On either side of their
2        time line they're wrong.  Any way you want to cut
3        it, they're wrong.  And that's reasonable doubt.
4              Now I'm going to ask you to focus on
5        Reddicks' statement.  Reddicks made a statement,
6        voluntarily went down to the police station,
7        waived his Miranda rights and spoke to them.
8              And what did he tell them?  Yup, that's
9        my phone.  Yup, that's my grandmother's car.  Yes,
10       I've dealt marijuana in the past.  I know of Mr.
11       Malave, but I didn't kill him.  I know he was a
12       drug dealer, but I never did any deal with him.
13             He said that.  Why would he say that,
14       ladies and gentlemen?  Why would he put himself in
15       the middle of that?  What's the explanation for
16       that?  And they're going to say, whoa, whoa, he
17       canceled his phone.  Well, let's look at everyone
18       else who canceled their phone.  That's not enough.
19             What about the fact that he lied about
20       being there?  Well, his mother was sitting right
21       outside of the interrogation room.  He's three
22       days past his 18th birthday, and he lies about
23       dealing marijuana.  So did Alex.  So did Edmond.
24       So did Ian.  And they're not sitting here today.
25       Not a single one of them is sitting here today.

36

1        And so let's think about what they said

2    in terms of their testimony.  Let's think about

3    for a second whether or not any of the physical

4    evidence can corroborate what they were saying.

5        Their story is bang, bang, bang, and

6    everybody runs.  The table gets flipped up and

7    then you run to the outside closet, you run to the

8    outside closet or you run down the back stairs or

9    the front stairs.

10        Now, his girlfriend said she ran down

11    the back stairs.  That' would have been impossible

12    because she would have ran into whoever was doing

13    the shooting.  So, she's certainly wrong about

14    that.  But she was positive she was on the second

15    step when she heard -- or the second landing when

16    she heard the second shot.

17        If that's the case that she's at the

18    Dunkin Donuts at 6:24, how could it be Mr.

19    Reddicks if he's at the MBTA station at 6:24?  It

20    can't be.  It simply can't.  And their story is

21    that it happened and they all dashed.  Nobody

22    waits around for the police.

23        So, how do you explain, ladies and

24    gentlemen, the disarray of the bedroom?  Who did

25    that?  Alex said he didn't do it.  He never said

37

1          anything about going in the bedroom and searching

2          around.  Edwin Lockhart said he didn't do it.  He

3          didn't go in the bedroom and search around.

4                    Clearly, the bedroom was ransacked.

5          What do you think they were looking for, ladies

6          and gentlemen?  Who was in there ransacking that

7          bedroom?  Who's pulling up the mattress?  Who's

8          doing all that?  The physical evidence doesn't fit

9          what they're saying happened.

10                   But you know what does?  If you think

11         about what Rod, the brother, said, 6:16, four

12         frantic calls from Lucky about his brother being

13         dead, and then you remember Pamela Arthur.

14                   And you remember she said three shots

15         and then scurrying for 10 minutes from the front

16         of the house to the back of the house, scurrying

17         for 10 minutes, front of the house to the back of

18         the house.  Who's doing that?

19                   No one said anything about scurrying.

20         She said there was scurrying for 10 solid minutes

21         from the front of the house to the back of the

22         house.

23                   And if that's the case, ladies and

24         gentlemen, that the shots happened at 6:16, then

25         when Edwin Lockhart is walking down those stairs

38

1          trying to avoid the police and calling 911 and

2          lying to them, that happens at 6:27, about 11

3          minutes later, 11 minutes later.

4                    How else did you explain what happened

5          here?  How else did you explain the disarray of

6          that bedroom?  How else did you explain the fact

7          that everyone is saying that they took off?

8                    And you remember that they didn't search

9          Alex's car.  They didn't search Edwin's car.  They

10         didn't even check out Lucky's  -- I'm sorry, they

11         didn't even check out Ian Follette's alibi.  We

12         don't know where he was that night, except by his

13         own testimony.  But the physical evidence doesn't

14         fit.

15                   And then we have, ladies and gentlemen,

16         this evidence.  See it?  Blood spatter outside the

17         kitchen.  And you look and it goes all the way

18         into the bathroom, the blood spatter on that

19         floor.  He was shot in the hallway, ladies and

20         gentlemen.  Where does that come from?  How does

21         that blood spatter happen?

22                   They might try to suggest it's the cat.

23         Remember the cat that was in the apartment?  But

24         look around that blood spatter.  Do you see any

25         paw prints?  Do you see anything consistent with a

39

1      cat doing that?  Did you hear any testimony that

2      the cat did that?

3              How did that blood get on the wall?  Who

4      is ransacking that house?  Who's scurrying from

5      the front of the house to the back of the house

6      for 10 minutes?  That's reasonable doubt.

7              The Commonwealth is going to say that in

8      this case you can believe what the witnesses say

9      because it's corroborated by the physical

10     evidence, and they're going to show you a picture

11     of the door, and they're going to say the door had

12     to have been open at the time of the shooting

13     because there's no bullet holes in the door.

14             Well, exactly, exactly there's no bullet

15     holes in the door.  So you're going to have to be

16     the best shot in the world to get that shot

17     between that crack in the door to end up in the

18     house.

19             And this is what they say happened.

20     They say there were three shots.  One they say

21     went through the outside wall up into the kitchen

22     corner.  That's one.  We account for that.

23     There's a second bullet in the victim's head.

24     That's number two.

25             And the third bullet, according to them,

40

1          went in through the back, out through the

2          shoulder, and somehow ends up outside of bedroom

3          number three.  Now, where it was originally, we

4          won't know because they say the cat played with it

5          or whatever it did.

6                   But here's the problem with that, ladies

7          and gentlemen.  You remember Detective Camper's

8          testimony, the one with the junk science.  He says

9          he can tell that all three bullets were fired from

10         the same gun.

11                  Well, you can if you can ignore all the

12         dissimilarities.  Of course you can.  There's no

13         minimum number of points you need to declare a

14         match.  So how do you believe that?  How do you

15         believe that they all came from the same gun?

16         There's at least two different manufacturers.

17                  And here's what doesn't make sense.

18         Here's what you need to think about.  That third

19         bullet, the one that was supposed to go through

20         the victim's back and out his shoulder and somehow

21         through a crack in the door and into the

22         apartment, that one has no red-brown stains on it.

23         It has no tissue on it.  It has no nothing on it.

24                  According to them, it went through his

25         back and out his shoulder.  Now you remember the

41

1           bullet that they pulled from the victim's head.

2           It had red-brown stains on it, which you would

3           assume would be the blood from the victim.

4                   Why isn't there any blood on that bullet

5           that's outside of bedroom number three?  If their

6           theory works, then why isn't there any tissue,

7           blood, anything on that bullet?  There's nothing.

8           That's reasonable doubt.

9                   Now, ladies and gentlemen, they also

10          want you to believe in this case that because in

11          this case Mr. Reddicks' statement, when he made

12          the statement, they're going to say he lied to

13          them and somehow that's the focus of your

14          attention.

15                  And they're going to say everything is

16          corroborated by these cell tower records and this

17          video at the MBTA station.  But where is the video

18          of Lucky's car?  Where's that?

19                  And then they're going to ask you,

20          they're going to say this time line doesn't work

21          because who answered the phone at 6:20 from the

22          victim's apartment?  I don't know.  There's lots

23          of scurrying by 6:20, according to Pamela Arthur.

24                  And we know for sure somebody was making

25          phone calls off the victim's phone because he died

42

1    on the 27th and there were calls all the way up

2    until the 30th.  Who's making those calls?  Who is

3    that?

4            They want you to believe that the cell

5    phone went right into police custody.  If that's

6    the case, why didn't Sergeant Detective Daly say,

7    "I made those calls."  Why didn't he say that?

8    There's no evidence as to anyone making those

9    calls, but we know that phone made calls.

10           And we know that they didn't investigate

11   who was calling.  And we know that they didn't ask

12   for any phone records or any cell tower records

13   for anyone other than Mr. Reddicks because they

14   want you to focus your attention on him.  And then

15   they want you to think there's something sinister

16   about the way that he was supposed to have

17   conducted a drug deal that day.

18           According to them, he uses his

19   grandmother's 1992 blue rot-ridden car that would

20   stick out like a sore thumb.  Who would do that if

21   they were going to commit a murder?  Who would do

22   that, use your grandmother's car?

23           Then they're going to say right after he

24   parked the car in the back of that house where his

25   cousins were.  Maybe he did, maybe he didn't.  He

43

1          was there for a drug deal.  But then he parked it

2          outside of his grandmother's house.

3                    Wouldn't you think if you had committed

4          a homicide in that car you would look for a way to

5          get rid of it?  You wouldn't park it outside of

6          your grandmother's house, and then when the police

7          ask you about it, you tell them you were driving

8          it that day?

9                    And what's the most important thing he

10         said to the police?  "I didn't kill anyone.  I

11         didn't kill anyone."  And so could he have been

12         there for a drug deal?  Yeah, he could have.

13         But it doesn't make him a murderer. The evidence

14         just doesn't make sense.

15                   THE COURT:  Ms. Scapicchio.

16                   MS. SCAPICCHIO:  So, ladies and

17         gentlemen, there's no physical evidence -- well,

18         let me just say one thing really quickly because

19         the Judge is going to cut me off.

20                   So, you're going to hear some

21         instructions from the Judge about inferences that

22         you can draw.  And one of the instructions is

23         going to hear is about this mailman, and you can

24         infer that if you see the mailman deliver the mail

25         that there's actual evidence that the mail was

44

1    delivered because you saw it with your own eyes.

2            And then there's this instruction on

3    inference, that if the next day you're not home

4    but you see mail in the mailbox, you can infer

5    that the mailman came, and you absolutely can.

6            But you can't infer that your regular

7    mailman came.  How do you know there wasn't a

8    substitute mailman that day?  That's the part that

9    you need to concentrate on on the inference.

10   That's the part that matters.

11           And when you look at this case, ladies

12   and gentlemen, you need to understand that there

13   is simply no physical evidence that connects

14   Charles Reddicks to this crime.

15           You will remember that they took his

16   coat.  No gunshot residue here or here or anywhere

17   on his coat.  They took his car.  No gunshot

18   residue anywhere in the car.  They want you to

19   believe that he's the one who went up the stairs.

20   No fingerprints on any of the doorknobs on that

21   stairs, no gloves on his hands, no weapon in his

22   hand when they said he left that car or came back,

23   if you believe that testimony.

24           And then where are the drugs?  And they

25   want you to concentrate on the fact that they say

45

1          2011, I think it was December of 2011 he had a

2          gun.  If you believe that testimony, so what?  It

3          doesn't mean he had a gun that night.  And it

4          doesn't mean he had a motive to kill anyone.

