No. 25-1048

# UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

CHARLES REDDICKS,

*Petitioner - Appellant,*

v.

KENNETH LIZOTTE,

*Respondent - Appellee.*

On Appeal from the United States District Court
for the District of Massachusetts (1:23-cv-10455-WGY)

## BRIEF OF AMICI CURIAE LAW SCHOOL CENTERS, PRACTICUMS, AND PROFESSORS IN SUPPORT OF THE PETITIONER-APPELLANT CHARLES REDDICKS AND IN FAVOR OF REVERSAL

Adam B. Murphy
*Counsel of Record*
Jalen Banks
Law school graduate
Coleman Powell
Law school graduate

New York University School of Law
Federal Appellate Clinic
245 Sullivan Street, Fifth Floor
New York, NY 10012
Telephone: 212-992-7245
Facsimile: 212-995-4031
E-mail: Adam.Murphy@law.nyu.edu

# DISCLOSURE STATEMENTS

Pursuant to Fed. R. App. P. 26.1, undersigned counsel certifies that amici curiae have no parent corporation and that no publicly held corporation owns 10% or more of their stock. Pursuant to Fed. R. App. P. 29(a)(4)(E), undersigned counsel states that no party's counsel authored the brief in whole or in part; that no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and that no person other than amici curiae contributed money that was intended to fund preparing or submitting the brief. The parties have consented to/not opposed the filing of this brief. Fed. R. App. P. 29(a)(2).

# TABLE OF CONTENTS

DISCLOSURE STATEMENTS ................................................................. i

TABLE OF CONTENTS ..................................................................... ii

TABLE OF AUTHORITIES .................................................................. iii

INTERESTS OF AMICI CURIAE ........................................................... 1

SUMMARY OF ARGUMENT ............................................................... 2

ARGUMENT ...................................................................................... 7

    I.    When Prosecutors Run CORI Searches and Wield the Results to Strike Only Black Prospective Jurors an Inference of Discrimination Has Been Raised Within the Meaning of *Batson* ........................................................ 7

        A. CORI Results Reflect Racial Bias in Policing and the Criminal Legal System Writ Large. ................................................................. 9

    II.    The Reviewing Courts Unreasonably Applied Clearly Established Supreme Court Precedent When Affirming the Trial Court's Denial of Mr. Reddicks's *Batson* Claim at Step One ............................................... 14

CONCLUSION ................................................................................... 26

ADDENDUM ..................................................................................... 27

CERTIFICATE OF COMPLIANCE ....................................................... 30

CERTIFICATE OF SERVICE .............................................................. 31

# TABLE OF AUTHORITIES

## Cases

*Batson v. Kentucky*, 476 U.S. 79 (1986)........................................................ *passim*

*Commonwealth v. Arriaga*, 438 Mass. 556 (2003)................................................11

*Commonwealth v. Buckley*, 478 Mass. 861 (2018)...............................................11

*Commonwealth v. Feyenord*, 445 Mass. 72 (2005)...............................................11

*Commonwealth v. Gonsalves*, 429 Mass. 658 (1999)....................................... 11, 12

*Commonwealth v. Laltaprasad*, 475 Mass. 692 (2016).........................................11

*Commonwealth v. Long*, 485 Mass. 711 (2020) ....................................................11

*Commonwealth v. Phillips*, 413 Mass. 50 (1992)..................................................12

*Commonwealth v. Reddicks*, 99 Mass. App. Ct. 1118,
 2021 WL 1307911 (Mass. App. Ct. Apr. 8, 2021) (unpublished) .............. *passim*

*Commonwealth v. Williams*, 481 Mass. 443 (Mass. 2019).....................................13

*Commonwealth v. Wren*, 475 Mass. 530 (Mass. 2016) ..........................................11

*Drumgold v. Callahan*, 707 F.3d 28 (1st Cir. 2013)...............................................17

*Fields v. Thaler*, 588 F.3d 270 (5th Cir. 2009)......................................................21

*Flowers v. Mississippi*, 588 U.S. 284 (2019).................................................. *passim*

*Hardcastle v. Horn*, 368 F.3d 245 (3d Cir. 2004) .................................................23

*Hernandez v. New York*, 500 U.S. 352 (1991).......................................................23

*Herring v. United States*, 555 U.S. 135 (2009)........................................................9

*Johnson v. California*, 545 U.S. 162 (2005)................................................... *passim*

*Johnson v. Martin*, 3 F.4th 1210 (10th Cir. 2021) ................................................ 7, 23

*Jordan v. Lefevre*, 206 F.3d 196 (2d Cir. 2000) ...................................................7

*Miller-El v. Dretke*, 545 U.S. 231 (2005) ................................................ 6, 21, 23, 25

*Paulino v. Castro*, 371 F.3d 1083 (9th Cir. 2004) ...................................................23

*Powers v. Ohio*, 499 U.S. 400 (1991) ...................................................25

*Reddicks v. Alves*, 759 F. Supp. 3d 198 (D. Mass. Dec. 4, 2024) .................. *passim*

*Sanchez v. Roden*, 753 F.3d 279 (1st Cir. 2014) ...................................... 5, 7, 19, 20

*Smith v. Texas*, 311 U.S. 128 (1940) ...................................................19

*Snyder v. Louisiana*, 552 U.S. 472 (2008) ...................................... 6, 20, 22

*United States v. Brown,* 553 F.3d 768 (5th Cir. 2008) ...........................................21

*United States v. Forest*, 402 F.3d 678 (6th Cir. 2005) ...........................................21

*United States v. Wilcox*, 487 F.3d 1163 (8th Cir. 2007) .........................................21

*Upshaw v. Stephenson*, 97 F.4th 365 (6th Cir. 2024) ............................................23

## Rules

Fed. R. App. P. 26 ................................................................... i

Fed. R. App. P. 29 ................................................................ i, 31

Fed. R. App. P. 32 ...............................................................31

## Other Authorities

ACLU of Massachusetts, *Black, Brown and Targeted* (2014),
https://www.aclum.org/sites/default/files/wp-content/uploads/2015/06/reports-
black-brown-and-targeted.pdf ................................................................. 2, 10, 12

Anastasia R. Tomkin, *Report Exposes the Fallacies of Black Criminality*, Non-
Profit Quarterly (2021), https://nonprofitquarterly.org/report-exposes-the-
fallacies-of-black-criminality/ ...............................................................................14

Ben Grunwald & Jeffrey Fagan, *The End of Intuition-Based High-Crime Areas*,
107 Cal. L. Rev. 345 (2019) ...............................................................................10

Charles Crawford et al., *Race, Racial Threat, and Sentencing of Habitual
Offenders*, 36 Criminology 481 (1998) ...............................................................13