5                    No physical evidence.  No DNA evidence.

6          No fingerprint evidence.  No gunshot residue.

7          Nothing to suggest he did anything.  There was no

8          robbery.  It's just a theory.  There was no

9          murder.

10                    And certainly, ladies and gentlemen,

11          certainly, the Commonwealth's burden in this case

12          is guilt beyond a reasonable doubt.  Guilt beyond

13          a reasonable doubt, that's their burden.

14                    And my suggestion to you is they didn't

15          meet it by any stretch of the imagination.

16          There's all of the questions that I asked you

17          here.  If you're even thinking about one of them,

18          any one of them results in a not guilty for

19          Charles Reddicks.

20                    And I suggest that the Commonwealth said

21          the pieces of the puzzle will fit together.  And

22          my suggestion is not only they don't fit, but

23          there are huge gaps in their case.  And you have

24          to make giant assumptions in order to fit the

25          puzzle together, and the law doesn't allow you to

46

1        do that.

2               And I suggest you evaluate all this

3        evidence.  When you realize there's nothing

4        physical that connects him to the crime, when you

5        realize that everybody else in that apartment lied

6        and evaded the police except for Mr. Reddicks, I

7        would ask you to find him not guilty.  Thank you.

8               THE COURT:  Thank you, Ms. Scapicchio.

9               Mr. Henning?

10              MR. HENNING:  Thank you.

11    CLOSING ARGUMENT ON BEHALF OF THE COMMONWEALTH

12    BY MR. HENNING:

13              MR. HENNING:  Here's what I'm not going

14        to do, ladies and gentlemen.  I'm not going to

15        yell at you.  I'm not going to raise my voice and

16        suggest my own interpretation of the evidence is

17        how you should interpret the evidence because it's

18        your job to go back in the jury room and apply

19        your common sense, your logic, your understanding

20        of the evidence to this to make a decision.

21              I'm not going to mischaracterize time

22        lines.  I'm not going to restate testimony and

23        leave out gaps.  I'm going to ask you to

24        collectively review the evidence because this case

25        is really about two things.  It's about the

47

1        evidence against Mr. Reddicks and his attempt to

2        cover up what he did through his lies and his

3        actions.

4                I want you to go back into the jury room

5        and collectively think about you know about this

6        defendant or what you know about what happened

7        that day and then apply your common sense.

8                First, you know that Charles Reddicks

9        was a marijuana dealer.  You know it from the

10       testimony of Ian Follette, and you know it from

11       the evidence in this case and the cell phone

12       communications.

13               And it's important that you know that

14       and you establish that because that helps

15       establish three things.  Number one, it connects

16       Charles Reddicks to Mariano Malave.  You know the

17       connection because of Ian Follette, not something

18       a person necessarily wants to admit on the witness

19       stand in a homicide trial.

20               Number two, it helps to establish that

21       Charles Reddicks knows how to discuss and

22       negotiate.  He knows prices, quantities, types,

23       what's reasonable, what's not.  And you can use a

24       fake name like Jonathan to help set up that deal

25       if you're never going to have to deal with the

48

1      person again.  If you're going to rob and take

2      those drugs instead of paying for them, you need

3      to be able to walk the walk and talk the talk.

4      Charles Reddicks could do that.

5             Yes, Ian Follette sold drugs.  He got up

6      on that witness stand and talked about all the

7      people he sold to, people in his neighborhood,

8      high school friends at Latin Academy.

9             If Ian Follette was the neighborhood

10     dealer for his friends in high school, this guy

11     was Costco.  He is dealing in heavier amounts,

12     quarter pounds, discussing amounts like pounds

13     with Mariano Malave, because he needs larger

14     quantities in order to operate his business.

15            You know he's a drug dealer, and you

16     know when the police asked him that question

17     during his interview, he lied, the first of many

18     lies that are not tiny, white lies.  They are huge

19     whoppers that help to establish what was going on

20     in his mind.

21            He needed to lie about being a marijuana

22     dealer because he had just set up a marijuana deal

23     and executed the man he was going to take the

24     drugs from.

25            So, when he was asked if he was still

49

1    dealing drugs, he said, "No.  In 2011 I was.  But

2    I'm not doing it now."  That's a lie that helps to

3    separate him from the scene of the crime, which is

4    what the motive was for every one of the lies he

5    told the police.

6           Second, you know that Charles Reddicks

7    had a car, not just any car, a terrible beat-up,

8    blue 1992 Ford Escort registered to his

9    grandmother.  And Ms. Scapicchio has suggested why

10   would you go commit a murder and a robbery in a

11   beat-up car like this.  Well, when you're 18 years

12   old and that's all the car you've got, that's what

13   you use.

14          Now, Charles Reddicks was responsible

15   for this car, and you know it from four or five

16   different ways, from Grandma, from Ian saying he

17   saw him drive it, from Khadijah, from his own

18   mouth, basically the only thing he told the truth

19   to the police about.

20          And this car is important because when

21   he was asked about the car, Charles Reddicks told

22   the police who was responsible for that car.  He

23   said, "The keys were on me.  I was driving it that

24   day.  Yeah, I had it after school that day," and

25   he provided police with a time line, and that time

50

 1          line was a lie because he needed to keep this car

 2          separate from the scene of the crime.

 3                  Now, the lie he told about the car is

 4          different than some of the other stories he told,

 5          and you need to understand why.  Every one of us

 6          living in the cellular age realizes your cell

 7          phone records the things that you do, your texts,

 8          your phone communications, the people that you

 9          deal with.

10                  But Charles Reddicks had no way of

11          knowing that there was a crystal clear video

12          camera out in front of Forest Hills.  He had no

13          way of knowing that he would be captured driving

14          to the crime scene before the murder and from the

15          crime scene on the way back from the murder.  And

16          so he didn't feel like he would be caught.

17                  When the police asked were you at Forest

18          Hills, he said, "No, of course not.  I wasn't at

19          Forest Hills," even though we know the keys were

20          in his pocket and he was the only one responsible

21          for the car that day.

22                  He also had no way of knowing that a

23          woman he never met, who had nothing to do with

24          him, was parked in front of 132 Hyde Park Ave. and

25          took down the license plate, not a random

51

1    occurrence.  It's not like somebody had fed her

2    this information.  She's standing or in the car in

3    front of 132 Hyde Park Ave., and she gets the same

4    information that you can get from reviewing this

5    video.

6            Yet when asked about going to Forest

7    Hills, he needed to lie because he needed to keep

8    himself as far away from the scene of the crime as

9    possible.

10           Third, you know that he had a phone, and

11   counsel has suggested that, of course, he's a

12   teenager.  He has a phone.  Other people got rid

13   of their phone numbers and changed their phone

14   numbers.  It's not about changing your phone

15   number.  It's about what he admitted to and what

16   the phone records prove in this case.

17           Charles Reddicks owned the number that

18   ends in 8189.  You know it from Grandma.  You know

19   it from girlfriend.  You know it from Ian.  You

20   know it from phone records.  You even know it from

21   his own mouth.  That was the number used to set up

22   the murder of Mariano Malave.

23           You know that for a few reasons.  You

24   have the texts that set it up in the beginning of

25   the morning, and you know that the very last

1    person that Mariano Malave ever spoke to, the man

2    sitting at this table called him at 6:20:51.

3        Charles Reddicks was asked about this

4    phone call.  And this is where he began to help

5    make up a story to keep him separate from the

6    crime.  Remember what he told police first, "I had

7    it stolen."  A few minutes later, "I left it

8    someplace."  A few minutes later, "Maybe I dropped

9    it."  A few minutes later, "Somebody else picked

10   it up."  Because he realized at this time that the

11   phone could connect him to a murder, and he needed

12   to separate himself from that number.

13       Now, Ms. Scapicchio said he was using

14   that phone even after the murder.  Not true.  Take

15   a look at the records.  It shows seven calls to

16   his girlfriend, and then after that the phone

17   becomes a paperweight.  It's basically a glorified

18   answering machine in his pocket.  He doesn't use

19   the phone.  Check the records.  It's all incoming

20   and then to voicemail.

21       Because when you've killed somebody and

22   left their body in the kitchen of 132 Hyde Park

23   Ave. and you know this phone is in your pocket, it

24   becomes radioactive.  You need to get that away

25   from you or figure out a way to explain it.

1          And eventually he does because on May

2      1st he calls T-Mobile, and you can listen to that

3      call, hesitating to explain what happened to this

4      phone, because he knew that the phone had been

5      used to set up the murder and that it was the

6      phone in his possession afterwards.

7          You know that Charles Reddicks had

8      access to guns, and I'm saying guns with an S,

9      plural, to make sure the Court Reporter gets it

10     and you get it because you have evidence that he

11     had access to firearms, multiple.

12         First, you've got Thomas Washington who

13     testified from that witness stand that he saw

14     Charles Reddicks a few months before the murder

15     sticking a silver-colored revolver with a black

16     handle inside of his waistband.

17         And, yes, it looks an awful lot like the

18     picture we have here.  But here's the scariest

19     part of the whole story.  We don't know if the gun

20     that Thomas Washington saw him with in December is

21     the same gun that's pictured here.

22         We don't know if it's the same gun

23     that's pictured here.  All we know is that it's a

24     silver revolver.  All of them are revolvers.  And

25     you heard from Detective Camper, semi-automatic

54

1    weapons leave shell casings.  Revolvers do not.

2    No shell casings were left at the scene.

3              And yet again, just like all of the

4    pieces of evidence that helped close in on Mr.

5    Reddicks to put him at the scene, to give him a

6    motive, to give him the means to commit this

7    crime, when asked about this he lied.

8              "Have you ever handled a firearm?"

9    "Nope.  Nope."  "Have you ever had a gun?"  "Uh-

10   uh, nope."  Lies.

11             But they're important not just because

12   he didn't want to say something about having

13   weapons, but because what's pictured and what

14   Thomas Washington saw on him in December of 2011

15   is the exact, same type of weapon used to execute

16   and rob Mariano Malave.

17             MS. SCAPICCHIO:  Objection.

18             THE COURT:  Overruled.

19             MR. HENNING:  You know that this crime

20   was planned days in advance.  Now, counsel

21   mentioned this guy Sean Warfield, the guy who got

22   up on the witness stand from Dorchester.  Is he a

23   scumbag?  Is he racist?  Perhaps.

24             You don't have to like him.  But you

25   have to listen to his testimony and compare it to

55

1      the rest of the evidence that you have in the

2      case.  There is no way in the world he could have

3      possibly known that communications he would

4      receive from this guy's phone number about three

5      days before the murder would contain the exact,

6      same type of fake identity, set-up, negotiation

7      for prices and a request.

8               He had no way of possibly making that

9      up, and he took the witness stand and described

10     what happened.  Some guy named Jonathan contacted

11     him.  Never heard of the guy before.  The phone

12     numbers and the times of these incoming calls and

13     texts match up, and he was asking for a pound of

14     marijuana.