Elisabeth Semel et al., *Whitewashing the Jury Box: How California Perpetuates
the Discriminatory Exclusion of Black and Latinx Jurors*, Berkeley Law Death
Penalty Clinic (2020), https://www.law.berkeley.edu/wp-
content/uploads/2020/06/Whitewashing-the-Jury-Box.pdf ...................................8

Elizabeth Hinton et al., Vera Institute of Justice, *An Unjust Burden: The Disparate
Treatment of Black Americans in the Criminal Justice System* (2018),
https://vera-institute.files.svdcdn.com/production/downloads/publications/for-
the-record-unjust-burden-racial-disparities.pdf ........................................... 13, 14

Elizabeth Tsai Bishop et al., *Racial Disparities in the Massachusetts Criminal
System* (2020), Massachusetts-Racial-Disparity-Report-FINAL.pdf ... 2, 3, 10, 13

Equal Justice Initiative, *Race and the Jury: Illegal Discrimination in Jury Selection*
(2021), https://eji.org/report/race-and-the-jury/ ...................................................8

Jaquelyn Hahn et al., *Racial Disparities in Neighborhood Arrest Rates During the
COVID-19 Pandemic* (2021), https://open.bu.edu/handle/2144/42755 ...............12

Jeffrey Fagan et al., *An Analysis of Race and Ethnicity Patterns in Boston Police
Department and Field Interrogation, Observation, Frisk, and/or Search Reports*,
Issue Lab (2015), https://search.issuelab.org/resource/an-analysis-of-race-and-
ethnicity-patterns-in-boston-police-department-field-interrogation-observation-
frisk-and-or-search-reports.html...........................................................................2

Jessica Eaglen & Danyelle Solomon, *Reducing Racial and Ethnic Disparities in Jails*, Brennan Center for Justice (2015), https://www.brennancenter.org/our-work/policy-solutions/reducing-racial-and-ethnic-disparities-jails ......................2

Katy Naples Mitchell & Haruka Margaret Braun, *Inequitable and Undemocratic: A Research Brief on Jury Exclusion in Massachusetts and a Multipronged Approach to Dismantle It*, Harvard Kennedy School (2023), https://www.hks.harvard.edu/sites/default/files/centers/wiener/programs/pcj/files/Felony-Jury-Exclusion-in-Massachusetts.pdf .......................................................8

Lewis R. Katz, Terry v. Ohio *at Thirty-Five: A Revisionist View*, 74 Miss. L.J. 423 (2004)...............................................................................................................10

Mass. Sentencing Comm'n, *Selected Race Statistics* (2016), https://www.mass.gov/doc/selected-race-statistics/download ...............................2

Monica C Bell, *Police Reform and the Dismantling of Legal Estrangement*, 126 Yale L.J. 2054 (2017) ...........................................................................................25

Nazgol Ghandnoosh, et al., *One in Five: Racial Disparity in Imprisonment—Causes and Remedies*, The Sentencing Project (2020), https://www.sentencingproject.org/reports/one-in-five-racial-disparity-in-imprisonment-causes-and-remedies/ ....................................................................2

Nazgol Ghandnoosh, *Race and Punishment: Racial Perceptions of Crime and Support for Punitive Policies*, The Sent'g Project (2014), https://www.sentencingproject.org/publications/race-and-punishment-racial-perceptions-of-crime-and-support-for-punitive-policies/#III.%20Racial%20Perceptions%20of%20Crime...................................10

Osborne Jackson et al., *Reintegrating the Ex-Offender Population in the U.S. Labor Market: Lessons from the CORI Reform in Massachusetts*, New England Public Policy Center Research Reports (2017) .....................................................9

Sonja B. Starr & M. Marit Rehavi, *Mandatory Sentencing and Racial Disparity: Assessing the Role of Prosecutors and the Effects of Booker*, 123 Yale L.J. 2 (2013)...............................................................................................................13

United States Sentencing Commission, *Demographic Differences in Sentencing: An Update to the 2012 Booker Report* (2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171114_Demographics.pdf.................................................13

The Boston Indicators Project, MassINC & the Mass. Criminal Justice Reform Coalition, *The Geography of Incarceration: The Cost and Consequences of High Incarceration Rates in Vulnerable City Neighborhoods* (2016)............................2

The Sentencing Project, *Report of The Sentencing Project to the United Nations*, https://www.sentencingproject.org/app/uploads/2022/08/UN-Report-on-Racial-Disparities.pdf. .......................................................................................................13

Vida Johnson, *Arresting* Batson: *How Striking Jurors Based on Arrest Records Violates* Batson, 32 Yale L. & Pol. Rev. 387 (2016) .................................... 3, 8, 9

## INTERESTS OF AMICI CURIAE

Amici curiae are academic centers, practicums, and professors at United States law schools with subject matter expertise in race, criminal law, and criminal procedure. The faculty directing these institutions teach, research, and write about the influence of race on the criminal legal system, and regularly publish articles and reports about racial discrimination in the jury selection process. In addition to their academic work, they have collectively litigated dozens of claims raised pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), and share the common interest of ensuring that *Batson*'s framework is faithfully applied in the First Circuit and beyond. Amici are especially interested in this case because it presents yet another example of criminal records being used to exclude Black people from jury service, as well as an opportunity to correct the standard at *Batson*'s first step. The list of Amici and their descriptions are listed in the Addendum below.

## SUMMARY OF ARGUMENT

Throughout the United States, law enforcement disproportionately profiles Black citizens, who are then subject to elevated rates of arrest, prosecution, and incarceration.[1] These racial disparities are particularly acute in Boston, where law enforcement has a well-documented history of hyper-policing Black neighborhoods.[2] Racially biased policing leads to racial disparities in arrests, which contributes to the alarming disparities present at every stage of the Commonwealth's criminal adjudication process.[3] All told, Massachusetts incarcerates its Black

---

[1] *See, e.g.*, Nazgol Ghandnoosh, et al., *One in Five: Racial Disparity in Imprisonment—Causes and Remedies*, The Sentencing Project (2020) ("Black Americans [are] still imprisoned at five times the rate of whites."); Jessica Eaglen & Danyelle Solomon, *Reducing Racial and Ethnic Disparities in Jails*, Brennan Center for Justice (2015) ("If current trends persist, one in three African American men born today will be incarcerated in his lifetime.").

[2] *See, e.g.*, Jeffrey Fagan et al., *An Analysis of Race and Ethnicity Patterns in Boston Police Department and Field Interrogation, Observation, Frisk, and/or Search Reports*, Issue Lab 2 (2015), https://search.issuelab.org/resource/an-analysis-of-race-and-ethnicity-patterns-in-boston-police-department-field-interrogation-observation-frisk-and-or-search-reports.html; ACLU of Massachusetts, *Black, Brown and Targeted* (2014), https://www.aclum.org/sites/default/files/wp-content/uploads/2015/06/reports-black-brown-and-targeted.pdf; Mass. Sentencing Comm'n, *Selected Race Statistics* 3, 7 (2016), https://www.mass.gov/doc/selected-race-statistics/download.