15              That's the exact, same scenario that

16     Charles Reddicks used with Mariano Malave, because

17     it's not just a scenario to buy weed.  It's a

18     scenario to use a fake name or fake identity to

19     establish contact and also a relationship

20     identifying the man who had set him up, Ian.

21              Charles Reddicks was using this fake

22     name, this fake identity, because he didn't want

23     people to know who he was.  If you're going to

24     establish a long-term relationship with somebody,

25     like Ian did with Charles Reddicks, you learn

56

1    their nickname and then things about them, Cash,

2    Keyon, those are the nicknames for Charles

3    Reddicks.  Ian figured out where he went to school

4    and learned about him.

5         Charles Reddicks didn't want to use his

6    real name.  This is part of the fake identity he

7    used in order to set up Mariano Malave, to lull

8    him into this happening.  And the only difference

9    between Sean Warfield who got on the stand and

10   Mariano Malave is that Sean Warfield broke off

11   communications and he is alive.

12        MS. SCAPICCHIO:  Objection, Your Honor.

13        THE COURT:  Overruled.

14        MR. HENNING:  Mariano Malave continued

15   negotiations with Charles Reddicks and how he is

16   dead.

17        This last comment here in the middle of

18   this page, "My boy Ian some other boys in JP said

19   that you had loud," yet another thing that Charles

20   Reddicks used to lie, to separate himself from the

21   crime.

22        The police asked him, "Did Ian connect

23   you to Mariano Malave?"  "Nope, nope.  Absolutely

24   not."  And he lied because that's exactly how it

25   happened.  Ian got on the stand and said, "I put

57

1      these guys in touch."  Charles Reddicks said,

2      "Nope, didn't happen.  Nope, haven't talked to Ian

3      in a while."  You know that that's a lie.

4              You know that Charles Reddicks was at

5      132 Hyde Park Ave.  I'm not going to focus right

6      now on Leanne Parker or the video or the fact that

7      the Dunkin Donuts video doesn't show the car

8      passing.

9              For right now, I just want to focus on

10     the tower records because you're going to need to

11     look at these when you go back in the jury room.

12     So, think about the accuracy and also the

13     information provided in these records.

14             And the first call I want you to look at

15     is down at the bottom right.  It didn't even

16     happen on the day of the murder.  But you can use

17     it when you go in the jury room to determine how

18     accurate these records can be.

19             It's a call at 11:35 at night, the night

20     before the murder, that lasts four hours.  And you

21     know who he was calling?  His girlfriend.  So, as

22     he sat in his house, you can understand a teenager

23     talking to his girlfriend for four hours, that

24     call was banging off of the north sector of the

25     tower near Millett Street.  You can see it's only

58

1      a few blocks away.

2              And after hearing from the witnesses

3      like Patrick Quinn and Raymond McDonald, you can

4      understand that that same relationship between the

5      calls and the towers can be used to follow his

6      path on the day of the murder.

7              We'll cover that in a minute.  But focus

8      just on this other set of calls.  This is the

9      tower right across from the Forest Hills T

10     Station.  There's one call in particular that you

11     can focus on to know exactly where he was because

12     while four telephone calls on the day of the

13     murder hit that tower, only one was bouncing off

14     of the southern or lower left sector of the tower,

15     and that was the call from Charles Reddicks to

16     Mariano Malave, just before he walked up and

17     killed him.

18             You know Reddicks was there because of

19     the MBTA video and Leanne Parker and the cell

20     tower records, and you can use all of those things

21     to corroborate the testimony of other witnesses,

22     as well.

23             You also know, despite what counsel

24     suggested, that Charles Reddicks was in the back

25     of 132 Hyde Park Ave.  The only two people in that

59

1          hallway are the defendant and the person that he

2          killed.  But you can infer and apply your common

3          sense to understand how you know he was there.

4                    First, the last call Mariano Malave ever

5          took was from the person that eventually pulled

6          the trigger.  You know that that call was placed

7          from this person's phone, the defendant, to

8          Mariano Malave.

9                    You know that he received the call and

10         it lasted approximately a minute.  At around that

11         time, Elissa Dennehy, despite what counsel says,

12         heard a conversation in the backyard between

13         people who did not seem familiar.  She kept using

14         that sentence but leaving out the word "not".

15                   Remember, Ms. Dennehy said these two

16         people greeted each other like they were just

17         meeting each other.  Now, that is happening

18         underneath her kitchen window.  That type of

19         greeting happens when you haven't met the man

20         you're buying drugs from or you haven't met the

21         man you're about to shoot.

22                   You know that that call happened.  You

23         know that Ms. Dennehy heard that conversation.

24         And lastly, you know that the defendant was asked

25         about this communication.  He was asked about

60

1       meeting Mariano Malave.

2               Sergeant Detective Daly very

3       deliberately described on the witness stand when I

4       asked him what happened when you asked Mr.

5       Reddicks what Mariano Malave looks like?  What was

6       his response?  "He didn't say, no, I've never met

7       him.  The first thing he did was say, 'um,' and

8       look up in the air."

9               And if he had never met him before, you

10      know what the automatic response would be, I don't

11      know, I've never met the guy.  He needed time to

12      pause and to think.

13              He needed time to come up with how this

14      lie would fit in place with all the other lies.

15      That moment of delay to try to give himself a

16      moment to figure out what to say, that shows you

17      that Charles Reddicks had met this person, and he

18      needed to work it out in his brain before he gave

19      an answer to Sergeant Detective Daly.

20              Now, Ms. Scapicchio suggested some

21      interpretation of the evidence, and I'm not going

22      to go through all the ones that I disagree with.

23      I just want to point out a couple to you to show

24      how your interpretation and your collective

25      knowledge of the evidence will look.  It's not

61

1   about what the attorneys say to you.  It's about

2   what the evidence will show.

3        She said why was there blood on the

4   kitchen floor near the bathroom.  If you put a

5   bullet through the head of 205 pound man, and his

6   head slams on the ground, blood spatters.  It

7   doesn't mean that there's a grand conspiracy.

8        It means that somebody with a gaping

9   head wound hits the ground and suffers by having

10  that blood spatter.  She said Rod, the brother of

11  Mariano Malave, got calls at 6:16 that were

12  frantic saying is brother was dead.  No.

13       He said he got calls from Lucky at 6:16,

14  and he didn't take them.  And then later on he

15  received some calls from Lucky where Lucky told

16  him his brother had been shot.  Don't conflate or

17  confuse those calls.  Use your notes and your

18  collective memory to understand how those calls

19  were.

20       Counsel said that there were cell phone

21  calls used -- or taken on the victim's phone after

22  it was recovered by the police.  You can imagine

23  Sergeant Detective Daly, not exactly a young guy,

24  looking through the phone to try to figure out

25  what's going on inside of it with the phone in his

62

1          possession in the days after the murder.

2                    He may not know the buttons.  He may not

3          know what he's doing with it.  But the phone is in

4          his possession because he got up on that witness

5          stand and said, "I recovered it from the victim's

6          pocket.  I reviewed it.  It was in my possession."

7                    One other important thing to cover,

8          because this is the sort of exercise you're going

9          to be doing in the jury room.  The witnesses in

10         this case come as they come.  We don't get to

11         choose who our witnesses are in a case like this,

12         and people don't volunteer to be homicide

13         witnesses.

14                   Leanne Parker came down from Maine not

15         expecting that she would see a person with curly

16         dreads jump out of and into a car right before and

17         after a murder.  She didn't expect to see or have

18         to describe the hair style three and a half years

19         later.  But she got up on the stand and she did.

20                   She didn't expect to be able to say that

21         the license plate that she was reluctant to talk

22         about happens to match the same person whose phone

23         was contacting the victim minutes before he died,

24         but she did it.

25                   Thomas Washington didn't want to have to

63

1        get up on the witness stand and say the friend

2        that I used to have, I saw him with a firearm a

3        few months before the murder, but that's what he

4        did.  He had no way of knowing that four or five

5        months later Charles Reddicks would commit murder.

6                Khadijah Warren, the girlfriend, she had

7        no expectation whatsoever that when Charles

8        Reddicks left that house on Westminster Avenue on

9        the 27th, he was going out the back door to get in

10       his car, because for that two-hour gap where she

11       didn't know where he was, he was driving to Forest

12       Hills to commit murder.

13               These people don't volunteer for the

14       job.  But they testified in this case, and you had

15       an opportunity to hear what they had to say.  The

16       police investigated from the moment they arrived

17       on scene and had two separate, distinct and

18       completely independent, unbiased routes to connect

19       to Charles Reddicks.

20               It wasn't just thrown up in the air and

21       identifying him from the scene.  They didn't

22       randomly pick him.  There was a car with a license

23       plate going back to Mrs. Reddicks, and one of the

24       licensed drivers happen to fit the description of

25       what Leanne Parker had given.

64

1          Completely separately and through a

2     completely different chain of events, they had a

3     phone number that had called the victim minutes

4     before he died.  They're not on a witch hunt.

5     They're following the trail of evidence because

6     that's how murderers are caught and that's how

7     cases are solved.

8          Now, Ms. Scapicchio talked about the

9     MBTA video and she mocked it.  And she suggested,

10    well, after 911 they must have put a lot of money

11    into their security system.  I think she probably

12    drives to work, because anybody who has used the

13    MBTA over the past few years, it's not a stretch

14    of the imagination to suggest that their time

15    frame is off, that things don't always run on

16    time.

17         But this picture behind us is a perfect

18    example of the exercise that you're going to have

19    to do in the jury room.  Think about what this

20    picture shows.  Remember, undisputed from what Ms.

21    Scapicchio said and what I say and what the

22    evidence says, the phone call to 911 comes in at

23    6:27 p.m.  There is no doubt whatsoever.

24         And Officer Robert Cordasco got up, the

25    second witness in this case, and he identified

65

1      from this picture his car.  He said, "That's me.

2      I'm responding to the call.  I'm coming from about

3      a half a mile away.  It took me about two minutes

4      to get there," so maybe 6:29 when he arrived.

5      "That's me.  That's the light on my car.  That's

6      the same window tint.  That's my car because I can

7      tell from the paint on the back."

8              So, 6:27 is the 911 call, and Officer

9      Cordasco is responding here.  What's wrong with

10     Ms. Scapicchio's theory?  Look at the timestamp on

11     the video.  Do you see it?  This is being taken at

12     6:26:18 on the timestamp, and according to Ms.

13     Scapicchio, Officer Cordasco would be responding

14     to a 911 call that hasn't even been made yet.

15             But if you take the two and a half

16     minute gap that Detective Dolloff testified about,

17     if you say, yeah, this guy looked at the video,

18     took his computer, then double-checked on his cell

19     phone and handwrote on the disc the time

20     differential, this is 6:28:48.  He's still about

21     .2 or .3 miles away from the scene.