[3] The Boston Indicators Project, MassINC & the Mass. Criminal Justice Reform Coalition, *The Geography of Incarceration: The Cost and Consequences of High Incarceration Rates in Vulnerable City Neighborhoods* 3 (2016); Elizabeth Tsai Bishop et al., *Racial Disparities in the Massachusetts Criminal System*, 3–4 (2020), Massachusetts-Racial-Disparity-Report-FINAL.pdf.

residents at 7.9 times the rate of its white residents.[4]

The obvious upshot of these racial disparities is that Black people are significantly overrepresented in the state's criminal record system, which is called CORI.[5] Prosecutors know this. And some insist on accessing the CORI records of prospective or seated jurors. Those records "inevitably arm prosecutors who seek to discriminate with a basis to strike Black jurors."[6] Thus, in the context of jury selection, CORI is a "symptom of our racially unfair criminal justice system . . . used to perpetuate even greater racial disparities."[7]

For that reason, when prosecutors invoke CORI to strike Black jurors it raises an inference of intentional racial exclusion. That inference is especially strong when the record suggests that a prosecutor relies on CORI to engage in a game of "gotcha." In such cases, prosecutors—without providing any guidance to lay jurors—purport to exclude them for having not disclosed arrests, dismissed charges, or sealed records.[8]

Such was the case here. During jury selection, in a trial involving a Black

---

[4] Elizabeth Tsai Bishop et al., *supra* note 3, at 3–4.

[5] CORI stands for Massachusetts Criminal Offender Record Information, and "includes arrest records along with records of conviction." *Reddicks v. Alves*, 759 F. Supp. 3d 198, 216 (D. Mass. Dec. 4, 2024).

[6] Vida Johnson, *Arresting* Batson: *How Striking Jurors Based on Arrest Records Violates* Batson, 32 Yale L. & Pol. Rev. 387, 395 (2016).

[7] *Id*. at 406.

[8] *Id*. at 408.

defendant, prospective jurors were asked on a questionnaire to write down their experience with the law.[9] Once the jurors were selected and seated, the white prosecutor insisted on subjecting them to CORI searches, which he did over defense counsel's repeated objections.[10] Based on racial bias and disparities in the criminal legal system, the results were predictable: all six jurors flagged were Black.[11]

The prosecutor pressed the court to interrogate and exclude two of the Black jurors, Nos. 47 and 122, based on the claim that they failed to disclose some part of their criminal record.[12] But Juror No. 47, a Black woman, was surprised to learn that her record contained what the trial judge described as "relatively innocuous motor vehicle offenses," all of which had been *dismissed*, and a drug possession charge that had also been *dismissed* fifteen years earlier.[13] Meanwhile, Juror No. 122, a

---

[9] As the Massachusetts Court of Appeals noted, the "juror questionnaire at issue was not included in the record on appeal." *Commonwealth v. Reddicks*, 99 Mass. App. Ct. 1118, 2021 WL 1307911, at *5 n.11 (Mass. App. Ct. Apr. 8, 2021) (unpublished). The appeals court suggested that "it might be wise for the jury commissioner to consider reviewing the questionnaire's language to expressly state that jurors must disclose all charges and convictions whether dismissed or sealed." *Id*.

[10] R597; *see also* R131, R409, R596. Citations to "R" refer to the Record Appendix filed with Mr. Reddicks's opening brief on May 28, 2025.

[11] As defense counsel explained, "Just so the record is clear, Judge, everyone so far that [the prosecutor] has run . . . that's come back with a record has been African American, and so it appears to me that the running of records of potential jurors, in Suffolk County . . . leads to the disclosure of criminal records and exclusion of African American individuals of potential jurors. My client is African American. I would object at this point, judge." R597.

[12] R403, R406, R409, R595–97.

[13] R406.

Black man with children attending college, admitted on his questionnaire that he was convicted years ago of assault but "didn't recognize the fact that [he] had to write down every charge that [he] went through in life."[14] The trial judge found both explanations to be credible and declined to strike the jurors for-cause.[15] Undeterred, the prosecutor employed peremptory strikes to remove both jurors.[16]

Despite the specter of racial exclusion, the trial court denied Mr. Reddicks's *Batson* challenge at step one. But the facts here were more than sufficient to have "permitt[ed] the trial judge to draw an inference that discrimination ha[d] occurred," which should have advanced the court's analysis. *Johnson v. California*, 545 U.S. 162, 170 (2005); *accord Batson v. Kentucky*, 476 U.S. 79, 93–94 (1986); *Sanchez v. Roden*, 753 F.3d 279, 301–02 (1st Cir. 2014).

In affirming the step one denial, the Massachusetts Court of Appeals (MCA) and the district court unreasonably applied clearly established Supreme Court precedent.[17] *See Commonwealth v. Reddicks*, 99 Mass. App. Ct. 1118, 2021 WL 1307911, at *5–6 (Mass. App. Ct. Apr. 8, 2021) (unpublished); *Reddicks v. Alves*, 759 F. Supp. 3d 198, 213–15 (D. Mass. Dec. 4, 2024). In so doing, the reviewing

---

[14] R595.

[15] R409, R595‒96.

[16] *Id*.

[17] The MCA's decision was the "last reasoned state court decision," which makes it operative for purposes of federal habeas review. *Sanchez*, 753 F.3d at 298 n.13 (citations omitted).

courts erred in three fundamental respects. First, when reviewing the MCA's decision—which failed entirely to assess the totality of the circumstances—the district court dramatically elevated the step one standard by assessing the *Batson* claim under the far more demanding standard articulated by step three. Under *Johnson*, the question at step one is whether there was an *inference* of discrimination. In contrast, the question at step three is whether the non-moving party *actually* discriminated. Because the district court asked the wrong question, it arrived at the wrong answer.

Second, the MCA assessed the strikes of Juror Nos. 47 and 122 in isolation rather than in connection with each other. The Supreme Court expressly rejected this mode of analysis in *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008), and re-affirmed that rejection in *Flowers v. Mississippi*, 588 U.S. 284, 314–15 (2019). Relatedly, the MCA failed to consider "all the facts and circumstances" bearing on racial exclusion, including CORI's significant and foreseeable racially disparate effect. *Johnson*, 542 U.S. at 168; *accord Miller-El v. Dretke*, 545 U.S. 231, 239 (2005).