22             He can drive pretty quick with lights

23     and sirens.  He's there at about 6:29, right when

24     he said he would be there.

25             That takes work.  It takes effort.  And

66

```
1          no one is expecting your job to be easy.  But when

2          you go back in the jury room, it's the sort of

3          work we are asking you to do.

4                    When it gets hard, look deeper at the

5          evidence because it is all there.  The time line

6          can be established when you use your common sense

7          and when you understand what the evidence actually

8          shows.

9                    If you compare those things and then

10         consider what Charles Reddicks said when he was

11         asked by police, you will understand that these

12         lies are not tiny, white lies.  These are

13         whoppers, and they're designed to keep him as far

14         away from the scene of the murder as possible.

15                   Here's the time line, because I agree

16         with counsel, it's important.  Alex, the cousin,

17         is out in Brockton.  He's met with Mario during

18         that afternoon and he's going to bring drugs.

19         Around four o'clock or so there's phone calls from

20         the cousin Alex to Mario, around 4:45.

21                   Alex said he was confirming with Mario

22         that he was on his way to bring the drugs.  And

23         you can see immediately after that, calls between

24         Charles Reddicks and Mariano Malave.  The drugs

25         are on the way.
```

67

1          About an hour of time passes.  Think

2     about how long it takes to get from Brockton to

3     Boston.  And around that time is when Alex says he

4     arrives. And when he arrives on scene, the drugs

5     are now there.  The wait is now there and

6     communications continue between Mariano Malave and

7     Charles Reddicks.

8          But here's where you need to dig a

9     little bit deeper.  It's not just communications.

10    It's travel time and locations and direction of

11    travel, because at the same time Mariano is

12    confirming with Charles Reddicks the product is

13    here, you can see phone calls from Charles

14    Reddicks, starting at 5:47 and going into 6:01,

15    6:05 and 6:12.

16          He moves south and west, and in this

17    direction, heading down toward the area of Forest

18    Hills, heading off of Washington Street, and it

19    gets a little crowded during rush hour, and

20    instead swinging down to the east toward the

21    Forest Hills T Station.

22          As he's doing that, you can see

23    communications between Charles Reddicks and Ian, a

24    phone call that's corroborated by what Ian said.

25    The defendant called him and said two important

68

1       things.  Number one, "I connected with your boy."

2       This is at 6:01 p.m.  The victim would be dead in

3       about 24 or 23 minutes.  "I connected with your

4       boy."

5               Then he asked him about going up the

6       back steps, and that confirms for you that what

7       Charles Reddicks told the police earlier, "I never

8       had any communications with him after our text

9       messages," that lie is huge because he did have

10      communications.  He did learn about the back door.

11      He did learn the way you get to Mario's house to

12      buy drugs, and he went up those back steps.

13              After talking to Ian, there are other

14      phone calls between the defendant and the victim

15      at 6:05.  These are ones that Ruth Camille hears

16      inside the house.  Remember she described Mario at

17      the window giving directions to somebody, then

18      telling somebody where to park, and then he left

19      and went to the kitchen.

20              This is around the time there are phone

21      calls between Lucky and Mariano Malave and Leanne

22      Parker is coming up to the house.  She's not yet

23      stopped and parked because there's still repeated

24      phone calls between Lucky and Mariano Malave.

25              Around the time that Charles Reddicks is

69

1    calling Ian Follette back for one more request

2    between 6:12 and 6:13, around that time is about

3    when Lucky gets to the house.  And you know at

4    this time that there's people in the kitchen,

5    Lucky, Edwin and Alex, the cousin.

6         And the witnesses who testified said at

7    some point Mario leaves and he heads out with the

8    dog.  And the vast majority of the drugs, the

9    product at that house, end up in recycling bin, a

10   stash as Sergeant Detective Daly described it,

11   outside because if you're an experienced marijuana

12   dealer, like Mario, you don't just walk around

13   with a bucket of drugs.  You hide the product and

14   leave samples so that your customer can check out

15   what you're going to sell him.

16        6:12 and 6:13, the defendant is calling

17   Ian to check in and get one more piece of

18   information.  He calls Ian and says, "Do you want

19   to go with me?"  And Ian says no.  But in

20   addition, Charles Reddicks lets him know, "I am on

21   my way to see him.  I'm headed there."

22        And that's corroborated by three

23   different events, the testimony of Ian Follette,

24   the cell phone records that put this phone call

25   starting to the west and moving right to where the

70

1        Forest Hill T station is, and you have him passing

2        the T station at 6:14:30.

3                Remember, the call with Ian starts here

4        at about 6:13:21.  It lasted about a minute and 20

5        seconds.  That means that Charles Reddicks is

6        basically hanging up the phone as he passes the

7        Forest Hills station on his way up to 132 Hyde

8        Park Ave.

9                Now, counsel suggested that he wasn't

10       there for a few minutes.  That's not what the

11       evidence shows.  He never passes Dunkin Donuts,

12       and Leanne Parker gets his license plate in front

13       of 132 Hyde Park Ave.  So he pulls up there.

14               And this is actually the most disturbing

15       part of the whole case because Charles Reddicks

16       was stopped in front of Leanne Parker for probably

17       five minutes.  She saw the man in front of her

18       turning, looking over his shoulder.  But that

19       means Charles Reddicks was sitting in the car

20       waiting for those five minutes.

21               What goes through your mind when you're

22       preparing to go rob and shoot somebody?  What do

23       you think about when you're going to put a bullet

24       in someone's head?

25               Was he stuffing the gun into his

71

1    waistband like Thomas Washington had seen him do a

2    few months before?  Was he sliding the bullets

3    into the cylinder of that gun and closing it so he

4    was ready?  How do you prepare to commit a murder?

5         At 6:20:51 Charles Reddicks called

6    Mariano Malave.  That call is highlighted in red

7    on these sheets.  It lasted about a minute.  You

8    stood at that house and you walked up those steps

9    and walked down the side of the house and went

10   into the backyard.  You know how long that takes.

11        And when Elissa Dennehy looked out her

12   window and heard conversation between a male that

13   she knew, Mario, and a guy that she didn't, she

14   said they were unfamiliar with each other.  Then

15   she hears sounds of people moving upstairs, and

16   Pamela Arthur hears what she called bomping.

17        This back door, this window, you stood

18   there.  You know that Elissa Dennehy had an

19   opportunity to hear that and to see the dog in the

20   backyard and to not see when you're standing on

21   these steps exactly who was having the

22   conversation.

23        It's corroborated by the physical

24   evidence.  This is where Mariano Malave died.  The

25   only two people in that back hallway were the

72

1    defendant and Mariano.  And the difficult part

2    here is that you may never know precisely what

3    happened.

4         But Mariano Malave went into the kitchen

5    and told his cousin, "The dude is here," and

6    grabbed the sample product.  Then he went back out

7    in the hallway.  Moments later, he went back into

8    the kitchen to get a larger sample, and those were

9    in his hand when he went back into the hallway

10   that second time.

11        Something must have caught his

12   attention.  Something must have scared him.  He

13   must have noticed something because his back was

14   turned.  We don't know if he was heading back into

15   the kitchen because he saw the glint of a handgun

16   in Charles Reddicks' hand.

17        We don't know if the gun had already

18   been pulled when he came out the second time.

19   But something caused Charles Reddicks to draw that

20   weapon, and Mariano Malave must have known it was

21   coming because he turns his back, and Charles

22   Reddicks pulled that trigger three different

23   times, firing at Mariano Malave.

24        One bullet flies through the wall,

25   literally over the heads of Julio, Lucky and Edwin

73

1          sitting at the table.  It hits the top, drops to

2          the ground, and you saw it in the photographs.

3          Plaster through the wall.  Edwin actually

4          described it coming out of the wall and falling

5          down over his back.

6               Mariano Malave dies on the floor seconds

7          later.  The people that were inside that kitchen

8          ran for their lives.  And you know that not just

9          because they told you and not just because the

10         physical evidence supports it and not just because

11         the witnesses downstairs told you that that's what

12         it sounded like, but because that's what you do

13         when bullets fly over your head.

14               One floor down Elissa Dennehy said it

15         sounded like furniture was being overturned.

16         There was furniture overturned.  Alex and Edwin

17         said we got behind the table.  We didn't know if

18         someone was coming through that door to kill us or

19         not.

20               There's three men down on the ground

21         there.  Elissa Dennehy, after hearing the

22         furniture, hears running down the back steps.

23         Pamela Arthur hears scurrying down the back steps.

24         That's Charles Reddicks beginning his escape.

25               Around the time he's getting to the car,

74

1    he passes back in front of Leanne Parker getting

2    into that blue car and taking off.  It's not very

3    far to Forest Hills.  Counsel made it sound like

4    he's running a marathon.  You saw it.  It's .2, .3

5    miles.  It's a straight shot.

6            So, as he's passing at 6:24:30, the

7    people in the house are running.  The first one

8    out is Ruth Camille.  Go to the timestamp, look at

9    Dunkin Donuts.  She's captured on video going into

10   that pizza shop at about 6:24:45.

11           Julio, Alex and Lucky try to hide in the

12   closet, and then Lucky tries to kick in the door

13   downstairs, corroborated by what Elissa Dennehy

14   said.  Then he goes out the front and gets in the

15   car with Leanne and they leave, but then they come

16   back.

17           Remember she described a white sedan,

18   four-door.  She described Lucky wearing red.  Pick

19   up the Dunkin Donuts video.  You can see them

20   after the murder parked in front of the Dunkin

21   Donuts.  There's no question about where he was.

22           Julio walks out the front of the house.

23   Pamela Arthur, that most descriptive witness that

24   we had, said a puss-colored Hispanic guy with a

25   black and red hat, black top, black pants, white

75

1    undershirt came out and was standing on her front

2    porch.  And he is picked up on video wearing that

3    same thing walking by the Forest Hills -- excuse

4    me, walking by the Dunkin Donuts on Walk Hill

5    Street.

6            And the last person out is Edwin.  Yes,

7    he told the police a different story on the phone

8    than what actually happened because moments

9    earlier bullets had been flying over his head.

10            Everyone on scene is accounted for.

11    Leanne Parker doesn't see anybody else run by her.

12    She doesn't see any cars take off.  Pamela Arthur

13    does see anyone else out front.  There's nobody on

14    the Dunkin Donuts video.  Everyone is accounted

15    for by the physical evidence there, by the witness

16    testimony, by the time line.

17            And now because of the trial, Charles

18    Reddicks' activities and actions are accounted

19    for.  He took the exact, same route leaving this

20    area, heading north and east, coming back to 14

21    Westminster.

22            He called his girlfriend seven times,

23    and then that phone became junk because he had

24    just used it to kill somebody, to set up a robbery

25    and a murder.  And over the course of the next few

76

1          days, he came up with that story; my phone got

2          stolen, I left it, I dropped it.  The call to T-

3          Mobile on May 1st is when he first confirmed it to

4          the outside world.