Third, the MCA did precisely what the Supreme Court said courts should not do: it identified *a reason* the prosecutor could have exercised his peremptory strikes to negate the prima facie case. But *Batson* was "designed to produce actual answers." *Johnson*, 545 U.S. at 172. The Supreme Court made clear that just because a trial judge or reviewing court can find a reason for the prosecutor's strike does not mean

that it was the prosecutor's "real reason." *Id*. (citation omitted).

By improperly raising the bar at step one and compounding that problem with other errors, the trial judge and the reviewing courts undermined *Batson*'s purpose: to eliminate the "crippling burden of proof" that for so long defined "assessing a prima facie case." 472 U.S. at 92. Amici urge this Court to reverse the district court's denial of habeas relief and to grant the writ.[18]

## ARGUMENT

**I.    When Prosecutors Run CORI Searches and Wield the Results to Strike Only Black Prospective Jurors an Inference of Discrimination Has Been Raised Within the Meaning of *Batson*.**

"Exclusion of Black citizens from service as jurors constitutes a primary example of the evil the Fourteenth Amendment was designed to cure." *Batson*, 476 U.S. at 85. The Supreme Court issued *Batson* to redress the evil of racial exclusion, overturning precedent that had left prosecutors' use of peremptory strikes "largely immune from constitutional scrutiny." *Id*. at 92–93. Concurring in *Batson*'s judgment, Justice Thurgood Marshall nevertheless warned that "the protections

---

[18] In the alternative, this Court can order a remand to the district court "to conduct an evidentiary hearing and complete the *Batson* inquiry." *Sanchez*, 753 F.3d at 309. If the Court chooses that path, it should direct the district court to decide as a threshold matter whether the passage of time (over a decade after trial by the time this appeal is decided) would make such a hearing "impossible or unsatisfactory." *Johnson v. Martin*, 3 F.4th 1210, 1227 (10th Cir. 2021) (quoting *Jordan v. Lefevre*, 206 F.3d 196, 202 (2d Cir. 2000)).

erected by the Court" risked being "illusory." *Id.* at 106 (Marshall, J., concurring). The last four decades have proven his words prescient.[19] As the Equal Justice Initiative explained in a recent report, "[t]he *Batson* decision did not deter prosecutors from engaging in illegal race-based peremptory strikes so much as it incentivized them to find ways to keep striking [non-white] jurors."[20]

One of the more pernicious ways that prosecutors have circumvented *Batson* is by running criminal record searches of prospective jurors and using the results of those searches—or the alleged failure to disclose the results—as the basis for exclusion. As one scholar put it, while "striking a juror because of an arrest record could be considered 'race neutral' . . . in the most technical sense . . . [i]n practice, prosecutors use this reason to strike jurors to achieve the very end that *Batson* sought

---

[19] Studies from across the United States have demonstrated staggering race-based strike disparities, the presence of pretextual justifications, and judicial willingness to reflexively accept purportedly "race neutral" justifications. *See, e.g.*, Katy Naples Mitchell & Haruka Margaret Braun, *Inequitable and Undemocratic: A Research Brief on Jury Exclusion in Massachusetts and a Multipronged Approach to Dismantle It*, Harvard Kennedy School (2023), https://www.hks.harvard.edu/sites/default/files/centers/wiener/programs/pcj/files/Felony-Jury-Exclusion-in-Massachusetts.pdf; Elisabeth Semel et al., *Whitewashing the Jury Box: How California Perpetuates the Discriminatory Exclusion of Black and Latinx Jurors*, Berkeley Law Death Penalty Clinic (2020), https://www.law.berkeley.edu/wp-content/uploads/2020/06/Whitewashing-the-Jury-Box.pdf.
[20] Equal Justice Initiative, *Race and the Jury: Illegal Discrimination in Jury Selection* Ch. 4 (2021).

to prevent—a deliberately whiter jury."[21] Thus, a prosecutor's insistence on running CORI searches and using the results as the basis to exclude Black jurors is not evidence of race neutrality. Rather, it is a red flag that warrants judicial scrutiny.[22]

### A. CORI Results Reflect Racial Bias in Policing and the Criminal Legal System Writ Large.

CORI's racially disparate impact on jury selection is a feature of our criminal legal system rather than a bug. The records are generated when a person is arrested or charged with a crime, and that person remains in the CORI database even when those charges are dismissed.[23] As the district court explained, "Massachusetts classifies a significant cohort of its citizens as 'criminal offenders' even though none of them has ever been convicted of any crime." *Reddicks*, 759 F. Supp. 3d at 215. That is because CORI includes both arrests and conviction records, meaning that if a "citizen whose sole brush with the law is his arrest at a boisterous party, which got out of hand, the charges later dropped will continue to turn up as a 'criminal offender' though he is, of course, presumed innocent of his dropped charges and his

---

[21] V. Johnson, *supra* note 6, at 390.

[22] CORI and other criminal records systems are also known for being unreliable, which further problematizes their use to exclude jurors—especially jurors who prosecutors accuse of misreporting information. As Justice Ruth Bader Ginsburg warned decades ago, "[t]he risk of error stemming from these databases is not slim." *Herring v. United States*, 555 U.S. 135, 155 (2009) (Ginsburg, J., dissenting).

[23] Osborne Jackson et al., *Reintegrating the Ex-Offender Population in the U.S. Labor Market: Lessons from the CORI Reform in Massachusetts* 5 (2017), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3031193.

conduct otherwise spotless." *Id*. at 216. More troubling, the district court explained that "this group is disproportionately composed of people of color." *Id*. at 215–16.

There are several interrelated reasons why Black people and other people of color are overrepresented in CORI. For starters, race influences perceptions about crime that shape policing patterns and practices.[24] As studies have shown, a neighborhood's racial composition is more determinative of whether it will be perceived as "high-crime" than any other factor—including the *actual crime rate* of that neighborhood.[25] These false perceptions create an increased police presence, which in turn leads to increased police encounters in predominately Black communities.[26] Increased police encounters in these communities lead to racial disparities in arrest, prosecution, and conviction rates, which create perverse confirmation biases that lead to more policing, greater disparities, and a cycle of discrimination.[27]

This cycle has plagued Boston. Here, Black people make up only 24% of the

---

[24] *See, e.g.,* Ben Grunwald & Jeffrey Fagan, *The End of Intuition-Based High-Crime Areas*, 107 Cal. L. Rev. 345 (2019); Nazgol Ghandnoosh, *Race and Punishment: Racial Perceptions of Crime and Support for Punitive Policies*, The Sent'g Project (2014), https://www.sentencingproject.org/publications/race-and-punishment-racial-perceptions-of-crime-and-support-for-punitive-policies/#III.%20Racial%20Perceptions%20of%20Crime.