5                    But everything he did after the fact,

6          all of the statements he made to the police, all

7          of his actions with the phone, calling T-Mobile,

8          his lies about the car, about the phone, about

9          meeting Mario, about meeting Ian, about where the

10         phone was, about what number was in use, about

11         going to 132, about being in the back hallway, all

12         of those statement were lies.

13                    They were part of a cover-up.  And now

14         the cover-up is over.  What Charles Reddicks did

15         is no longer able to be covered up.  The trial has

16         revealed the truth about what happened.  You know

17         that he is responsible for this murder and this

18         robbery, and I would ask you to that.  Thank you.

19                         THE COURT:  Thank you, Mr. Henning.

20                         MS. SCAPICCHIO:  Can we be seen, Judge?

21                         THE COURT:  Absolutely.

22    SIDEBAR CONFERENCE:

23                         THE COURT:  Yes, Ms. Scapicchio?

24                         MS. SCAPICCHIO:  Judge, I'm going to

25         move for a mistrial on two different grounds.  In

77

1          the Commonwealth's closing, he indicated that it

2          was the same gun that was seen by Thomas

3          Washington that was used in this case.  There is

4          absolutely no evidence of that whatsoever.

5                    MR. HENNING:  I didn't say that.

6                    MS. SCAPICCHIO:  He did.  I wrote it

7          down.  He said "same gun."  No evidence

8          whatsoever, Judge.  And I would ask for a mistrial

9          as a result of it.  And in the alternative or in

10         the alternative, a limiting instruction striking

11         that part of his closing argument.

12                   And then he also said the only

13         difference between the kid from Dorchester and the

14         victim was that one was dead and the other was

15         still alive.  There's no evidence that he was ever

16         going to rob the victim in Dorchester.  That was a

17         complete fabrication by the Commonwealth.  It's

18         not supported by the evidence.

19                   And I would move for a mistrial on that,

20         as well.

21                   MR. HENNING:  For the first point, I did

22         not say same gun.  I said same type of gun, which

23         is what the evidence supports.  I also established

24         multiple times that we will never know which gun

25         was used, which was part of the opening and part

78

1       of the closing.

2               And second, what I described there was

3       part of the planning of the crime regarding Sean

4       Warfield.  I don't need to prove that he was going

5       to do that.  It's part of the pattern establishing

6       what the defendant was intending to do.

7               THE COURT:  I do believe Mr. Henning

8       said it was the same type of gun, so your

9       objection is overruled and your motion is denied.

10              And his second point was within the

11      boundaries of permissible argument --

12              MS. SCAPICCHIO:  Judge --

13              THE COURT:  So again, your objection is

14      noted, and your motion is denied.

15              MS. SCAPICCHIO:  -- if I could just make

16      a record, Judge, with respect to the same type of

17      gun.

18              THE COURT:  Of course.

19              MS. SCAPICCHIO:  There was no evidence

20      it was the same type of gun at all.

21              THE COURT:  Absolutely.  It was a

22      revolver.  Clearly, there was evidence through at

23      least Detective Camper, the fact that there were

24      no cartridges left at the scene --

25              MR. HENNING:  Shell casings, Your Honor.

79

1           THE COURT:  I'm sorry, shell casings, I
2      should say.  Clearly, there was evidence to
3      support that inference.
4           MS. SCAPICCHIO:  Note my objection,
5      Judge.
6           THE COURT:  Duly noted.
7           MS. SCAPICCHIO:  Thank you.  And the
8      motion for a mistrial is denied?
9           THE COURT:  Yes.
10          MS. SCAPICCHIO:  Note my objection.
11          MR. HENNING:  Your Honor, may I ask a
12     favor?  I know you're about to do jury
13     instructions.  I do need to use the men's room,
14     and I apologize.
15          THE COURT:  Okay.
16          MR. HENNING:  I'm happy to step out
17     while you're doing it, but I don't know what your
18     preference is.
19          THE COURT:  Can you run right out now?
20          MR. HENNING:  Sure.
21          THE COURT:  Because I don't like to
22     break this up.
23     END OF SIDEBAR CONFERENCE.
24     JURY CHARGE:
25          THE COURT:  Members of the jury, you are

NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

19-P-71

COMMONWEALTH

<u>vs</u>.

CHARLES REDDICKS.

<u>MEMORANDUM AND ORDER PURSUANT TO RULE 23.0</u>

Following a jury trial, the defendant, Charles Reddicks, was convicted of murder in the second degree, carrying a firearm without a license, and carrying a loaded firearm without a license.[1] On appeal, the defendant argues that permitting the Commonwealth to conduct an inquiry into the criminal offender record information (CORI) of prospective jurors violated the equal protection clause of the United States Constitution. He further argues that the Commonwealth improperly exercised peremptory challenges based on the results of the CORI inquiry, and that the trial judge erred in failing to conduct an analysis pursuant to Batson v. Kentucky, 476 U.S. 79, 95 (1986), and

---

[1] The defendant was acquitted of armed robbery, and his conviction for possession of ammunition without a license was dismissed as duplicative of his conviction of carrying a loaded firearm.

Commonwealth v. Soares, 377 Mass. 461, 486, cert. denied, 444
U.S. 881 (1979).  In addition, the defendant claims error in the
admission of certain firearm evidence, purported identification
testimony by Sergeant Detective Richard Daley, and statements
made by the defendant during an interview with Detective John
Callahan and Sergeant Detective Daley.  Finally, the defendant
contends that his ability to cross-examine a witness for the
Commonwealth was impermissibly restricted.  For the reasons that
follow, we affirm.

    Background.  We briefly summarize the facts underlying the
defendant's convictions, reserving certain details for our
discussion.  The defendant and the victim, Mariano Malave, did
not know each other but both sold marijuana.  In April of 2012,
the defendant asked Ian Follette, who had previously purchased
marijuana from both the defendant and the victim, if he knew
"any connects that sold large quantities of marijuana."  In
response, Follette provided the defendant with the victim's name
and contact information.

    On the morning of April 27, 2012, the defendant sent a text
message to the victim, identifying himself as "Jonathan," and
inquired about purchasing a pound of marijuana.  The purchase
was arranged via text messages, and that evening, the defendant
drove to the victim's home located in the Jamaica Plain section
of Boston.  At 6:20 P.M., a call from the defendant's cell phone

was placed to the victim's cell phone.  Around the same time,
the victim's girlfriend overheard the victim providing
directions to the victim's apartment to an individual over the
phone.[2]  Upon ending the call, the victim "grabbed a sample of
the marijuana," and exited his kitchen into the back hallway of
his apartment building.  After a brief period of time, the
victim returned inside the apartment to retrieve additional
marijuana, and then went back to the back hallway area.  At this
point, three shots were fired at the victim, one of which struck
the victim in the head, and another of which struck the victim
in the back.

A 911 call was placed, and police reported to the scene
shortly thereafter.  That same evening, police conducted
interviews of nearby witnesses, and obtained a partial license
plate number of a blue vehicle that was parked outside the
victim's home at the time of the homicide.  One witness, Leanne
Parker, informed police that shortly before the homicide, while
sitting in her vehicle, she observed a black man, with "long
dreads" or curls, exit a blue vehicle while talking on the phone
and walking toward the victim's home.  After a few moments, the
witness heard the sound of gunshots and observed the same man

---

[2] At around 6 P.M. that evening, the defendant communicated with
Follette, and notified him that he was going to the victim's
home.

3

R895

run from the house, get into the driver's seat of the blue car, and drive away.

The police traced the partial license plate number that Parker had provided to a 1992 blue Ford Escort registered to the defendant's grandmother, Catherine Reddicks, at 116 Millet Street. There were six registered drivers who lived at that residence, and of those six individuals, police determined that the defendant was the only one to fit the description given by Parker. The defendant was interviewed by Detective Callahan and Sergeant Detective Daley, and admitted to driving the Ford Escort on April 27, 2012. In his interview, the defendant admitted to sending text messages to the victim to purchase marijuana, but stated that he had never met the victim in person, and denied involvement in the homicide. The defendant was ultimately indicted by a grand jury for murder, armed robbery, carrying a firearm without a license, carrying a loaded firearm without a license, and possession of ammunition without a license.

Discussion. 1. Inquiry into jurors' criminal records. Prior to trial, the Commonwealth filed a motion in limine seeking to conduct a CORI inquiry of the prospective jurors, pursuant to Commonwealth v. Cousin, 449 Mass. 809, 815-820 (2007). The defendant filed a corresponding motion to preclude the Commonwealth from accessing such information, but requested

in the alternative that the Commonwealth also run the prospective jurors' information through the victim/witness database.[3]  The judge allowed the Commonwealth's motion, and as requested by the defendant, ordered the Commonwealth to check the prospective jurors' information in both the CORI database and the victim/witness database.

During jury empanelment, a CORI inquiry was conducted of each prospective juror, and the inquiry revealed that six jurors failed to disclose all or part of their criminal record on the juror questionnaire.  Of those six jurors, one had a restraining order against her and three had relatively minor offenses on their record.[4]  Both defense counsel and the prosecutor agreed that there was no need to inquire further of those four jurors and they were seated in the jury box.

However, although juror no. 47 indicated on the questionnaire that she had no prior record, her CORI revealed a number of "innocuous motor vehicle offenses," as well as a

---

[3] As grounds for the motion, the defendant claimed that allowing the prosecution to access the CORI of prospective jurors violated his rights to a trial "drawn from a representative cross-section of the community" and to due process.

[4] Juror no. 5 had a restraining order against her.  Juror no. 28, who was later excused for cause for unrelated reasons, was charged with "failure to use a stolen Registry of Motor Vehicle's signature."  Juror no. 29 had a charge for operating to endanger that was dismissed.  Finally, juror no. 102 was charged with driving with a suspended license, which was later dismissed upon the payment of court costs.

dismissed charge for possession of a Class B substance sixteen years earlier. The Commonwealth then requested that the judge conduct a voir dire of juror no. 47. During the voir dire, juror no. 47 informed the judge that all of her charges had been dismissed, and that she did not recognize that she was required to disclose dismissed charges when filling out her questionnaire. The judge credited the juror's explanation and informed counsel that she encountered this scenario "quite often" and "[saw] no reason to excuse [juror no. 47] for cause." The Commonwealth then exercised a peremptory challenge, and defense counsel objected stating, "I objected to the Commonwealth's ability to run the records, and I just want to preserve that objection." Over that objection, the judge excused juror no. 47.