[25] ACLU of Mass., *supra* note 2, at 7–9; Fagan et al., *supra* note 2, at 540, 544–45.

[26] *Id*.

[27] Lewis R. Katz, Terry v. Ohio *at Thirty-Five: A Revisionist View*, 74 Miss. L.J. 423, 493 (2004).

population but comprise 63% of people subject to formal police encounters.[28] Describing decades of racial disparities, the Massachusetts Supreme Judicial Court has recognized that "[B]lack men in the city of Boston were more likely to be targeted for police-civilian encounters such as stops, frisks, searches, observations and interrogations" and are "disproportionately targeted for repeat police encounters." *Commonwealth v. Wren*, 475 Mass. 530, 539–40 (Mass. 2016); *see also Commonwealth v. Long*, 485 Mass. 711, 736 (2020) (Budd, J., concurring) ("Racial profiling in traffic stops has [also] proven to be an intractable problem, the devastating consequences of which members of this court have recognized for many years."). In Boston, "driving while Black" or "walking while Black" continues to be a way of life for countless citizens.[29]

---

[28] Bishop et al., *supra* note 3, at 18.

[29] The Massachusetts Supreme Judicial Court cases recognizing these realities are legion. *See, e.g.*, *Commonwealth v. Buckley*, 478 Mass. 861, 876–77 (2018) (Budd, J., concurring) ("Years of data bear out what many have long known from experience: police stop drivers of color disproportionately more often than Caucasian drivers for insignificant violations (or provide no reason at all)."); *Commonwealth v. Laltaprasad*, 475 Mass. 692, 702 (2016) ("[D]ata concerning convictions for drug offenses in Massachusetts raise a serious concern about the disparate impact of mandatory minimum sentences on defendants who are part of racial or ethnic minority groups."); *Commonwealth v. Feyenord*, 445 Mass. 72, 88 (2005), cert. denied, 546 U.S. 1187 (2006) (Greaney, J., concurring) (discussing "humiliating, painful, and unlawful" nature of some police encounters targeting African-American and Hispanic individuals); *Commonwealth v. Arriaga*, 438 Mass. 556, 571 (2003) ("Racial and ethnic bias in the Massachusetts courts is an issue of long-standing concern."); *Commonwealth v. Gonsalves*, 429 Mass. 658, 670 (1999)

Racial profiling occurs at both the individual and neighborhood levels. The Boston Police Department (BPD) targets largely Black neighborhoods like Roxbury, Mattapan, parts of Jamaica Plain, and Dorchester—where Mr. Reddicks is from and a neighborhood from where his jury was drawn—for patrol, surveillance, and enforcement activities, causing Black residents in these areas to be unjustly overrepresented in the criminal legal system.[30] Studies of the BPD have found that the department "initiated more street encounters in the neighborhood with more Black residents . . . [and that] the mere presence of Black residents increased the number of police-civilian encounters."[31] According to the state's high court, the BPD has been known to enact formal "search on sight" policies, effectively enacting "martial law" for young Black people in Boston neighborhoods like Roxbury and Dorchester. *Commonwealth v. Phillips*, 413 Mass. 50, 53 (1992).

The extent of racial disparities in policing is difficult to overstate. Scholars have observed that police presence in Black neighborhoods is so severe that it is challenging to draw meaningful neighborhood-level conclusions about actual crime rates, as "Black communities experience such extreme levels of police contact that

---

(Ireland, J., concurring) (collecting studies on disparate policing of Black people in traffic stops).
[30] The Boston Indicators Project, *supra* note 3, at 3.
[31] ACLU of Mass., *supra* note 2, at 7–9.

there are not enough white neighborhoods to draw relevant comparisons."[32]

Racial bias and attendant disparities in policing are then exacerbated by the adjudication process. On the national level, Black adults are 5.9 times more likely to be incarcerated than white adults.[33] According to the Massachusetts Sentencing Commission's analysis of data from around the time of Mr. Reddicks's trial, "the Commonwealth significantly outpaced national race and ethnicity disparity rates in incarceration, imprisoning Black people at a rate 7.9 times that of white people."[34]

In sum, Black Americans, especially in Boston, "are more likely than white Americans to be arrested; once arrested, they are more likely to be convicted, and once convicted, they are more likely to experience lengthy prison sentences."[35]

---

[32] Jaquelyn Hahn et al., *Racial Disparities in Neighborhood Arrest Rates During the COVID-19 Pandemic* 2 (2021), https://open.bu.edu/handle/2144/42755.

[33] The Sentencing Project, *Report of The Sentencing Project to the United Nations Special Rapporteur on Contemporary Forms of Racial Discrimination, Xenophobia, and Related Intolerance Regarding Racial Disparities in the United States Criminal Justice System* 1 (2018), https://www.sentencingproject.org/app/uploads/2022/08/UN-Report-on-Racial-Disparities.pdf.

[34] Bishop et al., *supra* note 3, at 3–4.

[35] The Sentencing Project, *supra* note 33, at 1; *see also Commonwealth v. Williams*, 481 Mass. 443, 451 n.6 (Mass. 2019) (citing Elizabeth Hinton et al., Vera Institute of Justice, *An Unjust Burden: The Disparate Treatment of Black Americans in the Criminal Justice System*, at 7–9 (2018), citing Sonja B. Starr & M. Marit Rehavi, *Mandatory Sentencing and Racial Disparity: Assessing the Role of Prosecutors and the Effects of Booker*, 123 Yale L.J. 2, 28–30 (2013) (Federal prosecutors are more likely to charge Black citizens than similarly situated white citizens with offenses that carry higher mandatory minimum sentences); Charles Crawford et al., *Race, Racial Threat, and Sentencing of Habitual Offenders*, 36 Criminology 481, 503

CORI is a compilation of these problems—both a window into and a mirror reflecting how and *who* we police, prosecute, and punish. When prosecutors invoke CORI to exclude Black jurors, they are relying on a symptom to deepen the disease.

Baked into the disparities reflected by CORI are pretextual stops and baseless arrests, which turn into charges that are later dismissed. These dismissed charges are perhaps the most likely to be the fruits of arbitrary policing, which make citing them as a basis for exclusion, or using them in a game of "gotcha," particularly perverse. Even among those who claim justice is blind, it is undeniable that Black people are significantly overrepresented in the criminal legal system; not because they are more criminal but because police departments like the BPD disproportionately target them.[36] That means Black people will make up a disproportionate number of "hits" from the CORI searches prosecutors insist on running against their own constituents.

## II. The Reviewing Courts Unreasonably Applied Clearly Established Supreme Court Precedent When Affirming the Trial Court's Denial of Mr. Reddicks's *Batson* Claim at Step One.