Later during empanelment, it was discovered that juror no. 122, who had disclosed on his questionnaire that he had been convicted of assault and battery, had not disclosed a number of additional charges and convictions that occurred over a fourteen-year period, including violation of an abuse prevention order, resisting arrest, malicious destruction of property, possession of marijuana, forgery, trespassing, disorderly conduct, and multiple assault and battery charges. Sua sponte, the judge conducted a voir dire of juror no. 122, and the juror explained that all of his charges, except the one that he

disclosed on his questionnaire, had been sealed.  The juror
expressed that he was not aware that he had to disclose sealed
charges and convictions.  The judge credited the juror's
explanation, stating that she had "heard this before," and
believed it to be "absolutely reasonable" for the juror to think
that he was not required to disclose charges and convictions
that had been sealed.  The judge declined to excuse the juror
for cause, and the Commonwealth again exercised a peremptory
challenge.

At this point, the defendant objected and raised for the
first time that the Suffolk County District Attorney's office's
practice of conducting an inquiry into the prospective jurors'
criminal records resulted in the systematic exclusion of
prospective African-American jurors from the jury.
Specifically, defense counsel stated,

> "Just so the record is clear, Judge, everyone so far that
> [the prosecutor] has run, and I'm not blaming him, that's
> come back with a record has been African-American, and so
> it appears to me that the running of records of potential
> jurors, in Suffolk County, anyhow, leads to the disclosure
> of criminal records and exclusion of African-American
> individuals or potential jurors.  My client is an African-
> American.  I would object at this point, Judge."

The judge noted defense counsel's objection but responded
that "in the two instances that [the prosecutor] has done that,
I've accepted the jurors' explanations, but that doesn't excuse
them from fully revealing their criminal history, and in both of

those situations, neither juror faithfully disclosed their criminal history."  The judge then excused juror no. 122.  When jury empanelment concluded, the judge commented on the record that the jury "consist[ed] of at least five African-Americans."

a.  <u>Constitutionality of CORI inquiry of prospective jurors</u>.  The defendant argues that allowing the Commonwealth to conduct a CORI inquiry of prospective jurors was itself a violation of the equal protection clause and the defendant's right to a jury of his peers.  The crux of the defendant's argument is that such a practice disproportionately impacts African-American jurors who are "more likely to face discrimination during every single phase of our criminal justice system."[5]  The argument is unavailing.

In <u>Cousin</u>, 449 Mass. at 817-819, the Supreme Judicial Court (SJC) held that the CORI statute, G. L. c. 6, § 172, permits prosecutors to access prospective jurors' CORI as part of their "criminal justice duties."  In so holding, the court recognized that a criminal justice function of prosecutors is "the selection of a qualified and impartial jury," and that "[i]nquiring into the criminal records of jurors in a criminal

---

[5] As noted, the defendant's motion in limine raised different grounds to assert that the Commonwealth should not be permitted to access prospective jurors' CORI.  The argument he advances on appeal was raised for the first time during his objection to the peremptory challenge exercised to exclude juror no. 122.

case" assists in serving that function.  Id. at 816.  In
addition, the court noted that "the prosecution has a legitimate
interest in securing 'a jury not unfairly biased in favor of
acquittal,'" and that as a result, the Commonwealth, even before
the advent of CORI, had often been permitted to check the
criminal histories of prospective jurors.  Id., quoting Soares,
377 Mass. at 483.

The defendant now asks us to hold otherwise and determine
that the practice of running prospective jurors' CORI is
unconstitutional.[6]  The defendant, however, has failed to provide
us with the factual basis or the constitutional standard to do
so.  In supporting his claim, the defendant has done no more
than argue that prospective jurors who are African-American are
more likely to have a criminal record, and as such, are more
likely to be excluded from jury service for that reason.[7]  In

---

[6] The defendant argues that "[t]he SJC's approval of running
jurors' records in Cousin simply runs afoul of the principles
set forth in Batson and Soares, and its recent progeny in
[Commonwealth v. Robertson, 480 Mass. 383 (2018)], [Commonwealth
v. Jones, 477 Mass. 307 (2017)], [Commonwealth v. Ortega, 480
Mass. 603 (2018)], and [Flowers v. Mississippi, 139 S. Ct. 2228
(2019)]."  We, however, "have no power to alter, overrule or
decline to follow the holding of cases the Supreme Judicial
Court has decided."  Commonwealth v. Dube, 59 Mass. App. Ct.
476, 485 (2003).

[7] The defendant also contends that the practice is particularly
unfair because a prospective juror's answer regarding the
juror's interactions with law enforcement is the only part of
the questionnaire that is "checked" to determine if it is fully
complete.  In this case, however, upon request, the judge

doing so, he cites law review articles that assert this very proposition.  To be sure, the SJC, in recent decisions, has acknowledged that there is systemic racism present in the Commonwealth's criminal justice system that leads to disproportionate stops, frisks, searches, and in turn, arrests of people of color.  See Commonwealth v. Long, 485 Mass. 711, 717-718 (2020); id. at 740 (Budd, J., concurring); Commonwealth v. Evelyn, 485 Mass. 691, 701 (2020).  However, this observation, alone, does not provide us with a basis for declaring unconstitutional a practice specifically sanctioned by the SJC.

To begin with, the defendant has not set forth the standard to be applied to his claim.  See Commonwealth v. Cassidy, 470 Mass. 201, 209 n.9 (2014) (defendant's burden to cite relevant legal authority).  The Commonwealth argues that, to show systemic discrimination in jury selection, the defendant must demonstrate that

> "(1) the group allegedly discriminated against is a
> 'distinctive' group in the community, (2) that the group is
> not fairly and reasonably represented in the venires in
> relation to its proportion of the community, and (3) that

---

ordered the Commonwealth to also check the prospective jurors' information in the victim/witness database.  In any event, both parties are free to take reasonable steps, using public sources, to check other information provided on the jury questionnaire. We likewise discern no abuse of discretion by a trial judge in compelling the prosecution to check the prospective jurors' information in the victim/witness database, as was done in the present case.

underrepresentation is due to systematic exclusion of the group in the jury selection process."

Commonwealth v. Tolentino, 422 Mass. 515, 519 (1996), quoting

Commonwealth v. Bastarache, 382 Mass. 86, 96-97 (1980).  We

agree.[8]

It is undisputed that African-American jurors are a distinctive group in the community, and specifically that the two jurors who were ultimately excluded in this case as a result the CORI inquiry were African-American.  The defendant, however, has not provided us with sufficient information regarding the number of African-American jurors in his venire or in past Suffolk County venires.  Nor is there any information in the record about the racial composition of the community from which the venire was drawn.  Accordingly, the defendant has failed to carry his burden.  While "[a] criminal defendant is constitutionally entitled to a jury selection process free of systematic discrimination against his grouping in the community," on this record, we cannot conclude that permitting

---

[8] Though this is the test applied to a Sixth Amendment to the United States Constitution challenge to the fair cross section requirement, and the defendant contends that this is not the precise challenge he is making, "[u]nder art. 12 [of the Massachusetts Declaration of Rights] there is no distinction between the equal protection analysis . . . and the Sixth Amendment analysis," and "art. 12 affords a defendant at least as much protection as the Sixth and the Fourteenth Amendment [to the United States Constitution]."  Commonwealth v. Fryar, 425 Mass. 237, 241-242, 244 (1997).

the Commonwealth to check the CORI of prospective jurors is
inconsistent with that right.  Commonwealth v. Fryar, 425 Mass.
237, 241 (1997).

Moreover, we note that, contrary to the defendant's
contentions, the CORI inquiry conducted by the Commonwealth did
not result in the exclusion of jurors simply for having a
criminal record.  In fact, the judge did not excuse for cause
any of the jurors who had a criminal record but failed to
disclose it, and perhaps more significantly, the majority of the
jurors who failed to make the requisite disclosure, all of whom
were African-American,[9] were seated on the jury without a voir
dire being conducted.  Only juror no. 47 and juror no. 122, who
arguably had more significant charges on their record, were
questioned by the judge about their lack of disclosure.  Though
the judge recognized that individuals with dismissed charges or
sealed records often misinterpret their obligation with regard
to disclosure,[10] and found that both jurors' omissions were

---

[9] Defense counsel stated on the record that each of the jurors
who failed to make the requisite disclosure was African-
American.  Nobody disagreed.

[10] The juror questionnaire at issue was not included in the
record on appeal.  Assuming without deciding that it is not
uncommon for jurors to misinterpret the disclosure required by
the questionnaire when it comes to jurors' "experience with the
law," Commonwealth v. Carnes, 457 Mass. 812, 832 (2010), it
might be wise for the jury commissioner to consider revising the
questionnaire's language to expressly state that jurors must
disclose all charges and convictions whether dismissed or

inadvertent, the prosecutor had an independent duty to ensure that "a qualified and impartial jury" was selected. Cousin, 449 Mass. at 816. A properly exercised peremptory challenge serves that purpose. See Commonwealth v. Wood, 389 Mass. 552, 560 (1983) ("The purpose of the properly exercised peremptory challenge is to aid the constitutional right to a fair and impartial jury"). See also Cousin, supra at 822 (even inadvertent failure to disclose criminal record deprives parties of right to make intelligent decision whether to exercise peremptory challenge).

b. Peremptory challenges exercised after CORI inquiry.[11] The defendant further argues that the peremptory challenges to juror no. 47 and juror no. 122 as a result of their CORI were

---

sealed. Likewise, it may be prudent for judges to caution or remind jurors appearing in their venires of their obligation to disclose all charges and convictions including those sealed or dismissed. An example of such a cautionary instruction is present in Carnes, where the judge "emphasized [to the jurors] that some people do not answer the questions accurately, perhaps because they are embarrassed about a crime in which they were involved or may have forgotten a minor offense that occurred a long time ago. . . . He stated that every juror's record was checked on the computer. When he finished, the judge asked jurors to raise their hands if they had not 'fully, accurately and completely answered the questions contained in the section . . . entitled, "Your experience with the law,"' so that they could have an opportunity to 'add to the detail as . . . necessary.' . . . [N]ineteen jurors raised their hands." Id. at 832.

[11] We deny the Commonwealth's motion to strike this portion of the defendant's brief.

improperly exercised for a discriminatory purpose, and therefore, the judge abused her discretion in failing to conduct a <u>Batson</u>-<u>Soares</u> inquiry.

"The Fourteenth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights prohibit a party from exercising a peremptory challenge on the basis of race." <u>Commonwealth</u> v. <u>Sanchez</u>, 485 Mass. 491, 493 (2020), quoting <u>Commonwealth</u> v. <u>Jones</u>, 477 Mass. 307, 319 (2017).  When the defendant makes a <u>Batson</u>-<u>Soares</u> objection, it "triggers a three-step process." <u>Commonwealth</u> v. <u>Henderson</u>, 486 Mass. 296, 311 (2020).  In the first step, the defendant bears the burden of rebutting the presumption that the peremptory challenge was proper.  See <u>Commonwealth</u> v. <u>Jackson</u>, 486 Mass. 763, 768 (2021). To do so, he "'must make out a prima facie case' that [the challenge] was impermissibly based on race or other protected status 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" <u>Id</u>., quoting <u>Johnson</u> v. <u>California</u>, 545 U.S. 162, 168 (2005).  Second, if such a showing is made, "the burden shifts to the party exercising the challenge to provide a 'group-neutral' explanation for it." <u>Jackson</u>, <u>supra</u>, quoting <u>Sanchez</u>, <u>supra</u> at 493.  "Third and finally, the judge must then determine whether the explanation is both 'adequate' and 'genuine'" (quotation and citation omitted).  <u>Jackson</u>, <u>supra</u>.