On January 17, 2016, two Black Americans dutifully reported for jury service

_____

(1998) (similar disparity for State prosecutors with respect to decisions to charge under habitual offender statutes)); *see also* United States Sentencing Commission, *Demographic Differences in Sentencing: An Update to the 2012 Booker Report*, at 6 (2017) (Black male defendants received sentences that were 19.1 percent longer on average than similarly situated white male defendants).

[36] *See generally* Hinton, *supra* note 35; Fagan, *supra* note 2; Anastasia R. Tomkin, *Report Exposes the Fallacies of Black Criminality*, Non-Profit Quarterly (2021), https://nonprofitquarterly.org/report-exposes-the-fallacies-of-black-criminality/.

at the Suffolk County Courthouse. They were assigned to a panel in the case of a Black teenager named Charles Reddicks. Eager to participate in the democratic process, both jurors (Nos. 47 and 122) completed their questionnaires and sat patiently through voir dire. At no time during jury selection did the prosecutor inform the prospective jurors that he expected them to write down any and all arrests; any and all charges that had been dismissed; or any and all criminal cases that had been sealed.

When completing her questionnaire, Juror No. 47, a Black woman, did not indicate justice system involvement; after all, she had never been convicted of a crime.[37] But at the end of jury selection, the white prosecutor ran her name through the CORI database and confronted the court with the results—"innocuous driving offenses" that were long dismissed and a misdemeanor drug possession charge (from Roxbury) that had been dismissed fifteen years earlier.[38] When questioned about her "criminality," Juror No. 47 responded, "I wasn't convicted, I was arrested," emphasizing that she had no idea she was expected to write down dismissed charges.[39] The court credited her explanation and remarked that she had "encountered this quite often."[40]

---

[37] R407.
[38] R405–06.
[39] R407–08.
[40] R409.

Juror No. 122, a Black man from Dorchester, answered on his questionnaire that he had an assault conviction, from years earlier in Roxbury, that resulted in probation.[41] In search of a problem, the prosecutor accessed his CORI records, which produced several charges not listed in his questionnaire. In response to questioning, Juror No. 122 explained, "I really didn't recognize the fact that I had to write down every charge that I ever went through in life."[42] The court credited his explanation, described the disclosure he made on his questionnaire as "scrupulous," and commented again that she had seen this before.[43]

But the prosecutor remained steadfast in his attempt to remove Juror Nos. 47 and 122. Despite the prosecutor's efforts, the court declined to strike the jurors for-cause because it had determined that both jurors had acted "absolutely reasonab[ly]."[44] Still motivated, the prosecutor exercised peremptory strikes against both Black jurors, and they were removed from the jury.[45]

Hours after the close of jury selection, and likely out of concern that the record would suggest racial exclusion, the trial court went out of its way to proclaim, "I just need to put on the record the fact that the composition of this jury consists of at least

---

[41] R482.
[42] R595.
[43] R409, R595.
[44] R595; *see also* R 409.
[45] R409, R595.

16

five African Americans. I just wanted to let the record reflect that."[46]

Thus, the record demonstrates that all of this evidence was before the court. As were defense counsel's multiple race-based objections, including counsel objecting to the prosecutor's use of CORI and his exercise of peremptory strikes.[47] The question, then, is whether the prosecutor's peremptory strikes of Juror Nos. 47 and 122 raised an "*inference* of discrimination." *Johnson*, 545 U.S. at 170 (emphasis in original).

That question should answer itself. At the very least, it is clear how the question would be answered by *Batson* and its progeny, which have established that step one's burden is not particularly demanding. The Court's cases stand for the proposition that when all the facts and circumstances raise an eyebrow or suspicion that discrimination is afoot, *Batson*'s first step is satisfied.

---

[46] Case No. 1:23-cv-10455-WGY, Doc. 11-1, at 405–06.

[47] R131, R409, R595–97. The record demonstrates that the prosecutor exercised peremptory strikes against Juror No. 47 and 122 and defense counsel *immediately* objected. R409, R595–97. Nevertheless, the MCA suggested that the *Batson* objection was not properly raised; at least with respect to Juror No. 47. But that would have been news to the trial court who, after defense counsel objected to the prosecutor's exercise of peremptory strikes against the Black jurors, subsequently made a record about the number of Black people who were seated. Case No. 1:23-cv-10455-WGY, Doc. 11-1, at 405–06. Especially within the context of the case, it was no mystery that when the prosecutor exercised peremptory strikes against Juror No. 47 and 122 and defense counsel objected, counsel was objecting to them being peremptorily struck on the basis of race. In other words, although Mr. Reddicks "did not cite [*Batson*] . . . . [w]hat matters is not the nomenclature of [the] claim" but "what the parties [and] the court . . . understood about the nature of the claim." *Drumgold v. Callahan*, 707 F.3d 28, 44 (1st Cir. 2013).

*Batson* itself was a step one case. After the Court articulated its new three-step framework to overturn *Swain*, the remaining question was whether Mr. Batson had satisfied his burden at step one. The Court issued a remand for the lower courts to answer that question in the first instance but made clear that *Batson's* first step is met when a defendant raises an "inference of discrimination." 476 U.S. at 97, 100.

Applying *Batson*'s first step in *Johnson*, the Supreme Court held that the California Supreme Court's "more likely than not rule" was "an inappropriate yardstick by which to measure the sufficiency of a prima facie case." *Johnson*, 545 U.S. at 168. As the Court stated plainly, "[w]e did not intend the first step to be so onerous." *Id.* at 170. Instead, the Court re-affirmed that "a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge an inference that discrimination has occurred." *Id.*

In so holding, the Court stressed two things. First, *Batson* was "designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process." *Id*. at 172. As the Court opined, "it does not matter that the prosecutor might have had good reasons, what matters is the *real reason* they were stricken." *Id.* (cleaned up) (emphasis added). In service of finding the real reason, coupled with the "inherent uncertainty" of evaluating subjective intent, the Court cautioned against trial judges "engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question." *Id*.

In other words, once an inference can be drawn, it is time to hear what the prosecutor has to say at step two.

Second, *Batson*'s purpose is at odds with a demanding step one standard. The Court specifically recognized the many "constitutional interests *Batson* sought to vindicate," and that the harms perpetrated by race based peremptory strikes "'touch the entire community . . . undermine public confidence in the fairness of our justice system' and are 'at war with our basic concepts of a democratic society and a representative government.'" *Johnson*, 545 U.S. at 171–72 (quoting *Batson*, 476 U.S. at 87; *Smith v. Texas*, 311 U.S. 128, 130 (1940)). It would not make sense, the Court explained, to recognize those unique historical, constitutional, and institutional concerns while at the same time making it difficult to address them.