First, when the prosecutor exercised a peremptory challenge to juror no. 47, the defendant objected, but not on the ground of discriminatory exclusion.  Rather, defense counsel stated that she was preserving her objection to the Commonwealth conducting a CORI inquiry in the first place.  At this point, no mention of discriminatory purpose had been made, and accordingly, the defendant's objection failed to "trigger an obligation on the judge's part to make a finding whether the presumption of propriety was rebutted." Commonwealth v. Smith, 450 Mass. 395, 406 (2008).  While a trial judge may raise a Batson-Soares violation sua sponte, see id., the judge here did not abuse her discretion in failing to do so where the challenge was in direct response to the juror failing to disclose her criminal record.  See Commonwealth v. LeClair, 429 Mass. 313, 321 (1999) ("A trial judge is in the best position to decide if a peremptory challenge appears improper and requires an explanation by the party exercising it").  Cf. Jones, 477 Mass. at 324 ("the possibility that [juror] was struck because of her race is heightened by the fact that the record reveals no race-neutral reason that might have justified the strike").

Secondly, after it was learned that juror no. 122 had an extensive and undisclosed criminal record, the prosecutor exercised a peremptory challenge, and the defendant objected raising the issue of race for the first time.  However, in his

objection, the defendant did not argue that the prosecutor was improperly challenging the juror based on the juror's race, nor did he specifically raise a <u>Batson</u>-<u>Soares</u> objection.[12]  Instead, he argued that the practice of checking prospective jurors' CORI, in Suffolk County, leads to the exclusion of African-American jurors from the jury.  It is the defendant's burden to not only state his objection to the Commonwealth's peremptory challenge, but also to state the grounds for that objection. See <u>Smith</u>, 450 Mass. at 406.  Although we agree with the defendant that he need not specifically cite <u>Batson</u>-<u>Soares</u>, a general objection is likely insufficient to preserve such a challenge.  See <u>id</u>.  See also <u>Commonwealth</u> v. <u>Lopes</u>, 478 Mass. 593, 600 (2018).

Moreover, even if we were to determine that the defendant properly raised a <u>Batson</u>-<u>Soares</u> objection to the strike of prospective juror no. 122, a conclusion we do not reach, "[w]e will not overturn the judge's ruling if there is a sound basis in the record for her ruling." <u>Commonwealth</u> v. <u>Suarez</u>, 59 Mass. App. Ct. 111, 114 (2003).  The judge, in her response to defense counsel's objection, implicitly determined that the requisite showing of impropriety had not been made.  See <u>id</u>.  While rebutting the presumption of propriety is "not an onerous task,"

_____

[12] Defense counsel, in her objection, specifically stated that she was "not blaming [the prosecutor]."

Jones, 477 Mass. at 321, the defendant must show "that the totality of the relevant facts gives rise to an inference of discriminatory purpose." Jackson, 486 Mass. at 768, quoting Johnson, 545 U.S. at 168.

Here, the strike exercised by the Commonwealth against juror no. 122 "appeared to be made for obvious reasons that did not raise any inference of bias." Jackson, 486 Mass. at 775. Initially, juror no. 122 was seated on the jury and the Commonwealth expressed contentment with the juror. It was only after the CORI inquiry revealed that juror no. 122 failed to "faithfully disclose [his] criminal history" that the Commonwealth exercised a peremptory challenge. The judge, accordingly, determined that the Commonwealth was entitled to exercise such a challenge at that point because the juror's CORI was "a piece of information that was not available to [the prosecutor] at the time of his vetting."[13] Though the defendant is also African-American, there were, in total, five African-American jurors seated on the sixteen-person jury. See Henderson, 486 Mass. at 313 (considering number of black jurors seated on jury as one factor in assessment of "whether the prosecutor had challenged a disproportionate number of black

---

[13] Juror no. 47 was excused under the very same circumstances. See Jackson, 486 Mass. at 773 (considering "similarities and differences between excluded jurors" [quotation and citation omitted]).

jurors"). Cf. <u>Commonwealth</u> v. <u>Ortega</u>, 480 Mass. 603, 607
(2018). Based on the totality of the facts and circumstances
here, the judge did not abuse her discretion in concluding that
the defendant failed to meet his burden of showing the
impropriety of the prosecutor's peremptory challenge to
prospective juror no. 122. See <u>Jackson</u>, 486 Mass. at 776.

2. <u>Evidentiary issues</u>. a. <u>Prior bad act evidence</u>. The
defendant next claims that he was prejudiced by the admission of
improper prior bad act evidence. At trial, Thomas Washington, a
friend of the defendant, testified that four months before the
murder he observed the defendant in possession of a silver
revolver with a black handle.[14] In addition, the Commonwealth
introduced two photographs, recovered from the defendant's cell
phone, of the defendant holding a silver revolver with a black
handle. The defendant objected to the admission of this
evidence at trial, and thus we review its admission for
prejudicial error. See <u>Commonwealth</u> v. <u>Montez</u>, 450 Mass. 736,
744 (2008).

Although the prosecution may not introduce evidence of the
defendant's prior bad acts to show that he has a propensity to

---

[14] In relation to the defendant's possession of that weapon, the
defendant was charged with and pleaded guilty to assault and
battery by means of a dangerous weapon and carrying a firearm
without a license. The gun, however, was never recovered in
that case.

commit such acts, this evidence may be otherwise admissible "if relevant for another purpose, 'such as to show a common scheme, pattern of operation, absence of accident or mistake, identity, intent, motive, or state of mind.'" Commonwealth v. Philbrook, 475 Mass. 20, 25-26 (2016), quoting Commonwealth v. Howard, 469 Mass. 721, 738 (2014).  Specifically, evidence that the defendant possessed a weapon prior to the commission of a weapons-related crime may be admissible "to show that the defendant had access to or knowledge of firearms and bullets." Commonwealth v. McGee, 467 Mass. 141, 157 (2014).  "The critical questions are whether the weapons-related evidence is relevant and, if so, whether the probative value of the evidence is substantially outweighed by its prejudicial effect." Commonwealth v. Valentin, 474 Mass. 301, 306 (2016).  The decision to admit such evidence is left to the sound discretion of the trial judge, and we will not disturb that decision "absent palpable error."  McGee, 467 Mass. at 156.

Here, the Commonwealth introduced the two photographs of the defendant holding a silver revolver, as well as the testimony of Washington, to demonstrate that the defendant had access to firearms, and more specifically revolvers, just four months prior to the homicide.  There was testimony before the jury that, of the possible seventeen firearms that could have been used as the murder weapon, fifteen of those firearms were

in fact revolvers.  Accordingly, the challenged firearm evidence was relevant, and we discern no abuse of discretion in the judge's determination that the probative value of this evidence was not substantially outweighed by its prejudicial effect.[15] Further, immediately following Washington's testimony, the judge provided a limiting instruction to the jury cautioning them that they were only permitted to consider the defendant's prior possession of a firearm as evidence that the defendant had "familiarity with or access to firearms."  The judge specifically instructed the jurors that there was no evidence that the firearm, testified to by Washington, was the same firearm used during the homicide.  We presume the jury followed these instructions, see Commonwealth v. Ridge, 455 Mass. 307, 323 (2009), and perceive no prejudicial error by the admission of this evidence.

    b.  Motion to exclude photographs.  Prior to trial, the defendant moved to exclude the photographs depicting him holding

---

[15] While the defendant argues that the judge abused her discretion in admitting this evidence because the SJC has cautioned against admitting firearm evidence "[w]here a weapon definitively could not have been used in the commission of the crime," Commonwealth v. Barbosa, 463 Mass. 116, 122 (2012), that is not the case here.  The revolver testified to by Washington was never recovered by the police, the photographs both depict a revolver, and the murder weapon in this case was, statistically speaking, most likely a revolver.  Evidence of "[a] weapon that could have been used in the course of a crime is admissible, in the judge's discretion."  Id.

the silver revolver arguing, that they were obtained in an
unrelated prior case without a valid search warrant.  In his
prior case, the defendant moved to suppress evidence obtained
from his cell phone arguing that the search warrant lacked
probable cause.  The judge in the prior case found that the
search of the cell phone was conducted pursuant to a valid
warrant, and accordingly, denied the defendant's motion.  The
defendant then pleaded guilty to the charges in that case.  See
note 14, supra.  The Commonwealth argues that because the
defendant already litigated the validity of the search warrant,
he is estopped from relitigating the issue in this case.  We
agree.

There are five requirements that must be satisfied in order
for collateral estoppel, or issue preclusion, to apply in the
context of a suppression motion:

> "(1) the issues in the two proceedings must be identical;
> (2) the party estopped must have had sufficient incentive
> to litigate the issue fully and vigorously; (3) the party
> estopped must have been a party to the previous litigation;
> (4) the applicable law must be identical in both
> proceedings; and (5) the first proceeding must have
> resulted in a final judgment on the merits such that the
> defendant had sufficient incentive and an opportunity to
> appeal."

Commonwealth v. Cabrera, 449 Mass. 825, 829 (2007).

Here, there is no dispute that the parties, legal issues,
and applicable law were the same in both proceedings.  The
defendant argues however that he did not have sufficient

incentive to litigate the issues in the prior case "fully and vigorously," nor did he have the incentive or opportunity to appeal. This argument is belied by the nature of the significant charges against the defendant in the prior case. See note 14, supra. Furthermore, "[b]y pleading guilty, the defendant gave up his right to pursue a challenge to the denial of his suppression motion, and therefore his plea generated a judgment that is final, at least in regard to the suppression issue." Cabrera, 449 Mass. at 831. See id. at 830 ("a plea of guilty by its terms waives all nonjurisdictional defects").

Though the defendant contends that his guilty plea was tendered "before the advent of conditional pleas, where a defendant was forced to face trial in order to preserve his appellate rights on a motion to suppress decision," the opportunity to appeal is the focus of the inquiry. See Cabrera, 449 Mass. at 831. A trial and opportunity to appeal from that trial was available to the defendant, and in deciding to forego those options, "the defendant also gave up any right to relitigate the suppression issue." Id. The defendant was therefore estopped from raising the search warrant's validity in the present case, and his motion to exclude was properly denied.

c. "Identification" testimony. The defendant next claims that the testimony of Sergeant Detective Daley was improper lay opinion and impermissibly constituted an in-court identification

22

by an eyewitness, Leanne Parker, who had never formally participated in an identification procedure.  We disagree.