This Court's decision in *Sanchez* is a sound application of *Johnson*. In *Sanchez*, which was on appeal from a denial of federal habeas relief, the Court held that the MCA's application of *Batson*'s step one standard was unreasonable. *Sanchez*, 753 F.3d at 299. In reaching that conclusion, the Court explained that the reviewing courts improperly focused on the *ultimate* question of intent (i.e., the step three inquiry) rather than whether the "facts and circumstances were sufficient to permit an *inference* that the prosecutor's challenge [of a Black prospective juror] *may* have been racially motivated." *Id*. at 307 (emphasis added). The relevant facts and circumstances, this Court explained, raised an inference that the prosecutor had

excluded at least one young Black man based on race because the record suggested that there were similarities between him and a young white juror who was seated. *Id*. at 304. Notably, this inference was in no way negated by the "facile and misguided" retort that five Black people sat on the jury. *Id*. at 299. Indeed, the MCA's heavy reliance on the number of seated Black jurors loomed large in the Court's finding that the state court's decision was unreasonable. *Id*.[48]

With that backdrop, the reviewing courts in Mr. Reddicks's case unreasonably applied clearly established federal law by committing several fundamental errors. **First**, when reviewing the MCA's decision, the district court did precisely what *Johnson* and *Sanchez* instructed courts not to do: it replaced the proper step one inquiry (i.e., was there *an inference* of discrimination?) with the step three inquiry (was there *in fact* discrimination?). In so doing, the district court substituted the first step of *Batson* with the last, thereby elevating the standard at step one. *Reddicks*, 759 F. Supp. 3d at 213–15. Indeed, the court expressly "evaluat[ed] *whether discrimination occurred*" and then quoted from *Batson* cases discussing the step three standard. *Id.* at 213 (emphasis added). The court even listed, as evidence

---

[48] As in *Sanchez*, the MCA made entirely too much of the fact that five Black people were seated on Mr. Reddicks's jury of sixteen. If anything, the fact that the trial court felt compelled to make a record of this fact long after the jury was empaneled only underscores the suspicions raised in this case. In any event, the Supreme Court has made clear that "the constitution forbids striking a single juror on the basis of race." *Snyder*, 552 U.S. at 478.

relevant to the ultimate determination, "a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing." *Id.* (quoting *Flowers*, 588 U.S. at 302). That evidence is not even available at step one.

From there, the district court relied on cases applying *Batson*'s third step. With respect to Supreme Court precedent, the court relied on *Miller-El* and *Flowers*—the Court's first and most recent step three cases. *Reddicks*, 759 F. Supp. 3d at 215. In fact, the only case that the district court pulled out of parentheticals for a more comprehensive case comparison was *Flowers*: "The Appeals Court had no opportunity to engage in a side-by-side comparison between the jurors and the broader community. By contrast in *Flowers*, the Supreme Court devoted a significant part of its analysis to the state's dramatically disparate questioning of Black prospective jurors . . ." *Id.* Ironically, many of the key points in both the *Flowers* and *Miller-El* analyses relied on the prosecutor's justification at step two, which is the very step the trial court failed to reach here.

With respect to federal appellate court decisions, the district court committed the exact same error. The court cited *United States v. Forest*, 402 F.3d 678, 687 (6th Cir. 2005), *United States v. Wilcox*, 487 F.3d 1163, 1170 (8th Cir. 2007), *Fields v. Thaler*, 588 F.3d 270, 277 (5th Cir. 2009), and *United States v. Brown,* 553 F.3d 768, 796 (5th Cir. 2008), which are all step three cases that the court used to evaluate Mr. Reddicks's step one claim. *Reddicks*, 759 F. Supp. 3d at 215.

In sum, the district court failed to apply binding step-one case law when reviewing the MCA's decision.

**Second**, the MCA failed to consider all the relevant facts and circumstances. The entire decision is structured as if the strikes were assessed in isolation rather than in connection with each other and the context of the case—an approach that the Supreme Court has expressly rejected: "Our disagreement with the Mississippi courts . . . largely comes down to whether we look at the Wright strike in isolation or instead look at the Wright strike in the context of all the facts and circumstances. Our precedents require that we do the latter." *Flowers*, 588 U.S. at 314–15.

For starters, the MCA did not "consider the strike of [Juror No. 47] for the bearing it might have upon the strike of [Juror No. 122]." *Snyder*, 552 U.S. at 478. Indeed, the MCA's decision contained zero analysis about the suspect nature of Juror No. 47's exclusion. Even if the MCA believed that defense counsel failed to lodge a specific *Batson* objection as to Juror No. 47, the circumstances surrounding Juror No. 47's peremptory strike were still relevant for assessing the prosecutor's strike of Juror No. 122. This was among the major takeaways in *Snyder*, where the strike of only one juror was at issue: "Here, as just one example, if there were persisting doubts as to the outcome, a court could be required to consider the strike of Ms. Scott for the bearing it might have upon the strike of Mr. Brooks." 552 U.S. at 478.

The MCA also failed to factor into its analysis the racially disparate impact of

running CORI searches. And it did so despite the Supreme Court specifically stating that when a prosecutor's purported basis for striking jurors creates "disproportionate exclusion" it is a relevant part of the court's analysis. *Hernandez v. New York*, 500 U.S. 352, 363 (1991). Finally, the fact that the Suffolk County trial judge had "encountered this [scenario] quite often," strongly suggests that there is a history of this "gotcha" practice among Suffolk County prosecutors. The Supreme Court has made clear that the history of a prosecutor's office's practice is an important part of the required totality analysis. *Flowers*, 588 U.S. at 304; *Miller-El*, 545 U.S. at 253, 263–64.

**Third**, both the MCA and the district court speculated about the prosecutor's justification as a basis for the affirmance. *See Reddicks*, 759 F. Supp. 3d at 214 (citing 99 Mass App. Ct. at *6). As detailed above, however, just because a trial judge or reviewing court can identify *a reason* for the prosecutor's strike does not mean that it was their actual reason. *Johnson*, 545 U.S. at 172. Instead, the putative reason must be stated by the prosecutor and then probed for pretext. *Id.*; *accord Upshaw v. Stephenson*, 97 F.4th 365, 377 (6th Cir. 2024); *Johnson v. Martin*, 3 F.4th 1210, 1225–28 (10th Cir. 2021); *Paulino v. Castro*, 371 F.3d 1083, 1090 (9th Cir. 2004); *Hardcastle v. Horn*, 368 F.3d 245, 256, 261 (3d Cir. 2004).