At trial, Sergeant Detective Daley testified that, upon interviewing Parker on the date of the murder, he obtained a partial license plate number and a physical description of the defendant and the vehicle he was operating.  Another detective conducted a query of the partial license plate number in the Registry of Motor Vehicles database and discovered that the vehicle was a 1992 blue Ford Escort registered to Catherine Reddicks at 116 Millet Street.  The detective then conducted a search of that address in the Registry of Motor Vehicles database and learned that three males and three females were registered drivers at that location.  At this point, Sergeant Detective Daley testified that only one of those registered drivers looked similar to the physical description provided by Parker; that individual was the defendant.[16]  Sergeant Detective Daley then identified the defendant in court.[17] Contemporaneously, the judge instructed the jury that they were

---

[16] The defendant objected to this testimony and requested a limiting instruction.

[17] On appeal, the defendant does not challenge the in-court identification made by Sergeant Detective Daley.

not to consider Sergeant Detective Daley's testimony as an identification of the defendant by Parker.[18]

The defendant is correct that "[m]aking a determination of the identity of a person from a photograph or video image is an expression of an opinion," Commonwealth v. Wardsworth, 482 Mass. 454, 475 (2019), quoting Commonwealth v. Pina, 481 Mass. 413, 429 (2019), and that such an identification by a lay witness is admissible only "when the witness possesses sufficiently relevant familiarity with the defendant that the jury cannot also possess." Id., quoting Commonwealth v. Vacher, 469 Mass. 425, 441 (2014).  However, the defendant is incorrect in his assertion that this is what occurred here.

Sergeant Detective Daley was not shown a photograph of the defendant to identify at trial.  Rather, the detective merely testified that he obtained a photograph of the defendant from the Registry of Motor Vehicles database,[19] and connected the defendant to the crime based on the physical description provided by Parker as well as the partial license plate number

---

[18] Specifically, the judge instructed the jury:  "Members of the jury, you're not to construe the testimony just now of Sergeant Detective Daley as any identification of the defendant by Ms. Parker.  It is offered merely for the limited purpose of helping you understand what steps the police took in this investigation and why they took them, and for no other reason."

[19] There is no real dispute that the photograph, taken from the Registry of Motor Vehicle database, was of the defendant.

that led him to the defendant's address.  Contrary to the
defendant's claim, at trial there was no lay opinion
identification made by Sergeant Detective Daley based on a
photograph of the defendant.  Cf. Commonwealth v. Yang, 98 Mass.
App. Ct. 446, 452-453 (2020) (improper for detective to testify
at trial "that the man depicted in the photograph appeared to be
the defendant").

Additionally, there was no "back-door" admission of an in-
court identification of the defendant by Parker.  While
Commonwealth v. Crayton, 470 Mass. 228, 241-242 (2014),
prohibits the admission of an in-court identification, absent
"good reason," when an eyewitness has not participated in a
prior out-of-court identification, Parker did not identify the
defendant in-court, and Sergeant Detective Daley did not testify
that she had.  Instead, Daley merely testified to the steps
taken by the detectives during the course of the investigation
that ultimately led them to narrow their focus on the defendant.
This was permissible in light of the fact that, in his defense,
the defendant attacked the nature and quality of the police
investigation.  See Commonwealth v. Avila, 454 Mass. 744, 755
(2009) (where defendant attacks police investigation, "the
Commonwealth was entitled to elicit testimony about why the
investigators chose the particular investigative path they
did").

The defendant also claims that Sergeant Detective Daley improperly identified Catherine Reddicks's vehicle from Massachusetts Bay Transportation Authority surveillance footage presented at trial.[20]  However, contrary to the defendant's contentions, Sergeant Detective Daley did not identify at trial the blue Ford Escort from video surveillance footage.  Daley testified only to the steps he took in locating the vehicle and connecting it to the crime based on the partial license plate number he obtained from a witness on the date of the murder.  As previously stated, such testimony was permissible.  See Avila, 454 Mass. at 755.

d.  Voluntariness of defendant's statements.  The defendant next claims that statements made by him during an interview with Detective Callahan and Sergeant Detective Daley were not voluntary and should have been suppressed.  "[I]n reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error but conduct an independent review of his ultimate findings and conclusions of law."  Commonwealth v. Tremblay, 480 Mass. 645, 652 (2018), quoting Commonwealth v. Clarke, 461 Mass. 336, 340 (2012).  "[W]e

---

[20] It is unclear whether the rule against lay witness identifications is applicable to inanimate objects.  See Wardsworth, 482 Mass. at 475 ("Making a determination of the identity of a person from a photograph or video image is an expression of an opinion" [emphasis added]).  We, however, assume otherwise for the purpose of the defendant's claim.

26

'review de novo any findings of the motion judge that were based entirely on the documentary evidence.'" Commonwealth v. Monroe, 472 Mass. 461, 464 (2015), quoting Commonwealth v. Thomas, 469 Mass. 531, 539 (2014).

"A voluntary statement is one that is 'the product of a rational intellect and a free will,' and not induced by physical or psychological coercion." Monroe, 472 Mass. at 468, quoting Tremblay, 460 Mass. at 207. "The test for voluntariness is 'whether, in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act.'" Commonwealth v. Durand, 457 Mass. 574, 595-596 (2010), quoting Commonwealth v. Souza, 428 Mass. 478, 483-484 (1998). "Factors relevant to the totality of the circumstances include whether promises or other inducements were made to the defendant by the police, as well as the defendant's age, education, and intelligence; experience with the criminal justice system; and his physical and mental condition, including whether the defendant was under the influence of drugs or alcohol." Durand, supra at 596. In addition, "the 'use of false information by police during an interrogation is deceptive and is a relevant factor indicating a possibility that the defendant's statements were made involuntarily.'" Commonwealth v. Novo, 442 Mass. 262, 267

(2004), quoting Commonwealth v. Selby, 420 Mass. 656, 664
(1995).

During the interview, Detective Callahan made statements to
the defendant suggesting that the defendant's silence and denial
could be used against him in court.  Specifically, Detective
Callahan stated,

> "[T]his is a golden opportunity to give your version of the
> story because a year down the road, two years down the road
> we're going to be in a courtroom and I'm going to be
> sitting across from you, maybe both, or Rich Daley and if
> I'm there, it's me, I'm going to be looking at you.  I'm
> going to be sitting up there in a suit and tie.  I'm going
> to be looking at you, and I'm going to be saying I gave
> him, Sergeant Daley gave him, the opportunity to offer a
> reason as to why he did what he did, as opposed to not
> saying anything and me looking over at the jury as I'm
> looking back to you and everything that is going to come
> out of our investigation to the jury is going to be that
> Charles Reddicks is a cold-blooded killer.  That he robbed
> dude, shot dude over nothing.
>
> As opposed to you telling us, there's got to be a viable
> reason you do what you did.  You can -- Charles you can
> deny it all you want but you're there, we've got you
> there."

We agree with the motion judge that these statements were
improper and were akin to the "now-or-never" language that was
deemed impermissible in Novo, 442 Mass. at 267-269.[21]  In an
attempt to get the defendant to confess his motive for the
murder, the detective improperly suggested to the defendant that
his failure to provide that information, and his denial of

---

[21] The statements at issue here were not quite as egregious as
those in Novo, 442 Mass. at 267-269.

committing the murder, could be used against him in court, which is "plainly untrue." Id. at 268. See Commonwealth v. Spencer, 465 Mass. 32, 46 (2013) (defendant's denial of accusation, similar to his silence, is inadmissible). We, however, also agree with the motion judge that the Commonwealth met its burden of proving that the defendant's statements were nevertheless voluntary.

On the date of the interview, the defendant was eighteen years old, and was a student at the Community Academy.[22] During the interview, the defendant admitted to knowing someone by the name of "Mario,"[23] admitted to sending him text messages on the date of the homicide to purchase marijuana, and further admitted to knowing the difference between an automatic weapon and a revolver. However, none of the incriminating statements made by the defendant were tied to "or otherwise made in response to the pressure tactics employed by the officers." Durand, 457 Mass. at 596-597. The improper statements made by Detective Callahan were designed to elicit a motive for the murder, or put another way, a confession. Throughout the interview, however, the defendant never wavered in denying his involvement in the

---

[22] Community Academy is a high school in the Jamaica Plain section of Boston.

[23] The detective explained to the defendant that the victim went by "Mario."

murder.  In short, the detective's improper tactics were unsuccessful.  As the motion judge concluded, the defendant's behavior during the interview reflects "a young man who made limited, carefully chosen responses."  The defendant remained calm during the interview, and acted in a manner that revealed that he was not "at the mercy of the interrogating officers." Id. at 597.  Based on the totality of the circumstances here, the defendant's will was not overborne by the improper statements made by the detective.  There was no error in the denial of the motion to suppress.

3.  Cross-examination.  Finally, the defendant argues that he was impermissibly restricted from cross-examining a witness for the Commonwealth, namely Thomas Washington.  "Both the Sixth Amendment and art. 12 guarantee a criminal defendant's right to confront the witnesses against him through cross-examination." Commonwealth v. Miles, 420 Mass. 67, 71 (1995).  "However, a criminal defendant's confrontation right is not absolute," and "the scope of cross-examination rests largely in the sound discretion of the trial judge."  Id.  In determining whether the trial judge unreasonably limited cross-examination, "we weigh the materiality of the witness's direct testimony and the degree of the restriction on cross-examination."  Id. at 72.  We will not disturb a "trial judge's determination as to the proper scope of cross-examination unless the defendant demonstrates

that the judge abused [her] discretion and that the defendant was prejudiced thereby." Id.

During a motion in limine and at trial, the judge informed defense counsel that if, on cross-examination, she attempted to suggest that Washington was lying about observing the defendant with a gun, there was a possibility that counsel might open the door to the defendant's conviction for possessing that weapon. As a result of that exchange, the defendant decided to forego cross-examining Washington altogether. The defendant now claims that the judge erred in limiting his cross-examination in this manner. The claim is without merit.

While Washington's testimony was material in proving that the defendant had access to and familiarity with weapons, specifically revolvers, the judge did not wholly restrict the defendant from cross-examining him. Rather, the judge merely warned the defendant that, if he sought to introduce a false narrative and argue that Washington was not telling the truth about observing him with a weapon, the Commonwealth would likely be entitled to rebut that evidence with the defendant's prior conviction related to that gun. We discern no abuse of discretion in this ruling. See Commonwealth v. Oliveira, 74 Mass. App. Ct. 49, 53 (2009) (where defendant unfairly depicts

himself, Commonwealth entitled to rebut with evidence of prior convictions).

Judgments affirmed.

By the Court (Neyman, Henry & Desmond, JJ.[24]),

*Joseph F. Stanton*

Clerk

Entered:  April 8, 2021.

---

[24] The panelists are listed in order of seniority.