The MCA ignored this point and premised its defective legal conclusion on an unreasonable determination of the facts. The MCA did not include in its *Batson*

analysis that the court completely credited both jurors' explanations for why they did not list dismissed charges or sealed records. Nor did the MCA note the court's observation that a "layperson wouldn't understand" that the questionnaire called for sealed records.[49] Nor did it mention that the court characterized Juror No. 122 as being "scrupulous" for disclosing an older conviction that was not yet sealed.[50] Instead, the MCA described Juror No. 122 in the most myopic terms—as having an "extensive and undisclosed criminal record." *Reddicks*, 99 Mass. App. Ct. at *5. In addition to every "undisclosed" record being one that was sealed (and many years old), the record includes low-level offenses that arise in Black neighborhoods and rarely in white ones: possession of marijuana, trespassing and disorderly conduct, and resisting arrest.[51]

Two final points bear emphasis. One, the trial court's laissez faire approach to engaging with claims of racial exclusion cannot be reconciled with the Supreme Court's admonition that "trial judges possess the primary responsibility to enforce *Batson* and prevent racial discrimination from seeping into the jury selection process." *Flowers*, 588 U.S. at 302. After the court felt compelled to state post-hoc that there were five Black people on the jury, a reasonable observer could conclude that the trial court was more concerned with creating a record than ameliorating jury

---

[49] R595.
[50] *Id.*
[51] *Id.*; R593.

discrimination.

Two, the reviewing courts' undue deference to the trial court's complete lack of probing is an affront to those suffering from the systemic harms inflicted by jury discrimination. As the Supreme Court has repeatedly recognized, some of the most serious harms are to the jurors themselves. *See, e.g.*, *Powers v. Ohio*, 499 U.S. 400, 406 (1991). Such an injury is made even more insulting when the claimed basis for exclusion are hybrid accusations of criminality and deceit, which are both "rooted in and reflective of historical prejudice." *Miller-El,* 545 U.S. at 238 (citation omitted).

The dignitary harm is difficult to overstate. Consider dutifully reporting for jury service; having your criminal record run; being questioned about your "criminal" history; being questioned about allegations of dishonesty; and then being stricken by a representative of the person for whom you are a constituent. At best, the process is unpleasant. More likely, you have a strong inclination that there is something immutable that makes you unworthy of full citizenship. Either way, the sting of exclusion depreciates respect for the rule of law and the rule of law itself.[52]

Finally, it is encouraging that the district court recognized jury discrimination

---

[52] The dignitary harm of being excluded in this fashion is a prime example of Yale Law Professor Monica Bell's "legal estrangement" theory, which describes the intuition among many people in poor communities of color that the law operates to exclude them from society. *See generally* Monica C Bell, *Police Reform and the Dismantling of Legal Estrangement*, 126 Yale L.J. 2054 (2017).

as an ongoing problem. *Reddicks*, 759 F. Supp. 3d at 215–20. And it is commendable that it proposed well supported steps to address the defects in *Batson*'s framework. *Id*. at 217–19. But such proposals were unnecessary here: a faithful application of *Batson*'s step one would have been the recipe for relief.

## CONCLUSION

For the reasons detailed above and in Mr. Reddicks's opening brief, Amici urge this Court to grant the writ.

*Adam Murphy*

Adam B. Murphy
*Counsel of Record*
Jalen Banks
Law school graduate
Coleman Powell
Law school graduate

New York University School of Law
Federal Appellate Clinic
245 Sullivan Street, Fifth Floor
New York, NY 10012
Telephone: 212-992-7245
Facsimile: 212-995-4031
E-mail: Adam.Murphy@law.nyu.edu

# ADDENDUM

**Professor Stephen Bright,** Visiting Lecturer, Yale Law School and Visting Professor at Georgetown Law. Professor Bright teaches courses on race and poverty in death penalty and other criminal cases. He is one of the country's leading *Batson* experts.

**Professor Daniel S. Harawa,** is a Professor of Law and Director of the Federal Appellate Clinic at the New York University School of Law. Professor Harawa is a leading expert on race and the criminal legal system. He has written extensively about *Batson* and jury discrimination, including his most recent article, *Complicating Racial Justice Narratives: The Peremptory Elimination Debate*, for which he received an award from the Association of American Law Schools. As a practitioner, he has won federal habeas relief on *Batson* claims and seeks to ensure that trial and appellate courts apply the proper standard at the prima facie stage.

**The Antiracism and Community Lawyering Practicum (ACLP) at the Boston University School of Law** is comprised of law students and a faculty instructor who engage in legal projects that challenge racial marginalization and exclusion. As such, the ACLP has an interest in ensuring that the racial biases and disparities that infect the legal system are not relied on to exclude Black people from jury service and other forms of democratic participation. The persistence of these practices in the Commonwealth, despite the protections set forth in *Batson*, requires

correction. The ACLP does not, in this brief or otherwise, represent the official views of Boston University or Boston University School of Law.

**The Center for Law, Equity and Race (CLEAR)**, established by Northeastern University School of Law in 2021, addresses the role of the law and legal systems in creating and perpetuating racial inequalities and disparities. CLEAR provides interdisciplinary, hands-on advocacy, learning opportunities, research, legislative engagement, and community outreach. As a result, CLEAR has a strong interest in ensuring that there is not discrimination against any protected groups within the jury selection process. Such discrimination negatively impacts the ability of individuals to be judged by a jury of their peers and raises questions about the fairness of the justice system. CLEAR joins this brief to provide important context for the position that the use of criminal records to exclude Black people from jury service is discriminatory, and the importance of correcting the standard at *Batson*'s first step. CLEAR does not, in this brief or otherwise, represent the official views of Northeastern University or Northeastern University School of Law.

**The Center on Race, Inequality, and the Law ("CRIL") at the New York University School of Law** was created to confront the laws, policies, and practices that lead to the oppression and marginalization of people of color. CRIL focuses, in part, on the intersection of race, bias, and the criminal legal system, including the exercise of discretion by actors within that system. CRIL uses public education,

research, advocacy, and litigation to highlight and dismantle structures and institutions that have been infected by racial bias and plagued by inequality. CRIL does not, in this brief or otherwise, represent the official views of New York University or New York University School of Law.

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

*Adam Murphy*
Adam B. Murphy
New York University School of Law
Federal Appellate Clinic
245 Sullivan Street, Fifth Floor
New York, NY 10012

# CERTIFICATE OF COMPLIANCE

In compliance with Fed. R. App. P. 29(5) and 32(a)(7)(B)(i), I hereby certify that the brief contains 6,472 words, excluding the parts of the brief exempted by Rule 32(f). Pursuant to Fed. R. App. P. 32(a)(5), (a)(6), and (g)(1), I also certify that this brief has been prepared in proportionally spaced Time New Roman font with 14-point type and complies with the type-volume limitation.

*Adam Murphy*
Adam B. Murphy
New York University School of Law
Federal Appellate Clinic
245 Sullivan Street, Fifth Floor
New York, NY 10012